John Kaempf, OSB #925391
KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: (503) 224-5006
Email: john@kaempflawfirm.com

Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC. an Oregon public benefit corporation; BRAD LOHREY, SHERMAN COUNTY SHERIFF; and ADAM JOHNSON, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>KATE BROWN, GOVERNOR OF THE STATE OF OREGON, in her official capacity; and ELLEN ROSENBLUM, ATTORNEY GENERAL OF THE STATE OF OREGON, in her official capacity,<br><br>Defendants. | Civil No. 2:22-cv-01815-IM<br><br>**PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW**<br><br>**(EXPEDITED ORAL ARGUMENT REQUESTED)** |

# TABLE OF CONTENTS

EMERGENCY MOTION ......................................................................................... 1

MEMORANDUM .................................................................................................. 3

INTRODUCTION .................................................................................................. 3

LEGAL STANDARDS GOVERNING THIS MOTION........................................ 4

FACTUAL BACKGROUND.................................................................................. 5

    I.      THE PROHIBITED MAGAZINES HAVE LONG BEEN IN COMMON
           USE FOR LAWFUL PURPOSES ............................................................ 7

    II.     THE HISTORY OF MAGAZINE CAPACITY RESTRICTIONS ...................... 9

    III.   OREGON'S MAGAZINE POSSESSION BAN AND ITS IMPACT ON
           PLAINTIFFS ................................................................................. 10

ARGUMENT ................................................................................................... 10

    I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS....................... 10

          A.  114 Violates the Second Amendment....................................... 10
          B.  A detailed discussion of the Supreme Court's recent controlling
             decision in *Bruen,* which warrants granting this Motion........................... 11
          C.  Other relevant law...................................................... 22
          D.  114 is an Unconstitutional Taking ......................................... 26
          E.  114 Violates the Due Process Clause ...................................... 30

    II.     THE REMAINING PRELIMINARY INJUNCTION FACTORS
           WARRANT RELIEF ....................................................................... 31

          A.  Plaintiffs Will Suffer Irreparable Harm if the Court Denies Relief.......... 31
          B.  Granting Preliminary Injunctive Relief is in the public interest............... 33

          C.  The Balance of Equities Tips Sharply in Plaintiffs' Favor ........................ 34

CONCLUSION................................................................................................. 35

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (CA9 2011) ............................................................. 34

*Am. Trucking Ass'n, Inc. v. City of Los Angeles*,
559 F.3d 1046 (CA9 2009) ............................................................. 4

*Andrus v. Allard*,
444 U.S. 51 (1979) ........................................................................ 27

*Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers*,
584 F.2d 308 (9th Cir. 1978) ......................................................... 5

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) ...................................................................... 2

*Carson Harbor Vill. Ltd. v. City of Carson*,
353 F.3d 824 (CA9 2004) ............................................................. 30

*Chalk v. U.S. Dist. Ct.*,
840 F.2d 701 (CA9 1998) ........................................................ 4, 32

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................................................. passim

*Duncan v. Bonta*,
49 F.4th 1228 (CA9 September 23, 2022, Mem.) ........................... 3

*E. Enters. v. Apfel*,
524 U.S. 498 (1998) ................................................................ 30, 31

*Edenfield v. Fane*,
507 U.S. 761 (1993) ...................................................................... 23

*Elrod v. Burns*,
427 U.S. 347 (1976) ...................................................................... 2

*First English Evangel. Luth. Church v. Los Angeles Cty.*,
482 U.S. 304 (1987) ...................................................................... 30

*Friedman v. City of Highland Park*,
784 F.3d 406 (CA7 2015) ............................................................. 22

*Fyock v. City of Sunnyvale*,
25 F. Supp. 3d 1267 (N.D. Cal. 2014) .......................................... 23

*Fyock v. City of Sunnyvale*,
779 F.3d 991 (CA9 2015) ........................................................ 22, 23

*Griffin v. California*,
380 U.S. 609 (1965) ...................................................................... 6

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

*Heller v. District of Columbia* (Heller II),
670 F.3d 1244 (D.C. Cir. 2011) ................................................. 22

*Horne v. Dep't of Agric.*,
135 S. Ct. 2419 (2015) ................................................. 7, 26, 28, 30

*Irvin v. HSBC Bank USA, N.A.*,
2017 WL 5075246 (D Or 2017) ................................................. 4

*Jackson v. City & County. of San Francisco*,
746 F.3d 953 (CA9 2014) ................................................. 22, 29

*Jacob Ruppert, Inc. v. Caffey*,
251 U.S. 264 (1920) ................................................. 27

*James Everard's Breweries v. Day*,
265 U.S. 545 (1924) ................................................. 27

*Kelo v. City of New London*,
545 U.S. 469 (2005) ................................................. 31

*Klein v. City of San Clemente*,
584 F.3d 1196 (CA9 2009) ................................................. 33

*Leiva–Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) ................................................. 5

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) ................................................. 27, 30

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ................................................. 27

*McDonald v. Chicago*,
561 U.S. 742 (2010) ................................................. passim

*Melendres v. Arpaio*,
695 F.3d 990 (CA9 2012) ................................................. 32, 33

*Monterey Mech. Co. v. Wilson*,
125 F.3d 702 (CA9 1997) ................................................. 32

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
804 F.3d 242 (CA2 2015) ................................................. 22

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) ................................................. passim

*Preminger v. Principi*,
422 F.3d 815 (CA9 2005) ................................................. 33

*Richmond Elks Hall Ass'n v. Richmond Redevel. Agency*,
561 F.2d 1327 (CA9 1977) ................................................. 28, 29

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

*Richmond v. Peraino*,
128 F. Supp. 3d. 425 (D Mass 2015) .......................................................... 4, 35

*Rodde v. Bonta*,
357 F.3d 988 (CA9 2004) ................................................................................ 34

*Rodriguez v. Robbins*,
715 F.3d 1127 (CA9 2013) .............................................................................. 34

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020) ......................................................................................... 2

*Schad v. Borough of Mount Ephraim*,
452 U.S. 61 (1981) .......................................................................................... 29

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002) ............................................................................ 26, 28, 29

*Taylor v. Westly*,
488 F.3d 1197 (CA9 2007) .............................................................................. 32

*Too Marker Products, Inc. v. Shinhan Art Materials, Inc.*,
2009 WL 4718733 (D Or 2009)......................................................................... 4

*Underwood v. Rochester*,
2018 WL 3613990 (D Or 2018)......................................................................... 5

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) .......................................................................................... 5

*Usery v. Turner Elkhorn Mining Co.*,
428 U.S. 1 (1976) ............................................................................................ 31

*Wesson v. Town of Salisbury*,
113 F. Supp. 3d 171 (D Mass 2014) ......................................................... 4, 35

**Statutes**

42 U.S.C. § 1983.............................................................................................. 11

**Other Authorities**

2022 Oregon Ballot Measure 114 ..................................................................... 1

Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb.
L. Rev. 849 (2015) ............................................................................................. 7

Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts
on Gun Markets and Gun Violence* (Nat'l Instit. Just. June 2004) ................... 8

Massad Ayoob, *The Complete Book of Handguns Magazine* (2013)................. 8

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

**Rules**

FRCP 65 ............................................................................................................. 1, 4

LR 7-4 ................................................................................................................. 1

**Constitutional Provisions**

U.S. Const., amend. I ................................................................... 2, 15, 21, 32

U.S. Const., amend. II ............................................................................. passim

U.S. Const., amend. V ..................................................................... 2, 6, 30

U.S. Const., amend. XIV ......................................................................... passim

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

## EMERGENCY MOTION

Under FRCP 65 and LR 7-4, Plaintiffs Oregon Firearms Federation "OFF," Sherman County Sheriff Brad Lohrey, and Adam Johnson—gun and gun store owner—collectively "Plaintiffs"—move the Court for a temporary restraining order and a preliminary injunction. They seek to enjoin Defendants from enforcing any part of 2022 Oregon Ballot Measure 114—"114."[1]  That is because 114 violates Plaintiffs' bedrock Second Amendment right to keep and bear arms.  The Court should hold 114 is unconstitutional on its face, and as applied to Plaintiffs.  114 is deeply flawed.  Its draconian terms turn the Second Amendment on its head by stating that, instead of adults presumptively **having** a constitutional right to keep and bear arms, they do <u>not</u> have that right unless they can affirmatively prove to the *government* that they are "good enough" to have a gun.  114 makes the foundational constitutional right to keep and bear arms the **exception**, not the rule.

And 114 should be accurately renamed the "Gun Magazine Confiscation and Gun Registry Act."  That is because that is what it unconstitutionally creates by requiring the government to issue a "Permit to purchase" "PTP"— and "unique approval number"—for a private gun transfer to occur.  114 defines PTP as "an authorization issued to a person to purchase or acquire a firearm, provided all other requirements at the time of purchase or acquisition are met."

Since the ratification of the Second Amendment over 230 years ago, 114 is just the *opposite* of how it works.  All competent adults have the "**right**" to keep and bear arms, in

---

[1] A true copy of 114 is attached as exhibit A to the Complaint.

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

private and public, and it is the *government's* burden to show why they do <u>not</u>.  It is not met here.

The Second Amendment provides:  "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."[2]

Plaintiffs also bring this Motion because 114—to the extent it bars the possession of firearm magazines over 10 rounds that were lawfully acquired, used, and possessed in Oregon before December 8, 2022—the effective date of 114[3]—violates Plaintiffs' Second Amendment right to possess commonly used magazines.  And it constitutes an unlawful government taking under the Takings Clause of the Fifth Amendment, and the Due Process Clause of the Fourteenth Amendment.

Thus, respectfully, unless this Court immediately (before December 8) orders the requested preliminary relief, Defendants will begin enforcing 114—and irreparable injury will result to Plaintiffs.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").  That statement by the Supreme Court applies with even *more* force here, given that exercising Second Amendment rights is often the difference between life and **death**.  And *see Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68-69 (2020): "The applicants have made the showing needed to obtain relief, and there is no

---

[2] The Supreme "Court has held that the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  And this "Second Amendment right is fully applicable to the States."  *Caetano v. Massachusetts*, 577 U.S. 411 (2016).

[3] https://www.oregonlive.com/politics/2022/11/oregons-strict-new-gun-limits-under-measure-114-go-into-effect-even-sooner-state-says.html

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

reason why they should bear the *risk* of suffering further irreparable harm." (Emphasis added.)[4]

## MEMORANDUM

## INTRODUCTION

114 bars "large-capacity magazines." It defines them as a "fixed or detachable magazine, belt, drum, feed strip, helical feeding device, or similar device" that "has an overall capacity of" more "than 10 rounds of ammunition and allows a shooter to keep firing without having to pause to reload." 114 also requires a PTP to buy a firearm.

It involves a background check and other digging into an applicant's life, and a resulting registry of that information. And the "affirmative defense" in 114 refers to complying with "ORS 166.055," a statute that does <u>not</u> exist. So, there cannot be an affirmative defense. And as shown herein, the <u>State</u> has the burden to "affirmatively" show why an adult does *not* have the "right" to keep and bear arms. The Supreme Court has long held that the Second Amendment protects the right of an adult to keep and bear arms in their home for self-defense. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010).

Then, this year, the Supreme Court held the same right applies to using a gun for self-defense in <u>public</u>; and that a State, like in 114, requiring an adult to show a "special need" for self-defense to purchase a firearm violates the Second Amendment. *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

---

[4] The Ninth Circuit addressed some of these issues before *Bruen*, but the Supreme Court vacated its judgment, and it then remanded to the district court for further proceedings consistent with *Bruen*. *Duncan v. Bonta*, 49 F.4th 1228 (CA9 September 23, 2022, Mem.).

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

And district courts addressing challenges to State PTPs even <u>before</u> *Bruen* hold they are unconstitutional. *Wesson v. Town of Salisbury*, 13 F. Supp. 3d 171 (D Mass 2014); *Richmond v. Peraino*, 128 F. Supp. 3d. 415 (D Mass 2015).

So, the Court should grant this Motion to prevent irreparable injury to Plaintiffs.

## <u>LEGAL STANDARDS GOVERNING THIS MOTION</u>

"The purpose of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Ct.,* 840 F.2d 701, 704 (CA9 1998). The moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (CA9 2009).

"The same legal standard applies to temporary restraining orders and preliminary injunctions sought pursuant to Federal Rule of Civil Procedure 65." *Too Marker Products, Inc. v. Shinhan Art Materials, Inc.*, 2009 WL 4718733 at *2 (D Or 2009). "To restrain or enjoin a defendant from acting, a plaintiff must show: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest." *Id.* "The elements of [this] test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Irvin v. HSBC Bank USA, N.A.*, 2017 WL 5075246 at *1 (D Or 2017).

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

To satisfy the first element of the standard for injunctive relief, it is not necessary for the moving party to "prove his case in full." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)—or show that they are "more likely than not" to prevail. *Leiva–Perez v. Holder*, 640 F.3d 962, 966 (CA9 2011).

Instead, a party need only demonstrate a "fair chance of success on the merits" or raise questions "serious enough to require litigation." *Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (CA9 1978).

And this Court states that "in the alternative, the courts of the Ninth Circuit recognize that a preliminary injunction may properly issue where serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction. *** Thus, a preliminary injunction may be granted 'if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest.'" *Underwood v. Rochester*, 2018 WL 3613990 at *2 (D Or 2018) (citing 9th Circuit cases).

"Given the haste," a "preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

## FACTUAL BACKGROUND

Ammunition magazines that can hold more than 10 rounds are ubiquitous in the United States, coming standard with approximately half of all firearms sold and in use today. Estimates show that well over 100 million such magazines have been lawfully acquired in

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

just the past quarter century; the clear majority of them, by law-abiding citizens who keep them for self-defense.  To date, very few states have taken the extraordinary step of banning the possession of these commonly owned and commonly used arms.

But on December 8, 2022, Oregon will join them.  On that date, every Oregonian who merely possesses a magazine over 10 rounds—even at home—will be a criminal.  Plaintiffs' only options to avoid prosecution are to surrender their magazines to the government, transfer them out of state, or sell them to one of a few state-approved purchasers—all without government compensation.  Oregon's impending magazine possession ban is an outlier that violates multiple constitutional provisions and should thus be preliminarily enjoined.

First, a total ban on the possession of magazines "in common use" by law-abiding citizens for self-defense plainly violates the Second Amendment.  *Heller*, 554 U.S. at 627. The State can point to no justification—let alone one sufficient to withstand the new controlling standard—for banning magazines lawfully and safely owned by tens of millions.

Second, *physically* dispossessing magazine owners of their private property without just compensation from the government violates the Takings Clause.  The Fifth Amendment provides, in relevant part, that private property shall not "be taken for public use, without just compensation."

"The Fifth Amendment applies to the States in all its refinements."  *Griffin v. California*, 380 U.S. 609, 615-616 (1965)  (Harlan. J. concurring).

It is no answer that the owner of a soon-to-be-illegal magazine can give it to the government, remove it from the state, or sell it on a state-restricted market.  Whatever

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

expectations people may have regarding regulation of their property, they do not expect it to be "occupied or taken away." *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427 (2015).

Third, because it retroactively criminalizes and deprives owners of lawfully acquired magazines, 114's possession ban violates the Due Process Clause. There is no reason to believe that physical dispossession of magazines from those, like Plaintiffs, who have safely and lawfully possessed them for years is now related to advancing the state's interest in public safety.

Finally, Plaintiffs are not only likely to succeed on the merits, but also satisfy the other preliminary injunction requirements. Denial of a constitutional right is the quintessential irreparable injury, and the need for immediate relief is only more evident when the injury involves physical dispossession of property on an imminent date certain. There is no public interest in inflicting a likely constitutional violation, especially when the status quo can be preserved with no demonstrable harm to anyone. Plaintiffs seek merely to preliminarily enjoin 114. Oregon has gone its entire history without taking these magazines from law-abiding citizens. So, it should not be allowed to start until the multiple constitutional defects in 114 are adjudicated.

## I.  THE PROHIBITED MAGAZINES HAVE LONG BEEN IN COMMON USE FOR LAWFUL PURPOSES

Magazines over 10 rounds are commonly possessed by the American public—and they have been for generations. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851-872 (2015).

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

Such magazines have existed since <u>before</u> the American Revolution. They have been very commonly possessed in the United States since 1862. And their popularity has steadily increased ever since, especially as technology has improved.

Although exact numbers are difficult to calculate, a sizable percentage—perhaps a majority—of all firearms sold in the United States today come from the factory with magazines over 10 rounds. Massad Ayoob, *The Complete Book of Handguns Magazine*, 87, 89-90 (2013).

Indeed, "it is indisputable that magazines of up to thirty rounds for rifles and up to twenty rounds for handguns" are commonly used. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence*, 1994-2003, (Nat'l Instit. Just. June 2004).

These magazines are overwhelmingly used for lawful purposes. And common sense tells us that the small percentage of the population who are violent gun criminals is not remotely large enough to explain the *massive* market for magazines of more than ten rounds that has existed since the mid-nineteenth century. Civilians overwhelmingly choose them to increase their chances of staying **alive** in violent confrontations.

The reasons a potential victim benefits from having a magazine over 10 rounds for self-defense are obvious. The presence of multiple attackers may require far more defensive discharges to eliminate the threat. The stress of a criminal attack greatly reduces the likelihood that shots fired will hit an attacker, and bullet-hits do not necessarily incapacitate a criminal before he can complete his attack. Further, because most people do not keep back-up magazines or firearms immediately accessible, victims are often limited to shots available

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

from a single firearm. (Plaintiffs' Declarations.)  For these reasons, discussed below, the magazines 114 bans are commonly preferred by law-abiding Oregonians, including Plaintiffs, for self-defense.  That makes 114 unconstitutional.

## II.  THE HISTORY OF MAGAZINE CAPACITY RESTRICTIONS

Though magazines over 10 rounds <u>predate</u> the Second Amendment by over **200** years, there were <u>no</u> ammunition capacity restrictions when the Second Amendment was ratified. In fact, the first such laws—found in just three states and the District of Columbia—appeared during the prohibition era, nearly a century and half <u>after</u> the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment.  Except for D.C.'s law, a version of which remains in effect, all have since been repealed.  *Id.* at 100-102.  Today, the overwhelming majority of states place <u>no</u> restrictions on magazine-capacity. The restrictions that are in place are of recent vintage, and they differ.

In 1994 (before the Supreme Court confirmed that the Second Amendment protects an individual right), Congress adopted the first nationwide magazine-capacity restriction—a federal law banning possession and transfer of "large-capacity magazines" manufactured before 1994.  But Congress allowed that restriction to expire in 2004 after a Department of Justice-commissioned study on the effectiveness of the federal ban showed <u>no</u> real impact. "*What Should America Do About Gun Violence?*," Hearing Before U.S. S. Comm. on Judiciary, 113th Cong. 11 (2013).

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

### III. OREGON'S MAGAZINE POSSESSION BAN AND ITS IMPACT ON PLAINTIFFS

Beginning on December 8, 2022, Oregon will regulate the manufacture, importation, sale, and transfer of any "large-capacity magazine"—defined as "any ammunition feeding device with the capacity to accept more than 10 rounds."

The individual Plaintiffs state in their Declarations filed today that they (and OFF's members) are responsible and law-abiding residents of Oregon who are not prohibited from owning or possessing firearms. Plaintiffs either own and possess a lawfully acquired magazine over 10 rounds, or seek to acquire and possess one soon. For purposes of this Motion, Plaintiffs declare that, but for the enforcement of 114, they would continue to possess their magazines in Oregon for self-defense and other lawful purposes. Plaintiff OFF represents its countless law-abiding members, who lawfully acquired and possess magazines over 10 rounds, and who would retain possession of them if this Court enjoins 114.

### ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

#### A. 114 Violates the Second Amendment

The Supreme Court has described "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" as the Second Amendment interest "surely *elevated* above <u>all</u> others." *Heller*, 554 U.S. at 635 (emphasis added).

And <u>this</u> year, the Court held, "consistent with *Heller*"—and *McDonald*, 561 U.S. 742, 780 (2010)—"that the Second and Fourteenth Amendments protect an individual right to carry a handgun for self-defense <u>outside</u> the home." *Bruen*, 142 S. Ct. at 1122 (emphasis added).

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

**B.     A detailed discussion of the Supreme Court's recent controlling decision in *Bruen,* which warrants granting this Motion**

The New York statute held unconstitutional in *Bruen* this year, like 114, "conditions issuance of a license to carry on a citizen's showing of some additional **special need**," so "we conclude that the state licensing regime violates the Constitution." *Id.*

"Because the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendments' text and historical scope." *Id.* at n.11.

In *Bruen*, like the Plaintiffs here, the individual petitioners "are law-abiding citizens" of New York. *Id.* at 2124-2125. And just like OFF, "Petitioner New York State Rifle & Pistol Association Inc. is a public-interest group" organized "to defend the Second Amendment rights of New Yorkers." *Id.* at 2125. As here, the individual plaintiffs in *Bruen* "simply wanted to carry a handgun for self-defense." *Id.* They "face no special dangers," but "wanted a handgun for general self- defense." *Id.*

As here, the *Bruen* plaintiffs sued "for declaratory and injunctive relief" under "42 U.S.C. § 1983, alleging that respondents violated their Second and Fourteenth Amendment rights by denying their unrestricted-license applications on the basis that they had failed to show 'proper cause.'" The district court dismissed petitioners' complaint, and the Court of Appeals affirmed. *Id.* But the Supreme Court **reversed**.

The Court in *Bruen* initially noted that since *Heller* and *McDonald*, the Courts of Appeals have "coalesced" around a "two-step" framework "for analyzing Second Amendment challenges that combines history with means-end scrutiny. Today, we decline

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

to adopt that two-part approach." *Id*. at 1125-1126. Rather, "in keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution **presumptively** *protects* that conduct. To justify its regulation, the government may not [as in 114 here] simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." "Only" then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Id*. at 1126 (citation omitted). "The government must **affirmatively** prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 1127 (citing *Heller*). *Bruen* notes that in *Heller*, the Court found "no doubt" that "the Second Amendment conferred an individual right to keep and bear arms." *Id*.

The Court "looks to history" because "it has always been widely understood that the Second Amendment codified a pre-existing right." *Id*. "The Amendment is not codified to lay down a novel principle but rather codified a right inherited from our English ancestors." *Id*. The Second Amendment "guarantees the individual right to possess and carry weapons in case of confrontation," and that "does not depend on service in the militia." *Id*. (emphasis added).

*Bruen* notes that in *Heller*, it found it "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons that the Second Amendment *protects* the possession and use of weapons that were in **common use** at the time." And *Bruen* notes that *Heller*, after applying a historical analysis, held that the Second Amendment

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

did not countenance a "complete prohibition" on the use of "the most popular weapon chosen by Americans for self–defense in the home." *Heller* "relied on text and history. It did not invoke any means–and test such as strict or intermediate scrutiny." And *Heller* and *McDonald* "expressly rejected the application of" any "judge-empowering interest-balancing inquiry that asked whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other governmental interest." *Heller* "declined to engage in means-end scrutiny because the very enumeration of the right takes out of the hands of the government—even the third branch of government—the right to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 2129 (emphasis in *Bruen*). "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Id.* (citing *Heller*).

"We reiterate that **the standard for applying the Second Amendment is as follows**: when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified <u>command</u>.'" *Id.* at 2126 (emphasis added).

"Reliance on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing* right—is, in our view, more legitimate, and more administrable, than asking judges to make difficult empirical judgments about the costs and benefits of firearms restrictions, especially given their lack of expertise in the field." *Id.*

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

(emphasis by the Court). "Courts are thus entitled to decide a case based on the historical record compiled by the parties." *Id*. at n.6.

And while deference "to the determination of legislatures" is "understandable —and, elsewhere, appropriate —it is <u>not</u> the deference that the Constitution demands here. The Second Amendment is the very *product* of an interest balancing by the people," and it "surely elevates above <u>all</u> other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Id*. at 2131 (italics by the Court; underlining added). "It is this balance—struck by the traditions of the American people—that demands our <u>unqualified deference</u>." *Id*. (emphasis added).

The new *Bruen* test "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." Likewise, "if earlier generations addressed the societal problem, but did so through materially different means, that would also be evidence that a modern regulation is unconstitutional." *Id.*

*Bruen* then turned to its facts. Like 114 here, "New York's proper-cause requirement concerns the same alleged societal problem addressed in *Heller*; handgun violence, primarily in urban areas." *Id*. And "we find no such tradition." *Id*. at 2132.

"While the historical analogues here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

require a more nuanced approach.  The regulatory challenges posed by firearms today are not always the same as those that preoccupied the founders in 1791 or the Reconstruction generation in 1868.  Fortunately, the founders created a Constitution—and a Second Amendment—intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *Id.*  "Although its meaning is fixed according to the understanding of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the founders specifically anticipated." *Id*.  "Its reference to 'arms' does <u>not</u> apply only to those arms in existence in the 18th century." *Id*. at 2118 (emphasis added).

"Just as the First Amendment protects modern forms of communications," for example, the "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 2132. Thus, "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id.*  As one example, it applies to "stun guns." *Id*. (citing *Caetano*).

"Much like we use history to determine which modern arms are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were imaginable at the founding.  When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogue." Determining "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id*.

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

"*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to self-defense." And "individual self-defense is the *central component* of the Second Amendment right." *Id.* at 2132-2133 (emphasis in *Bruen*). "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id*. at 2133.

"The Second Amendment is the product of an interest balancing by <u>the people</u>, *not* the evolving product of **federal judges**. Analogical reasoning requires judges to apply faithfully the balance struck to modern circumstances." *Id*. at n.7 (emphasis added). "It is not an invitation to revise that balance through means-end scrutiny." *Id*.

"We think respondents err in their attempt to characterize New York's proper-cause requirement as a 'sensitive place' law. It is true that people sometimes congregate in 'sensitive places,' and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Id.* at 2133-2134.

"It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the second amendment protects." *Id.* at 2129, 2134.

"Nor does any party dispute that handguns are weapons in 'common use' today for self-defense." *Id*. at 2134.

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

"We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense. We have little difficulty concluding that it does." *Id*. at 2135. "Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id*. And "the textual elements of the Second Amendment's operative clause—'the right of the people to keep and bear arms, shall not be infringed'—guarantee the individual right to possess and carry weapons in case of confrontation." *Id*. at 2134. "The right to bear arms refers to the right to wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id*. at 2135 (cleaned up).

"This definition of 'bear' naturally encompasses **public** carry." Although "individuals often 'keep' firearms in their home, at the ready for self-defense, most do not 'bear' *i.e.*, (carry) them in the home beyond moments of actual confrontation. To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." *Id*. at 2134-2135 (emphasis added).

"Moreover, confining the right to 'bear' arms to the home would make little sense given that self-defense is the *central component* of the Second Amendment right itself." *Id.* at 2135 (emphasis by the Court). "After all, the Second Amendment guarantees an individual right to possess and carry weapons in case of confrontation, and confrontation can surely take place outside the home." *Id*.

"Although we remarked in *Heller* that the need for armed defense is perhaps 'most acute' in the home, we did not suggest that the need was insignificant elsewhere. Many

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

Americans hazard *greater* danger <u>outside</u> the home than in it." *Id*. (emphasis added). "The

text of the Second Amendment reflects that reality. The Second Amendment's plain text

thus **presumptively guarantees** petitioners" a "right to 'bear' arms in public for self-

defense." *Id*. (emphasis added).

Like in 114 here, the *Bruen* governmental respondents "claim that the Second

Amendment permits the state to condition handgun carrying in areas frequented by the

general public on a showing of a non-speculative need for armed self-defense in those areas."

*Id*. "To support that claim, the burden falls on <u>respondents</u> to show that New York's **proper-**

**cause** requirement is consistent with this Nation's historical tradition of firearm regulation.

*Only* if respondents carry that burden can they show that the *pre-existing* right <u>codified</u> in the

Second Amendment" does "*not* protect petitioners' proposed course of conduct." *Id*.

(emphasis added).

"Constitutional rights are enshrined the scope they were understood to have *when the*

*people adopted them*." *Id*. at 2136 (citing *Heller*; emphasis in *Bruen*).

"And in light of the text of the Second Amendment, along with the Nation's history of

firearm regulation, we conclude" that "the State may not prevent law-abiding citizens from

publicly carrying handguns because they have not demonstrated a special need for self-

defense." *Id*. at n.8.

Petitioners "Nash and Koch allege that they were denied unrestricted licenses because

they had not demonstrated a special need for self-defense that distinguished them from the

general public. If those allegations are proven true," their "constitutional right to bear arms

in public for self-defense" were "violated." *Id*.

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

"We recognize that where a governmental practice has been open, widespread and unchallenged since the early days of the Republic, the practice should guide our interpretation of an unambiguous constitutional provision." *Id*. at 2137. And "to the extent later history contradicts what the text says, the text controls." *Id*. (emphasis added). "We have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*.

"Because the Second Amendment's bare text covers petitioners' public carry, the *respondents* here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope." *Id*. at n.11 (emphasis added).

The Court in *Bruen* then stated that "the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense. Nor is there any historical tradition limiting public carry only to those law-abiding citizens who demonstrate a **special need** for self-defense. We conclude that respondents have *failed* to meet their burden to identify an American tradition justifying New York's proper-cause requirement." *Id.* at 2119 *(*emphasis added). "The proper-cause requirement is therefore unconstitutional." *Id*. at 2138.

Here, the Preamble to 114 relies on the "increase in gun sales, gun violence, and raised **fear** in Oregonians of armed intimidation;" and "mass shootings" conducted through "large capacity magazines." But *Bruen* states that "respondents do not offer any evidence showing that, in the early 18th century or after, the mere public carrying of a handgun

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

*terrified* people.  In fact, the *opposite* seems to have been true.  As time went on, 'domestic gun culture in England softened' any 'terror' that firearms might once have conveyed."  *Id*. (emphasis added).

"We cannot conclude from this historical record that, by the time of the founding, English law would have justified restricting the right to publicly bear arms limited for self-defense only to those who demonstrate some **special need** for self-protection."  *Id*. (emphasis added).  At "most," the *Bruen* "respondents can show that colonial legislatures sometimes prohibited the carrying of 'dangerous *and* <u>unusual</u> weapons'—a fact we already acknowledged in *Heller*.  Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those in common use at the time, as opposed to those that are *highly unusual* in society at large."  *Id*. at 2143 (emphasis added).  And handguns "are indisputably in 'common use' for self-defense today.  They are, in fact, the quintessential self-defense weapon;" they "are unquestionably in common use today."  *Id*.

"There is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry."  *Id*.

"Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate."  *Id*.  But "none of these restrictions imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime." *Id*.  "The history reveals a consensus that states could *not* ban public carry altogether."  *Id*. (emphasis by the Court).

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

"This historical evidence" does "demonstrate that *the manner* of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others." *Id.* at 2150 (emphasis by the Court). But "none of these historic distinguishable al limitations on the right to bear arms approach New York's proper- cause requirement [**like 114's PTP**] because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id*.

Even before the Civil War, the Supreme Court recognized the right of citizens "to keep and carry arms *wherever they went;*" and "public carry was a component of the right to keep and bear arms." *Id*. at 2150-2151 (emphasis by the Court). There is "overwhelming" evidence "regarding the right to keep and bear arms for defense in public." *Id.*

"Respondents have not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* Except for a few outliers, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to demonstrate a special need for self-protection distinguishable from that of the general community in order to carry arms in public." *Id*. at 2153.

"The constitutional right to bear arms in public for self- defense is not a second-class right." We "know of no other constitutional right that an individual may exercise only after demonstrating to government officials some special need. That is not how the First Amendment works." And "it is not how the Second Amendment works when it comes to

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

public carry for self-defense." *Id.* at 2156. "New York's proper-cause requirement violates the 14th Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2156.

**C.    Other relevant law**

The Second Amendment's protection necessarily includes the ammunition and magazines required for the meaningful exercise of the right to keep and bear arms. *See Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (CA9 2015); *Jackson v. City & County. of San Francisco*, 746 F.3d 953, 967-968 (CA9 2014). The Second Amendment thus protects those magazines "in common use" by law-abiding citizens today. *See Heller*, 554 U.S. at 627. Even before *Bruen*, nearly every appellate court that analyzed this issue found, or was willing to assume without expressly holding, that bans on magazines over 10 rounds burden conduct protected by the Second Amendment—that is, they ban magazines in common use for lawful purposes. *See*, e.g., *Fyock*, 779 F.3d at 999 (holding the lower court did not abuse its discretion in holding that magazines over 10 rounds are in common use); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (CA2 2015); *Friedman v. City of Highland Park*, 784 F.3d 406, 415 (CA7 2015); *Heller v. District of Columbia* (Heller II), 670 F.3d 1244, 1261 (D.C. Cir. 2011).

And for good reason. These magazines have long been commonly possessed and used by law-abiding citizens—especially for the core lawful purpose of self-defense. There is <u>nothing</u> unusual or novel about magazines that can hold more than 10 rounds. Indeed, many of the nation's best-selling firearms—including the Glock pistol, the nation's most

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

popular handgun—have long come standard with magazines Oregon law will prohibit. (Plaintiffs' Declarations.)

Law-abiding citizens safely possess firearms equipped with such magazines in the clear majority of states, which have <u>no</u> magazine capacity restrictions. The reason for the popularity of these magazines is straightforward. In a confrontation with a violent attacker, having enough ammunition can be the difference between life and <u>death</u>. *Id*.

Proponents of magazine bans rely almost entirely on "mere speculation" that, given time, such bans may reduce gun violence. *Fyock*, 25 F. Supp. 3d at 1280; *Edenfield v. Fane*, 507 U.S. 761, 770-771 (1993).

In adopting 114, the People stated the intention behind the law was to prevent a specific category of "large-capacity magazines"—*i.e.*, "mass shootings." While the government has an important interest in promoting public safety and preventing crime, Defendants must also satisfy the new *Bruen* test. But they do not, and cannot, make the *Bruen* showing.

And nothing in the Northern District of California's pre-*Bruen* decision in *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014), or the Ninth Circuit's decision affirming it, warrants a different outcome. There, the district court declined to temporarily enjoin a citywide ban on magazines over 10 rounds because the plaintiffs had not established a likelihood of success on the record then before the court. *Id*. at 1282. While the Ninth Circuit affirmed the denial, it ruled simply that "the district court did not abuse its discretion . . . , on the record before it." *Fyock*, 779 F.3d at 1001 (emphasis added). Of course, it did not (and could not) hold the law satisfies *Bruen*. Indeed, the court in *Fyock* warned that "due to

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

the limited scope of our review . . . our disposition of appeals from most preliminary injunctions may provide little guidance as to the appropriate disposition on the merits." *Id.* at 995. In short, *Fyock* does not preclude this Court from granting the relief Plaintiffs seek.

And contrary to 114's claim that magazine bans promote public safety, such laws instead <u>decrease</u> public safety because they restrict the self-defense capabilities of the law-abiding—as the time it takes to change magazines is much more likely to negatively affect crime victims than their attackers. Unlike perpetrators of violent crime and mass shootings, *victims* do not <u>choose</u> when or where an attack will take place, the number of attackers, the location of the attack, or the attacker's intentions. And the time of the attack is completely unknown. For that reason, the prohibited magazines are overwhelmingly preferred by law-abiding Americans for personal and home defense. (Plaintiffs' declarations.)

The availability of more ammunition in a firearm increases the likelihood of surviving a criminal attack, while limiting the number of rounds available decreases one's chances of survival. A firearm's ammunition capacity is thus directly related to its suitability for self-defense. Evidence of this point is overwhelming. *Id*.

The reasons citizens benefit from having more than 10 rounds immediately available in a self-defense emergency are clear. Given that criminal attacks occur at a moment's notice, taking the victim by surprise, usually at night and in confined spaces, victims rarely have multiple magazines or extra ammunition readily available for reloading. Regardless, the victim likely cannot hold a spare magazine as he or she scrambles for cover. Often both hands will be on the firearm. If they are not, one hand is likely holding the phone to call the police. *Id*. Even if additional magazines are available, it is extremely difficult—and

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

potentially **deadly**—to stop to change magazines when one is under attack, the stress of which severely degrades the fine motor skills necessary for the task. *Id.* That same stress also reduces the accuracy of any shots that are fired. And even if accurate, it is rare that a single shot will immediately neutralize an attacker. And the presence of multiple attackers may require far more defensive discharges to eliminate the threat. *Id.* In other words, being limited to 10 rounds may often be not enough. *Id.*

Thus, 114's euphemistic name—the "Reduction of Gun violence Act" is, respectfully, bunk. It will make more people **victims** of gun violence. And 114 is not a small burden on self-defense. Forcing law-abiding citizens to change magazines while attempting to defend against a deadly criminal attack could cost them their **lives**. Because the magazine ban restricts the self-defense capabilities of the law-abiding, it is unconstitutional under *Bruen* and *Heller*.

The State flatly bans Oregonians—including those who, like Plaintiffs, have lawfully owned the soon-to-be banned magazines for <u>decades</u> without incident—from possessing magazines over 10 rounds. To ban certain arms because *criminals* might misuse them is to tell law-abiding citizens that their own constitutional rights depend not on their <u>own</u> conduct, but on the conduct of the *lawless* few who abuse those liberties—a perverse message.

And *Bruen* and *Heller* declare such policy choices "off the table" as to constitutionally protected arms—*i.e.*, those in "common use" for lawful purposes. *See Heller*, 554 U.S. at 636. There, D.C. sought to ban handguns for the same reasons Oregon wishes to ban magazines over 10 rounds. *Id.* at 682, 693. Despite these compelling public safety interests, *Heller* holds that D.C.'s handgun ban "failed constitutional muster." *Id.* at

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

628-629.  If the D.C. handgun ban could not even pass "intermediate scrutiny," it follows

that 114 cannot survive either given *Bruen*.  For if prohibiting law-abiding citizens from

possessing protected arms were a valid method of reducing criminal misuse, *Heller* and

*Bruen* would have been decided differently. Certainly, the justification for banning handguns

is at least as strongly related to the government's safety objectives, for handguns are

overwhelmingly preferred by criminals—accounting for 81 percent of all firearm homicides

from 1993 to 1997.  *Id.* at 697-699.  But despite the government's clear interest in keeping

concealable firearms out of the hands of criminals, banning the possession of commonly

used, protected arms by the law-abiding was held unconstitutional.  *Id.* at 628-629.  The

same result thus follows here, especially after *Bruen*.

### D.      114 is an Unconstitutional Taking

Plaintiffs are also likely to succeed on their claims that 114's ban violates the Takings

Clause, as it forces them to dispossess themselves of their lawfully acquired property without

just compensation.  The Takings Clause applies to two types of governmental action:

"physical takings" and "regulatory takings."  *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427

(2015).  A physical taking occurs when "the government physically takes possession of an

interest in property for some public purpose"—when it "dispossesses the owner" of private

property to promote the general good.  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan.*

*Agency*, 535 U.S. 302, 322, 325 n.19 (2002). When the government physically takes

property, it "has a categorical duty to compensate the former owner."  *Id.* at 322; *Horne*, 135

S. Ct. at 2427.

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

A regulatory taking is "a restriction on the use" of private property. *Id.* A regulation that deprives an owner of "all economically beneficial use of her property" categorically requires government compensation. *Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 538 (2005). A regulation of property use also requires compensation if it "goes too far." *Id.* at 537-540.

Oregon's magazine possession ban is a paradigmatic physical taking that requires compensation. 114 subjects to criminal punishment (**felony** and misdemeanor) any person who possesses any "large-capacity magazine" on or after December 8, 2022, regardless of when it was acquired. By its plain terms, the law is thus a government mandate that owners of private property physically dispossess themselves of it—a physical taking that requires government compensation. Indeed, physical dispossession of the kind mandated by 114 is the sine qua non of a physical taking. What "distinguishes" a physical from a regulatory taking is whether the regulation "absolutely dispossesses the owner." *Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419, 435 n.12 (1982).

Precisely because 114 prohibits possession of magazines over 10 rounds, it is distinguishable from restrictions on the use of personal property that have been upheld against takings challenges. *Compare Andrus v. Allard*, 444 U.S. 51 (1979). Likewise, in the Prohibition-era cases involving takings challenges to restrictive liquor laws, those challenges were rejected because the statutes restricted only the ability to sell lawfully acquired alcohol, not to continue to possess it. *See James Everard's Breweries v. Day*, 265 U.S. 545, 560 (1924); *Jacob Ruppert, Inc. v. Caffey*, 251 U.S. 264, 278-79 (1920).

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

As the Supreme Court explained in distinguishing those cases from a regulation that physically dispossessed farmers of their raisins, there is a fundamental difference between a regulation that restricts only the use of private property, and one that requires "physical surrender . . . and transfer of title." *Horne*, 135 S. Ct. at 2429. Because Oregon's ban requires the latter, it is a "per se taking" that requires government compensation. *See id.* "Whatever . . . reasonable expectations" people may have "with regard to regulations," they "do not expect their property, real or personal, to be actually occupied or taken away." *Id.* at 2427.

It is well-established that a physical taking can occur even if the government itself does not "directly appropriate the title, possession or use of the property." *Richmond Elks Hall Ass'n v. Richmond Redevel. Agency*, 561 F.2d 1327, 1330 (CA9 1977). Rather, "it is sufficient if the action by the government involves a direct interference with or disturbance of property rights." *Id.*

Indeed, selling property to avoid having it taken is an option in almost every takings case. *See Horne*, 135 S. Ct. at 2430. But "property rights 'cannot be so easily manipulated.'" *Id.* Similarly, the possibility of physically moving a prohibited magazine to another state—on pain of criminal prosecution if kept or returned in-state—does not make 114 any less a physical taking. Mandatory transfer of property out of state "physically dispossesses" a property owner and results in a taking. *See Tahoe-Sierra*, 535 U.S. at 324, n.19. It "is no answer" that the property owner may maintain title or access the property by traveling outside Oregon. "Retention of some access rights by the former owner of property does not preclude the finding of a per se taking." By stripping the property owner of his most basic property right—physical possession in the relevant jurisdiction—the magazine

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

ban works a physical taking regardless of whether the government itself "directly appropriate[s] the title, possession or use of the property." *Richmond Elks*, 561 F.2d at 1330.

Moreover, the option of transferring a magazine out of state exists only if (1) the property owner has some out-of-state location to store the magazine—which is certainly not true in all and maybe not true in most cases; and (2) the transferee state permits possession of the magazine—a policy choice by a different sovereign over which Oregon has no control. It can no more invoke the permissive firearms laws of other states to defend the constitutionality of its own restrictions on magazines than Missouri could invoke the permissive abortion laws of other states to defend the constitutionality of its restrictions on clinics. *See Jackson*, 746 F.3d at 967 ("That Jackson may easily purchase ammunition elsewhere is irrelevant.")

In short, there is no "first mover" exception to the Takings Clause. Oregon may <u>not</u> enact an unconstitutional law simply because other states have not. *Compare Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 76-77 (1981) ("One is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.")

Because the magazine ban works a physical taking of Plaintiffs' property, the state "has a categorical duty to compensate the former owner." *Tahoe-Sierra*, 535 U.S. at 322. 114 plainly fails to fulfill that duty. It makes no provision for government compensation.

"Although the Court has wrestled with many issues in its extensive takings jurisprudence . . . it has invariably operated under the assumption that the government is the entity charged with paying just compensation." *Carson Harbor Vill. Ltd. v. City of Carson*,

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

353 F.3d 824, 831 (CA9 2004) (O'Scannlain, J., concurring) (emphasis added). And *see First English Evangel. Luth. Church v. Los Angeles Cty.*, 482 U.S. 304, 319 (1987) ("The Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land.").

This case underscores the reason for that rule. The Constitution requires not simply *some* compensation for a taking of private property, but "just compensation,"—that is, "the market value of the property at the time of the taking." *Horne*, 135 S. Ct. at 2432. But nothing in Oregon's magazine ban even suggests, let alone ensures, that the compensation a magazine owner receives for the potential sale of their property to a third party will reflect its fair market value.

### E.     114 Violates the Due Process Clause

For largely the same reasons that it runs afoul of the Takings Clause, 114's magazine ban also violates the Due Process Clause, as retroactively prohibiting the possession of lawfully acquired magazines does not substantially advance a "legitimate governmental objective." *Lingle*, 544 U.S. at 542.

Our legal system "for centuries . . . has harbored a singular distrust of retroactive statutes, and that distrust is reflected in the [Supreme Court's] due process jurisprudence." *E. Enters. v. Apfel*, 524 U.S. 498, 502 (1998). "If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership." *Id.* at 548. It therefore "does not follow . . . that what [a legislature] can legislate prospectively it can legislate retrospectively. The retrospective aspects of legislation, as well as the prospective aspects,

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

must meet the test of due process, and the justifications for the latter may not suffice for the former." *Usery v. Turner Elkhorn Mining Co*., 428 U.S. 1, 16-17 (1976). Courts accordingly have "given careful consideration to due process challenges to legislation with retroactive effects." *E. Enters*., 524 U.S. at 547-548 (Kennedy, J., concurring in part and dissenting in part) (collecting cases)— subjecting such laws to "heightened scrutiny," *Kelo v. City of New London*, 545 U.S. 469, 493 (2005) (Kennedy, J., concurring).

While the State undoubtedly has a legitimate interest in public safety, applying its ban retroactively against magazine owners like Plaintiffs, who have complied with the law, does not further that interest in a meaningful way. There is no reason to think that applying a criminal possession ban—as opposed to some additional form of regulation to address the State's safety concerns—to individuals who have *lawfully* possessed the soon-to-be banned magazines for decades will have any tangible public safety benefit. To the contrary, depriving them of their magazines will have the perverse effect of punishing compliance with the law and may well *reduce* public safety by preventing individuals from effectively exercising self-defense. The state's effort to "change the legal consequences of transactions long closed," *E. Enters*., 524 U.S. at 548, cannot "meet the test of due process," *Usery*, 428 U.S. at 17.

## II. THE REMAINING PRELIMINARY INJUNCTION FACTORS WARRANT RELIEF

### A. Plaintiffs Will Suffer Irreparable Harm if the Court Denies Relief

If this Court concludes that Plaintiffs are likely to succeed on one or more of the alleged constitutional violations, as it should, the remaining preliminary injunction factors follow readily. "It is well established that the deprivation of constitutional rights

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (CA9 2012). The Ninth Circuit has imported the First Amendment's "irreparable-if-only-for-a-minute" rule to cases involving other rights and, in doing so, has held a deprivation of these rights irreparable harm *per se*. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (CA9 1997). The Second Amendment should be treated no differently. *See McDonald*, 561 U.S. 742, 780 (2010) (refusing to treat the Second Amendment as a second-class right subject to different rules).

These constitutional violations alone are enough to satisfy the irreparable harm factor, but the circumstances here make the irreparable harm unmistakable. Because the magazine ban is set to take effect on December 8, 2022, the need to "preserve the status quo pending a determination of the action on the merits"—the <u>fundamental</u> purpose of a preliminary injunction—is particularly strong. *Chalk*, 840 F.2d at 704. The need for immediate injunctive relief is even more apparent because the impending harm is a physical taking of property that cannot be remedied easily if at all—a quintessential example of irreparable injury. *See*, e.g., *Taylor v. Westly*, 488 F.3d 1197, 1202 (CA9 2007) ("Without a preliminary injunction, plaintiffs run the risk that [Oregon] will permanently deprive them of their property . . . . Once the property is sold, it may be impossible for plaintiffs to reacquire it, thus creating the requisite 'irreparable harm.'").

Finally, the property being taken is not just any personal item, but one that is constitutionally protected for the most *essential* purpose—defense of a person's <u>life</u> against harm. *See Heller*, 554 U.S. at 595. Thus, the irreparable harm is plain.

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

## B. Granting Preliminary Injunctive Relief is in the public interest

For similar reasons, granting preliminary injunctive relief before the magazine possession ban takes effect on December 8, 2022 is in the public interest. When challenging government action that affects the exercise of constitutional rights, "the public interest . . . tips sharply in favor of enjoining" the law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (CA9 2009). Here, Plaintiffs seek to vindicate their fundamental Second Amendment rights, as well as their rights under the Takings and Due Process Clauses. As the Ninth Circuit has made clear, "<u>all</u> citizens have a stake in upholding the Constitution," and have "concerns that are implicated when a constitutional right has been violated." *Preminger v. Principi*, 422 F.3d 815, 826 (CA9 2005) (emphasis added). Thus, not only Plaintiffs' rights are at stake, but so are the rights of **all** Oregonians seeking to engage in conduct that is prohibited by the State's magazine ban. The public interest thus tips sharply in Plaintiffs' favor. "It is **always** in the public interest to prevent the violation of a party's *constitutional* rights." *Melendres*, 695 F.3d at 1002 (emphasis added).

Moreover, Oregon has no plausible argument that enjoining enforcement of the magazine ban with respect to current owners of magazines that can hold more than 10 rounds will endanger public safety. After all, Oregon banned [effective December 8] the purchase, sale, and importation of such magazines without banning their possession for the better part of the past two <u>decades</u>. It strains credulity to suggest that simply preserving the status quo for magazine possessors who have complied with the law and not endangered public safety for decades will somehow endanger public safety now.

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

### C. The Balance of Equities Tips Sharply in Plaintiffs' Favor

The final factor considers "the balance of hardships between the parties." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137 (CA9 2011). In contrast to Plaintiffs' many demonstrated injuries, the State will suffer <u>no</u> harm from a preliminary injunction. The State "cannot suffer harm from an injunction that merely stops an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (CA9 2013). And even absent the significant constitutional dimensions of this lawsuit, the balance of harms still tips in Plaintiffs' favor. As explained above, physically dispossessing magazine owners who have complied with the law and not endangered public safety for decades cannot plausibly be understood to serve the public interest or increase public safety. To the contrary, the magazine ban makes the public <u>less</u> secure by making it more difficult for Plaintiffs to defend themselves, as established in Plaintiffs' Declarations.

The balance of equities also favors litigants who seek only "to preserve, rather than alter, the status quo while they litigate the merits of their action." *Rodde v. Bonta*, 357 F.3d 988, 999 n.14 (CA9 2004). Here, granting the relief Plaintiffs seek now will merely maintain the status quo while the case moves forward on the merits, which further "strengthens their position" in the analysis of the equitable injunction factors. *Id.* The sale of magazines over 10 rounds remains lawful in Oregon. So, it will not be flooded with new magazines just because an injunction is granted. On the other hand, enjoining 114 will prevent the violation of Plaintiffs' constitutional rights, ensuring they are free to exercise those rights without fear of prosecution.

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

## CONCLUSION

For the foregoing reasons, (1) the Court should grant Plaintiffs' Motion for a Preliminary Injunction.  Respectfully, only that satisfies *Heller* and *Bruen*.

And (2) consistent with the cited district court decisions in *Wesson* and *Richmond* striking down PTP laws as unconstitutional—and *Heller* and *Bruen*—the Court should also hold the PTP clauses in 114 are unconstitutional, and should enjoin their enforcement.  The PTP effectively creates an unconstitutional gun registry, and imposes unconstitutional burdens on Second Amendment rights contrary to *Heller* and *Bruen*.

Thus, (3) the Court should enjoin 114 in its entirety, and issue a related temporary restraining order.

DATED: November 23, 2022.

KAEMPF LAW FIRM PC

/s John Kaempf
John Kaempf, OSB #925391
john@kaempflawfirm.com

Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on November 23, 2022, I caused to be electronically filed the foregoing paper with the Clerk of the Court by using the CM/ECF system. The following participant in the case who is a registered CM/ECF user will be served by the CM/ECF system.

Brian Marshall
brian.s.marshall@doj.state.or.us

OREGON DEPARTMENT OF JUSTICE
Attorney for Defendants

DATED: November 23, 2022.

KAEMPF LAW FIRM PC

/s John Kaempf
John Kaempf, OSB #925391
john@kaempflawfirm.com

Attorney for Plaintiffs

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006