John Kaempf, OSB #925391
KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: (503) 224-5006
Email: john@kaempflawfirm.com

Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., an Oregon public benefit corporation; BRAD LOHREY, Sherman County Sheriff; CODY BOWEN, Union County Sheriff; BRIAN WOLFE, Malheur County Sheriff; HAROLD RICHARD HADEN, JR., an individual; and ADAM JOHNSON, an individual,<br><br>                              Plaintiffs,<br><br>     v.<br><br>KATE BROWN, GOVERNOR OF THE STATE OF OREGON, and ELLEN ROSENBLUM, ATTORNEY GENERAL OF THE STATE OF OREGON, in both their official and personal capacities,<br><br>                              Defendants. | Civil No. 2:22-cv-01815-IM<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

        1.      Plaintiffs Oregon Firearms Federation "OFF," and the individual Plaintiffs,

collectively "Plaintiffs," through their counsel, bring this action against Defendants Kate

Brown, the Governor of Oregon, and Ellen Rosenblum, the Attorney General of Oregon, in both their official and personal capacities; and make the following allegations.

2.      Tens of millions of law-abiding Americans own firearms equipped with magazines capable of holding more than 10 rounds of ammunition. There is nothing unusual or novel about this technology. Many of the nation's best-selling handguns and rifles come standard with magazines that can hold more than 10 rounds—and firearms equipped with such magazines are safely possessed by law-abiding citizens in the vast majority of States. The reason for the popularity of these magazines is that in a confrontation with a violent attacker, having enough ammunition can be the difference between life and death.

3.      Although magazines capable of holding more than 10 rounds have existed and been in common use for more than a century, Oregon, through 2022 Ballot Measure 114—"114"—bans their manufacture, sale, import, or transfer effective December 8, 2022. https://www.oregonlive.com/politics/2022/11/oregons-strict-new-gun-limits-under-measure-114-go-into-effect-even-sooner-state-says.html.

4.      In Oregon's view, these standard issue magazines are actually "large capacity magazines" that threaten public safety. In November 2022, the State took the additional and extreme step of banning mere possession of magazines over 10 rounds. Under 114, owners of such magazines who want to keep the property they lawfully acquired and have used only for lawful purposes may no longer continue to do so.

5.      The provisions of 114 limiting magazines to 10 rounds; the "permits to purchase" (PTP) provisions of 114; and the related registry it creates; are not part of America's historic tradition concerning gun rights and the Second Amendment. 114 is not

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

consistent with the Nation's historical tradition of sufficiently analogous regulations.  That makes 114 unconstitutional.

6.      Concerning the attempted purchase of a firearm, many Oregonians have been placed on "delay" status.  In many cases they cannot get an explanation from the Oregon State Police "OSP" for why this has happened.  And many people wait months and even years for a resolution.  If there is any question about an incident in their past and it involves another state, they often wait for very lengthy periods of time before that State provides the needed information to the OSP.  In many cases those records no longer exist, so the OSP may have an arrest record and no record of the disposition of the case leaving would be buyers in legal limbo.  Measure 114 will require two of these background checks.  Each of which can potentially last forever.

7.      Plaintiff Brad Lohrey, Sherman County Sheriff, specifically alleges: Sherman County is a rural frontier county in Eastern Oregon.  My agency only has six sworn deputies.  We are responsible for 24/7 law enforcement services.  While off duty, my deputies attend community events.  All of them carry concealed weapons because they know they could be called to work at a moment's notice.  The 10-round magazine limit in 114 will cause my deputies to break the law when off-duty, because their off-duty weapons have more than 10 rounds in order to maintain the tactical advantage.  Limiting my off-duty deputies to only 10 rounds will hinder their ability to respond, and it may cause lives to be lost.  If my deputies were to insist on carrying more than 10 rounds off duty, they would be committing a misdemeanor crime because of 114, which would also bring risk to their police certification and career.

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

8.     Plaintiff Lohrey further specifically alleges:

When you work in law enforcement long enough, you inevitably upset some people because of the work you do and the cases you investigate. Some of my deputies, along with their families, have received death threats over the years. Due to this inherent risk, my deputies have to defend themselves and their families, even when they are off-duty. If my deputies cannot carry more than 10 rounds off-duty, they will be less prepared to defend themselves and their families. At some point, the risk is not worth it, and I am aware that at least one of my deputies will resign if his ability to protect his family while off-duty is hindered by 114.

9.     Plaintiff Lohrey further specifically alleges:

114 creates significant funding and training problems for Sherman County. The permitting process that my citizens would be required to pursue because of 114 is not funded. I do not have the personnel, nor the funding, to provide any training. The Sherman County Sheriff's Office is the only law enforcement agency in Sherman County. We do not have any city police departments, so the entire responsibility of law enforcement services falls on the Sheriff's Office. Additionally, there are no civilian firearms instructors in Sherman County to certify that could train the public. Sherman County is 90% private property. There are no public or private ranges in the entire county. We have no location to provide training, and we have no one to conduct the training. Even if funding and personnel were provided to my office to cover the 114-permitting process, I also do not have funding to cover the insurance required to cover the liabilities that this process will require. There are significant liabilities when it comes to certifying and training civilians on a range with live fire.

10.     114 violates multiple constitutional provisions. The Second Amendment protects the right to keep and bear arms "typically possessed by law-abiding citizens for

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 624-625 (2008).  This

applies to keeping and bearing arms both inside and outside the home.  *Id.*; *New York State*

*Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2122 (2022).  "The standard for applying the

Second Amendment is as follows: When the Second Amendment's plain text covers an

individual's conduct, the Constitution presumptively protects that conduct.  The government

must then justify its regulation by demonstrating that it is consistent with the Nation's

historical tradition of firearm regulation.  Only then may a court conclude that the

individual's conduct falls outside the Second Amendment's unqualified command."  *Bruen*,

142 S. Ct. at 2129-2130.  "The Second and Fourteenth Amendments protect an individual's

right to carry a handgun for self-defense outside the home."  *Id*. at 2122.  "The State's

licensing regime violates the Constitution."  *Id*.  "Individual self-defense is the *central*

*component* of the Second Amendment right."  *Id*. at 2133 (emphasis by the Court).  114 fails

to meet the new controlling *Bruen* standard.

> 11.     Second, Article 1, Section 27 of the Oregon Constitution states, in relevant

part, that "the people shall have the right to bear arms for the defence [sic] of themselves."

> 12.     The Second and Fourteenth Amendments thus protect an individual's right to

carry a gun for self-defense inside and outside the home.

> 13.     The Second Amendment protects the purchase and use of ammunition and

magazines necessary to make firearms effective.  Because the magazines Oregon prohibits in

114 are "in common use for lawful purposes like self-defense," the prohibition "cannot

stand."  *Heller*, 554 U.S. at 624, 636.

> 14.     114 also violates the Takings Clause.  By banning possession—in addition to

sales and use—of magazines that were lawfully acquired and are presently possessed, 114

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

constitutes a physical appropriation of property without compensation that is *per se* unconstitutional.

15.     114 violates the Due Process Clause.  Banning magazines over 10 rounds is no more likely to reduce criminal abuse of guns then banning high horsepower engines is likely to reduce criminal abuse of automobiles.  To the contrary, the only thing the ban contained in 114 ensures is that a criminal unlawfully carrying a firearm with a magazine over 10 rounds will have a potentially devastating advantage over his law-abiding victim.

16.     And 114 raises particularly acute due process concerns because it criminalizes the continued possession of magazines that were lawful when acquired.  Desiring to acquire, possess, use, and/or transfer these constitutionally protected magazines for lawful purposes, including self-defense, but justifiably fearing prosecution if they do so, Plaintiffs respectfully request that this Court (1) declare that 114 infringes Plaintiffs' constitutional rights; and (2) immediately and permanently enjoin Defendants from enforcing 114 to the extent it prevents law-abiding Oregonians, like Plaintiffs, from acquiring, possessing, using or transferring constitutionally protected arms.

17.     Criminals, by definition, do not obey the law.  Gun control laws only affect law-abiding people who go through legal avenues to obtain firearms.  Criminals overwhelmingly obtain their firearms through illegal channels and will never be deterred by laws like 114.  This is why background checks, for example, have virtually no impact on criminals.  https://www.nraila.org/why-gun-control-doesn-t-work/

18.     The congressionally-mandated study of the federal "assault weapon ban" of 1994-2004 found that the ban had no impact on crime, in part because "the banned guns were never used in more than a modest fraction of gun murders."  Rifles of any type are used in

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

only two percent of murders.  Subsequent research conducted by the RAND Corporation found no conclusive evidence that banning "assault weapons" or "large" capacity magazines has an effect on mass shootings or violent crime.  https://www.nraila.org/get-the-facts/assault-weapons-large-magazines/ (citing FBI data).

19.     While most news concentrates on the violence in our urban areas, rural parts of Oregon are facing high levels of crime from international drug cartels who clearly are not impacted by permits or magazine capacity restrictions.  Law enforcement is no match for these heavily armed cartels and Oregonians who live there will be faced by well-armed criminals while having their own ability to protect themselves greatly restrained, if not completely eliminated, by a system that requires they comply with requirements that may, in fact, be impossible to meet.

20.     There is little evidence that high-capacity magazine restrictions have any positive effects on public safety.  To support these laws, some states, as in 114, point to horrific crimes involving large-capacity magazines.  But the connection between the crime and the magazine is conjectural at best, while the prohibitions against such magazines have disrupted the lives of many otherwise law-abiding gun owners—and all without any evidence of improvements in public safety.  Restrictions on "high-capacity" magazines are not only ineffective, but dangerous.  Standard magazines designed for the weapon in question are the most effective tools for lawful defense.  These restrictions would only affect the outcome of the incredibly rare shooting in which more than a few shots are fired.

https://www.cato.org/legal-policy-bulletin/losing-count-empty-case-high-capacity-magazine-restrictions#self-defense-implications

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

21.     The tremendous delays on background checks that exist under current Oregon law, and 114, removing any deadline for the state police to process a background check, means, for example, that a young, single mother who is being stalked by her ex-husband who just was released from jail may be long dead, along with her child, before her background check and license to purchase a firearm is finally processed in possibly over a year.

22.     The one-two punch of (1) being first required to meet mandates that have no cap on their price tag (the required training) and then (2) being constrained to having far inferior tools than criminals have, will be especially catastrophic for single women and people of color at a time when the ability of police to respond to them is greatly diminished.

23.     Currently the most vulnerable people in our state, those in our "Address Confidentiality Program," are facing extreme hurdles purchasing firearms because their addresses are suppressed and are not printed on their ID.  Under 114, if they do overcome those hurdles and apply for a permit, all their private information will be on a public database.

24.     Under 114, most shotguns used for trap and skeet youth competitions will be contraband, thereby crushing those programs because their integral magazines can hold more than ten rounds.

25.     There is no reliable estimate of time for how long it would take to implement the regulations 114 requires, meaning that virtually all smaller stores that sell mostly firearms will not be able to survive.  Then, even should a person somehow overcome the hurdles created by 114, there will be few places with knowledgeable staff left to serve them.

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

26.     Meanwhile, violent criminals will continue to ignore the law and have unfettered access to the tools being banned by 114, since they don't apply for permits, and standard capacity magazines will continue to be unregulated and available in most states.

27.     Under federal law, a Federal Firearms Licensee (FFL) is required to resubmit a background check and have the transferee fill out a new BATFE Form 4473 (background check form) if the transfer has not taken place within thirty days of the date of original submission.  The massive increase (over 500%) in sales of firearms as a result of the passage of 114 since November 8, 2022 has created the largest queue of individuals waiting for a background check the Oregon State Police has ever seen.  As of this writing, there are over 27,000 in the queue for a check.  The highest number we had ever previously seen was approximately 8,000 in mid-2020.  At that time, it was taking roughly three weeks to receive a response from the state police.  Now, with the queue more than three times higher than that, it will likely take greater than 30 days to receive an "approved" response from OSP.  If that is the case, the transfer may still not take place, as the FFL is required by federal law to submit another background check and receive a response from OSP.  This cycle, if not enjoined, could create a feedback loop where people are unable to take possession of a firearm they have paid for, and received potentially multiple "approved" responses from the OSP's FICS background check system, but it would be unlawful to complete the transfer without resubmitting a Form 4473 in the event the process took longer than 30 days.

28.     The background check required by 114 is completely superfluous and redundant.  Oregon has had universal background checks since 2015.  The law already requires that every private transfer of a firearm be conducted by an FFL at the FFL's licensed business or a sanctioned gun show.  Any firearm transferred by an FFL to an individual must

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

undergo a criminal background check under the Brady Act. This is not optional; it is a

revocable offense and punishable by imprisonment. 114 forces individuals to pay $65 to a

local law enforcement agency in order to receive a background check to receive a permit.

The background check performed in the granting of that permit is functionally identical to

the background check that will be performed by the FFL at the time of transfer, making the

permit process entirely unnecessary and completely redundant. Oregon law currently does

not have any exemptions or "loopholes" to the Brady Act background check process. 100%

of firearms transactions and transfers in the State of Oregon that are conducted in compliance

with the law already entail a background check.

## JURISDICTION AND VENUE

29. This Court has original jurisdiction of this civil action under 42 U.S.C. § 1331,

because the action arises under the Constitution and laws of the United States, thus raising

federal questions. The Court also has jurisdiction under 28 U.S.C. § 1343(a) and 42 U.S.C.

§ 1983 since this action seeks to address the deprivation, under color of the laws, statutes

ordinances, regulations, customs and usages of the state of Oregon and political subdivisions

thereof, of rights, privileges or immunities secured by the United States Constitution and by

Acts of Congress.

30. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28

U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42

U.S.C. § 1988.

31. Venue in this judicial district and division is proper under 28 U.S.C. § 1391

(D)(d)(2) because a substantial part of the offenses or omissions giving rise to Plaintiffs'

claims occurred in this district and division, and many Plaintiffs reside here.

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

# PARTIES

## PLAINTIFFS

32.     Plaintiff Adam Johnson is a resident of Marion County, Oregon, and a law-abiding citizen of the United States.  He owns numerous magazines prohibited by 114.  But for Oregon's restrictions on magazines over 10 rounds, and his reasonable fear of criminal prosecution for violating them, plaintiff Johnson would continually possess a magazine over 10 rounds in Oregon for lawful purposes, including in-home and outside self-defense. Plaintiff Johnson owns Coat of Arms Custom Firearms, a store in Keizer, Oregon.

33.     Plaintiff Harold Richard Haden, Junior is a resident of Umatilla County, Oregon, and a law-abiding citizen of the United States.  He owns Garner's Sporting-Goods, located in Pendleton, Umatilla County, Oregon.  It sells guns and related items prohibited by 114.  But for Oregon's restrictions on magazines over 10 rounds, and his reasonable fear of criminal prosecution for violating them, plaintiff Haden would continually possess a magazine over 10 rounds in Oregon for lawful purposes, including in-home and outside self-defense.

34.     Plaintiff Brad Lohrey is the Sheriff of Sherman County, Oregon.  If 114 takes effect, he and his officers will be unable to adequately protect the residents of Sherman County.  Plaintiff Lohrey is a resident of Sherman County, Oregon, and a law-abiding citizen of the United States.  He owns magazines prohibited by 114 for self-defense and other lawful purposes.  But for Oregon's restrictions on magazines over 10 rounds and his reasonable fear of criminal prosecution for violating them, plaintiff Lohrey would continually possess a magazine over 10 rounds in Oregon for lawful purposes, including in-home and outside self-defense, and law enforcement.

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

35. Plaintiff Cody Bowen is the Sheriff of Union County, Oregon. If 114 takes effect, he and his officers will be unable to adequately protect the residents of Union County. Plaintiff Bowen is a resident of Union County, Oregon, and a law-abiding citizen of the United States. He owns magazines prohibited by 114 for self-defense and other lawful purposes. But for Oregon's restrictions on magazines over 10 rounds and his reasonable fear of criminal prosecution for violating them, Plaintiff Bowen would continually possess a magazine over 10 rounds in Oregon for lawful purposes, including in-home and outside self-defense, and law enforcement.

36. Plaintiff Brian Wolfe is the Sheriff of Malheur County, Oregon. If 114 takes effect, he and his officers will be unable to adequately protect the residents of Malheur County. Plaintiff Wolfe is a resident of Malheur County, Oregon, and a law-abiding citizen of the United States. He owns magazines prohibited by 114 for self-defense and other lawful purposes. But for Oregon's restrictions on magazines over 10 rounds and his reasonable fear of criminal prosecution for violating them, plaintiff Wolfe would continually possess a magazine over 10 rounds in Oregon for lawful purposes, including in-home and outside self-defense, and law enforcement.

37. Plaintiff OFF is an Oregon public benefit corporation located in Canby, Clackamas County, Oregon. OFF is qualified as tax-exempt under 26 U.S.C. § 501(c)(4). OFF seeks to defend the civil rights of all law-abiding individuals, including all of its members, and including the fundamental right to acquire and possess commonly used firearm magazines.

38. OFF regularly provides guidance to Oregon gun owners regarding their legal rights and responsibilities. In addition, OFF is dedicated to promoting the shooting sports

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

and providing education, and training for adult and junior shooters. OFF members include law enforcement officers, prosecutors, professionals, firearm experts, and the public.

39.     In this suit, OFF represents the interests of thousands of its members who reside in Oregon, and who are too numerous to conveniently bring this action individually. OFF represents the interests of those who are affected by Oregon's restriction on magazines capable of holding more than 10 rounds, and the "permits to purchase" provisions of 114. In addition to their standing as citizens and taxpayers, those members' interests include their wish to exercise their constitutionally protected right to keep and bear arms without being subjected to criminal prosecution, and to continue to lawfully possess property that they lawfully obtained. But for Oregon's restrictions on magazines over 10 rounds; and its "permits to purchase" provisions; and the reasonable fear of felony and misdemeanor prosecution for violating them, OFF members would seek to acquire, keep, possess, and/or transfer such magazines for in-home and outside self-defense and other lawful purposes, including self-defense inside and outside the home. And the "permits to purchase" and magazine round provisions of 114 also violate Plaintiffs' Second and Fourteenth Amendment rights.

## DEFENDANTS

40.     Defendant Kate Brown is the Governor of the State of Oregon. Defendant Ellen Rosenblum is the Attorney General of the State of Oregon. Defendants are the chief law enforcement officers of Oregon. They are charged by the Oregon Constitution with the duty to see that the laws of Oregon are uniformly and adequately enforced. Defendant Rosenblum also has direct supervision over every district attorney and sheriff in all matters pertaining to the duties of their respective offices. Her duties also include informing the

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

public, local prosecutors, and law enforcement regarding the meaning of the laws of Oregon,

including restrictions on certain magazines classified as "large capacity magazines."

Defendants act and acted in their official and personal capacities. Defendants are responsible

for formulating, executing, and administering 114's restrictions on magazines capable of

holding more than 10 rounds at issue in this lawsuit. Defendants can enforce Oregon's

restriction on magazines capable of holding more than 10 rounds; and its "permits to

purchase" clauses; against Plaintiffs and other Oregon citizens under color of state law

within the meaning of 42 U.S.C. § 1983.

## <u>GENERAL ALLEGATIONS</u>

### **RIGHT TO KEEP AND BEAR ARMS**

41.     The Second Amendment to the United States Constitution declares that "the

right of the people to keep and bear arms shall not be infringed."  The United States Supreme

Court has concluded that "self-defense is a basic right, recognized by many legal systems

from ancient times to the present day, and individual self-defense is the central component of

the Second Amendment right."  *McDonald v. City of Chicago*, 562 U.S. 742, 767 (2010).

The Supreme Court holds that a prohibition of an entire class of arms that is overwhelmingly

chosen by American society is unconstitutional, especially when that prohibition extends to

the home, where the need for defense of self, family, and property is most acute.  *Heller*, 554

U.S. at 628.

42.     The "arms" protected by the Second Amendment are those "typically

possessed by law-abiding citizens for lawful purposes" today.  Second Amendment

protection also includes the ammunition and magazines necessary to meaningfully keep and

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

bear arms for self-defense.  As such, the Second Amendment protects magazines and the firearms equipped with them that are in common use for lawful purposes.

43.     The Supreme Court also holds that the Second Amendment right to keep and bear arms is incorporated into the Due Process Clause of the 14th Amendment and may not be infringed by state or local governments.  *McDonald*, 561 U.S. at 750.

44.     Americans own some 415 million firearms, including 171 million handguns, 146 million rifles, and 98 million shotguns.  About 30 percent of American gun owners have owned AR-15s or similar rifles, which are classified as "assault weapons" under some state laws.  Such legislation also commonly imposes a limit on magazine capacity, typically 10 rounds, like 114.  48 percent of American gun owners have owned magazines that can hold more than 10 rounds.  Up to 44 million AR-15-style rifles and up to 542 million magazines with capacities exceeding 10 rounds are already in circulation in America.  Two-thirds of Americans who report owning AR-15-style rifles use them for recreational target shooting, while half use them for hunting, and a third use them for competitive shooting.  62 percent of Americans use such rifles for home defense, and 35 percent use them for self-defense outside the home.  https://reason.com/2022/09/09/the-largest-ever-survey-of-american-gun-owners-finds-that-defensive-use-of-firearms-is-common/

45.     Historically, the Winchester Model 1892, depending on the cartridge, held up to 17 rounds and could be fired as fast as one could cycle the lever action and pull the trigger.  More than a million were sold in the 1800s and used by hunters, ranchers, farmers, pioneers, etc., both to put food on the table and for self-defense.  The most common 1892 with a capacity higher than ten rounds was the Spanish Tigre that was chambered in .44 Largo (.44-40 Win) with 12-round tubes as standard capacity.

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

46.     The classic Winchester 1873, the "gun that won the West," held 15 rounds in the tubular magazine plus one in the chamber. The "24" version could hold 14 cartridges in the tube, plus one chambered. The "36" model could feed up to 21 rounds from the tube.

47.     The 1860 Henry, used by countless hunters, farmers and ranchers for hunting and self-defense, held up to 16 rounds in the magazine plus 1 in the chamber.

48.     The Henry 1860 chambered in .44 Henry rimfire had a standard capacity of 16 rounds.

49.     The Winchester 1894, which sold more than 7 million rifles, had a capacity in many configurations exceeding 10 rounds.

50.     The Marlin/Glenfield Mod. 60 is one of the most produced firearms of all time, and is still in production today. There have been over 11 million of them sold since 1960. They were even produced by Sears, and could be ordered from the catalog and shipped directly to your house. The standard capacity of the Model 60 is a 14-round tube.

51.     The belt-fed machine gun was invented by Hiram Maxim in 1885.

52.     The Puckle Gun was a tripod mounted multi-barreled flintlock firearm that held 11 rounds, and is considered by many gunsmiths and historians to be the first "machine gun" was patented in 1718—73 years before the Bill of Rights, and subsequently the Second Amendment, were ratified.

53.     The Remington Model 8 hit the market in 1900; over one hundred thousand were produced. They were available with 5, 10, and 15 round magazines from the factory. The Model 8 also became popular as a defensive rifle after its adoption by the FBI. The Model 8 was the rifle used to shoot down infamous bank robbers Bonnie and Clyde.

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

54.     As Pioneers, farmers and ranchers headed West, Eastern deer hunters carried these rifles through the woods and fields, and no one in the U.S. thought that these allegedly "high capacity" rifles posed an unusual danger, or did not belong in civilian hands, or could be regulated, much less outlawed.  The above rifles were considered essential tools of the trade and survival for everyone that hoped to survive the westward flow of "manifest destiny" and general westward expansion.

55.     The Browning BAR is also one of the most used hunting rifles of all time and was available with 20 round magazines from the factory.

56.     The Kel-Tec KSG shotgun (14 rounds), the Tavor X95 (30 rounds standard), the Knights Armament SR-25, SR-15, Beretta ARX-100 (30 rounds), Sig Sauer 716, HK MR556, and about a dozen others are sold throughout the United States, and the AR-15/M4 weapons platform has literally hundreds of variants, made by dozens of manufacturers.

57.     Attached as Exhibit B is a non-exclusive list of over one hundred handgun makes and models that would be affected by Measure 114.  The vast majority on the list are firearms currently in stock at plaintiffs Johnson's and Haden's stores.

58.     114 contains a "carve out" exception appliable to a tube fed magazine for an attached tubular device designed to accept, and capable of operating only with .22 caliber rimfire ammunition; or tubular ammunition feeding device that is contained in a lever-action firearm.  That means the exception applies to the Winchester Model 1892; the Winchester Model 1873; the Model 36; the 1860 Henry all lever action rifles that feed from a magazine tub; and the Marline/Glenfield, a .22 caliber tube magazine-fed semi-auto rifle.  This confirms that Oregon and America have had "high-capacity" magazines in this form for a long time that were not subject to regulations analogous to those in 114.  And this "carve

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

out" is inconsistent. If magazines exceeding 10 rounds are as dangerous as Defendants contend, then they should not be allowed in any gun. And this "carve out" confirms the many firearms that are not exempt from 114, further showing it is unconstitutional. The conditions and exemptions in 114 are inconsistent with America's historical tradition concerning gun rights, and cannot withstand any scrutiny that may apply.

## DUE PROCESS CLAUSE

59.     The Due Process Clause of the 14th Amendment provides that "no state shall deprive any person of life, liberty, or property without due process of law." The "touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

60.     Legislation that changes the law retroactively—making conduct that was legal when undertaken illegal—is especially likely to run afoul of the Due Process Clause. *See Turner Elkhorn Mining Co.*, 428 U.S. 1, 16-17 (1976). If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership. Consequently, due process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity.

61.     "The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156.

62.     A law that deprives an owner of private property without a permissible justification violates the Due Process Clause regardless of whether it violates the Takings Clause.

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

## THE ILLEGALLY RESTRICTED ITEMS AND THEIR USES

63.     A firearm magazine is a device that stores ammunition, and it is a critical part of delivering a loaded cartridge to the firing chamber of a rifle, pistol, or shotgun for distant charge of a projectile (bullet or shot).

64.     Magazines can be either "fixed" to ("integral") or detachable from a firearm. Removal of fixed magazines requires disassembly of the firearm. Once a fixed magazine is removed from a firearm, the firearm lacks a structure to store ammunition, rendering the firearm unable to accept ammunition for firing, unless manually loaded into the chamber one round at a time after each discharge.

65.     On the other hand, detachable magazines are designed to be routinely removed from and reinserted into a firearm. Removal generally requires a shooter to use a finger on the shooter's dominant hand to press a button or push a lever that releases the magazine from the cavity into which it is inserted to feed ammunition into the firearm's chamber for firing. Once a detachable magazine is removed, the firearm is unable to accept ammunition for firing, unless manually loaded into the chamber one round at a time after each discharge.

66.     Originally, firearms only had "fixed" magazines. The modern detachable magazine was given form in 1879 with the introduction of the Remington-Lee bolt action rifle, and detachable magazines have been in common use ever since.

67.     Detachable magazines offer several advantages beyond ease of reloading the firearm. Most important to self-defense, including inside and outside the home, detachable magazines allow for quick loading. This is especially beneficial if the gun is stored in an unloaded condition.

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

68.     The detachable magazine is also useful if the firearm "jams."  A "jam" is the failure of an expended cartridge to eject or the failure of a loaded cartridge to enter the chamber properly.  The proper procedure for clearing a "jam" usually involves first removing the magazine.  If the magazine is "fixed," clearing the "jam" can be more difficult and dangerous because the next round in the magazine is trying to feed into the chamber and the user does not have the option, as there would be with a detachable magazine, of removing the magazine from below to stop that pressure.

69.     Even outside a "jam" situation, detachable magazines offer safety advantages.  Many fixed magazines require that the cartridges be cycled through the loading process for unloading.  That creates many more opportunities for an accidental discharge—opportunities that are exacerbated when unloading must occur in a vehicle, in darkness, or in a crowded location.

70.     Detachable magazines are a convenient and safe way to store and transport ammunition.  And if mud or dirt gets into the magazine, it is often much easier to clean or replace a detachable magazine.

71.     Pre-loaded detachable magazines allow shooters to conveniently share ammunition while practicing—if they have similar firearms—or to safely reload while waiting one's turn to shoot, since the magazine is outside of the firearm while reloading takes place.

72.     Firearm users have had the choice of magazine types and capacity for over 130 years.  What they select is based on their respective need.  For generations, Americans have overwhelmingly chosen detachable magazines.

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

73.     While Oregon does not prohibit all detachable magazines—allowing for those with a capacity of 10 rounds or less—it does prohibit the sizes of magazines that are most popular and in common use among the American public.  Indeed, detachable magazines capable of holding more than 10 rounds come standard with countless handgun and rifle models throughout the country.  And law-abiding Americans own such magazines by the tens of millions.

74.     Detachable magazines capable of holding more than 10 rounds are so commonly used that only a few states place any restrictions on them.  Not only are these restrictions recent, but they differ as to what capacity is acceptable and for what types of firearms magazine capacity should be restricted.

75.     Magazines having a capacity over 10 rounds are popular and commonly used for self-defense purposes.  The grip of a handgun is sized to the common human hand.  If enough space exists inside the grip for detachable magazines capable of holding more than 10 rounds—as is true for most commonly sold handguns and rifles—it makes sense, from a self-defense perspective, to take advantage of that space by accommodating as much ammunition as possible.  Each available round is an additional opportunity to end the threat.  That is precisely why millions of Americans choose magazines over 10 rounds for self-defense, including inside and outside the home.

**TERMS OF BALLOT MEASURE 114**

76.     A true copy of Ballot Measure 114 is attached and incorporated as Exhibit A.

**VIOLATION OF PLAINTIFFS' RIGHT TO KEEP AND BEAR ARMS**

77.     114 prohibits magazines that come standard with and are commonly used in firearms that are "typically possessed by law-abiding citizens for lawful purposes"

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

throughout the United States. *Heller*, 554 U.S. at 624-625. Indeed, millions of firearms—including the most popular models—that come stock from the factory with magazines over 10 rounds—have been sold in the United States. People also buy such magazines after-market by the millions. Notwithstanding Oregon's description of the prohibited magazines as being "large capacity," magazines with capacities of more than 10 rounds are, instead, standard-capacity for many common firearms that are lawfully possessed and commonly used in the clear majority of States.

78.     Prohibiting law-abiding adults from acquiring, keeping, possessing, and/or transferring these commonly owned and commonly used magazines implicates and violates their Second Amendment rights. A total ban on standard-issue, commonly possessed magazines decreases public safety.

79.     The "permits to purchase" provisions of 114 violate the Second, Fifth, and Fourteenth Amendments. The "proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Bruen*, 142 S. Ct. at 2156.

**VIOLATION OF PLAINTIFFS' RIGHTS UNDER THE TAKINGS CLAUSE**

80.     114 makes it a crime for individuals to continue to possess magazines that they lawfully acquired and presently lawfully possess.

81.     By forcing individuals who would otherwise keep their lawfully acquired property to instead physically surrender that property without government compensation, 114 is a *per se* constitutional taking.

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

## VIOLATION OF PLAINTIFFS' RIGHT TO DUE PROCESS

82.     Due process concerns are heightened when the law applies retroactively to change the consequences of conduct that was lawful at the time.

83.     "The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156.

84.     114 making it a making it a crime for individuals to continue to possess property that they lawfully acquired deprives individuals of protected property interests without due process of law.  Any "legitimate governmental objective" sufficient to survive any scrutiny under the Due Process Clause must be extraordinary, and subject to the strictest of scrutiny, not merely ordinary scrutiny, when the deprivation of due process also violates a fundamental personal civil right under the Bill of Rights.  Merely any legitimate governmental purpose will not suffice to deprive citizens of their property when the taking intersects a fundamental civil right, such as Second Amendment rights.

## DECLARATORY JUDGMENT ALLEGATIONS

85.     114 is set to go into effect on December 8, 2022.  Enforcing 114 violates Plaintiffs' rights under the Second Amendment, the Takings Clause, and the Due Process Clause by including the acquisition, possession, and use of firearm magazines that are "typically possessed and commonly used by law-abiding citizens for lawful purposes" nationwide.

86.     If not immediately enjoined by this Court, Defendants will enforce 114 in derogation of Plaintiffs' constitutional rights, which will cause Plaintiffs to suffer immediate and irreparable injury  Plaintiffs have no plain, speedy, and adequate remedy at law.

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiffs because they are unable to engage in constitutionally protected activity if 114 is enforced by Defendants. But Plaintiffs seek an award of nominal damages from Defendants in their personal capacities to recognize the violation of their constitutional rights, thereby entitling Plaintiffs to an award of prevailing party attorney fees and expenses under 42 U.S.C. § 1988. *George v. City of Long Beach*, 973 F.2d 706, 708 (CA9 1992) ("In this Circuit, nominal damages must be awarded if a plaintiff proves a violation of his constitutional rights."). *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 604 (2001) (an award nominal damages makes a party "prevail" under § 1988).

## FIRST CLAIM FOR RELIEF

### RIGHT TO KEEP AND BEAR ARMS

87.     All paragraphs above are realleged and incorporated by reference.

88.     114's definition of "large-capacity magazine" includes many firearm magazines that come standard with or are common for firearms "typically possessed by law-abiding citizens for lawful purposes" nationwide. 114, therefore, generally prohibits Oregonians, including Plaintiffs, from acquiring, keeping, possessing, and/or transferring magazines protected by the Second Amendment, subject to significant criminal penalties, including imprisonment.

89.     These restrictions on magazines that are commonly possessed and commonly used throughout the United States by law-abiding, responsible adults for lawful purposes infringe on the right of the people of Oregon, including Plaintiffs, to keep and bear protected

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

arms as guaranteed by the Second Amendment to the United States Constitution, and as made applicable to Oregon by the Fourteenth Amendment.

90.     In violation of the Second Amendment, 114 blocks law-abiding, responsible adults, including Plaintiffs, and all OFF members, who would otherwise do so, from acquiring, keeping, possessing, and/or transferring magazines capable of holding more than 10 rounds that are in common use by law-abiding citizens for lawful purposes throughout the United States.  Defendants enforcing 114 prevents the sheriff Plaintiffs from adequately and fully protecting the residents of their counties.

91.     114's prohibitions extend to Plaintiffs' homes, where Second Amendment protections are at their highest, but also affect lawful and constitutionally protected conduct such as hunting, recreational shooting, and competitive marksmanship participation; and self-defense outside the home.

92.     Defendants cannot satisfy their burden of justifying 114's restrictions on the Second Amendment right of the people, including Plaintiffs, to acquire, keep, possess, transfer, and use magazines that are in common use by law-abiding adults throughout the United States for the important rights of defense of self and home, and other lawful purposes. Defendants also cannot justify the unconstitutionally burdensome "permits to purchase" provisions of 114.

## SECOND CLAIM FOR RELIEF

### TAKINGS CLAUSE

93.     All paragraphs above are realleged and incorporated by reference.

94.     Due process concerns are heightened when a law applies retroactively to change the consequences of conduct was lawful at the time.  "The constitutional right to bear

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156.

95.     By making it a crime for individuals to continue to possess property that they lawfully acquired, 114 deprives individuals of protected property interests without due process of law.

## PRAYER FOR RELIEF

Plaintiffs pray that the Court:

A.     Enter a declaratory judgment under 208 U.S.C. § 2201 that 114 is unconstitutional on its face or, alternatively, to the extent its prohibitions apply to law-abiding adults like all Plaintiffs, and all OFF members, seeking to acquire, use, or possess firearm magazines that are in common use by the American public for lawful purposes; because such prohibition infringes on the right of the people to keep and bear arms in violation of the Second and Fourteenth Amendments to the United States Constitution; unconstitutionally takes property without compensation in violation of the Takings Clause; and arbitrarily deprives Plaintiffs of protected property interests under the Due Process Clause.

B.     Issue an injunction immediately enjoining Defendants and their officers, agents, and employees from enforcing 114 in its entirety, or, alternatively, to the extent that such can be segregated from the rest of 114, any provision of 114 that prohibits the acquiring, using, or possessing of firearm magazines that are in common use by the American public for lawful purposes.  This includes, but is not limited to, enjoining the "permits to purchase" provisions of 114.

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

C.     An award of all remedies available under 42 U.S.C. § 1983, and all reasonable

attorney's fees, costs, and expenses under 42 U.S.C. § 1988, or any other applicable law.

This includes an award of nominal damages against Defendants in their personal capacities.

D.     And grant any such other and further relief as the court may deem proper.

DATED: November 28, 2022.

KAEMPF LAW FIRM PC

/s John Kaempf
John Kaempf, OSB #925391
john@kaempflawfirm.com

Attorney for Plaintiffs

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006



## PREAMBLE

Whereas the People of the State of Oregon have seen a sharp increase in gun sales, gun violence, and raised fear in Oregonians of armed intimidation, it is imperative to enhance public health and safety in all communities; and

Whereas the gun violence in Oregon and the United States, resulting in horrific deaths and devastating injuries due to mass shootings,  homicides and suicides is unacceptable at any level, and the availability of firearms, including semiautomatic assault rifles and pistols with accompanying large-capacity ammunition magazines, pose a grave and immediate risk to the health, safety and well-being of the citizens of this State, particularly our youth; and

Whereas Oregon currently has no permit requirements for purchasing a semiautomatic assault firearm or any other type of weapon and studies have shown that permits-to-purchase reduce firearm-related injuries and death and studies further have shown that firearm ownership or **access to firearms triples the risk of suicide and doubles the risk of homicide when compared to someone who does not have access**, this measure will require that anyone purchasing a firearm must first complete a safety training course, successfully pass a full background check and, only then, will an individual be granted a permit-to-purchase a firearm, so that firearms are kept out of dangerous hands; and

Whereas large-capacity magazines are often associated with semiautomatic assault rifles, and can also be used with many semiautomatic firearms including shotguns and pistols, and estimates suggest that nearly 40% of crime guns used in serious violent crimes, including attacks on law enforcement officers, are equipped with large-capacity magazines; and

Whereas firearms equipped with large-capacity magazines increase casualties by allowing a shooter to continue firing for longer periods of time before reloading, thus explaining their use in all 10 of the deadliest mass shootings  since 2009, and in mass shooting events from 2009 to 2018 where the use of large-capacity magazines caused twice as many deaths and 14 times as many injuries, including the 2015 shooting at Umpqua Community College in Roseburg, Oregon in which 10 people were killed and 7 more were injured; and

Whereas restrictions on high-capacity magazines during the 10-year federal ban from 1994-2004 and the ban in over nine (9) states and the District of Columbia have been found to reduce the number of fatalities and injuries in shooting incidents, this measure will enhance the safety of residents, particularly children, of this state by prohibiting the manufacture, sale, or transfer of large-capacity ammunition magazines and regulate the use of such magazines that are currently owned;

Now, therefore:

Be It Enacted by the People of the State of Oregon

**SECTION 1.** Sections 2 to 11 of this 2022 Act are added to and made a part of ORS 166.210 to 166.490.

**SECTION 2.** The People of the State of Oregon find and declare that regulation of sale, purchase and otherwise transferring of all firearms and restriction of the manufacture, import, sale, purchase, transfer, use and possession of ammunition magazines to those that hold no more than 10 rounds will promote the public health and safety of the residents of this state and this Act shall be known as the Reduction of Gun Violence Act.

## DEFINTIONS

**SECTION 3.**  Definitions. As used in sections 3 to 10 of this 2022 Act:

(1) "Criminal background check"  has the same meaning given to this term in ORS 166.432(1)(a) to (e).

(2) "Department" means the Department of State Police.

(3) "Gun dealer" means a person engaged in the business, as defined in 18 U.S.C. 921, of selling, leasing or otherwise transferring a firearm, whether the person is a retail dealer, pawnbroker or otherwise.

(4) "Permit" or "permit-to-purchase" mean an authorization issued to a person to purchase or acquire a firearm, provided all other requirements at the time of purchase or acquisition are met.

(5) "Permit Agent" means a county sheriff or police chief with jurisdiction over the residence of the person making an application for a permit-to-purchase, or their designees.

(6) "Transfer" has the meaning given that term in ORS 166.435(1)(a).

(7) "Transferor" means a person who is not a gun dealer or licensed as a manufacturer or importer under 18 U.S.C.  923

PAGE - 1     New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [~~struck through~~ and bracketed] is intended to be omitted.

Exhibit A
Page 1 of 12

and who intends to deliver a firearm to a transferee.

PERMIT-TO-PURCHASE PROCESS

<u>SECTION 4.</u>

(1)(a) **A person may apply for a permit-to-purchase a firearm or firearms under this section to the police chief or county sheriff with jurisdiction over the residence of the person making the application, or their designees, hereinafter referred to as "permit agent".**

(b) **A person is qualified to be issued a permit-to-purchase under this section if the person:**

(A) **Is not prohibited from purchasing or acquiring a firearm under state or federal law, including but not limited to successfully completing a criminal background check as described under paragraph (e) of this subsection;**

(B) **Is not the subject of an order described in ORS 166.525 to 166.543;**

(C) **Does not present reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence;**

(D) **Provides proof of completion of a firearm safety course as defined in subsection (8) of this section; and**

(E) **Pays the fee described in paragraph (b) of subsection (3) of this section.**

(c) **An application for a permit under this section must state the applicant's legal name, current address and telephone number, date and place of birth, physical description, and any additional information determined necessary by department rules. The application must be signed by the applicant in front of the permit agent.**

(d) **The permit agent shall verify the applicant's identity with a government-issued form of identification bearing a photograph of the applicant.**

(e) **The applicant must submit to fingerprinting and photographing by the permit agent. The permit agent shall fingerprint and photograph the applicant and shall conduct any investigation necessary to determine whether the applicant meets the qualifications described in paragraph (b) of this section. The permit agent shall request the department to conduct a criminal background check, including but not limited to a fingerprint identification, through the Federal Bureau of Investigation. The Federal Bureau of Investigation shall return the fingerprint cards used to conduct the criminal background check and may not keep any record of the fingerprints. Upon completion of the criminal background check and determination of whether the permit applicant is qualified or disqualified from purchasing or otherwise acquiring a firearm the department shall report the results, including the outcome of the fingerprint-based criminal background check, to the permit agent.**

(2)(a) **If during the background check, the department determines that:**

(A) **A purchaser is prohibited from possessing a firearm under ORS 166.250 (1)(c), the department shall report the attempted application for a permit, the purchaser's name and any other personally identifiable information to all federal, state and local law enforcement agencies and district attorneys that have jurisdiction over the location or locations where the attempted application for a permit was made and where the permit applicant resides;**

(B) **Based on the judgment of conviction, the permit applicant is prohibited from possessing a firearm as a condition of probation or that the permit applicant is currently on post-prison supervision or parole, the department shall report the attempted application for a permit to the permit applicant's supervising officer and the district attorney of the county in which the conviction occurred.**

(C) **The permit applicant is prohibited from possessing a firearm due to a court order described in ORS 166.255 (1)(a), the department shall report the attempted application for a permit to the court that issued the order.**

(D) **The permit applicant is under the jurisdiction of the Psychiatric Security Review Board, the department shall report the attempted application for a permit to the board.**

(b) **Reports required by paragraphs (A) to (D) of subsection (2)(a) shall be made within 24 hours after the determination is made, unless a report would compromise an ongoing investigation, in which case the report may be delayed as long as necessary to avoid compromising the investigation.**

(c) **On or before January 31 of each year, beginning in 2024, the department shall annually publish a report indicating for each county the number of applications made to any permit agent, the number of permits-to-purchase issued and the number of permits-to-purchase denied and the reasons for denial. The department may, by rule, include any additional**

PAGE - 2     New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [~~struck through~~ and bracketed] is intended to be omitted.

Exhibit A
Page 2 of 12

information that it determines would be helpful to ensuring the permit-to-purchase process is being administered in a consistent and equitable manner.

(3)(a) Within 30 days of receiving an application for a permit under this section, if the permit agent has verified the applicant's identity and determined that the applicant has met each of the qualifications described in paragraph (1)(b) of this section, the permit agent shall issue the permit-to-purchase.

(b) The permit agent may charge a reasonable fee reflecting the actual cost of the process but shall not exceed $65, including the cost of fingerprinting, photographing and obtaining a criminal background check.

(4)(a) The department shall develop:

(A) A standardized application form for a permit under this section; and

(B) A form in quadruplicate for use by permit agents in issuing permits under this section.

(b) The issuing permit agent shall maintain a copy of each permit issued under this section.

(c) The person named in a permit shall:

(A) Maintain a copy of the permit as long as the permit is valid.

(B) Present a copy of the permit to the gun dealer or transferor of a firearm when required under ORS 166.412, 166.435, 166.436 or 166.438.

(5)(a) The permit agent shall report the issuance of a permit under this section to the department, and shall provide to the department a copy of the permit and any information necessary for the department to maintain an electronic searchable database of all permits issued under this section. A permit agent revoking a permit shall report the revocation to the department at the time that notice of the revocation has been sent to the permit holder.

(b) The department shall maintain the electronic database described in paragraph (a) of this subsection by ensuring that new permits are added to the database, renewed permits are assigned a new expiration date, and expired or revoked permits are marked expired or revoked but retained in the database.

(6)(a) A permit-to-purchase issued under this section does not create any right of the permit holder to receive a firearm.

(b) A permit-to-purchase issued under this section is not a limit on the number of firearms the permit holder may purchase or acquire during the time period when the permit is valid.

(7)(a) A permit-to-purchase issued under this section is valid for five years from the date of issuance, unless revoked.

(b) A person may renew an unexpired permit issued under this section by repeating the procedures set forth in subsection (1) of this section, except:

(A) A full finger print set does not need to be taken again if the original set has been retained by the permit agent or is otherwise available; and

(B) The training course does not need to be completed, provided the course previously taken fully complies with each of the requirements set forth in subsection 8 of this section.

(c)The permit agent may charge a reasonable fee for renewal of the permit, reflecting the actual cost of the process but shall not exceed $50, including the cost of obtaining a criminal background check and photographing.

(8) As used in this section, "proof of completion of a firearm safety course" means the following:

(a) Proof of completion of any firearms training course or class available to the general public that is offered by law enforcement, a community college, or a private or public institution or organization or firearms training school utilizing instructors certified by a law enforcement agency, and that includes the components set forth in paragraph (c) of this subsection; or

(b) Proof of completion of any law enforcement firearms training course or class that is offered for security guards, investigators, reserve law enforcement officers, or any other law enforcement officers, and that includes the components set forth in paragraph (c) of this subsection;

(c) A firearms training course or class required for issuance of a permit-to-purchase must include:

(A) Review of federal and state laws in place at the time of the class and other safe practices related to ownership, purchase, transfer, use and transportation of firearms;

(B) Review of federal and state safe storage laws in place at the time of the class and other safe practices related to safe storage, including reporting lost and stolen guns;

PAGE - 3    New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [~~struck through~~ and bracketed] is intended to be omitted.

Exhibit A
Page 3 of 12

**(C) Prevention of abuse or misuse of firearms, including the impact of homicide and suicide on families, communities and the country as a whole; and**

**(D) In-person demonstration of the applicant's ability to lock, load, unload, fire and store a firearm before an instructor certified by a law enforcement agency. This requirement may be met separately from the other course requirements in subpargaphs (A), (B) and (C) of paragraph (c), which may be completed in an on-line course, provided the on-line course has been conducted by a trainer certified by law enforcement.**

**(d) Proof of successful completion of a training course in order to meet the requirements for a concealed handgun license issued under ORS 166.291 and 166.292 may be submitted for a permit as a substitute for the requirements in paragraph (c) of this subsection, provided the completed course included each of the components set forth in paragraph (c) of this subsection.**

**(9) The department may adopt rules to carry out the provisions of this section.**

## PERMIT-TO-PURCHASE DUE PROCESS APPEAL

**SECTION 5. (1) If the application for the permit-to-purchase is denied, the permit agent shall set forth in writing the reasons for the denial. The denial shall be placed in the mail to the applicant by certified mail, restricted delivery, within 30 days after the application was made. If no decision is issued within 30 days, the person may seek review under the procedures in subsection (5) of this section.**

**(2) Notwithstanding subsections (1) to (3) of section 4 of this 2022 Act, and subject to review as provided in subsection (5) of this section, a permit agent may deny a permit-to-purchase if the permit agent has reasonable grounds to believe that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence.**

**(3)(a) Any act or condition that would prevent the issuance of a permit-to-purchase is cause for revoking a permit-to-purchase.**

**(b) A permit agent may revoke a permit by serving upon the permittee a notice of revocation. The notice must contain the grounds for the revocation and must be served either personally or by certified mail, restricted delivery. The notice and return of service shall be included in the file of the permit holder. The revocation is effective upon the permit holder's receipt of the notice.**

**(4) Any peace officer or corrections officer may seize a permit-to-purchase and return it to the issuing permit agent if the permit is held by a person who has been arrested or cited for a crime that can or would otherwise disqualify the person from being issued a permit. The issuing permit agent shall hold the permit for 30 days. If the person is not charged with a crime within the 30 days, the permit agent shall return the permit unless the permit agent revokes the permit as provided in subsection (3) of this section.**

**(5) A person denied a permit-to-purchase or whose permit is revoked or not renewed may petition the circuit court in the petitioner's county of residence to review the denial, nonrenewal or revocation. The petition must be filed within 30 days after the receipt of the notice of denial or revocation.**

**(6) The judgment affirming or overturning the permit agent's decision shall be based on whether the petitioner meets the criteria that are used for issuance of a permit-to-purchase and, if the petitioner was denied a permit, whether the permit agent has reasonable grounds for denial under subsection (2) of this section. Whenever the petitioner has been previously sentenced for a crime under ORS 161.610 (Enhanced penalty for use of firearm during commission of felony) or for a crime of violence for which the person could have received a sentence of more than 10 years, the court shall grant relief only if the court finds that relief should be granted in the interest of justice.**

**(7) Notwithstanding the provisions of ORS 9.320 (Necessity for employment of attorney), a party that is not a natural person, the state or any city, county, district or other political subdivision or public corporation in this state, without appearance by attorney, may appear as a party to an action under this section.**

**(8) Petitions filed under this section shall be heard and disposed of within 15 judicial days of filing or as soon as practicable thereafter.**

**(9) Filing fees for actions shall be as for any civil action filed in the court. If the petitioner prevails, the amount of the filing fee shall be paid by the respondent to the petitioner and may be incorporated into the court order.**

**(10) Initial appeals of petitions shall be heard de novo.**

PAGE - 4     New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [struck through and bracketed] is intended to be omitted.

Exhibit A
Page 4 of 12

**(11)** Any party to a judgment under this section may appeal to the Court of Appeals in the same manner as for any other civil action.

**(12)** If the governmental entity files an appeal under this section and does not prevail, it shall be ordered to pay the attorney fees for the prevailing party.

## REQUIRES PERMITS FOR LICENSED DEALER SALES

**SECTION 6.** ORS 166.412 is amended to read:

(1) As used in this section:

(a) "Antique firearm" has the meaning given that term in 18 U.S.C. 921;

(b) "Department" means the Department of State Police;

(c) "Firearm" has the meaning given that term in ORS 166.210, except that it does not include an antique firearm;

(d) "Firearms transaction record" means the firearms transaction record required by 18 U.S.C. 921 to 929;

(e) "Firearms transaction thumbprint form" means a form provided by the department under subsection (11) of this section;

(f) "Gun dealer" means a person engaged in the business, as defined in 18 U.S.C. 921, of selling, leasing or otherwise transferring a firearm, whether the person is a retail dealer, pawnbroker or otherwise; and

(g) "Purchaser" means a person who buys, leases or otherwise receives a firearm from a gun dealer.

(2) Except as provided in subsection[s (3)(c) and] (12) of this section, a gun dealer shall comply with the following before a firearm is delivered to a purchaser:

(a) The purchaser shall present to the gun dealer current identification meeting the requirements of subsection (4) of this section **and a valid permit issued under section 4 of this 2022 Act**.

(b) The gun dealer shall complete the firearms transaction record and obtain the signature of the purchaser on the record.

(c) The gun dealer shall obtain the thumbprints of the purchaser on the firearms transaction thumbprint form and attach the form to the gun dealer's copy of the firearms transaction record to be filed with that copy.

(d) The gun dealer shall**,** [request] by telephone **or computer, verify that the purchaser has a valid permit-to-purchase a firearm issued under section 4 of this 2022 Act and request** that the department conduct a criminal history record check on the purchaser and shall provide the following information to the department:

(A) The federal firearms license number of the gun dealer;

(B) The business name of the gun dealer;

(C) The place of transfer;

(D) The name of the person making the transfer;

(E) The make, model, caliber and manufacturer's number of the firearm being transferred;

(F) The name and date of birth of the purchaser;

(G) The Social Security number of the purchaser if the purchaser voluntarily provides this number to the gun dealer; and

(H) The type, issuer and identification number of the identification presented by the purchaser.

(e) The gun dealer shall receive a unique approval number for the transfer from the department and record the approval number on the firearms transaction record and on the firearms transaction thumbprint form.

(f) The gun dealer may destroy the firearms transaction thumbprint form five years after the completion of the firearms transaction thumbprint form.

(3)(a) Upon receipt of a request of the gun dealer for a criminal history record check, the department shall immediately, during the gun dealer's telephone call or by return call:

(A) Determine, from criminal records and other information available to it, whether the purchaser is disqualified under ORS 166.470 from completing the purchase; and

(B) Notify the gun dealer when a purchaser is disqualified from completing the transfer or provide the gun dealer with a unique approval number indicating that the purchaser is qualified to complete the transfer.

(b) If the department is unable to determine if the purchaser is qualified or disqualified from completing the transfer within 30 minutes, the department shall notify the gun dealer and provide the gun dealer with an estimate of the time when the

PAGE - 5     New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [struck through and bracketed] is intended to be omitted.

Exhibit A
Page 5 of 12

department will provide the requested information.

(c) **The dealer may not transfer the firearm unless the dealer receives a unique approval number from the department and, within 48 hours of completing the transfer, the dealer shall notify the state that the transfer to the permit holder was completed**. [~~If the department fails to provide a unique approval number to a gun dealer or to notify the gun dealer that the purchaser is disqualified under paragraph (a) of this subsection before the close of the gun dealer's next business day following the request by the gun dealer for a criminal history record check, the gun dealer may deliver the firearm to the purchaser.~~]

(4)(a) Identification required of the purchaser under subsection (2) of this section shall include one piece of current identification bearing a photograph and the date of birth of the purchaser that:

(A) Is issued under the authority of the United States Government, a state, a political subdivision of a state, a foreign government, a political subdivision of a foreign government, an international governmental organization or an international quasi-governmental organization; and

(B) Is intended to be used for identification of an individual or is commonly accepted for the purpose of identification of an individual.

(b) If the identification presented by the purchaser under paragraph (a) of this subsection does not include the current address of the purchaser, the purchaser shall present a second piece of current identification that contains the current address of the purchaser. The Superintendent of

State Police may specify by rule the type of identification that may be presented under this paragraph.

(c) The department may require that the gun dealer verify the identification of the purchaser if that identity is in question by sending the thumbprints of the purchaser to the department.

(5) The department shall establish a telephone number that shall be operational seven days a week between the hours of 8 a.m. and 10 p.m. for the purpose of responding to inquiries from gun dealers for a criminal history record check under this section.

(6) No public employee, official or agency shall be held criminally or civilly liable for performing the investigations required by this section provided the employee, official or agency acts in good faith and without malice.

(7)(a) The department may retain a record of the information obtained during a request for a criminal history record check for no more than five years**, except for the information provided to the dealer under subsection (2)(d) of this section, sufficient to reflect each firearm purchased by a permit holder, which must be attached to the electronic record of the permit stored by the department.  The department may develop a system for removal of the information in subsection (2)(d)(E) of this section, upon proof of sale or transfer of the firearm to another permit holder and for recording of the information to reflect the transfer of ownership to the permit of the new owner**.

(b) The record of the information obtained during a request for a criminal history record check by a gun dealer is exempt from disclosure under public records law.

(c) If the department determines that a purchaser is prohibited from possessing a firearm under ORS 166.250 (1)(c), the department shall report the attempted transfer, the purchaser's name and any other personally identifiable information to all federal, state and local law enforcement agencies and district attorneys that have jurisdiction over the location or locations where the attempted transfer was made and where the purchaser resides.

(d) If the department determines that, based on the judgment of conviction, the purchaser is prohibited from possessing a firearm as a condition of probation or that the purchaser is currently on post-prison supervision or parole, the department shall report the attempted transfer to the purchaser's supervising officer and the district attorney of the county in which the conviction occurred.

(e) If the department determines that the purchaser is prohibited from possessing a firearm due to a court order described in ORS 166.255 (1)(a), the department shall report the attempted transfer to the court that issued the order.

(f) If the department determines that the purchaser is under the jurisdiction of the Psychiatric Security Review Board, the department shall report the attempted transfer to the board.

(g) Reports required by paragraphs (c) to (f) of this subsection shall be made within 24 hours after the determination is made, unless a report would compromise an ongoing investigation, in which case the report may be delayed as long as necessary to avoid compromising the investigation.

(h) On or before January 31 of each year, a law enforcement agency or a prosecuting attorney's office that received a report pursuant to paragraph (c) of this subsection during the previous calendar year shall inform the department of any action that was taken concerning the report and the outcome of the action.

PAGE - 6     New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [~~struck through~~ and bracketed] is intended to be omitted.

Exhibit A
Page 6 of 12

(i) The department shall annually publish a written report, based on any information received under paragraph (h) of this subsection, detailing the following information for the previous year:

(A) The number of purchasers whom the department determined were prohibited from possessing a firearm under ORS 166.250 (1)(c), arranged by category of prohibition;

(B) The number of reports made pursuant to paragraph (c) of this subsection;

(C) The number of investigations arising from the reports made pursuant to paragraph (c) of this subsection, the number of investigations concluded and the number of investigations referred for prosecution, all arranged by category of prohibition; and

(D) The number of criminal charges arising from the reports made pursuant to paragraph (c) of this subsection and the disposition of the charges, both arranged by category of prohibition.

(8) A law enforcement agency may inspect the records of a gun dealer relating to transfers of firearms with the consent of a gun dealer in the course of a reasonable inquiry during a criminal investigation or under the authority of a properly authorized subpoena or search warrant.

(9) When a firearm is delivered, it shall be unloaded.

(10) In accordance with applicable provisions of ORS chapter 183, the Superintendent of State Police may adopt rules necessary for:

(a) The design of the firearms transaction thumbprint form;

(b) The maintenance of a procedure to correct errors in the criminal records of the department;

(c) The provision of a security system to identify gun dealers that request a criminal history record check under subsection (2) of this section; and

(d) The creation and maintenance of a database of the business hours of gun dealers.

(11) The department shall publish the firearms transaction thumbprint form and shall furnish the form to gun dealers on application at cost.

(12) This section does not apply to transactions between persons licensed as dealers under 18 U.S.C 923.

(13)(a) If requested by a transferor who is not a gun dealer, a gun dealer may request a criminal background check pursuant to ORS 166.435 or 166.438 and may charge a reasonable fee for providing the service.

(b) A gun dealer that requests a criminal background check under this subsection is immune from civil liability for any use of the firearm by the recipient or transferee, provided that the gun dealer requests the criminal background check as described in this section **and also provided that the dealer verifies that the recipient has a valid permit-to-purchase the firearm and the dealer has received a unique approval number from the department indicating successful completion of the background check.**

**(14) Knowingly selling or delivering a firearm to a purchaser or transferee who does not have a valid permit-to-purchase a firearm in violation of subsection 2(d) of this section, or prior to receiving a unique approval number from the department based on the criminal background check in violation of subsection 3(c) of this section, is a Class A misdemeanor.**

## REQUIRES PERMITS FOR PRIVATE TRANSFERS

**SECTION 7.** ORS 166.435 is amended to read:

(1) As used in this section:

(a) "Transfer" means the delivery of a firearm from a transferor to a transferee, including, but not limited to, the sale, gift, loan or lease of the firearm. "Transfer" does not include the temporary provision of a firearm to a transferee if the transferor has no reason to believe the transferee is

prohibited from possessing a firearm or intends to use the firearm in the commission of a crime, and the provision occurs:

(A) At a shooting range, shooting gallery or other area designed for the purpose of target shooting, for use during target practice, a firearms safety or training course or class or a similar lawful activity;

(B) For the purpose of hunting, trapping or target shooting, during the time in which the transferee is engaged in activities related to hunting, trapping or target shooting;

(C) Under circumstances in which the transferee and the firearm are in the presence of the transferor;

(D) To a transferee who is in the business of repairing firearms, for the time during which the firearm is being repaired;

PAGE - 7     New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [struck through and bracketed] is intended to be omitted.

Exhibit A
Page 7 of 12

(E) To a transferee who is in the business of making or repairing custom accessories for firearms, for the time during which the accessories are being made or repaired; or

(F) For the purpose of preventing imminent death or serious physical injury, and the provision lasts only as long as is necessary to prevent the death or serious physical injury.

(b) "Transferee" means a person who is not a gun dealer or licensed as a manufacturer or importer under 18 U.S.C. 923 and who intends to receive a firearm from a transferor.

(c) "Transferor" means a person who is not a gun dealer or licensed as a manufacturer or importer under 18 U.S.C. 923 and who intends to deliver a firearm to a transferee.

(2) Except as provided in ORS 166.436 and 166.438 and subsection (4) of this section, a transferor may not transfer a firearm to a transferee unless the transfer is completed through a gun dealer as described in subsection (3) of this section.

(3)(a) A transferor may transfer a firearm to a transferee only as provided in this section. Except as provided in paragraph (b) of this subsection, prior to the transfer both the transferor and the transferee must appear in person before a gun dealer, with the firearm **and a valid permit-to-purchase issued to the transferee under section 4 of this 2022 Act**, and request that the gun dealer perform a criminal background check on the transferee.

(b) If the transferor and the transferee reside over 40 miles from each other, the transferor may ship or deliver the firearm to a gun dealer located near the transferee or a gun dealer designated by the transferee, and the transferor need not appear before the gun dealer in person.

(c) A gun dealer who agrees to complete a transfer of a firearm under this section shall request a criminal history record check on the transferee as described in ORS 166.412 and shall comply with all requirements of federal law.

(d) If, upon completion of a criminal background check, the gun dealer:

(A) Receives a unique approval number from the Department of State Police indicating that the transferee is qualified to complete the transfer, the gun dealer shall notify the transferor, enter the firearm into the gun dealer's inventory and transfer the firearm to the transferee.

(B) Receives notification that the transferee is prohibited by state or federal law from possessing or receiving the firearm **or that the department is unable to determine if the transferee is qualified or disqualified from completing the transfer**, the gun dealer shall notify the transferor and neither the transferor nor the gun dealer shall transfer the firearm to the transferee. If the transferor shipped or delivered the firearm to the gun dealer pursuant to paragraph (b) of this subsection, the gun dealer shall comply with federal law when returning the firearm to the transferor.

(e) A gun dealer may charge a reasonable fee for facilitating a firearm transfer pursuant to this section.

(4) The requirements of subsections (2) and (3) of this section do not apply to:

(a) The transfer of a firearm by or to a law enforcement agency, or by or to a law enforcement officer, private security professional or member of the Armed Forces of the United States, while that person is acting within the scope of official duties.

(b) The transfer of a firearm as part of a firearm turn-in or buyback event, in which a law enforcement agency receives or purchases firearms from members of the public.

(c) The transfer of a firearm to:

(A) A transferor's spouse or domestic partner;

(B) A transferor's parent or stepparent;

(C) A transferor's child or stepchild;

(D) A transferor's sibling;

(E) A transferor's grandparent;

(F) A transferor's grandchild;

(G) A transferor's aunt or uncle;

(H) A transferor's first cousin;

(I) A transferor's niece or nephew; or

(J) The spouse or domestic partner of a person specified in subparagraphs (B) to (I) of this paragraph.

(d) The transfer of a firearm that occurs because of the death of the firearm owner, provided that:

(A) The transfer is conducted or facilitated by a personal representative, as defined in ORS 111.005, or a trustee of a trust created in a will; and

PAGE - 8     New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [struck through and bracketed] is intended to be omitted.

Exhibit A
Page 8 of 12

(B) The transferee is related to the deceased firearm owner in a manner specified in paragraph (c) of this subsection.

(5)(a) A transferor who fails to comply with the requirements of this section commits a Class A misdemeanor.

(b) Notwithstanding paragraph (a) of this subsection, a transferor who fails to comply with the requirements of this section commits a Class B felony if the transferor has a previous conviction under this section at the time of the offense.

## REQUIRES PERMITS FOR ALL TRANSFERS AT GUN SHOWS

**SECTION 8.** ORS 166.436 is amended to read:

(1) The Department of State Police shall make the telephone number established under ORS 166.412 (5) available for requests for criminal background checks under this section from persons who are not gun dealers and who are transferring firearms at gun shows.

(2) Prior to transferring a firearm at a gun show, a transferor who is not a gun dealer [may request] **shall** by telephone **verify that the transferee has a valid permit-to-purchase a firearm under section 4 of this 2022 Act and request** that the department conduct a criminal background check on the recipient upon providing the following information to the department:

(a) The name , address and telephone number of the transferor;

(b) The make , model, caliber and manufacturer's number of the firearm being transferred;

(c) The name, date of birth , race, sex and address of the recipient ;

(d) The Social Security number of the recipient if the recipient voluntarily provides that number ;

(e) The address of the place where the transfer is occurring; and

(f) The type, issuer and identification number of a current piece of

identification bearing a recent photograph of the recipient presented by the recipient. The identification presented by the recipient must meet the requirements of ORS 166.412 (4)( a).

(3)(a) Upon receipt of a request for a criminal background check under this section, the department shall immediately, during the telephone call or by return call:

(A) Determine from criminal records and other information available to it whether the recipient is disqualified under ORS 166.470 from completing the transfer or is otherwise prohibited by state or federal law from possessing a firearm; and

(B) Notify the transferor when a recipient is disqualified from completing the transfer or provide the transferor with a unique approval number indicating that the recipient is qualified to complete the transfer. The unique approval number is a permit valid for 24 hours for the requested transfer. If the firearm is not transferred from the transferor to the recipient within 24 hours after receipt of the unique approval number, a new request must be made by the transferor.

(b) If the department is unable to determine whether the recipient is qualified for or disqualified from completing the transfer within 30 minutes of receiving the request , the department shall notify the transferor and provide the transferor with an estimate of the time when the department will provide the requested information.

**(c) The transferor may not transfer the firearm unless the transferor receives a unique approval number from the department and, within 48 hours of the completed transfer, the transferor shall notify the state that the transfer to the permit holder was completed.**

(4) A public employee or public agency incurs no criminal or civil liability for performing the criminal background checks required by this section, provided the employee or agency acts in good faith and without malice.

(5)(a) The department may retain a record of the information obtained during a request for a criminal background check under this section for the period of time provided in ORS 166.412 (7), **as amended by this 2022 Act**.

(b) The record of the information obtained during a request for a criminal background check under this section is exempt from disclosure under public records law.

(c) If the department determines that a recipient is prohibited from possessing a firearm under ORS 166.250 (l)(c), the department shall report the attempted transfer, the recipient's name and any other personally identifiable information to all federal, state and local law enforcement agencies and district attorneys that have jurisdiction over the location or locations where the attempted transfer was made and where the recipient resides.

PAGE - 9    New sections are in **boldfaced** type. Matter in amended sections in **boldfaced** type is new; matter [struck through and bracketed] is intended to be omitted.

Exhibit A
Page 9 of 12

(d) If the department determines that, based on the judgment of conviction, the recipient is prohibited from possessing a firearm as a condition of probation or that the recipient is currently on post-prison supervision or parole, the department shall report the attempted transfer to the recipient's supervising officer and the district attorney of the county in which the conviction occurred.

(e) If the department determines that the recipient is prohibited from possessing a firearm due to a court order described in ORS 166.255 (1)(a), the department shall report the attempted transfer to the court that issued the order.

(f) If the department determines that the recipient is under the jurisdiction of the Psychiatric Security Review Board, the department shall report the attempted transfer to the board.

(g) Reports required by paragraphs (c) to (f) of this subsection shall be made within 24 hours after the determination is made, unless a report would compromise an ongoing investigation, in which case the report may be delayed as long as necessary to avoid compromising the investigation.

(h) On or before January 31 of each year, a law enforcement agency or a prosecuting attorney's office that received a report pursuant to paragraph (c) of this subsection during the previous calendar year shall inform the department of any action that was taken concerning the report and the outcome of the action.

(i) The department shall annually publish a written report, based on any information received under paragraph (h) of this subsection, detailing the following information for the previous year:

(A) The number of recipients whom the department determined were prohibited from possessing a firearm under ORS 166.250 (1)(c), arranged by category of prohibition;

(B) The number of reports made pursuant to paragraph (c) of this subsection;

(C) The number of investigations arising from the reports made pursuant to paragraph (c) of this subsection, the number of investigations concluded and the number of investigations referred for prosecution, all arranged by category of prohibition; and

(D) The number of criminal charges arising from the reports made pursuant to paragraph (c) of this subsection and the disposition of the charges, both arranged by category of prohibition.

(6) The recipient of the firearm must be present when the transferor requests a criminal back-ground check under this section.

(7)(a) Except as otherwise provided in paragraph (b) of this subsection, a transferor who receives notification under this section that the recipient is qualified to complete the transfer of a firearm, has the recipient fill out the form required by ORS 166.438 (1)(a) and retains the form as required by ORS 166.438 (2) is immune from civil liability for any use of the firearm from the time of the transfer unless the transferor knows, or reasonably should know, that the recipient is likely to commit an unlawful act involving the firearm.

(b) The immunity provided by paragraph (a) of this subsection does not apply:

(A) If the transferor knows, or reasonably should know, that the recipient of the firearm intends to deliver the firearm to a third person who the transferor knows, or reasonably should know, may not lawfully possess the firearm; or

(B) In any product liability civil action under ORS 30.900 to 30.920.


## REQUIRES PERMITS FOR ALL TRANSFERS AT GUN SHOWS (2015 Amendment)


**SECTION 9.** ORS 166.438 is amended to read:

(1) A transferor who is not a gun dealer may not transfer a firearm at a gun show unless the transferor:

 (a)**(A) Verifies with the department that the recipient has a valid permit-to-purchase  issued under section 4 of this 2022 Act;**

([A]**B**) Requests a criminal background check under ORS 166.436 prior to completing the transfer;

([B]**C**) Receives a unique approval number from the department indicating that the recipient is qualified to complete the transfer; and

([C]**D**) Has the recipient complete the form described in ORS 166.441; or

(b) Completes the transfer through a gun dealer.

(2) The transferor shall retain the completed form referred to in subsection (1) of this section for at least five years and shall make the completed form available to law enforcement agencies for the purpose of criminal investigations.

(3) A person who organizes a gun show shall post in a prominent place at the gun show a notice explaining the requirements of subsections (1) and (2) of this section. The person shall provide the form required by subsection (1) of this section to any person transferring a firearm at the gun show.

PAGE - 10    New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [struck through and bracketed] is intended to be omitted.

Exhibit A
Page 10 of 12

(4) Subsection (1) of this section does not apply if the transferee is licensed as a dealer under 18 U.S.C. 923.

(5)(a) Failure to comply with the requirements of subsection (1), (2) or (3) of this section is a Class A misdemeanor.

(b) Notwithstanding paragraph (a) of this subsection, failure to comply with the requirements of subsection (1), (2) or (3) of this section is a Class C felony if the person has two or more previous convictions under this section **at the time of the offense.**

(6) It is an affirmative defense to a charge of violating subsection (1) or (3) of this section that the person did not know, or reasonably could not know, that more than 25 firearms were at the site and available for transfer.

**SECTION 10.** **The amendments to ORS 166.412, 166.435, 166.436 and 166.438 by sections 3 to 9 of this 2022 Act apply to firearm transfers conducted on or after the effective date of this 2022 Act.**

## PROHIBITIONS/EXCEPTIONS TO LARGE-CAPACITY MAGAZINES

**SECTION 11.** **(1) As used in this section:**

**(a) "Armed Forces of the United States" has the meaning given that term in ORS 348.282.**

**(b) "Detachable magazine" means an ammunition feeding device that can be loaded or unloaded while detached from a firearm and readily inserted in a firearm;**

**(c) "Fixed magazine" means an ammunition feeding device contained in or permanently attached to a firearm in such a manner that the device cannot be removed without disassembly of the firearm action;**

**(d) "Large-capacity magazine" means a fixed or detachable magazine, belt, drum, feed strip, helical feeding device, or similar device, including any such device joined or coupled with another in any manner, or a kit with such parts, that has an overall capacity of, or that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition and allows a shooter to keep firing without having to pause to reload, but does not include any of the following:**

**(A) An ammunition feeding device that has been permanently altered so that it is not capable, now or in the future, of accepting more than 10 rounds of ammunition;**

**(B) An attached tubular device designed to accept, and capable of operating only with 0.22 caliber rimfire ammunition; or**

**(C) A tubular ammunition feeding device that is contained in a lever-action firearm.**

**(e) "Loaded" has the meaning given that term in ORS 166.360;**

**(f) "Person" means any natural person, corporation, partnership, fire or association.**

**(2) Notwithstanding ORS 166.250 to 166.470, and except as expressly provided in subsections (3) to (5) of this section, a person commits the crime of unlawful manufacture, importation, possession, use, purchase, sale or otherwise transferring of large-capacity magazines if the person manufactures, imports, possesses, uses, purchases, sells or otherwise transfers any large-capacity magazine in Oregon on or after the effective date of this 2022 Act.**

**(3) Subsection (2) of the section does not apply during the first 180 days following the effective date of this 2022 Act, with respect to:**

**(a) A licensed gun dealer that within 180 days of the effective date of this 2022 Act:**

**(A) Transfers or sells the large-capacity magazines in the gun dealer's inventory to a non-resident gun dealer or other transferee outside of this state;**

**(B) Purchases or acquires temporary custody from an owner of any large-capacity magazine for permanent removal from this state within the 180 days of the effective date of this 2022 Act;**

**(C) Permanently alters any large-capacity magazine in the gun dealer's inventory or custody so that it is not capable, upon alteration or in the future, of accepting more than 10 rounds of ammunition or permanently alter the magazine so it is no longer a; or**

**(D) Permanently disposes of the large-capacity magazines in the gun dealer's custody or inventory.**

**(b) A firearms manufacturer, properly licensed under federal, state and local law, that is a party to a contract, in existence and binding on the effective date of this 2022 Act, with an entity outside of this state, for the manufacture of large-capacity magazines, provided that:**

**(A) All manufacturing is completed no later than 180 days after the effective date of this 2022 Act; and**

**(B) The entity outside of Oregon receiving the large-capacity magazines is made aware in writing on or before the delivery of the ammunition devices of the restrictions pertaining to large-capacity magazines in this state as set forth in this 2022 Act.**

**(4) Subsection (2) of the section does not apply at any time to:**

PAGE - 11     New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [~~struck through~~ and bracketed] is intended to be omitted.

Exhibit A
Page 11 of 12

(a) A firearms manufacturer properly licensed under federal, state and local law that manufactures large-capacity magazines, provided:

(A) The manufacturing is for exclusive sale or transfer to the Armed Forces of the United States or a law enforcement agency and solely for authorized use by that entity related to the official duties of the entity; and

(B) Any large-capacity magazine, permitted to be manufactured under paragraph (a)(A) of this subsection after the effective date of this 2022 Act, shall include a permanent stamp or marking indicating that the large-capacity magazine was manufactured or assembled after the effective date of this 2022 Act. The stamp or marking must be legibly and conspicuously engraved or cast upon the outer surface of the large-capacity magazine. The department may promulgate such rules as may be necessary for the implementation of this section, including but not limited to rules requiring such large-capacity magazine be stamped with  information indicating the limitation for use only by military and law enforcement or such other identification to distinguish clearly large-capacity magazines manufactured after the effective date of this 2022 Act.  Except as provided in paragraph (3)(b) of this section, no large-capacity magazines without such stamp may be manufactured in this state after the effective date of this Act.

(b) A licensed gun dealer that sells or otherwise transfers large-capacity magazines to the Armed Forces of the United States or a law enforcement agency solely for authorized use by that entity, provided the large-capacity magazines have been engraved as provided in paragraph (a)(B) of this subsection.

(c) Any government officer, agent or employee, member of the Armed Forces of the United States or peace officer, as that term is defined in ORS 133.005, that is authorized to acquire, possess or use a large-capacity magazine provided that any acquisition, possession or use is related directly to activities within the scope of that person's official duties.

(5) As of the effective date of this 2022 Act, it shall be an affirmative defense, as provided in ORS 166.055, to the unlawful possession, use and transfer of a large-capacity magazine in this state by any person, provided that:

(a) The large-capacity magazine was owned by the person before the effective date of this 2022 Act and maintained in the person's control or possession; or

(b) The possession of a large-capacity magazine was obtained by a person who, on or after the effective date of this section, acquired possession of the large-capacity magazine by operation of law upon the death of a former owner who was in legal possession of the large-capacity magazine; and

(c) In addition to either (a) or (b) of this subsection the owner has not maintained the large-capacity magazine in a manner other than:

(A) On property owned or immediately controlled by the registered owner;

(B) On the premises of a gun dealer or gunsmith licensed under 18 U.S.C. 923 for the purpose of lawful service or repair;

(C) While engaging in the legal use of the large-capacity magazine, at a public or private shooting range or shooting gallery or for recreational activities such as hunting, to the extent permitted under state law; or

(D) While participating in firearms competition or exhibition, display or educational project about firearms sponsored, conducted by, approved or under the auspices of a law enforcement agency or a national or state-recognized entity that fosters proficiency in firearms use or promotes firearms education; and

(E) While transporting any large-capacity magazines in a vehicle to one of the locations authorized in paragraphs (c)(A) to (D) of this subsection, the large-capacity magazine is not inserted into the firearm and is locked in a separate container.

(d) The person has permanently and voluntarily relinquished the large-capacity magazine to law enforcement or to a buyback or turn-in program approved by law enforcement, prior to commencement of prosecution by arrest, citation or a formal charge.

(6) Unlawful manufacture, importation, possession, use, purchase, sale or otherwise transferring of a large-capacity magazine is a class A misdemeanor.

**SECTION 12.** If any provision of this 2022 Act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable. The people hereby declare that they would have adopted this Chapter, notwithstanding the unconstitutionality, invalidity and ineffectiveness of any one of its articles, sections, subsections, sentences or clauses.

**SECTION 13.**  The provisions of this 2022 Act apply to all actions taken on or after the effective date of this 2022 Act, unless expressly stated otherwise herein. This 2022 Act may be known and cited as the Reduction of Gun Violence Act.

RECEIVED
MAY 4, 2021 9:20am
Elections Division
Exhibit A
Page 12 of 12

**PISTOLS:**

**Berretta:**
APX; 92; 96A1; 92A1; Px4 Storm; 92X; 92A3; M9; M9A1; M9A3; M9A4

**Bersa:**
Thunder; TPRC; TPR; TPR380;

**Cannik:**
TP9; TP9SF; TP9SFX; METE; SFX Rival

**CZ:**
Accushadow; P10C; P10F; SP-01; P-01; CZ-75; CZ-75B; 75 Omega; P-07; P-09; Shadow

**FMK:**
9C1G2; Elite

**FN:**
509; FNX-9; FNX-45; High Power; Five-Seven; 502

**Glock:**
17; 19; 20; 21; 22; 23; 19x; 31; 32; 34; 35; 45; 41;

**Heckler & Koch (HK):**
P2000; MK-23; USP-9; USP-40; USP-45; P7; VP9; P30; VP40; P30SK; VP9SK

**IWI/Desert Eagle:**
Masada; Jericho 941; Baby Eagle

**Kel-Tec:**
P15; P17

**Ruger:**
P345; Max-9; Security-9; American; Ruger-5.7; LC9; P85; P90; P95

**Shadow Systems:**
CR920; MR920; XR920; DR920

**Sig Sauer:**
P226; P228; P229; P250; SP2022; P320; M17; M18; P365X; P365XL; P365 Macro; M11; M11A1; P320AXG;

**Smith & Wesson:**
5903; 5904; 5905; 5906; SW9VE; SW40VE; SD9VE; SD40VE; M&P-9C; M&P-9; M&P-40; M&P-45; M&P 2.0; CSX; Shield Plus; Equalizer;
**Springfield Armory:**
XD-9; XD-40; XD-45; XDm 9; XDm 40; Xdm 45; Hellcat, Prodigy, SA-35

**Staccato:**
CS; C2; P; XC; XL

**Taurus:**
Millennium; Millennium Pro; 24/7; GX4; G3C; G2; G2C; G3

**Walther:**
PPQ; Q4 SF; P99; PDP; Q5; WMP

**Wilson Combat:**
EDCX9; SFX9; Experior

**VERIFICATION**

I, John Kaempf, declare that I have personal knowledge of the factual matters set out in this Complaint and declare under penalty of perjury that the foregoing is true and correct.

DATED: November 28, 2022.

KAEMPF LAW FIRM PC

/s John Kaempf
John Kaempf, OSB #925391
john@kaempflawfirm.com

Attorney for Plaintiffs

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

**CERTIFICATE OF SERVICE**

I hereby certify that on November 28, 2022, I caused to be electronically filed the

foregoing paper with the Clerk of the Court by using the CM/ECF system.  The following

participant in the case who is a registered CM/ECF user will be served by the CM/ECF

system.


Brian Marshall
brian.s.marshall@doj.state.or.us

OREGON DEPARTMENT OF JUSTICE
Attorney for Defendants



KAEMPF LAW FIRM PC

/s John Kaempf
John Kaempf, OSB #925391
john@kaempflawfirm.com

Attorney for Plaintiffs

**KAEMPF LAW FIRM PC**
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006