ELLEN F. ROSENBLUM
Attorney General
BRIAN SIMMONDS MARSHALL  #196129
Senior Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Brian.S.Marshall@doj.state.or.us

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC. an Oregon public benefit corporation; BRAD LOHREY, SHERMAN COUNTY SHERIFF; and ADAM JOHNSON, an individual,<br><br>       Plaintiffs,<br><br>   v.<br><br>KATE BROWN, GOVERNOR OF THE STATE OF OREGON, in her official capacity; and ELLEN ROSENBLUM, ATTORNEY GENERAL OF THE STATE OF OREGON, in her official capacity,<br><br>       Defendants. | Case No.  2:22-cv-01815-IM<br><br>DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION |

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... IV

I.   INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................... 2

     A.   Measure 114 ............................................................................................. 2

          1.   Large-Capacity Magazines ............................................................. 2

          2.   Permit-to-Purchase .......................................................................... 3

     B.   This Case ................................................................................................... 7

III. LEGAL STANDARDS ......................................................................................... 8

IV.  ARGUMENT ....................................................................................................... 10

     A.   Plaintiffs Are Unlikely to Succeed on the Merits of their Claims ........ 10

          1.   Measure 114's restrictions on large-capacity magazines are
               constitutional ................................................................................... 10

               a.   Restrictions on large-capacity magazine do not violate the
                    Second Amendment. .............................................................. 10

                    i.    Large-capacity magazines are not "arms" under the
                          Second Amendment, because they are neither
                          necessary to use covered weapons nor suited for
                          self-defense rather than military applications. .............. 11

                    ii.   Restricting large-capacity magazines is consistent
                          with the nation's historical tradition of banning
                          unusually dangerous weapons. ....................................... 14

               b.   Large-capacity magazine restrictions do not violate the
                    Takings Clause. ....................................................................... 19

Page ii -  DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
           PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

c.    Large-capacity magazine restrictions do not violate the Due

Process Clause. .................................................................................. 23

2.    Measure 114's permit-to-purchase requirement complies with the

Second Amendment. ........................................ …………………………24

B.    The Balance of the Equities Disfavors a Preliminary Injunction ........................ 28

1.    Plaintiffs have not shown irreparable harm. ............................................. 28

2.    The public interest disfavors an injunction. ............................................. 30

V.    CONCLUSION ............................................................................................................. 34

Page iii -  DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
          PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ........................................ 9, 10

*Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ......................................... 10

*Ass'n of N.J. Rifle & Pistol Clubs v. Attorney Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018) .............. 12

*Associated Gen. Contractors of Cal., Inc. v. Coal. For Econ. Equity*, 950 F.2d 1401 (9th Cir. 1991) .................................................................................................................................................. 32

*Boise Cascade Corp. v. State ex rel. Oregon State Bd. of Forestry*, 164 Or. App. 114 (1999) .................................................................................................................................................... 26

*Burke v. State ex rel. Dep't of Land Conservation & Dev.*, 352 Or. 428 (2012) .......................... 23

*Cantwell v. Connecticut*, 310 U. S. 296 (1940) ............................................................................... 28

*Cf. Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014) ....................................... 37

*Chalk v. United States Dist. Court for the Cent. Dist. of Cal.*, 840 F.2d 701 (9th Cir. 1988) ...................................................................................................................................................... 36

*Coal. for Econ. Equity v. Wilson,* 122 F.3d 718 (9th Cir. 1997) .................................................... 35

*Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399 (9th Cir. 1993) ............................................................ 35

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................. 1, 11, 12, 15, 20, 28, 34

*Drake v. Filko*, 724 F.3d 426 (3rd Cir. 2013) ................................................................................. 28

*Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019) .......................................................... 38

*Duncan v. Becerra*, No. 17-CV-1017-BEN-JLB, 2019 WL 1510340, at *3 (S.D. Cal. Apr. 4, 2019) ........................................................................................................................................ 38

*Duncan v. Bonta*, 142 S. Ct. 2895 (June 30, 2022) ......................................................................... 25

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) ..................... 1, 12, 13, 14, 15, 16, 19, 20, 25, 33

*E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832 (9th Cir. 2020) ............................................... 10

*Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015) ..................... 12, 16, 17

*Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ............................................................. 14

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ........................................................................ 37

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) .................................................................... 10

Page iv -  DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
            PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Hale v. State of Ariz.*, 967 F.2d 1356 (9th Cir. 1992), *on reh'g*, 993 F.2d 1387 (9th Cir. 1993) ............................................................................................................................ 8

*Heller v. District of Columbia (Heller II)*, 670 F.3d 1244 (D.C. Cir. 2011) ................................ 12

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013) ................... 9

*Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014) .............................. 13, 33

*Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019) ............................................. 26

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ..................................................................... 12, 14

*Landgraf v. USI Film Prod.*, 511 U.S. 244 (1994) ...................................................................... 27

*Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) .......................................................................... 9

*Maryland v. King*, 567 U.S. 1301 (2012) ..................................................................................... 35

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ..................................................................... 32

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ..................................... 12

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) ....... 1, 2, 11, 12, 13, 14, 15, 17, 19, 21, 25, 29, 30, 31, 34

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................................... 9, 32

*Oregon Rest. & Lodging Ass'n v. Brown*, No. 3:20-CV-02017-YY, 2020 WL 6905319, at *6 (D. Or. Nov. 24, 2020) .................................................................................................. 26

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ................................................ 8

*Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) .................................................... 20

*Presser v. Illinois*, 116 U.S. 252 (1886) ..................................................................................... 21

*Rocky Mountain Gun Owners v. Bd. of Cnty. Commissioners of Boulder Cnty.*, No. 1:22-CV-02113-CNS-MEH, 2022 WL 4098998, at *1 (D. Colo. Aug. 30, 2022) ................. 15

*Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004) ............................................................................ 10

*San Francisco Veteran Police Officers Ass'n v. City & Cnty. of San Francisco*, 18 F. Supp. 3d 997 (N.D. Cal. 2014) ................................................................................... 10, 33, 34

*Seymour v. Dep't of Rev.*, 311 Or. 254 (1991) ............................................................................ 24

*Short v. Brown*, 893 F.3d 671 (9th Cir. 2018) ......................................................................... 9, 32

*Shuttlesworth v. Birmingham*, 394 U. S. 147 (1969) ................................................................... 28

*State v. Christian*, 354 Or. 22 (2013) ............................................................................................ 8

Page v -   DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
             PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*State v. Gilbreath*, 310 Or. App. 724, *rev. den.*, 368 Or. 637 (2021) ........................................... 23

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) ......................................................... 34

*Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372 (Fed. Cir. 2009) .............................. 9

*United States v. Earnest*, Case No. 3:19-cr-01850-AJB (S.D. Cal.), Tr. 9/17/2021 (ECF 125) at 14:17–20, 14:25 (Plea Hearing) ...................................................................................... 38

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976) .............................................................. 27

*Verduzco v. State*, 357 Or. 553 (2015) ........................................................................................ 24

*Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 F. App'x 89 (9th Cir. 2009) ........................................................................................................................................... 35

*Wesson v. Town of Salisbury*, 13 F. Supp. 3d 171 (D. Mass. 2014) ........................................... 32

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .............................................................. 9, 33

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) .................................................................. 12, 16

**Statutes**

Measure 11 § 11 (1)(d)(A) .......................................................................................................... 17

Measure 11(5)(c) .......................................................................................................................... 20

Measure 11(5)(c)(A) ..................................................................................................................... 20

Measure 114 ............................ 1, 2, 3, 5, 6, 7, 10, 13, 14, 17, 18, 19, 22, 23, 24, 25, 27, 28, 31, 32

Measure 114 § 11(2); *see also id.* § 11(1)(d) ................................................................................. 2

Measure 114 § 11(3) ...................................................................................................................... 3

Measure 114 § 11(3)(a)(C) ............................................................................................................ 3

Measure 114 § 11(4)(c) .................................................................................................................. 3

Measure 114 § 11(5)(a) .................................................................................................................. 2

Measure 114 § 11(5)(b) .................................................................................................................. 2

Measure 114 § 11(5)(c) .................................................................................................................. 2

Measure 114 § 11(5)(d) .................................................................................................................. 3

Measure 114 § 12 ........................................................................................................................... 9

Measure 114 § 3(5) ........................................................................................................................ 3

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Measure 114 § 4(1)(b) ................................................................................ 5

Measure 114 § 4(1)(d) and (e) .................................................................. 3

Measure 114 § 4(3)(a) ................................................................................ 4

Measure 114 § 4(3)(b) ................................................................................ 4

Measure 114 § 4(3)(c) ................................................................................ 4

Measure 114 § 4(4)(a) ................................................................................ 3

Measure 114 § 4(7) ..................................................................................... 4

Measure 114 § 4(7)(a) ................................................................................ 4

Measure 114 § 5(1) and (5) ....................................................................... 4

Measure 114 § 5(11) ................................................................................... 4

Measure 114 § 5(8) and (10) ..................................................................... 4

Measure 114 §§ 6–9 .................................................................................... 3

Measure 114 §4 (1)(e) ................................................................................ 3

Measure 114, § 4(1)(b)(C) ....................................................................... 26

Measure 114, §§ 6(3)(c), 7(3)(d)(B), and 8(3)(c) .................................. 6

Or. Rev. Stat. § 138.510(3) ..................................................................... 21

Or. Rev. Stat. § 161.035(2) ..................................................................... 22

Or. Rev. Stat. § 161.055(2) ..................................................................... 22

Or. Rev. Stat. § 166.055 .......................................................................... 21

Or. Rev. Stat. § 166.412(2)(c) ................................................................ 26

Or. Rev. Stat. § 173.160 .......................................................................... 22

Or. Rev. Stat. § 174.040 ............................................................................ 9

Or. Rev. Stat. §§ 166.412(3)(a)(A), 166.436(3)(a)(A) ........................... 6

Or. Rev. Stat. §§ 166.412, 166.435, 166.436, 166.438 ........................... 5

Or. Rev. Stat. §§ 166.525 to 166.543 ....................................................... 5

**Rules and Regulations**

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Or. Admin. Reg. 257-010-0015(6) ................................................................................ 6

Or. Admin. Reg. 257-010-0055 ............................................................................... 6, 26

**Constitutional Provisions**

Or. Const. art. I, § 27 ......................................................................................... 8

Or. Const. art. IV, § 1(4)(d) ................................................................................ 2

U.S. Const. amend. II.................................................. 1, 10, 11, 12, 13, 18, 19, 22, 24, 28, 29, 30

U.S. Const. amend. V ........................................................................................ 23

U.S. Const. amend. XI ....................................................................................... 8

**Other**

19 *Criminology & Public Policy* 171 (2020) ............................................................. 31

*American Journal of Public Health* 1546, 1549 (Oct. 2020)....................................... 32

*American Journal of Public Health* 1754, 1755 (Dec. 2019) ...................................... 32

Giffords Law Center, *Large Capacity Magazines*, *available at*
https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-
capacity-magazines/ (last visited Nov. 26, 2022) ................................................. 10

Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide
and Suicide in 4 US States, 1985–2017," 110(10) ................................................. 32

*San Diego Union-Tribune* (Sept. 19, 2019) ................................................................ 33

*San Francisco Chronicle* (Apr. 11, 2019), https://perma.cc/YWW3-EN3H............................. 33

The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–
2017, 109 ...................................................................................................... 32

*The Morality of Law* 51–62 (1964)........................................................................ 24

Voters' Pamphlet (2022), at 90, *available at* https://oregonvotes.gov/voters-
guide/pdf/book13.pdf........................................................................................ 21

Page viii -DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
       PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# I. INTRODUCTION

The people of Oregon enacted legislation to prohibit the purchase and restrict the use of large-capacity magazines and to require a permit to purchase firearms to prevent "horrific deaths and devastating injuries due to mass shootings, homicides and suicides."[1] The Oregon Firearms Federation and five individual Plaintiffs claim that the statute is unconstitutional, arguing that their Second Amendment right to keep and bear arms requires the state to allow them to purchase and use magazines with 11 or more rounds and to purchase firearms without acquiring a permit.

Plaintiffs are wrong and therefore unlikely to prevail on their Second Amendment claims. All seven courts of appeals to consider challenges to such laws have held large-capacity magazine restrictions are consistent with the Second Amendment. Although the decisions upholding these laws predate *Bruen*, that case does not undermine their conclusions. In the Ninth Circuit's decision, it explained that "large-capacity magazines provide significant benefit to soldiers and criminals who wish to kill many people rapidly" but have "little to no usefulness in self-defense." *Duncan v. Bonta*, 19 F.4th 1087, 1106, 1108 (9th Cir. 2021) (en banc), *vacated and remanded*, 142 S. Ct. 2895 (2022). Under the governing law, states may continue to prohibit weapons "most useful in military service…." *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008). Measure 114's large-capacity magazine restrictions are also "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022). Either of these reasons remains sufficient under *Bruen* to determine that states retain authority to prohibit large-capacity magazines. Plaintiffs' other constitutional challenges to Measure 114's large capacity restrictions also fail because Measure 114 neither effects a taking nor is retroactive.

And *Bruen* itself directly forecloses Plaintiffs' facial challenge to Measure 114's permit-to-purchase requirement. That decision expressly allows states to adopt "shall-issue regimes,

---

[1] Measure 114, preamble.

Page 1 -   DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
PRELIMINARY INJUNCTION

which often require applicants to undergo a background check or pass a firearms safety course…." *Bruen*, 142 S. Ct. at 2138 n.9. That is precisely the regime that Measure 114 puts in place.

Because Plaintiffs cannot show they are likely to succeed on the merits of their constitutional claims, they cannot establish an irreparable injury and the public interest disfavors an injunction. The motion for a preliminary injunction should therefore be denied.

## II. BACKGROUND

### A. Measure 114

Measure 114 generally prohibits the sale and restricts the use of large-capacity magazines. It also requires a permit-to-purchase firearms. Its provisions will take effect when the Governor proclaims the result of the election on December 8. *See* Or. Const. Art. IV, § 1(4)(d).

### 1. Large-Capacity Magazines

Measure 114 generally prohibits the manufacture, importation, possession, use, purchase, sale, or transfer of magazines that hold more than 10 rounds of ammunition ("large-capacity magazines").[2] Measure 114 allows existing owners of large-capacity magazines to keep them. Owning the large-capacity magazine when Measure 114 went into effect and maintaining it lawfully is an affirmative defense to a charge of its unlawful possession, use, or transfer.[3] This affirmative defense allows a large-capacity magazine to be kept on one's own property; used at a shooting range, for hunting or sport shooting, and in defined educational programs; repaired or serviced at a registered gun dealer or gunsmith; and transported for a permissible use in a locked container.[4]

---

[2] Measure 114 § 11(2); *see also id.* § 11(1)(d) (defining large-capacity magazine).

[3] *Id.* § 11(5)(a). A similar provision allows magazines to be inherited. *Id.* § 11(5)(b).

[4] *Id.* § 11(5)(c).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

A large-capacity magazine may be modified or altered to comply with the law.[5] It is also permissible, but not required, to voluntarily surrender a large-capacity magazine to law enforcement.[6]

The large-capacity magazine restrictions do not apply to law enforcement officers and other government agents acting within the scope of their official duties.[7] Measure 114 also provides a 180-day transition period for licensed gun dealers to transfer unsold large-capacity magazines out of state.[8]

## 2. Permit-to-Purchase

Under Measure 114, most firearm transfers require the recipient to have a permit-to-purchase.[9] A permit-to-purchase is issued to an applicant by a municipal police agency or a county sheriff, called permit agents.[10] Under the measure, the Oregon State Police (OSP) must develop the application form for permits-to-purchase.[11] A permit agent receiving an application must (1) verify the applicant's identity; (2) fingerprint and photograph the applicant, and (3) "conduct any investigation necessary" to determine whether the applicant is qualified to receive a permit.[12]

Permit agents must also ask OSP to conduct "a criminal background check, including but not limited to a fingerprint identification, through the Federal Bureau of Investigation [(FBI)]."[13]

---

[5] *Id.* § 11(3)(a)(C); Busse Decl. ¶¶ 7, 14.

[6] *Id.* § 11(5)(d).

[7] *Id.* § 11(4)(c).

[8] *Id.* § 11(3).

[9] *Id.* §§ 6–9.

[10] *Id.* § 3(5).

[11] *Id.* § 4(4)(a).

[12] *Id.* § 4(1)(d) and (e).

[13] *Id.* §4 (1)(e).

Page 3 -   DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
          PRELIMINARY INJUNCTION

After OSP has completed the background check and determined "whether the permit applicant is qualified or disqualified from purchasing or otherwise acquiring a firearm the department shall report the results, including the outcome of the fingerprint-based criminal background check, to the permit agent."[14]

Permit agents "shall issue" the requested permit within 30 days of the application if the permit agent has verified the applicant's identity and determined that the applicant is qualified to receive a permit under the measure.[15] That permit remains valid for five years.[16] The permit agent "may charge a reasonable fee reflecting the actual cost of the process," capped at $65.[17] A permit-to-purchase is valid for five years and may be renewed under a streamlined process.[18] Permit holders must present a copy to a transferer when required.[19]

If a permit application is denied, or if no written response has been received within 30 days of the application, the applicant may file an action in state circuit court to compel the issuance of the permit.[20] The court reviews the issue de novo and must issue a decision on the matter "within 15 judicial days of filing or as soon as practicable thereafter."[21] That decision is appealable as a matter of right to the Oregon Court of Appeals, like any other civil matter.[22]

---

[14] *Id.*

[15] *Id.* § 4(3)(a).

[16] *Id.* § 4(7)(a).

[17] *Id.* § 4(3)(b).

[18] *Id.* § 4(7).

[19] *Id.* § 4(3)(c).

[20] *Id.* § 5(1) and (5).

[21] *Id.* § 5(8) and (10).

[22] *Id.* § 5(11).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Under Measure 114:

> A person is qualified to be issued a permit-to-purchase under this section if the person:
>> (A) Is not prohibited from purchasing or acquiring a firearm under state or federal law, including but not limited to successfully completing a criminal background check as described under paragraph (e) of this subsection;
>> (B) Is not the subject of an order described in ORS 166.525 to 166.543;
>> (C) Does not present reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence;
>> (D) Provides proof of completion of a firearm safety course as defined in subsection (8) of this section; and
>> (E) Pays the fee described in paragraph (b) of subsection (3) of this section.[23]

The first two requirements for obtaining a gun are not newly established by the permit-to-purchase system. The provisions of Or. Rev. Stat. §§ 166.525 to 166.543, for example, already prevent some individuals from obtaining firearms.

Measure 114 does not change which transfers require background checks; they are already required for nearly all firearm transfers in Oregon. *See* Or. Rev. Stat. §§ 166.412, 166.435, 166.436, 166.438. Measure 114's permit-to-purchase provisions change background check requirements in only two ways relevant to this litigation. First, a background check is required at the time of the permit application. Prior law requires such a check only at the time of purchase.

Second, that initial background check will require OSP to obtain the applicant's fingerprints from the permit agent and to request that the FBI conduct a background check and fingerprint-based identification verification. Currently OSP obtains thumbprints only if it

---

[23] *Id*. § 4(1)(b).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

concludes that the identity of the purchaser is in question.[24] And currently, OSP is not specifically required by statute to seek information (including fingerprint results) from the FBI. As a practical matter, however, the statutory command under current law to "[d]etermine, from criminal records and other information available to it, whether the purchaser is disqualified," Or. Rev. Stat. §§ 166.412(3)(a)(A), 166.436(3)(a)(A), requires a process that "involves accessing criminal history records from all 50 states and the federal government."[25] And it is the FBI that operates the national databases used for firearm eligibility checks.[26]

It is also true that before Measure 114 neither state nor federal law required *completed* background checks before firearms transfers can proceed.[27] But even so, that requirement is not unique to the permit-to-purchase requirements of Measure 114. That is because other aspects of Measure 114, which Plaintiffs have not challenged, prohibit transfers from occurring before background checks have been completed.[28]

---

[24] Or. Admin. Reg. 257-010-0055.

[25] Oregon State Police Firearms Instant Check System (FICS) Update, FICS Background Requests (Dec. 16, 2022), https://www.oregon.gov/osp/programs/cjis/pages/firearms-instant-check-system.aspx (accessed November 25, 2022, describing system prior to implementation of Measure 114.)

[26] Federal Bureau of Investigation, Firearms Checks (NICS), https://www.fbi.gov/how-we-can-help-you/need-an-fbi-service-or-more-information/nics (accessed November 25, 2022) (FBI operates NCIS, and Oregon is one of thirteen states that have "designated state agencies to conduct firearm background checks for [Federal Firearm Licensees] … by electronically accessing NICS"); Or. Admin. Reg. 257-010-0015(6) (noting that federal offender systems "maintained and operated by the Federal Bureau of Investigation."

[27] Or. Rev. Stat. § 166.412(3)(c) ("If the department fails to provide a unique approval number to a gun dealer or to notify the gun dealer that the purchaser is disqualified under paragraph (a) of this subsection before the close of the gun dealer's next business day following the request by the gun dealer for a criminal history record check, the gun dealer may deliver the firearm to the purchaser."); 18 U.S.C. § 922(t)(1)(C)(ii) (transfers may occur after three days if no response to background check request).

[28] Measure 114, §§ 6(3)(c), 7(3)(d)(B), and 8(3)(c).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

In sum, Measure 114 establishes a "shall issue" permitting system that creates only the following unique requirements to obtain a firearm:

1. The permit itself must be obtained and presented to acquire a firearm;

2. A background check is required at the time of the permit application;

3. All applicants' fingerprints will be provided to OSP;

4. The applicant cannot present reasonable grounds for the permit agent to conclude that the applicant's mental state or behavioral history makes the applicant a risk to self, others, or the community;

5. The applicant must complete a firearm safety course that meets statutory requirements; and

6. The applicant must pay a fee, capped at $65.

## B.     This Case

Plaintiffs are five Oregon citizens (three county sheriffs and two gun store owners) and the Oregon Firearms Federation (OFF). The individual Plaintiffs and OFF members currently own large-capacity magazines.[29] The Plaintiffs who filed declarations on this motion testify that neither they nor OFF members are "prohibited from owning firearms" under federal or Oregon law.[30] None of Plaintiffs' declarations suggest when they intend to next purchase additional firearms or magazines.

Plaintiffs assert three claims on this motion:

- that the large-capacity magazine and permit-to-purchase provisions violate Plaintiffs' right to bear arms under the Second Amendment;

- that the large-capacity magazine provisions violate the Takings Clause; and

- that the large-capacity magazine provisions violate the Due Process Clause because, Plaintiffs argue, they are retroactive.[31]

---

[29] Starrett Decl. (ECF 8), ¶¶ 9–10; Lohrey Decl. (ECF 7), ¶¶ 11–12; Johnson Decl. (ECF 6), ¶¶ 9–10.

[30] Starrett Decl. (ECF 8), ¶ 8; Lohrey Decl. (ECF 7), ¶ 10; Johnson Decl. (ECF 6), ¶ 8.

[31] The Amended Complaint also mentions the right to bear arms provision of the Oregon Constitution (art. I, § 27). *See* Am. Compl. ¶ 11. Plaintiffs do not appear to assert a state

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

### III. LEGAL STANDARDS

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (emphasis original). To obtain a preliminary injunction, plaintiffs must establish that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). When the government is a party, courts consider the last two factors together, because the defendants' equities merge with the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A plaintiff must establish each of the elements. *Winter*, 555 U.S. at 20–21.

"[T]he rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). Whatever the burdens of proof at trial, on a preliminary injunction the movant has the burden to persuade the court it is likely to succeed on the merits. *See Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009).

"[S]erious questions going to the merits" combined with a balance of hardships that tips sharply towards the plaintiff can satisfy those two factors together, so long as the plaintiff also shows that there is a likelihood of irreparable injury. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Because the balance of equities and public interest are

---

constitutional claim (*see* Am. Compl. ¶¶ 88–92), or move for a preliminary injunction on that basis, but if they had, these state law claims would be barred in this Court by the Eleventh Amendment. *See Hale v. State of Ariz.*, 967 F.2d 1356, 1369 (9th Cir. 1992), *on reh'g*, 993 F.2d 1387 (9th Cir. 1993) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984)). In any event, under Article I, section 27, "the legislature has wide latitude to enact specific regulations restricting the possession and use of weapons to promote public safety." *See State v. Christian*, 354 Or. 22, 33 (2013).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

considered together, the *Alliance* balancing test requires Plaintiffs to show that their claims raises serious constitutional questions and that the balance of equities tips sharply in their favor—that is, that their own irreparable injury in complying with the law while the case is decided greatly exceeds the public interest served by the law.

Plaintiffs argue that "[t]he balance of equities also favors litigants who seek only 'to preserve, rather than alter, the status quo while they litigate the merits of their action.'" Mot. at 34 (quoting *Rodde v. Bonta*, 357 F.3d 988, 999 n.14 (9th Cir. 2004)). While it's true that the preliminary injunction standard for a mandatory injunction that disrupts the status quo is "doubly demanding," *see Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015), a plaintiff still must meet each of the traditional factors to be entitled to a prohibitory injunction that maintains the pre-dispute status quo. *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (addressing all four preliminary injunction factors despite concluding that the plaintiffs sought a prohibitory injunction). That Plaintiffs filed their lawsuit before the law becomes effective is not reason alone to enjoin it. *See San Francisco Veteran Police Officers Ass'n v. City & Cnty. of San Francisco*, 18 F. Supp. 3d 997, 1005 (N.D. Cal. 2014) (holding "the public interest favors *immediate enforcement*" because "preventing another Sandy Hook tragedy constitutes a 'critical public interest'" (emphasis added)).

If a court issues a preliminary injunction, it must be no broader "than necessary to provide complete relief to the plaintiffs before the court." *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 855–56 (9th Cir. 2020); *see also* Measure 114 § 12 (severability); Or. Rev. Stat. § 174.040 (severability of unconstitutional statutes).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## IV.  ARGUMENT

**A.      Plaintiffs Are Unlikely to Succeed on the Merits of their Claims**

**1.      Measure 114's restrictions on large-capacity magazines are constitutional.**

**a.      Restrictions on large-capacity magazine do not violate the Second Amendment.**

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." But "like most rights, the right secured by the Second Amendment is not unlimited." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626) (cleaned up). To determine whether a regulation passes constitutional muster under *Bruen*, a court first asks whether "the Second Amendment's plain text covers" the conduct being regulated. 142 S. Ct. at 2129. If so, the conduct is "presumptively" protected. *Id.* at 2130. The government may rebut that presumption by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," in which case the conduct is outside the scope of the Second Amendment. *Id.*

Twelve other states and the District of Columbia have enacted laws restricting large-capacity magazines. *See* Giffords Law Center, *Large Capacity Magazines*, *available at* https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/ (last visited Nov. 26, 2022) (summarizing large-capacity magazine laws from 12 states and D.C.). The federal courts of appeals have uniformly rejected Second Amendment challenges to those laws.[32] Although those decisions predate *Bruen*, which set forth a new standard for adjudicating Second Amendment claims, the new standard should not change the outcome of those cases: Restrictions on large-capacity magazines are constitutional because

---

[32] *See Duncan*, 19 F.4th at 1096; *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019); *Ass'n of N.J. Rifle & Pistol Clubs v. Attorney Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018); *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017) (en banc); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015); *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1263–64 (D.C. Cir. 2011).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

possession or use of large-capacity magazines is not covered by the Second Amendment's plain text and because restrictions are consistent with the nation's historical tradition of regulating unusually dangerous weapons that are not needed for lawful self-defense.

> **i.** **Large-capacity magazines are not "arms" under the Second Amendment, because they are neither necessary to use covered weapons nor suited for self-defense rather than military applications.**

The Second Amendment does not protect a right to keep and bear all weapons—only "Arms." *Heller*, 554 U.S. at 623 ("[T]he Second Amendment right . . . extends only to certain types of weapons."). Under *Heller*, the "arms" covered by the Second Amendment include only weapons "typically possessed by law-abiding citizens for lawful purposes"—in particular, weapons "in common use" for self-defense. *Id.* at 625. Those were the arms that able-bodied men were expected to supply for themselves and appear bearing when called for militia service. *Id.* at 624. By contrast, the "arms" covered by the Second Amendment do not include military-grade weapons, like "M-16 rifles." *Id.* at 627. Prohibitions against civilians possessing military weapons is "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* (internal quotation marks omitted); *see also Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (explaining that *Bruen* does not change limitations on "the kinds of weapons that people may possess").

For two reasons, large-capacity magazines are not "arms" covered by the Second Amendment. First, they are neither weapons themselves nor necessary to use weapons. Second, these accessories are most useful for military applications and do not qualify as "arms."

Although the Second Amendment covers weapons and also items "necessary to use" weapons such as firearms, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), large-capacity magazines are neither. A magazine is not by itself useable as a weapon for self-defense; it is an ammunition feeding device that can be a component in a firearm. *See Duncan*, 19 F.4th at 1096 ("On its own, a magazine is practically harmless and poses no threat to

Page 11 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

life or limb.").[33] Magazines in general may be protected by the Second Amendment to the extent they are necessary to use covered "arms." *See Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (recognizing a "corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable"). But *large-capacity* magazines are not needed for any firearm. Busse Decl. ¶ 15 ("[A] large capacity magazine is not a required component for a firearm to operate."). Because large-capacity magazines are neither arms themselves nor necessary to use arms covered by the Second Amendment, restrictions on large-capacity magazines do not textually implicate the right to keep and bear arms.

Large-capacity magazines are also not protected because they are most useful for military applications rather than self-defense, and therefore are not protected as arms under the Second Amendment. As the Ninth Circuit has explained, "large-capacity magazines provide significant benefit to soldiers and criminals who wish to kill many people rapidly. But the magazines provide at most a minimal benefit for civilian, lawful purposes." *Duncan*, 19 F.4th at 1106.

The Fourth Circuit has held that large-capacity magazines are outside the scope of the Second Amendment because they are "most useful in military service." *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017) (en banc). Large-capacity magazines "enable a shooter to hit multiple human targets very rapidly." *Kolbe*, 849 F.3d at 137 (internal quotation marks omitted). That "uniquely military feature" makes them "particularly designed and most suitable for military and law enforcement applications." *Id.*

By contrast, large-capacity magazines have "little to no usefulness in self-defense." *Duncan*, 19 F.4th at 1108. Lawful self-defense does not typically involve the "extraordinary

---

[33] The Supreme Court vacated *Duncan* for reconsideration in light of *Bruen*, but the en banc opinion remains persuasive authority to the extent its reasoning does not conflict with *Bruen*. Although *Duncan*'s discussion of the legal test under the Second Amendment is no longer good law, nothing in *Bruen* undermined its discussion of the characteristics of large-capacity magazines—or, for that matter, similar conclusions in the many other pre-*Bruen* decisions rejecting challenges to large-capacity magazine restrictions.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

firepower" and need to hit "multiple human targets very rapidly," *id.*, that large-capacity

magazines facilitate. Rather, "most homeowners only use two to three rounds of ammunition in

self-defense." *Duncan*, 19 F.4th at 1104; *see also* Marshall Decl., Attach. 1 ("Allen Decl.") ¶ 10

(analyzing more than 700 incidents of self-defense and concluding that the average number of

shots was 2.2; only 0.3% of incidents involved more than 10 shots).

Because large-capacity magazines are designed and suitable for military applications

rather than lawful self-defense, they are not "arms" within the meaning of the Second

Amendment. While the Ninth Circuit "decline[d] to decide" that the Second Amendment does

not cover large-capacity magazines, ruling that the restriction is lawful on other grounds, it found

that California's position that such magazines are not covered had "significant merit." *Duncan*,

19 F.4th at 1102–03.

Plaintiffs argue that large-capacity magazines deserve Second Amendment protection

because they are "commonly possessed by the American public." Mot. at 7.[34] But that is not the

proper test under *Heller* and *Bruen*. *Heller*, for example, held that a complete ban on handguns—

but not long guns—was invalid not just because handguns are common, but because they are

uniquely suited to self-defense:

> There are many reasons that a citizen may prefer a handgun for
> home defense: It is easier to store in a location that is readily
> accessible in an emergency; it cannot easily be redirected or
> wrestled away by an attacker; it is easier to use for those without
> the upper-body strength to lift and aim a long gun; it can be
> pointed at a burglar with one hand while the other hand dials the
> police.

---

[34] Plaintiffs' motion for leave to file supplemental authority cites nine district court cases relying on *Bruen* to invalidate government policies.  Only one of them concerns a challenge to a law like Measure 114, *Rocky Mountain Gun Owners v. Bd. of Cnty. Commissioners of Boulder Cnty.*, No. 1:22-CV-02113-CNS-MEH, 2022 WL 4098998, at *1 (D. Colo. Aug. 30, 2022). That lightly reasoned temporary restraining order was issued without a hearing or the defendants filing a response in opposition. The plaintiffs later voluntarily dismissed their case, dissolving the temporary restraining order. *See* Docket, Case 1:22-cv-02113-CNS-MEH (D. Colo.).

Page 13 - DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
            PRELIMINARY INJUNCTION

554 U.S. at 629. Relying solely on "how common a weapon is at the time of litigation" would be "circular," because commonness depends in part on what the law allows. *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015). For example, machine guns were "all too common" during Prohibition, but that did not immunize them from heavy regulation and an eventual ban on the ground that they were military-grade weapons. *Id.* at 408–09; *see also Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) ("measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical").

What matters more than the number of individuals who own a particular weapon or accessory is whether it is particularly suited to lawful self-defense, rather than military or law-enforcement applications. *See Duncan*, 19 F.4th at 1127 (Berzon, J., concurring) ("*Heller* focused not just on the prevalence of a weapon, but on the primary use or purpose of that weapon."). As explained above, large-capacity magazines are neither designed for typical self-defense use nor necessary to operate weapons commonly used in self-defense. And the extra rounds offered by large-capacity magazines over other magazines are not in fact commonly *used* for lawful self-defense. Large-capacity magazines thus are not protected by the Second Amendment's plain text. On that basis alone, Plaintiffs' Second Amendment challenge to Measure 114's large-capacity magazine provisions is unlikely to succeed.

### ii. Restricting large-capacity magazines is consistent with the nation's historical tradition of banning unusually dangerous weapons.

In addition, Measure 114's provision restricting large-capacity magazines is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. As explained below, restricting large-capacity magazines is analogous to well-established prohibitions against unusually dangerous weapons that are associated with unlawful activities rather than lawful self-defense.

Although that category of historical precursor may not be a "dead ringer" for Measure 114's restrictions, that is not what *Bruen* requires. 142 S. Ct. at 2133. *Bruen* recognized that

Page 14 - DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

"[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. In an era when "[m]ost guns available then could not fire more than one shot without being reloaded," *Friedman*, 784 F.3d at 410, government officials and courts had no occasion to consider the lawfulness of large-capacity magazines capable. When modern laws implicate "unprecedented societal concerns or dramatic technological changes," and therefore involve "regulations that were unimaginable at the founding," courts must reason by analogy. *Id.* And although analogical reason is not a "regulatory blank check," it also is not a "regulatory straightjacket." *Id.* at 2133. What matters is not how comparable a modern law is to historical analogues in form or substance, but how comparable it is in "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* The Court explained that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* (quotation marks and emphasis omitted).

Large-capacity magazines are an example of "dramatic technological changes" that explain the absence of precise "founding-era historical precedent." *Id.* at 2131–32. Large-capacity magazines "were not common in 1791." *Friedman*, 784 F.3d at 410. "Most guns available then could not fire more than one shot without being reloaded; revolvers with rotating cylinders weren't widely available until the early 19th century. Semi-automatic guns and large-capacity magazines are more recent developments." *Id.*[35] Plaintiffs assert, without offering any factual support, that large-capacity magazines have been around for centuries.[36] But in 1791, "virtually all firearms were single-shot" and "guns capable of firing more than a single round

---

[35] *See also* Marshall Decl., Attach. 2 ("Spitzer Decl."), ¶¶ 18–30 (discussing differences in 19th century and the 20th century firearms technologies).

[36] Johnson Decl. ¶ 2; Lohrey Decl. ¶ 4; Starrett Decl. ¶ 2.

Page 15 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
            PRELIMINARY INJUNCTION

could best be described as exotic." Marshall Decl., Attach. 3 ("Cornell Decl.") ¶ 37; *see also* Spitzer Decl. ¶¶ 18–31 (describing early "experimental" multi-shot guns and the difficulty of developing reliable, commercially successful multi-shot guns until after the Civil War). To the extent that any firearms employed high-capacity magazines, they were regarded as weapons for the military or law enforcement.[37] They were not widely marketed to civilians until recent decades.[38]

Large-capacity magazines also implicate societal concerns that have no founding-era precedent. Mass shootings by a single individual that resulted in 10 or more deaths were unknown in U.S. history until 1949 and rare until 2007. *See* Klevaris Decl. ¶¶ 10–11 & tbl. 1. Large-capacity magazines are "often used in public mass shooting events…." Allen Decl. ¶ 26. Casualties are also three times higher in mass shootings that involve weapons with large-capacity magazines than in other mass shooting: an average of 27 fatalities or injuries with a large-capacity magazine versus an average of 9 without.[39] Every mass shooting since 2004 that resulted in 14 or more deaths involved large-capacity magazines.[40] The use of large-capacity magazines to perpetrate mass shootings has no precedent in the founding or reconstruction eras. The social concern of massacres perpetrated by single shooters has no precedent in 1791 or even in 1868. In such cases, *Bruen* instructs the courts to look for "a well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original).

In seeking that analogue, *Bruen* instructs the court to focus on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133. The

---

[37] Marshall Decl., Attach. 4 ("Vorenberg Decl.") ¶ 7.

[38] Marshall Decl., Attach. 5 ("Klarevas Decl."), ¶ 16 & tbl. 2; Busse Decl. ¶ 6.

[39] Allen Decl. ¶ 27; *see also id.* ¶ 29 & n.39 (citing a 2016 article showing an average of 21 fatalities or injuries in mass shootings with large-capacity magazines versus 8 for those without).

[40] Klarevas Decl. ¶¶ 12–13.

Page 16 - DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
PRELIMINARY INJUNCTION

burden of large-capacity magazine restrictions is minimal. There is no shortage of widely available firearm magazines that comply with the limits of Measure 114. And, as noted above, any firearm that accepts a magazine with a capacity exceeding 10 rounds can also accept a magazine with capacity of 10 or less. Measure 114 specifically allows permanent alterations to reduce magazine capacity. The vast majority of self-defense uses of firearms—99.7%[41]—involve fewer than ten shots. Firearms incorporating magazines that already comply with the restriction are widely available, and firearm owners who currently use non-compliant magazines can substitute a compliant magazine or permanently alter the magazine to comply.[42] Owners who decline to do either will be permitted to use large-capacity magazines they currently own in restricted ways, but can avoid those restrictions if they use a lower capacity magazine in situations where a high-capacity magazine is unlawful.

This is a "minimal burden" on Plaintiffs' use of firearms. *Duncan*, 19 F.4th at 1104. "The law has no effect whatsoever on which firearms may be owned; as far as the challenged statute is concerned, anyone may own any firearm at all. Owners of firearms also may possess as many firearms, bullets, and magazines as they choose." *Id.* Certainly, Measure 114's burden is no heavier than that imposed by the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *Heller*, 554 U.S. at 627. As far back as 1541, the English parliament forbade members of the public from owning or carrying certain kinds of weapons. *See Peruta v. County of San Diego*, 824 F.3d 919, 930–31 (9th Cir. 2016) (en banc), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (citing a 1541 statute banning "little shorte handguns and little hagbutts"). In the 1800s, states enacted a range of laws restricting weapons like "Bowie knives," "slingshots," and certain kinds of pistols.[43] Those weapons were commonly used for

---

[41] Allen Decl. ¶ 10.

[42] Measure 11 § 11 (1)(d)(A).

[43] Spitzer Decl., Ex. C.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

fighting or other criminal activities rather than lawful self-defense.[44] More recently, the twentieth-century ban on most machine guns continued the historical tradition of restricting unusually dangerous weapons that are not needed for legitimate self-defense. *Heller*, 554 U.S. at 627; *Duncan*, 19 F.4th at 112 (Berzon, J., concurring) (noting the history). Such restrictions completely disallowed certain weapons with particularly dangerous features, while leaving other arms available for self-defense. If anything, the burden of those historical restrictions was heavier than the burden now imposed by Measure 114 given the broad array of lethal weapons that will remain legal in Oregon, including every currently lawful firearm so long as it is used with a ten-round magazine.

Other well-established historical regulations similarly sought to prevent criminal actors from assembling the sort of firepower a large-capacity magazine provides. In an era of single-shot weapons, that sort of firepower likely could come only from a group rather than an individual, and the Supreme Court confirmed in *Heller* that the Second Amendment "does not prevent the prohibition of private paramilitary organizations." 554 U.S. at 621 (discussing *Presser v. Illinois*, 116 U.S. 252 (1886)). Laws that prohibit "private paramilitary organizations" from drilling or parading burden the right of self-defense in a manner, and for a reason, that is analogous to restrictions on large-capacity magazines: making it difficult to discharge multiple rounds rapidly. Like laws prohibiting unusually dangerous weapons, laws restricting paramilitary organizations impose practical limits on firepower for armed self-defense.

Those restrictions are analogous to restrictions on large-capacity magazines in "how and why" they affect the right to armed self-defense. *Bruen*, 142 S. Ct. at 2133. Large-capacity magazines, like the weapons prohibited in other eras, are suited to unlawful purposes, are not needed for legitimate self-defense, and pose significant risks to public safety and security.

* * *

---

[44] Spitzer Decl. ¶¶ 36–37, 44, 49.

Page 18 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
              PRELIMINARY INJUNCTION

For all of those reasons, Plaintiffs' Second Amendment challenge to Measure 114's restrictions on large-capacity magazines will fail: large-capacity magazines are not "arms," but rather accessories that convert otherwise-protectable "arms" into military-style weapons not covered by the Second Amendment. Large-capacity magazines are also analogous to dangerous weapons that have historically been restricted without infringing on the core right of self-defense. Plaintiffs are unlikely to succeed and have not even raised serious questions going to the merits of their Second Amendment claim.

**b.** **Large-capacity magazine restrictions do not violate the Takings Clause.**

Plaintiffs' takings claim is unlikely to succeed for three reasons: (1) individuals who, like Plaintiffs, own large-capacity magazines can retain them even after Measure 114 is effective; (2) the Ninth Circuit, sitting en banc, unanimously rejected a takings claim based on California's more restrictive large-capacity-magazine law; and (3) in any event, an injunction is unavailable to bar a taking.

First, Plaintiffs' claim relies on the mistaken premise that Measure 114 "*physically dispossess[es]* magazine owners of their private property…." Mot. at 6. Not so: Measure 114 allows those who, like Plaintiffs, currently own large-capacity magazines to keep and use those magazines as long as they do so within the law's restrictions. Under section 11(5), owners have an affirmative defense for possession or use of a large-capacity magazine that they owned before Measure 114's effective date, provided that they maintain and use it in a lawful manner. Measure 114 allows, but does not require, owners to turn in their large-capacity magazines to law enforcement; owners may keep their current large-capacity magazines if they abide by the limits set forth in the measure, which including on their own property, at shooting ranges, for hunting,

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

or as part of a competition or educational project. Section 11(5)(c). They can also modify their magazines to comply with law.[45]

Although Plaintiffs' motion does not make the argument, Plaintiffs' declarations suggest that they view one of these affirmative defenses—for possession on the owner's property—as inoperative because of a reference to the "registered owner" of the large-capacity magazine.[46] Section 11(5)(c) provides that owners may maintain their large-capacity magazines in one of a number of listed places, including (in subsection (A)) "[o]n property owned or immediately controlled by the registered owner." Plaintiffs fear that because there is no provision to register ownership of a large-capacity magazine, no one can invoke the affirmative defense.

But that misinterprets section 11(5)(c)(A) under the statutory interpretation principles of Oregon law. Much as Oregon courts interpret statutes enacted by the legislature, they interpret statutes enacted by initiative by examining the text, context, and legislative history of the measure "to discern the intent of the voters who adopted it." *Burke v. State ex rel. Dep't of Land Conservation & Dev.*, 352 Or. 428, 433 (2012).

Nothing suggests that the voters intended the phrase "registered owner" to mean anything other than "lawful owner." The measure does not require that owners register their large-capacity magazines. And although the term "registered" can connote formal enrollment on a centrally maintained list (for example, "registered voters"), it also can include less organized means of noting a fact for the record. To say that "the lawyer registered an objection" does not suggest that the lawyer lodged the objection on some centrally maintained list, just that the lawyer made the objection known. Without a formal registry for large-capacity magazine ownership, a "registered owner" of a large-capacity magazine simply means a person who makes their lawful ownership known.

---

[45] Busse Decl. ¶¶ 7, 14.

[46] Starrett Decl. (ECF 8), ¶ 21; Lohrey Decl. (ECF 7), ¶ 23; Johnson Decl. (ECF 6), ¶ 21.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Context and legislative history support that construction. If Plaintiffs' concern were well-founded, it would be impossible for current owners to keep their large-capacity magazines on their property, making that component of the affirmative defense surplusage. The Oregon courts would construe the measure to avoid reading that defense out of the statute. *See State v. Gilbreath*, 310 Or. App. 724, 728, *rev. den.*, 368 Or. 637 (2021) ("[A]s a general rule, we assume that the legislature did not intend any portion of its enactments to be meaningless surplusage.") (internal quotation marks omitted). And the explanatory statement in the voters' pamphlet expressly told voters that there was an exception for "those who own or later inherit large-capacity magazines when used on owner's property." Voters' Pamphlet (2022), at 90, *available at* https://oregonvotes.gov/voters-guide/pdf/book13.pdf. Oregon courts would construe the measure to give effect to that intent. *See Seymour v. Dep't of Rev.*, 311 Or. 254, 259 (1991) (looking to the voters' pamphlet to interpret a ballot measure).

At most, the reference to a "registered" owner is a drafting error, but that error will not cause the Oregon courts to interpret it in the manner that Plaintiffs suggest. The Oregon courts avoid hyper-literal interpretations when necessary to effectuate the enactors' manifest intent. For example, the statute of limitations in Oregon's Post-Conviction Hearing Act allows an exception for claims that "could not reasonably have been raised in the original or amended petition." Or. Rev. Stat. § 138.510(3). Read literally, that exception would not apply if the person never filed an original or amended petition. But the Oregon Supreme Court held that the exception should not be read literally; it applies to any claims that could not have been asserted within the limitations period regardless of whether a petition was filed. *Verduzco v. State*, 357 Or. 553, 564 & n.9 (2015). So too here, the Oregon courts would disregard a hyper-literal interpretation of "registered" owners if necessary to effectuate the voters' intent.

For similar reasons, there is no merit to Plaintiffs' assertion that "there cannot be an affirmative defense" because section 11 refers to "ORS 166.055," a statute that does not exist. Mot. at 3. The typographical error—the reference should be to Or. Rev. Stat. § 161.055, the

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

statute governing the allocation of burdens of proof for defenses—will presumably be fixed by Oregon's Legislative Counsel when Measure 114 is compiled into the Oregon Revised Statutes. *See* Or. Rev. Stat. § 173.160 (authorizing Legislative Counsel to "[s]ubstitute the proper subsection, section, or chapter or other division numbers" and "[c]orrect manifest clerical, grammatical or typographic errors" so long as counsel does not "alter the sense, meaning, effect, or substance" of the Act). Even without fixing the cross-reference, the burdens of proof set forth in Or. Rev. Stat. § 161.055(2) will apply because of Measure 114's explicit use of the term "affirmative defense." *See* Or. Rev. Stat. § 161.035(2) (providing that unless "expressly provided" otherwise or as required by context, the provisions of the Oregon Criminal Code of 1971 govern "the construction and application of any defense to a prosecution" for a defense defined outside of the Code).

Second, the Ninth Circuit, sitting en banc, has squarely rejected a takings claim asserted against California's large-capacity magazine ban. *Duncan*, 19 F.4th at 1111–13.[47] California's exercise of its police powers, *Duncan* held, cannot trigger a takings claim. "Nothing in the case law suggests that any time a state adds to its list of contraband—for example, by adding a drug to its schedule of controlled substances—it must pay all owners for the newly proscribed item." *Id.* at 1112.

That holding precludes the Court from finding that Measure 114 effects a taking. Unlike California's law, *id.* at 1111–12, Oregon's law allows individuals to maintain possession of any large-capacity magazine they have previously purchased and continue to use it on their own property and for sport shooting. Thus, even more than California's law, Measure 114 does not

---

[47] Neither of the dissenting opinions in *Duncan* took issue with the en banc court's rejection of the takings claim. The Supreme Court granted certiorari, vacated, and remanded *Duncan* "for further consideration in light of" *Bruen*. *Duncan v. Bonta*, 142 S. Ct. 2895 (June 30, 2022). Nothing in the Supreme Court's order or the Ninth Circuit subsequent remand to the district court, 49 F.4th 1228, suggests that *Bruen*'s Second Amendment holding disturbs the Ninth Circuit's rejection of the *Duncan* plaintiffs' takings claim.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

"effect a physical taking," *id.* at 1112, and "plainly does not deprive an owner of 'all economically beneficial use of the property,'" *id.* Nor can a facial claim on a regulatory takings theory succeed, because there is no basis to conclude "a regulatory taking has necessarily occurred with respect to every owner of a large-capacity magazine." *Id.*

Third, "even if Plaintiffs were able to establish that" Measure 114 "resulted in a regulatory taking under the Fifth Amendment, the appropriate remedy would be 'just compensation' in the form of damages, not the injunctive relief sought here." *See Oregon Rest. & Lodging Ass'n v. Brown*, No. 3:20-CV-02017-YY, 2020 WL 6905319, at *6 (D. Or. Nov. 24, 2020) (citing *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162, 2176 (2019)). Under the Takings Clause, a state can take private property so long as it is for a public purpose; it must only provide just compensation. "As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Knick*, 139 S. Ct. at 2176. Such a damages remedy for a Takings Clause violation is available against the State. *See Boise Cascade Corp. v. State ex rel. Oregon State Bd. of Forestry*, 164 Or. App. 114, 124 (1999) ("[A] state may be sued in state court for takings in violation of the federal constitution"). That precludes an equitable remedy.

### c. Large-capacity magazine restrictions do not violate the Due Process Clause.

Contrary to Plaintiffs' assertion, Measure 114 does not "retroactively prohibit[] the possession of lawfully acquired" large-capacity magazines. Mot. at 30. The law does not punish past purchases, only future conduct. As discussed above, Measure 114 even allows current owners of large-capacity magazines to keep and continue to use those magazines for certain purposes.[48]

---

[48] Section 11(5)(c)(C)–(D).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

A statute does not operate retroactively merely because it implicates conduct before the statute's enactment or upsets expectations based on prior law. Legislation readjusting rights and burdens of such ownership is not unlawful solely because it upsets otherwise settled expectations. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976) (citations omitted). Rather, the court must ask whether the new provision attaches new legal consequences to events *completed* before its enactment. *Landgraf v. USI Film Prod.*, 511 U.S. 244, 269–70 (1994). This is true even though the effect of the legislation is to impose a new duty or liability based on past acts. *Id.* "If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever." *Id.* at 270 n. 24 (quoting Fuller, *The Morality of Law* 51–62 (1964)). That Plaintiffs purchased large-capacity magazines before Measure 114 was enacted but can no longer use them for certain purposes after December 8 does not render the legislation retroactive.

Measure 114 does not attach new legal consequences to any conduct completed before Measure 114 is in effect. It is therefore not retroactive, and it does not violate the Due Process Clause.

**2.      Measure 114's permit-to-purchase requirement complies with the Second Amendment.**

Measure 114 establishes a "shall issue" permit-to-purchase system that creates very few new limitations on gun acquisition. The Supreme Court is well aware of state firearms licensing requirements, and *Bruen* made clear that it did not prohibit "shall issue" permit systems:

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." *Drake v. Filko*, 724 F. 3d 426, 442 (CA3 2013) (Hardiman, J., dissenting). Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. *District of Columbia v. Heller*, 554 U. S. 570, 635 (2008). Rather, it appears that these shall-issue regimes, which

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." *Ibid.* And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, *Shuttlesworth v. Birmingham*, 394 U. S. 147, 151 (1969), rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cantwell v. Connecticut*, 310 U. S. 296, 305 (1940)—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

*Bruen*, 142 S.Ct. at 2138 n.9.[49] Despite this plain statement by the *Bruen* majority, Plaintiffs do not offer any particular legal argument why the court should enjoin the shall-issue permitting requirements of Measure 114.

Measure 114's permit-to-purchase requirements are precisely what the *Bruen* allows under a shall-issue licensing regime:

1. Presenting the permit to acquire a firearm;

2. A background check when applying for the permit;

3. Providing fingerprints to OSP for its use in the background check;

4. The permit agent can reject an application if there are reasonable grounds to conclude that the applicant's mental state or behavioral history makes the applicant a risk to self, others, or the community;

5. Completion of a firearm safety course that meets statutory requirements; and

6. Paying a fee, capped at $65.

The first requirement is simply the permit requirement itself, the precise thing that *Bruen* makes clear remains permissible.

---

[49] Although *Bruen* specifically concerned a law requiring a permit to carry arms, rather than to acquire them in the first place, the opinion offers no reason to believe that the constitutional right "to keep and bear arms" gives greater protection to the right to acquire arms than it gives to the right to bear them.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

The second requirement is "a background check … designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen* unequivocally anticipates such checks in connection with permits. 142 S. Ct. at 2138 n.9 (recognizing that requiring a background check is a legitimate way to determine that "those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'").

Similarly, the third requirement, fingerprinting, simply provides a specific means to carry out a background check. Given that transferees are already required to provide their thumbprints to acquire a firearm, Or. Rev. Stat. § 166.412(2)(c), and that OSP already has access to those prints when needed for background check purposes, Or. Admin. Reg. 257-010-0055, this aspect of the permit-to-purchase system creates no unique burden on those seeking firearms. It merely changes OSP's method of conducting background checks to make them more reliable— obtaining fingerprints in all cases rather than thumbprints in some.

The fourth requirement likewise presents a simple, objective standard for permit agents "to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9. A person is eligible under this provision so long as he or she:

> Does not present reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence[.]

Measure 114, § 4(1)(b)(C). This does not invite subjectivity. Rather, the requirement turns specifically on what the applicant presents to the permit agent, either because of demonstrated unlawful behavior (actual or threatened) or the applicant's mental or psychological state, to the extent those things are presented to the permit agent. It expressly requires reasonable grounds for a conclusion that the applicant has been, or is reasonably likely to be, a danger. And under

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Section 5 of Measure 114, the applicant can seek expedited, de novo review of a permitting agent's dangerousness finding.

The fifth requirement is completing a firearm safety course. A "firearms safety course" is, like a background check, specifically recognized in *Bruen* as a permissible way to ensure that those bearing arms are law-abiding and responsible. 142 S. Ct. at 2138 n.9.

Finally, the sixth requirement is to pay a fee of the lesser of the actual costs of the permitting process or $65. A fee calculated based on actual cost, and capped at an amount far below the manufacturer's suggested retail price of any common firearm,[50] is not an "exorbitant fee" that *Bruen* suggests would be problematic.

In short, the features of Measure 114's permit to purchase requirement are exactly the type of "shall issue" permitting requirements the *Bruen* majority specifically says its opinion does not cast doubt on. A concurring opinion on behalf of two members of the six-member *Bruen* majority emphasizes this: "shall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring).

Plaintiffs offer no explanation to the contrary. They do not follow *Bruen*'s suggestion that Plaintiffs may only challenge shall-issue permitting requirements that are "put toward abusive ends … where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 142 S.Ct. at 2138, n.9. Again, two members of the majority emphasized this important clarification of *Bruen*: "shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice." *Id.* at 2162 (Kavanaugh, J., concurring).

---

[50] Busse Decl. ¶ 13.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

This case presents no such as-applied challenge. None of the Plaintiffs have applied for a permit. Nor have Plaintiffs offered any reason to think that one or more of them would be denied a permit under Measure 114 in violation of the Second Amendment. And if they were denied a permit, or one was not approved after 30 days, they could seek speedy review in the Oregon courts.

Instead, Plaintiffs imply that, in pre-*Bruen* cases, the federal district courts rejected permitting requirements. But neither case Plaintiffs cite so hold. In both *Wesson v. Town of Salisbury*, 13 F. Supp. 3d 171 (D. Mass. 2014), and *Richmond v. Peraino*, 128 F. Supp. 3d. 415 (D. Mass. 2015), district courts required the government to process permits-to-purchase *for individual plaintiffs*, finding that their convictions for possession of small amounts of marijuana were insufficient cause for a state to bar them from buying a firearm. An order requiring a state to process a particular individual's permit is a far cry from enjoining permitting requirements based on the Second Amendment. Even if these cases were more favorable to the Plaintiffs' position, *Bruen*'s later approval of shall-issue permitting systems like Measure 114 would supersede them.

Plaintiffs' Second Amendment claim against Measure 114's the permit-to-purchase requirements is unlikely to succeed.

## B. The Balance of the Equities Disfavors a Preliminary Injunction

To prevail on a preliminary injunction, a plaintiff must also show "the balance of equities tips in [its] favor; and … an injunction is in the public interest." *Short*, 893 F.3d at 675. Because state officials are parties, these factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The balance of the equities and the public interest disfavor an injunction.

### 1. Plaintiffs have not shown irreparable harm.

Plaintiffs argue they have shown irreparable harm, because "'the deprivation of constitutional rights "unquestionably constitutes irreparable injury."'" Mot. at 31–32 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). But an injury based on a plaintiff's

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

loss of constitutional rights requires the plaintiff to establish it is likely to succeed on its constitutional claim. *See Associated Gen. Contractors of Cal., Inc. v. Coal. For Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991); *see also Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 970 (9th Cir. 2014) (Ikuta, J.) (affirming denial of preliminary injunction because Second Amendment claim was unlikely to succeed without considering other preliminary injunction factors); *San Francisco Veteran Police Officers Ass'n v. City & Cnty. of San Francisco*, 18 F. Supp. 3d 997, 1006 (N.D. Cal. 2014) ("'serious questions' do not translate to a violation severe enough to trigger a presumption of irreparable harm"). For the reasons explained in Section IV.A, above, they have not made that showing. Because Plaintiffs do not show that irreparable harm is likely (here, by showing their constitutional rights would be violated in the absence of an injunction), the Court cannot issue a preliminary injunction. *See Winter*, 555 U.S. at 22 (holding the "standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction"; the "'possibility' standard is too lenient") (emphasis original)).

Moreover, as a practical matter, Plaintiffs can continue to "keep and bear arms" while the Court decides the merits of their claims. Plaintiffs testify that they already own large-capacity magazines. They can continue to keep those magazines in their home and use them outside the home for limited purposes. They can also use their existing firearms with a compliant magazine.[51] Their ability to lawfully defend themselves is not impaired even outside the home: The National Rifle Association's database of the defensive uses of firearms shows that more than 10 rounds are fired in 0.3% of such instances.[52] It is highly improbable that a large-capacity magazine will be used, let alone necessary, for Plaintiffs to defend themselves. "In assessing the balance of equities, those rare occasions must be weighed against the more frequent and

---

[51] *See* Busse Decl. ¶¶ 8–10.

[52] *See* Allen Decl. ¶ 10; *see also Duncan*, 19 F.4th at 1104.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

documented occasions when a mass murderer with a gun holding eleven or more rounds empties the magazine and slaughters innocents. One critical difference is that whereas the civilian defender rarely will exhaust the up-to-ten magazine, the mass murderer has every intention of firing every round possible and will exhaust the largest magazine available to him." *San Francisco Veteran Police Officers Ass'n*, 18 F. Supp. 3d at 1005.

Plaintiffs' interest in enjoining the permit-to-purchase requirement is even weaker. Plaintiffs do not allege, let alone submit evidence, that they intend to purchase firearms while this case is pending. Nor is there any indication that they would be denied a permit if they sought one. And even if there were some barrier to Plaintiffs' acquisition of more firearms, they already own firearms that they employ for self-defense. The Second Amendment, as interpreted under the *Heller-Bruen* historical framework, only protects the right to purchase firearms when it is necessary to "keep and bear arms." *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 686–87 (9th Cir. 2017) ("[N]o historical authority suggests that the Second Amendment protects an individual's right to *sell* a firearm unconnected to the rights of citizens to 'keep and bear' arms."); *see also Heller*, 554 U.S. at 582 ("[T]he most natural reading of 'keep arms' in the Second Amendment is to 'have weapons.'"). Both firearms and magazines are durable goods with a long useful life.[53] Plaintiffs can continue to keep and bear the arms they currently possess, which is enough to protect their Second Amendment rights for the pendency of this litigation.

## 2. The public interest disfavors an injunction.

"[A] state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 F. App'x 89, 92 (9th Cir. 2009) (quoting *Coal. for Econ. Equity v. Wilson,* 122 F.3d 718, 719 (9th Cir. 1997)); *accord Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, Circuit Justice). Delay particularly impedes the State's policy here, because purchases of firearms and accessories spike

---

[53] Busse Decl. ¶ 19.

Page 30 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
             PRELIMINARY INJUNCTION

when a new firearms regulation is expected to go into effect.[54] Before November 8, Oregon averaged 849 background check requests for new firearms transfers per day; since November 8, the daily average has quadrupled to 4,092.[55] Any firearms purchased before Measure 114 becomes effective can be retained, even by individuals who never obtain a permit-to-purchase. And large-capacity magazines can be retained on individuals' own property and in other settings. Extending this transition period for the length of the litigation would mean that tens of thousands more firearms and magazines would be grandfathered.

Plaintiffs are correct that whether Measure 114 becomes law on December 8 implicates "life and death." Mot. at 2. "Public safety should be considered by a court when granting equitable relief." *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1404 (9th Cir. 1993) (citing *Chalk v. United States Dist. Court for the Cent. Dist. of Cal.*, 840 F.2d 701, 711 (9th Cir. 1988)).

In 2020, 593 Oregonians died by firearm.[56] Robust peer-reviewed academic work shows "that laws requiring firearm purchasers to be licensed through a background check process supported by fingerprints and laws banning LCMs [large-capacity magazines] are the most effective gun policies for reducing fatal mass shootings."[57] Regression analyses show that "handgun purchaser licensing laws requiring in-person application with law enforcement or fingerprinting were associated with incidents of fatal mass shootings 56% lower than that of other states ...."[58] When Connecticut implemented a permit to purchase requirement like the one

---

[54] *Id.* ¶ 17.

[55] Marshall Decl., Attach. 6 (Oregon State Police Firearms Instant Check System (FICS) Update, FICS Background Requests (Dec. 16, 2022)).

[56] Marshall Decl., Attach. 7.

[57] Marshall Decl., Attach. 8 at 1 (Daniel W. Webster, et al., "Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States," 19 *Criminology & Public Policy* 171 (2020)).

[58] *Id.* That study defined a mass shooting to include shootings with "four or more murdered victims" but excluded "gang- or drug-related shootings...." *Id.* at 11.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Measure 114 adopts, firearm homicides dropped by 28% and firearms suicides fell by 23%.[59] When Missouri repealed such a policy, firearms homicides rose by 47% and firearms suicides increased by 23%.[60] Delaying the implementation of this constitutional policy while the merits are litigated would likely result in unnecessary deaths.

Since the federal ban on large-capacity magazines expired in 2004, every mass shooting that caused 14 or more deaths has used a large-capacity magazine,[61] and mass shootings using large-capacity magazines were 62% more lethal than those that did not.[62] Regression analyses using data from the 50 states show that prohibitions of large-capacity magazines are associated with a "48% lower risk of fatal mass shootings …."[63] The equities therefore disfavor a preliminary injunction that would forestall Oregon's effort to reduce the risk of a massacre within its borders. *Cf. Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1282 (N.D. Cal. 2014), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ("[T]he risk that a major gun-related tragedy would occur is enough to at least balance out the inconvenience to Plaintiffs in disposing of their now-banned magazines.").

A recent tragedy in California illustrates the public interest at stake on this motion. California is one of 12 other states that prohibits large-capacity magazine sales. Its law was challenged in the U.S. District Court for the Southern District of California. On March 29, 2019, the district court granted summary judgment against California and issued a permanent

---

[59] Marshall Decl., Attach. 9 at 4 (Alexander D. McCourt, et al., "Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in 4 US States, 1985–2017," 110(10) *American Journal of Public Health* 1546, 1549 (Oct. 2020).)

[60] *Id.*

[61] Klarevas Decl. ¶¶ 12–13.

[62] Marshall Decl., Attach. 5 at 44 (Louis Klarevas, et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017, 109 *American Journal of Public Health* 1754, 1755 (Dec. 2019)); *see also* Allen Dec. ¶¶ 27-28.

[63] Marshall Decl., Attach. 8 (Webster, et al.) at 11; *see also id.* Attach. 5 at 47 (Klarevas, et al.) (finding "the rate of high-fatality mass shootings per capita was 2.3 times higher in states without an LCM [large-capacity magazine] ban").

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

injunction.[64] Large-capacity magazines immediately poured into California's gun stores.[65] The district court first denied a stay, but then reversed course and stayed its injunction of California's prohibition of large-capacity magazine sales, effective April 5.[66]

The next week, with the California's ban on large-capacity magazine sales restored, a 19-year-old man bought a rifle and several 10-round magazines from a San Diego gun store.[67] He picked up his purchase two weeks later.[68]

The next day, April 27, the man entered a synagogue with the rifle loaded with a 10-round magazine.[69] He wore a tactical vest with five more 10-round magazines.[70] He fired the 10 rounds in his magazine, killing one congregant and injuring three others.[71] Before the gunman could reload with one of his five other magazines, an unarmed congregant rushed at him, forcing him to retreat to his car.[72] That provided time for an armed off-duty law enforcement officer to intervene and return fire.[73] The gunman then fled by car and surrendered to the police.[74]

---

[64] *Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019) (subsequent history omitted).

[65] *See* Busse Decl. ¶ 17; Matthias Gafni, "For One Week, High-Capacity Ammunition Magazines Were Legal in California. Hundreds of Thousands May Have Been Sold," *San Francisco Chronicle* (Apr. 11, 2019), https://perma.cc/YWW3-EN3H.

[66] *See Duncan v. Becerra*, No. 17-CV-1017-BEN-JLB, 2019 WL 1510340, at *3 (S.D. Cal. Apr. 4, 2019).

[67] Marshall Decl., Attach. 10 (*United States v. Earnest*, Case No. 3:19-cr-01850-AJB (S.D. Cal.), Tr. 9/17/2021 (ECF 125) at 14:17–20, 14:25 (Plea Hearing)).

[68] *Id.* at 14:21–22, 14:25.

[69] *Id.* at 15:9–12, 16:2.

[70] *Id.* at 15:9–12, 16:2.

[71] *Id.* at 14:21–22, 14:25.

[72] *Id.* at 16:3–7.

[73] Marshall Decl., Attach. 11 (Pauline Repard, "'There was chaos': Witnesses in court hearing recall Poway synagogue shooting," *San Diego Union-Tribune* (Sept. 19, 2019)).

[74] Marshall Decl., Attach. 10 at 16:3–7.

Page 33 - DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
            PRELIMINARY INJUNCTION

Before the shooting began, the man posted a letter on his Facebook page saying, "I can only kill so many Jews. I only wish I killed more."[75] Had large-capacity magazines been available when he bought his weaponry, he may have done so.

## V. CONCLUSION

Plaintiffs are unlikely to succeed on the merits of their claims, and the balance of equities disfavors an injunction. Plaintiffs' motion for a preliminary injunction should therefore be denied.

DATED November  30  , 2022.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General


_s/ Brian Simmonds Marshall_
BRIAN SIMMONDS MARSHALL #196129
Senior Assistant Attorney General
Trial Attorney
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.state.or.us
Of Attorneys for Defendants

---

[75] _Id._ at 15:1–8.

Page 34 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR
          PRELIMINARY INJUNCTION