1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  ROBERT L. MEYERHOFF
   Deputy Attorney General
4  State Bar No. 298196
     300 South Spring Street, Suite 1702
5     Los Angeles, CA 90013-1230
     Telephone: (213) 269-6177
6   Fax: (916) 731-2144
     E-mail: Robert.Meyerhoff@doj.ca.gov
7  Attorneys for Defendant Rob Bonta in his
   official capacity as Attorney General of the
8  State of California

9              IN THE UNITED STATES DISTRICT COURT

10         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                     CIVIL DIVISION

12

13

| | |
|---|---|
| **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants. | 17-cv-1017-BEN-JLB<br><br>**DECLARATION OF MICHAEL VORENBERG**<br><br>Courtroom:      5A<br>Judge:          Hon. Roger T. Benitez<br>Action Filed:   May 17, 2017 |

1

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

# DECLARATION OF MICHAEL VORENBERG

I, Michael Vorenberg, declare under penalty of perjury that the following is true and correct:

1. I am an associate professor of history at Brown University. I make this declaration in support of Defendants' Supplemental Brief in Response to the Court's Order of September 26, 2022.

2. This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3. I received my A.B. from Harvard University in 1986, and my Ph.D. in history from Harvard in 1995. After receiving my Ph.D., I began a postdoctoral fellowship at the W.E.B. Du Bois Institute at Harvard, and then served as an assistant professor of History at the State University of New York at Buffalo. I joined the faculty at Brown University in 1999, and have taught history there ever since.

4. I have concentrated my research on the history of the U.S. Civil War and Reconstruction. My first book, *Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment*, was published by Cambridge University Press in 2001. The book was a Finalist for the Gilder Lehrman Lincoln Prize. I am also the author of *The Emancipation Proclamation: A Brief History with Documents*, published by Bedford/St. Martin's in 2010. I am the author of a number of articles and essays on Reconstruction and the law. These include: "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Southern Illinois University Press, 2018); Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," in Alexander Tsesis, ed., *The Promises of Liberty: The History and Contemporary Relevance of*

1

ATTACHMENT 4, Page 2 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

1 *the Thirteenth Amendment* (Columbia University Press, 2010); "Reconstruction as a
2 Constitutional Crisis," in Thomas J. Brown, ed., *Reconstructions: New Directions*
3 *in the History of Postbellum America* (Oxford University Press, 2006); and
4 "Imagining a Different Reconstruction Constitution," *Civil War History*, 51 (Dec.
5 2005), 416-26. I have provided expert witness testimony in *Miller v. Bonta*, No.
6 3:19-cv-01537-BEN-JLB (S.D. Cal.).

7      5.    My curriculum vitae is attached as Exhibit A.

8      6.    I have been retained by the California Department of Justice to serve
9 as an expert witness in this case. I am being compensated at a rate of $250 per
10 hour.

**OPINIONS**

**I.**   **SUMMARY**

13      7.    This declaration provides results of an investigation into the existence,
14 usage, and regulation of high-capacity firearms (guns capable of firing more than
15 10 rounds without re-loading) during the Reconstruction period of U.S. History
16 (1863-1877), with special focus on the period during Reconstruction when the
17 Fourteenth Amendment to the U.S. Constitution was created, ratified, and enforced
18 (1866-1876). The result of the investigation can be summarized as follows: There
19 were high-capacity firearms during Reconstruction, and all of them, including those
20 that could easily be carried by a single individual, were regarded in all the states at
21 the time as weapons suitable only for law enforcement officers, not for ordinary
22 citizens. With very few exceptions, almost all of which were in the Western
23 Territories, high-capacity firearms during the era were understood to be weapons of
24 war or anti-insurrection, not weapons of individual self-defense.

25      8.    Evidence for these assertions does not necessarily take the form of
26 statutes or court decisions, and that is entirely unsurprising: explicit legal text
27 prohibiting civilian possession of the most dangerous weapons of war was not
28 commonly the means by which such weapons were regulated in the United States

2

ATTACHMENT 4, Page 3 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

during the Civil War and Reconstruction.[1]  Rather, prohibitions existed in the policies and practices of the U.S. army and its auxiliary or allied units, such as the state-wide militias that operated as law enforcement bodies during Reconstruction. No statutes or court opinions can be found during the period that banned civilian possession of artillery pieces, hundreds of which existed unused after the Civil War, but of course the absence of such express prohibitions cannot be read as evidence that civilians were allowed to possess such pieces.  Rather, policy and practice dictated that only the U.S. army and its allied military units could possess such weapons.  High-capacity firearms, which like artillery pieces were created as weapons of war, were regulated in the same way, through policy and practice limiting possession of such firearms to the U.S. army and its allied military units. Unlike artillery pieces, however, high-capacity firearms during Reconstruction did come to be regarded by their manufacturers as having a potential market among U.S. civilians.

9. However, efforts to create a market for high-capacity firearms in the United States during Reconstruction failed miserably.  Americans who were not part of legal law enforcement bodies rarely bought high-capacity firearms.  One reason why these firearms failed to sell was the regulatory climate surrounding them.  U.S. and pro-Union state authorities sometimes seized shipments of such weapons on the assumption that they were intended for use by insurrectionary groups.  Because of the negligible demand for such weapons, owners of gun shops rarely stocked them.  The primary, almost exclusive buyers of high-capacity weapons during Reconstruction were a small number of U.S. army units and state law enforcement bodies.  Manufacturers of high-capacity firearms during Reconstruction thus looked outside the United States for buyers.  The Winchester Repeating Rifle Company, the only company to produce such weapons during post-

---

[1] In contrast, state and local laws did regulate other types of weapons, such as concealable weapons associated with criminal use, during this period.

Civil War Reconstruction, stayed afloat during Reconstruction only by selling high-capacity firearms to foreign armies.

10.    During Reconstruction, high-capacity firearms did not circulate widely among the civilian population; thus there was no need for legislative efforts to regulate them among civilians.  Instead, during Reconstruction, high-capacity firearms were possessed almost exclusively by the U.S. army and related military units, and they were regulated by the policies and practices of the army and these related military units.

**II.    SCOPE**

**A.    Time Period Covered**

11.    The time period covered by this declaration is Reconstruction, typically defined as 1863-1877.  This is the time period assigned to Reconstruction in the most commonly used study of the period, Eric Foner's *Reconstruction*.[2]  The start point of 1863 correlates to the Emancipation Proclamation, the final version of which was signed by President Abraham Lincoln on January 1, 1863.  The endpoint correlates to March 1877, when a new president, the Republican Rutherford B. Hayes, was inaugurated after a months-long contested election; and Hayes, once in office, oversaw the removal of all remaining U.S. troops in southern states that had been part of the Confederate States of America, the rebellious entity that had fought the United States during the Civil War of 1861-1865.  Within the general period of Reconstruction, the more narrow time period examined in this declaration is 1866-1876.  This is the period covering events relevant to the relationship between the Fourteenth Amendment and firearms during the greater period of Reconstruction.  Such events include (in chronological order):  the passage by the U.S. Congress of the Civil Rights Act of 1866 and the new Freedman's Bureau Act (the initial Freedman's Bureau Act, passed in March 1865, was for one year only); the passage

---

[2] Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (New York: Harper and Row, 1988), xxvii.

4

ATTACHMENT 4, Page 5 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

of the Fourteenth Amendment by Congress in 1866; the passage by Congress of the Reconstruction Act of 1867 (sometimes referred to as the "Military Reconstruction Act"); the adoption of the Fourteenth Amendment by state ratification in 1868; the enforcement of the Fourteenth Amendment by U.S. Statutes adopted in 1870-71; and the first interpretation of the Fourteenth Amendment's relation to the Second Amendment by the U.S. Supreme Court, in *U.S. v. Cruikshank* of 1876 (92 U.S. 542). This declaration also mentions the opinion in *Presser v. Illinois* (116 U.S. 252 (1886)), even though it came well after Reconstruction, because the events that led to the case occurred in early 1879, very soon after the end of Reconstruction.

**B.  Geographical Focus**

12.    This declaration covers the geographic area of the entire United States, both its states and territories, during Reconstruction. However, its particular regional focus is on the southern states that had declared themselves seceded in 1860-61 and had joined together into the Confederacy by April 1861. These states collectively represented the region during 1866-1876 where there was the most frequent use of firearms, mainly because of armed conflict either between contending factions within these states or between the U.S. army and insurgents in these states. Even more specifically, this was the only region outside of the Western Territories where Henry Rifles and Winchester Repeating Rifles were used. As will be explained later, these are the weapons examined most closely in this declaration (see IV. Historical Background and Terminology). In the Western Territories during Reconstruction, these weapons were used primarily by the U.S. army against Native Americans in the so-called "Indian Wars" that extended from the 1860s to the 1890s. Some civilian U.S. citizens in the Western Territories during this period also possessed these weapons. However, as with all firearms in the region at the time, it is difficult to determine how common possession of Henry Rifles and Winchester Repeating Rifles was in the Western Territories in the Reconstruction period. Also, laws in these territories in this period were in flux, so

5

ATTACHMENT 4, Page 6 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

1  it is difficult to know whether possession by civilian U.S. citizens there was lawful.

2  Whatever the laws were at any given moment in this region during Reconstruction,

3  the number of non-army U.S. citizens in the Western Territories was always

4  negligible.

5  **III.    RESEARCH MATERIALS AND METHODOLOGY**

6         13.     Research materials included standard scholarly works on firearms and

7  U.S. history for the period of Reconstruction—roughly twenty scholarly books and

8  thirty scholarly articles.  Materials also included newspaper and magazine articles

9  contemporary to the period studied.  Hundreds of these are accessible and were

10  accessed via commonly used databases by scholars, such as Chronicling America,

11  Pro-Quest Historical Newspapers, and the Hathi Trust. U.S. government documents

12  and documents from U.S. states and territories were accessed via the Hein Online

13  database or the Nexis Uni database (a version of the better-known Lexis Nexis legal

14  database).

15         14.     All of these documents, whether contemporary to the period studied or

16  produced by scholars after that period, were searched for information regarding

17  firearms—especially Henry Rifles and Winchester Repeating Rifles—with special

18  attention to the presence, use, and regulation of these firearms during the

19  Reconstruction era (1863-1877).

20         15.     In all my research, I gave more weight to evidence that attested to

21  firearms being owned and/or used than to evidence that manufacturers of the

22  firearms or other sellers were trying to get people to buy and use them.

23  Advertisements for the firearms are not evidence of possession.  However, if

24  advertising material provided testimony of the firearms being owned or used, I

25  treated that testimony as legitimate evidence, albeit evidence that might have been

26  embellished, even invented, for the sake of sales.

27

28

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

## IV. HISTORICAL BACKGROUND AND TERMINOLOGY

### A. Firearm Capacity at or near the Founding

16. Weapons capable of holding more than ten rounds did exist by the time that the Second Amendment was adopted in 1791, but only in very small numbers, and almost exclusively in Europe. Those that might have existed in the U.S. at the time were made to order by individual gunsmiths for individual customers. These bespoke weapons were extraordinarily rare in the United States surrounding the period of the adoption of the Second Amendment.

17. One of these rare guns was the "Cookson" or "Hill" model, based on the "Lorenzoni system" established in Europe in the 1600s. Only one gun of this type definitively existed in early America; it was an 11-shot rifle mentioned in an account of 1722 from Boston. Even if others of this type existed in British North America, they would not have been well known. According to one expert, the slightest defect in these weapons would lead to an explosion, so they required perfect construction by "fine craftsmen." Thus, only "wealthy sportsmen" could afford them.[3]

18. Another rare high-capacity gun of the era was the Girardoni (or Girandoni) air rifle, which could hold at least 20 rounds. The Girardoni was manufactured exclusively in Europe. Most of the guns manufactured were custom-ordered in the late 1700s by the Austrian army, which used the weapons with some success. To maintain a military advantage, the Austrians demanded that the guns be manufactured in secret.[4] No Girardoni is known to have appeared in America prior to 1800. There were about 30-40 guns on the Lewis and Clark expedition of 1804-1806, including a single Girardoni. Expedition leaders used it not for self-defense or hunting but for one purpose only: to impress Native Americans with

---

[3] Harold L. Peterson, *Arms and Armor in Colonial America (New York: Bramhall House*, 1956), 215-17.
[4] W. H. B. Smith, *Gas, Air and Spring Guns of the World* (Harrisburg, Penn.: Military Service Publishing Company, 1957). 30.

(continued…)

7

white Americans' advanced technology.[5]  Its presence on the expedition is not evidence that the gun was well-known to Americans of the period, much less to Americans at the time of the Second Amendment's adoption more than ten years earlier.

19.  The final example of a high-capacity gun of the era was the "Belton," though this gun held fewer than ten rounds. Joseph Belton, who traveled between Philadelphia and England, owned a nine-shot repeating gun.  It had almost certainly been produced in England in 1758.  In 1777, during the American Revolution, Belton demonstrated the gun to seven Americans known for their military or technical expertise.  They supported his petition to the Continental Congress of an order of 100 similar weapons to be delivered by Belton.  Congress soon canceled the order because of the extraordinary expense Belton demanded.  An expert on the "Belton" gun has come to the conclusion that of the 100 guns initially ordered, "none was ever made."[6]

**B.  The Henry Rifle and the Winchester Repeating Rifle**

20.  For the purposes of this declaration, a high-capacity firearm is defined as a firearm that can hold more than 10 rounds.  The magazine holding the rounds can either be integral to the gun or external to it.  The gun itself can be carried by a single person.  Finally, the gun must have the potential for common usage:  it has to be mass-manufactured or have the potential to be mass-manufactured, thus excluding experimental weapons that were never widely adopted.

---

[5] Jim Garry, *Weapons of the Lewis and Clark Expedition* (Norman, Okla.: Arthur H. Clark, 2012), 94; S. K. Wier, "The Firearms of the Lewis and Clark Expedition" (2010), http://www.westernexplorers.us/Firearms_of_Lewis_and_Clark.pdf (accessed Nov. 7, 2022).
[6] Robert Held, *The Belton Systems, 1758 and 1784-86: America's First Repeating Firearms* (Lincoln, R.I.: Andrew Mowbray, 1986), 33-39 (quote at 39). The prototype gun from 1758 that is believed to have been Belton's is preserved at the National Museum of American History; see https://americanhistory.si.edu/collections/search/object/nmah_440031 (accessed Nov. 7, 2022).

21.     Within these specifications, there were only two high-capacity firearms in the entire world that were produced during Reconstruction: the Henry Rifle and the Winchester Repeating Rifle.  I note the exclusion here of the Gatling Gun.  That weapon was indeed a high-capacity firearm produced during Reconstruction, but it could not be carried by a single person, as it was massive in size and nearly 200 pounds in weight.

22.     The Henry Rifle and the Winchester Repeating Rifle were nearly the same weapon.  Manufacturing of the Henry began soon after the weapon was patented, in 1860.  In 1866, the Winchester Repeating Rifle was established in New Haven, Connecticut.  Its owner, Oliver Winchester, hired the inventor of the Henry, who designed a slightly modified version of the Henry Rifle.  The new model was dubbed a Winchester Repeating Model.  Because it was released in 1866, it was sometimes called the "Winchester 66."  In 1873, a new model of Winchester was released, the "Winchester 73."  The rifle was nearly the same as the "Winchester 66" but used a slightly different type of ammunition.  All of these rifles, the Henry and the two models of the Winchester, had the following features: they held fifteen rounds in a chamber fixed within a stock just below the rifle barrel; they used a lever below the trigger to eject spent shells and load new rounds; and they were easily reloaded.  The Winchester was easier to reload than the Henry—it had a "gate" on the side near the trigger that allowed the user to feed rounds into the gun during lulls in firing or after all the rounds in the chamber were spent).  Advertisements for Henrys and Winchesters claimed that the weapons could fire two rounds per second (this rate might have been exaggerated—some of the same ads made the false claim that the guns held eighteen rounds, not fifteen—but all agreed that the rifle could fire at a rate at least as fast as any existing rifle).

23.     There were other individual-use weapons during the Reconstruction era that could fire multiple shots in rapid sequence, but none had a higher capacity than ten rounds.  Some sidearms, most notably six-shot revolvers, could fire rounds

9

1  in rapid sequence.  But no sidearm held more than ten rounds.  Certain rifles beside

2  the Henry and Winchester could fire multiple rounds rapidly, but none held more

3  than ten rounds. These included the Spencer Rifle (4-round capacity) and the

4  Sharps Rifle (7-round capacity).  The U.S. army and the Confederate army

5  approved the adoption of the Spencer and Sharps rifles.  These weapons were

6  known either by their company name or by the generic term "repeaters" or

7  "repeating rifles."  Henrys and Winchesters were also repeating rifles, but because

8  they were in a class of their own, due to their high capacity, they were generally

9  known only as Henrys or as Winchesters.  In the language of the day, they did not

10  fall into the generic category of "repeaters" or "repeating rifles" (thus a very well-

11  armed individual of the period might be described as having "a revolver, a repeater,

12  and a Winchester"—three distinct categories).

13       24.    This declaration occasionally uses the term "Henry-Winchester."

14  Although the Winchester Repeating Rifle effectively replaced the Henry Rifle,

15  Henry Rifles continued to be used long after Winchesters began to be produced.  At

16  certain times and places during Reconstruction, both types of weapons might be

17  found in possession of a single, armed group.  For such situations, the phrase

18  "Henry Rifles and/or Winchester Repeating Rifles" would be appropriate, but

19  seeing how cumbersome that phrase is, it has been shortened in this declaration to

20  "Henry-Winchester" or "Henry-Winchesters."

21      **C.**    **The Henry Rifle and the American Civil War**

22       25.    Production and sales numbers reveal that Henry Rifles and their

23  successors, Winchester Repeating Rifles, were uncommon during the Civil War and

24  Reconstruction compared to other rifles.[7]  Until 1866, manufacturers of Henrys and

25                    [7] Unless otherwise noted, this declaration relies on two sources for numbers

26  of Henry Rifles and Winchester Repeating Rifles manufactured and sold:  Pamela

    Haag, *The Gunning of America: Business and the Making of American Gun Culture*

27  (New York: Basic Books, 2016); and John E. Parsons, *The First Winchester: The*

*Story of the 1866 Repeating Rifle* (New York: Morrow, 1955).

28                                               (continued…)

| | |
|---|---|
| 1 | Winchesters concentrated their marketing efforts within the United States on trying |
| 2 | to persuade the U.S. army and pro-Union state militias to adopt the high-capacity |
| 3 | rifles as standard weapons for soldiers.[8]  The U.S. War Department never adopted |
| 4 | Henry-Winchesters.  The army's chief of ordnance, General James Ripley, reported |
| 5 | early in the war that these rifles, along with lower-capacity rifles were "too |
| 6 | complicated, too heavy, and too costly . . . and apt to waste ammunition."[9]  The |
| 7 | ordinance department never changed its position on Henry-Winchesters.  During |
| 8 | the Civil War, the U.S. army opted instead for single-shot rifles and, in some |
| 9 | instances, low-capacity "repeaters" (rifles that held magazines of two to seven |
| 10 | rounds).  The U.S. army did allow individual commanders of army units or allied |
| 11 | units to buy Henry-Winchesters for their soldiers.  For example, of the 900 Henry |
| 12 | rifles sold during 1862, 300 went to Kentucky's pro-Union state militia.[10]  Although |
| 13 | some military units that purchased Henry Rifles were able to do so using funds |
| 14 | allotted to them by state governments, most of the soldiers and officers who |
| 15 | purchased the weapons used their own money.  By the end of the Civil War in |
| 16 | 1865, U.S. soldiers had purchased about 8,500 Henry Rifles; most of those had |
| 17 | been bought with the soldiers' own money.  By contrast, the U.S. government had |
| 18 | purchased nearly 107,000 Spencer single-shot rifles for use by the army.[11] |
| 19 |       26.    Meanwhile during the Civil War, the Confederate War Department |
| 20 | also never adopted Henry Rifles.  Whether that was by choice is unclear. Oliver |
| 21 | Winchester, who had the greatest control of the company that made Henrys, |
| 22 | declared that he did not want the weapons sold to Confederates.  His policy may |
| 23 | have been due to pure loyalty to the Union cause or to fear that he would be |

[8] Haag, *The Gunning of America*, 65-81.  During the Civil War, the pro-Union border states of Kentucky and Missouri had state-wide militias that were authorized by state governments to fight for the Union.

[9] Haag, *The Gunning of America*, 70.

[10] Haag, *The Gunning of America*, 76.

[11] Haag, *The Gunning of America*, 81.

(continued…)

ATTACHMENT 4, Page 12 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

1    charged with treason by the U.S. government if he facilitated gun sales to the

2    rebels.  Some Confederate soldiers were able to acquire Henrys by theft or by using

3    agents who purchased them in the North and smuggled them to the South.[12]  Most

4    Confederates knew about the weapon.  A widely-circulated story told of a

5    Confederate soldier who called the gun "that damned Yankee rifle that can be

6    loaded on Sunday and fired all week."  One of the soldiers in Robert E. Lee's Army

7    of Northern Virginia regretted that "we never did secure the Winchester."[13]  Some

8    Confederate soldiers did manage to obtain Henry-Winchesters, either by smuggling

9    or, more commonly, by confiscating them from captured Union soldiers.  In late

10    1862, for example, a number of pro-Union Kentucky soldiers who had just acquired

11    Henry Rifles were overrun by pro-Confederate Kentuckians and Tennesseans.  As

12    many as 300 Henry rifles ended up in Confederate hands as a result.[14] These

13    weapons probably did not stay with the southerners for very long.  By June 1865,

14    all of the major Confederate armies had surrendered.  Typically, surrender required

15    all Confederate soldiers to "stack arms."  If they had sidearms, they could keep

16    them, but any rifles had to be relinquished.  Confederate veterans would thus have

17    been prohibited from having Henry-Winchesters.  At least some ex-Confederate

18    soldiers ended up with Henry-Winchesters, however, though not legally.  If they

19    failed to turn in their rifles, they were in violation of the "parole" agreement that

20    protected them from imprisonment after surrender.  Some ex-Confederates

21    managed to get Henry-Winchesters by stealing them from U.S. army depots.

22    Others bought them from smugglers who had gotten the weapons in Mexico and

23    then carried them across the border to Texas.  Henry-Winchesters were easier to

---

24

25    [12] Haag, *The Gunning of America*, 65.  For evidence that U.S. authorities would have regarded the sale of Henrys to Confederates as treasonous, and thus that Winchester had good reason to avoid such sales, see Haag, *The Gunning of America*, 90.

26

27    [13] Harold F. Williamson, *Winchester: The Gun That Won the West* (Washington, D.C.: Combat Forces Press, 1952), 38.

28    [14] Haag, *The Gunning of America*, 76.

find in Mexico than in the U.S. in 1864-1867. They had been sold by the thousands to the Juaristas, the rebel force that would ultimately wrest Mexico from Maximilian, the self-proclaimed "Emperor" installed in Mexico City by Napoleon III of France.

27. Not only the Juaristas but other non-U.S., non-Confederate armies possessed Henry-Winchesters. Indeed, foreign armies were the main market for Henry-Winchester manufacturers during Reconstruction. Had it not been for the war in Mexico, along with the Franco-Prussian War and the various armed conflicts between the Russian and Ottoman empires—all wars involving thousands of Henry-Winchesters—the manufacturers of these weapons would likely have gone bankrupt.[15]

28. In the United States by 1866, Henry-Winchesters did exist, to be sure, but in much smaller numbers than in foreign countries. U.S. veterans of the Civil War could possess Henry rifles. Beginning in May 1865, U.S. army volunteers began mustering out in significant numbers. The non-regular U.S. army (that is, the volunteer force), nearly a million strong by April 1865, would fall well below 100,000 by the end of the year. Unlike ex-Confederate soldiers, ex-U.S. soldiers could keep their rifles upon discharge. This meant that U.S. soldiers at the time who had Henry rifles might continue to possess them once they re-entered civilian life. However, the number of such U.S. veterans who kept their Henrys was small, perhaps 7,500,[16] and those that opted to keep them paid dearly. The U.S. army did not simply give weapons away for free to discharging soldiers who had acquired

[15] Haag, *The Gunning of America*, 109-42.

[16] The figure of 7,500 Henrys kept by pro-Union soldiers after the war is reached in the following way. 8,500 had been purchased by or for U.S. soldiers. See Haag, *The Gunning of America*, 81. Of these, roughly 2,000 were purchased for soldiers (based on a count of regiments known to have bought the rifles with public funds). Thus 6,500 Henrys were privately owned by soldiers. Of the roughly 2,000 Henrys purchased for soldiers, 808 were known to have been bought by the soldiers at the end of the war. See 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," *U.S. Congressional Serial Set* (1871), pp. 167-172. Thus, a generous estimate of how many U.S. veterans had Henrys after the war is 7,500.

1  them at no cost from their military units. Rather, soldiers wanting to keep their

2  weapons had to buy them at market value. A Spencer carbine (a short-barreled,

3  repeating rifle, and one of the most popular weapons among U.S. soldiers), would

4  cost a discharging soldier about $10 (roughly $175 in 2022 dollars). A Henry

5  would cost at least $30 (roughly $525 in 2022 dollars). A private in the U.S. army

6  typically made $13 per month. If he had a Spencer that he wanted to buy, he would

7  have to pay less than one month's wages—not a bad deal for a perfectly sound and

8  popular rifle. If he wanted to buy a Henry, though, that would cost him more than

9  two months' wages, and there would be little to persuade him that the difference in

10  price corresponded to the difference in value. The result was that very few Henrys

11  were purchased by discharged U.S. soldiers. According to a U.S. army report, 808

12  Henrys were purchased by discharging Civil War soldiers, compared to 8,289

13  Spencer Carbines.[17] Henrys that were not purchased went to the U.S. War

14  Department's ordnance department, which did not sell them.

15       29.    By the end of the Civil War in 1865, very few combatants had used

16  Henry Rifles, and fewer still had kept them once they were discharged. The result

17  was that only a small number of Henrys were in circulation in the United States

18  immediately after the war—perhaps 10,000, and this in a country of roughly 35

19  million people.[18] Those veterans who possessed the guns understood that they were

20  weapons of war—they had used them as such—rather than weapons of individual

21  self-defense. Maybe veterans kept them as souvenirs, maybe as commodities to be

22         [17] General Orders, No. 101, May 30, 1865, *The War of the Rebellion*
23  (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43; 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," *U.S. Congressional Serial Set* (1871), pp. 167-172.
24  
       [18] 11,000 Henry Rifles were produced between 1861 and 1865; see Parsons,
25  *The First Winchester*, 48. Assuming that all were sold—a generous assumption— then 2,500 were sold to civilians and 8,500 to U.S. soldiers (the 8,500 figure comes
26  from note 12 above). Of the 8,500 U.S. soldiers who had Henrys, 7,500 kept them after the war; see note 12 above. Thus 10,000 Henrys were in circulation after the
27  war (again, a generous estimate). The U.S. census of 1860 reported just over 31 million Americans; the census of 1870 reported just over 38 million. Thus 35
28  million is given as an estimate of the population of the United States in 1865.

ATTACHMENT 4, Page 15 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

sold at a later date, maybe as novelties to be displayed at local shooting contests or social gatherings (rifle clubs and shooting galleries were common in the North). Maybe they planned to travel to or through the Western Territories, where Henrys were gaining a reputation as good weapons against hostile Native Americans or roaming bands of criminals, known as "highwaymen" or "road agents." Regardless of why a U.S. veteran might have kept a Henry, he would have understood that it was an uncommon weapon, and one not intended for individual self-defense. It was strictly a weapon of war.

### D. State Secession, State Readmission, State Redemption

30. Reconstruction was a time period (1863-1877) but also a process. The process was described by President Abraham Lincoln in his last public speech (April 11, 1865) as getting "the seceded States, so called," which were "out of their proper practical relation with the Union," back into their "proper practical relation" with the Union.[19] To better understand this process, one must understand the meaning of key terms used during the Reconstruction period: state secession, state readmission, and state redemption.

#### 1. State Secession

31. Lincoln used the phrase "seceded States, so called" because he did not accept the constitutionality of state secession. All eleven states of the Confederacy had declared themselves "seceded" from the Union by May 20, 1861. The governments of all of these states regarded state secession, by which they meant a breaking-off from the Union, as constitutional. The Lincoln administration rejected this interpretation and declared instead that the "so-called" seceded states had remained in the Union but had had their governments overtaken by disloyal, insurrectionary groups. Reconstruction, therefore, would be complete when all of the "so-called" seceded states had governments that were loyal to the Union. The

---

[19] Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick, N.J.: Rutgers University Press, 1953), 8:403-4.

15

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)
ATTACHMENT 4, Page 16 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

1  presidential administrations of the Reconstruction era that followed Lincoln's

2  (Andrew Johnson's and Ulysses S. Grant's) adopted this understanding of

3  secession.  So, too, did all the Reconstruction-era Congresses, though a minority of

4  Congressmen took a somewhat different view, claiming that secession was indeed

5  unconstitutional but that the states in question had indeed broken off from the

6  Union and therefore could be treated as territories.  This declaration does not delve

7  into the question of the constitutionality of secession.  It simply notes that U.S.

8  lawmakers of the Reconstruction era generally regarded secession as

9  unconstitutional and a form of insurrection.

10     **2.    State Readmission**

11     32.    There were competing views among U.S. lawmakers during

12  Reconstruction as to when a "so-called" seceded state could be deemed

13  "readmitted" to the Union.  The dominant view among U.S. lawmakers was that a

14  state was deemed readmitted when Congress agreed to seat Representatives and

15  Senators from that state. This meaning of state readmission is used in this

16  declaration. In justifying federal intervention into "so-called" seceded states and the

17  imposition of qualifications on states for readmission, national law makers relied on

18  two constitutional principles: 1) "war powers"; and 2) the "guarantee clause"—the

19  clause of the U.S. Constitution declaring that "The United States shall guarantee to

20  every State in this Union a Republican Form of Government" (U.S.C., Art. IV, Sec.

21  4).  This declaration does not delve into the question of the legitimacy and scope of

22  these constitutional principles.  It simply notes that these were the principles of the

23  time used to justify federal policy towards the "so-called" seceded states during

24  Reconstruction.

25     **3.    State Redemption**

26     33.    Between 1866 and 1871, all of the "so-called" seceded states were

27  readmitted to the Union.  At the point of readmission, each state had a government

28  that was loyal to the Union and controlled by a political party affiliated with the

16

national Republican Party, which for all the years of Reconstruction was the Party in control of the U.S. government.  In 1866-68, the last years of the administration of Andrew Johnson, he renounced the Republican Party and declared himself a Democrat, which he had been prior to the Civil War, but the U.S. government as a whole was still Republican.  The Republicans in Congress beginning in December 1866 had a two-thirds majority that allowed them to override Johnson's vetoes; and beginning in March 1867, with the Reconstruction Act, they effectively took control of the "Commander-in-Chief" powers typically vested in the Executive branch. In each state after readmission there was internal conflict.  Part of that conflict involved efforts by Democrats, many of whom were former Confederates or Confederate-sympathizers, to take control of the state government from Republicans.  By 1877, the Democrats had taken control of the governments of all the states of the former Confederacy.  At the point when Democrats took control of a state, they declared the state "redeemed" and began rolling back reforms instituted by prior Republican state authorities.  In this declaration, state redemption means the period when Democrats declared a state "redeemed" and began instituting reactionary measures.

**E.    Militias**

34.    Militias have a long history in the United States, and they have been studied extensively by scholars investigating the Second Amendment, especially for the period of Colonial America and the Early Republic.  Militias existed during Reconstruction, but the militias of that period were fundamentally different from the militias of the earlier periods.

35.    By the time that the Civil War broke out in 1861, well-organized state militias such as had existed in the Early Republic technically existed but were practically defunct, except in frontier states like Missouri and Texas.  Militias by 1861 essentially existed as volunteer local groups authorized by state governments but were only lightly controlled by those governments.  Such militias were used, to

17

1    be sure. Local militias in Virginia in 1859, for example, had worked together with

2    a unit of the U.S. army commanded by Robert E. Lee to put down the effort by

3    John Brown to seize the U.S. armory at Harpers Ferry and distribute arms to

4    enslaved Black Americans in the region.

5    36.    The fact that state militias did technically exist by 1861 became very

6    important once the Civil War broke out. The power under the U.S. Constitution for

7    a President to call up state militias is what Abraham Lincoln invoked at the start of

8    the war when he authorized up to 75,000 men to come together to put down the

9    insurrection in the southern states. The Confederate States of America, which

10    adopted a constitution quite similar to the U.S. Constitution, invoked this same

11    authority when calling up its national army.

12    37.    Although soldiers had been called to national armies in their role as

13    state militiamen, the armed units that formed the basis of national armies during the

14    Civil War were not state-based militia units but rather state-formed regiments

15    approved as national army units by the U.S. War Department (hence only in rare

16    instances would a regiment be a replica of a local militia unit). Nonetheless, the

17    national armies continued to be managed at times by laws designed in the pre-war

18    era to manage state militias. In July 1862, for example, the United States passed a

19    Militia Act that standardized the terms of membership in state-wide militias even

20    though state-wide militias had grown defunct in the North prior to the war; only in

21    this way—by legislating via the old state militia system—did the U.S. War

22    Department have the authority to manage the personnel of the national army. The

23    July 1862 Act significantly declared that Black Americans could not be denied

24    admission to state militias. That was a pivotal development, as most state militias

25    prior to the war (all of them in the South, most of those in the North), had denied

26    membership to Black Americans.

27    38.    When the Civil War ended in mid-1865, state militias, which had been

28    given new life by the war, thrived, but not everywhere. In the North, they fell again

18

ATTACHMENT 4, Page 19 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

into disuse, though they would begin to appear again with strength in the late 1870s and 1880s.  In the border states of Missouri and Kentucky, which had remained loyal to the Union despite being slave states, state militias continued to be important, as guerrillas caused disturbances in the states long after the Civil War was over.  In the states of the former Confederacy after the war, the state militias had the most visible—and notorious—presence.  Invoking newly passed discriminatory state laws ("Black Codes"), or simply acting on their own discretion, southern state militias, which excluded all Black Americans, harassed, assaulted, and even killed Black Americans and pro-Union whites.  These militias were composed mostly of former Confederate soldiers, many of whom wore their Confederate uniforms while in action.  These militias were regarded by U.S. lawmakers as pernicious and unlawful.  Leaving aside the obvious illegality of the many acts committed by these militias, they were in violation of U.S. law simply by wearing Confederate uniforms.[20]

39.     In March 1867, the U.S. Congress abolished all southern state militias, with some exceptions.  Exempted were the border states, the four slave states that had never seceded, though Kentucky and Missouri were the only border states with state militias, and both states would disband their militias by 1868.  Also exempted were two states that had joined the Confederacy:  Arkansas and Tennessee.[21] Arkansas was exempted because it had proven itself to President Johnson as a genuinely loyal state.  It had established a loyal state government, led by Governor Powell Clayton, that conformed to the guidelines that Abraham Lincoln had laid

---

[20] James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, *Opinions of the Attorney Genera*l, 11:208-9. For these immediate post-war southern militias, see William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel Hill: University of North Carolina Press, 2021), 66-67.

[21] 14 U.S. Statutes 487, Chap 170, Sec. 6 (Approved March 2, 1867); James E. Sefton, *The United States Army and Reconstruction*, 1865-1877 (Baton Rouge: Louisiana State University Press, 1967), 112.

(continued…)

1    out in December 1863 and that Johnson had affirmed soon after taking office.

2    Arkansas in 1868 created a state militia that U.S. authorities regarded as a

3    legitimate armed organization loyal to the United States.[22]  Tennessee was

4    exempted because it, too, had established a loyal state government, led by Governor

5    William ("Parson") Brownlow.  It had gone one step further.  It had ratified the

6    Fourteenth Amendment, passed by Congress in mid-1866, thus becoming the first

7    southern state to do so and, as a result, becoming the first formerly seceded state to

8    be formally readmitted to the Union.  With Brownlow's urging, Tennessee in 1866

9    had created a state militia, the "Tennessee State Guard."  This organization was

10   composed of both white and black members; it was well-armed (with Enfield

11   single-shot rifles, not with Henrys or Winchesters); and it drilled regularly.  Former

12   Confederates in the state despised the force.[23]

13        40.    After Congress in 1867 abolished all but the exempted southern state

14   militias, some of the newly created pro-Union governments in the non-exempted

15   southern states created new state militias that were expressly tasked with subduing

16   insurrection and anti-black activities.  Such states included Louisiana, North

17   Carolina, South Carolina, and Texas.  Loyal state governments in Alabama and

18   Florida proclaimed an intention to organize such new state militias, but they never

19   followed through.  A loyal government in Mississippi in 1870 went so far as to

20   organize such a state militia, but the force was never used.  The state militias of the

21   South that did exist and saw action, those in Arkansas, Louisiana, North Carolina,

22   Tennessee, South Carolina, and Texas, were wholly new innovations (though Texas

23   made the dubious claim that the pre-war Texas Rangers was a predecessor

24   organization).  The new, post-1867 southern state militias were under the direct

25   _____

26   [22] Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," *Arkansas Historical Quarterly*, 64 (Winter 2005), 356-58.

27   [23] Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction*, 1867-1869 (Knoxville: University Press of Tennessee, 2005), 1-119.

28

control of the state (the Governor and/or state adjutant general), as opposed to merely authorized by the governor. They drilled and paraded regularly. They were paid and armed by the state, with the arms kept in state-maintained, state-guarded armories or arsenals. Finally, all of the militias allowed if not encouraged Black American men to join, though some, like North Carolina's, segregated white companies from black companies. The high number of Black Americans in the southern state militias led some people at the time as well as some early historians to call these organizations "Negro Militias." This declaration does not use that label. Pre-Civil War state militias in the South, in contrast to these wholly new post-war organizations, were unpaid, self-armed, and all-white.[24]

41.     Two of the new southern state militias, those of Louisiana and South Carolina, are particularly relevant to the subject of this declaration. As will be discussed below, the state militias of Louisiana and South Carolina—and only those state militias—were armed with Winchester Repeating Rifles.

42.     The composition of and membership requirements of the new state militias indicate much about attitudes toward firearms regulation among law makers of the time. The inclusion of Black Americans in the militias was part of a larger understanding among Republicans in the era of the Fourteenth Amendment that regulations restricting blacks from possessing firearms were no longer to be regarded as constitutional.[25] The new militias did more than include blacks. They excluded some whites, specifically those who were regarded as still supporting the

_____

[24] Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University of Texas Press, 1957), 3-33; Otis A. Singletary, "The Texas Militia During Reconstruction," *Southwestern Historical Quarterly*, 60 (July 1956), 25-28; Allan Robert Purcell, "The History of the Texas Militia, 1835-1903" (Ph.D. diss., University of Texas, Austin, 1981), 221-27.

[25] Clayton E. Cramer, Nicholas J. Johnson, and George A. Mocsary, "'This Right is Not Allowed by Governments That Are Afraid of the People': The Public Meaning of the Second Amendment when the Fourteenth Amendment was Ratified," *George Mason Law Review*, 17 (2010), 823-863, esp. 852-863.

(continued…)

Confederate cause.[26]  Thus, the new state militias that began forming in 1868, the same year as the adoption of the Fourteenth Amendment, indicated that lawmakers understood that Black Americans' security required not simply the absence of regulations denying them arms but the presence of regulations denying arms to those who were known to support insurrection against the United States and violence against blacks.

### F.  The U.S. Army During Reconstruction

43.    The U.S. army began occupying parts of the South as soon as the Civil War broke out and would not end its occupation until 1877, the end of Reconstruction, when it removed its last units from Florida, Louisiana, and South Carolina.  During the war, the U.S. army had exclusive police powers in the occupied South until or unless local policing institutions—courts and constabularies—were deemed loyal to the United States.  At that point, the U.S. army cooperated with local police institutions to "keep the peace."  Yet U.S. commanders retained the power, which they had had since the start of the war, to declare martial law in an area, thus suspending the civil institutions there.  This arrangement carried over from the Civil War into the early years of post-war Reconstruction.  Until April 1866, U.S. troops had unrestrained power to operate within state boundaries to keep the peace.  As part of that power, they could use troops as police and hold their own courts that could try civilians.[27]

44.    The army also was willing to use this power in states that had never declared themselves seceded.  The army had overseen arrests and prosecutions of alleged traitors in Indiana in 1864, actions that were ultimately deemed unconstitutional in the U.S. Supreme Court's post-war *Milligan* opinion. In June 1866, the army had intervened in New York and Vermont to capture Irish nationalists known as Fenians who had fought against British troops in Canada and

---

[26] Singletary, *Negro Militia and Reconstruction*, 23-24.
[27] Sefton, *The U.S. Army and Reconstruction*, 5-106.

ATTACHMENT  4, Page 23 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

then crossed over to the United States.  (Neither Henrys nor Winchesters were used in the conflicts between the Fenians and Canadian troops.)  General-in-Chief Ulysses S. Grant ordered General George Meade to inform the New York and Vermont governors that they should call out volunteer militia units to capture the Fenians.[28]

45.     The federal-state structure of armed enforcement that took place during the 1866 Fenian crisis was the model that U.S. authorities had in mind for the South once the southern states began creating pro-Union state militias.  The hope was that the southern states would end up like New York and Vermont during the Fenian crisis:  they would develop and sustain new, pro-Republican state militias that would be the primary armed force in the states, with the U.S. army playing only an ancillary role.

46.     This plan for U.S. army-southern state militia cooperation nearly came apart beginning in April 1866. In that month, President Andrew Johnson proclaimed that a state of "cessation of hostilities" existed in all the southern states but Texas (in August 1866 he would proclaim that in Texas, too, there was a "cessation of hostilities").  Johnson thus effectively removed "war powers" as a constitutional justification for the army's presence in the South.  His move was part of his general turn against the Republican program of Reconstruction.  Also in April 1866, he vetoed the Civil Rights Act of 1866, a veto that Congress overrode.  Two months earlier, he had vetoed the act renewing the Freedman's Bureau.  Eventually, Congress passed a new act for the Bureau, which Johnson again vetoed but Congress overrode.  Both the Civil Rights Act and the Freedman's Bureau Act established, among other things, that the army would continue to have policing powers in the southern states.  Those powers were to be used specifically to put down insurrectionaries who threatened to undermine the civil rights of Black

---

[28] W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71.

1   Americans or in any way jeopardize pro-Union citizens and institutions. The Civil
2   Rights Act contained a military provision that empowered the army to act reactively
3   or preemptively against any actual or anticipated insurrectionary threat.[29]  Even
4   though Congress was able to sustain this military provision as well as the rest of the
5   Civil Rights Act of 1866 against Johnson's veto, the military provision was
6   jeopardized by Johnson's declaration of a "cessation of hostilities." The declaration
7   signaled that Johnson might not sustain the army in its duties specified by
8   Congressional measures like the Civil Rights Act. Also in April 1866, the U.S.
9   Supreme Court announced that it was ruling in favor of the plaintiff in the *Milligan*
10  case (the actual opinion was not issued until January 1867). That case was
11  narrowly about the power of the army to try civilians in areas where civil courts
12  were operative; more broadly it was about the power of the army to have any
13  authority at all to occupy an area ostensibly at peace.

14       47.    U.S. Republican authorities moved quickly to protect their power to
15  occupy the formerly rebel South. Secretary of War Stanton prepared an order that
16  invoked the military provision of the Civil Rights Act of 1866 to justify continued
17  military occupation of the South. This was a novel move, as it allowed military
18  occupation in the absence of "war powers." The Civil Rights Act was justified not
19  by "war powers" but by the Thirteenth Amendment abolishing slavery. A small
20  number of Republicans, most notably Representative John Bingham, thought the
21  Civil Rights Act needed more justification than that. For this reason, among others,
22  Bingham pressed for a new constitutional amendment, which ultimately emerged as
23  the Fourteenth Amendment. The resolution for the amendment was passed by
24  Congress a few months after the Civil Rights Act and sent to the states for

25

26          [29] Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of
27  Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest
    Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.:
28  Southern Illinois University Press, 2018), 60-88.

1    ratification.  Congress would ultimately declare that the Civil Rights Act of 1866

2    was authorized by the Fourteenth as well as the Thirteenth Amendments.

3        48.    The military provision of the Civil Rights Act of 1866 was not enough

4    to put U.S. military occupation of the South on sure footing.  The President still

5    controlled the army in his capacity as commander-in-chief.  Congress thus began to

6    wrest control of the army from President Johnson.  First, it passed the

7    Reconstruction Act of 1867, which formalized military occupation and required

8    southern states to ratify the Fourteenth Amendment in order to be readmitted to the

9    Union.  Then Congress passed measures (most notably the Tenure of Office Act)

10    that shifted aspects of army control from the President to Congress.  Then it

11    impeached Johnson, though Johnson was ultimately acquitted by the Senate.  In the

12    meantime, the army and the U.S. Attorney General opted to take the narrowest

13    possible reading of the Milligan decision, such that the only power deemed out of

14    the army's hands in occupied areas was the power to try civilians if civilian courts

15    were operative.  By 1868, then, the year of the Fourteenth Amendment's adoption,

16    the U.S. army had secured for itself a place in the southern states as a legitimate

17    occupying force in the South.  It would affirm this status with the acts of 1870 and

18    1871 enforcing the Fourteenth Amendment as well as the Fifteenth Amendment,

19    which had been adopted in 1870.  The last of these enforcement acts, the so-called

20    "KKK Act," was aimed directly at breaking up the Ku Klux Klan and similar

21    insurrectionary, paramilitary organizations that terrorized Black Americans and

22    pro-Union whites ("terror" was one of the most commonly used words of the time

23    to describe the Klan's intent toward Black Americans).

24        49.    The reason to understand this sequence of events is to appreciate the

25    army's distinctive, unprecedented role in the era of the Fourteenth Amendment.  It

26    did not operate under martial law.  It had the power to declare martial law, but in

27    practice, it avoided using that power.  Instead, it looked to pro-Republican state

28    governors to declare martial law if martial law was deemed necessary (and such

gubernatorial declarations were extraordinarily rare during Reconstruction).

Furthermore, in the wake of *Milligan*, it yielded to the states the judicial power it

had wielded prior to 1866. States' attorneys and state courts were to be the main

sites of judicial action, though the U.S. Attorney General reserved the power to

remove cases to federal courts if they involved matters relating to civil and political

rights covered by national legislation (to help centralize federal judicial activity in

the South, the Department of Justice was created in 1870).  During the era of the

Fourteenth Amendment, then, the main role of the U.S. army was to act as an

ancillary police force to the state militias or other local and state policing

operations.  In this capacity, the army worked with states to detect and arrest

insurrectionaries and civil-rights violators.  Although sometimes those arrested

would stand trial in a federal court—this happened most famously in the South

Carolina Ku Klux Klan trials of 1871-72—the army and agents of the Department

of Justice looked to the state courts to be the primary judicial institutions of locales.

As an example: President Ulysses S. Grant in 1871, in his capacity as commander-

in-chief of the U.S. army, ordered all insurrectionaries in South Carolina to turn in

their firearms to legitimate authorities.  If insurrectionaries were found who had not

turned in their weapons, they could be arrested and denied habeas corpus rights

under Grant's order.[30]  However, prosecutions and trials of such insurrectionaries

going forward would be conducted by state authorities, if those authorities were

known to be loyal to the United States.  In its capacity as an ancillary police force

to state militias, with both armed organizations committed to subduing

insurrectionaries and civil-rights violators, the U.S. army sought to prevent

weapons from reaching unlawful insurgent groups.  Army officers relied on their

---

[30] Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, pp. 4086-87 (March 24, 1871), 4089-90 (Oct. 12, 1871), 4090-92 (Oct. 17, 1871), 4092-93 (Nov. 3, 1871; this proclamation revoked suspension of habeas corpus in Marion County, South Carolina), 4093-4095 (Nov. 10, 1871).

1  own intelligence operators as well as private intelligence agencies like the

2  Pinkertons to learn of arms shipments. By the terms of the Civil Rights Act of

3  1866 and the Enforcement Acts of 1870, the U.S. army and related military units

4  were authorized to act preemptively to prevent insurrectionaries from making

5  armed assaults on loyal Unionists. The seizure of weapons intended for

6  insurrectionaries thus represented a lawful use of military authority under the

7  Fourteenth Amendment.[31]

8      50.    As a result, any southern person or combination of persons considering

9  having Henry or Winchester rifles shipped to them faced the prospect that the U.S.

10  army or state militia might keep the shipment from reaching them and that, even if

11  the shipment did reach them, the policing forces could arrest them and confiscate

12  the weapons.

13  **V.    FINDINGS: HIGH-CAPACITY FIREARMS DURING RECONSTRUCTION**

14      **A.    Overview: Henry Rifles and Winchester Repeating Rifles**

15              **During Reconstruction**

16      51.    An oft-cited scholar in legal debates over firearms contends that "the

17  Winchester Model 1866 . . . became a huge commercial success. So by the time the

18  Fourteenth Amendment was ratified in 1868, rifles holding more than 10 rounds

19  were common in America." The first part of this statement is true: the "Winchester

20  66" did become a commercial success. The author neglects to mention, however,

21  that prior to the end of Reconstruction, that commercial success was due almost

22  entirely to sales to foreign armies. Thus it does not follow that the success of the

23  company during Reconstruction is evidence of the presence of Winchesters in the

24  United States. Indeed, the author's second statement, that "rifles holding more than

25

26  ───────────────

27  [31] No U.S. court ever denied the constitutionality of such seizures of weapons or the legislation that authorized the seizures. See Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction."

28                                               (continued…)

10 rounds were common in America" at the time of the Fourteenth Amendment, is false.[32]

52.     Rifles holding more than 10 rounds made up a tiny fraction of all firearms in the United States during Reconstruction.  Furthermore, as will be discussed in more detail below, possession of such rifles—legal possession, that is—was limited almost exclusively to U.S. soldiers and civilian law enforcement officers.

**B.     Henrys and Winchesters in the Reconstruction-Era West**

53.     One of the places that Henrys and Winchesters could be found during Reconstruction was in the West, though the weapons did not proliferate there at the time at anything like the scale invented by novelists and film-makers of the late nineteenth and twentieth centuries.

54.     With the passage of the Homestead Act (1862), the end of the Civil War (1865), the completion of the first transcontinental railroad (1869), and the discovery of gold in the Black Hills of Dakota Territory, the appeal of traveling to

_____

[32] David Kopel, "The History of Magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post*, May 29, 2014, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/ (accessed September 22, 2022).  Kopel's contention also appears on page 4 of his co-authored Amicus Brief in a federal case from California, *Fyock v. City of Sunnyvale*, Case No. 14-15408 (9th Cir. 2015).  See David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.).  For the number of Henrys and Winchesters manufactured 1861-1877, as well as the number of these rifles shipped to foreign armies, see John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123. To understand the scale of these numbers, one should contrast them to the production and sales of other rifles of the era.  For example, according to Parsons, the total number of Henrys and Winchesters manufactured in 1861-1877 was 164,466 (this includes the 56,000 shipped to foreign armies), whereas in the same period, 845,713 Springfield "trap-door" single-shot rifles were manufactured. See "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3; some of the data in this report is aggregated and printed at the Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoor-production-serial-numbers.htm.

(continued…)

28

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)
ATTACHMENT 4, Page 29 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

1  or through the Western Territories increased.  Because law enforcement was

2  minimal in the region, and also because the U.S. army could offer travelers and

3  settlers little protection—they were too consumed during the era with subduing

4  Native Americans—Americans came to regard self-defense as particularly

5  important in the region.  The Winchester company tried to capitalize on the

6  situation by touting the benefits of its rifle.  The "Winchester 73" model in

7  particular was aimed at Westerners or potential Westerners.  The company

8  emphasized that the speed and high capacity of the rifle allowed a single person to

9  hold off a band of outlaws or hostile Native Americans.[33]  The marketing campaign

10  was aimed especially at Americans hoping to travel to the Western Territories. The

11  campaign had minimal success.

12      55.    Many travelers to the West carried firearms, to be sure, but a very

13  small number of those arms were Henrys or Winchesters.  Most of the accounts of

14  privately held Winchesters during Reconstruction that I found in the research for

15  this declaration did come from the Western Territories, but there were fewer than

16  fifteen such accounts that were not expressly fictional.  Two such accounts became

17  legendary, mainly because the manufacturers of the Henry-Winchesters used them

18  to advertise their rifles.  One account was of two former U.S. soldiers who were

19  part of a mining operation in the Rocky Mountains and used their Henry Rifles to

20  defeat some raiding Blackfoot Indians.  Another was of a private guard hired by

21  Wells Fargo to accompany a cash shipment to the West; he was attacked by robbers

22  near Nevada City and used his Henry Rifle to kill them all.  It might be noted that

23

24      [33] See, for example, the ad printed over three issues in the *Wyoming Leader*
(March 16, April 21, May 8, 1868, always p. 4).  Ads for Winchesters that said

25  nothing of their possible purposes appeared occasionally in newspapers published
in the in Western Territories; see for example, a gun dealer's ad for "Sharps and

26  Winchester Rifles" as specialties: *Bismarck Tri-Weekly Tribune* (Dakota Territory),
June 29, 1877, p. 4.  On the post-Reconstruction invention of the myth of

27  Winchesters proliferating in the Reconstruction-era West, see Haag, *The Gunning
of America*, 179-202, 353-68.

28                                                      (continued…)

these stories, assuming they are true, did not involve individual self-defense by ordinary civilians. They involved defense of economic enterprises by trained gunmen.[34] Less oft-told incidents involving Henrys and Winchesters from the Western Territories involved brutal violence between thuggish combatants. There was no heroic road warrior or "Indian fighter" in these tales, and thus they were not likely to build appeal for the rifles. Particularly gruesome were the murder-by-Winchester accounts stemming from the Horrell-Higgins feud in New Mexico Territory near the Texas border.[35]

56. Because some Henrys and Winchesters found their way to the Western Territories, and because some of the U.S. army operations against Native Americans took place in Western *states* as well as the Western Territories, Henrys and Winchesters may have ended up in the Western states during Reconstruction (these included California, Colorado, Nevada, and Oregon). However, I found no significant evidence of Henrys or Winchesters in the Western states.[36]

57. The Winchester company hoped that West-bound Americans' desire to hunt, and not just their wish for protection, would fuel sales of their weapon. The great bison hunts on the Plains were famous by the late 1860s, and the Winchester company tried to capitalize on the craze. Its marketing effort failed. Bison-hunters preferred other models. It did not help that the most famous Western hunter of the

---

[34] Williamson, *Winchester*, 42-44.

[35] C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49.

[36] Exceptions to this statement about the absence of Henry-Winchesters in western states are the state armories in these states. Reports from these armories sometimes mention the rifles. For example, the armory in the state penitentiary at Salem, Oregon in 1868 had 13 Henry rifles and zero Winchesters, compared to hundreds of other firearms. Because this was a penitentiary armory, the Henrys that were there necessarily were for use by law enforcement officers, not individuals seeking self-defense. "Penitentiary Report" to Legislative Assembly, September 1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95.

(continued…)

30

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)
ATTACHMENT 4, Page 31 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

1  time, Buffalo Bill Cody, did not use a Winchester.  His famous gun, which he

2  dubbed "Lucretia Borgia," was a single-shot Springfield.

3      58.     The Winchester company had only marginally more success trying to

4  sell its guns elsewhere to hunters and "sportsmen," a term used to describe not only

5  hunters but competitive target-shooters.  The only place where Winchesters caught

6  on for hunting was in Africa, where American and European "big game" hunters

7  wanted to shoot large animals with as many rounds as possible, in as fast a time as

8  possible, in order to avoid being killed by the prey.[37]  Target-shooters demanded

9  accuracy of their guns, and potential buyers worried that a rifle built for capacity

10 and speed would lose something in accuracy.  To assuage such concerns, a

11 Winchester model that began selling in early 1877 (the "Winchester 76") came with

12 the option of a "set trigger," such that the shooter could set the trigger by moving it

13 very slightly forward, at which point only a tiny bit of pull would set off the shot.

14 The "set trigger" type of Winchester was more popular at shooting contests than

15 earlier Winchesters, but it still was not as popular as other rifles, especially

16 Remingtons and Springfields.  One reason why was its price.  The "set trigger"

17 version of the Winchester was typically $10 more than the "standard trigger"

18 models, which already were on the expensive side ("standard trigger" Winchesters

19 were typically 20-30% more expensive than Remingtons and Springfields).

20     59.     Meanwhile, U.S. army units in the West rarely possessed Winchesters

21 during Reconstruction.  The army had continued its Civil War-era policy of non-

22 adoption of Winchesters.  Yet soldiers in the West did understand the weapons'

23 lethality, in part because they had seen it first-hand in their skirmishes and battles

24 with the Sioux and their allies on the Plains.  U.S. soldiers in the West at first

25

26  [37] My research uncovered fewer than ten accounts of African big-game
hunting that appeared in U.S. publications during Reconstruction. As an example,

27 see "Lovejoy," "Letter from Africa," *Fayette County Herald* (Washington, Ohio),
Dec. 21, 1871, p.2 (by "accounts" I mean supposedly true accounts; there were

28 even more accounts that were expressly fictional).

31

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)
ATTACHMENT 4, Page 32 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

1    assumed that the Natives were getting the weapons legally from traders who were

2    operating with the approval of the U.S. Bureau of Indian Affairs.  That assumption

3    fueled long-standing hostility of the U.S. army toward the Bureau.  The main

4    newspaper of the armed services of the time, the *Army and Navy Journal*, published

5    a satirical piece in 1867 pretending to be a Native American expressing gratitude to

6    the Bureau for allowing tribes to acquire single-shot guns and suggesting that the

7    Bureau might now "give us Spencer or Henry rifles."[38]

8    60.    In fact, the Sioux and their allies did not get their Henrys (or

9    Winchesters) from the Bureau.  Many of the weapons had been seized from

10   American emigrants and settlers whom the Natives had attacked.  Many also had

11   been robbed from shippers heading to or through the Western Territories.

12   61.    Here it is important to understand that no matter who might want a

13   Henry-Winchester, they were dependent on a successful shipping operation.  The

14   weapons were manufactured in New Haven, Connecticut and shipped around the

15   country to U.S. ordnance depots, state arsenals, private gun stores, and, in rare

16   cases, individuals (individual mail-order did not become common until the 1890s,

17   and the first mail-order guns were shipped by Sears in the early 1900s).[39]  There

18   was no U.S. parcel post until 1913; all shipping was done by private companies like

19   Wells Fargo.  These companies divided up regions of the country, a legal

20   monopolistic practice, in order to maximize profits.  In practical terms, this meant

21   that shipping costs were high, so buyers would be reluctant to ship goods that could

22   be lost.  Loss was a very real possibility when it came to shipping weapons to

23   hostile areas.  Shipping companies might use armed guards—some, as we have

24   seen, armed with Henrys or Winchesters—but the guards stood little chance against

25   an enemy that outnumbered them and was armed with the same type of guns.  The

26   cost of the risk was passed from the manufacturers and "jobbers" who arranged for

27   [38] *Army and Navy Journal*, June 1, 1867, p. 350.

28   [39] Williamson, *Winchester*, 178.

sales to the consumers. The risk-induced increase in cost was a disincentive to prospective individual or gun-store buyers in the West. This was one more factor providing a disincentive not only to potential private buyers but to the U.S. army to adopt Henry-Winchesters.

62.     Whatever the root causes of the minimal proliferation of Winchesters among non-Natives of the West, the result was that Natives were more likely to use Winchesters than anyone else in the region. The most heavily armed Americans of the region, those of the U.S. cavalry units assigned to the Western Territories, used for the most part their army-issued single-shot Springfield rifles. Meanwhile, as a U.S. Colonel noted, Winchesters and lower-capacity repeating rifles in the late 1860s transformed "the Plains Indian from an insignificant, scarcely dangerous adversary into as magnificent a soldier as the world can show."[40]

63.     The truth of that observation was borne out at the Battle of Little Big Horn in 1876. Famously, the U.S. army commanded by George Custer was wiped out by the Plains Indians. Most of Custer's troops carried single-shot Springfield rifles. The Native Americans carried a variety of weapons, many of which were Winchesters.[41] One of Custer's underlings, Marcus Reno, wrote after the battle that "the Indians had Winchester rifles and the column [of U.S. cavalry] made a large target for them and they were pumping bullets into it.[42] Weaponry was not the sole reason for Custer's defeat that day at the Little Big Horn. Still, it is worth noting that "the gun that won the West" was in the hands of Native Americans, not U.S. soldiers, at the most famous battle in the West of all time.

---

[40] Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power* (New Haven, Conn.: Yale University Press, 2019), 299. In the northwest part of the Western Territories, the Nez Perce also were fond of Winchesters. Chief Joseph usually kept one close at hand. See Jerome A. Greene, *Nez Perce Summer, 1877: The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42, 310-12.

[41] Hämäläinen, *Lakota America*, 340.

[42] Haag, *The Gunning of America*, 176-77.

64.     Humiliated by Custer's defeat, the U.S. army in the West still did not choose to adopt Winchesters after Little Big Horn.  However, an increasing number of regiments in the West did act on their own to use ordnance funds to buy Winchesters.  Although the army did not officially adopt the Winchester, it did all it could to keep the weapon, along with lower-capacity repeating rifles, out of the hands of the Plains Indians.  Right away after Custer's defeat the army banned traders from trading any types of guns to any types of Natives, friendly or hostile.  U.S. officers sought to arrest traders who had been selling Winchesters to Plains Indians against government policy.[43]  Meanwhile, American civilians in the Western Territories demanded that Canadian authorities also intervene to keep Winchesters from Native Americans, specifically the Blackfoot.[44]

65.     It is impossible to know all the reasons why the U.S. army did not adopt Henrys or Winchesters before or even soon after Little Big Horn, but one reason was the same one that had lingered on Americans' minds ever since the Henry Rifle was introduced in the early 1860s:  the fear that the weapon was as dangerous to its user as it was to its intended target.  The stories that manufacturers had helped circulate early on from the West about the power of the rifle to allow one person to defeat many failed to muster much enthusiasm for the weapon.  It did not help that some assessments from experts were negative.  At a showcase of firearms in Switzerland soon after the Civil War, a judge rendered the verdict that the rifle seemed delicate and unnecessarily lethal—"more wonderful than practical."[45]  Back in the U.S., skeptics worried that the rifle would fail at a crucial moment or explode.  When it came to Henrys and Winchesters, argued a writer for the *New York Herald*, the most widely circulating newspaper in the country, the "dangers are too many."[46]

---

[43] *Chicago Daily Tribune*, July 23, 1876, p. 4.
[44] *Chicago Daily Tribune*, April 15, 1878, p. 4.
[45] Haag, *The Gunning of America*, 70.
[46] "Breech-Loading Arms," *New York Herald*, Oct. 12, 1866, p. 4.

34

ATTACHMENT 4, Page 35 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## C.   Henrys and Winchesters in the Reconstruction-Era North

66.     The North was the region in the United States where Henrys and Winchesters were hardest to find, either because they were deemed too dangerous or because northerners already felt themselves well-armed.  Recall that hundreds of thousands of U.S. soldiers had returned home from the Civil War with rifles in hand, almost all of the weapons Spencers or Sharps or Enfield, rarely Henrys.

67.     The near-absence of Henry-Winchester rifles in the North became clear during the "Great Strike" of 1877.  The "Great Strike" began as a local labor action in West Virginia and turned into a massive strike stretching from Philadelphia to Chicago.  Mob violence was prevalent.  In this months-long episode, during which thousands of Americans were injured and hundreds were killed, there were only two incidents that I found involving Henrys or Winchesters. In Chicago during the rioting, a U.S. soldier fired a Henry rifle in response to civilians pelting his regiment with rocks.  He may purposefully have avoided shooting anyone—no one was hit.  But the sound of the shot went a long way toward quieting the crowd.  The soldier in question was from a regiment that had been assigned to the Western Territories but transferred temporarily to Chicago to put down the unrest.  That explained why he had a Henry.  His regiment likely acquired Henrys to fight Plains Indians; now he used the weapon—albeit sparingly—to subdue strikers.[47]  In Jackson County, Kansas, just north of Topeka, railroad managers armed forty employees with Winchester rifles, ordering them to scare off the local strikers.  To give the gang the veneer of a legitimate posse, the managers arranged for the local sheriff to deputize the gunmen.  Violence ensued when the "posse" confronted the strikers, and at least one of the strikers was killed, though not necessarily by a Winchester.[48]

---

[47] Robert V. Bruce, *1877: Year of Violence* (1959; repr., Chicago: Quadrangle Books, 1970), 251-52.

[48] "A Tough Customer," *St. Louis Globe-Democrat*, Oct. 1, 1877, p. 4.

35

68.    In general, however, Henrys and Winchesters were rare to find among northerners during Reconstruction.  They were sometimes mentioned in ads displayed in northern publications aimed at hunters and target-shooters.  If the ads were any indication of the target audience, the hoped-for buyers of the rifles were elites—not the types who showed up during the mobbing of the Great Strike of 1877—and they were interested in peaceful shooting contests, not fending off potential violent attackers.[49]  Reports from state adjutant generals in the North sometimes show Henrys and Winchesters in arsenal inventories, but these guns were always far outnumbered by the more popular rifles of the era in the region— Sharps, Spencers and Springfields.

69.    Beginning in about the mid-1870s, northerners became more interested in owning Winchesters and modern rifles in general, not for purposes of self-defense but for purposes of collective defense of their communities and states.  This was the period when National Guard units came into being, beginning in the northern states.  They were in effect state militias.  The engine that drove their creation was not a fear of tyranny or of insurrection but a nationalistic fervor fueled in particular by the nation's Centennial, which began to be celebrated in the early 1870s even before the major exhibitions and commemorations of 1876.[50]  With the rise of this movement came a perceived business opportunity for the Winchester company, which began placing ads for their rifles in northern newspapers,

---

[49] See, for example, an ad for many types of guns, including "Henry's Sporting Rifle," in Wilkes' *Spirit of the Times: The American Gentleman's Newspaper*, March 24, 1866, p. 59 (the ad was reprinted in the same weekly publication irregularly through June 16, 1866).

[50] Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. Hannah's dissertation is crucial for countering the assumption, now rejected by historians, that the rise of the National Guard movement in the northern states was a reaction to events in the South of the 1870s or to the Great Strike of 1877. See also, Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97.

(continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

ATTACHMENT  4, Page 37 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

magazines, and gun catalogs. The greatest number of ads appeared in western Pennsylvania.[51] The ads seem to have had some effect. A newspaper published in northwestern Pennsylvania reported in October 1877 that "Winchester rifles are becoming quite fashionable in this section, and are rapidly displacing the old double-barreled rifles. . . . The Remington rifle is highly spoken of by those who have used it, but it is not a repeater, or 'stem-winder,' and so the Winchester is ahead."[52]

70.     The rise of National Guard units in northern states in the late 1870s inspired private armed companies to form, drill, and parade. One of these groups was the Lehr und Wehr Verein of Chicago, Illinois, led by the Socialist activist Henry Presser. Presser's company paraded one day in the spring of 1879. They carried rifles—not Winchesters but Springfields. Socialist sympathizers nearby joined with the group, and Presser was arrested and tried for organizing a private militia. His case ended up in the Supreme Court, which ruled in the *Presser* case in 1886 that the armed company's actions were indeed unlawful.

### D.     Henrys and Winchesters in the Reconstruction-Era South

71.     In the South during Reconstruction, high-capacity firearms proliferated far more than in any other region of the country. The reason for this proliferation is clear: Winchester Repeating Rifles were the preferred weapon of two large state militias, those of Louisiana and South Carolina, that were organized to put down insurrection against state and national authority as well as terrorism against Black Americans.

72.     The story of the South Carolina state militia getting armed with Winchesters begins with the inauguration of Robert K. Scott as the state's governor in 1868. Scott, a white man, was a pro-Reconstruction Republican. He had been

---

[51] See, for example, *James Bown and Son's Illustrated Catalogue and Price List*, 29th annual ed. (Pittsburgh, Penn., 1877), 33.

[52] *The Forest Republican* (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4.

1 born in Pennsylvania, he grew up in Ohio, and he became a high-ranking officer in
2 the U.S. army during the Civil War.  After the war, he was an officer in the
3 Freedman's Bureau.  As Governor of South Carolina, he endorsed and helped
4 arrange the creation of a pro-Republican state militia open to Black Americans and
5 pro-Republican whites.

6      73.      The state act creating the state militia was adopted in 1868.  The
7 militia was always a work-in-progress, so it is impossible to know exactly how
8 many men served in it at any given time.  A reasonable estimate is that 1000 men
9 were in the militia by 1869.  Scott hoped that the force would grow eventually to
10 6000.  Although the militia was open to pro-Republican whites, most of the
11 members were Black Americans.  The state did not have enough arms to supply the
12 men.  In the summer of 1869, the state's adjutant general traveled to Washington,
13 D.C. to arrange with the U.S. War Department for an allotment of funds to pay for
14 arms for the state militia.  This arrangement was a restoration of a policy that had
15 long been in place but had often fallen into disuse:  the U.S. War Department would
16 pay each state an annual allotment to sustain its state militia. With the funds that the
17 South Carolina adjutant general received in mid-1869, he helped arrange the
18 purchase of hundreds of guns, both Winchesters and Springfields.[53]

19      74.      By August 1869, Winchesters had begun to arrive in South Carolina,
20 earmarked for members of the state militia.  In the middle of that month, a company
21 of Black American state militiamen armed with Winchesters appeared at a wharf in
22 Charleston.  The occasion was the arrival of a white baseball team from Savannah,
23 which was scheduled to play a white team in Charleston.  A few days earlier, the
24 team had made the same trip.  But when it arrived, Black American civilians had
25 decided to disrupt the match as a form of protest.  They showed up on the streets,

_____

[53] Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina*
(Columbia: University of South Carolina Press, 1996), 75; Singletary, *Negro Militia and Reconstruction*, 20-21.

1    got in the way of the white players as they made their way to the field, and hurled

2    insults. The team turned around and headed back to Savannah. This time, on

3    August 15, the Mayor of Charleston was prepared to make sure that things went

4    smoothly—though not in a way that whites in the city would approve of. He had

5    given the order for the company of black state militiamen to arrive at the wharf and

6    escort the Savannah baseball team to the playing fields. The game took place. But

7    white Democrats in the city as well as the rest of the state (and throughout the

8    whole of the former Confederacy) were furious.[54] Meanwhile, Black Americans

9    throughout the state celebrated the role that members of their race would play in the

10    keeping of the peace.

11         75.     From late 1869 to early 1871, companies of black state militiamen

12    armed with Winchesters appeared regularly across South Carolina. At first,

13    Governor Scott was thrilled with the organization. On March 29, 1870, he

14    delivered a speech that extolled the Black-American dominated militia as the best

15    way to ensure that peace would return to the state and that future elections would be

16    fairly held. He particularly recommended that state militias be armed with

17    Winchesters. He had seen first-hand how these weapons intimidated potentially

18    violent protesters even without being fired. His neighboring state of Georgia

19    should have such a militia staffed with blacks and armed with Winchesters, Scott

20    advised. "I tell you the Winchester rifle is the best law that you can have there," he

21    declared. Georgia, one of the states that had had its pro-Democrat, anti-black

22    militia dissolved by Congress in 1867, never did create a new militia. Scott knew

23    that it wouldn't. His speech was meant to announce not only to South Carolina but

24    to neighboring states that the old ways of the Confederacy were gone for good.

25    Members of the opposition to Scott and the Republicans in South Carolina became

26

27    _____

[54] *Washington Evening Star*, Aug. 16, 1869, p. 1.

28                                        (continued…)

1 furious. Many called him "Winchester Scott" and bewailed "Scott's Winchester
2 Rifle tactics."[55]

3     76. During the election season of 1870, Scott decided that he had erred.
4 Opposition papers regularly reprinted his "Winchester" speech and attacked Scott
5 as a tyrant trying to stir up a race war. Much more troubling was the fact that state
6 chapters of the Ku Klux Klan began plotting a response to Scott's speech and the
7 existence of the militia.

8     77. The Klan had decided to meet Winchesters with Winchesters. They
9 sent agents to the North to buy crates of Winchesters and ship them to South
10 Carolina in crates with false labels ("Agricultural Implements" said one; "Dry
11 Goods" said another). The state militia and the U.S. army were able to intercept
12 some of the crates, but others arrived at their destination. The Klan and auxiliary
13 white supremacist groups distributed the weapons to Scott's opponents in towns
14 across the state.[56] Violence broke out across the state. That was a regular
15 occurrence during election season, but this time the lethality was more severe than
16 usual. Both sides had Winchesters.

17     78. With the help of the intervention of the U.S. army and his own state
18 militia, Scott was able to win re-election in 1870. Almost immediately he tried to
19 draw down the violence in the state by attempting to remove Winchesters from the
20 population. Aided by U.S. army units, his administration attempted to confiscate as
21 many Winchesters as they could from insurrectionary groups like the Klan. Then
22 he asked those state militiamen who were holding onto their Winchesters instead of
23 storing them in state arsenals to turn the weapons in. Some Winchesters did end up
24 coming back into state arsenals, either by way of confiscation from Klansmen or
25 voluntary submissions by militiamen. But most of the Winchesters stayed in
26 circulation. Scott suspended the state militia.

27 [55] See, for example, *Charleston News*, Oct. 17, 1870, p. 2.
28 [56] Zuczek, *State of Rebellion*, 79-80.

40

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)
ATTACHMENT 4, Page 41 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

79.     In early 1874, South Carolina was again the site of violent uprisings from insurrectionists, and the pro-Republican government responded by re-forming the state militia.  The adjutant general of the state reported that he barely had any guns for the men.  In fact, a report he had issued the year before declared that there were 627 Winchesters in state arsenals.  Probably the official was worried that widespread arming of Black Americans and white Republicans with Winchesters would create a mini-civil war like the one in 1870.[57]  The re-activated state militia was poorly organized and poorly armed.  For armed support between 1874 and 1876, the Republican administration of the state relied mostly on the U.S. army.

80.     Then, in 1876, came the final battles between pro-Republican, U.S.-authorized armed men (the U.S. army units and state militia) and the insurrectionary opposition forces, the "Red Shirts."  Of the many reasons that the opposition forces could be categorized as insurrectionary, perhaps the most obvious was that they regularly stole weapons, including Winchesters, from state arsenals.[58] When the voting in 1876 was over, the two sides in the struggle each declared victory.  Two governors then existed, and since no one was going to accept a resolution of the crisis by law, the state was in political chaos, with armed groups on each side ready to go to battle.  When companies of armed men marched for their respective candidates, plenty of them carried Winchesters.  Only some of those Winchesters had been obtained legally.  Those carried by the "Red Shirts" had almost certainly been stolen from state depots.

81.     The Louisiana state militia was created in 1870.  The story of how Louisiana state militiamen ended up armed with Winchesters starts before the organization was created.  In 1868, the New Orleans metropolitan police force was re-organized under Republican leadership.  It now used "Metropolitans" as its nickname.  Its members included Black Americans as well as whites of varying

---

[57] Zuczek, *State of Rebellion*, 140-41.

[58] Zuczek, *State of Rebellion*, 171.

ATTACHMENT 4, Page 42 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

ethnicities, the city being one of the most ethnically diverse in the country. The number of Metropolitans in 1868 was small—perhaps just over 100—but by 1870 that number was close to 700. During its earliest years, from 1868 to 1870, the Metropolitans' superintendent, A. S. Badger, armed many of the men with Winchesters. In 1870, Governor Henry Warmoth engineered the creation of the state militia. Warmoth envisioned a state militia that would be composed of 2,500 Black Americans and 2,500 white former Confederates. The Confederates, in theory, would be loyal to the United States and thus supportive of Reconstruction programs created by Republicans. Anyone could see that the two sides of this force would not fit together easily. To help foster something approaching unity across the state militia, Warmoth appointed James Longstreet, a former Confederate General, as head of the state militia. As part of the act creating the state militia, the New Orleans Metropolitans were incorporated into the state militia. The Metropolitans after 1870 were thus both an urban police force and a company of state militiamen. In this latter role, they were authorized to operate outside of city limits. The Metropolitans were the best-trained unit in the state militia. Because many of their number carried Winchesters, they were also the best armed.[59]

     82.     Between 1870 and 1874, politics in Louisiana was multifaceted and ever-shifting. Warmoth regularly changed his political stances, outside blocs suddenly gained inside influence, and through it all, pro-Democratic factions, supported by armed "White Leagues," tried to resurrect the Old South on the soil of Louisiana. In 1872, William Kellogg won the governorship. Kellogg was a Republican, one more radical than Warmoth and more in line with the Republicans in the U.S. Congress. Warmoth in 1872 had sided with John McEnery, a former

---

[59] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 130-31; Singletary, *Negro Militia and Reconstruction*, 69-70.

1 Confederate, an anti-Reconstruction Democrat, and a leading voice for state
2 redemption.

3       83.    The state militia, composed of a group loyal to the Warmoth-McEnery
4 faction and a group loyal to Kellogg, was rendered ineffective after 1872 by its lack
5 of cohesion.  Individual units within the state militia were nonetheless important, as
6 they were the only legitimate state-level armed forces.  Of these units, the
7 Metropolitans remained the most effective and best armed, as they still carried
8 Winchesters, whereas most of the other units did not.  In politics, whoever
9 controlled the Winchester-armed Metropolitans would always have an advantage
10 because, as Governor Scott of South Carolina had said in 1870, "the Winchester
11 rifle is the best law that you can have."  By late April 1873, William Kellogg, the
12 newly elected Governor, had established control of the Metropolitans.
13 Unfortunately, he had established that control too late to use the Metropolitans to
14 help avert the worst racial massacre that the state had ever seen, probably the worst
15 racial massacre of Reconstruction: the Colfax Massacre of April 13, 1873.

16       84.    The tragedy of the Colfax Massacre has been the subject of much
17 historical study, but never from the perspective of a Winchester Repeating Rifle.
18 The combatants at Colfax, in Grant Parish, about 200 miles northwest of New
19 Orleans, consisted of one legitimate armed force and one illegitimate one.  The
20 legitimate armed force was a unit of the state militia led by William Ward, a Black
21 American who had fought for the U.S. during the Civil War.  More than 100 of
22 Ward's men, perhaps more than 150, would be murdered at Colfax.  The
23 illegitimate armed force was a "posse" deputized by two local men, one who
24 claimed to be a judge and one who claimed to be a sheriff.  In fact, as all in the
25 "posse" knew, the so-called judge and so-called sheriff had held those positions
26 under the former governor, not under the current governor, who had denied them
27 commissions that would have kept them in office.  The claim of the "judge" and
28 "sheriff" was that the former governor had in fact won the 1872 election and thus

43

1  that they held their positions legitimately. (Election-result denial is not a new
2  phenomenon; it was rampant in the South during Reconstruction.) Years later,
3  when the Colfax episode came before the U.S. Supreme Court in the form of the
4  *Cruikshank* case, Justice Bradley, author of the controlling opinion, declared that
5  leaders of the so-called posse were private citizens, not state officers. Bradley was
6  technically right. But at the time of the Colfax Massacre, the lead murderers had
7  donned masks of state-legitimated authority. Neither the legitimate nor the
8  illegitimate side at Colfax carried Winchesters. But if William Ward had had his
9  way, his side would have had them.

10     85.    Two days before the massacre, Ward had left Colfax for New Orleans.
11 He knew that violence might erupt in Colfax, and he wanted to persuade Governor
12 Kellogg to send military support. Almost certainly, Ward was going to ask Kellogg
13 to send the Winchester-armed Metropolitans. Ward never made it to New Orleans.
14 Even if he had, the Metropolitans could not have made it to Colfax in time to stop
15 the massacre. They might not have been willing to go—it would be another ten
16 days beyond the massacre before their loyalty to Kellogg was cemented. The
17 important point amid all these hypotheticals is this: William Ward believed that a
18 cadre carrying Winchesters was the best chance his men had.

19     86.    By October 1873, the Metropolitans had pledged their loyalty to
20 Kellogg, and Kellogg had helped secure for them and other state militia units
21 hundreds of new Winchesters. Kellogg dispatched the Metropolitans to Grant
22 Parish, the site of the Colfax Massacre, to reestablish control of the area for the
23 Republicans. They and their Winchesters arrived at the end of the month—more
24 than 25 weeks after William Ward had hoped they would come.[60]

25     87.    The power of the Metropolitans, along with their Winchesters, would
26 soon stripped away. Opponents of Kellogg gained control of the Metropolitans'

27  ――――――――――――――
    [60] *New Orleans Republican*, June 13, 1873, p. 1; *Ouachita Telegraph*,
28  October 24, 1873, p 1.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

1 Board by early 1864. They reduced the numbers of the force and limited their
2 geographical range to New Orleans and its outskirts. If violence broke out in a
3 rural area like Grant Parish, there would be nothing that the Metropolitans could do
4 about it. Then, on September 14, 1874, came the final blow: the Battle of Liberty
5 Place, fought in the heart of New Orleans. Thousands of White Leaguers launched
6 a coordinated attack on the city. Some of them may have been carrying
7 Winchesters, but none of the reports from that day mentioned Winchesters in their
8 hands. The Metropolitans had Winchesters, of course, but they were outnumbered
9 more than 10 to 1 and easily overwhelmed. After the White Leaguers had
10 demonstrated their superior force, Governor Kellogg knew that he might soon be
11 removed, so he engineered a compromise that kept him in office. Part of the deal
12 was the disbandment of the state militia. Thus ended the prospect of a reign-by-
13 Winchester Republican regime in Louisiana.[61]

14     88.    In the brief time that Winchesters were in the hands of southern state
15 militias, the rifles showed that they could do much to intimidate the forces of white
16 supremacy and insurrection. But there was a dark flip side to the positive quality of
17 this particular high-capacity firearm.

18     89.    Those opposed to the state militias and to Reconstruction in general
19 used the presence of Winchesters in state militias as fodder to attack all
20 Republicans and especially Black Americans. At a rally in April 1870, a Georgia
21 Black-American leader, Simeon Beard, pleaded for more guns so blacks could have
22 their own militia rather than relying on the U.S. army. "We don't want soldiers; we
23 want the power to raise a militia; we want guns put in our hands, and we will see
24 whether we cannot protect ourselves. Give us this, and we will give you the State
25 of Georgia evermore." In response, a redeemer newspaper editor mocked Black
26 Americans like Beard who clamored "lustily for arms," including "Winchester

[61] Rousey, *Policing the Southern City*, 155-56.

45

1    rifles."  The redeemer editor then brought up the South Carolina experiment with

2    Winchester-armed state militias as evidence that the lives of ordinary white people

3    were in grave danger:  "There are thousands of white people in this State who have

4    no arms at all, not even a pistol, while there is not one negro in three who does not

5    own some sort of firearm.  They are armed now-fully armed. It is the white people

6    who need arms, not the negroes."[62]

7        90.    The Winchester was as much a symbolic weapon as a real one in the

8    battles between Republicans and Redeemers in the Reconstruction-era southern

9    states.  Republicans saw the gun as the emblem of power—the sign that the cause

10   of Reconstruction had a strong, locally controlled force behind it.  The Redeemers

11   saw the gun as evidence of the Republicans' tyranny and barbarity. In Texas,

12   Democrats opposed to Reconstruction howled that there must be "no money, no

13   Winchester rifles and ammunition" for Republicans—this despite the fact that

14   Republicans in the state had never suggested arming themselves with

15   Winchesters.[63]

16       91.    In terms of real as opposed to imagined Winchesters, even though the

17   weapons in Louisiana and South Carolina were housed under guarded armories,

18   they could still end up in the hands of insurrectionaries or criminals.  In Louisiana,

19   as in all the states of Reconstruction, there were internal, often violent conflicts

20   over the control of the state government.  By various means, from outright theft to

21   the legitimate winning of a state election, the opposition to a Republican

22   government in a state like Louisiana could gain access to Winchesters.  Once these

23   weapons were in the hands of insurrectionary groups, they could end up with

24   anyone, including an outlaw with no particular political persuasion.  That is

25   probably how a Winchester ended up among a large cache of arms held by the

26   _____

27   [62] *Georgia Weekly Telegraph and Georgia Journal & Messenger*, April 5, 1870, pp. 4, 8.

28   [63] *The Weekly Democratic Statesman* (Austin, Texas), August 24, 1871, p. 2.

46

1    husband-wife team known as the Guillorys, a pair of marauding thieves who went

2    on a rampage near Opelousas, Louisiana in the late summer of 1873. When a posse

3    caught up with them, it easily dispatched the couple, killing the husband and

4    seriously wounding the wife.[64]

5        92.      By 1874, all of the state militias had been disbanded. Redeemers—

6    those in each state wanting state redemption from Reconstruction—had been

7    against the state militias from the start and were glad to see them go. By the end of

8    Reconstruction, all of the southern states had reverted to their pre-1867 militia

9    system, 1867 being the year that the U.S. Congress abolished all southern militias

10    except those in Arkansas and Tennessee.[65] Under the renewed militia system,

11    volunteer militias could form on their own with the explicit or implicit approval of

12    state governors. Because most of the southern state governments after 1874 were

13    ruled by pro-redemption Democrats, most of the militias that formed after 1874

14    were of the sort that would have been considered insurrectionary by pro-

15    Reconstruction Republicans in the states as well as by the Congressional

16    Republicans who had abolished such militias in 1867.

17        93.      The three states that were not controlled by Redeemers after 1874 were

18    Florida, Louisiana, and South Carolina. In Louisiana and South Carolina, the 1876

19    state elections were disputed (so, too, quite famously, was the national election of

20
21        [64] "Another Battle," *The Opelousas Journal*, Aug. 29, 1873, p. 3. A side note to the episode: No one in the posse had a Winchester, and the Guillorys in the exchange of gunfire opted not to use their Winchester, only their low-capacity rifles and shotguns.

22
23        [65] The Texas Rangers claimed to be a state militia loyal to the U.S. right up until it was disbanded in 1877, but by 1874, if not earlier, the group was clearly on the side of the Democrats in the state. A number of Democrats in 1877 pleaded with the state government not to disband the Rangers. One wealthy Democrat in 1877 even offered the state government a voluntary donation of Winchesters for the state militia (the militia had not used Winchesters prior to that point). The state government rejected the offer and disbanded the militia. See Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers* (New York: Oxford University Press, 2002), 169-70; Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press, 1965), 292-93.

(continued…)

1    1876).  In both states, as a result, the two contending sides, pro-redemption

2    Democrats and pro-Reconstruction Republicans, claimed victory and claimed that

3    their gubernatorial candidate was the legitimate governor of the state.  In each of

4    these states, therefore, there were two governors.  Meanwhile, in Florida, there was

5    no dispute over the governor's office, but there was conflict nonetheless because

6    the electoral board of the state was controlled by pro-Reconstruction Republicans

7    while the rest of the state government was controlled by pro-redemption

8    Democrats.[66]  As a result of the internal conflicts within Florida, Louisiana, and

9    South Carolina, the U.S. army dispatched troops to the capitals of each state.  The

10   troops were intended to "keep the peace" in all the states, to ensure that the pro-

11   Reconstruction Republican governors of Louisiana and South Carolina were

12   accepted as the only legitimate governors of the states, and to protect the Florida

13   electoral board from being disbanded by pro-redemption Democrats.

14       94.    The circumstances described above had important consequences for

15   who came to possess Henrys and Winchesters by the end of Reconstruction. In

16   Louisiana and South Carolina prior to 1874, these high-capacity firearms were

17   possessed and regulated by pro-Reconstruction Republicans, who possessed them

18   specifically for the purpose of state defense against armed insurrectionaries allied

19   with pro-redemption Democrats.  Once pro-redemption Democrats in these states

20   after 1874 claimed that their "governor" was the only legitimate governor of the

21   state—a position supported by most whites in each state—the "governor" in

22   question used his alleged authority to distribute Winchesters held in state armories

23   to pro-redemption volunteer militia groups.  In Louisiana, the pro-redemption

24   groups known as White Leaguers in 1876-77 marched through the streets of New

25   Orleans demanding that their "governor," Francis T. Nicholls, be recognized as the

---

[66] Jerrell H. Shofner, "Florida Courts and the Disputed Election of 1876," *Florida Historical Quarterly*, 48 (July 1969), 26-46.

(continued…)

1  sole governor of the state.  At least 500 of the White Leaguers, but probably

2  hundreds more, carried Winchester rifles.[67]  According to a Black American who

3  later testified about events in New Orleans at the time, some of the White Leaguers

4  not only paraded with their Winchesters but also wore their old Confederate

5  uniforms.[68]  The U.S. army regarded these marchers as insurrectionaries.

6    95.    A similar situation played out in South Carolina, though there, the pro-

7  redemption Democrats were known as Red Shirts.  Beginning in 1874 and

8  continuing through 1876, South Carolina Red Shirts created volunteer militias that

9  obtained Winchesters from pro-redemption authorities in the state government.

10  There were many Winchesters to be had in that state, as the pro-Reconstruction

11  Governor Robert "Winchester" Scott back in 1869-1870 had purportedly ordered

12  thousands of them.  The exact number that Scott had acquired remains in dispute.[69]

13  Whatever the number was, it seems that only a few hundred ended up in the hands

14  of Red Shirts in the 1874-76 period, though that was still a few hundred more than

15  Republicans of the era thought was legal.[70]

16    96.    Despite these developments, the total number of Henrys and

17  Winchesters in the southern states during Reconstruction remained small relative to

18  firearms in general in the country—no more than 8,000, I would estimate.[71]

19
20  [67] *Chicago Daily Inter Ocean*, January 12, 1877, p. 1; *New Orleans Republican*, March 13, 1877, p. 2.

21  [68] Testimony of William Murrell, *Report and Testimony of the Select Committee to Investigate the Causes of the Removal of the Negroes from the Southern States to the Northern States* (Washington, D.C.: Government Printing Office, 1880), pt. 2, p. 521.

23  [69] During the U.S. Congressional investigations into Klan activities, investigators tried to ascertain how many Winchesters had actually arrived in South Carolina for Scott's militia; they failed to learn what the number was, though one witness did confirm that the Winchesters that did arrive there were intended for the state militia, including the Black Americans among them. See 42nd  Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 3 (South Carolina), *U.S. Congressional Serial Set* (1871), p. 467; and ibid., vol. 4 (South Carolina,), p. 767.

26  [70] Zuczek, *State of Rebellion*, 140-41, 170-71 (some of the Winchesters were referred to as "militia guns"; see ibid., 171).

28  [71] This estimate is based on the assumption that all 6,000 Winchesters that
(continued…)

Equally important, almost all of these high-capacity firearms were in the hands of law enforcement officers, either U.S. soldiers, pro-Reconstruction militias, or pro-Redemption militias. These last set of armed bodies were illegitimate, to be sure—chapters of the KKK were among them—but, importantly, even they regarded it essential to claim that it was their status as militiamen, and only that status, that legitimated their possession of high-capacity firearms.

97. With only a few exceptions (fewer than five), all reliable reports in which Henrys or Winchesters were mentioned in accessible records from the Reconstruction South indicate that they were regarded solely as firearms for legitimate law enforcement officers.[72] An example of an exception comes from Marianna, Florida in September 1869. There, a group of about twenty-five Black Americans, including women and children, were having a barbecue. From the woods nearby an unseen assailant fired "thirteen or fourteen shots in rapid succession," killing and wounding many of the party. The U.S. officer who later reported on the episode assumed that the assailant had used a Henry rifle because of the speed and volume of the shots fired. He wrote to his superior asking for a "first-class detective" to be sent to the town to investigate who the perpetrator or perpetrators might be. "If detectives can't be furnished," he added, "a few Henry rifles would have an excellent moral effect here."[73]

98. At least some state-level law enforcement officials outside of Louisiana and South Carolina ended up with Henrys or Winchesters. A pro-

_____

Governor Scott ordered for the South Carolina state militia were delivered (the exact number delivered is unknown, and most likely is lower). When this number is combined with the roughly 1,000 Winchesters used to arm the Metropolitans in Louisiana over a six-year period, along with perhaps another 1,000 stolen from U.S. army depots, the sum is 8,000.

[72] This declaration does not accept as evidence second- or third-hand rumors of Henrys or Winchesters being present, though even such rumors prior to 1870 were infrequent.

[73] J. Q. Dickinson to "Hamilton," in 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 13 (Florida), *U.S. Congressional Serial Set* (1871), pp. 289-90.

(continued...)

ATTACHMENT 4, Page 51 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

Republican jailer in a sheriff's office in Alabama was able to use a Winchester to fend off attacking Klansmen in January 1871.[74]  In 1873, a dozen men in southwestern Texas deputized to fight Native Americans near the Mexican border were successful in subduing the Natives and, in reward, were presented by the state legislature with Winchester rifles (they had not used Winchesters to fight the Natives, though the Natives that they fought might well have used Winchesters).[75] The most revealing example comes from 1875 Mississippi, in the testimony of Sheriff John Milton Brown of Coahoma.  Brown was the first Black American sheriff anywhere in Mississippi.  He reported that Black Americans in his region had no guns and implied that they had been ordered to turn in their arms to the white insurrectionaries who controlled most of the state.  Brown, though, had not turned in any weapons because he believed that his position as sheriff allowed him to keep his weapons.  As he told an investigator, he had "one Henry rifle" and he thought that he "was justified in having that, because I was sheriff."[76]

99.     Americans have long disputed and no doubt will continue to dispute the meaning, implications, and correctness of the U.S. Supreme Court's two earliest "Second Amendment" opinions, which were offered during or soon after Reconstruction:  *U.S. v. Cruikshank* and *Presser v. Illinois*.[77]  But one issue regarding those cases is beyond dispute: they did not involve high-capacity firearms.  There were no Henrys or Winchesters at Colfax on the tragic day of the massacre there in 1873.  There were none in the hands of the military companies

---

[74] 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama), *U.S. Congressional Serial Set* (1871), pp. 414-15.

[75] *Texas Session Laws*, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26.

[76] 46th Cong., 2nd sess., S. Rep. 693, pt. 2 "Investigation of Causes of Migration of Negroes from Southern to Northern States," *U.S. Congressional Serial Set* (1879-88), 357.

[77] *U.S. v. Cruikshank*, 92 U.S. 542 (1875); *Presser v. Illinois*, 116 U.S. 252 (1886).

(continued…)

that marched on that spring day in Chicago in 1879—the episode that would lead to the 1886 *Presser* decision (Presser's men carried single-shot Remington rifles).[78] On the question of whether the law could treat high-capacity firearms differently from other types of weapons, the Reconstruction-era Justices had nothing to say. But the land they lived in, the land they ruled over, was one where high-capacity firearms were held only by a select few, almost all of whom were U.S. soldiers or civilian law enforcement officers sworn to uphold the U.S. government. These gunmen held their distinctive weapons not to defend themselves as individuals from imagined foes but to defend their state and country against all-too-real criminals and insurrectionaries.

100.  Many of these gunmen were Black Americans, specifically the Black American men who made up the largest contingents of southern state militias. Serving in these militias was one of many ways that Black Americans demonstrated their gun-bearing rights. Other ways that this right was demonstrated are well known to scholars: Black Americans helped make sure that the U.S. government and state authorities overturned white supremacist efforts to ban blacks from militias, deny them access to firearms, or seize their firearms (these efforts had been embodied in the southern state Black Codes of 1865-67, which were overturned by the Civil Rights Act of 1866 and the Fourteenth Amendment of 1868). It is worth noting, though, that a Black American who carried a Winchester for a state militia was different from the much larger population of Black Americans who did not belong to state militias. The Winchester-toting black militiaman held his gun only with the authorization of and regulation by the state government. He did not own his gun. It belonged to the state. It was supposed to be in an armory, not at a private home, when not in militia-use. Hypothetically, if Black Americans wanted Henrys or Winchesters at their homes, they might lawfully have been allowed to

---

[78] "The Reds," *Chicago Daily Tribune*, March 23, 1879, p. 7.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

ATTACHMENT 4, Page 53 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

1    have them there. But this hypothetical scenario is irrelevant. Southern Black

2    Americans for the most part lacked the means to buy Winchesters. Mostly rural

3    workers, their wages were notoriously low—sometimes only in the form of shares

4    of crops—and they would not be inclined to spend $30 to $40 on a gun that would

5    represent perhaps 3 to 6 months wages. There was no necessity for them to do so:

6    perfectly adequate guns for individual self-defense, even some "repeaters," would

7    have been in their price range.

8        101. The Fourteenth Amendment assured Black Americans that they could

9    possess firearms for self-defense but did not assure them that they could possess

10   any firearms they wanted, including high-capacity rifles. This same principle of the

11   Amendment held equally true for whites.

12       102. Americans in the Reconstruction-era South understood perhaps better

13   than anyone that Henrys and Winchesters were weapons for organized military use

14   that did not belong in the general population. Except for a small number of

15   insurrectionary militias, like the Ku Klux Klan, the enemies of the Republican state

16   administrations in Louisiana and South Carolina that armed their state militias with

17   high-capacity firearms did not respond by trying to obtain the same weapons for

18   themselves. Rather, they responded by demanding the removal of the weapons and

19   the organizations that carried them. When these opposition factions came into

20   power in 1877, they disbanded the state militias and warehoused the Winchesters.

21   To be sure, they maintained laws that allowed citizens to possess firearms for their

22   individual self-defense, but they did not view high-capacity firearms as appropriate

23   for such a purpose.

24       103. My examination of statutes and state-level court opinions from the

25   Reconstruction-era South revealed that firearms were sometimes mentioned as

26   weapons of individual self-defense, but in such instances, the types of firearms

27

28

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

mentioned were, with one exception, low-capacity firearms such as pistols, revolvers, muskets, and rifles.[79]

104.　The one potential exception comes from a Tennessee state court opinion of 1871, *Andrews v. State*.  The court in *Andrews* ruled that among the weapons a citizen might possess were rifles "of all descriptions," including "the shot gun, the musket, and repeater."[80]  This opinion has been cited by at least one scholar as evidence that high-capacity firearms were understood to be possible weapons of individual self-defense.[81]  Yet, a "repeater" at the time of the *Andrews* opinion (1871), and during the whole of Reconstruction, would have been understood to be a low-capacity repeating rifle, such as a Spencer or Sharps, neither of which could hold more than ten rounds.  The parlance of the day put Henrys and Winchesters in a separate category from "repeaters."  Again and again during Reconstruction, from the Western Territories to the northern and southern states, when a cache of firearms was described, Henrys and Winchesters, though obviously repeating rifles, were always listed separately from "repeaters."  Furthermore, the firearms mentioned in Judge Thomas J. Freeman's majority opinion in *Andrews*— shotguns, muskets, repeaters—were mentioned exclusively in terms of what a person might possess in his role as a member of the militia.  The chief judge of the court, Alfred O. P. Nicholson, joined in that opinion.  There was one judge on the court, though, who believed that the Andrews opinion should go further—that it should allow individuals to possess any weapon, regardless of what the militias in the state did or did not possess.  That judge, Thomas A. R. Nelson, expressed his

---

[79] The survey that I conducted was of all state statutes and state-level cases in the period 1863-1877 from the South relating to regulation of weapons. A list of state-level cases from all states appears at https://guncite.com/court/state/ (accessed September 25, 2022).

[80] *Andrews v. State*, 50 Tenn. (3 Heisk.) 179 (1871).

[81] See, for example, Kopel, "The Second Amendment in the 19th Century," B.Y.U. L. Rev. 1359, 1418-21 (1998).

(continued…)

1    view in a concurring opinion, which he alone signed.  The opinion did not mention

2    Henrys or Winchesters as weapons that he thought that any individual might

3    possess.[82]

4        105.  Even more revealing evidence for Reconstruction-era officials

5    believing that high-capacity firearms should be regulated comes from Louisiana.

6    Of the states that had militias that carried Henrys or Winchesters, Louisiana was the

7    only one that left behind a readily accessible record of how these high-capacity

8    firearms were to be managed by state authorities.  All arms for the state militia were

9    overseen by the state adjutant general, James Longstreet.  A former Confederate

10   General who joined the Louisiana Republican Party after the Civil War—a move

11   that forever marked him as a turncoat by his former Confederate comrades—

12   Longstreet well understood the ongoing insurrectionary intentions of former

13   Confederates in his state and elsewhere.  He thought it crucial to ensure that such

14   men did not end up with Winchesters, and that they be incited as little as possible

15   by the sight of Winchesters being carried in public by their organized enemies,

16   Black-American militiamen foremost among them.  For these reasons, he took

17   extraordinary precautions concerning the Winchesters that were held in the New

18   Orleans armory.  His orders for the armory began with typical provisions such as

19   putting guards around the building and making sure that all guns inside were racked

20   when not in authorized use.  Then, in the last provision of his orders, he turned

21   specifically to Winchesters.  They were not to "be taken to pieces, or any part of

22   [them] removed . . . unless authorized by the Division Commander."  The

23   Winchesters were also not to be used for "parade or drill upon the streets or public

24   highways" without the Division Commander's authority.  Such restrictions were

25   not put on the other weapons in the arsenal; they were only for the Winchesters.[83]

---

26   [82] *Andrews v. State*, 50 Tenn. (3 Heisk.) 193-200 (1871).

27   [83] Adjutant General James Longstreet, General Orders No. 16, New Orleans,
     July 19, 1870, in *Annual Report of the Adjutant General of the State of Louisiana*,
28   for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39.

1  **VI. CONCLUSION. RECONSTRUCTION AND TODAY: CONTINUITY AND
2       CHANGE**

3      106.   How does the situation surrounding high-capacity firearms today
4  compare to the Reconstruction era?  High-capacity firearms are still being sold
5  under the name Winchester, by companies such as Browning, but the Winchester
6  Repeating Rifle Company ceased to exist long ago.  Of course, high-capacity
7  firearms can be found under plenty of other names today.  But whereas today the
8  owners of such firearms might be civilians, in the Reconstruction era they would be
9  almost exclusively soldiers or law enforcement officers.  There were civilians
10 during Reconstruction who owned high-capacity rifles, to be sure.  Yet almost all
11 such civilians were "frontiersmen" of the Western Territories, and the population of
12 the Western Territories was tiny compared to the population of the United States as
13 a whole.  Furthermore, Henrys and Winchesters, the only high-capacity firearms of
14 the era, were not the preferred firearms of the "frontiersmen" of the region.

15     107.   By far the largest population possessing Henrys and Winchesters
16 during Reconstruction were members of state-wide militias.  These organizations
17 no longer exist under their Reconstruction name of "state militias."  They evolved
18 into the National Guard, a term first used in place of "state militias" in the North in
19 the 1880s but ultimately applied to all state-level forces that were auxiliary to the
20 U.S. army, including those in the South. National Guard units today are not
21 analogues to the Reconstruction-era state militias; they are direct descendants.[84]
22 And they operate in exactly the same way.  They are under the command of state
23 governors but can be used as auxiliary forces of the U.S. army—that is, they can be
24 "federalized."[85]  Membership in the National Guard, like membership in the

25     [84] Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the
26 Origins of Gun Control in America* (New York: Oxford University Press, 2006),
    196-97.

27     [85] The statutory language that enabled Abraham Lincoln to call up state
28 militias in 1861, which was then invoked occasionally during Reconstruction to
                                                              (continued…)

1    Reconstruction-era state militias, is regulated. National Guard units, like

2    Reconstruction-era state militias, are expected to have proficiency with the weapons

3    they use and to have unfailing allegiance to the recognized governments of their

4    state and nation. Their access to high-capacity firearms is regulated. Such weapons

5    are typically kept under guard in a central location, such as an armory, and

6    dispensed to their users only for purposes of drilling, training, or actual use on those

7    occasions when National Guard units are called out. Beside today's National

8    Guard, other users of high-capacity firearms at present include civilian law

9    enforcement officers. As this declaration has shown, the analogs of such officials

10   during the Reconstruction era—urban policemen, sheriffs, or U.S. marshals—also

11   were known on occasion to carry high-capacity firearms.

12        108.   What is distinctly different today compared to Reconstruction is the

13   ownership of high-capacity firearms by Americans who have no connection to the

14   military or law enforcement. If such owners along with their weapons were

15   transported by a time machine back to the Reconstruction-era South, they would

16   find themselves suspected of being outlaws by law enforcement officers. If they

17   then gathered together into organized companies, they would be considered

18   insurrectionary militias, which is precisely how the Ku Klux Klan was regarded

19   during Reconstruction by the U.S. army, the state militias, and other legitimate,

20   pro-Union law enforcement officials.

21

22

23   _____

     federalize state militias, now resides in the statute that enables the President to
     federalize the National Guard; see 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A
24   Stat. 15; Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006, 119 Stat.
     3440). One of the reasons for the rise in significance of the National Guard after
25   Reconstruction was the federal "Posse Comitatus Act" of 1878, which prohibited
     the direct intervention of the U.S. army into states except in extraordinary
26   circumstances. After that legislation, the National Guard units were needed not so
     much as auxiliaries to the U.S. army as substitutes for them. On the "Posse
27   Comitatus Act" see Gautham Rao, "The Federal "Posse Comitatus" Doctrine:
     Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," *Law
28   and History Review*, 26 (Spring, 2008), 1-56.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

1         Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the

2    laws of the United States of America that the foregoing is true and correct.

3         Executed on November 10, 2022, at Providence, Rhode Island.

4

5

6

7    _____

8             Michael Vorenberg

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INDEX OF EXHIBIT

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Curriculum Vitae of Michael Vorenberg | 1-10 |

# EXHIBIT A

# CURRICULUM VITAE

**Michael Vorenberg**
Associate Professor of History
Brown University

**Education**    Ph.D. in History, Harvard University, November 1995 (American History)
A.M. in History, Harvard University, March 1990 (American History)
A.B. in History, Harvard University, June 1986, *summa cum laude* (Ancient History)

## Professional Appointments

Associate Professor of History (with tenure), Brown University, 2004-
Vartan Gregorian Assistant Professor, Brown University, 2002-2004
Assistant Professor, History Department, Brown University, 1999-
Assistant Professor, History Department, SUNY at Buffalo, 1996-99
Post-Doctoral Fellow, W.E.B. Du Bois Center, Harvard University, 1995-96
Lecturer, History and Literature Program, Harvard University, 1995-96

## Scholarship

### Books

*Lincoln's Peace: The Elusive End of the American Civil War* (forthcoming with Alfred A. Knopf).
*The Emancipation Proclamation: A Brief History with Documents* (Bedford/St. Martin's, 2010).
*Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment*. Cambridge: Cambridge University Press, 2001. (Paperback edition, 2004.)

### Chapters in Books

"The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88.
"The Thirteenth Amendment," in *1865: America Makes War and Peace* in *Lincoln's Final Year* (Carbondale, Ill.: Southern Illinois University Press, 2015), 7-21.
"Liberté, Égalité, and Lincoln: French Readings of an American President," in Richard Carwardine and Jay Sexton, eds., *The Global Lincoln* (New York: Oxford University Press, 2011), 95-106.
"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," in Alexander Tsesis, ed., *The Promises of Liberty: The History and Contemporary Relevance of the Thirteenth Amendment* (New York: Columbia University Press, 2010).

"Did Emancipation Create American Citizens?: Abraham Lincoln's View" (in Russian), in Victoria Zhuravleva, ed., *Abraham Lincoln: Lessons of History and the Contemporary World* (Moscow: Russian State University for the Humanities Press, 2010).

"Abraham Lincoln's 'Fellow Citizens'—Before and After Emancipation," in William A. Blair and Karen Fisher Younger, eds., *Lincoln's Proclamation: Emancipation Reconsidered* (Chapel Hill: University of North Carolina Press, 2009), 151-169.

"The Thirteenth Amendment Enacted," in Harold Holzer and Sara Vaughn Gabbard, eds., *Lincoln and Freedom: Slavery, Emancipation, and The Thirteenth Amendment* (Carbondale, Ill.: Southern Illinois University Press, 2007).

"After Emancipation: Abraham Lincoln's Black Dream," in John Y. Simon, Harold Holzer, and Dawn Vogel, eds., *Lincoln Revisited* (New York: Fordham University Press, 2007)

"Slavery Reparations in Theory and Practice: Lincoln's Approach," in Brian Dirck, ed., *Lincoln Emancipated: The President and the Politics of Race* (DeKalb: Northern Illinois Univ. Press, 2007).

"Reconstruction as a Constitutional Crisis," in Thomas J. Brown, ed., *Reconstructions: New Directions in the History of Postbellum America* (New York: Oxford University Press, 2006).

"The World Will Forever Applaud: Emancipation," in Aaron Sheehan-Dean, ed., *The Struggle for a Vast Future: The American Civil War* (Oxford, UK: Osprey, 2006).

"Emancipating the Constitution: Francis Lieber and the Theory of Amendment," in Charles R. Mack and Henry H. Lesesne, eds., *Francis Lieber and the Culture of the Mind* (Columbia: Univ. of South Carolina Press, 2005).

"The Chase Court (1864-1873): Cautious Reconstruction," in Christopher Tomlins, ed., *The United States Supreme Court: ThePursuit of Justice* (Boston: Houghton Mifflin, 2005).

"Bringing the Constitution Back In: Amendment, Innovation, and Popular Democracy during the Civil War Era," in Meg Jacobs, William Novak, and Julian Zelizer, eds., *The Democratic Experiment: The Promise of American Political History* (Princeton: Princeton University Press, 2003).

"The King's Cure: Abraham Lincoln and the End of Slavery," in Charles Hubbard, ed., *Lincoln Reshapes the Presidency* (Mercer, Penn.: Mercer Univ. Press, 2004).

"Rutherford B. Hayes," in Alan Brinkley and Davis Dyer, eds., *TheReader's Companion to the American Presidency*. Boston: Houghton Mifflin, 2000.

"Abraham Lincoln and the Politics of Black Colonization," in Thomas F. Schwartz, ed., *"For a Vast Future Also": Essays from the Journal of the Abraham Lincoln Association*. New York: Fordham University Press, 1999. (Reprint of article listed below.)

EXHIBIT HM Vorenberg 63 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

**Refereed Journal Articles**

"Spielberg's *Lincoln*: The Great Emancipator Returns," *Journal of the Civil War Era*, 3 (December 2013), 549-72.

"Imagining a Different Reconstruction Constitution," *Civil War History*, 51 (December 2005), 416-26.

"'The Deformed Child': Slavery and the Election of 1864." *Civil War History*, 47 (September 2001), 240-257.

"Abraham Lincoln and the Politics of Black Colonization." *Journal of the Abraham Lincoln Association*, 14 (Summer 1993): 23-46.

**Non-Refereed Journal Articles**

"Emancipation—Then What?," *New York Times*, "Disunion" Blog, January 15, 2013, http://opinionator.blogs.nytimes.com/2013/01/15/emancipation-then-what/?_php=true&_type=blogs&_r=0

"Hearts of Blackness: Reconsidering the Abolitionists—Again," *Reviews in American History*, 32 (March 2004), 33-40.

"The Battle Over Gettysburg: What Lincoln Would Have Said about September 11, 2001." *Brown Alumni Magazine*, 103 (Jan./Feb. 2003), 27.

"Recovered Memory of the Civil War," *Reviews in American History*, 29 (Dec. 2001), 550-58.

**Invited Lectures**

"A Righteous Peace: Abraham Lincoln, the Civil War, and the End of Slavery," The Humanities Forum, Providence College, Oct. 18, 2019.

"How Wars End--or Don't: The Civil War as a Case Study," Henry E. Huntington Society of Fellows Lecture, May 8, 2019.

"Lincoln's Peace: The Struggle to End the American Civil War," Occidental College (Billington Lecture), Feb. 21, 2019.

"The Fate of Slavery after Emancipation," The Great Lectures Series (as OAH Distinguished Lecturer), New York City, October 14, 2017.

"Abraham Lincoln, the Thirteenth Amendment, and the Struggle for American Peace and Freedom," University of Saint Mary Annual Lincoln Lecture, Topeka, Kansas, February 20, 2017.

"The 14th Amendment as an Act of War," Boston College, Clough Center, Newton, Massachusetts, September 20, 2016.

"Born in the USA—So What?" Worcester Polytechnic Institute, Constitution Day University Speaker, Worcester, Massachusetts, September 19, 2016.

"The Slave Power on the Gallows: The Deeper Meaning of the Execution of Henry Wirz, Confederate Commandant," University of California, Berkeley, Legal History Workshop, March 29, 2016.

Salmon P. Chase Symposium on the Thirteenth Amendment (participant), Georgetown Law Center, Dec. 4-5, 2015, Washington, DC.

"The Last Surrender: Looking for the End of the Civil War," presented at The Lincoln Forum, Gettysburg, Pennsylvania, November 17, 2015.

EXHIBIT A Vorenberg 64 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

"Voting Rights and the Meaning of Freedom: The View from the Civil War Era," Annual
Lincoln Legacy Lecture, University of Illinois at Springfield, October 15, 2015.
"Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth
Amendment," Roger Williams University, October 6, 2015.
"Lincoln and the Jews, Freedom and Discrimination," Brown Hillel Alumni Association,
New York City, May 17, 2015.
"When Should History Say That Slavery Ended in the United States?," Center for Slavery
and Justice, Brown University, May 8th, 2015.
"Lincoln, the Constitution, and the Civil War," Community College of Rhode Island,
April 29, 2015.
"Judgment at Washington: Henry Wirz, Lew Wallace, and the End of the Civil War,"
Annual Symposium of Capitol Historical Society, Washington, DC, May 2, 2014.
"Emancipation, Lincoln, and the Thirteenth Amendment," Dole Forum, Dole Institute of
Politics, University of Kansas, Lawrence, Kansas, November 21, 2013.
"Spielberg's Lincoln and the Relation between Film and History," Department of
History, Loyola University, Chicago, Illinois, November 13, 2013.
"The Appomattox Effect: Struggling to Find the End of the American Civil War,"
Newberry Library Colloquium, Chicago, Illinois, November 6, 2013.
"Reconstruction and the Origins of Civil Rights," National Endowment for the
Humanities Summer Institute on Civil Rights History, Harvard University,
Cambridge, Massachusetts, July 1, 2013.
"The Origins and Process of Emancipation," Emancipation at 150 Symposium, Boston
College Clough Center, Newton, Massachusetts, April 23, 2013.
"Emancipation—Then What?  Citizenship?"  Emancipation Proclamation Symposium,
University of Michigan, October 26, 2012.
"Blood, Allegiance, Belief: The Meanings of Citizenship in the Civil War Era,"
University of Michigan Law School, January 31, 2012.
"American by War: The People and Their Nations during the Civil War," Phillips
Andover Academy, Andover, MA, Nov. 17, 2011.
"Birthright and the Myth of Liberal Citizenship," JANUS Forum, Brown University,
Nov. 15, 2011.
"American by War: The People and Their Nations during the Civil War," Western
Kentucky University, Bowling Green, KY, Oct. 12, 2011.
"The Elections of 1860 and 2010 and the Politics of Citizenship," Colby College
Symposium on the American Civil War Sesquicentennial, Waterville, Maine,
November 10, 2010.
"Americans Debate Citizenship—Then and Now," Brown Club of England, October 12,
2010, London.
"War Powers, *Ex Parte Merryman*, and the Relevance of the American Civil War,"
American Bar Association Workshop for High School Teachers, Washington,
D.C., June 19, 2010
"Originalism and the Meanings of Freedom," Georgetown Law School, Washington,
D.C., March 30, 2010.
"Abraham Lincoln, Politician," Rotary Club of Rhode Island, Warwick, R.I.,
November 6, 2008.

EXHIBIT A Vorenberg 65 of 71
to Marshall Declaration
page 65
USDC Case No. 2:22-5-01815-IM

"Lincoln the Citizen," Abraham Lincoln Symposium, National Archives,
    Washington, D.C., September 20, 2008.
"Emancipation and its Meaning in Current Scholarship," National Endowment for
    the Humanities Summer Institute on "Slavery and Emancipation,"
    Philadelphia, Pennsylvania, July 28, 2008.
"Lincoln the Citizen–Or Lincoln the Anti-Citizen?," Abraham Lincoln
    Symposium, Springfield, Illinois, February 12, 2008.
"The Tangled History of Civil Rights and Citizenship in the Civil War Era,"
    University of Virginia School of Law, November 2007.
"Civil Liberties and Civil Rights: The Civil War Era," American Bar Association,
    Chicago, May 2006.
"Race, the Supreme Court, and the Retreat from Reconstruction," Boston College
    School of Law, April 2007.
"Forever Free: The Meanings of Emancipation in Lincoln's Time and Ours," St.
    Louis University, December 7, 2006.
"Slavery Reparations in Historical Context," Connecticut College, New London,
    Connecticut, March 2, 2006.
"Abraham Lincoln, The Civil War and the Conflicting Legacies of
    Emancipation," presented as part of the "Forever Free" series, Providence
    Public Library, Providence, R.I., January 26, 2006.
"Abraham Lincoln, War Powers, and the Impact of the Civil War on the U.S.
    Constitution," presented at symposium on "War Powers and the
    Constitution," Dickinson College, Dickinson, Penn., October 3, 2005.
"Reconsidering Law, the Constitution, and Citizenship," presented at "New
    Directions in Reconstruction" symposium, Beaufort, S.C., April 15-18,
    2004.
"Abraham Lincoln, Slavery, and Modern Legacies," Public History Series,
    University of Las Vegas, Nevada, February 12, 2004.
"Oaths, African Americans, and Citizenship," University of Nevada at Las Vegas
    Law School, February 12, 2004.
"Reconsidering the Era of the Oath: African Americans Before Union Military Courts
    during the American Civil War," presented to the Law and History symposium,
    Northwestern University Law School, Chicago, Ill., November 3, 2003.
"Racial and Written Constitutions in Nineteenth-Century America," presented to
    the workshop of the Department of History, Boston College, Newton,
    Massachusetts, March 2003.
"Abraham Lincoln, Abolition, and the Impact of the Civil War on the Cult of the
    Constitution," presented at the Social Law Library, Suffolk University,
    Boston, Massachusetts, February 2002.
"Francis Lieber, Constitutional Amendments, and the Problem of Citizenship,"
    presented at The Francis Lieber Symposium, University of South Carolina,
    Columbia, S.C., November 2001.
"How Black Freedom Changed the Constitution," presented at the
    "Writing the Civil War" symposium, Atlanta History Center, Atlanta,
    Georgia, September 2001.

"From a Covenant with Death to a Covenant with Life: The Constitution's Transformation during the American Civil War," presented as the Annual Constitutional Anniversary Lecture, National Archives, Washington, D.C., September 2001.

"New Perspectives on Abraham Lincoln, Emancipation, and the Civil War," presented to the Civil War Round Table of Rhode Island, Cranston, Rhode Island, June 2001.

"Historical Roots of the Modern Civil Rights Movement: The Constitution," presented at the Civil Rights Summer Institute, Harvard University, Cambridge, Massachusetts, June 2001.

"Race, Law, and the Invention of the State Action Doctrine in the Late Nineteenth Century," presented at the Columbia University Law School, New York City, April 2001.

"A King's Cure, a King's Style: Lincoln, Leadership, and the Thirteenth Amendment," presented at the "Abraham Lincoln and the Legacy of the Presidency" conference, Lincoln Memorial University, Harrogate, Tennessee, April 2001.

"The Tangled Tale of Civil War Emancipation," presented at the University of Richmond, Richmond, Virginia, March 2001.

"The King's Cure: Abraham Lincoln, the Thirteenth Amendment, and the Fate of Slavery," presented at the Abraham Lincoln Institute of the Mid-Atlantic, Washington, D.C., March 2001.

"Race, the Supreme Court, and the Retreat from Reconstruction," presented at the Boston College School of Law, Newton, Mass., April 2000.

**Papers Read or Discussed**

"Prisoners of Freedom, Prisoners of War: An Untold Story of Black Incarceration--And How it Might be Told," Brown Legal History Workshop, Oct. 28, 2019.

"Bearer of a Cup of Mercy: Lew Wallace's American Empire," Henry E. Huntington Library, Research Fellows Meeting, Feb. 6, 2019.

"Anti-Imperialism and the Elusive End of the American Civil War," presented at the "Remaking North American Sovereignty" Conference, Banff, Alberta, Canada, July 31, 2015.

"The Election of 1864: Emancipation Promised, Emancipation Deferred," presented at The Annual Meeting of the Organization of American Historians, Atlanta, Georgia, April 11, 2014.

"The Appomattox Effect: Struggling to Find the End of the American Civil War," Department of History, Northwestern University, Evanston, Ill., Nov. 15, 2013.

"Birth, Blood, and Belief: Allegiance and the American Civil War," presented at the Elizabeth Clark Legal History Workshop Series, Boston University School of Law, Nov. 16, 2011.

"French Readings of Lincoln's Role in the Creation of American Citizenship," presented at the conference on European Readings of Abraham Lincoln, His Times and Legacy, American University of Paris, Paris, France, October 18, 2009.

EXHIBIT MV, Page 67 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

"Was Lincoln's Constitution Color-Blind?," presented at the Abraham Lincoln Bicentennial Symposium, Harvard University, Cambridge, Mass., April 24, 2009.

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," presented at conference on Slavery, Abolition, and Human Rights: Interdisciplinary Perspectives on the Thirteenth Amendment, April 17, 2009

"Did Emancipation Create American Citizens?—Abraham Lincoln's View," presented at the conference on Abraham Lincoln: Issues of Democracy and Unity, Russian State University, Moscow, Feb. 8, 2009.

"The Racial and Written Constitutions of Nineteenth-Century America," Cogut Center for the Humanities, Brown University, Nov. 4, 2008.

"Civil War Era State-Building: The Human Cost," Boston University Political History Workshop, March 19, 2008.

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," annual meeting of the *Law and Society Association*, Montreal, May 30, 2008.

"Claiming Citizenship: Black and White Southerners Make Their Cases During the Civil War," presented at the annual meeting of the *Southern Historical Association*, Memphis, November 2004.

"Imagining a Different Reconstruction Constitution," presented at the annual meeting of the Social Science History Association, Baltimore, November 2003.

"West of Reconstruction: Resolving Mexican-American Property and Citizenship in the Civil War Era," presented at the annual meeting of the *American Historical Association*, San Francisco, California, January 2002.

"The Limits of Free Soil: The Resolution of Mexican Land Claims during the American Civil War," presented at the annual meeting of the *Organization of American Historians*, St. Louis, Missouri, April 2000.

"Written Constitutions, Racial Constitutions, and Constitutional Permanence in Nineteenth-Century America," presented at the annual meeting of the *American Society for Legal History*, Toronto, Ontario, October 1999.

"Law, Politics, and the Making of California Free Soil during the American Civil War," presented at the annual meeting of the *Western History Association*, Portland, Oregon, October 1999.

"Land Law in the Era of Free Soil: The Case of New Almaden," *American Society for Environmental History*, Tucson, Arizona, April 1999.

"Written Constitutions, Racial Constitutions, and Constitutional Permanence in Antebellum America," presented at the annual meeting of the *Society for Historians of the Early American Republic*, Harpers Ferry, W.V., July 1998.

"The Constitution in African-American Culture: Freedom Celebrations and the Thirteenth Amendment," presented to the *W.E.B. Du Bois Institute*, Harvard University, Cambridge, Massachusetts, April 1996.

"Civil War Emancipation and the Sources of Constitutional Freedom," presented at the annual meeting of the *Organization of American Historians*, Washington, D.C., April 1995.

EXHIBIT, Vorenberg 68 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

"The Origins and Original Meanings of the Thirteenth Amendment," presented at the annual meeting of the *American Society for Legal History*, Washington, D.C., October 1994.

"Civil War Emancipation in Theory and Practice: Debates on Slavery and Race in the Border States, 1862-1865," presented at the *Southern Labor Studies Conference*, Birmingham, Alabama, October 1993.

## Service

### University

Anna S. K. Brown Library advisory committee, member, 2016-present.

Co-Organizer (with Faiz Ahmed, Rebecca Nedostup, Emily Owens), Brown Legal History Workshop, 2015-present.

Political Theory Project, Advisory Board, 2010-2019

Organizer and Presenter, "Abraham Lincoln for the 21st Century: A Symposium honoring the Abraham Lincoln Bicentennial," John Hay Library, Brown University, Feb. 27-28, 2009.  Plenary lecture by Benjamin Jealous, president of NAACP, and six symposium participants.  Funding secured from Rhode Island Foundation, Rhode Island Lincoln Bicentennial Commission, Brown Provost, Brown Dean of Faculty, History Department, Africana Studies Department

### Profession

Program Committee, Society of Civil War Historians, 2022 annual conference, 2020-present.

Cromwell Prize Committee, American Society for Legal Historians, 2014-2017.

Board of Editors, *Law and History Review*, 2004-2013 (reappointed 2009).

Advisory Committee, United States Abraham Lincoln Bicentennial Commission, 2002-10.

Board of Advisors, Lincoln Prize, Gettysburg Institute (2000-present).

Co-Chair, Local Arrangements Committee, Annual Meeting of the Society for Historians of the Early American Republic, Providence, Rhode Island, Summer 2004.

Referee for National Endowment for the Humanities Scholarly Editions, 2002; Summer Grants, 2001-2003.

Committee Member, Local Arrangements Committee, Annual Meeting of the American Society for Environmental History, to be held in Providence, Rhode Island, Spring 2003.

Referee for article manuscripts submitted to the *Journal of American History*, *Law and History Review*, *Law and Social Inquiry*, *Journal of the Civil War Era*, and *Civil War History*.

Referee for book manuscripts submitted to Houghton Mifflin, Harvard University Press, Oxford University Press, New York University Press, University of Chicago Press, University of Illinois Press, and University of North Carolina Press.

Advisory Editor for *Proteus* (special issue devoted to the American Civil War, Fall 2000).

**Community**

> Lecture on American Citizenship and Exclusion, Center for Reconciliation, Providence, R.I., July 2018.
>
> Instructor in co-taught course at the Rhode Island Adult Correctional Institute (ACI) through the Brown University BELLS program, 2013.
>
> Lecture on Reconstruction-Era Constitutional Amendments, Barrington, RI, Open Classroom, April 4, 2013.
>
> Lecture on 150th Anniversary of the Emancipation Proclamation, Wheeler School, Providence, Rhode Island, January 17, 2013.
>
> Rhode Island Civil War Sesquicentennial Commission, 2011- .
>
> Rhode Island Abraham Lincoln Bicentennial Commission (appointed by Governor), 2005-2009.
>
> Lecturer on the Brown Steering Committee on Slavery and Justice, The Wheeler School, Providence, Rhode Island, November 2006.
>
> Seminar leader for National Endowment for the Humanities "We the People" initiative at Deerfield Historical Society, Deerfield, Mass., April 2006.
>
> Seminar leader for National Endowment for the Humanities "Teaching American History" initiative at Rhode Island Historical Society, Providence, R.I., September 2005.
>
> Seminar leader for National Endowment for the Humanities "We the People" initiative at Deerfield Historical Society, Deerfield, Mass., March 2005.
>
> Advisor to the Burrillville, Rhode Island, School Department, on securing and administering a "Teaching American History" grant from the United States Department of Education, 2001-2002.

## Academic Honors and Fellowships

> Ray Allen Billington Professor, Occidental College/Henry E. Huntington Library, 2018-19.
>
> Pembroke Center for the Study of Women and Gender Fellowship, Brown University, 2016-17.
>
> National Endowment for the Humanities Long-Term Fellowship, Massachusetts Historical Society, Boston, Massachusetts, 2014.
>
> National Endowment for the Humanities Long-Term Fellowship, Newberry Library, Chicago, Illinois, 2013.
>
> Finalist, CIES Fulbright Fellowship for University of Rome III (2010-11 competition)
>
> Cogut Center for the Humanities Fellowship, Brown University, Fall 2008.
>
> William McLoughlin Prize for Teaching in the Social Sciences, Brown University, 2007.
>
> Karen Romer Prize for Undergraduate Advising, Brown University, 2007.
>
> History News Network (HNN) "Top Young Historian," 2005 (1 of 12 named in the U.S.).
>
> Vartan Gregorian Assistant Professorship, Brown University, 2002-2004.
>
> Finalist, Lincoln Prize, 2002 (for *Final Freedom*).
>
> American Council of Learned Societies/Andrew W. Mellon Fellowship, 2002-03.
>
> Kate B. and Hall J. Peterson Fellowship, American Antiquarian Society, 2002-03.
>
> Salomon Research Award, Brown University, 2002-2003.
>
> National Endowment for the Humanities Summer Stipend, 2001.
>
> Julian Park Fund Fellowship, SUNY at Buffalo, 1998.

EXHIBIT AV Vorenberg 20 of 71
to Marshall Declaration
USDC Case No. 2:22-cv-01815-IM

Research Development Fund Fellowship, SUNY at Buffalo, 1997.
Harold K. Gross Prize for Best Dissertation at Harvard in History, 1996.
Delancey Jay Prize for Best Dissertation at Harvard on Human Liberties, 1996.
W.E.B. Du Bois Fellowship, Harvard University, 1995.
Whiting Fellowship in the Humanities, 1994.
Bowdoin Prize for Best Essay at Harvard in the Humanities, 1993.
Indiana Historical Society Graduate Fellowship, 1993.
W. M. Keck Fellowship, Henry E. Huntington Library, 1993.
Everett M. Dirksen Congressional Research Fellowship, 1993.
Mark DeWolfe Howe Fellowship, Harvard Law School, 1993.
Charles Warren Center Research Fellowship, Harvard History Dept., 1991-2.
Derek Bok Award for Distinction in Teaching at Harvard, 1991.
Philip Washburn Prize for Best Senior Thesis at Harvard in History, 1986.

EXHIBIT A Vorenberg 21 of 71
to Marshall Declaration
Page 010
USDC Case No. 2:23-cv-01815-IM