Tyler Smith, OSB No. 075287
TYLER SMITH & ASSOCIATES P.C.
181 N. Grant Street, Suite 212
Canby, OR 97013
(503) 496-7177
tyler@ruralbusinessattorneys.com

Thomas R. McCarthy*
Taylor A.R. Meehan*
C'Zar Bernstein*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
*Pro hac vice motions forthcoming

Counsel for Amici Curiae

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC. an Oregon public benefit corporation; BRAD LOHREY, SHERMAN COUNTY SHERIFF; and ADAM JOHNSON, an individual,<br><br>        Plaintiffs,<br><br> v.<br><br>KATE BROWN, GOVERNOR OF THE STATE OF OREGON, in her official capacity; and ELLEN ROSENBLUM, ATTORNEY GENERAL OF THE STATE OF OREGON, in her official capacity,<br><br>       Defendants. | Civil No. 2:22-cv-01815-IM<br><br><br>**BRIEF OF AMICI CURIAE GUN OWNERS OF AMERICA, INC. AND GUN OWNERS FOUNDATION** |

# TABLE OF CONTENTS

Table of Authorities ...............................................................................................................iii

Introduction .......................................................................................................................1

Background..........................................................................................................................1

    A.    Measure 114 purports to ban magazines in common use. ....................................1

    B.    Measure 114 purports to impose an onerous permit-to-purchase regime............3

Argument ...........................................................................................................................5

    I.    Legal framework under *Bruen* ................................................................................5

    II.    Measure 114 fails constitutional scrutiny after *Bruen*. ........................................7

        A.    The magazine ban violates the Second and Fourteenth Amendments...................8

        B.    The permit-to-purchase scheme violates the Second and Fourteenth
            Amendments. .................................................................................................13

Conclusion ........................................................................................................................16

## TABLE OF AUTHORITIES

**Cases**

*Andrews v. State*,
  50 Tenn. 165 (1871) ............................................................................................................13

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. (ANJRPC) v. Att'y Gen.*,
  910 F.3d 106 (3d Cir. 2018) ........................................................................................ 9, 12

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ..................................................................................................passim

*Duncan (I) v. Becerra*,
  970 F.3d 1133 (9th Cir. 2020) ...............................................................................9, 10, 12

*Duncan v. Becerra*,
  366 F. Supp. 3d 1131 (S.D. Cal. 2019) ..............................................................................12

*Duncan v. Bonta (II)*,
  19 F.4th 1087 (9th Cir. 2021) ................................................................................. 6, 8, 12

*Fyock v. Sunnyvale*,
  779 F.3d 991 (9th Cir. 2015) .................................................................................................9

*Heller v. D.C.*,
  670 F.3d 1244 (D.C. Cir. 2011) ........................................................................................ 9, 12

*Jackson v. San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ................................................................................... 8, 10

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) .........................................................................................................1, 6

*New York Rifle & Pistol Ass'n, Inc. v. Cuomo*,
  804 F.3d 242 (2d Cir. 2015) ..................................................................................................9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) ...............................................................................................passim

*Rocky Mountain Gun Owners v. Bd. of Cnty. Comm. of Boulder Cnty.*,
  2022 WL 4098998 (D. Colo. Aug. 30, 2022) ..................................................................12

*United States v. Miller*,
  307 U.S. 174 (1939) .............................................................................................................9

**Other Authorities**

David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on
  Legis. 303, 346-47 (2016) ..................................................................................................14

Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System Misses the Mark of
Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529, 543 (2021) ..................................14

## INTEREST OF AMICI CURIAE

Gun Owners of America, Inc. ("GOA") is a 501(c)(4) nonprofit social welfare organization. Gun Owners Foundation ("GOF") is a 501(c)(3) nonprofit educational and legal organization. The shared missions of GOA and GOF include participating in the public policy process by conducting research and informing and educating the public about their state and federal constitutional rights to self-defense under the Second Amendment and state constitutions. Together, GOA and GOF have more than two million members and supporters nationwide, including many within the state of Oregon who will be irreparably harmed by Oregon Measure 114.

## INTRODUCTION

In June 2022, the Supreme Court of the United States reaffirmed that the right to keep and bear arms "for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)). The Court could not have been clearer: a State cannot "prevent[] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.*

Mere months after *Bruen*, Oregon has done just that. Testing the limits of *Bruen*, Oregon Measure 114 purports to ban magazines exceeding 10 rounds. And the same law implements a "permit-to-purchase" scheme—even to acquire a firearm—that is a "shall issue" regime in name only. Because both restrictions infringe the Second Amendment rights to keep and bear arms, they are unconstitutional. Measure 114 should be preliminarily enjoined.

## BACKGROUND

### A.    Measure 114 purports to ban magazines in common use.

Measure 114 contains an outright ban of magazines that have an overall capacity of more than 10 rounds of ammunition. "[A] person commits the crime of unlawful manufacture, importation, possession, use, purchase, sale or otherwise transferring of large-capacity magazines if the person manufactures, imports, possesses, uses, purchases, sells or otherwise transfers any large-capacity magazine in Oregon." 114 §11(2). "Large-capacity magazine," in turn, "means a fixed or detachable magazine … that has an overall capacity of, or that can be readily restored, changed, or converted to accept, *more than 10 rounds of ammunition* and allows a shooter to keep firing without having to pause to reload." *Id.* §11(1)(d) (emphasis added). In practice, section 11 will ban firearms as common as some shotguns and popular handguns. *See* Starrett Dec. ¶20; *accord* Johnson Dec. ¶20; Lohrey Dec. ¶22; Am. Compl. ¶24.

As relevant here, the magazine ban contains a telling exception. The ban "does not apply at any time to" "[a]ny government officer, agent or employee, member of the Armed Forces of the United States or peace officer … that is authorized to acquire, possess or use a large-capacity magazine." 114 §11(4)(c). The exception is narrow, applying only if "any acquisition, possession or use is related directly to *activities within the scope of … official duties*." *Id.* (emphasis added). There is no personal self-defense exception to the ban—not even for members of the military or police officers. Starrett Dec. ¶18 (explaining potential for violations when off-duty); *accord* Lohrey Dec. ¶20.

Section 11 arguably prohibits officers like Sheriff Lohrey—a plaintiff in this case—from purchasing the magazines he needs to perform his duties. "Law enforcement officers often have to purchase their own firearms and magazines to use on duty." Lohrey Dec. ¶2. And "[l]aw enforcement officers today use firearms with magazines that hold more than 10 rounds." *Id.* But because of the ban, officers "will not be able to purchase the proper equipment."[1] *Id.* So section 11 "limit[s]" the ability of officers like Sheriff Lohrey "to defend themselves." *Id.* ¶3; *accord* Am. Compl. ¶¶7-8, 34-36.

To be sure, section 11's magazine ban includes a narrow grandfather clause, not as an exception, but as an affirmative defense to a criminal charge for violation of this new and unconstitutional crime. "[I]t shall be an affirmative defense" if a person possesses magazines exceeding 10 rounds if the "magazine was owned by the person before the effective date of this 2022 Act and *maintained* in the person's control or possession," or otherwise acquired after the death of someone who lawfully owned such a magazine. 114 §11(5)(a)-(b) (emphasis added). But the affirmative defense is no self-defense carve-out. It does not permit the self-defense use of such magazines, even by those lucky

---

[1] Section 11 includes two additional exceptions that do not apply to the circumstance Sheriff Lohrey described. First, section 11 includes an exception for a "firearms manufacturer" provided that the "manufacturing is for exclusive sale or transfer to … a law enforcement *agency* and solely for authorized use by that *entity* related to the official duties of the *entity*." 114 §11(4)(a)(A) (emphases added). Second, section 11 includes an exception for "[a] licensed gun dealer that sells or otherwise transfers large-capacity magazines to …a law enforcement *agency* solely for authorized use by that *entity*." 114 §11(4)(b) (emphases added).

enough to possess them now. The law permits the owner only to "maintain[]" the magazines (1) "[o]n property owned or immediately controlled by the registered owner;" or (2) "[o]n the premises of a gun dealer or gunsmith … for the purpose of lawful service or repair;" or (3) "[w]hile engaging in the legal use of the large-capacity magazine," at shooting ranges "or for recreational activities such as hunting" or "participating in firearms competition or exhibition…." *Id.* §11(5)(c)(A)-(D). In all other circumstances, even grandfathered magazines become illegal contraband when taken off private property, unless transporting them (separate from a firearm and "locked in a separate container") to and from permitted locations. *Id.* §11(5)(c)(E).

The ban covers magazines that are in common use and, indeed, ubiquitous among modern gun owners. "Magazines over 10 rounds are commonly possessed by the American public, and have been for generations." Starrett Dec. ¶2; *accord* Lohrey Dec. ¶¶4-6; Am. Compl. ¶44 ("48 percent of American gun owners have owned magazines that can hold more than 10 rounds. Up to 44 million AR-15-style rifles and up to 542 million magazines with capacities exceeding 10 rounds are already in circulation in America."). "They have been very commonly possessed in the United States since 1862." *Id.*; *accord* Am. Compl. ¶¶46-55, 73-75. "Magazines of up to thirty rounds for rifles, and up to twenty rounds for handguns, are standard equipment for many popular firearms." Starrett Dec. ¶4. "Indeed, many of the nation's best-selling firearms—including the Glock pistol, the nation's most popular handgun—have long come standard with magazines" covered by the ban. *Id.* ¶7. "These magazines are overwhelmingly used for lawful purposes" and "[c]ivilians overwhelmingly choose them to increase their chances of staying alive in violent confrontations." *Id.* ¶4.

## B.    Measure 114 purports to impose an onerous permit-to-purchase regime.

In addition to its magazine ban, section 4 of Measure 114 requires that persons obtain a permit from the government—not to carry a firearm in public, but merely to purchase and acquire a firearm at all. Persons "may apply for a permit-to-purchase a firearm or firearms … to the police chief or

county sheriff with jurisdiction over the residence of the person making the application." 114 §4(1)(a).

A person is "qualified" to apply for a permit to purchase only if:

- he or she is "not prohibited from purchasing or acquiring a firearm under state or federal law, including but not limited to successfully completing a criminal background check," *id.* §4(1)(b)(A);

- "[i]s not the subject of an order described in ORS 166.525 to 166.543," *id.* §4(1)(b)(B);

- "[d]oes not present reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence," *id.* §4(1)(b)(C);

- "[p]rovides proof of completion of a firearm safety course," *id.* §4(1)(b)(D); and

- pays a fee of up to $65. *Id.* §4(1)(b)(E), (3)(b).

"[I]f the permit agent has verified the applicant's identity and determined that the applicant has met each of the qualifications" described above, "the permit agent shall issue the permit-to-purchase." *Id.* §4(3)(a).

This training requirement, in turn, is novel and extensive, especially for those in rural parts of Oregon. A person must prove that he or she completed a "course or class" that includes four components. First, the course must include "[r]eview of federal and state laws in place at the time of the class and other safe practices related to ownership." *Id.* §4(8)(c)(A). Second, the course must include "[r]eview of federal and state safe storage laws in place at the time of the class and other safe practices related to safe storage, including reporting lost and stolen guns." *Id.* §4(8)(c)(B). Third, the course must include "[p]revention of abuse or misuse of firearms, including the impact of homicide and suicide on families, communities and the country as a whole." *Id.* §4(8)(c)(C). Finally, the course must

include "[i]n-person demonstration of the applicant's ability to lock, load, unload, fire and store a firearm before an instructor certified by a law enforcement agency." *Id.* §4(8)(c)(D). In short, the training requirement is imposed not on those who wish to carry firearms in public, but on those who simply wish to obtain a firearm.

In practice, these requirements will preclude new gun ownership due to the obvious cost and time constraints they impose, along with substantial delays and the natural consequences of requiring training from or those certified by "law enforcement." "The tremendous delays on background checks that exist under current Oregon law, and 114 … means" that people will not be able to adequately defend themselves. Am. Compl. ¶21. And the unduly formal nature of the training will foreclose permits altogether for many persons. Some law enforcement agencies—particularly in rural areas—do not have the resources to comply with the training requirements. *Id.* ¶¶7, 9. For example, Sheriff Lohrey does not "have the personnel, nor the funding, to provide any training" and the county does "not have any city police departments." *Id.* "[T]here are no civilian firearms instructors in Sherman County to certify that could train the public," and "no public or private ranges" in which to train them in any event. *Id.*

## ARGUMENT

Measure 114 is unconstitutional. Both the magazine ban and the permit-to-purchase requirement regulate conduct protected by the Second Amendment: keeping and bearing arms for self-defense. And there is no longstanding tradition in this country of banning magazines or firearms of a certain capacity, or establishing the kind of permit-to-purchase regime at issue here. Because Defendants cannot satisfy their burden to demonstrate those traditions, Measure 114 violates the Second Amendment.

## I.  Legal framework under *Bruen*

Before *Bruen*, the Courts of Appeals had erroneously "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny."

*Bruen*, 142 S. Ct. at 2125. The Ninth Circuit was no exception. *E.g.*, *Duncan v. Bonta (II)*, 19 F.4th 1087, 1100 (9th Cir. 2021), *vacated*, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022). Earlier this year, the Supreme Court categorically rejected that framework. *See Bruen*, 142 S. Ct. at 2125-26. The required constitutional analysis instead begins and ends with the Second Amendment's original meaning, informed by this Nation's historical tradition.

*First*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. Courts must look to the "'textual elements' of the Second Amendment's operative clause." *Id.* at 2134. That clause provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Both *Bruen* and *Heller* confirm that the Second Amendment's textual elements "'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Bruen*, 142 S. Ct. at 2134 (quoting *District of Columbia v. Heller*, 554 U.S. 570,  592 (2008)). And the Second Amendment further includes "the right to wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* (cleaned up). For those reasons, the Second Amendment protects a right to keep and carry firearms for self-defense. *See Heller*, 554 U.S. at 628-29 (invalidating handgun regulation because it "bann[ed] from the home the most preferred firearm in the nation to keep and use for protection of one's home and family" (cleaned up)); *Bruen*, 142 S. Ct. at 2156 (invalidating "proper-cause requirement" because it "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms").

*Second*, to overcome the presumptive protection of Second Amendment conduct, the government bears the burden to justify its regulation based on historical analogues. No longer may Courts sustain infringements on Second Amendment rights by subjecting regulations to means-end scrutiny. *Bruen*, 142 S. Ct. at 2125-26. Both *District of Columbia v. Heller*, 554 U.S. 570, and *McDonald*, 561 U.S. 742, "expressly rejected the application of any judge-empowering interest-balancing inquiry that asks

whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Bruen*, 142 S. Ct. at 2129 (cleaned up). Accordingly, "[t]o justify its regulation, the government may not simply posit that the regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*

That historical inquiry is "fairly straightforward" in two circumstances. First, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* As the preamble to Measure 114 makes clear, Oregon's magazine-capacity ban and permit-to-purchase scheme target the societal problem of gun violence, mirroring the aim of the ban in *Heller*. *See id.* The question here, as in *Heller* and *Bruen*, is "whether 'historical precedent' … evinces a comparable tradition of regulation," *id.* at 2131-32, or whether Measure 114 infringes the Second Amendment's self-defense guarantee for Oregonians.

## II.    Measure 114 fails constitutional scrutiny after *Bruen*.

Applying *Bruen*'s simple framework, both the magazine ban and the permit-to-purchase scheme unambiguously regulate conduct protected by the Second Amendment: the keeping and bearing of arms by law-abiding persons, for protected purposes like self-defense. Thus, Oregon must demonstrate that the regulations in Measure 114 fall within a longstanding historical tradition of such regulation before this Court can conclude that the regulated conduct is entirely outside the protection

of the Second Amendment. But there is no longstanding historical tradition of banning magazines, or in any way limiting the capacity of ammunition contained in firearms. *Duncan II*, 19 F.4th at 1142 (Bumatay, J., dissenting) ("Large-capacity magazines are bearable arms that are commonly owned for lawful purposes, and not subject to longstanding regulatory measures."). And there is likewise no longstanding historical tradition of requiring licensure to simply acquire a firearm, which is precisely what the permit-to-purchase scheme does. Accordingly, Defendants cannot satisfy their burden under *Bruen* to "demonstrate[e] that [Measure 114] is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Without historical analogues, both the magazine ban and the permit-to-purchase scheme violate the Second and should be preliminarily enjoined, as they "prevent[] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2156.

### A.    The magazine ban violates the Second and Fourteenth Amendments.

The Second Amendment presumptively protects the possession and use of the magazines that section 11 would prohibit—magazines ubiquitous for ordinary self-defense. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. The meaning of "arms" in the Second Amendment "covers modern instruments that *facilitate* armed self-defense." *Bruen*, 142 S. Ct. at 2132 (emphasis added); *accord Jackson v. San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be meaningless."). And the Second Amendment presumptively protects both keeping and bearing those instruments for self-defense, whether in or outside the home. *See Bruen*, 142 S. Ct. at 2135 (explaining that "[t]he Second Amendment's plain text … presumptively" protects the "proposed course of conduct" of "carrying handguns publicly for self-defense" because "[n]othing in the Second Amendment's text draws a home/public distinction").

There is no question that magazines are inherent in the "arms" protected by the Second Amendment. *See Duncan (I) v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020), *vacated by Duncan II,* 19 F.4th 1087, *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022). In fact, "[w]ithout a magazine, many weapons would be useless, including 'quintessential' self-defense weapons like the handgun." *Id.* (quoting *Heller*, 554 U.S. at 629). And even before *Bruen*, the Ninth Circuit explained that if "firearms capable of use with a magazine—e.g., certain semiautomatic handguns—are commonly possessed by law-abiding citizens for lawful purposes, … there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable." *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015). Because magazines are "modern instruments that facilitate armed self-defense," *Bruen*, 142 S. Ct. at 2135, the Second Amendment protects the objects of section 11's ban. *See also New York Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 258 (2d Cir. 2015) ("[L]arge-capacity magazines are commonly owned by many law-abiding Americans, and their complete prohibition, including in the home, requires us to consider the scope of the Second Amendment guarantees 'at their zenith.'"); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. (ANJRPC) v. Att'y Gen.*, 910 F.3d 106, 116-17 (3d Cir. 2018), *abrogated by Bruen*, 142 S. Ct. 2111 ("The law challenged here regulates magazines, and so the question is whether a magazine is an arm under the Second Amendment. The answer is yes."); *cf. United States v. Miller*, 307 U.S. 174, 180 (1939) ("'The possession of arms also implied the possession of ammunition.'").

The magazines banned by Measure 114 are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625; *Heller*, *Heller v. D.C.*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("[M]agazines holding more than ten rounds are indeed in 'common use.'"). "Millions of Americans across the country own" large-capacity magazines and "half of all magazines in America hold more than ten rounds." *Duncan I*, 970 F.3d at 1142. "'[Q]uintessential self-defense weapon[s]'" like "variants of the Glock pistol" "come standard" with magazine capacities greater than ten rounds. *Id.*; *accord* Am.

Compl. ¶¶44-55, 73-75 & Ex. B. And although the historical pedigree of firearms technology is not

necessary under *Heller*, "firearm[s] that could fire more than ten rounds without reloading" go back as

far as "around 1580." *Duncan I*, 970 F.3d at 1147-48 (recounting the history and concluding that "fire-

arms capable of holding more than ten rounds of ammunition have been available in the United States

for well over two centuries"). In short, section 11 prohibits arms that have long been in common use

for the purpose of self-defense. *See id.* at 1152 (explaining that a similar ban "imposes a substantial

burden on the Second Amendment" because it "comes close to categorically banning the possession

of arms that are commonly used for self-defense").

      The Oregon ban thus runs afoul of the Second Amendment. On its face, section 11 implicates

the "'textual elements' of the Second Amendment's operative clause," *Bruen*, 142 S. Ct. at 2134, be-

cause it restricts the right of law-abiding citizens to defend themselves inside and outside the home.

*See Duncan I*, 970 F.3d at 1152; *Jackson*, 746 F.3d at 963-64 (holding that a law "[o]n its face, … impli-

cate[d] the core because it applie[d] to law-abiding citizens, and impose[d] restrictions on the use of

handguns within the home"). Section 11 itself establishes that the magazine ban infringes the right to

keep and bear arms for self-defense. The exception for members of the Armed Forces and police

officers is a tacit admission that the prohibited magazines are necessary for self-defense. *See* 114

§11(4)(c). But even that exception does not permit the privileged few—military members and law

enforcement—to exercise their self-defense rights. It does not apply to their possession or use of these

ordinary magazines when unrelated "to activities within the scope of … official duties." *Id.* So section

11 infringes not only the right of persons generally to defend themselves, but also "negatively im-

pact[s]" police officers in addition. Lohrey Dec. ¶¶2-3, 20; Am. Compl. ¶¶7-8, 34-36.

      Because section 11 bans so-called large-capacity magazines "everywhere for nearly everyone,

it necessarily bans [them] within" and outside the home. *Duncan I*, 970 F.3d at 1152; *see* 114 §11(2).

The only exception for persons generally is the grandfather clause, *see id.* §11(5), and even that flunks

any constitutional standard. Oregon would permit one to "maintain[]" the otherwise forbidden magazines in one's home. That stops short of permitting Oregonians to *use* arms for self-defense within their homes. *But see Heller*, 554 U.S. at 629-35. Section 11 further prohibits their carriage to and from the home, 114 §11(5)(c)(E), "mak[ing] it impossible for citizens to use [such firearms] for the core lawful purpose of self-defense" outside the home, *Heller*, 554 U.S. at 630. "The Second Amendment's plain text thus presumptively guarantees" the right to keep and bear the magazines targeted by the ban. *See Bruen*, 142 S. Ct. at 2135.

The burden therefore falls on Defendants to show that the magazine ban "is consistent with this Nation's historical tradition of firearm regulation." *Id.* Until they do so, the law should be preliminarily enjoined. To satisfy their burden, Defendants must "demonstrate a tradition of *broadly* prohibiting" magazines "commonly used … for self-defense." *Id.* at 2138 (emphasis added). That demonstration, in turn, requires *early* evidence. "The Second Amendment was adopted in 1791; the Fourteenth in 1868." *Id.* at 2136. Courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* "[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.* at 2237-38 (quoting *Heller*, 554 U.S. at 614). And the Supreme Court treats later evidence "'as mere confirmation of what … had already been established'" by earlier evidence. *Id.* So, Defendants must demonstrate that there is a historical tradition of broadly prohibiting magazines commonly used for self-defense by identifying regulations that existed around the time of the Founding. *See id.* at 2136 ("[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791.").

Defendants cannot meet that burden. "[W]hen the Founders ratified the Second Amendment, no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some

200 years." *Duncan I*, 970 F.3d at 1150. "[T]he magazine ban's earliest analogues only show up in the early twentieth century," *Duncan II*, 19 F.4th at 1156-57 (Bumatay, J., dissenting), history which does not constitute a "longstanding" regulation, *see Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626. Section 11 "applies to detachable magazines." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1149 (S.D. Cal. 2019); 114 §11(1)(d). But "[t]he oldest statute limiting the permissible size of a detachable firearm magazine" was introduced in 1990 by New Jersey. *Duncan*, 366 F. Supp. at 1149. Even if the analogy is broadened to ammunition capacity generally, "laws restricting ammunition capacity emerged in 1927 and all but one have since been repealed." *Duncan I*, 970 F.3d at 1150-51. None of the regulations from the first half of the 20th century limited that capacity to 10 rounds. *Duncan*, 366 F. Supp. at 1152-53 ("No regulation on 'firing-capacity' set a limit as low as California's 10-round limit.").[2] And such "short lived" and "passing regulatory efforts" cannot demonstrate "an enduring American tradition of state regulation." *Bruen*, 142 S. Ct. at 2155; *id.* at 2153-54 (rejecting government's appeal to regulations from "the late-19th century" because "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence").

It follows that Defendants cannot meet their burden. And because Defendants cannot "meet their burden to identify an American tradition justifying" the magazine ban, section 11 "is therefore unconstitutional." *Bruen*, 142 S. Ct. at 2138; *see also Rocky Mountain Gun Owners v. Bd. of Cnty. Comm. of Boulder Cnty.*, 2022 WL 4098998, at *2 (D. Colo. Aug. 30, 2022) (holding that plaintiffs "establish[ed]

---

[2] Even before *Bruen*, the Courts of Appeals recognized that magazine bans are not longstanding and lack historical pedigree. *See, e.g., Heller*, 670 F.3d at 1260 ("We are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity."); *ANJRPC*, 910 F.3d at 116-17 ("The record shows that millions of magazines are owned, often come factory standard with semi-automatic weapons, are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense, and there is no longstanding history of LCM regulation." (citations omitted)); *id.* at 117 n.18 ("LCMs were not regulated until the 1920s, but most of those laws were invalidated by the 1970s.").

a substantial likelihood of success on the merits" of their claim that a magazine ban violates the Second Amendment under *Bruen*).

## B.    The permit-to-purchase scheme violates the Second and Fourteenth Amendments.

Oregon's new permit-to-purchase regime is also unconstitutional. It is little different in effect from New York's "may issue" regime in *Bruen*. In Oregon, new firearms owners must now secure a permit to use a firearm before they may even purchase one. 114 §4(1)(b), (3)(a). That permitting regime restricts the conduct protected by both core "textual elements" of the Second Amendment: "the individual right to possess and carry weapons in case of confrontation." *Bruen*, 142 S. Ct. at 2134-35. For example, persons who do not have firearms—*i.e.*, would-be first-time purchasers—cannot obtain a firearm by purchase. The permitting requirements involve "tremendous delays on background checks," Am. Compl. ¶21, and the onerous training requirements will also either delay or destroy the exercise of Second Amendment rights for at least some persons, *see id.* ¶¶7, 9. Either way, section 4 makes it difficult if not impossible for some persons to keep arms in the home. *See Heller*, 554 U.S. at 628-29. And it likewise restricts their ability to carry firearms, whether in or outside the home. *See Bruen*, 142 S. Ct. at 2134-35. It follows that the Second Amendment "presumptively guarantees" the right to purchase firearms for self-defense. *Id.*; *cf. Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them" and "use them in such a way as is usual.").

The burden once again falls on Defendants to establish that the requirements in the permit-to-purchase scheme are "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. The requirements in the permit-to-purchase scheme "fall outside of the Second Amendment's 'unqualified command'" "[o]nly if [they are] consistent with this Nation's historical tradition." *Id.* at 2125-26. Defendants cannot meet their burden for several reasons.

**First**, like magazine bans, permit-to-purchase regimes are creatures of the last century. "State laws requiring a permit to purchase or a permit to possess a handgun were a rarity as of the early 1920s." David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 346 (2016). "Following the Civil War and in the early twentieth century, isolated racially neutral permitting schemes came into effect to prevent freedmen from acquiring means to defend themselves." Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529, 543 (2021). Permit-to-purchase schemes developed between 1911 and 1931 in New York, Oregon, North Carolina, Missouri, Connecticut, Michigan, Hawaii, New Jersey, and Texas. *Id.* Oregon repealed its original scheme in 1925. *Id.* "The majority of state gun laws of the early 1900s were less restrictive than the permitting systems put in place in the minority of states." *Id.* And even if the evidence were not lopsided as of the early 20th century, the evidence would in any event be too late. *Bruen*, 142 S. Ct. at 2237-38, 2153-54; *id.* at 2131 ("[T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.").

**Second**, section 4 is a shall-issue regime in name only because it "requir[es] the 'appraisal of facts, the exercise of judgment, and the formation of an opinion'"—"features that typify" the requirements invalidated by *Bruen. Id.* at 2138 n.9. Instead of an objective requirement concerning past conduct, section 4 invites permit agents to form opinions about an applicant's likelihood of being a danger to himself or others "as a result of the applicant's mental or psychological state." 114 §4(1)(b)(C). Permit agents are "county sheriff[s] or police chief[s] with jurisdiction over the residence of the person making an application for a permit-to-purchase," *id.* §3(4), not persons qualified to make predictions based on subjective opinions about the applicant's psychology.

**Third**, regimes that are ostensibly shall-issue can fail *Bruen*'s test if they are "put toward abusive ends" to "deny ordinary citizens their right" to keep and bear arms. *See Bruen*, 142 S. Ct. at 2138 n.9.

Applied here, Oregon's background check scheme already has created, and Measure 114 will continue to exacerbate, "tremendous delays" preventing citizens from exercising their core Second Amendment rights. Am. Compl. ¶21. The onerous training requirements foreclose permits altogether for many persons—particularly in rural areas where would-be permitting agents like Sheriff Lohrey cannot provide residents the requisite training. *Id.* ¶¶7, 9. Sheriff Lohrey, for example, cannot "provide *any* training." *Id.* ¶9 (emphasis added). Because the required course demands an "[i]n-person demonstration of the applicant's ability to lock, load, unload, fire and store a firearm before an instructor," 114 §4(8)(c)(D), there is no guarantee that a would-be first-time purchaser without previous experience owning firearms could *ever* qualify.[3] And because that same requirement cannot be met without a firearm, an applicant who cannot obtain a firearm for lack of a permit must rely on the generosity of strangers to loan one to him before he can demonstrate competency. *See id.* The Second Amendment does not permit governments to impose such an onerous competency test prior to *permitting* the exercise of the right to keep and bear arms. *See Bruen*, 142 S. Ct. at 2138 n.9 (explaining that shall-issue regimes may be unconstitutional if they impose "lengthy weight times in processing license applications or exorbitant fees"). Accordingly, Defendants cannot "meet their burden to identify an American tradition justifying" the onerous requirements in section 4. *Bruen*, 142 S. Ct. at 2138.

Until such time as the mandated training requirements are established and training becomes available, the permit-to-purchase requirements operate as a complete ban on gun ownership for anyone wishing to purchase a firearm for the first time for ordinary self-defense. Such a person cannot obtain a firearm outside of extraordinary circumstances until he or she has completed a training course that complies with the mandated training requirements. And as explained, first-time gun owners may

---

[3] Among other troubling ambiguities in section 114, the requirement that applicants demonstrate in person firearm proficiency does not require instructors to train applicants before they test them. *See* 114 §4(8)(c)(D).

not be able to demonstrate proficiency precisely because section 4 eliminates their ability to obtain a

firearm altogether.

## CONCLUSION

For all these reasons, this Court should grant Plaintiffs' emergency motion for preliminary

injunction.

Dated: November 30, 2022                      Respectfully submitted,

_s/ Tyler Smith_                              _s/ Thomas R. McCarthy_
Tyler Smith, OSB No. 075287                   Thomas R. McCarthy*
TYLER SMITH & ASSOCIATES P.C.                 Taylor A.R. Meehan*
181 N. Grant Street, Suite 212                C'Zar Bernstein*
Canby, OR 97013                               CONSOVOY MCCARTHY PLLC
(503) 496-7177                                1600 Wilson Blvd., Ste. 700
tyler@ruralbusinessattorneys.com              Arlington, VA 22209
                                              (703) 243-9423
                                              tom@consovoymccarthy.com

                                              *_Pro hac vice_ motions forthcoming

                                              _Counsel for Amici Curiae_

**CERTIFICATE OF SERVICE**

I e-filed this brief with the Court, which will email everyone requiring service.

Dated: November 30, 2022                    _s/ Tyler Smith_