John Kaempf, OSB #925391
KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: (503) 224-5006
Email: john@kaempflawfirm.com

Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC. an Oregon public benefit corporation; BRAD LOHREY, SHERMAN COUNTY SHERIFF; and ADAM JOHNSON, an individual,<br><br>      Plaintiffs,<br> v.<br><br>KATE BROWN, GOVERNOR OF THE STATE OF OREGON, in her official capacity; and ELLEN ROSENBLUM, ATTORNEY GENERAL OF THE STATE OF OREGON, in her official capacity,<br><br>      Defendants. | Civil No. 2:22-cv-01815-IM<br><br>**PLAINTIFFS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL HISTORICAL AUTHORITIES IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY INJUNCTION** |

# WHY PLAINTIFFS REQUEST LEAVE TO FILE THESE SUPPLEMENTAL AUTHORITIES

At oral argument on December 2, 2022, and in a Minute Order shortly afterward, the Court reminded the "parties that the extent to which amicus briefs are considered is wholly within this Court's discretion."

And under *New York Pistol & Rifle Assn v. Bruen, New York Pistol & Rifle Assn v. Bruen,* 142 S.Ct. 2111, 2127 (2022), the key issue now is that *Defendants* "<u>must</u> affirmatively *prove* that its firearms regulation [in Ballot Measure 114] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." (Emphasis added.) "The government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Id*. at 2126. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Id*. at 2129-2130. And "*only* if Defendants carry that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect Plaintiffs' proposed course of conduct. *Id*. at 2135. (Emphasis added.)

And Defendants must "demonstrate a tradition of *broadly* prohibiting" magazines commonly used for self-defense—and "broadly requiring permits to purchase a gun." *Id.* at 2138 (emphasis added).

That demonstration, in turn, requires *early* evidence. "The Second Amendment was adopted in 1791; the Fourteenth in 1868." *Id.* at 2136. Courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* "Because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.* at 2237-38. And the Supreme Court treats later evidence "'as mere confirmation'" of what "had already been established'" by earlier evidence. *Id.*

In making this decision, courts are "entitled to decide a case based on the historical record compiled by the parties." *Id*. at 2130, n.6.

And *Bruen* noted that "apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense. Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense. We conclude that respondents have failed to meet their burden to identify an American tradition justifying New York's **proper-cause** requirement." Under the "text-and-history standard, the proper-cause requirement is therefore unconstitutional. *Id.* at 2138 (emphasis added). "A State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense." *Id*. at 2135, n.8.

Page 3 –   PLAINTIFFS' MOTION FOR LEAVE

So, Defendants here must "affirmatively prove" that <u>all</u> terms of Ballot Measure 114—including (1) requiring "permits to purchase" a firearm—and its (2) ban on magazines exceeding 10 rounds—are consistent with our "Nation's historic tradition" relating to gun rights.

But they fail in that effort. That is why the Court should grant Plaintiffs injunctive relief.

And Plaintiffs seek to help the Court make the correct ruling on a more complete and accurate "Nation's historic tradition" record—which Plaintiffs respectfully submit is to grant a Preliminary Injunction and Temporary Restraining Order before the December 8, 2022 effective date of 114.

## MOTION

Under FRCP 15(a), and the Court's inherent authority, Plaintiffs respectfully move the Court to consider this supplemental pleading and cited authorities. "Given the haste that is often necessary" to obtain a preliminary injunction, they are "customarily granted on the basis of procedures that are less formal" than a trial on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). *Vanderzanden Farms, LLC v. Dow Agrosciences, LLC*, 323 F.Supp.2d 1075 (D Or 2004) ("The Court grants Defendant's …Motion for Leave to File Supplemental Authority and has considered both parties' arguments.").

**First**, plaintiffs incorporate by reference in their entirety the briefs (and all related submissions) of Amici Gun Owners of America; Gun Owners Foundation; and Silent Majority Foundation.

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

**Second**, Plaintiffs respectfully remind the court of the Declarations of Plaintiffs Starrett, Johnson, and Lohrey already on file with the Court about this issue.

**Third**, as supplemental authority in support of their Emergency Motion for Preliminary Injunction, Plaintiffs respectfully submit the following historical authorities below.

**OUR NATION'S HISTORICAL TRADITION DOES NOT SUPPORT THE RESTRICTIONS IN BALLOT MEASURE 114.**

**1. Magazines exceeding 10 rounds <u>preexist</u> our Nation's founding.**

Magazines of <u>more</u> than ten rounds are <u>older</u> than the United States itself. Firearms fitted with Magazines that 114 would prohibit have been used historically since at least **1580** using "superposed" loads (each round stacked on top of the other).[1] And such firearms and magazines have <u>gained</u> popularity in the ensuing centuries. The first American presence of such firearms occurred in <u>Oregon</u>, with a firearm that included a twenty-two round magazine as Meriwether Lewis carried a Girandoni air rifle on his famous expedition with William Clark and the Corps of Discovery in <u>1804-06</u>.[2]

There is <u>no</u> longstanding historical tradition of banning magazines, or in any way limiting the capacity of ammunition contained in firearms. *Duncan v. Bonta*, 19 F.4th 1087, 1142 (CA9 2021) (Bumatay, J., dissenting) ("Large-capacity magazines are bearable arms that are commonly owned for lawful purposes, and not subject to longstanding regulatory Measures.").

---

[1] Lewis Winant, *Firearms Curiosa* 168-70 (2009).

[2] Jim Garry, *Weapons of the Lewis & Clark Expedition*, 94 (2012); See also: Exhibit 2, Declaration of Ashley Hlebinsky *Miller v. Becerra*, 3:19-cv-01537 (S.D. Cal.) ECF No.: 22-14 (December 6, 2019).

Page 5 –   PLAINTIFFS' MOTION FOR LEAVE

When the Founders ratified the Second Amendment in 1791, no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some **200 years**." *Duncan* , 970 F.3d at 1150.  "The magazine ban's earliest analogues only show up in the early twentieth century," *Duncan*, 19 F.4th at 1156-57 (Bumatay, J., dissenting).  So, that is not a "longstanding" regulation, *see Bruen,* 142 S. Ct. at 2133.

The Model 1873 Short Rifle, manufactured by Winchester Repeating Arms, held ten to eleven rounds in a tubular magazine, and was so immensely popular and widespread that it has entered American lore as "the gun that won the West."  The Model 1873 built on the commercial success of the Model 1866, marketed and touted by Winchester for defense against "sudden attack either from robbers or Indians."[3]

The M-1 Carbine, in wide use during World War II, was mass-produced for the returning citizen soldier.[4]  In 1903, Congress created the Civilian Marksmanship Program to foster marksmanship, training, and safety, and made the M-1 widely available at steeply-discounted prices with its standard magazine sizes of fifteen or thirty rounds.[5]

Pistols historically also carried more than ten rounds, dating back to "pepperbox" pistols of the 1830s.  Samuel Colt's famous revolvers were not as commercially successful as pepperboxes initially, but due to technical simplicity and durability, surpassed pepperboxes as the sidearm of choice, especially among the cowboys and frontiersman of American lore.

---

[3] R.L. Wilson, *Winchester: An American Legend*, 32 (1991).

[4] Bruce N. Canfield, *Bruce Canfield's Complete Guide to the M1 Garand and the M1 Carbine*, 163 (1999).

[5] *Id*., note 85, at 163; Larry L. Ruth, 2 *War Baby! Comes Home: the US caliber .30 Carbine*, 575 (R. Blake Stevens 1993).

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

Finally, addressing magazines, "box" style magazines were patented as early as **1855**, with a detachable version patented in 1864, and a vertically stacked version patented in 1879.

### 2. There is no historical tradition of restricting ammunition capacity.

At the time the Second Amendment was adopted in 1791, there were no laws restricting ammunition capacity. And that was *not* because guns did not have the capacity to fire more than one round. In fact, states, based on federal legislation passed in 1792, *required* that men between the ages of 18 and 45 years of age "shall . . . provide himself with . . . not less than 24 cartridges."[6]

The first laws that restricted magazine capacity were enacted during the Prohibition era of **1920-33**, nearly a century and a half after the adoption of the Second Amendment, and more than half a century after the adoption of the Fourteenth Amendment. *See* David B. Kopel, *The History of Firearms Magazines and of Magazine Prohibition*, 78 Albany L. Rev. 849, 864-868 (2015).

The *only* longstanding statute banning magazines with a capacity more than ten (the statute prohibits more than twelve shots without reloading) is found in the District of Columbia. (Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652.) Only nine states currently have ammunition capacity restrictions, all enacted after the *Violent*

---

[6] *See An Act to Organize, Govern, and Discipline the militia of the State of Maine*, Passed March 21, 1821 at 4-5, https://digitalcommons.usm.maine.edu/me_collection/5/, last viewed 11/30/2022; *See also* Duke Center for Firearms Law, 1791 S.C. Acts 16, *An Act To Amend And More Effectually Put In Force For The Time Therein Limited, The Act Entitled An Act For The Regulation Of The Militia Of This State,* https://firearmslaw.duke.edu/laws/1791-s-c-acts-16-an-act-to-amend-and-more-effectually-put-in-force-for-the-time-therein-limited-the-act-entitled-an-act-for-the-regulation-of-the-militia-of-this-state/, last viewed 11/30/2022.

*Crime Control and Law Enforcement Act of 1994*, which Congress allowed to "sunset" in 2004. (Pub. L. 103-322, § 110103(a)-(b), 108 Stat. 1796, 1998-99, § 110105, 108 Stat. at 2000.) The *Violent Crime Control and Law Enforcement Act of 1994* prohibited the sales of "large capacity magazines," which the law defined as, *inter alia*, a magazine that "has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." (PL 103-332, Sec. 110103 (108 STAT 1999). It expired within 10 years of its adoption and has not been readopted in the ensuing years.

Equally notable is the volume of "large capacity magazines" in commerce in the 1990s prior to Congress' Act. One study indicates that at that time, approximately "40 percent of the semiautomatic handgun models and a majority of the semiautomatic rifle models being manufactured and advertised prior to the ban were sold with LCMs [large capacity magazines] or had a variation that was sold with an LCM."[7] The same study further states that "A national survey of gun owners found that **18%** of all civilian-owned firearms and 21% of civilian-owned handguns were equipped with magazines having 10 or more rounds as of 1994."[8]

In this Century, California's definition of "large-capacity magazine" of 10 rounds has been effective only since January 1, 2011, and operative since January 1, 2012. (Cal. Penal Code § 16740 (2012).)

Colorado passed a magazine restriction of over 15 rounds as late as 2013. (2013 Colo.

---

[7] Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence*, at 6. (Nat'l Instit. Just. June 2004). Available at: https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf. Last accessed: November 30, 2022

[8] *Id*.

House Bill 13-1224.) Hawaii's 10 round high-capacity magazine law was passed only in 2011. (HI Rev Stat § 134-8 (2011) through Reg. Sess.). Maryland passed a 10-round magazine restriction in 2013. (2013 Md. Laws ch. 427.) New Jersey passed its 10-round magazine limit in 2019. (N.J.S.A. 2C:39-1. In 2018, Vermont restricted long-gun magazines to 10-rounds and hand gun magazines to 15 rounds. (13 V.S.A. § 4021.) Just this year Rhode Island passed a large-capacity magazine ban. (11 R.I. 47.1.) Additionally, local jurisdictions in Illinois, New York and Ohio have restrictions that vary from five rounds to 35 rounds depending on the locality.[9]

But "the oldest statute limiting the permissible size of a detachable firearm magazine" was introduced in 1990 by New Jersey. "*Duncan v. Becerra*, 366 F.Supp.3d 1131, 1149 (SD Cal 20201).

The above historical inquiry is "fairly straightforward" under *Bruen* in two ways.

First, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S.Ct. *Id.* at 2131. Second, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.*

Even if the analogy is broadened to ammunition capacity generally, "laws restricting ammunition capacity emerged in 1927 and all but one have since been *repealed*." Duncan,

---

[9] USA Carry, Magazine Restrictions, https://www.usacarry.com/magazine-restrictions/, last viewed 11/30/2022.

Page 9 –   PLAINTIFFS' MOTION FOR LEAVE

KAEMPF LAW FIRM PC
2021 SW Main Street, Suite 64
Portland, Oregon 97205
Telephone: 503-224-5006

970 F.3d at 1150-51. None of the regulations from the first half of the 20th century limited that capacity to 10 rounds. *Duncan*, 366 F. Supp. at 1152-53 ("No regulation on 'firing-capacity' set a limit as low as California's 10-round limit."). And such "short lived" and "passing regulatory efforts" cannot demonstrate "an enduring American tradition of state regulation." *Bruen*, 142 S. Ct. at 2155; *id.* at 2153-54 (rejecting government's appeal to regulations from "the late-19th century" because "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence").

As the Preamble to Measure 114 makes clear, Oregon's magazine-capacity ban and permit-to-purchase scheme target the societal problem of gun violence, mirroring the aim of the ban struck down in *District of Columbia v. Heller*. 554 US 570 (2008).

The question here, as in *Bruen*, is "whether 'historical precedent'" evinces "a comparable tradition of regulation," *Bruen*, 142 S. Ct. at 2131-32, or whether Measure 114 infringes the Second Amendment's self-defense guarantee for Oregonians.

It does. *See Rocky Mountain Gun Owners v. Bd. of Cnty. Comm. Of Boulder Cnty.*, 2022 WL 4098998, at *2 (D. Colo. Aug. 30, 2022) (holding that plaintiffs "established a substantial likelihood of success on the merits" of their claim that a magazine ban violates the Second Amendment under *Bruen*).

**3. There is no historical tradition of requiring a permit to purchase a firearm.**

There is likewise no longstanding historical tradition of requiring licensure to simply acquire a firearm, which is precisely what the permit-to-purchase scheme in 114 does.

Accordingly, Defendants cannot satisfy their burden under *Bruen* to demonstrate that 114 is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

Without historical analogues, both the magazine ban and the permit-to-purchase scheme violate the Second Amendment, and should be preliminarily enjoined, as they "prevent law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2156.

Oregon's new "permit-to-purchase" regime is also <u>not</u> supported by our nation's historic tradition. It is little different in effect from New York's "may issue" regime struck down in *Bruen*. In Oregon, new firearms owners must now secure a permit to use a firearm before they may even purchase one. 114 §4(1)(b), (3)(a). That permitting regime restricts the conduct protected by both core "textual elements" of the Second Amendment: "the individual right to possess and carry weapons in case of confrontation." *Bruen*, 142 S. Ct. at 2134-35.

For example, persons who do not have firearms—*i.e.*, would-be first-time purchasers—<u>cannot</u> obtain a firearm by purchase. The permitting requirements involve "**tremendous delays** on background checks," First Amended Complaint at ¶21), and the onerous **training** requirements will also either delay or destroy the exercise of Second Amendment rights for at least some persons, *see id.* ¶¶7, 9 (emphasis added.)

Either way, 114 makes it difficult if not impossible for some persons to keep arms in the home. *See Heller*, 554 U.S. at 628-629. And it likewise restricts their ability to carry firearms, whether in or outside the home. *See Bruen*, 142 S. Ct. at 2134-2135.

The burden again falls on Defendants to establish that the requirements in the permit-to-purchase scheme are "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. The requirements in the permit-to-purchase scheme "fall outside of the Second Amendment's 'unqualified command'" only if they are "consistent with this Nation's historical tradition." *Id*. at 2125-2126.

Just like magazine bans, permit-to-purchase regimes are creatures of the last century. "State laws requiring a permit to purchase or a permit to possess a handgun were a rarity as of the early 1920s." David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 346 (2016). "Following the Civil War and in the early twentieth century, isolated racially neutral permitting schemes came into effect to prevent freedmen from acquiring means to defend themselves." Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529, 543 (2021).

Permit-to-purchase schemes developed between 1911 and 1931 in New York, Oregon, North Carolina, Missouri, Connecticut, Michigan, Hawaii, New Jersey, and Texas. *Id.* Oregon repealed its original scheme in 1925. *Id.* "The majority of state gun laws of the early 1900s were less restrictive than the permitting systems put in place in the minority of states." *Id.* And even if the evidence were not lopsided as of the early 20th century, the evidence would in any event be too late. *Bruen*, 142 S. Ct. at 2231, 2237-38, 2153-54; ("The lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.").

Based on the above, and Plaintiffs' prior submissions, the Court should hold that Defendants fail to meet their burden to prove that any of the provisions of 114 are part of our "Nation's historic tradition."

Therefore, it should grant Plaintiffs' motion for preliminary injunction and Temporary Restraining Order.

Respectfully submitted: November 5, 2022.

        KAEMPF LAW FIRM PC

        /s John Kaempf
        John Kaempf, OSB #925391
        john@kaempflawfirm.com

        Attorney for Plaintiffs

# CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2022, I caused to be electronically filed the foregoing paper with the Clerk of the Court by using the CM/ECF system. The following participant in the case who is a registered CM/ECF user will be served by the CM/ECF system.

    Brian Marshall
    brian.s.marshall@doj.state.or.us

    OREGON DEPARTMENT OF JUSTICE
    Attorney for Defendants

DATED: December 5, 2022.

    KAEMPF LAW FIRM PC

    /s John Kaempf
    John Kaempf, OSB #925391
    john@kaempflawfirm.com

    Attorney for Plaintiffs