# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **OREGON FIREARMS FEDERATION, INC.,** an Oregon public benefit corporation; **BRAD LOHREY,** Sherman County Sheriff; **CODY BOWEN,** Union County Sheriff; **BRIAN WOLFE,** Malheur County Sheriff; **HAROLD RICHARD HADEN, JR.,** an individual; and **ADAM JOHNSON,** an individual, | Case No. 2:22-cv-01815-IM **OPINION AND ORDER** |
| Plaintiffs, | |
| v. | |
| **KATHERINE "KATE" BROWN**, in her official capacity as Governor of the State of Oregon; and **ELLEN ROSENBLUM,** in her official capacity as Attorney General of the State of Oregon, | |
| Defendants. | |

John Kaempf, Kaempf Law Firm PC, 2021 SW Main Street, Suite 64, Portland, OR 97205.Karen Louise Osborne, KOsborne Law, LLC, 9721 NE Livingston Mountain Ct., Camas, WA 98607. Leonard W. Williamson, Van Ness Williamson, 960 Liberty St SE, Suite 100, Salem, OR 97302. Pete Serrano, Silent Majority Foundation, 5238 Outlet Dr., Pasco, WA 99301. Attorneys for Plaintiffs.

Brian Simmonds Marshall, Oregon Department of Justice, 100 SW Market Street, Portland, OR 97201. Harry B. Wilson, Markowitz Herbold PC, 1455 SW Broadway, Suite 1900, Portland, OR 97201. Attorneys for Defendant.

**IMMERGUT, District Judge.**

PAGE 1 – OPINION AND ORDER

Before this Court is Plaintiffs' Emergency Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction, ECF 5, pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiffs are two individual gun store owners, three Oregon sheriffs, and an Oregon gun rights group. They ask this Court to block implementation of Oregon Ballot Measure 114 ("Measure 114"), which is scheduled to go into effect on December 8, 2022. ECF 5 at 1.

A TRO—like a preliminary injunction—is "an extraordinary and drastic remedy . . . that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (internal citation omitted). As the party seeking a TRO and preliminary injunction, it is Plaintiffs' burden to show that this extraordinary remedy is warranted at this time. *See DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011).

Measure 114, which was passed by a majority of Oregon voters, changes existing Oregon law in two ways: by requiring prospective gun owners to obtain a permit before purchasing a firearm, and by prohibiting the purchase and use of magazines that can accept more than ten rounds of ammunition, subject to various exceptions. The purpose of these changes, as stated in the measure's preamble and as argued by Defendants, is to prevent "horrific deaths and devastating injuries due to mass shootings, homicides[,] and suicides." ECF 15 at 1. But Plaintiffs argue that these measures do little to protect public safety and instead violate their Second, Fifth, and Fourteenth Amendment rights. ECF 5 at 2, 24.

Plaintiffs bring their challenge to Measure 114 in the wake of the United States Supreme Court's recent clarification of the Second Amendment's protections and limits. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, decided five months before the passage of Measure 114, the Supreme Court held that when conduct is covered by the plain text of the Second

Amendment, any government action must be "consistent with the Nation's historical tradition of firearm regulation."142 S. Ct. 2111, 2126 (2022). But *Bruen* also made clear that "the right secured by the Second Amendment is not unlimited," and that governments may still impose certain restrictions on the purchase, possession, and use of firearms. *Id.* at 2128; *see also id.* at 2162 (Kavanaugh, J., concurring) ("[T]he Second Amendment allows a 'variety' of gun regulations," including the "presumptively lawful regulatory measures" such as laws prohibiting the keeping and carrying of "dangerous and unusual weapons.").

Plaintiffs filed their TRO on November 23, 2022 and asked this Court to block all of Measure 114, including the large-capacity magazine restrictions and the permit requirements, from taking effect. ECF 5 at 2. On December 4, 2022, Defendants submitted a letter to this Court stating that "challenges require postponing implementation" of Measure 114's permit-to-purchase provision. ECF 34 at 1. Defendants have asked this Court to postpone implementation of Measure 114's permit requirements. *Id.*

Against this backdrop, and based on the record before this Court at this early stage in the litigation, this Court finds that Plaintiffs have failed to meet their burden showing that they are entitled to the extraordinary relief they seek. Plaintiffs have failed to demonstrate that they will suffer immediate and irreparable harm if this Court does not block Measure 114 from taking effect on December 8, 2022. Plaintiffs have not produced sufficient evidence at this stage to demonstrate a likelihood of success on the merits of their challenge to Measure 114's restrictions on large-capacity magazines. Plaintiffs have also failed to demonstrate a likelihood of success on their facial challenge to Measure 114's permitting provisions. With respect to any as-applied challenge, Defendants have stated that they are not ready to implement the permitting requirements and have asked this Court to "enter an order providing a limited window in which

Oregonians will be able to purchase firearms even though they do not have a permit, while also allowing Oregonians to apply for and be issued permits." *Id.*

Accordingly, Plaintiffs' Motion for a TRO, ECF 5, is DENIED with respect to Measure 114's restrictions on large-capacity magazines. Plaintiffs' Motion is DENIED with respect to a facial challenge to Measure 114's permitting provision. However, in light of the difficulty the State has conceded in terms of implementation of the permitting provisions at this stage, implementation of those permitting provisions is stayed for thirty days. Parties are ordered to confer and report to the Court regarding any further postponement requests.

## BACKGROUND

### A. Factual History

Measure 114 was approved by a majority of Oregon voters in November of 2022.[1] *Measure 114*, OREGON SECRETARY OF STATE, https://results.oregonvotes.gov/resultsSW.aspx?type=MEASURE&map=CTY (last visited Dec. 3, 2022). Excluding certain exceptions for law enforcement and military use, Measure 114 prohibits the sale and restricts the use of large-capacity magazines holding more than ten rounds of ammunition. Measure 114 § 11. Measure 114 also requires individuals to obtain a permit before purchasing firearms. *Id.* at § 4. Measure 114 is scheduled to take effect on December 8, 2022. *See* Or. Const. Art. IV, § 1(4)(d).

---

[1] Oregon has a ballot measure system, which includes initiative, referenda, and legislative referral. Ballot initiatives allow Oregon voters to propose revisions or additions to the Oregon Revised Statutes. To be placed on the ballot, a statutory initiative must garner 1,000 sponsorship signatures followed by signatures totaling six percent of the total votes cast for governor at the last election. *Make or Change State Law,* OREGON SECRETARY OF STATE, https://sos.oregon.gov/elections/Pages/statelaw.aspx (last visited Nov. 30, 2022).

### 1. Pre-Measure 114 Landscape

Prior to Measure 114, any individual who wanted to purchase a firearm in Oregon was required to complete a background check at the time of purchase, including a criminal history check to determine whether the individual was disqualified from purchasing a gun under Oregon law. O.R.S. 166.412(3). Oregon law disqualifies the following persons from possessing a firearm: felons, certain criminal defendants, individuals with certain adjudged mental illnesses, and individuals subject to protective orders for domestic abuse or extreme risk protection. O.R.S. 166.470. If the required background check was not completed within three days, the gun dealer could nonetheless deliver the firearm to the individual. O.R.S. 166.412(3)(c). There was no requirement that individual firearm owners complete any kind of safety training, except to obtain a concealed handgun license or a hunting license for youth. Furthermore, there were no restrictions on the capacity of firearm magazines. Official Voters' Pamphlet, General Election, Nov. 8, 2022, 90.

#### a. Ballot Measure 114

Following the enactment of Measure 114, Oregon law will now require individuals to obtain a permit to purchase firearms, which in turn will require individual purchasers to both submit to a background check and complete a firearm safety course before they can buy a firearm. Measure 114 § 4. Additionally, unless one of Measure 114's exceptions apply, it will be a misdemeanor crime to use, manufacture, sell, and purchase large-capacity magazines, which are defined as magazines capable of accepting more than ten rounds of ammunition. *Id.* § 11. Details about each of the two components of Measure 114 are described below.

##### i. Permit-to-Purchase

Under Measure 114, any individual seeking to purchase a firearm in Oregon must first apply for a permit. *Id.* § 4(1)(a). An applicant receives a permit if they: (1) are not prohibited

from purchasing or acquiring a firearm under state or federal law; (2) are not subject to certain protective orders which prohibit individuals in Oregon from possessing guns; (3) are not reasonably likely to be a danger to themselves, others, or the community at large;[2] (4) provide proof that they have completed a firearm safety course;[3] and (5) pay a fee.[4] *Id.* §§ 4(1)(b)(A)–(E).

The applicant must submit to fingerprinting and photographing by a permitting agent. *Id.* § 4(1)(e).[5] The applicant must also submit to a criminal background check conducted by the Oregon State Police ("OSP") through the Federal Bureau of Investigations ("FBI"). *Id.* Within thirty days of receiving an application for a permit, if the applicant meets the criteria, the permit

---

[2] Measure 114 prohibits an individual from obtaining a permit if they "present reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence." Measure 114 § 4(1)(b)(C).

[3] Per Measure 114, the safety course must include review of applicable state and federal firearm laws, including laws about safe storage and reporting lost or stolen firearms. The course must also cover the dangers associated with the misuse of firearms. Safety courses can be completed in-person or online, though all permit applicants must complete an in-person demonstration that shows that the applicant can lock, load, unload, fire, and store a firearm. Measure 114 § 4(8)(c)(A)–(D).

[4] Measure 114 states that fees for first-time applicants must be "reasonable" and cannot exceed sixty-five dollars. Measure 114 § 4(3)(b). Fees for permit renewals must likewise be "reasonable" and cannot exceed fifty dollars. *Id.* § 4(7)(c). Fees are intended to "reflect[] the actual cost of the process . . . including the cost of obtaining a criminal background check and photographing." *Id.*

[5] Measure 114 defines a "permit agent" as either the police chief or county sheriff in the place where the applicant lives, or an individual designated to be a permit agent by the police chief or sheriff. Measure 114 §§ 3(5), 4(1)(a).

agent "shall issue the permit-to-purchase." *Id.* § 4(3)(a). A permit is valid for five years. *Id.* § 4(7)(a).[6]

If the permit application is denied, or if no written response has been received within thirty days of the application, the applicant may file an action in state circuit court to compel the issuance of the permit. *Id.* §§ 5(1), 5(5). The state circuit court reviews the application anew and must issue a decision on the matter "within 15 judicial days of filing or as soon as practicable thereafter." *Id.* §§ 5(8), 5(10). That decision is appealable, as a matter of right, to the Oregon Court of Appeals. *Id.* § 5(11).

Measure 114 requires licensed dealers to verify that any potential firearm purchaser has a valid permit and forbids a dealer from transferring the firearm to the purchaser unless the dealer receives a unique approval number from OSP. *Id.* § 6(3)(c). Measure 114 likewise requires individuals seeking to transfer firearms to confirm that the individual to whom the firearm is being transferred has a valid permit. *Id.* § 7(3)(a). And Measure 114 requires anyone seeking to sell or transfer a firearm at a gun show to confirm that the individual to whom the firearm is being sold or transferred has a valid permit. *Id.* §§ 8(3)(c), 9(1)(a)(A).

Measure 114 makes it a misdemeanor to sell or transfer firearms to an individual who does not have a permit. *Id.* §§ 6(14), 7(5)(a), 9(5)(a). Measure 114 does not criminalize possession of a firearm without a permit. Official Voters' Pamphlet, General Election, Nov. 8, 2022, 90.

---

[6] Any individual seeking to renew their permit must submit a new application, but they are not required to take another safety course or undergo fingerprinting if the earlier set "has been retained by the permit agent or is otherwise available." Measure 114 § 4(7)(b)(A)–(B).

### ii. Large-Capacity Magazines

Measure 114 also makes it a misdemeanor crime to manufacture, import, possess, use, purchase, sell, or otherwise transfer any large-capacity magazine in Oregon after December 8, 2022. Measure 114 § 11(2). Measure 114 defines large-capacity magazines as "a fixed or detachable magazine . . . or similar device . . . that has an overall capacity of, or that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition and allows a shooter to keep firing without having to pause to reload . . . ." Measure 114 § 11(d).

### (a) Exceptions to Measure 114's Large-Capacity Magazine Restrictions

Measure 114 contains various exceptions to the general prohibition on the manufacture, purchase, sale, or possession of large-capacity magazines. Licensed gun dealers that have large-capacity magazines in their inventory have several options for complying with Measure 114's new restrictions within the 180 days after Measure 114 takes effect. During that time, a licensed gun dealer may transfer or sell large-capacity magazines within their inventory to a non-resident gun dealer or other transferee located out of state. *Id.* § 11(3)(a)(A). The licensed dealer may also purchase large-capacity magazines from any owner for permanent removal from Oregon. *Id.* § 11(3)(a)(B). And, a licensed dealer may permanently alter any large-capacity magazine in their inventory such that it is no longer capable of accepting more than ten rounds of ammunition. *Id.* § 11(3)(a)(C).

Measure 114 also contains exceptions for certain firearms manufacturers that produced large-capacity magazines before the regulations went into effect. If a firearm manufacturer is properly licensed under federal, state, and local law and is party to a binding contract pre-dating the effective date of the measure with an entity outside of the state of Oregon for the manufacture of large-capacity magazines, then it may fulfill that contract so long as all manufacture is completed no later than 180 days after the effective date of the measure and the

manufacturer makes the entity aware of Measure 114's future requirement in writing. *Id.* §
11(3)(b)(A)–(B). Measure 114 does not apply, at any time, to a properly licensed firearms
manufacturer that manufactures large-capacity magazines exclusively for the United States
Armed Forces or law enforcement, or a licensed gun dealer that sells or otherwise transfers large-
capacity magazines to the United States Armed Forces or law enforcement. *Id.* § 11(4)(a)–(b).[7]

Current owners and future inheritors of large-capacity magazines can still possess and use
large-capacity magazines obtained prior to Measure 114's effective date, subject to certain
limitations.[8] Current owners and inheritors of large-capacity magazines may only use those
firearms at their home (or on property under their control), on the premises of a gun dealer, at
shooting ranges, for recreational activities like hunting, at firearms competitions or exhibitions,
for certain educational purposes, or during transport to or from one of these permissible
locations. *Id.* § 11(5)(c)(A)–(E). Measure 114 does not apply at all to any member of the United
States Armed Forces or law enforcement who acquire, possess, or use large-capacity magazines,
so long as that acquisition, possession, or use "is related directly to activities within the scope of
that person's official duties." *Id.* § 11(4)(c).

---

[7] Any magazine manufactured, sold, or otherwise pursuant to this exception must
"include a permanent stamp or marking indicating that the large-capacity magazine was
manufactured or assembled after the effective date of [Measure 114]." Measure 114
§ 11(4)(a)(B).

[8] Measure 114 states, in relevant part, that "it shall be an affirmative defense . . . that (a)
[t]he large-capacity magazine was owned by the person before the effective date of this 2022 Act
and maintained in the person's control or possession; or (b) [t]he possession of a large-capacity
magazine was obtained by a person who, on or after the effective date of this section, acquired
possession of the large-capacity magazine by operation of law upon the death of a former owner
who was in legal possession of the large-capacity magazine . . . ." Measure 114 § 11(5). Legal
possession of a large-capacity magazine prior to December 8, 2022, or subsequent inheritance of
a large-capacity magazine legally owned prior to that date, is thus an affirmative defense so long
as the individual has possessed or used the large-capacity magazine consistent with one of
Measure 114's five exceptions. *Id.* §§ 11(5)(c)(A)–(E).

## B. Procedural History

Plaintiff Adam Johnson is a resident of Marion County who owns large-capacity magazines covered by Measure 114. ECF 13 at ¶ 32. Plaintiff Harold Richard Haden Jr. is a resident of Umatilla County who owns Garner's Sporting-Goods, a gun store, which sells large-capacity magazines covered by Measure 114. *Id.* at ¶ 33. Plaintiff Haden Jr. also personally owns large-capacity magazines covered by Measure 114. *Id.* Plaintiff Brad Lohrey is the Sheriff of Sherman County and owns large-capacity magazines covered by Measure 114. *Id.* at ¶ 34. Plaintiff Cody Bowen is the Sheriff of Union County and owns large-capacity magazines covered by Measure 114. *Id.* at ¶ 35. Plaintiff Brian Wolfe is the Sheriff of Malheur County and owns large-capacity magazines covered by Measure 114. *Id.* at ¶ 36. Plaintiff Oregon Firearms Federation ("OFF") is a public benefit corporation whose members include law enforcement officers, prosecutors, professionals, firearm experts, and the public. *Id.* ¶ 37–38. Plaintiff OFF joins this lawsuit to represent its members' interests, including "their wish to exercise their constitutionally protected right to keep and bear arms without being subjected to criminal prosecution, and to continue to lawfully possess property that they lawfully obtained." *Id.* at ¶ 39. Together, Plaintiffs contend that the entirety of Measure 114—including both the permit-to-purchase provision and the restrictions on large-capacity magazines—violates the Second, Fifth, and Fourteenth Amendments of the United States Constitution. *Id.* at ¶¶ 85–95.

Plaintiffs filed their initial Complaint challenging the constitutionality of Measure 114 on November 18, 2022. ECF 1. Plaintiffs filed their Emergency Motion for a Preliminary Injunction on November 23, 2022 and asked this Court to prevent Measure 114 from taking effect on December 8, 2022. ECF 5. Plaintiffs filed a First Amended Complaint on November 28, 2022, adding Plaintiffs Haden Jr., Bowen, and Wolfe. ECF 13.

Plaintiffs' Motion for a TRO is aimed primarily at Measure 114's restrictions on large-capacity magazines. Although Plaintiffs make the sweeping contention that all of Measure 114 is unconstitutional, their Motion for a TRO and Preliminary Injunction does not present any argument or evidence as to why Measure 114's permit requirements infringe upon their constitutional rights.

On December 2, 2022, this Court held a hearing on Plaintiffs' TRO, as well as a related TRO challenging the constitutionality of Measure 114's large-capacity magazine restrictions in the case of *Fitz et al. v. Rosenblum et al.*, 3:22-cv-01859-IM. ECF 33. This Opinion and Order addresses only the TRO in the above-captioned case. This Court will issue a separate Order addressing the TRO in the related case.

## DISCUSSION

Plaintiffs allege that Measure 114's regulations on large-capacity magazines violate the Second Amendment because they prohibit magazines that are in common use for lawful purposes such as self-defense. ECF 5 at 22. Plaintiffs additionally contend that Measure 114's regulations on large-capacity magazines violate their Fifth and Fourteenth Amendment rights because the regulations deprive owners of large-capacity magazines of their property by banning, with certain exceptions, the possession, use, or sale of those magazines within the state of Oregon. *Id.* at 26–31. Plaintiffs also allege that Measure 114's permit-to-purchase provision violates the Second, Fifth, and Fourteenth Amendments. *Id.* at 1. Plaintiffs argue that, absent a TRO blocking Measure 114 from taking effect, they will suffer irreparable harm because their constitutional rights will be violated and they will be forced to relinquish their previously-owned large-capacity magazines. *Id.* at 32.

Defendants counter that Measure 114's restrictions on large-capacity magazines are constitutional because large-capacity magazines are not firearms protected by the Second

Amendment and because the regulation is consistent with the historical tradition of firearm regulations. ECF 15 at 1. Defendants also argue that Measure 114's permit-to-purchase provision is a "shall-issue" licensing scheme that is presumptively constitutional under existing United States Supreme Court jurisprudence. *Id.* Defendants additionally contend that Measure 114 violates neither the Fifth Amendment nor the Fourteenth Amendment, as it does not deprive Plaintiffs of their ability to maintain and use their property. *Id.* at 1–2. Finally, Defendants argue that Plaintiffs have failed to show that they would be irreparably harmed if Measure 114 were to take effect on December 8, 2022. *Id.* at 2.

**C. Plaintiffs' Motion for a Temporary Restraining Order**

In deciding whether to grant a motion for a TRO, courts look to substantially the same factors that apply to a decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A plaintiff seeking a preliminary injunction must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs bear the burden of demonstrating that they meet all four of the *Winter* factors. *DISH Network* Corp, 653 F.3d at 776.

**1. Likelihood of Success on the Merits**

This Court first considers Plaintiffs' likelihood of success on the merits of their Second, Fifth, and Fourteenth Amendment claims. This Court notes that its assessment "is not a preliminary adjudication on the merits" and nothing stated below would be binding at a trial on the merits. *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

### a. Likelihood of Success on the Merits of Plaintiffs' Second Amendment Claim

The Second Amendment states, in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment "protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). The Second Amendment "is fully applicable to the States." *Id.* at 750. "[L]ike most rights," however, "the right secured by the Second Amendment is not unlimited." *Bruen*, 142 S. Ct. at 2128 (internal citation omitted).

### i. Pre-*Bruen* Second Amendment Challenges to Large-Capacity Magazines

In *Heller v. District of Columbia*, the United States Supreme Court struck down a District of Columbia law banning possession of handguns in the home and requiring any lawful firearm in the home to always be disassembled or bound by a trigger lock, rendering it inoperable. 554 U.S. 570, 635 (2008). In so doing, the Supreme Court concluded that the Second Amendment protects the individual right to bear arms. *Id.* at 625. Two years later, in *McDonald*, the Court reiterated that the "central holding in *Heller*" is "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." 561 U.S. at 780.

Following *McDonald* and *Heller*, the Ninth Circuit adopted a two-step, means-end test to assess the constitutionality of firearms regulations. *Young v. Hawaii*, 992 F.3d 765, 783–84 (9th Cir. 2021) (en banc). First, courts asked whether the challenged law involved conduct protected by the Second Amendment. *Duncan v. Bonta*, 19 F.4th 1087, 1100, 1102–03 (9th Cir. 2021) (en banc), *vacated and remanded Duncan v. Bonta*, 49 F.4th 1228, 1231 (9th Cir. 2022). If the law did not involve conduct protected by the Second Amendment, then the law was upheld as constitutional. *Id.* at 1100. If the law did involve conduct protected by the Second Amendment,

courts would then proceed to analyze whether the law violated the Second Amendment under either strict or intermediate scrutiny, depending on how close the conduct regulated by the law came to the "core" of the Second Amendment. *Id.* at 1103–1111; *Bruen*, 142 S. Ct. at 2126.

Before the Supreme Court's decision in *Bruen*, seven circuits, including the Ninth Circuit, considered the constitutionality of restrictions on large-capacity magazines. Six of these circuits applied the two-step, means-end analysis and found that these restrictions did not violate the Second Amendment.[9] *See e.g.*, *Duncan*, 19 F.4th at 1095, 1111 (upholding a California law prohibiting possession of large-capacity magazines, defined as those that can hold more than ten rounds of ammunition, by applying intermediate scrutiny); *Worman v. Healey*, 922 F.3d 26, 30, 40 (1st Cir. 2019) (upholding a Massachusetts law proscribing the sale, transfer, and possession of certain semiautomatic assault weapons and large-capacity magazines by applying intermediate scrutiny); *Ass'n. of New Jersey Rifle and Pistol Clubs, Inc. v. Attny. Gen. New Jersey*, 910 F.3d 106, 122 (3rd Cir. 2018) (upholding a New Jersey law making it illegal to possess a magazine capable of holding more than ten rounds of ammunition by applying intermediate scrutiny); *Kolbe v. Hogan*, 849 F.3d 114, 130, 140 (4th Cir. 2017) (en banc) (finding both that "large-capacity magazines are *not* constitutionally protected arms" and, even if they were constitutionally protected arms, Maryland's ban on large-capacity magazines would survive intermediate scrutiny); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015) (applying intermediate scrutiny to uphold prohibitions on large-capacity magazines in

---

[9] As discussed in Footnote 15, *infra*, every circuit court to consider the constitutionality of large-capacity magazine restrictions pre-*Bruen* either held that large-capacity magazines were not protected by the Second Amendment, or assumed without explicitly deciding that they were protected. To the extent that the first step of a court's pre-*Bruen* analysis mirrors the first step of a court's post-*Bruen* analysis, these cases remain persuasive authority on whether the Second Amendment protects large-capacity magazines.

New York and Connecticut); *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1264 (D.C. Cir. 2011) (applying intermediate scrutiny to uphold the District of Columbia's prohibition on large-capacity magazines). The Seventh Circuit, for its part, declined to apply means-end scrutiny and instead asked "whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' . . . and whether law-abiding citizens retain adequate means of self-defense." *Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015) (citing *Heller*, 554 U.S. at 622–25). Under this analysis, the Seventh Circuit also found that restrictions on large-capacity magazines did not violate the Second Amendment. *Id.* at 407, 412.[10]

### ii. Post-*Bruen* Framework for Assessing the Constitutionality of Firearms Regulations

In June of 2022, the Supreme Court explicitly declined to adopt this two-step analysis and instead held that the proper test for whether a regulation impermissibly infringes on an individual's Second Amendment right is whether the government can "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

The Court noted that in many situations modern firearm technology has evolved well beyond that which existed at the time of the Second Amendment's ratification. *Id.* at 2132 ("The

---

[10] Plaintiffs cite to several post-*Bruen* cases in supplemental briefing provided to this Court. ECF 11. Only one of these cases considered a similar regulation on large-capacity magazines. *Rocky Mountain Gun Owners v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, No. 1:22-cv-02113-CNS-MEH, 2022 WL 4098998 (D. Co. August 30, 2022). In that unpublished order, a district court in Colorado granted a TRO enjoining Boulder County's restriction on large-capacity magazines. *Id.* at *2. As Defendants note, that order was issued without a hearing or the defendants filing a response in opposition. ECF 15 at 13 n.34. As such, it provides no guidance on the constitutionality of large-capacity magazine restrictions post-*Bruen*.

regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868.") In *Bruen*, the Supreme Court instructed lower courts, when faced with cases "implicating unprecedented societal concerns or dramatic technological changes" to follow "a more nuanced approach" and "conduct . . . reasoning by analogy" to determine whether a modern firearm regulation would be "unimaginable at the founding." *Id.* Though the Supreme Court declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it concluded that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* at 2132–33. Finally, the Supreme Court noted that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133.[11]

In discussing the ways in which *Bruen* altered the analysis for Second Amendment challenges, it is equally important to recognize what *Bruen* did not do. The *Bruen* majority noted that the Second Amendment is not a "regulatory straightjacket" that protects a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2133, 2128 (quoting *Heller*, 554 U.S. at 626). Justice Alito, writing in concurrence, noted that *Bruen*

---

[11] In determining which periods provide the most fruitful grounds for historical analogy, the *Bruen* Court cautioned that "not all history is created equal." *Bruen*, 142 S. Ct. at 2136. Most useful to understanding whether a modern regulation is consistent with history and tradition, the Supreme Court noted, is evidence that does not "long predate[]" either the adoption of the Second Amendment in 1791 or the Fourteenth Amendment in 1868. *Id.* Historical evidence that post-dates the adoption of the Fourteenth Amendment, according to the Supreme Court, can be used to confirm earlier historical traditions, but cannot be used as evidence to contradict or override those traditions. *Id.* at 2137 (citing *Heller II*, 670 F.3d at 1274 n.6 (Kavanaugh, J., dissenting) ("[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.")).

"decides nothing about who may lawfully possess a firearm," "the requirements that must be met to buy a gun," or "the kinds of weapons that people may possess," and disturbed nothing from *Heller* or *McDonald* "about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2157 (Alito, J., concurring). Instead, Justice Alito emphasized that all the Supreme Court decided in *Bruen* "is that the Second Amendment protects the right of law-abiding people to carry a gun outside of the home for self-defense" and a law that makes "that virtually impossible . . . is unconstitutional." *Id.* at 2159 (Alito, J., concurring).

Justice Kavanaugh, writing in a concurrence joined by Chief Justice Roberts, reiterated both the *Bruen* majority's statement that the Second Amendment is not a "regulatory straightjacket" and *Heller*'s holding that "the Second Amendment allows a 'variety' of gun regulations," including the "presumptively lawful regulatory measures" such as laws prohibiting the keeping and carrying of "dangerous and unusual weapons." *Id.* at 2162 (Kavanaugh, J., concurring).

The *Bruen* Court also acknowledged the constitutionality of particular gun licensing regimes. "[N]othing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes . . . . Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* at 2138 n.9. Justice Kavanaugh also wrote separately noting that "shall-issue regimes" that "do not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense" are "constitutionally permissible," even if they require an individual to "undergo fingerprinting, a background check, a mental health records check, and

training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring).

Thus, under *Bruen*, the test for assessing whether a regulation violates the Second Amendment is as follows: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

### iii. Measure 114's Restrictions on Large-Capacity Magazines

This Court turns first to Plaintiffs' claim that Measure 114's restrictions on magazines capable of accepting more than ten rounds of ammunition violate the Second Amendment.

### (a) Second Amendment's Plain Text

Under *Bruen*, the first step in assessing whether a regulation violates the Second Amendment is to determine whether the plain text of the Second Amendment covers the conduct regulated by the challenged law. *Bruen*, 142 S. Ct. at 2126. Accordingly, if the text of the Second Amendment does not cover the conduct, then the conduct is not protected by the Second Amendment. Plaintiffs argue that Measure 114's restrictions on large-capacity magazines regulate conduct covered by the plain text of the Second Amendment because large-capacity magazines are in common use for lawful purposes. ECF 5 at 7. Defendants argue that large-capacity magazines are not "arms" covered by the plain text of the Second Amendment because they are neither weapons themselves nor necessary to the use of weapons. ECF 15 at 11. Defendants also argue that large-capacity firearms are accessories most useful for military applications, not for individual self-defense. *Id.* at 12.

**(1) Plaintiffs Fail to Demonstrate Magazines Capable of Accepting More than Ten Rounds are Necessary to Use Firearms for Self-Defense**

The Second Amendment covers firearms and items "necessary to use" those firearms. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be meaningless."); *see also Bruen*, 142 S. Ct. at 2132 (noting that the Second Amendment "covers modern instruments that facilitate self-defense"). Like bullets, magazines are often necessary to render certain firearms operable.

The Ninth Circuit has recognized a "corollary, albeit not unfettered, right to possess the magazines necessary to render . . . firearms operable." *See Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015). "Without a magazine, many weapons would be useless, including 'quintessential' self-defense weapons like the handgun." *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020).[12] A restriction that banned the manufacture, sale, transfer, possession, and use of *all* magazines would make it impossible for individuals to operate firearms for self-defense, and so would implicate conduct clearly covered by the plain text of the Second Amendment. *See Heller*, 554 U.S. at 630 (holding that a regulation that "makes it impossible for citizens to use [their firearms] for the core lawful purpose of self-defense" is unconstitutional).

While magazines in general are necessary to the use of firearms for self-defense, Plaintiffs have not shown, at this stage, that magazines specifically capable of accepting more than ten rounds of ammunition are necessary to the use of firearms for self-defense. As noted

---

[12] *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020), was overruled by the Ninth Circuit en banc in *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), which was in turn vacated and remanded post-*Bruen* by *Duncan v. Bonta*, 49 F.4th 1228 (9th Cir. 2022). This Court cites to *Duncan v. Becerra* only as persuasive authority and not for the proposition that magazines are categorically recognized within the Ninth Circuit as falling within the plain text of the Second Amendment.

above, the "corollary . . . right to possess the magazines necessary to render . . . firearms operable" is "not unfettered." *Fyock*, 779 F.3d at 998. Instead, the right is limited to magazines that are necessary to render firearms operable for self-defense and other lawful purposes. Plaintiffs did submit evidence showing that popular firearms, such as certain variants of the Glock pistol, "come standard" with magazine capacities greater than ten rounds. ECF 13, Ex. B, at ¶ 2. But Plaintiffs have not produced evidence that these weapons can *only* operate with magazines that accept more than ten rounds of ammunition and cannot operate with magazines that contain ten or fewer rounds, as allowed under Measure 114.

By contrast, Defendants have produced evidence showing "all firearms that can accept a detachable large-capacity magazine can also accept a magazine that holds 10 or fewer rounds and function precisely as intended." ECF 16 at ¶ 7. And, for firearms with fixed magazines, Defendants' evidence shows that "[a]ny fixed-magazine firearm can be modified to hold 10 or fewer rounds and function as intended." *Id.* As such, Plaintiffs have not shown that the magazines restricted by Measure 114 are necessary to the use of firearms for lawful purposes such as self-defense. Therefore, Plaintiffs have failed to show that magazines capable of accepting more than ten rounds of ammunition are covered by the plain text of the Second Amendment. *Bruen*, 142 S. Ct. at 2129–30.

### (2) Plaintiffs Fail to Demonstrate That Magazines Capable of Accepting More than Ten Rounds are Firearms in Common Use for Lawful Purposes

Additionally, this Court finds Plaintiffs have not shown that magazines capable of accepting more than ten rounds of ammunition are firearms "'in common use' today for self-defense" and thereby covered by the plain text of the Second Amendment. *Id.* at 2134. Plaintiffs argue that "[m]agazines over 10 rounds are commonly possessed by the American public," ECF

5 at 7, and that "a sizable percentage—perhaps a majority—of all firearms sold in the United States today come from the factory with magazines over 10 rounds," *id.* at 8.

This Court acknowledges that some courts in other circuits, considering similar restrictions on large-capacity magazines, have found that these magazines are in common use. In *New York State Rifle & Pistol Ass'n*, for instance, the Second Circuit held that "assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller*." 804 F.3d at 255. And in *Heller II*, the D.C. Circuit likewise held that AR-15s and large-capacity magazines "are indeed in 'common use.'" 670 F.3d at 1261. Neither of these decisions are binding on this Court, and in each case, the court only assumed—without explicitly deciding— that large-capacity magazines were protected by the Second Amendment. And, perhaps more importantly, a finding that a firearm is in "common use" does not end the inquiry into whether the firearm falls within the ambit of the Second Amendment's protections. Instead, the question is whether the weapon is "'in common use' . . . *for lawful purposes* like self-defense." *Heller*, 554 U.S. at 624 (emphasis added); *accord Bruen*, 142 S. Ct. at 2134.[13]

Plaintiffs argue that magazines capable of accepting more than ten rounds of ammunition "are overwhelmingly used for lawful purposes" and that they "have long been commonly

---

[13] If commonality alone were enough to afford a firearm protection under the Second Amendment, then the National Firearms Act's 1934 restrictions on machine guns—which were "all too common" during Prohibition, *see Friedman*, 784 F.3d at 408—would be constitutionally suspect. Instead, as *Heller* notes, these regulations are presumptively constitutional because machine guns, while common in military use, were not in common use by civilians for the purpose of self-defense. *See Heller*, 554 U.S. 624–25 (noting that although machine guns were "useful in warfare in 1939," the Second Amendment protects only those weapons "'in common use at the time' for lawful purposes like self-defense."); *see also id.* at 627 (noting that "weapons that are most useful in military service—M–16 rifles and the like—may be banned" consistent with the Second Amendment). The Second Amendment, therefore, requires a court to not only consider the prevalence of a particular firearm, but also the nature of that firearm's use among civilians.

possessed and used . . . for the core lawful purpose of self-defense." ECF 5 at 8, 22. But

Plaintiffs cite to no evidence to support these conclusory statements.[14] Defendants, for their part,

counter Plaintiffs' assertion with statistics showing that is exceedingly rare for an individual, in a

self-defense situation, to fire more than ten rounds. ECF 17-1 at ¶ 10 (analyzing the NRA Armed

Citizen Database and finding that the defender fired more than 10 bullets in only two out of 736

reported instances of self-defense).

Both Plaintiffs and Defendants submit evidence illustrating magazines capable of

accepting more than ten rounds of ammunition are commonly used by law enforcement. Plaintiff

Lohrey states in his declaration that, in his role as sheriff of Sherman County, he relies on

"firearms with magazines that hold more than 10 rounds." ECF 7 at ¶ 2. Plaintiffs allege that law

enforcement carry these magazines "to maintain the tactical advantage" when carrying out their

official duties. ECF 13 at ¶ 7. And Defendants likewise note that, in addition to military use,

"other users of high-capacity firearms at present include civilian law enforcement officers." ECF

17-4 at ¶ 107.

Defendants also argue that large-capacity magazines are particularly suited to military

use. ECF 15 at 12. The Fourth Circuit, in a pre-*Bruen* en banc decision, found that large-capacity

magazines are not protected by the Second Amendment because they are "most useful in military

service." *Kolbe*, 849 F.3d at 137. That is because firearms with large-capacity magazines "enable

a shooter to hit multiple human targets very rapidly," making them "particularly designed and

---

[14] At the December 2, 2022 hearing, Plaintiffs pointed to the Declaration of OFF President Kevin Starrett, ECF 8, as providing evidence that large-capacity magazines are commonly used for lawful purposes. But the Starrett Declaration contains only broad assertions based on Mr. Starrett's own opinions and provides no foundation that would allow this Court to credit Mr. Starrett's opinions as an expert.

most suitable for military and law enforcement applications" rather than the core Second Amendment right of self-defense. *Id.* (internal citation omitted).

The Ninth Circuit has noted, without explicitly holding, that there is "significant merit" to the argument that large-capacity magazines are not firearms commonly used for lawful purposes like self-defense, and therefore are not covered by the plain text of the Second Amendment. *See Duncan*, 19 F.4th at 1102. "[L]arge-capacity magazines have limited lawful, civilian benefits, whereas they provide significant benefits in a military setting." *Id.* In *Duncan*, the Ninth Circuit highlighted a 1989 report by the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), which concluded that "large-capacity magazines are indicative of military firearms," in part because they "provide[ ] the soldier with a fairly large ammunition supply." *Id.* at 1105–06. Another ATF report from 1998 likewise found that "detachable large-capacity magazine[s] [were] originally designed and produced for . . . military assault rifles." *Id.* at 1106.[15]

Finally, Defendants submit evidence showing that while the civilian use of large-capacity magazines for self-defense appears to be relatively low, high-capacity magazines are disproportionately used in the commission of mass shooting events. According to Defendants' evidence, every mass shooting from 2004 that resulted in 14 or more deaths has involved large-capacity magazines. ECF 17-5 at ¶¶ 12–13. In a study of all mass shooting events resulting in four or more fatalities through 2019 where the magazine capacity was known, sixty percent involved large-capacity magazines. ECF 17-1 at ¶ 26. And, according to Defendants' evidence,

---

[15] Other circuits that have confronted the issue of large-capacity magazines have either held that the magazines are not protected by the Second Amendment because they were not commonly used for lawful purposes, *see Kolbe*, 849 F.3d at 137, or assumed that the magazines were protected without explicitly deciding whether they were commonly used for lawful purposes. *See, e.g.*, *Duncan*, 19 F.4th at 1103; *New York State Rifle & Pistol Ass'n*, 804 F.3d at 257; *Heller II*, 670 F.3d at 1262; *Worman*, 922 F.3d at 36; *Ass'n. of New Jersey Rifle and Pistol Clubs, Inc.*, 910 F.3d at 117; *Friedman*, 784 F.3d at 410.

shootings involving large-capacity magazines are deadlier than shootings involving those without these magazines. *Id.* at ¶ 29.

In sum, the evidentiary record before this Court, at this stage in the litigation, shows that while large-capacity magazines are rarely used by civilians for self-defense, they are often used in law enforcement and military situations. The evidentiary record also shows that large-capacity magazines are disproportionately used in crimes involving mass shootings. Based on this record, this Court concludes that Plaintiffs have not shown that large-capacity magazines are weapons "'in common use' . . . for lawful purposes like self-defense" such that they fall within the plain text of the Second Amendment. *See Heller*, 554 U.S. at 624.

### (b) Historical Tradition of Firearm Regulation

Assuming for the sake of argument that the Second Amendment's plain text covers large-capacity magazines, this Court next considers whether Measure 114 is consistent with the Nation's historical tradition of firearm regulation. In *Bruen*, the Supreme Court observed that the "regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2132. When lower courts are faced with dramatic technological changes or unprecedented societal concerns, the Supreme Court instructed them to reason by analogy—that is, consider historical analogues. *Id.*

The "burdens at the preliminary injunction stage track the burdens at trial." *Am. Beverage Ass'n. v. City & Cnty. of San Francisco*, 871 F.3d 884, 890 (9th Cir. 2017) (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)). At trial, if Plaintiffs demonstrate that their conduct is covered by the text of the Second Amendment, the Constitution presumptively protects that conduct and the burden shifts to the government to demonstrate that

the regulation is part of the historical tradition delimiting the outer bounds of the right to keep and bear arms. *Bruen*, 142 S. Ct. at 2127. Therefore, at the TRO stage, once Plaintiffs have demonstrated that Measure 114 burdens their right to bear arms under the Second Amendment, they "must be deemed likely to prevail," unless Defendants demonstrate that Measure 114 passes constitutional muster. *Am. Beverage Ass'n.*, 871 F.3d at 890 (quoting *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 666 (2004)).

However, the fact that Defendants carry the burden of demonstrating the constitutionality of Measure 114 does not eliminate Plaintiffs' initial burden at the TRO stage of showing likelihood of success on the merits. A TRO is still an extraordinary remedy that this Court may only award upon Plaintiffs' clear showing of entitlement to relief. This Court finds that, even presuming the Second Amendment covers the conduct at issue, Defendants have presented significant historical evidence to overcome the presumption of unconstitutionality of a measure that infringes upon conduct covered by the Second Amendment.[16]

### (1) Defendants' Evidence that Large-Capacity Magazines Implicate a Dramatic Change in Firearms Technology and Unprecedented Societal Concerns

First, Defendants argue that large-capacity magazines implicate a dramatic change in firearms technology. They have offered evidence that, while multi-shot rifles existed as early as the late 1500s, those firearms were experimental, designed for military use, rare, defective, or some combination of these features.[17] ECF 17-2 at ¶¶ 18–33. Defendants have also offered

---

[16] This Court reiterates that the record at the TRO stage is a limited one, and this finding is made on this limited record alone. Nothing this Court finds at this stage is later binding on this Court once the parties have had more time to develop the evidentiary record.

[17] Defendants have offered evidence of a firearm that could fire up to sixteen rounds existing as early as the late 1500s. ECF 17-2 at ¶ 18. The "Puckle Gun," designed for military use, was patented in 1718 in London and could fire nine-rounds per minute. *Id.* at ¶ 19. However,

evidence that semi-automatic weapons did not become "feasible and available" until the beginning of the twentieth century, with the primary market being the military. *Id.* at ¶ 24; *see also Friedman*, 784 F.3d at 410 (explaining that semi-automatic guns and large-capacity magazines were not common in 1791, that most guns available then could not fire more than one shot without being reloaded, that revolvers with rotating cylinders were not widely available until the early nineteenth century, and that semi-automatic guns and large-capacity magazines are more recent developments). Plaintiffs have offered no comparable historical evidence at this stage.[18] In short, Defendants have proffered evidence that large-capacity magazines represent the kind of dramatic technological change envisioned by the *Bruen* Court.

---

there is no record of such a gun ever having been manufactured. *Id.* at ¶¶ 19–20. The Jennings multi-shot flintlock rifle could fire up to twelve shots before reloading—it was introduced in 1821 in New York, but was both defective and extremely rare. *Id.* at ¶ 21. The Girondoni air rifle, developed for the Austrian army, could fire up to twenty rounds—one of these rifles was taken on the Lewis and Clark expedition, but they were extremely expensive, fragile, and rare and were pulled from military service in 1815. *Id.* at ¶ 22. The Volcanic repeating pistol was patented in 1854 and could fire up to ten or more rounds, but, again, the weapons were rare, experimental, and defective. *Id.* at ¶ 22. The Mannlicher "self-loading" rifle, which some describe as the first semi-automatic rifle, was developed in 1885, but was a failure and was never produced at scale. *Id.* at ¶ 24. The "Pepperbox" multi-shot firearm "found some civilian market popularity" in the early 1800s but was inaccurate, impractical, and quickly surpassed by the Colt revolver in the 1830s. *Id.* at ¶ 25–26. Nonetheless, the Colt multi-shot revolver did not cultivate a large civilian market until after the Civil War. *Id.* at ¶ 27. The 1873 Winchester rifle was designed for the military but rose to legendary status for its use in the American West. *Id.* at ¶ 28. Nonetheless, albeit a popular firearm, Defendants' record indicates its celebrity surpassed its actual production. *Id.* at ¶ 28. Defendants have also offered evidence that, although multi-shot weapons existed in the 1700s and 1800s, they were dramatically different than their twentieth and twenty-first century counterparts which are "capable of reliable, rapid fire." *Id.* at ¶ 17. And as explained further below, the rise in popularity of multi-shot weapons in the late 1800s and early 1900s correlated with a rise in states' prohibitions on concealed carry. *Id.* at ¶ 30; *see* Footnote 19, *infra*.

[18] At the December 2, 2022 hearing, Plaintiffs pointed to the Starrett Declaration in which Mr. Starrett states that magazines with over ten rounds have existed since the American Revolution and have been very commonly possessed in the United States since 1862. ECF 8 at 1–2. But as this Court noted above, this declaration provides no citations or information as to Mr. Starrett's qualifications to opine on these issues as an expert.

Second, Defendants argue that large-capacity magazines implicate unprecedented societal concerns. They have offered evidence that there is no known occurrence of a mass shooting resulting in double-digit fatalities from the Nation's founding in 1776 until 1948, with the first known mass shooting resulting in ten or more deaths occurring in 1949. ECF 17-5 at ¶ 10. There were only four mass shootings between 1949 and 1982; in the early 1980s, five mass shootings occurred within five years—two of which, for the first time, involved large-capacity magazines. *Id.* This time period is followed by a twenty-year span in which there were only two mass shootings resulting in ten or more deaths, correlating with the 1986 Firearm Owners Protection Act and the 1994 Federal Assault Weapons Ban. *Id.* at ¶ 11.

After the Federal Assault Weapons Ban expired in 2004, mass shootings increased substantially. *Id.* at ¶ 12; *see also* ECF 17-1 at ¶ 32 (analyzing data from mass shootings and finding that the majority of guns used in these shootings were obtained legally). Every mass shooting since 2004 resulting in fourteen or more deaths involved large-capacity magazines with ten or more bullets. ECF 17-5 at ¶ 13; *see also* ECF 17-1 at ¶¶ 22–28 (analyzing data from mass shootings resulting in four or more deaths and finding that (1) large-capacity magazines were often used in mass shootings and (2) casualties were three times higher in mass shootings that involved weapons with large-capacity magazines). Again, Plaintiffs have offered no evidence to the contrary other than to argue, without citation, that magazine bans decrease public safety. ECF 5 at 24; ECF 8 at ¶ 12. This Court finds, at this stage, that Defendants have proffered enough evidence that large-capacity magazines also implicate unprecedented societal concerns.

### (2) Imposition of a Comparable Burden That Is Comparably Justified

In cases involving dramatic technological change or unprecedented societal concerns, the next step is considering the how and the why—namely, reviewing the historical evidence

presented by Defendants, determining whether Measure 114 and analogous historical regulations impose comparable burdens on the right to self-defense, and deciding whether the burden imposed is comparably justified. Defendants offer evidence that, in the 1800s, states often regulated certain types of weapons, such as Bowie knives, blunt weapons, slingshots, and trap guns because they were dangerous weapons commonly used for criminal behavior and not for self-defense. ECF 15 at 17–18; ECF 17-2 at ¶¶ 34–53. Defendants also proffered evidence that every state, except New Hampshire, enacted laws restricting the carrying of arms in crowded places, in groups, or in a concealed matter. [19] ECF 17-2 at ¶ 49; ECF 17-2 Ex. B, at 1–3.[20]

---

[19] Bowie knives were widely prohibited in the 1800s because they were "intended for combat"; laws restricting this weapon tracked increasing homicide rates as well as the weapon's increase in notoriety. ECF 17-2 at ¶¶ 35–37. In an 1840 case, the Supreme Court of Tennessee upheld a conviction for concealed carry of Bowie knife and stated that the legislature had a right to prohibit "wearing or keeping weapons dangerous to the peace and safety of the citizens" and may "preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibit of arms might produce, or their lives from being endangered by desperadoes with concealed arms." *Id.* at ¶ 38; *see Aymette v. State*, 21 Tenn. 152, 159 (Tenn. 1840). Similarly, every state in the nation, except New Hampshire, had laws restricting clubs. *Id.* at ¶¶ 40–43. Twelve states enacted anti-bludgeon laws in the 1700s and 1800s; fourteen states enacted anti-billy club laws in the 1800s; and fourteen states barred carrying "clubs" generically in the 1600s, 1700s, and 1800s. *Id.* at ¶¶ 41–43. Forty-two states banned slingshots in the 1800s, *id.* at ¶¶ 44–46, and nine states enacted anti-trap gun laws in the 1700s and 1800s, *id.* at ¶¶ 50–53. Moreover, every state, except New Hampshire, enacted laws restricting the carrying of firearms. *Id.* at ¶ 49. New Jersey enacted a law against wearing weapons because they induced "great fear and quarrels" in 1686; three states enacted similar laws in the 1700s; forty-two states and the District of Columbia followed in the 1800s; and three more in the early 1900s. *Id.*; *see also* ECF 17-2, Ex. B at 1–3. The laws in the 1700s typically "restricted more general carrying of firearms, usually if done in crowded places, or in groups of armed people," while the laws in the 1800s and 1900s restricted the *concealed* carry of weapons, typically including pistols as well as other weapons. *Id.*; *see also* ECF 17-3 at ¶ 58 ("[d]uring America's first gun violence crisis in the Jacksonian era, states targeted pistols that were easily concealed").

[20] This Court notes that some of the historical regulations offered by Defendants pertain to weapons that are not firearms. While the *Bruen* Court counseled that government action must be consistent with the Nation's historical tradition of "*firearm* regulation," the Second Amendment protects the right to keep and bear "*arms.*" *Bruen*, 142 S. Ct. at 2127 (emphasis added). And throughout the *Bruen* opinion, the Court also refers to "weapons" and "arms." For example, in reviewing an 1801 Tennessee statute that forbid "publicly rid[ing] or go[ing] armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous

Defendants also argue that there is a historical tradition of regulating private military organizations. They point to the Supreme Court's 1886 opinion in *Presser v. People of State of Ill.*, where the Supreme Court rejected a challenge to an Illinois law which prohibited "any body of men . . . other than the regular organized volunteer militia of this state, and the troops of the United States, to associate themselves together as a military company or organization, or to drill or parade with arms in any city or town of this state, without the license of the governor." 116 U.S. 252, 253, 268 (1886).[21] Although the Second Amendment had not yet been held applicable to the states, the Supreme Court nonetheless concluded that the law "[did] not infringe the right of the people to keep and bear arms." *Id.* at 265. The *Presser* Court found that the exclusive exercise of the militia power by the states is "necessary to the public peace, safety, and good order." *Id.* at 268; *see also Heller*, 554 U.S. at 621 (reiterating that the *Presser* Court concluded that the Second Amendment "does not prevent the prohibition of private paramilitary organizations"). This Court recognizes that the prohibition on private militias does not squarely pertain to restricting certain weapons and that a more fully developed evidentiary record in this regard would be beneficial. However, it is nonetheless instructive. It arguably demonstrates the government's concern with the danger associated with assembling the amount of firepower

---

weapon," the *Bruen* Court explained that the law prohibited "bearing *arms* in a way that spreads 'fear' or 'terror' among the people." *Id.* at 2144–45 (emphasis added). Absent guidance to the contrary, this Court does not find at this stage that *Bruen* foreclosed consideration of this Nation's tradition of regulating other types of "arms."

[21] Defendants also provide evidence of an 1883 Missouri law which prohibited the concealed carry of deadly or dangerous weapons in churches, schools, election precincts, courts, or other places of public assembly "other than for militia drill or meetings *called under the militia law*," ECF 17-2, Ex. E, at 38 (emphasis added), and an 1871 Texas Law that prohibited the concealed carry of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense" except for imminent self-defense, as a policeman or peace officer, or as a "militiaman *in actual service*, " *id.* at 68 (emphasis added).

capable of threatening public safety—which, given firearm technology in the 1800s, could only arise collectively. [22]

In determining whether these historical analogues are "relevantly similar" to Measure 114, this Court must ask whether Measure 114 imposes a comparable burden as those imposed by these historical analogues and is comparably justified. *Bruen*, 142 S. Ct. at 2132–33. Defendants argue, and this Court agrees on this record, that the burden imposed by Measure 114 on the core Second Amendment right of self-defense is minimal. As explained above, Defendants have offered evidence that, in over seven hundred self-defense incidents, less than one half of a percent involved more than ten shots. Plaintiffs have not refuted these statistics with any evidence that magazines capable of accepting more than ten rounds of ammunition are necessary for self-defense. Accordingly, this Court finds that Measure 114 does not impose a greater burden on the right to self-defense than did analogous historical regulations.

Moreover, according to Defendant's evidence, large-capacity magazines appear to be the weapon of choice for the commission of mass shootings. While this Court observes that the *Bruen* Court rejected means-ends scrutiny, *Bruen* still instructed lower courts to consider the "how and why" of a particular regulation in historical context. *Id.* at 2132–33. In considering whether Defendants are comparably justified in imposing Measure 114 as were this Nation's

---

[22] Defendants also point to early twentieth-century state and federal regulations prohibiting civilian use of automatic firearms that were developed for the World War I battlefield but later "found favor among criminals and gangsters in the 1920s and early 1930s." ECF 15 at 18; ECF 17-2 at ¶ 4; *see also* ECF 15 at 18. This Court notes that, as instructed by the *Bruen* Court, this evidence is only useful to the extent that it confirms earlier historical tradition. *Bruen*, 142 S. Ct. at 2136. This Court finds this evidence has some persuasive value because it confirms earlier historical trends offered by Defendants of legislative efforts to ban weapons that "were developed with a focus on military applications and supplying military needs," "spread to . . . civilian markets and use," and then became commonly used for criminality rather than self-defense. ECF 17-2 at 16.

earlier legislatures in imposing historical regulations, this Court finds that it may consider the public safety concerns of today. In light of the evidence of the rise in mass shooting incidents and the connection between mass shooting incidents and large-capacity magazines—and absent evidence to the contrary regarding the role of large-capacity magazines for self-defense— Defendants are comparably justified in regulating large-capacity magazines to protect the public.

### iv. Measure 114's Permit-to-Purchase Provision

Turning next to Plaintiffs' challenge to Measure 114's permit-to-purchase provision, this Court finds that Plaintiffs have failed to establish a likelihood that this provision violates the Second Amendment. Measure 114's permit-to-purchase scheme is a "shall-issue" permit scheme based on objective standards and is therefore presumptively constitutional under the holding of *Bruen*.

There are currently 43 states with some kind of "shall-issue" licensing regime in place, under which "a general desire for self-defense is sufficient to obtain a [permit.]" *Id.* at 2138 n.9. Of these licensing regimes, *Bruen* concluded that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *Id.* Writing in concurrence, Justice Kavanaugh further noted that while discretionary regimes like the one at issue in *Bruen* are constitutionally suspect, "objective shall-issue licensing regimes" do not violate the Second Amendment, even when they ask a prospective gun purchaser to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring).

Under this clear guidance from *Bruen*, this Court finds that Plaintiffs have not shown, at this stage, that Measure 114's permit-to-purchase provision violates the Second Amendment.

Measure 114's permit-to-purchase requirements track squarely with the objective regime outlined in *Bruen*: they require applicants to undergo a background check, fingerprinting, a mental health check, and training in firearms. *See id.* If an applicant meets the criteria for a permit, the permit agent "shall issue" the permit. Measure 114 § 4(3)(a).[23] And, if an application is denied, the applicant may appeal that decision to a circuit court and may further appeal that decision to the Court of Appeals. *Id.* §§ 5(5), 5(11).

Bruen noted that shall-issue regimes can be subject to as-applied challenges if, for instance, a shall-issue regime includes a fee that effectively precludes an applicant from obtaining a permit or there are "lengthy wait times in processing license applications." *Id.* at 2138 n.9; *see also id.* at 2162 (Kavanaugh, J., concurring). Plaintiffs, however, do not currently present any argument to support such an as-applied challenge.[24] As such, this Court finds that, based on the current record before it, Plaintiffs are unlikely to succeed on the merits of their Second Amendment challenge to Measure 114's permit-to-purchase provision.

---

[23] Measure 114 requires a permit agent to determine whether the applicant "present[s] reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence." Measure 114 § 4(1)(b)(C). In Justice Kavanaugh's *Bruen* concurrence, a "mental health records check" is not constitutionally suspect. *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). Moreover, Measure 114's plain language requires "reasonable grounds" for the permit agent to conclude that the applicant poses some risk and allows denied applicants to appeal that decision to the state circuit courts. Measure 114 §§ 4(1)(b)(C), 5(5), 5(11). At this stage, this Court does not find that Measure 114 § 4(1)(b)(C) invites subjectivity such that the permit-to-purchase provision is not a "shall-issue" regime.

[24] In their Motion, ECF 5, Plaintiffs' state that "[t]he Court should hold 114 is unconstitutional on its face, and as applied to Plaintiffs." *Id.* at 1. Apart from this conclusory statement, Plaintiffs advance no argument about why Measure 114's permit provisions are unconstitutional as applied to Plaintiffs themselves.

### b. Likelihood of Success on the Merits of Plaintiffs' Fifth Amendment Takings Claim

Although Plaintiffs' TRO focuses largely on Plaintiffs' Second Amendment challenge, Plaintiffs have also alleged that Measure 114 will irreparably harm Plaintiffs in violation of the Fifth Amendment's Takings Clause. The Fifth Amendment provides "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. There are two kinds of government action which fall within the ambit of the Fifth Amendment: physical takings and regulatory takings. Plaintiffs do not bring a regulatory takings challenge to Measure 114.[25] Instead, they allege that the large-capacity magazine ban in Measure 114 is a "paradigmatic physical taking that requires compensation."[26] ECF 5 at 27.

A physical taking involves the "permanent physical occupation of property." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427 (1982). The physical appropriation of private property by the government gives rise to a per se taking. *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015). But the Takings Clause only applies to property that has been taken for public use—property seized pursuant to the police power is not taken for public use and is not compensable under the Fifth Amendment. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992); *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 417 (1922); *see also AmeriSource Corp. v. United*

---

[25] In fact, Plaintiffs argue that Measure 114 is distinguishable from restrictions on the use of private property. ECF 5 at 27. Accordingly, this Court finds it unnecessary to address whether Measure 114 effects a regulatory taking but notes that the Ninth Circuit rejected a regulatory taking challenge to California's similar large-capacity magazine ban. *Duncan*, 119 F.4th at 1112.

[26] This Court also notes that, while Plaintiffs seek to enjoin Measure 114 in its entirety, they make no argument about the measure's permit-to-purchase provisions in their Fifth Amendment challenge. As such, this Court finds it unnecessary to address whether the permit-to-purchase provisions violate the Fifth Amendment but notes that, while *Bruen* did not address the Fifth Amendment, the Court explicitly stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *Bruen*, 142 S. Ct. at 2138 n.9.

*States*, 525 F.3d 1149, 1152 (Fed. Cir. 2008). The Supreme Court has long held that states may regulate the use of certain property, without compensation, to protect public health and safety without violating the Fifth Amendment. *See e.g.*, *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887) (holding that a state law prohibiting the manufacture and sale of intoxicating liquors except for limited purposes did not constitute a compensable taking). In *Duncan*, the Ninth Circuit rejected a takings claim challenging a similar ban on large-capacity magazines in California[27] and explained that "[n]othing in the case law suggests that any time a state adds to its list of contraband—for example, by adding a drug to its schedule of controlled substances—it must pay all owners for the newly proscribed item." 19 F.4th at 1112.[28] "To the contrary, the Supreme Court has made clear that 'the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the legitimate exercise of its police powers.'" *Id.* (quoting *Lucas*, 505 U.S. at 1027). Moreover, "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin government action effecting a taking." *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162, 2176 (2019); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for public use . . . when a suit for compensation can be brought against the sovereign subsequent to the taking."). "Today, because

---

[27] This Court notes that the California ban imposes even stricter regulations. Unlike Measure 114, it does not contain a "grandfather clause" allowing current owners or future inheritors of large-capacity magazines to keep those magazines. *See* Cal. Penal Code § 32310.

[28] As noted previously in this Opinion, following the Ninth Circuit's en banc decision in *Duncan*, the Supreme Court issued its opinion in *Bruen* in June 2022 articulating a new test that lower courts must employ when analyzing Second Amendment claims. In September 2022, the panel's decision in *Duncan* was vacated and remanded to the District Court for further proceedings consistent with *Bruen*. *Duncan*, 49 F.4th at 1231. However, the Supreme Court did not consider a Fifth Amendment claim in *Bruen*, leaving the Ninth Circuit's takings analysis in *Duncan* undisturbed.

the federal and nearly all state governments provide just compensation remedies to property

owners who have suffered a taking, equitable relief is generally unavailable." *Knick*, 139 S. Ct at

2176; *see* 28 U.S.C. §§ 1346(a), 1491 (providing a federal cause of action for takings claims in

the Court of Federal Claims); O.R.S. 35.015 et seq. (prescribing the procedure for eminent

domain cases in Oregon, including a jury trial on the just compensation determination and a

property owner's right to appeal). In short, as long as there is an adequate remedy at law, a

plaintiff is not ordinarily entitled to injunctive relief. *Knick*, 139 S. Ct at 2176.

At the outset, this Court notes that Plaintiffs are not likely to succeed on their takings

claim because the appropriate remedy for a Fifth Amendment takings violation is ordinarily not

injunctive relief, but rather damages, making a TRO inappropriate. The merits also favor

Defendants' position because the Ninth Circuit, in considering a similar magazine ban, found

that the government is entitled to seize property pursuant to the police power. Moreover, while

Plaintiffs ask this Court to find that Measure 114 is unconstitutional on its face and as applied to

them, ECF 5 at 1, they have not made any specific arguments or provided evidence as to how

Measure 114 constitutes a taking as applied to each Plaintiff.

Even if this Court were to consider Plaintiffs' facial takings claim, Plaintiffs must

demonstrate that "the mere enactment of [Measure 114] constituted a taking," *Tahoe-Sierra*

*Pres. Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 318 (2002), such that "no

set of circumstances exists under which [Measure 114] would be valid." *United States v.*

*Salerno*, 481 U.S. 739, 745 (1987). For current owners or potential inheritors of large-capacity

magazines, Measure 114 includes a "grandfather clause"—those who already own, or will

inherit, large-capacity magazines may keep them. Measure 114 § 11(5)(a)–(c). The language of

the statute plainly does not deprive owners of their property. Such a regulation cannot be said to effect a physical taking.

This Court recognizes that Measure 114 is more restrictive for gun dealers and gun manufacturers. However, Plaintiffs have not demonstrated why Measure 114's multiple options within the 180-day grace period, including modifying the magazines, removing them from the state, selling them, or otherwise fulfilling their binding contractual obligations, are insufficient. *See Duncan*, 19 F.4th at 113 ("Mandating the sale, transfer, modification, or destruction of a dangerous item cannot reasonably be considered a taking akin to a physical invasion . . . ."). Accordingly, this Court finds that Plaintiffs are not likely to succeed on the merits of their Fifth Amendment claim.

### c. Likelihood of Success on the Merits of Plaintiffs' Fourteenth Amendment Due Process Claim

Under the Fourteenth Amendment, the government may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation . . . ." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 266 (1994). But a statute "does not operate retrospectively merely because it is applied in a case arising from conduct antedating the statute's enactment . . . or upsets expectations based in prior law." *Id.* at 269 (internal citation omitted). Rather, a court must ask whether the law "attaches new legal consequences to events completed before its enactment." *Id.* at 269–70.

Plaintiffs contend that Measure 114 deprives them of property without the due process of law, in violation of the Fourteenth Amendment. Plaintiffs argue that Measure 114's magazine ban violates the Due Process clause "[f]or largely the same reasons that it runs afoul of the Takings Clause" and "retroactively prohibits the possession of lawfully acquired magazines."

ECF 5 at 30. In *Duncan*, the Ninth Circuit summarily rejected the plaintiffs' due process claim in a footnote because it restated the plaintiffs' takings claim and therefore failed for the same reasons. 19 F.4th at 1096, 1099 n.1.[29]

This Court finds that, on this record, Plaintiffs have not shown a likelihood of success on the merits of their Fourteenth Amendment claim. As discussed above, Plaintiffs have not made out a viable takings claim at this time. To the extent that Plaintiffs rely on similar arguments to support their Fourteenth Amendment claim, that claim similarly fails for the reasons already discussed. Additionally, Measure 114 is not retroactive: it does not render Plaintiffs' already-possessed large-capacity magazines illegal, allows Plaintiffs to retain possession of these large-capacity magazines on their property, and allows Plaintiffs to use these large-capacity magazines in limited situations. Measure 114 § 11(5)(c)(C)–(D).

**2. Irreparable Harm Analysis For Each of Plaintiffs' Claims**

In order to prevail on their motion for a TRO, in addition to demonstrating likelihood of success on the merits, Plaintiffs must demonstrate that they will be irreparably harmed if Measure 114 goes into effect. *Winter*, 555 U.S. at 20. Irreparable harm is "traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Irreparable harm is harm that is immediate, rather than remote or speculative. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (The requirement of irreparable injury "cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged . . . ."); *see also Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (holding that a "speculative"

---

[29] The Supreme Court also did not consider a Fourteenth Amendment claim in *Bruen*, leaving the Ninth Circuit's due process analysis in *Duncan* undisturbed.

injury does not constitute irreparable harm); *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980) (holding that plaintiffs bear the "burden of demonstrating immediate threatened injury as a prerequisite to preliminary injunctive relief"). The mere possibility that Plaintiffs' constitutional rights under the Second Amendment, Fifth Amendment, or Fourteenth Amendment could be hampered at some point in the future, without a showing of some real and immediate harm, is not sufficient to support a TRO.

Again, Plaintiffs' briefing and oral argument with respect to irreparable harm focused almost exclusively on their Second Amendment challenge to Measure 114. Plaintiffs ask this Court to hold that the deprivation of Second Amendment rights alone, even for an instant, constitutes irreparable harm. Although First Amendment violations—even those that occur for "minimal periods of time"—are presumed to be irreparable, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), neither the Supreme Court nor the Ninth Circuit have explicitly extended that holding to the Second Amendment. Instead, the Ninth Circuit has held that constitutional violations can constitute irreparable harm only when coupled with a non-speculative threat of immediate future harm. *See DISH Network Corp*, 653 F.3d at 776 ("While a First Amendment claim 'certainly raises the specter' of irreparable harm and public interest considerations, proving the likelihood of such a claim is not enough to satisfy *Winter*.").

Plaintiffs have failed to show a non-speculative, immediate risk of irreparable harm. First, there is no immediate risk that Measure 114 would deprive Plaintiffs of the large-capacity magazines that they already legally possess. Under Measure 114, Plaintiffs would still be allowed to possess and store any large-capacity magazines on their property and could continue to use those magazines—within the limits of Measure 114—outside of their home. This greatly minimizes the likelihood of immediate irreparable harm, as Plaintiffs would be able to maintain

control of their property throughout the pendency of this litigation. *Cf. Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'").

Plaintiffs also argue that they will be irreparably harmed because Measure 114 restricts their ability to use large-capacity magazines for self-defense. ECF 5 at 32. Plaintiffs' declarations note that large-capacity magazines are "overwhelmingly preferred by law-abiding Americans for personal and home defense." *See, e.g.*, ECF 6 at ¶¶ 7, 12; ECF 7 at ¶¶ 9, 14; ECF 8 at ¶¶ 7, 12. But Plaintiffs' declarations also contain conflicting evidence, such as the claim that "criminals rarely fire more than a few rounds, making magazine capacity irrelevant for almost all crimes." *See, e.g.*, ECF 6 at ¶ 11; ECF 7 at ¶ 13; ECF 8 at ¶ 11. Defendants, meanwhile, have produced evidence suggesting that large-capacity magazines are rarely used in situations of self-defense. ECF 17-1 at ¶ 17. This conflicting evidence supports this Court's conclusions that Plaintiffs' injuries are speculative and thus insufficient to meet the burden of proving irreparable harm absent a TRO.[30]

Moreover, as previously stated, Measure 114 does not prohibit those who already own large-capacity magazines, or who inherit them, from using them on their own property. Nor does the measure prohibit individuals from using firearms capable of accepting ten or fewer rounds of ammunition for self-defense both inside and outside of the home, or from carrying multiple

---

[30] Plaintiffs' declarations contain other conflicting evidence. Plaintiffs allege that "it is extremely difficult and potentially deadly to stop to change magazines when one is under attack—the stress of which severely degrades the fine motor skills necessary for the task." *See, e.g.*, ECF 6 at ¶ 16; ECF 7 at ¶ 18; ECF 8 at ¶ 16. But Plaintiffs also allege that in mass shooting events, "mass shooters often change magazines without incident throughout their attack." *See, e.g.*, ECF 6 at ¶ 11; ECF 7 at ¶ 13; ECF 8 at ¶ 11. This Court notes that this conflicting evidence further supports its conclusion that Plaintiffs' allegations of irreparable harm are speculative.

magazines outside of the home. Plaintiffs provide no evidence in the record to show that the firearms available to Plaintiffs under Measure 114 would be so ineffective for use in self-defense as to constitute immediate and irreparable harm. Absent a more robust evidentiary record showing that Plaintiffs' ability to defend themselves inside and outside of the home would be immediately harmed by Measure 114, this Court finds that Plaintiffs have not shown that their ability to defend themselves would be immediately and irreparably harmed absent a TRO.

Additionally, this Court reiterates that Measure 114 contains an exception for law enforcement officers, who are authorized to acquire, possess, or use large-capacity magazines within the scope of their official duties. Measure 114 § 11(4)(c). In his declaration in support of the TRO, Plaintiff Lohrey, a sworn law enforcement officer, alleges that because law enforcement officers "often have to purchase their own firearms and magazines to use on duty" and typically "use firearms with magazines that hold more than 10 rounds," law enforcement officers would no longer be able to purchase "the proper equipment" if Measure 114 were to go into effect. ECF 7 at 2. But Measure 114 explicitly states that "peace officers"—which includes sheriffs—may "acquire, possess or use a large-capacity magazine provided that any acquisition, possession or use is related directly to activities within the scope of that person's official duties." Measure 114 § 11(4)(c). Measure 114 also allows licensed gun dealers to sell large-capacity magazines to law enforcement if they have been marked as being manufactured after Measure 114's effective date. *Id.* § 11(4)(b). Given these exceptions, this Court finds that the sheriff Plaintiffs, who would remain able to purchase, possess, and use large-capacity magazines for law enforcement purposes, would not suffer immediate and irreparable harm if Measure 114 takes effect.

Plaintiffs have also failed to establish that Measure 114 will cause immediate and irreparable harm to any gun store owner Plaintiffs. Although the loss of one's business can constitute an irreparable harm, Plaintiffs have not shown that any Plaintiff is likely to lose significant business if Measure 114 goes into effect. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022). Moreover, any economic harm that Plaintiffs might suffer by having to sell or transfer high-capacity magazines out of state would be neither irreparable nor immediate. *See Los Angeles Mem'l Coliseum Comm'n*, 634 F.2d at 1202 ("[M]onetary injury is not normally considered irreparable.").

Finally, Plaintiffs provide no evidence to support their claim that the permit-to-purchase provision would cause them immediate irreparable harm. Plaintiffs do not allege that their permit applications would likely be rejected if they were to apply for such a permit. Plaintiffs do not allege that they have concrete plans to purchase firearms in the future or even to apply for a permit to purchase firearms. Nothing in the permit-to-purchase scheme would make it impossible for Plaintiffs to use their pre-existing firearms for self-defense, as it is not illegal to possess a firearm without a permit. *See* Official Voters' Pamphlet, General Election, Nov. 8, 2022, 90. Measure 114, in short, does not retroactively make possession of already legally owned firearms illegal.

In sum, Plaintiffs have not demonstrated at this stage that they are likely to suffer irreparable harm if this Court does not enjoin Measure 114 before December 8, 2022.

### 3. Balance of Equities and Public Interest For All Claims

This Court turns finally to its consideration of the balance of equities and the public interest. *Winter*, 555 U.S. at 20. When the government is the party opposing a TRO or preliminary injunction, the defendant's equities merge with the public interest. *See Nken v.*

*Holder*, 556 U.S. 418, 435 (2009). This Court acknowledges public interest on both sides and concludes that these factors do not favor either party.

Defendants have a substantial interest in enforcing validly enacted statutes. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (internal citation omitted); *see also Coal. For Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) (same). Such an interest is particularly strong here, where Measure 114 was enacted directly by a majority of Oregon voters.

Defendants also have an interest in protecting the public safety of the people of Oregon from gun violence. *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1404 (9th Cir. 1993) ("Public safety should be considered by a court when granting equitable relief."). Defendants rely on evidence suggesting that permit-to-purchase provisions reduce mass shootings, homicides, and suicides. ECF 15 at 31–32. Defendants also note that since the federal ban on large-capacity magazines expired in 2004, every mass shooting that caused fourteen or more deaths has used a large-capacity magazine. ECF 15 at 32. Defendants thus have an interest in Measure 114 taking effect without delay to further the state's goal of public safety for its residents.

Plaintiffs have an interest in the continued exercise of their Second Amendment, Fifth Amendment, and Fourteenth Amendment rights. There is a recognized public interest in preventing the violation of a party's constitutional rights. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). This interest applies with full force to Plaintiffs' Second Amendment claim in particular, but also to their other constitutional claims. "The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*,

561 U.S. at 780). Because the rights articulated here are extremely compelling for both sides, this Court finds that a balancing of the equities does not favor either party.

## CONCLUSION

For the reasons stated above, Plaintiffs have failed at this stage to carry their burden of showing a likelihood of success on the merits and irreparable harm absent a TRO. Accordingly, Plaintiffs' Motion for a TRO, ECF 5, is DENIED with respect to Measure 114's restrictions on large-capacity magazines. Plaintiffs' Motion is DENIED with respect to a facial challenge to Measure 114's permitting provision. However, in light of the difficulty the State has conceded in terms of implementation of the permitting provisions at this stage, implementation of those permitting provisions is stayed for thirty days. Parties are ordered to confer and report to the Court regarding any further postponement requests.

Plaintiffs are entitled to a prompt hearing to determine whether a preliminary injunction should issue based on a more complete record. The parties are ordered to confer and propose a briefing schedule to this Court by December 7, 2022.

**IT IS SO ORDERED**.

DATED this 6th day of December, 2022.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge