Stephen J. Joncus, OSB #013072
JONCUS LAW PC
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
971.236.1200
steve@joncus.net

Leonard W. Williamson, OSB #910020
VAN NESS WILLIAMSON LLP
960 Liberty St. SE, Ste 100
Salem, Oregon 97302
503.365.8800
l.williamson@vwllp.com

*Attorneys for OFF Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al.,<br><br>                              Plaintiffs,<br><br>        v.<br><br>KATE BROWN, et al.,<br><br>                              Defendants. | Civil No. 2:22-cv-01815-IM (*Lead Case*)<br>Civil No. 3:22-cv-01859-IM (*Trailing Case*)<br>Civil No. 3:22-cv-01862-IM (*Trailing Case*)<br>Civil No. 3:22-cv-01869-IM (*Trailing Case*)<br><br>CONSOLIDATED CASES<br><br><br>**OREGON FIREARMS FEDERATION PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| MARK FITZ, et al.,<br><br>                              Plaintiffs,<br><br>        v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br><br>                              Defendants. | |
| KATERINA B. EYRE, et al.,<br><br>                              Plaintiffs,<br><br>        v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>                              Defendants. | |

DANIEL AZZOPARDI, et al.,

                         Plaintiffs,

      v.

ELLEN F. ROSENBLUM, et al.,

                        Defendants.

1.      Plaintiffs Oregon Firearms Federation ("OFF"), Sheriff Brad Lohrey, Adam Johnson, Sheriff Cody Bowen, Sheriff Brian Wolfe, Harold Richard Hadden, Jr., Sheriff Brian Pixley, Sheriff Terry Rowan, Kevin Starrett, and Damian Bunting (collectively "Plaintiffs") through their counsel, bring this action against Defendants Kate Brown, the Governor of Oregon, Ellen Rosenblum, the Attorney General of Oregon, and Terri Davie, Superintendent of the Oregon State Police (collectively, "Defendants"). Plaintiffs bring this Second Amended Complaint based on personal knowledge as to all Plaintiff facts, and on information and belief as to all other matters.

2.      Ballot Measure 114 ("Measure 114") bans commonplace firearms with commonplace magazines, turning law-abiding citizens into criminals overnight. Measure 114 creates a brand-new crime of manufacture, importation, possession, use, purchase, sale, or transfer of ammunition magazines capable of accepting, or which can be converted to accept, more than 10 rounds. This new crime is punishable by up to 364 days in prison and a $6,250 fine.

3.      Magazines that hold more than 10 rounds of ammunition are commonly owned by millions of Americans for all manner of lawful purposes, including self-defense, sporting, and hunting.  These magazines have long been standard issue with many of the most popular firearms

on the market. Today, Americans own roughly 115 million of them, accounting for approximately half of all privately owned magazines in the United States.

4.    Measure 114 creates a new permit system requiring Oregonians, who can otherwise lawfully purchase and own firearms, to ask permission from the government to purchase a firearm ("permit-to-purchase"). Only six states in the nation require government permission to purchase a firearm. With Measure 114, Oregon seeks to join this small minority of states by instituting a new and unprecedented permit system for anyone to purchase a firearm. Among other things, this new permit-to-purchase system **completely bans** first-time purchasers from acquiring a firearm.

5.    Moreover, now and for the foreseeable future, no Oregonian can satisfy the permit-to-purchase requirements of Measure 114. Among other things, the firearms safety course required to obtain a permit-to-purchase does not exist in Oregon. Accordingly, for the foreseeable future, this new permit-to-purchase system **completely bans** all purchasers from acquiring a firearm in Oregon.

6.    Prior to Measure 114, Oregon law provided that a firearm purchase may be transferred to the purchaser within one day of the sale, whether or not the Oregon State Police ("OSP") have completed a background check. Under Measure 114, the wait time for one's weapon is indefinite—one must now wait for the government to get around to it, and whether permission to buy a gun is ever granted depends on the whims of a government bureaucrat. Measure 114 institutes a complicated series of processes and demanding new criteria with indefinite time constraints for a purchaser to acquire a firearm. Prior to Measure 114, purchasers were only charged a modest $10 fee. Under Measure 114, purchasers must pay multiple fees and

expenses, the largest of which are still unknown, in order to be granted permission to purchase a firearm.

7.     Current Oregon law provides objective criteria for whether an individual can purchase a gun. Measure 114 institutes subjective criteria inviting a "Permit Agent" on a fishing expedition to investigate anyone who wants to buy a gun. A purchase can be denied if the Permit Agent finds a "reasonable" basis that a purchase is reasonably likely create a danger.

8.     Measure 114 turns the right to bear arms protected by the Second Amendment of the United States Constitution on its head. Measure 114 abolishes Oregonian's constitutionally protected right to purchase firearms and own them for self-defense, turning it into a privilege, subject to the whims of government bureaucrats, that may be bestowed on Oregonians at a time when it is convenient for the government.

9.     Measure 114 strips Oregonians of their fundamental rights under the Second Amendment. Plaintiffs therefore seek, declaratory and injunctive relief to prevent enforcement of Measure 114 in Oregon.

10.    A true copy of Ballot Measure 114 is filed contemporaneously with this Second Amended Complaint as Exhibit A.

## **PARTIES**

11.    Plaintiff Oregon Firearms Federation, Inc. is an Oregon public benefit corporation located in Canby, Clackamas County, Oregon.  OFF is qualified as tax-exempt under 26 U.S.C. § 501(c)(4).  OFF seeks to defend the civil rights of all law-abiding individuals, including all of its members, and including the fundamental right to acquire and possess commonly used firearm magazines.

12.     OFF regularly provides guidance to Oregon gun owners regarding their legal rights and responsibilities.  In addition, OFF is dedicated to promoting the shooting sports and providing education, and training for adult and junior shooters.  OFF members include law enforcement officers, prosecutors, professionals, firearm experts, and the public.

13.     In this suit, OFF represents the interests of thousands of its members who reside in Oregon, and who are too numerous to conveniently bring this action individually.  OFF represents the interests of those who are affected by Oregon's restriction on magazines capable of holding more than 10 rounds, and the "permit-to-purchase" provisions of Measure 114. In addition to their standing as citizens and taxpayers, those members' interests include their wish to exercise their constitutionally protected right to keep and bear arms without being subjected to criminal prosecution, and to continue to lawfully possess property that they lawfully obtained.  But for Oregon's restrictions on magazines over 10 rounds; and its "permit-to-purchase" provisions; and the reasonable fear of felony and misdemeanor prosecution for violating them, OFF members would seek to acquire, keep, possess, and/or transfer such magazines for in-home and outside self-defense and other lawful purposes, including self-defense inside and outside the home.

14.     Plaintiff Adam Johnson is a resident of Marion County, Oregon, and a law-abiding citizen of the United States.  He owns numerous magazines prohibited by Measure 114. But for Oregon's restrictions on magazines over 10 rounds, and his reasonable fear of criminal prosecution for violating them, plaintiff Johnson would continually possess a magazine over 10 rounds in Oregon for lawful purposes, including in-home and outside self-defense.  Plaintiff Johnson owns Coat of Arms Custom Firearms, a store in Keizer, Oregon.

15.     Plaintiff Harold Richard Haden, Junior is a resident of Umatilla County, Oregon, and a law-abiding citizen of the United States.  He owns Garner's Sporting-Goods, located in Pendleton, Umatilla County, Oregon.  It sells guns and related items prohibited by Measure 114. But for Oregon's restrictions on magazines over 10 rounds, and his reasonable fear of criminal prosecution for violating them, plaintiff Haden would continually possess a magazine over 10 rounds in Oregon for lawful purposes, including in-home and outside self-defense.

16.     Plaintiff Brad Lohrey is the Sheriff of Sherman County, Oregon.  If Measure 114 takes effect, he and his officers will be unable to adequately protect the residents of Sherman County.  Plaintiff Lohrey is a resident of Sherman County, Oregon, and a law-abiding citizen of the United States.  He owns magazines prohibited by Measure 114 for self-defense and other lawful purposes.

17.     Plaintiff Cody Bowen is the Sheriff of Union County, Oregon.  If Measure 114 takes effect, he and his officers will be unable to adequately protect the residents of Union County.  Plaintiff Bowen is a resident of Union County, Oregon, and a law-abiding citizen of the United States.  He owns magazines prohibited by Measure 114 for self-defense and other lawful purposes.  But for Oregon's restrictions on magazines over 10 rounds and his reasonable fear of criminal prosecution for violating them, Plaintiff Bowen would continually possess a magazine over 10 rounds in Oregon for lawful purposes, including in-home and outside self-defense, and law enforcement.

18.     Plaintiff Brian Wolfe is the Sheriff of Malheur County, Oregon.  If Measure 114 takes effect, he and his officers will be unable to adequately protect the residents of Malheur County.  Sheriff Wolfe is a resident of Malheur County, Oregon, and a law-abiding citizen of the United States.  He owns magazines prohibited by Measure 114 for self-defense and other lawful

purposes.  But for Oregon's restrictions on magazines over 10 rounds and his reasonable fear of criminal prosecution for violating them, plaintiff Wolfe would continually possess a magazine over 10 rounds in Oregon for lawful purposes, including in-home and outside self-defense, and law enforcement.

19.    Sheriff Brian Pixley is the Sheriff of Columbia County, Oregon. If Measure 114 takes effect, he and his officers will be unable to adequately protect the residents of Columbia County. Sheriff Pixley is a resident of Columbia County, Oregon, and a law-abiding citizen of the United States.  He owns magazines prohibited by Measure 114 for self-defense and other lawful purposes.  But for Oregon's restrictions on magazines over 10 rounds and his reasonable fear of criminal prosecution for violating them, Sheriff Pixley would continually possess a magazine over 10 rounds in Oregon for lawful purposes, including in-home and outside self-defense, and law enforcement.

20.    Sheriff Terry Rowan is the Sheriff of Umatilla County, Oregon. If Measure 114 takes effect, he and his officers will be unable to adequately protect the residents of Umatilla County. Sheriff Pixley is a resident of Oregon, and a law-abiding citizen of the United States. He owns magazines prohibited by Measure 114 for self-defense and other lawful purposes.  But for Oregon's restrictions on magazines over 10 rounds and his reasonable fear of criminal prosecution for violating them, Sheriff Pixley would continually possess a magazine over 10 rounds in Oregon for lawful purposes, including in-home and outside self-defense, and law enforcement.

21.    Kevin Starrett is a resident of the City of Canby, Clackamas County, Oregon. Mr. Starrett is the Executive Director of the Oregon Firearms Federation and served as OFF's registered lobbyist until approximately one year ago. Mr. Starret also serves as the

executive Director of the Oregon Firearms Educational Foundation, a 501(c)(3) nonprofit organizations whose mission is to provide education for Oregon gun ownersand to advance litigation to preserve and protect the rights of Oregon's gun owners. Mr. Starrett also serves as the director of the Oregon Firearms Federation Political Action Committee formed in 2000 and operating continuously to the present. Mr. Starrett is a nationally certified firearms instructor since 1989 who has instructed hundreds of persons in the safe use of firearms, an overwhelming majority of them are "first responders" including police officers. Mr. Starrett is qualified provide training to students that meet the state's training requirements for persons to obtain a concealed handgun licenses in Oregon, Florida, and Arizona. Mr. Starrett is the author of two books on Oregon gun laws which combined have sold over 20 thousand copies to civilians, police, lawyers, and law libraries.

22.    Damian Bunting is a resident of Multnomah County Oregon and is the owner of Security Guard Training Academy LLC located in Portland Oregon. Mr. Bunting works as an armed security guard certified under Oregon's Department of Public Safety Standards & Training ("DPSST") Private Security Program.

23.    Defendant Kate Brown is the Governor of the State of Oregon. Governor Brown is charged by the Oregon Constitution with the laws of Oregon are uniformly and adequately enforced. Governor Brown is responsible for the execution of the Oregon's laws, including Measure 114. At all relevant times, Governor Brown, as well as those subject to her supervision, direction, or control, are and will be acting under color of state law. Governor Brown is sued in her official capacity and her individual capacity.

24.    Defendant Ellen F. Rosenblum is the Attorney General of Oregon. She is "the chief law officer for the state and all its departments." Or. Rev. Stat. §180.210.  Attorney General

Rosenblum is a resident of Oregon, and her principal place of business is 1162 Court Street NE, Salem, Oregon. At all relevant times, Attorney General Rosenblum, as well as those subject to her supervision, direction, or control, are and will be acting under color of state law. Attorney General Rosenblum is sued in her official capacity and her individual capacity.

25.    Defendant Terri Davie is the Superintendent of the Oregon State Police ("OSP"). As Superintendent, Davie is "the executive and administrative head of the" OSP, Or. Rev. Stat. §181A.030, which is "charged with the enforcement of … all criminal laws," including by "institut[ing] criminal proceedings," *id.* §181A.080(1)(a), (2)(c).  Superintended Davie is a resident of Oregon, and her principal place of business is 3565 Trelstad Avenue SE, Salem, Oregon 97317.  At all relevant times, Superintendent Davie, as well as those subject to her supervision, direction, or control, are and will be acting under color of law. Superintendent Davie is sued in her official capacity and her individual capacity.

## ALLEGATIONS

### Magazine size is a critical component of self defense

26.    On August 14, 2014, the Coker family's home in Jacksonville, Florida was invaded at about 6:20 am by a gang member intent on robbery. Mr. Coker used all the ammunition in his 5-shot .38 special without disabling the attacker. Mr. Coker ended up in a wrestling match with the invader and luckily survived when his wife brought another gun to the fight. The lesson for the Cokers—you never know how much ammunition you need to defend from an attacker.

27.    The vast majority confrontations between a criminal and an armed person defending himself involve no firing of shots. In fact, 80% of defensive gun uses do not involve a shot being fired.  The lesson from this is not that an unloaded gun is useful for self-defense. The

lesson is that more ammunition that one has, the more likely one will be able to successfully defend oneself.

28.     Plaintiff Starrett was surrounded by a mob of approximately 30 people after he gave a television interview. The mob chanted "there he is" and "get him." How many bullets would Mr. Starrett have needed to protect himself against 30 people? Fortunately, as it turned out, the crowd backed up after they saw that Mr. Starrett was armed with a handgun. Mr. Starrett was able to get to his car and make his way out of the parking lot, but not without the crowd closing back in, pounding on his hood, and standing in front of his car.

29.     On April 11, 1986, in Miami-Dade County, two FBI agents were killed, and six others wounded, by two bank robbers. The FBI's investigation placed partial blame for the agents' deaths on the lack of ammunition capacity in their service revolvers. The FBI noted the difficulties of reloading revolvers while under fire and specified that agents should be armed with box magazine-fed semi-automatic pistols which lead to an increasing trend for law enforcement agencies to switch from revolvers to magazine-fed semi-automatic pistols across the United States.

30.     Damian Bunting works as a certified DPSST (Department of Public Standards and Training) armed private security guard withing multiple Portland grocery stores. His DPSST certification is exactly the same as armed Oregon law enforcement officers are to be armed. Over the past two and a half years Mr. Bunting has dealt on a daily basis with the potential of assaults on himself and those that he is contracted to protect. He has experienced actual assaults and attacks on his person. Problems in the Portland Police department have caused long delays in their response to criminal activity. Criminals in Portland know this and are well aware that security guards are on their own and unlikely to have rapid backup from the Portland Police.

31.     Currently Mr. Bunting carries four magazines, each holding 18 rounds, for a total of 72 rounds. He is prepared in this way because he often sees over 6,000 customers per day and is aware that three of the last four major mass shootings have taken place in grocery stores.

32.     In October 2022, Mr. Bunting responded to a homicide in the parking lot of a store that he was guarding. Mr. Bunting was well-aware that he was the only person in the area to protect the remaining customers in the parking lot and the store. Part of his job is dealing with the stress of not knowing when he might be facing criminals with overwhelming firepower.

33.     Measure 114 did not carve out an exception for certified DPSST armed security as it did for law enforcement officers acting in their official capacity.  Therefore, the capacity limit under Measure 114 applies to Mr. Bunting in the performance of his duties and would reduce Mr. Bunting's round count from 72 to 40, significantly undermining his ability to protect himself and those that he is contracted to protect.

34.     Mr. Bunting also has a significant need to rapidly purchase a new weapon for his work. If he is involved in a defense incident with shots fired, the police will almost certainly take his firearm as evidence in their investigation. Under the pre-Measure 114 law he was able to walk into a gun store and walk out with a new weapon that day with little delay. But under Measure 114's permit-to-purchase system, Mr. Bunting would be subject to an indefinite delay. He would be blocked from providing security services for an indefinite period of time and his clients would lose the protection that he provides on a daily basis.

35.     Mr. Bunting, and other private security guards like him, are a necessary component of the public security. Private security guards like Mr. Bunting are becoming more important over time as crime in Portland skyrockets and the government response to the crime

wave continues to deteriorate. Measure 114 significantly undermines Mr. Bunting's ability to protect himself and those that he is contracted to protect.

36.     Susan Gonzalez and her husband were attacked by two intruders within their home one night. The attackers shot both of them multiple times, but she was able to escape to their bedroom where she located her husband's semi-automatic pistol, while her husband bravely physically fought the attackers off into the front room. She entered the room where the attackers were struggling with her husband, and, not wanting to shoot her husband, discharged three warning shots in the air, hoping the attackers would flee. They did not. One attacker charged toward her, causing her to flee back to the bedroom. From an opening in the bedroom, she could see the attacker lying in wait for her in the kitchen. So, she used her knowledge of the house to exit the bedroom and approach the attacker from behind via another door leading to the kitchen. She pointed the pistol at the attacker and discharged seven rounds in his direction, gravely wounding him, but not immediately killing him. After firing 10 rounds, Susan Gonzalez was out of ammunition.

37.     One of the attackers demanded Mr. Gonzalez give him keys to an automobile to escape. He put the gun to her temple and demanded the keys, which she gave him. Fortunately, the attacker decided to spare Mrs. Gonzalez's life, but he could have just as easily pulled the trigger. Had she had more rounds in her magazine, maybe she would not have had to leave her fate to chance. It is impossible to say how many more cases where victims lost (or almost lost, as in Mrs. Gonzalez's case), due to having an insufficient amount of ammunition readily available in a self-defense firearm.

38.     Officer-involved shootings are relevant in evaluating private citizen shootings, for the simple reason that private citizens arm themselves for protection against the exact

same criminals the police are armed to deal with. Tim Gramins of the Skokie, Illinois police department was in a shootout with an armed robber whose car he had pulled over. The gunman came out shooting. The gunman was armed with two semiautomatic pistols, one on his person and one snatched from his car, both of which he fired during the gun battle. Officer Gramins fired 33 rounds at the gunman, fourteen of which struck the suspect in the body. Yet, the gunman continued to fight back against the officer and the gunfight only ended when Gramins fatally wounded the attacker by shooting him in the head three times. Of the last three rounds fired by Gramins the first two bullets struck his attacker in the face causing maxilla-facial damage but did not penetrate to the brain. It was the third shot to the head that ended the fight. Gramins' assailant had absorbed 17 hits by the time he was neutralized, and the officer had been forced to reload twice. The officer was armed with a Glock Model 21 .45 caliber pistol, loaded with a magazine containing 12 rounds and a thirteenth in the firing chamber. He also had two additional magazines containing 12 rounds each. The officer was down to the last few cartridges in his last magazine at the time he finally won the gunfight. Gramins was wounded in the shooting. As a result of this incident, he now carries a higher-capacity handgun with more spare magazines.

39.    The number of rounds fired in a self-defense shoot involving a private citizen is usually not documented, there are nevertheless a number of confirmed accounts of private citizens discharging more than ten rounds during a criminal attack. For example, a Baltimore man on the way to his bank with thousands of dollars of cash in his car, discharged sixteen rounds from a handgun he was licensed to carry when he was physically attacked by three

men, one of whom allegedly had a gun. One of the assailants died, while the other two fled, one of whom was arrested at a nearby hospital with a bullet wound in the hand.

40.     In a similar situation, a South Carolina gun store owner who lived in the rear of his shop was awoken by three men, at least one of them armed, crashing a van into his store. When going to investigate, one of the robbers yelled to another to kill him, so the owner opened fire, discharging thirty rounds, hitting all three attackers, mortally wounding one and causing the rest to flee.

41.     Ronald Honeycutt was delivering pizzas when approached by a man with a gun from behind. He turned and fired when he saw a gun in the man's hand, discharging all of his magazine's fifteen rounds, which still did not immediately stop the threat, as the attacker remained upright with the gun pointed at him, until he succumbed to his wounds.

42.     California shop owner Lance Thomas was limited by 10 round magazine limit under California law, similar to Measure 114. Thomas's strategy was to stage multiple loaded handguns every few feet in his workspace. He could do this, as a sole proprietor with a small shop, a workspace closed to the public, and with buzz-in entry. In one of the five incidents where Thomas was forced to fire his guns to defend himself, Thomas fired approximately nineteen shots before the last of his multiple opponents ceased attempting to murder him.

43.     A pair of brothers used the same strategy in defending themselves against two violent career criminals robbing their Richmond, Virginia jewelry store. They went through multiple firearms staged throughout the store placed in anticipation for such an event. The strategy of staging multiple firearms employed by these shopkeepers is a unique

circumstance, however, it would not be practical or safe for most shopkeepers or for homeowners, due to the danger of unexpected children wandering behind the counter or unexpectedly arriving at the given home. Thus, most private citizens could not be expected to have multiple handguns in multiple locations in their home or on their person in order to engage in a defensive gun use.

44.     The homeowner who keeps a defensive firearm and is awakened in the night by an intruder is most unlikely to have time to gather spare ammunition. The sudden and unpredictable nature of such attacks, and their occurring in relatively confined spaces, generally do not permit gathering multiple firearms or magazines. Ideally, one hand would be occupied with the handgun itself, and the other, with a telephone to call the police. And, assuming they even had time for a magazine change, most people do not sleep wearing clothing that would allow them to stow spare magazines, etc. on their person. They would have only what was in the gun.

45.     Most plainclothes police officers do not find it practical to carry multiple handguns, let alone private citizens. Any suggestion that private citizens simply carry more guns or more ammunition feeding devices would, for the reasons stated above, be impractical.

46.     Criminals bent on causing harm, on the other hand, even assuming they were impeded from obtaining over ten-round magazines by Oregon Measure 114, could simply arm themselves with multiple weapons, and often do. Criminals have time to assess and plan shootings, whereas victims do not. Whitman, the Texas Tower mass murderer, literally brought a large box of rifles, handguns, a shotgun and ammunition to his sniper perch. Harris

and Klebold had four firearms between them at Columbine. Holmes in Aurora brought a rifle, shotgun, and pistol into the theater. Hassan was armed with a pistol and a revolver at Fort Hood. Lanza entered the elementary school in Newtown, Connecticut armed with a rifle and two pistols. The mass murderer Cho entered Virginia Tech armed with two pistols and a backpack full of magazines. The Isla Vista attack was perpetrated by a man carrying two knives and three handguns. The Umpqua Community College shooter carried five handguns with him. The San Bernardino terrorists each had a semi-automatic rifle and handgun. Mateen likewise brought a semi-automatic rifle and handgun with him to perpetrate the Pulse nightclub Massacre in Orlando.

47.    The likelihood of the mass murderer arriving on scene with multiple firearms also largely negates the theory that with fewer rounds in the gun, the killer could be more easily disarmed and subdued by unarmed citizens when he first ran empty, before he could reload.

48.    Monroe Phillips, a lone gunman, armed with only with a double barrel Parker ten-gauge shotgun, killed five people and wounded thirty-two others in 1915 in what has been dubbed the *Brunswick Massacre*. Phillips employed a technique of constantly keeping his shotgun at the ready by only firing one round, breaking the shotgun open, extracting the spent round, while leaving the second barrel loaded. In this manner he simply needed to snap the shotgun closed if confronted, and he would be back in the fight killing and wounding people. Dr. G.W. Blanton, an eyewitness, told the Brunswick News a few days after the shooting, "that he had been waiting for Phillips to run dry so he or someone else could jump him and disarm him, but Phillips never gave them the opportunity." We learned over 100

years ago that realistically there is not natural break in the gunfight that allows for the police or a civilian to intervene during reloading and overpower a gunman.

49.    The virtuous citizen, by contrast, cannot practically be expected to have accessible that many guns or that much ammunition at a moment's notice. The virtuous citizen is the one who is, therefore, most deleteriously impacted by the magazine capacity limitation. If he or she must use the gun to protect self and family, they will most likely have only the ammunition in the gun with which to fend off determined, perhaps multiple, attackers.

50.    Virtuous citizens buy their guns to protect themselves from the same criminals, police carry guns to protect the citizens, the public, and themselves from. Consequently, armed citizens have historically modeled their choice of firearms on what police carry. The vast majority of Oregon law enforcement officers carry pistols with double-stack magazines whose capacities exceed those permitted under Measure 114. The on-duty, uniformed police officer generally will be armed with a service pistol containing a detachable magazine holding more than ten rounds, and generally, two spare magazines holding more than ten rounds on the uniform belt. He or she will normally be wearing body armor, have immediate access to a loaded shotgun and/or loaded patrol rifle with extra magazines holding more than ten rounds in the patrol car, and will have instant radio access to fellow officers and dispatch if backup help is needed.

51.    The off-duty officer and the law-abiding citizen alike are not likely to have that volume of spare ammunition on their person or elsewhere readily accessible. They are not likely to be wearing body armor, nor to be in reach of a rifle or shotgun. Their only

communication to potential backup will be by phone, relayed through Police Dispatch to responding officers. Thus, for them, the ability to have a pistol already loaded with a significant amount of ammunition is all the more important.

52.    A law-abiding person that carries a firearm for defense of themselves and their loved ones, does not have the luxury of knowing when and where they will be forced to react to an attack. Large capacity magazines afford responsible citizens a similar advantage extended to first responders to prevail and return home safely.

53.    Study of events in the real world indicates that Measure 114's restriction on magazine capacity can be expected to have no effect in reducing casualties due to intentional mass murder. However, law-abiding citizens, certain off-duty and retired criminal justice personnel, families of criminal justice personnel, recipients of death threats, stalking victims, and people working in places of business prone to armed robbery, will be severely disadvantaged by Measure 114 in terms of their ability to lawfully protect themselves and others. This impact will be particularly severe upon members of such groups who are physically disabled.

54.    Abled bodied persons are not the only crime victims to be concerned about. A particular subset of law-abiding citizens who are disparately, negatively impacted by Measure 114 is the physically disabled. This is true of many categories of the physically challenged. Over recent decades we have seen many war veterans joining the amputee community. Those who have lost fingers, or a hand will have great difficulty reloading an empty gun if a ten-round magazine does not prove sufficient to defeat an attacker. Work related injuries such as carpal tunnel syndrome can greatly slow ability to reload. So can many of the infirmities of age: rheumatism, arthritis, bursitis, etc. The wheelchair-bound

individual, and many more mobility-challenged individuals (back issues, ankle issues, knee issues, etc.), cannot run to cover to reload. They will be caught in the open if they have to reload in a fight with one or more armed criminals, and thus will become totally helpless as soon as their Measure 114 mandated ten-shot magazine is depleted.

**Measure 114 will do nothing to deter criminal activity or prevent mass shootings**

55.     Criminals do not abide by gun laws. They will buy weapons on the black market or in other states or they will steal them. Criminals are, therefore, often well-armed with guns with no limit on the capacities of the magazines that they use.

56.     Armed criminals are prepared and ready for a confrontation. They have thought about when and who to attack. And the criminal chooses where the attack will take place. In contrast, victims of criminal attacks do not chose the time or place of an attack. Victims of criminal attacks are forced to react to the unexpected attack by the criminal. The number of attackers, the location of the attack, the time of the attack, the attacker's intentions, and the weapons possessed by the unexpected attacker are all unknown.

57.     Civilians are much more likely to encounter criminals first before law enforcement does as they are the intended targets of criminals who wish to victimize them. Each civilian is his own first line of defense against a criminal. Civilians who believe that law enforcement will respond quickly enough to stop criminals naively risk their personal safety and their family's safety.

58.     Therefore, people who arm themselves for self-defense are wise to maximize the amount of ammunition that they can practically carry. The availability of more ammunition in a firearm increases the likelihood of surviving a criminal attack. Limiting the number of rounds available decreases one's chances of survival. Most handguns allow owners to practically carry

more than 10 rounds in a magazine because a firearm's ammunition capacity is directly related to its suitability for self-defense.

59.     Victims rarely carry multiple magazines loaded with ammunition. The more items that you have to carry, the less practical it is. Even when carrying more than one magazine, it is extremely difficult to stop and change magazines when one is under attack because the stress of the emergency severely degrades the motor skills necessary for the task. The same stress also reduces the accuracy of any shots that are fired.

60.     Criminals are more prepared than they were 20 years ago. They buy body armor. They practice with their firearms. Criminals know that if they work together, they can overwhelm their victims. By limiting law-abiding citizens to 10 rounds in a magazine, Measure 114 increases the advantages that criminals have in a confrontation.

61.     Many criminals are drug users and are more difficult to stop when they are under the influence of narcotics. Multiple hits with a handgun may not stop a criminal under the influence of narcotics. It is well-established that criminals under the influence of narcotics often continue to fight and present a danger after multiple strikes from handgun ammunition. The stress of a criminal attach greatly reduces the likelihood that shots fired will hit the attacker. A person could easily fire ten rounds of ammunition and not stop a single attacker, much less multiple attackers.

62.     Any limit on the number of rounds in a magazine decreases public safety because it decreases the effectiveness of law-abiding citizens trying to protect themselves, while not affecting at all the firepower that a criminal can bring to bear. Even if a criminal cannot not steal or buy a banned weapon on the black market in Oregon, he can easily cross state lines and acquire banned weapons in other states.

**Multiple 10 round magazines are no substitute for conventional magazines**

63.    The State contends that if you need more ammunition for defense, you can simply bring more 10 round magazines with you. First, if one accepts the dubious contention that a mass shooter will somehow be limited to 10-round magazines, he too can bring multiple magazines to the mass shooting that he is planning thereby defeating the entire supposed purpose of Measure 114. Second, having to use multiple magazines significantly impairs the effectiveness of the defensive weapon.

64.    Changing a magazine is a fine motor skill, the type of skill which degrades severely in human beings under stress due to vasoconstriction (loss of blood flow to the extremities) and also due to tremors induced by internally generated adrenaline (epinephrine). This is a well-known physiological reaction that has been defined as the "fight or flight" response in the medical literature and training literature for a century or longer, by Dr. Walter Cannon at Harvard Medical School before World War I. While a trained marksman or competitive shooter might easily change out a magazine quickly, one to two seconds at most, this is not representative of the average person's skill level. Most people, the average gun owner, take considerably longer time to change a magazine; especially someone who is under the mental duress typically experienced during an attack. Perpetrators of violent crimes pick the time, place and arms they will carry to assault and kill their victims. Victims on the other hand are in a reactive defensive posture and can only respond with what they have on their person or easy access to.

65.    In contrast an average person defending themselves with a standard capacity magazine can, by simply pulling the trigger again on a pistol still loaded with ammunition, fire another bullet in a fraction of a second. Forcing our victim to change magazines will cost

her time she may not have. Fractions of seconds can mean the difference between the victim successfully repelling an attacker and the victim being subdued. Thus, a magazine change for the person being attacked could be the difference between life and death.

66. The same, however, is not generally true for the attacker. The loss of time for a magazine change is generally of little consequence for the attacker. This is because it is the attacker who gets to choose when, where, how, and whom to attack. So, the attacker is not burdened by the surprise and shock factor suffered by the victim and is generally prepared for the confrontation—including a plan for reloading—large amounts of ammunition and multiple firearms. The attacker's plan minimizes the downtime for reloading so he is not vulnerable to counterattack by someone with their bare hands.

67. This is demonstrated by the multiple mass shootings where the attacker made magazine changes without being subdued. Perhaps the most illustrative example is the Virginia Tech shooting, where the attacker carried with him seventeen magazines for his two semi-automatic pistols, from which he fired 174 rounds. At least five of those magazines had a capacity of only ten rounds and would be legal under Measure 114. While it cannot be said exactly how many magazine changes he made during what was the deadliest mass shooting in the country's history, based on the number of rounds fired and the fact that authorities found seventeen empty magazines at the scene, he had to have made a number of reloads.

68. Another example is the Orlando Pulse Nightclub shooting, where the attacker carried both a Sig Sauer rifle with a 30-round capacity magazine and a Glock 17 pistol with a 17-round capacity magazine. It has been reported that the shooter fired over 202 rounds during his attack. Assuming the attacker used both firearms, and based upon the number of

rounds fired, the attacker would have been forced to reload his firearms (and possibly magazines) on at least 5 separate occasions. Despite being in a confined space surrounded by hundreds of men who he was murdering one-by-one, at no point during the attack did anyone in the night club tackle or otherwise subdue the attacker during the several times when he was forced to reload.

69.     Magazine capacity is not a factor in most violent gun crimes. Criminals rarely fire more than a few rounds, making magazine capacity irrelevant to almost all crimes. High volume of fire is usually limited to rare mass shootings. But even in such cases, larger magazines do not increase lethality because the perpetrators almost always possess multiple firearms or magazines that allow them to sustain the same amount and rate of fire, regardless of magazine size. Mass shooters plan their attack and come prepared to deploy firepower in a way that is not hindered by magazine size.

**Measure 114 effectively bans almost all magazines and shotguns**

70.     Virtually all magazines holding 10 rounds or less can be modified to hold more than 10 rounds because they have a removable floorplate for cleaning and servicing. An Oregon purchaser recently sought to order an 8-round magazine from an Internet store for his wife's handgun. The sale was rejected by the vendor, who would not make the shipment to Oregon because the 8-round magazine could be altered to more than 10 rounds.

71.     Measure 114 made up the term "large capacity magazine" for magazine capable of carry more than 10 rounds. There is not firearms industry term for magazines that hold more than 10 rounds, nor is it an accurate descriptive term for what is really standard equipment. Indeed, the law's definition of "large capacity magazine" is deliberately misleading. Many people buy a firearm for the purpose of self-defense. Such consumers are inherently interested in

maximizing the number of rounds available in a small package because it maximizes the effectiveness of their defensive tool. Characterizing standard capacity magazines as large capacity is a psychological trick designed to deceive the public.

72.     Most common shotguns have integral fixed magazines that are part of the gun, not readily removable without a gun smith, that can carry more than 10 rounds of mini shotgun shells. Measure 114 is an outright ban on the most common of non-military firearms.

**Sheriffs will be less able to protect themselves under Measure 114**

73.     Plaintiffs Sheriff Lohrey has been a law enforcement officer for 30 years and has been involved in many investigations of serious criminal offenses that have ultimately resulted in offenders being sentenced to prison/jail or otherwise punished. These offenders, their families, and/or their friends can sometimes be angry and seek retaliation against Sheriff Lohrey for the part that he played in a given investigation. Sheriff Lohrey has received many death threats over the years. Sheriff Lohrey has also been physically confronted while off-duty. In Sherman County, many citizens know who Sheriff Lohrey is, where he lives, and the places that he frequents. Sheriff Lohrey faces a very real and serious threat to personal safety because of the length of time spent as a law enforcement officer. Sheriff Lohrey has have made enemies along the way by doing his job well.

74.     While most news concentrates on the violence in our urban areas, rural parts of Oregon are facing high levels of crime from international drug cartels who clearly are not impacted by permits or magazine capacity restrictions.  Law enforcement is no match for these heavily armed cartels and Oregonians who live there will be faced by well-armed criminals while having their own ability to protect themselves greatly impaired.

75.     The Sherman County Sheriffs' Office is responsible for 24/7 law enforcement services.  While off duty, Sherman County Sheriff Deputies attend community events.  All of them carry concealed weapons because they know they could be called to work at a moment's notice.  The 10-round magazine limit in Measure 114 will cause these deputies to break the law when off-duty, because their off-duty weapons have more than 10 rounds in order to maintain the tactical advantage.  Limiting these off-duty deputies to only 10 rounds will hinder their ability to respond, and it may cause lives to be lost.  If these deputies were to insist on carrying more than 10 rounds off duty, they would be committing a misdemeanor crime because of Measure 114, which would also bring risk to their police certification and career.

76.     Sheriff Lohrey has a number of personal firearms—not one of them has a small magazine that can only carry 10 or fewer rounds. All of Sheriff Lohrey's guns have standard magazines that carry more than 10 rounds. Sheriff Lohrey selected his personal guns to maximize the amount of ammunition in a single magazine so that he is prepared to defend himself and his family while he is off duty. Measure 114 would make Sheriff Lohrey a criminal for carrying the guns that he now owns to protect himself and his family.

77.     Sheriff Pixley has been a law enforcement officer for 20 years. Those that he sent to prison or other punishment sometimes seek to retaliate against Sheriff Pixley. Many people in Columbia County know who Sheriff Pixley is, where he lives, and the places that he frequents. Sheriff Pixley has received death threats and his family has been threatened due to the nature of his work. Sheriff Pixley has been confronted in person while off duty.

78.     Sheriff Pixley carries a firearm while he is off duty to protect himself and his family. Almost every magazine owned by Sheriff Pixley has a capacity of more than 10 rounds. Sheriff Pixley in unaware of whether some of his firearms have an option to buy an unmodifiable

magazine with a capacity of 10 rounds or less. Measure 114 would make Sheriff Pixley a criminal for carrying the guns that he now owns to protect himself and his family.

79.     The firearms issued by Columbia County have magazines that hold more than 10 rounds. Law enforcement officers seek to maximize the number of rounds available in a single magazine for the simple reason that it makes the weapon a more effective tool for its purpose.

80.     Sheriff Bowen carries a firearm while he is off duty to protect himself and his family. He owns handguns with magazines that maximize the number bullets for the simple reason that it maximizes his capability to defend himself from a threat. If Sheriff Bowen is forced to defend himself and his family, he wants to every possible advantage available to him to survive an encounter with a criminal. That means he wants the maximum number of bullets that can be feasibly included in his firearms in a single package, ready for use. Measure 114 would make Sheriff Bowen a criminal for carrying the best available tools to protect himself and his family.

81.     Sheriff Wolfe has been a law enforcement officer for 30 years and has received death threats. Almost every magazine owned by Sheriff Wolfe holds more than 10 rounds. He knows that having more rounds available in a magazine improves the likelihood that he would survive a criminal attack. Sheriff Wolfe carries guns with more than 10 round magazines because he wants to maximize his ability to defend himself and his family. Restricting Sheriff Wolfe's ability to carry customarily sized magazines will impair his ability to defend himself.

82.     Sheriff Terry Rowan likes to hike, and he carries a handgun with more than 10 rounds to protect himself against wild animals such as cougars and bears that live in Sherman County. He also carries a handgun with more than 10 rounds when he is off-duty because he has received death threats over the years and has been physically confronted while off-duty. Many in

the community know Sheriff Rowan, where he lives, and places that he frequents. Someone wishing to do Sheriff Rowan harm will know how to find him. Measure 114 would make Sheriff Rowan a criminal for carrying the guns that now owns and would impair his ability to protect himself and his family.

**The permit system functions as a complete ban on new firearm owners**

83.     A first-time purchaser of a firearm is de facto barred from purchasing a firearm under the Measure 114 permit scheme. The permit scheme requires that a first-time purchaser lock, load, unload, fire, and store a firearm in front of a certified law enforcement firearms instructor. But a first-time purchaser has no firearm to use to make this demonstration. The first-time purchaser cannot simply borrow a firearm from another because the act of loaning a firearm is defined as a transfer under Oregon law. ORS 166.435 (1)(a). And a firearm cannot be transferred to a first-time purchaser until she has a permit. Measure 114 constitutes an outright ban and violation of a first-time purchaser's Second Amendment rights.

**The required permit system cannot be implemented in the foreseeable future**.

84.     The Sherman County Sheriff's Office is the only law enforcement agency in Sherman County. For the foreseeable future, Sherman County will not offer any capability for residents to obtain a permit to purchase a firearm. Sherman County has only six sworn law enforcement officers and one non-sworn employee. Sherman County has no funds or personnel to process or issue permits to purchase. Sherman County has no insurance to cover a permit-to-purchase process.

85.     Sherman County has no instructors for a live fire training course. Sherman County has no public or private firearm ranges where live fire training could occur. There is no

process for Sherman County to use to certify instructors. There is no training program for live fire training in Sherman County or anywhere else in Oregon.

86.     Columbia County has 12 sworn law enforcement officers and 6 non-sworn office personnel. Columbia County has no funds or personnel to process or issue permits-to-purchase. Columbia county has no facilities necessary to satisfy the requirements for the permit-to-purchase process. Columbia County has no insurance to cover a permit-to-purchase process.

87.     Union County has 17 sworn law enforcement officers and 5 non-sworn office personnel to provide law enforcement services for more than 2,000 square miles of territory and over 26,000 citizens. Union County does not have the funds, personnel, or facilities required to process and issue a permit-to-purchase. Residents of Union County would be unable to obtain a permit to buy a gun for the foreseeable future.

**Repeating firearms were well known at the Founding.**

88.     During the timeframe when the Second Amendment was ratified, two armories existed in the United States, but many guns for the battlefield were made or assembled by individuals or were imported via foreign aid. It is estimated that 2,500-3,000 gunsmiths worked in the colonies alone. These gunsmiths, as private citizens, were responsible for making guns for both the military and civilians.

89.     The concept of a repeating firearm (in which ammunition is automatically fed into the weapon from a container, detachable or fixed) dates to the earliest technology of firearms. By the time of the ratification of the Second Amendment, repeating, including magazine-fed, firearms had been around for a long time. Additionally, repeaters, including those with magazines, could have capacities of over ten rounds at least a century before and during the ratification of the Second Amendment. Despite the existence of the repeating

firearm technology, firearms laws during this time were not directed towards limiting

magazine capacity. Rather, firearm laws were directed towards restricting access to enslaved,

Native, and free Black peoples as well as other people of color.

90.     By the 1630s, a Dutch gun making family, Kalthoff, began experimenting with

a design that allowed up to fifteen shots to be fired in rapid succession. It utilized a tubular

magazine located in a pistol's butt or a fowling piece's stock to hold powder and balls.  This

system was so innovative it was reproduced and modified for over 150 years. Also, by the

mid-seventeenth century in Italy, magazine-fed repeaters were being developed. According

to the Royal Armouries (Leeds), the earliest example can be found at the Musée de l'Armée

which was made by Giacomo Berselli of Bolognia in the late 1660s.  However, more well-

known and relevant to the Founding Fathers, is Michele Lorenzoni of Florence. He

developed a magazine-fed repeater, in pistol and rifle form, known as the Lorenzoni system.

91.     The notion that the "founding fathers" never envisioned higher capacity

firearms than the single shot musket of their day and that the Second Amendment was never

intended to offer protection for higher capacity firearms is without merit. Among the

Founders, George Washington and John Adams were personally involved in the decision to

purchase for the Continental Army 100 Belton 8-shot firearms, which were repeating

muskets with detachable magazines. The Belton flintlock was one of a number of multi-shot

firearms (including the Girardoni air rifle and the Lorenzoni among others) that were

beginning to appear at the end of the 18th century.

92.     The Belton flintlock, invented around 1758, utilized superimposed loads.

Notably, Belton petitioned the Continental Congress during the American Revolution to

adopt his firearm. In 1776, he wrote Congress saying he designed a firearm that could fire eight shots in three seconds. Benjamin Franklin wrote to George Washington in support of the idea.  Washington ordered one hundred Belton firearms for use in the Continental Army. However, this order was canceled because, as this report has previously stated, cost is often an impediment to battlefield adoption. It is believed that Belton then sold these one hundred firearms to the public.

93.     Around 1779, the Girardoni air rifle was developed. It was a repeating arm that could fire twenty-two rounds from a tubular magazine.  This design also was copied by gunmakers around the world. Roughly a 1,500 of these rifles were in service with the Austrian military from 1780 (prior to the signing of the constitution) to 1815. President Thomas Jefferson thought so highly of the Girardoni air rifle that he sent one with the Lewis and Clark Expedition (1804-1806) and it was used by Meriweather Lewis during the expedition to defend against Indians.

94.     These and other repeaters of the Founding Era are criticized as "one-off examples." But, that was how firearms were often manufactured in the Founding Era. One-off examples were typical because they were often made by private gunsmiths and sometime individually commissioned. These weapons are criticized as unsuccessful by modern standards. But just because some firearm designs had flaws or issues does not undermine the existence of repeater technology, that repeaters were desired by both the military and the public, and that repeaters were unregulated by any law.

95.     The law of the time did not restrict certain types of firearms—it restricted certain groups of people from having firearms. In 1640, Virginia law stated, "that all such

free Mulattoes, Negroes and Indians…shall appear without arms." South Carolina also had similar bans in 1712. It is generally understood that early laws regulating firearms were largely motivated by race.

96.     Americans own some 415 million firearms, including 171 million handguns, 146 million rifles, and 98 million shotguns. About 30 percent of American gun owners have owned AR-15s or similar rifles, which are classified as "assault weapons" under some state laws. Such legislation also commonly imposes a limit on magazine capacity, typically 10 rounds, like Measure 114. 48 percent of American gun owners have owned magazines that can hold more than 10 rounds. Up to 44 million AR-15-style rifles and up to 542 million magazines with capacities exceeding 10 rounds are already in circulation in America. Two-thirds of Americans who report owning AR-15-style rifles use them for recreational target shooting, while half use them for hunting, and a third use them for competitive shooting. Sixty-two percent of Americans use such rifles for home defense, and 35 percent use them for self-defense outside the home.

97.     AR-156 style rifle and pistols are widely recommended as the best home defense weapon. Plaintiff Adam Johnson is a certified firearms instructor and he teaches that AR-15 style weapons are vastly superior to any other firearm for home defense. First, they have much higher magazine capacity. A standard capacity magazine for an AR-15 has 30 rounds. You never want to run out of ammunition when you are defending your life under massive stress. To deploy another bullet, one just has to pull the trigger, and only in the most extraordinary circumstances would one need to reload with another magazine. Secondly, the velocity of a bullet from an AR-15 has excellent stopping power, far exceeding any handgun. When one has to shoot an intruder in self-defense, one wants to end the fight quickly. An intruder is far more likely to be incapacitated when hit by a round from an AR-15 than a round from a handgun. Thirdly, it is

much easier to aim and hit a target with a longer gun. Handguns are notoriously hard to keep on the target because of their smaller size and the effect of recoil. Lastly, rifles are essentially just as maneuverable as a handgun held at arm's length. The fact is, that AR-15 style rifles and pistols are the most effective home defense weapon and they are widely deployed for that purpose.

98.   Historically, the Winchester Model 1892, depending on the cartridge, held up to 17 rounds and could be fired as fast as one could cycle the lever action and pull the trigger. More than a million were sold in the 1800s and used by hunters, ranchers, farmers, pioneers, etc., both to put food on the table and for self-defense.  The most common 1892 with a capacity higher than ten rounds was the Spanish Tigre that was chambered in .44 Largo (.44-40 Win) with 12-round tubes as standard capacity.

99.   The classic Winchester 1873, the "gun that won the West," held 15 rounds in the tubular magazine plus one in the chamber.  The "24" version could hold 14 cartridges in the tube, plus one chambered.  The "36" model could feed up to 21 rounds from the tube.

100.   The 1860 Henry, used by countless hunters, farmers and ranchers for hunting and self-defense, held up to 16 rounds in the magazine plus 1 in the chamber.

101.   The Henry 1860 chambered in .44 Henry rimfire had a standard capacity of 16 rounds.

102.   The Winchester 1894, which sold more than 7 million rifles, had a capacity in many configurations exceeding 10 rounds.

103.   The Marlin/Glenfield Mod. 60 is one of the most produced firearms of all time, and is still in production today.  There have been over 11 million of them sold since 1960.  They were even produced by Sears, and could be ordered from the catalog and shipped directly to your house.  The standard capacity of the Model 60 is a 14-round tube.

104.    The belt-fed machine gun was invented by Hiram Maxim in 1885.

105.    The Puckle Gun was a tripod mounted multi-barreled flintlock firearm that held 11 rounds, and is considered by many gunsmiths and historians to be the first "machine gun" was patented in 1718—73 years before the Bill of Rights, and subsequently the Second Amendment, were ratified.

106.    The Remington Model 8 hit the market in 1900; over one hundred thousand were produced.  They were available with 5, 10, and 15 round magazines from the factory.  The Model 8 also became popular as a defensive rifle after its adoption by the FBI.  The Model 8 was the rifle used to shoot down infamous bank robbers Bonnie and Clyde.

107.    As Pioneers, farmers and ranchers headed West, Eastern deer hunters carried these rifles through the woods and fields, and no one in the U.S. thought that these allegedly "high capacity" rifles posed an unusual danger, or did not belong in civilian hands, or could be regulated, much less outlawed.  The above rifles were considered essential tools of the trade and survival for everyone that hoped to survive the westward flow of "manifest destiny" and general westward expansion.

108.    The Browning BAR is also one of the most used hunting rifles of all time and was available with 20 round magazines from the factory.

109.    The Kel-Tec KSG shotgun (14 rounds), the Tavor X95 (30 rounds standard), the Knights Armament SR-25, SR-15, Beretta ARX-100 (30 rounds), Sig Sauer 716, HK MR556, and about a dozen others are sold throughout the United States, and the AR-15/M4 weapons platform has literally hundreds of variants, made by dozens of manufacturers.

110.    Attached as Exhibit B is a non-exclusive list of over one hundred handgun makes and models that would be affected by Measure 114 Measure 114.  The vast majority on the list are firearms currently in stock at plaintiffs Johnson's and Haden's stores.

111.    Measure 114 contains a "carve out" exception appliable to a tube fed magazine for an attached tubular device designed to accept, and capable of operating only with .22 caliber rimfire ammunition; or tubular ammunition feeding device that is contained in a lever-action firearm. That means the exception applies to the Winchester Model 1892; the Winchester Model 1873; the Model 36; the 1860 Henry all lever action rifles that feed from a magazine tub; and the Marline/Glenfield, a .22 caliber tube magazine-fed semi-auto rifle. This confirms that Oregon and America have had "high-capacity" magazines in this form for a long time that were not subject to regulations analogous to those in Measure 114. And this "carve out" is inconsistent. If magazines exceeding 10 rounds are as dangerous as Defendants contend, then they should not be allowed in any gun. The conditions and exemptions in Measure 114 are inconsistent with America's historical tradition concerning gun rights, and cannot withstand any scrutiny that may apply.

**Magazines are an integral part of firearm.**

112.    Magazine fed firearms are systems with many parts that must function together in order to operate properly, and the ammunition feeding device is critical to the overall performance and success of the firearm. To this day, especially in modern handguns, the magazine is often the cornerstone of the pistol design. Engineers will start a new pistol project with the magazine. The ammunition feeding device must be optimized to reliably deliver cartridges into the operating system. The engineers must consider the dimensions of the cartridge, with specific attention to the cartridge case being either a straight wall or a

tapered case, and angles at which the magazine presents cartridges to the action. The manner in which the magazine and action interface is critical. The remainder of the firearm design builds upon the foundation laid by the magazine's form. Many, if not most, modern pistols are built around a magazine designed to hold more than 10 rounds.

113.    As an integral part of the firearm, magazines are required for proper function. A firearm without a functional magazine is of little use to an owner, and of little value to another consumer.

114.    Firearms manufacturers choose to utilize the services of highly skilled outside vendors to deliver a superior product built to their design specifications precisely because of the importance of the magazine in the overall system. As an added benefit to all commercial, law enforcement, and military customers, these specialized magazine companies have grown and matured and are far more capable to produce significantly higher quality products for the entire marketplace. Gun barrels and other critical components are also routinely outsourced to specialized manufacturers. For example, a firearm manufacturer may specify a hammer forged barrel to meet safety and performance standards, and it would be absurd to contend the mere act of outsourcing somehow reduces the importance of the barrel.

115.    The magazine is correctly considered an integral part of the firearm, not merely an accessory. It is considered such a vital part of the firearm that the magazine's value is included in the cost of the firearm for calculation of the Firearms and Ammunition Excise Tax (FAET) paid by the manufacturer or importer. In contrast, accessories, even if included with the firearm, are not subject to FAET. Typical examples of accessories include holsters, cleaning kits, gun locks, optics, and other accoutrement not critical to the function

of the firearm.

**An injunction is necessary**.

116.    Enforcing Measure 114 violates Plaintiffs' rights under the Second Amendment, the Takings Clause, and the Due Process Clause by including the acquisition, possession, and use of firearm magazines that are "typically possessed and commonly used by law-abiding citizens for lawful purposes" nationwide.

117.    If not immediately enjoined by this Court, Defendants will enforce Measure 114 in derogation of Plaintiffs' constitutional rights, which will cause Plaintiffs to suffer immediate and irreparable injury. Plaintiffs have no plain, speedy, and adequate remedy at law. Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiffs because they are unable to engage in constitutionally protected activity if Measure 114 is enforced by Defendants.  But Plaintiffs seek an award of nominal damages from Defendants in their personal capacities to recognize the violation of their constitutional rights, thereby entitling Plaintiffs to an award of prevailing party attorney fees and expenses under 42 U.S.C. § 1988.  *George v. City of Long Beach*, 973 F.2d 706, 708 (CA9 1992) ("In this Circuit, nominal damages must be awarded if a plaintiff proves a violation of his constitutional rights."). *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 604 (2001) (an award nominal damages makes a party "prevail" under § 1988).

## JURISDICTION

118.    Plaintiffs' causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  This Court therefore has jurisdiction pursuant to 28 U.S.C. §1331.

119.    This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) because this action seeks to "redress the deprivation, under color of a[] State law," of "right[s], privilege[s] or

immunit[ies] secured by … an[] Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

## CLAIMS FOR RELIEF

### COUNT ONE
### (Second Amendment – "Permit-to Purchase" Regime)

120.    All paragraphs above are realleged and incorporated by reference.

121.    "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2125 (2022).

122.    On its face, Oregon's new permit-to-purchase law restricts a person's ability "to purchase or acquire a firearm." §3(4); *see id.* §§4, 5(2), 6(2)(a), 6(3)(c), 7(3)(a), 7(3)(d)(B), 8(2), 9(2).

123.    Because the Second Amendment plainly entitles the people to acquire the firearms that it guarantees them the right to keep and bear, Measure 114 treads on ground "presumptively protect[ed]" by the Constitution, and Oregon "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen,* 142 S.Ct. at 2126.

124.    Oregon cannot do so because there is no "well-established and representative historical analogue" of the new permit-to-purchase regime. *Id.* at 2140.

125.    Only six states have ever had a permit-to-purchase for any substantial period of time—and all of those came in the twentieth century: New York (1911), Oregon (1913, repealed 1925), North Carolina (1919), Missouri (1921, repealed 2007), Connecticut (1923), Michigan (1927, partially repealed by several steps in early twenty-first century), Hawaii

(1927), New Jersey (1927), and Texas (1931, later declared void).  *See* David B. Kopel,

*Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on

Legis. 303, 360-61 (2016); Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase*

*Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev.

529, 543 (2021).  As the Supreme Court made crystal clear in *Bruen*, laws enacted for the

first time in the twentieth century "come too late to provide insight into the meaning of [the

Constitution]."  *Bruen*, 142 S.Ct. at 2137 (alteration in original) (quoting *Sprint Commc'ns*

*Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting)); *see id.*

at 2138 (rejecting reliance even on "a handful of late-19th-century [laws]" similar to the

challenged restriction).

126.    To be sure, a purely objective, and time-limited background-check regime may

be consistent with the right to keep and bear arms.  *See Bruen*, 142 S.Ct. at 2138 & n.9;

*McDonald v. Chicago*, 561 U.S. 742, 786 (2010); *District of Columbia v. Heller*, 554 U.S.

570, 626-27 (2008).  But the Supreme Court recently went out of its way to underscore that

the Second Amendment does not countenance "regimes where, for example, lengthy wait

times in processing license applications or exorbitant fees deny ordinary citizens their right

to public carry."  *Bruen*, 142 S.Ct. at 2138 n.9.

127.    Measure 114 ticks all of these problematic boxes and more.  It gives "licensing

officials" discretion to "exercise … judgment"; it allows the application or verification

process to create "lengthy" delays; and it imposes "exorbitant" fees and costs.  *Id.*

128.    First, the new law affords officials discretion unbecoming a proper "shall

issue" regime—namely, DSP may demand "any additional information" it wants before

deciding whether to issue the permit.  §4(1)(c), (2)(c).  This opens unbounded discretion for the department to add additional criteria for the permit to issue.  Indeed, the new law contemplates that the sheriff or police chief may deny a permit both before an individual applies, *see* §4(1)(b)(C), ***and after***—that is, even if DSP determines that the applicant passes the state's new background check, the sheriff or police chief can still deny the permit application, *see* §5(2).  Such unbounded discretion means that Measure 114 operates functionally as a constitutionally impermissible may-issue, rather than a valid shall-issue, regime, with licensing agents free to make their own judgments about who seems "reasonably likely" to misuse one.

129.    Second, delay is baked into the new regime.  Under Measure 114, there is no limit on how long DSP can take to complete the background check.  *See generally* §4.  Nor are there penalties if the State Police fail to complete the check.  That means that DSP can delay completion of the background check, and thus the issuance of a permit, indefinitely. This was not the case before Measure 114 was adopted.  Before Measure 114, Oregon law mirrored federal law.  Until the adoption of Measure 114, ORS 166.412(3)(c) provided as follows:  "If the department fails to provide a unique approval number to a gun dealer or to notify the gun dealer that the purchaser is disqualified … before the close of the gun dealer's next business day following the request by the gun dealer for a criminal history record check, the gun dealer may deliver the firearm to the purchaser."  *See also* 18 U.S.C. §922(t)(1)(B)(ii) (similar under federal law).  But now, under Measure 114, a "dealer may not transfer the firearm unless the dealer receives a unique approval number from the department."  §6(3)(c); *see also* §6(13)(b) & (14) (making it a crime to "[k]nowingly sell[] or

deliver[] a firearm … prior to receiving a unique approval number from the department," even if the purchaser already possesses a concealed handgun license); §§7(3)(d)(B), 8(3)(B)(c) (extending this amendment to person-to-person transfers and gun shows).

130.    This is critically important.  According to the Oregon State Police's own published statistics, over the past five years, more often than not it has taken OSP more than 10 days to complete a background check.  *See* Oregon State Police, Criminal Justice Information Services Division, *2020 FICS Program Overview*, Appendix B, https://bit.ly/3BNMSGT.  Some years, the wait has been even longer.  *See id.*  Before Measure 114, that wait did not prevent law-abiding citizens from acquiring a firearm, as explained above.  And nearly all of them were indeed law-abiding:  Between 2015 and 2020, OSP approved 99.5% of the 1.5 million transactions that came across it, approving 1,497,293 transactions, and denying only 7,124.  But, as a result of Measure 114 §6(3)(c), (13)(b), & (14), most individuals will have to wait more than 10 days to acquire a firearm from a licensed dealer, on the off chance that they are among the tiny fraction of individuals unable to lawfully acquire a firearm.  And as a result of §§7(3)(d)(B) & 8(3)(B)(c), most other forms of transfers (person-to-person or at gun shows) will take too long to be completed at all.

131.    Even if an applicant were to successfully run this veritable gauntlet and convince the state to issue a permit and return a background check with a unique approval number in a timely manner, Measure 114 gives DSP a 30-day clock to issue the permit even after satisfying itself that the individual has passed the background check.  That 30-day deadline for issuance of the permit when (or if) the background check is completed and passed, *see* §4(3)(a), is unconstitutionally long all by itself.  *Cf.* 18 U.S.C. §922(t)(1)(B)(ii)

(deeming four days too long to force law-abiding citizens to wait if no background check is returned).

132.    Third, Oregon's regime creates significant costs and barriers to compliance. Defendants may suggest that the sticker price is just $65 for the first license and then $50 to renew every five years thereafter.  But that masks other costs embedded in the regime. Those amounts, after all, cover only the license fee.  They do not account for the price an applicant must pay to complete a safety course and then live-fire training.  *See* §§4(1)(a)(D), (8)(c)(D).  And while Defendants may argue that no one yet knows exactly what those expenditures will be, that just underscores the problem.  While Measure 114 requires classes, it makes no provision for offering such classes, and the state has not yet certified any privately offered classes.  Oregon has thus tasked law-abiding individuals with paying unknown amounts for non-existent courses, and all just to exercise a fundamental constitutional right.

133.    Finally, and compounding all the other constitutional concerns, the state is rushing to implement Measure 114 before it has set up the systems by which it can be administered.  Oregon has not yet even provided the necessary funding for its new and onerous permitting scheme—there is an approximately $70-million shortfall between the anticipated annual cost of administering the system and the revenue currently provided to do so—let alone set up the systems required to administer it.  As of right now, not one in-person firearms training course has been certified by the state, which means that no one can lawfully obtain a permit-to-purchase—and thus no citizen can obtain a firearm.  Even if there were approved courses, moreover, the DSP has not put in place the background check system

necessary to process applications, which too means that no one can lawfully obtain a permit-to-purchase (and thus a firearm). When it comes down to it, to purchase a firearm in Oregon, a citizen will need to comply with a regime that does not exist.

134.    None of that is remotely consistent with the Second Amendment. Oregon's regime marks a radical departure even from the most restrictive state regimes in place today. That is not owing to some "dramatic technological change[]" or "unprecedented societal concern." *Bruen*, 142 S. Ct. at 2132. As the Supreme Court articulated last June, there is nothing remotely novel about the concern that firearms might fall into the wrong hands, and background-check regimes have been used to address that concern for decades. *See id.* at 2156. The only thing novel here is Oregon's attempt to use a not-so-thinly-veiled "permitting" regime to frustrate the ability of law-abiding citizens to obtain the arms that the Constitution guarantees them the right to keep and bear.

135.    Measure 114's permitting provisions violate the Second Amendment.

### COUNT TWO
### (Due Process Clause– "Permit-to-Purchase" Regime)

136.    All paragraphs above are realleged and incorporated by reference.

137.    The Due Process Clause protects against arbitrary government action, especially when the result of that arbitrary government action is to deprive individuals of the ability to exercise a fundamental substantive right secured by the Constitution.

138.    As things stand now, if Measure 114 is allowed to take effect, it will be impossible to comply with the new law. Oregon has not yet funded or set up the systems required to administer its new and onerous permitting scheme. No live-fire training courses are approved. And DSP has no background check system in place. Add it all up, and

Oregon will soon require Oregonians looking to purchase a firearm to comply with a regime that does not exist and cannot be satisfied.  That is the very definition of arbitrary government action in violation of due process.

### COUNT THREE
**(Second Amendment – "Large Capacity Magazine" Ban)**

139.    All paragraphs above are realleged and incorporated by reference.

140.    "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense."  *Bruen*, 142 S.Ct. at 2125.

141.    The Supreme Court has made clear that when a court confronts a flat ban on possession of a type of arm, the only question is whether the arm at issue is "typically possessed by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S. at 625.  If the answer is "yes," then the ban is unconstitutional, because a state cannot prohibit ordinary law-abiding Americans from possessing what the Constitution explicitly entitles them to "keep."  *See* U.S. Const. amend. II.

142.    The magazines that §11 of Measure 114 bans are indisputably "arms" within the meaning of the Second Amendment.  *See* U.S. Const. amend. II.  The right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate.  As the Ninth Circuit has put it, "without bullets, the right to bear arms would be meaningless."  *Jackson*, 746 F.3d at 967. And §11 of Measure 114 does more than just ban detachable magazines; it defines the term "large capacity magazine" to include *fixed* magazines as well, thus effectively banning commonplace firearms themselves.

143.    The first question under *Bruen* is whether "the Second Amendment's plain text covers an individual's conduct."  142 S.Ct. 2426.  The text of the Second Amendment guarantees "the people" the right "to keep and bear Arms."  U.S. Const. amend. II.  Thus, the Supreme Court has made clear that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Bruen*, 142 S.Ct. at 582.  And the word "arms" meant at the Founding the same thing it "mean[s] today"—namely, "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another,'" not just those things that are necessary for self-defense.  *Heller*, 554 U.S. at 581 (quoting 1777 dictionary).  The magazines and firearms that §11 of Measure 114 prohibits are therefore "arms."

144.    To be sure, not all arms are constitutionally protected, in the same way that that the First Amendment does not protect fighting words and obscenity even though they are literally "speech."  But the Supreme Court has made clear—twice—that the Second Amendment protects arms that are "in common use today."  *Bruen*, 142 S.Ct. at 2142; *see also Heller*, 554 U.S. at 624-25 (Second Amendment protects arms "typically possessed by law-abiding citizens for lawful purposes," as opposed to those typically possessed by criminals for criminal purposes).

145.    The magazines and firearms that §11 of Measure 114 prohibits plainly satisfy that test.  As noted, magazines capable of holding more than 10 rounds come standard with many of the most popular handguns and long guns on the market.  Indeed, *every single one* of the 10 highest-selling pistols in 2022 comes standard with such a magazine.  Americans own more than 100 million of these arms, which today account for "approximately half of all

privately owned magazines in the United States." *Duncan,* 19 F.4th at 1097.  In short,

millions of Americans own millions of these arms for lawful purposes, including self-

defense, sporting, and hunting.

146.    Because magazines capable of holding more than 10 rounds and firearms with

fixed magazines of such capacity are arms typically possessed by law-abiding citizens for

lawful purposes, they are protected by the Second Amendment—full stop.  *Bruen*, 142 S.Ct.

at 2134.  Oregon's effort to ban them is thus blatantly unconstitutional.

147.    At a bare minimum, the arms that §11 of Measure 114 ban are "presumptively

protect[ed]" by the Second Amendment, so Oregon would have to "affirmatively prove that

its [magazine ban] is part of the historical tradition that delimits the outer bounds of the right

to keep and bear arms."  *Id.* at 2126.

148.    Oregon cannot come close to making that showing.  There were no restrictions

on firing or magazine capacity when either the Second Amendment or the Fourteenth

Amendment was ratified.  The first state to restrict magazine capacity did not do so until

*1990*, and laws enacted for the first time in the twentieth century "come too late to provide

insight into the meaning of [the Constitution]."  *Id.* at 2137 (alteration in original) (quoting

*Sprint*, 554 U.S. at 312 (Roberts, C.J., dissenting)); *see id.* at 2138 (rejecting reliance on

"late-19th-century [laws]").

149.    Indeed, Oregon cannot even identify a "well-established" tradition of

restricting magazine capacity *today*.  *Id.* at 2133.  Only a handful of jurisdictions have laws

analogous to Measure 114's flat ban on possessing magazines capable of holding 10 or more

rounds.  As for the federal government, it did not restrict magazine capacity until 1994—and

Congress allowed that law to expire in 2004 after a study by the Department of Justice revealed that the law had produced "no discernable reduction" in gun violence. Christopher S. Koper et al., U.S. Dep't of Justice, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003, Rep. to the Nat'l Inst. of Justice* 96 (2004), https://bit.ly/3wUdGRE.

150.    The absence of historical laws restricting firing capacity is not the result of some "dramatic technological change[]" that came about in the past few decades or some "unprecedented societal concern[]" that did not exist until 1990. *Bruen*, 142 S.Ct. at 2132. Firearms capable of firing more than 10 rounds long predate the Founding. *See Duncan*, 970 F.3d at 1147. They were marketed to and bought by civilians, for self-defense, hunting, and other lawful purposes, from the start. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty. Gen. of N.J.*, 974 F.3d 237, 255 (3d Cir. 2020) (Matey, C.J. dissenting). Indeed, the federal government itself sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount just as the AR-15 and its standard 30-round magazine came on the market. *Duncan*, 970 F.3d at 1148. In short, "magazines of more than ten rounds ha[ve] been well established in the mainstream of American gun ownership" for a very long time. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions,* 78 Alb. L. Rev. 849, 862 (2015).

151.    Defendants have not identified and cannot identify any "enduring American tradition of state regulation" forbidding the purchase and/or possession of magazines capable of holding more than 10 rounds by law-abiding citizens for lawful purposes. *Bruen*, 142 S.Ct. at 2135. Because Oregon cannot "affirmatively prove that its firearms regulation is

part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id.* at 2127, §11 of Measure 114 unconstitutionally infringes upon Second Amendment rights, *id.* at 2130.

## COUNT FOUR
### (Fifth Amendment Takings Clause – "Large Capacity Magazine" Ban)

152.    All paragraphs above are realleged and incorporated by reference.

153.    The Takings Clause provides that "private property" shall not "be taken for public use, without just compensation."  U.S. Const. amend. V; *see Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 239 (1897) (applying Takings Clause to the states).

154.    The Takings Clause protects against two kinds of governmental takings: (1) "physical appropriation[s]" of "interest[s] in property"; and (2) "restriction[s] on the use of property" (known as "regulatory takings").  *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015).

155.    A physical taking occurs whenever the government "dispossess[es] the owner" of property.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982).  That is true of both real property and personal property; the "categorical duty" the Takings Clause imposes applies "when [the government] takes your car, just as when it takes your home."  *Horne*, 576 U.S. at 358; *see Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner.").  It is true even if the dispossession arises from a regulation, rather than from the use of eminent domain:  "Government action that physically appropriates property

is no less a physical taking because it arises from a regulation." *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021). And it is true, finally, even when the government-authorized "invasion" is only partial. *Id.* at 2072.

156.    Oregon's confiscatory ban in §11 of Measure 114 plainly runs afoul of these settled principles. The new law makes it a crime for licensed gun dealers to continue to possess in Oregon magazines and firearms that they lawfully acquired and that, but for the new law, they would lawfully sell to law-abiding citizens.

157.    "A licensed gun dealer" that currently possesses "large-capacity magazines" in Oregon can avoid committing a "crime" under Measure 114 only if, "within 180 days of the effective date of this 2022 Act," it:

> (A) Transfers or sells the large-capacity magazines in the gun dealer's inventory to a non-resident gun dealer or other transferee outside of this state;
>
> (B) Purchases or acquires temporary custody from an owner of any large-capacity magazine for permanent removal from this state within the 180 days of the effective date of this 2022 Act;
>
> (C) Permanently alters any large-capacity magazine in the gun dealer's inventory or custody so that it is not capable, upon alteration or in the future, of accepting more than 10 rounds of ammunition or permanently alter the magazine so it is no longer a [sic]; or
>
> (D) Permanently disposes of the large-capacity magazines in the gun dealer's custody or inventory.

§11(3)(a). In other words, a licensed gun dealer in Oregon can avoid criminal liability only by sending its "large-capacity magazines" out of state, rendering them inoperable (and thus unsalable), or dispossessing itself altogether. And come June 7, 2023, not even those options will be on the table.

158.    By forcing licensed gun dealers to physically surrender, destroy, or send away their lawfully acquired property, Measure 114 effects a physical taking.

159.    Courts assess physical takings "using a simple, per se rule:  The government must pay for what it takes."  *Cedar Point*, 141 S.Ct. at 2071.

160.    Because Measure 114 offers no compensation for the lawfully acquired property it turns into unlawful contraband, it violates the Takings Clause.

161.    To the extent Measure 114 does not effect a physical taking, it effects an unconstitutional regulatory taking as to both dealers and manufacturers and individuals.  *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537-39 (2005) (a regulation that "goes too far"—by, for example, depriving a property owner of economically beneficial use or otherwise "interfer[ing] with legitimate property interests"—also constitutes a taking that requires just compensation).  But for Measure 114, these magazines and firearms would be salable and in demand (as evidenced by the fact that Americans have purchased hundreds of millions of them and counting).  And but for Measure 114, individuals who already possess them would be able to continue putting them to all the same uses to which they put any other lawfully acquired and possessed arm.  Measure 114 has deprived them of the value they had when they were lawfully acquired.

## COUNT FIVE
### (Fourteenth Amendment Due Process Clause – "Large Capacity Magazine" Ban)

162.    All paragraphs above are realleged and incorporated by reference.

163.    Under the Due Process Clause of the Fourteenth Amendment, government may deprive individuals of their property only when doing so furthers a "legitimate governmental objective."  *Lingle*, 544 U.S. at 542.  Due process protections are particularly

acute when a law applies retroactively to change the consequences of conduct that was lawful at the time. *See E. Enters. v. Apfel*, 524 U.S. 498, 547-50 (1998) (Kennedy, J., concurring in part and dissenting in part).

164.   By making it a crime to continue to possess property that they lawfully acquired, Measure 114 deprives persons of protected property interests without due process of law, as prohibiting the possession and full use of lawfully acquired and commonly owned magazines based solely on their ability to accept more than 10 rounds does not further a "legitimate governmental objective" in a permissible way. *Lingle*, 544 U.S. at 542.

165.   For largely the same reasons that it violates the Takings Clause, Measure 114's confiscatory ban violates the Due Process Clause.

166.   Moreover, Measure 114 violates law-abiding citizens' due process rights by treating all magazines capable of holding more than 10 rounds of ammunition and firearms with fixed magazines of such capacity as contraband even if individuals lawfully acquired them, and by requiring individuals who lawfully acquired such products to "affirmative[ly] defen[d]" themselves in a criminal prosecution. §11(2), (5).

## COUNT SIX
### (Vagueness – "Large Capacity Magazine" Ban)

167.   All paragraphs above are realleged and incorporated by reference.

168.   Measure 114 defines "large-capacity magazine" to mean "a fixed or detachable magazine, belt, drum, feed strip, helical feeding device, or similar device, including any such device joined or coupled with another in any manner, or a kit with such parts, that has an overall capacity of, *or that can be readily restored, changed, or converted*

*to accept*, more than 10 rounds of ammunition and allows a shooter to keep firing without having to pause to reload[.]"  §11(1)(d) (emphasis added).

169.    The highlighted clause—"or that can be readily restored, changed, or converted to accept"—is unconstitutionally vague.

170.    To satisfy "[t]he due process clause of the Fourteenth Amendment," all state laws "must be intelligible, defining a 'core' of proscribed conduct that allows people to understand whether their actions will result in adverse consequences." *orbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000). "[V]agueness review is even more exacting" when "a statute subjects transgressors to criminal penalties, as this one does." *Id.* "In addition to defining a core of proscribed behavior to give people constructive notice of the law, a criminal statute must provide standards to prevent arbitrary enforcement." *Id.* (citing *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999)). "Without such standards, a statute would be impermissibly vague even if it did not reach a substantial amount of constitutionally protected conduct, because it would subject people to the risk of arbitrary deprivation of their liberty." *Id.* at 1011-12.

171.    In light of these principles, the Sixth Circuit has held that a provision of a municipal ordinance defining "assault weapon" to mean "any firearm which *may be restored* to an operable assault weapon as defined in [other provisions]" was "unconstitutionally vague in its own right" (*i.e.*, not just in combination with the other provisions) because "the phrase 'may be restored' fails to provide sufficient guidance to a person of average intelligence as to what is prohibited." *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 537 (6th Cir. 1998) (emphasis added).

172.    The same conclusion obtains here.  Measure 114 provides no guidance as to what "readily restored" means.  Does it mean able to "be restored by the person in possession, or [simply that it] may be restored by a master gunsmith using the facilities of a fully-equipped machine shop[?]" *Id.*  Nothing in Measure 114 directs citizens where to look to determine the answer.

173.    And that is all the more problematic given that Measure 114 lacks any sort of knowing requirement or other mens rea element.  Even an individual who concededly does not know that an arm he possesses can be "readily restored" is still subject to criminal punishment under Measure 114.  That is not consistent with due process.

174.    In short, "the provision, which imposes strict liability, violates the constitutional requirement that a law give fair warning of that which it prohibits."  *Id.*

## PRAYER FOR RELIEF

Plaintiffs pray for the following relief from the Court:

A.  a declaratory judgment under 28 U.S.C. §2201 that Oregon Measure 114 is unconstitutional;

B.  a preliminary injunction enjoining Defendants and their officers, agents, and employees from enforcing Oregon Measure 114;

C.  a permanent injunction enjoining Defendants and their officers, agents, and employees from enforcing Oregon Measure 114;

D.  any attorneys' fees, costs, and expenses to which Plaintiffs may be entitled by law;

E.  nominal damages; and

F.  any further relief the Court deems just and proper.

Respectfully submitted,

DATED: January 4, 2023.          By:      s/ Stephen Joncus
                                          Stephen J. Joncus, OSB #013072
                                          JONCUS LAW PC
                                          13203 SE 172nd Ave Ste 166 #344
                                          Happy Valley, Oregon 97086
                                          971.236.1200
                                          steve@joncus.net

                                          Leonard W. Williamson, OSB #910020
                                          VAN NESS WILLIAMSON LLP
                                          960 Liberty St. SE, Ste 100
                                          Salem, Oregon 97302
                                          503.365.8800
                                          l.williamson@vwllp.com

                                          *Attorneys for OFF Plaintiffs*