Stephen J. Joncus, OSB #013072
JONCUS LAW PC
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
971.236.1200
steve@joncus.net

Leonard W. Williamson, OSB #910020
VAN NESS WILLIAMSON LLP
960 Liberty St. SE, Ste 100
Salem, Oregon 97302
503.365.8800
l.williamson@vwllp.com

*Attorneys for OFF Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al.,<br><br>               Plaintiffs,<br><br>     v.<br><br>KATE BROWN, et al.,<br><br>               Defendants. | Civil No. 2:22-cv-01815-IM (*Lead Case*)<br>Civil No. 3:22-cv-01859-IM (*Trailing Case*)<br>Civil No. 3:22-cv-01862-IM (*Trailing Case*)<br>Civil No. 3:22-cv-01869-IM (*Trailing Case*)<br><br>CONSOLIDATED CASES<br><br><br>**FIRST DECLARATION OF CLAYTON CRAMER**<br><br>**(PERMIT SYSTEM)** |
| MARK FITZ, et al.,<br><br>               Plaintiffs,<br><br>     v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br><br>               Defendants. | |
| KATERINA B. EYRE, et al.,<br><br>               Plaintiffs,<br><br>     v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>               Defendants. | |

DANIEL AZZOPARDI, et al.,

                    Plaintiffs,

         v.

ELLEN F. ROSENBLUM, et al.,

                    Defendants.

Stephen J. Joncus, OSB No. 013072
JONCUS LAW P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
Telephone: (971) 236-1200 steve@joncus.net

Leonard W. Williamson, OSB No. 910020
VAN NESS, WILLIAMSON LLP
960 Liberty Road S., Ste 100
Salem, Oregon 97302
Telephone: (503) 365-8800
l.williamson@vwllp.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **OREGON FIREARMS FEDERATION, INC.**, an Oregon public benefit corporation; **BRAD LOHREY**, Sherman County Sheriff; **ADAM JOHNSON, CODY BOWEN**, Union County Sheriff; **BRIAN WOLFE**, Malheur County Sheriff; **HAROLD RICHARD HADEN, JR.**, <br><br> Plaintiffs, <br><br> v. <br><br> **GOVERNOR KATE BROWN**, Governor of Oregon, and **ATTORNEY GENERAL ELLEN ROSENBLUM**, Attorney General of Oregon, and **TERRI DAVIE**, Superintendent of the Oregon State Police, <br><br> Defendants. | Civil No. 2:22-cv-01815-IM <br><br> **FIRST DECLARATION OF CLAYTON CRAMER** <br><br> **(PERMIT SYSTEM)** |

# TABLE OF AUTHORITIES

**Cases**

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2119 (2022)..........................................................................................................................3, 5

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2136 (2022)..............................................................................................................................6

Watson v. Stone, 4 So.2d 700, 703 (Fla. 1941).....................................................................10

**Statutes**

1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, 1636-1776 79 (1850)..............................................................................................................................6

2 Hening, STATUTES AT LARGE 481 (1823). ...........................................................................6

4 Hening, STATUTES AT LARGE, 131 (1820). ..........................................................................7

75 ARCHIVES OF MARYLAND 268..........................................................................................7

Fla. Sess. Laws (1866), at 25.................................................................................................9

Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly (1820), 39............................................................................................................10

North Carolina  sess. Laws, ch. 30 quoted in State v. Newsom, 27 N.C. 250 (1844)..............................................................................................................................8

Revised Laws of Indiana, in Which Are Comprised All Such Acts of a General Nature as Are in Force in Said State; Adopted and Enacted by the General Assembly at Their Fifteenth Session (1831), 192. .............................................................10

Revised Statutes of the State of Arkansas, Adopted at the October Session of the general Assembly of Said State, A.D. 1837 (1838), Div. VIII, Art. I, § 13, p. 280 ...........................................................................................................................10

Shurtleff, 4 (part 2) RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY 365 (1854)....................................................................................7

State v. Newsom, 27 N.C. 252 (1844)....................................................................................9

**Other Authorities**

Boston (Mass.), "Blank License to Keep and Sell Gunpowder in the City of Boston," (1833?),.............................................................................................................8

Boston Board of Fireworks, An Act, Further Regulating the Storage, Safe Keeping, and Transportation of Gunpowder, in the Town of Boston, Together With the Rules and Regulations of the Firewards, Relative to the Same (1821) ..................................................................................................................8

Clayton E. Cramer, ARMED AMERICA: THE REMARKABLE STORY OF HOW AND WHY GUNS BECAME AS AMERICAN AS APPLE PIE (2007) ...................................................4

Clayton E. Cramer, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM......................................................4

Clayton E. Cramer, FOR THE DEFENSE OF THEMSELVES AND THE STATE: THE ORIGINAL INTENT AND JUDICIAL INTERPRETATION OF THE RIGHT TO KEEP AND BEAR ARMS (1994).......................................................................................................4

Clayton E. Cramer, Nicholas J. Johnson, George A. Moscary, *This Right Is Not Allowed by Governments That are Afraid of the People: The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 GEO. MASON L. REV. 823, 855-6 (2009-2010) ................................................. 9

Edward McPherson, THE POLITICAL HISTORY OF THE UNITED STATES OF AMERICA DURING THE PERIOD OF RECONSTRUCTION 35 (2d ed. 1875) (1871) ..................................................................................................................................... 9

Florence Olsen, *Bellesiles Resigns From Emory After University Report Questions His Research for Book on Guns,* CHRONICLE OF HIGHER EDUCATION, Oct. 28, 2002 ................................................................................................... 4

Jen Matteis, *Michael Bellesiles: Bartender, Writer, History Buff*, THE DAY, Sep. 17, 2012 ....................................................................................................................... 4

LOCK, STOCK, AND BARREL: THE ORIGINS OF AMERICAN GUN CULTURE (2018) ...................................................................................................................................... 5

Oral Arguments, Dec. 7, 2022, Moore v. Harper (2022 .............................................................. 5

Pamela Haag, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016) ........................................................................................ 5

Peter Schmidt, *Columbia U. Rescinds Bancroft Prize Awarded to Michael Bellesiles for Book on Gun Ownership,* CHRONICLE OF HIGHER EDUCATION, Dec. 16, 2002 ................................................................................................ 4

*Race-Specific and Religion-Specific Gun Control Statutes,* http://claytoncramer.com/primary/primary.html#RaceGunControlStatutes ....................... 7

I, Clayton Cramer, declare as follows:

## I.    PURPOSE

1.    This Expert Declaration and Report examines the history of firearms licensing and restriction in the United States in the years before 1868. Why 1868? Bruen established an analytical schema under which the constitutional "good fit" for a modern law is that it, or an analog, existed before 1791, when the states ratified the Second Amendment or before 1868, when the states ratified the Fourteenth Amendment, incorporating the Second Amendment against the states. Laws passed after the ratification of the Fourteenth Amendment are considered non-probative for establishing the intent of the authors of the Fourteenth Amendment and the states that ratified it.[1]

During oral arguments in Moore v. Harper (2022), counsel for Moore asserted

> But -- so it can be a confirming -- that subsequent history as in Bruen can be a confirming historical tradition that -- that -- but it can't undermine what the text and the founding era history show to be the case.

None of the Justices disputed that characterization.[2]

For this reason, the only laws that we need examine are those in effect before 1868.

## II.   THE NATURE OF MY RESEARCH

Since 1989, when I changed my undergraduate major from computer science to history, I have dedicated myself to examining three interwoven threads: weapons regulation, black history, and mental illness treatment.  Some years back, a weak advocate of gun

---

[1] ""Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." … The Second Amendment was adopted in 1791; the Fourteenth in 1868." New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2119 (2022).

[2] Oral Arguments, Dec. 7, 2022, Moore v. Harper (2022).

regulation paid me to read through every colonial statute in effect or passed by the newly

independent states between 1775 and 1789 that in some way impacted firearms possession or

use. (This was more than 10,000 pages, all but a few of which were available online.) This

included laws regulating possession, carrying, hunting, Sabbath-breaking, and gunpowder

storage.

For my second book (also my last undergraduate research paper), FOR THE DEFENSE

OF THEMSELVES AND THE STATE: THE ORIGINAL INTENT AND JUDICIAL INTERPRETATION OF

THE RIGHT TO KEEP AND BEAR ARMS (1994), I read through hundreds of decisions by state

supreme courts and both U.S. Supreme and appellate court decisions, tracing each back to

decisions of first impression. (To do this, I read through the dust of centuries at UC Hastings

Law Library; nothing ancient was yet online.)

For my fifth book and master's thesis, CONCEALED WEAPON LAWS OF THE EARLY

REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM (1999), I again pored

through antebellum sources, more commonly newspapers on microfilm, which is far more

unpleasant than the dust of previous centuries.

Book six, ARMED AMERICA: THE REMARKABLE STORY OF HOW AND WHY GUNS

BECAME AS AMERICAN AS APPLE PIE (2007) examined and refuted the briefly accepted

claims of Professor Michael Bellesiles that guns were scarce in antebellum America,

Americans did not hunt, and generally guns were very tightly regulated. The ensuing

brouhaha as I and other scholars checked his claims led to an unprecedented revocation of

his Bancroft Prize[3] and his middle of the school year "resignation" of a tenured professorship

---

[3] Peter Schmidt, *Columbia U. Rescinds Bancroft Prize Awarded to Michael Bellesiles for Book on Gun Ownership,*

at Emory University,[4] followed by a new position tending bar.[5]

Book ten, LOCK, STOCK, AND BARREL: THE ORIGINS OF AMERICAN GUN CULTURE (2018) shredded claims almost identical to Bellesiles' in Pamela Haag, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).  She apparently failed to examine the controversy that destroyed Bellesiles reputation.  Her errors appear to have been failures to read sources in context and tendentious reading of sources, as opposed to the crude alteration of quotes and misrepresentation of sources which undid Bellesiles.

For these reasons, I consider myself rather uniquely qualified in the history of American gun regulation.

## III.    WHICH LAWS ARE RELEVANT?

Bruen established an analytical schema under which the constitutional "good fit" for a modern law is that it, or an analog, existed before 1791, when the states ratified the Second Amendment or before 1868, when the states ratified the Fourteenth Amendment, incorporating the Second Amendment against the states. Laws passed after the ratification of the Fourteenth Amendment are considered non-probative for establishing the intent of the authors of the Fourteenth Amendment and the states that ratified it.[6]

---

CHRONICLE OF HIGHER EDUCATION, Dec. 16, 2002, https://www.chronicle.com/article/columbia-u-rescinds-bancroft-prize-awarded-to-michael-bellesiles-for-book-on-gun-ownership/, last accessed December 14, 2022..

[4] Florence Olsen, *Bellesiles Resigns From Emory After University Report Questions His Research for Book on Guns,* CHRONICLE OF HIGHER EDUCATION, Oct. 28, 2002, https://www.chronicle.com/article/bellesiles-resigns-from-emory-after-university-report-questions-his-research-for-book-on-guns/, last accessed December 14, 2022.

[5] Jen Matteis, *Michael Bellesiles: Bartender, Writer, History Buff,* THE DAY, Sep. 17, 2012, https://www.theday.com/person-of-the-week/20120917/michael-bellesiles-bartender-writer-history-buff/, last accessed December 14, 2022.

[6] ""Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." … The Second Amendment was adopted in 1791; the Fourteenth in 1868."  New York State Rifle & Pistol

During oral arguments in Moore v. Harper (2022), counsel for Moore asserted

> But -- so it can be a confirming -- that subsequent history as in Bruen can be a confirming historical tradition that -- that -- but it can't undermine what the text and the founding era history show to be the case.

None of the Justices disputed that characterization.[7]

For this reason, the only laws that we need examine are those in effect before 1868.

Bruen also places the burden *on the government* to demonstrate that the historical evidence exists to defend the constitutionality of a law:

> To support. that claim, the burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct.[8]

## III.    LICENSING OF FIREARMS

### A.    Colonial Licensing

Laws licensing firearms possession are surprisingly scarce in American history before 1868.  More typically, colonies and states utterly prohibited possession or carrying of arms by members of suspect groups.  Example include a 1642 Connecticut statute: "It is ordered that noe man within this Jurisdiction shall directly or indirectly [mend], repaire, or cause to be [mended] or repaired, any gun, smale or great, belonging to any Indean, nor shall [endeavor] the same, nor shall sell or [give] to any Indean, directly or indirectly such gun or

---

Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2119 (2022).

[7] Oral Arguments, Dec. 7, 2022, Moore v. Harper (2022).

[8] .New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2136 (2022).

gunpowder, or shott, or lead, or mould, or military weapons, or armor…"[9]  Virginia in 1680

prohibited: ""any negroe or other slave to carry or arme himselfe with any club, staffe, gunn,

sword or any other weapon of defence or offence…[10]

Similar racial and sectarian discriminatory laws from the colonial period with images

of the statutes can be found at *Race-Specific and Religion-Specific Gun Control Statutes*

http://claytoncramer.com/primary/primary.html#RaceGunControlStatutes for Connecticut,

Delaware Georgia, Maryland, Massachusetts, New Jersey, North Carolina, Pennsylvania, and

Virginia.[11]

Where licensing appears in the colonial period it is always applicable to the

dangerous sorts, as defined by race.  In the same legislative session that disfranchised free

blacks, Virginia passed a law regulating gun ownership by free blacks and Indians: "That

every free negro, mulatto, or Indian, being a house-keeper, or listed in the militia, may be

permitted to keep one gun, powder, and shot."  Those blacks and Indians who were "not

house-keepers, nor listed in the militia" were required to dispose of their weapons by the end

of October 1723.  Blacks and Indians living on frontier plantations were required to obtain a

license from a justice of the peace "to keep and use guns, powder, and shot."[12]

Some references to licenses refer to a master's permission, not a governmentally

issued license.  This 1715 Maryland statute is a good exemplar: ""That no Negro or other

---

[9]  1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, 1636-1776 79 (1850)

[10] 2 Hening, STATUTES AT LARGE 481 (1823).

[11] *Race-Specific and Religion-Specific Gun Control Statutes,*
http://claytoncramer.com/primary/primary.html#RaceGunControlStatutes, last accessed December 14, 2022.

[12] 4 Hening, STATUTES AT LARGE, 131 (1820).

slave, within this Province, shall be permitted to carry any Gun or any other offensive Weapon, from off their Master's Land, without License from their said Master...."[13]

Other licenses are specifically licenses to *sell*, not requirements for buyers or possessors to have a license. In 1668, the Massachusetts General Court licensed the sale of "pouder, shott, lead, guns, i.e., handguns" to Indians "not in hostility with us or any of the English in New England."[14]

### B.    1791-to 1868 Licensing

Most licensing laws of this period are not *firearms* possession licenses but gunpowder storage licenses.  Boston's 1821 ordinance licensed possession of more than five pounds of gunpowder within the city.  Wholesalers and retailers were regulated as to the quantities, storage methods, and public notice, but quantities under five pounds were exempt from all regulation.[15]  At least one additional gunpowder licensing law from 1833 has left its mark in the form of a blank license.[16]

The only antebellum licensing law of which I have found record is from North Carolina.

> *Be it enacted, etc*. That if any free negro, mulatto, or free person of color, shall wear or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger or bowie-knife, unless he or she shall have

---

[13] 75 ARCHIVES OF MARYLAND 268.

[14] Shurtleff, 4 (part 2) RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY 365 (1854).

[15] Boston Board of Fireworks, *An Act, Further Regulating the Storage, Safe Keeping, and Transportation of Gunpowder, in the Town of Boston, Together With the Rules and Regulations of the Firewards, Relative to the Same* (1821).  Hagley Museum and Library.

[16] Boston (Mass.), "Blank License to Keep and Sell Gunpowder in the City of Boston," (1833?), Massachusetts Historical Society.

obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor, and may be indicted therefor.[17]

Defendant Newsome challenged the constitutionality of the statute as violating both the Second Amendment and the North Carolina Constitution's arms guarantee. The North Carolina Supreme Court followed Barron v. Baltimore (although scrambled into Barrow v. Baltimore) to take the Second Amendment out of consideration. The idea that the authors of the North Carolina Constitution could have included free blacks as members of "the people" protected by the state arms guarantee was so absurd that, "If so, then is the whole of our legislation upon the subject of free negroes void. From the earliest period of our history free people of color have been among us as a separate and distinct class, requiring, from necessity in many cases, separate and distinct legislation."[18]

After the Civil War, the resistant Southern legislatures enacted the Black Codes which prescribed licensing of firearms possession. One example from the state of South Carolina:

Persons of color constitute no part of the militia of this State, and no one of them shall, without permission in writing from the district judge or magistrate, be allowed to keep a fire-arm, sword, or other military weapon , except that one of them, who is the owner of a farm may keep a shot-gun or rifle, such as is ordinarily used in hunting, but not a pistol, musket, or other fire-arm or weapon appropriate for purposes of war.[19]

Florida adopted a similar licensing law in 1866:

---

[17] North Carolina  sess. Laws, ch. 30 quoted in State v. Newsom, 27 N.C. 250 (1844).

[18] State v. Newsom, 27 N.C. 250, 252 (1844).

[19] Edward McPherson, THE POLITICAL HISTORY OF THE UNITED STATES OF AMERICA DURING THE PERIOD OF RECONSTRUCTION 35 (2d ed. 1875) (1871).

Sec 12. Be it further enacted, That it shall not be lawful for any negro, mulatto, or other person of color, to own, use or keep in his possession or under his control, any Bowie-knife, dirk, sword, fire-arms or ammunition of any kind, unless he first obtain a license to do so from the Judge of Probate of the county in which he may be a resident for the time being.[20]

Union General Sickles responded to the South Carolina statute directing declaring that "[t]he constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless, this shall not be construed to sanction the unlawful practice of carrying concealed weapons, nor to authorize any person to enter with arms on the premises of another against his consent. "[21]   These Black Codes, limiting the civil rights blacks provoked passage of the Civil Rights Act of 1866 and eventually the 14th Amendment.[22]

## V.   SUMMARY

The reader may wonder why the firearms licensing over which most legal battles have been fought these last few years are not herein mentioned: the licensing of concealed carry. The answer is that licensing of concealed carry is a post-1868 phenomenon.  Concealed weapon laws were complete bans with ill-defined exceptions:

Sec. 1.  *BE it enacted by the General Assembly of the State of Indiana*, That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be fined in any sum not exceeding one hundred dollars, for the use of county seminaries: *Provided however*, that this act shall not be so construed as to affect travellers.[23]

---

[20] Fla. Sess. Laws (1866), at 25.

[21] McPherson *supra* n. 19, at 37.

[22] Clayton E. Cramer, Nicholas J. Johnson, George A. Moscary,  *This Right Is Not Allowed by Governments That are Afraid of the People: The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 GEO. MASON L. REV. 823, 855-6 (2009-2010).

[23] *Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly* (1820), 39.

The 1831 Indiana ban,[24] and the 1838 Arkansas ban,[25] are similar.  The idea of licensing concealed carry is a post-1868 innovation which allowed respectable whites to obtain licenses while keeping blacks and unrespectable whites from engaging in armed self-defense.  Justice Buford concurring opinion in Watson v. Stone (Fla. 1941) (an unlicensed carry prosecution) explains this:

> I know something of the history of this legislation. The original Act of 1893 was passed when there was a great influx of negro laborers in this State drawn here for the purpose of working in turpentine and lumber camps. The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers and to thereby reduce the unlawful homicides that were prevalent in turpentine and saw-mill camps and to give the white citizens in sparsely settled areas a better feeling of security. The statute was never intended to be applied to the white population and in practice has never been so applied. We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in the rural sections of Florida have violated this statute. It is also a safe guess to say that not more than 5% of the men in Florida who own pistols and repeating rifles have ever applied to the Board of County Commissioners for a permit to have the same in their possession and there has never been, within my knowledge, any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention to the Constitution and non-enforceable if contested.[26]

The licensing of firearms, for possession or carry is a very modern idea in America except when applied to Indians and blacks.  Indeed, only three laws come immediately in sight that do so, and all are race specific.

## BACKGROUND AND QUALIFICATIONS

---

[24]. *Revised Laws of Indiana, in Which Are Comprised All Such Acts of a General Nature as Are in Force in Said State; Adopted and Enacted by the General Assembly at Their Fifteenth Session* (1831), 192.

[25]. *Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837* (1838), Div. VIII, Art. I, § 13, p. 280.

[26] Watson v. Stone, 4 So.2d 700, 703 (Fla. 1941).

A copy of my *curriculum vitae* is attached to this Declaration as **Exhibit Cramer-1**.

I attended Sonoma State University where I received a Bachelor of Arts and master's degree in history. My Master's Thesis was "Concealed Weapon Laws of the Early Republic".

I was awarded First Place by the Association for Education in Journalism and Mass Communication Ethics Prize for my article "Ethical Problems of Mass Murder Coverage in the Mass Media," *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

I am currently employed as an Adjunct Professor College of Western Idaho, Nampa, teaching Western Civilization I and U.S. History I.

My publication "Why Footnotes Matter: Checking Arming America's Claims," *Plagiary* 1(11):1-31 (2006) revealed the falsehoods presented in Michael A. Bellesiles's book "Arming America: The Origins of a National Gun Culture" (New York: Alfred A. Knopf, Inc., 2000), including significant discrepancies in American history and citations and quotes that did not match the historical record. Bellesiles' book contained quotations taken out of context, which completely reversed the author's original intent. Dates were altered and statutory text was changed to completely reverse the meaning of the law. The sheer volume of these errors, and their consistent direction, would seem to preclude honest error. Emory University conducted an investigation that strongly criticized Bellesiles' ethical standards; Bellesiles resigned from his tenured position at Emory. Columbia University initially awarded Bellesiles the Bancroft prize for his book "Arming America", but revoked the award after my research proved that the book was fraudulent.

**My publications include:**

· Lock, Stock, and Barrel: The Origins of America Gun Culture, Praeger Press, 2018;

· *Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*, CreateSpace, 2016;

· *Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*, CreateSpace, 2016;

· *My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*, CreateSpace, 2012;

· "What Did 'Bear Arms' Mean in the Second Amendment?" *Georgetown Journal of Law and Public Policy*, 6:2 [2008]. Co-authored with Joseph Edward Olson;

· *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*, Nelson Current, 2006;

· *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*, Praeger Press, 1999;

· *Black Demographic Data*, 1790-1860: *A Sourcebook*, Greenwood Press, 1997;

· *Firing Back: Defending Your Right to Keep and Bear Arms*, Krause Publishing, 1995;

· *For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*, Praeger Press, 1994;

· *By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine*, Editor, Library Research Associates, Inc., 1990

I was retained at a rate of $75/hour to prepare this declaration.

My compensation is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinion.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on December 19, 2022.

*Clayton C. Cramer*

_____

Clayton Cramer

# EXHIBIT CRAMER-1

**Clayton E. Cramer**
36 Sunburst Road
Horseshoe Bend, ID 83629
(208) 793-3044
clayton@claytoncramer.com
http://www.claytoncramer.com

**EDUCATION:**

|  |  |
|---|---|
| June 1998 | Sonoma State University, Rohnert Park, California
M.A. in History |
| June 1994 | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic"
B.A. in History |
|  | *Honors*: *cum laude* and With Distinction |

**AWARDS:**

1993   Association for Education in Journalism and Mass Communication Ethics Prize
          First Place, Undergraduate Division

**TEACHING EXPERIENCE:**

| | |
|---|---|
| Fall, 2017 – present | *Adjunct Faculty*: College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
| Fall, 2014 – Spring, 2017 | Recovering from stroke |
| Spring, 2010 – Spring, 2014 | *Adjunct Faculty*: College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
| Fall, 2009 – Summer 2010 | *Adjunct Faculty*: ITT Technical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**. |
| Fall, 2003 | *Adjunct Faculty*: Boise State University, teaching **U.S. Constitutional History** and at George Fox University (Boise Center), teaching **America and the World**. |

1996            ***Teaching Assistant***: Assisted Professor Peter Mellini in his course "Twentieth Century World." I graded quizzes, exams, and answered weekly written questions from students. I also prepared and lectured about the rise of totalitarianism in the period between the world wars.

## BOOKS:

*Lock, Stock, and Barrel: The Origins of America Gun Culture* Praeger Press, 2018

*Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America CreateSpace, 2016*

*Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause* CreateSpace, 2016

*My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill CreateSpace, 2012*

*Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie* Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook* Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms* Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine,* editor Library Research Associates, Inc., 1990

**SELECTED PUBLICATIONS:**

"Bellesiles' Arming America Redux: Does the Gunning of America Rewrite American History to Suit Modern Sensibilities?" Southern Illinois University Law Journal Spring 2017 Forthcoming "

"Assault Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America's* Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic." *Ideas on Liberty* 52:9 [September, 2002] 17-22.

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

"An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241.  Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

## CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995

American Society of Criminology, San Diego, Cal., November, 1997.  "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002.  "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v. *Heller* (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

**WORKS CITED IN COURT DECISIONS:**

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

"Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester,* 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien,* 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008). In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine,* 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting); *U.S.* v. *Emerson,* 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010).

"A Tale of Three Cities," cited in *State* v. *Mendoza,* 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic,* cited in *Senna* v. *Florimont,* 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

**LANGUAGES:**

Very basic reading competence in German.

**OTHER SKILLS:**

I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance. I also have an unusually detailed knowledge of the physical sciences (for an historian), a deep interest in the history of science and technology, and how both influence society.