Shawn M. Lindsay
shawn@jurislawyer.com
JurisLaw LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: (503) 968-1475
  *Attorney for Eyre Plaintiffs*


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Case No. 2:22-cv-01815-IM *(Lead Case)* |
| Plaintiffs, | Case No. 3:22-cv-01859-IM *(Trailing Case)* |
| | Case No. 3:22-cv-01862-IM *(Trailing Case)* |
| v. | Case No. 3:22-cv-01869-IM *(Trailing Case)* |
| KATE BROWN, et al., | |
| Defendants. | CONSOLIDATED CASES |
| | **EYRE PLAINTIFFS' SUPPLEMENTAL** |
| MARK FITZ, et al., | **MEMORANDUM IN SUPPORT OF** |
| Plaintiffs, | **MOTION FOR PRELIMINARY** |
| | **INJUNCTION** |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |
| KATERINA B. EYRE, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |
| DANIEL AZZOPARDI, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |

EYRE PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

JURISDICTION ................................................................................................................. 8

ARGUMENT ..................................................................................................................... 8

I.      Plaintiffs Are Likely To Succeed On The Merits ............................................... 8

      A.      The Permit-to-Purchase Regime Is Unconstitutional ........................... 8

      B.      The Magazine Ban Is Unconstitutional ............................................... 14

            1.      The magazine ban violates the Second Amendment ............................... 14

            2.      The magazine ban violates the Fifth and Fourteenth Amendments .............................................. 23

II.      The Remaining Factors All Favor Injunctive Relief ...................................... 27

CONCLUSION ............................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*,
  910 F.3d 106 (3d Cir. 2018) ........................................................................................ 17, 20

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*,
  974 F.3d 327 (3d Cir. 2020) ........................................................................................ 19, 21

*Bank Markazi v. Peterson*,
  578 U.S. 212 (2016) ........................................................................................................ 26

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) .......................................................................................................... 3

*Cal. Hosp. Ass'n v. Maxwell-Jolly*,
  776 F.Supp.2d 1129 (E.D. Cal. 2011) ............................................................................. 28

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ............................................................................................ 8

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940) .................................................................................................... 2, 10

*Cedar Point Nursery v. Hassid*,
  141 S.Ct. 2063 (2021) ................................................................................................ 23, 24

*Chi., Burlington & Quincy R.R. Co. v. City of Chicago*,
  166 U.S. 226 (1897) ........................................................................................................ 23

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998) ........................................................................................................ 14

*Craig v. Boren*,
  429 U.S. 190 (1976) ........................................................................................................ 27

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................................................. *passim*

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ......................................................................................... 28

*Duncan v. Becerra*,
  970 F.3d 1133 (9th Cir. 2020) ................................................................................. *passim*

*E. Enters. v. Apfel*,
  524 U.S. 498 (1998) ............................................................................................. 25, 26, 27

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ................................................................. 15

*Fyock v. City of Sunnyvale,*
    25 F.Supp.3d 1267 (N.D. Cal. 2014) ...................................................... 18

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) .............................................................. 18

*Horne v. Dep't of Agric.,*
    576 U.S. 350 (2015) ......................................................................... 23, 24

*Jackson v. City & Cnty. of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) ................................................................. 15

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005) ............................................................................... 25

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982) ............................................................................... 23

*Luis v. United States,*
    578 U.S. 5 (2016) ..................................................................................... 8

*Maryland Shall Issue, Inc. v. Hogan,*
    971 F.3d 199 (4th Cir. 2020) ................................................................. 27

*McCutcheon v. FEC,*
    572 U.S. 185 (2014) ............................................................................... 13

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ................................................................. 28

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) .................................................................. 17

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    142 S.Ct. 2111 (2022) ..................................................................... *passim*

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
    458 U.S. 50 (1982) ................................................................................. 25

*Penn Cent. Transp. Co. v. City of N.Y.,*
    438 U.S. 104 (1978) ............................................................................... 27

*Peoples Rights Org., Inc. v. City of Columbus,*
    152 F.3d 522 (6th Cir. 1998) ................................................................... 7

*Planned Parenthood Arizona, Inc. v. Humble*,
    753 F.3d 905 (9th Cir. 2014) .......................................................................... 27

*Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*,
    561 F.2d 1327 (9th Cir. 1977) .................................................................. 25, 26

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ...................................................................... 28

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S.Ct. 63 (2020) ........................................................................................ 8

*Schad v. Borough of Mount Ephraim*,
    452 U.S. 61 (1981) ....................................................................................... 25

*Shuttlesworth v. Birmingham*,
    394 U.S. 147 (1969) ..................................................................................... 10

*Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
    535 U.S. 302 (2002) ..................................................................................... 23

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008) ................................................................................. 9, 20

*Texaco, Inc. v. Short*,
    454 U.S. 516 (1982) ..................................................................................... 14

*United States v. Knights*,
    534 U.S. 112 (2001) ..................................................................................... 13

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976) ........................................................................................ 26

**Constitutional Provision**

U.S. Const. amend. V ............................................................................................ 23

**Other Authorities**

*10 Highest Selling Pistols of 2022 (So Far)*, Refactor Tactical
    (Apr. 21, 2022), https://bit.ly/3FBEH1K ....................................................... 16

Appendix B, Oregon State Police, *Criminal Justice Information Services Division,*
    *2020 FICS Program Overview*, https://bit.ly/3BNMSGT
    (last visited Jan. 6, 2022) ............................................................................... 5

H.W.S. Cleveland, *Hints to Riflemen* (1864) ..................................................... 22

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022) ................................................................ 15, 16, 17

Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529 (2021) .................................................................................. 9

Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* (Bombardier Books 2022) ................................................................................ 21

2 J. Story, *Commentaries on the Constitution* (5th ed. 1891) ...................................... 26

Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (3d ed. 2021) ............................................................... 21

7 *Journals of the Continental Congress 1774-1789* (1907) ........................................ 21

David Kopel, *Magazines Over 10 Rounds Were Well-known to the Founders*, Reason (Feb. 11, 2020), https://bit.ly/3uZRHJF ...................................... 21

David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303 (2016) ........................................... 9

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) .................................................................. 16, 21, 22

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice* (2004), https://bit.ly/3wUdGRE .................. 20

Samuel Niles, *A Summary Historical Narrative of the Wars in New England*, in Mass. Hist. Soc. Collections, 4th ser., vol. 5 (1837) .............................................. 20

Op. & Order, *Oregon Firearms Federation, Inc. v. Brown*, No. 2:22-cv-01815-IM (D. Or. Dec. 6, 2022) ........................................................................ 9, 14

Ida B. Wells, *Southern Horrors and Other Writings: The Anti-Lynching Campaign of Ida B. Wells, 1892-1900* (1997) ........................................................ 22

## INTRODUCTION

Last fall, Oregon voters narrowly adopted Ballot Measure 114, the "Changes to Firearm Ownership and Purchase Requirements Initiative." Measure 114 creates a "permit-to-purchase" regime that vests local officials with broad discretion to deny law-abiding citizens the ability to acquire a firearm—even if they have passed a background check. Measure 114 labels this a "shall issue" regime, but it is not. Indeed, it is clear on the face of the law that Oregon's new regime suffers from the very defects that led the Supreme Court to invalidate New York's carry licensing scheme in *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022).

"[T]o be issued a permit-to-purchase" under Measure 114, an applicant not only must satisfy objective criteria—completing a criminal background check and an approved firearm safety course (which is currently impossible), and paying a fee—but also must convince the permit agent that she is not "reasonably likely to be a danger to self or others, or to the community at large," §§4(1)(b)(C), 5(2). That latter component is a textbook example of "granting licensing officials discretion to deny licenses based on a perceived lack of … suitability." *Bruen*, 142 S.Ct. at 2123. Although states may "require applicants to undergo a background check or pass a firearms safety course" to ensure "that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" *id.* at 2138 n.9 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)), states may not give officers discretion to exercise on-the-spot subjective judgment about applicants' "suitability" to keep or bear arms, *id.* Measure 114 plainly does the latter. As §5(2)—which repeats §4(1)(b)(C) verbatim—makes clear, an officer may deny an application, *even if an applicant has passed a background check* and completed an approved safety course, if he perceives the applicant to be "reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state." §5(2). That is a pure judgment call that requires permit agents to "apprais[e] … facts" and "form[]" a subjective "opinion"—verboten

"features that typify proper-cause standards like [the] New York[]" regime the Court invalidated in *Bruen*. 142 S.Ct. at 2138 n.9 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)).

Allowing officers to deny permits necessary to exercise a fundamental right based on on-the-spot subjective judgments is perhaps the most palpable problem with Oregon's new permit-to-purchase regime, but it is not the only one. Delay is baked into the new regime at every turn. First, Measure 114 makes all firearms transactions contingent on receiving a green light from the Oregon State Police ("OSP")—it is now a crime to transfer a firearm if OSP has not yet returned the results of a background check, *see* §§6(3)(C), (13)(b), (14), 7(3)(d)(B), 8(3)(B)(c)—but it imposes no time constraints on OSP's investigation, and it creates no mechanism to impel OSP to act. Second, even if OSP returns a background check in a timely manner and the applicant satisfies all objective and subjective criteria, the permit agent can sit on the application for 30 days after making a determination, §4(3)(a), during which time the proven-to-be-law-abiding applicant cannot acquire a firearm. Third, after that 30-day clock has run out and the law-abiding citizen has a permit-to-purchase in hand, the process starts over again: Measure 114 requires *another* background check (and requires the transferor to wait for the completed results) before a firearm may be transferred. None of that is consistent with the Supreme Court's teaching that the Second Amendment does not countenance "regimes" that impose "lengthy wait times in processing license applications" and thus effectively "deny ordinary citizens their right to [keep and bear arms]." *Bruen*, 142 S.Ct. at 2138 n.9. Oregon's new permit-to-purchase regime is unconstitutional many times over.

Separately, Measure 114's ban on commonplace arms violates the Second Amendment and the Takings Clause. The Supreme Court has made clear that when a court confronts a flat ban on the possession of a type of arm, the only question is whether the arm at issue is "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625; *see, e.g.*, *Caetano v.*

*Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring).  If the answer to that question is "yes," then the ban is unconstitutional, because a state cannot prohibit law-abiding Americans from possessing what the Constitution explicitly entitles them to "keep."  The answer here is plainly "yes."  Measure 114 makes it a crime to manufacture, sell, use, or even just possess any "fixed or detachable magazine … that has an overall capacity of … more than 10 rounds of ammunition." §11(1)(d).  Millions of law-abiding American citizens own tens (if not hundreds) of millions of these arms, nearly all of which are kept and borne for lawful purposes, including self-defense. While a small number of bad actors have used similar arms to perpetrate crimes, the *typical* person who possesses these arms is a law-abiding citizen who keeps and bears them for lawful purposes. Measure 114's flat ban on commonplace arms violates the Second Amendment.

It violates the Takings Clause as well.  Measure 114 does more than just ban the manufacture, sale, or use of a "large capacity magazine"; it also bans its mere possession.  This prohibition is particularly onerous as to those plaintiffs who are licensed gun dealers, as Measure 114 does not give them the option to retain possession of any of these commonplace, otherwise-salable products.  A licensed gun dealer can avoid criminal liability only if, within 180 days, it sends its "large-capacity magazines" out of state, renders them inoperable (and thus unsalable), or dispossesses itself altogether.  Because none of those options enables the dealer to keep its property, they are not sufficient to evade the government's obligation to provide just compensation.

Finally, the remaining factors support injunctive relief.  Denial of a constitutional right is the quintessential irreparable injury, and the need for immediate relief is only more evident when the injury involves physical dispossession of property.  Oregon has gone its entire history without subjecting individuals' ability to exercise fundamental rights to the whims of government officials or taking common arms away from law-abiding citizens.  It should not be allowed to start now.

EYRE PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
           MOTION FOR PRELIMINARY INJUNCTION

## BACKGROUND

1. Under Measure 114, an ordinary law-abiding citizen cannot lawfully acquire a firearm without a "permit-to-purchase."  *See* §§6(2)(a), (2)(d), (3)(c), 7(3)(a), (3)(d)(B), 8(2), 9(2).  And individuals must run a gauntlet before they can obtain the new permit—and when (or if) they finally get one, they are still not entitled to acquire a firearm:  "A permit-to-purchase issued under this section does not create any right of the permit holder to receive a firearm."  §4(6)(a).

The first step on the long, winding path to securing a permit-to-purchase is completing a "firearms training course."  §4(1)(b)(D).  That sounds straightforward, but it is not.  Oregon does not provide training courses, and Measure 114 does not require it to do so, or even contemplate the possibility that it ever will.  The state instead apparently expects individuals to obtain training privately, at their own expense.  And not just any course will suffice; to secure the requisite state approval, a course must, among other things, include an "in-person demonstration" of proficiency with a firearm and "utiliz[e] instructors certified by a law enforcement agency."  §4(8)(a), (c)(D).  No course that satisfies those stringent requirements presently exists because no instructor has been so "certified."  Yet, again, only after an individual manages to (someday) find and complete an approved course can that individual even submit an application for a "permit-to-purchase."

If an individual clears that hurdle—which is currently impossible, as no training courses have been approved—she must submit to fingerprinting and photographing at a local sheriff's office or police station, where a permit agent can demand "any additional information determined necessary by department rules" and can even deny her application on the spot if he "conclude[s] that [she] has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state."  §4(1)(b)(C), (1)(c).

Satisfying a permit agent that one is not "a danger" is not the end of the process.  At that point, after collecting the application fee, the permit agent must reach out to OSP to conduct a

EYRE PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

background check.  §4(1)(e).  Oregon law imposes no time constraint on OSP's investigation.  That is a problem, because (1) OSP's own statistics show that it typically takes weeks to complete a background check, *see* Appendix B, Oregon State Police, *Criminal Justice Information Services Division, 2020 FICS Program Overview*, https://bit.ly/3BNMSGT (last visited Jan. 6, 2022), and (2) Measure 114 repeals the longstanding Oregon-law provision that allowed dealers to "deliver [a] firearm to [a] purchaser" when OSP "fail[ed] to provide a unique approval number to a gun dealer or to notify the gun dealer that the purchaser is disqualified … before the close of the gun dealer's next business day following the request by the gun dealer for a criminal history record check," ORS 166.412(3)(c) (repealed), and replaces it with a blanket ban on transfers unless and until OSP gives the green light.  Under Measure 114 §6(3)(c), a "dealer may not transfer the firearm unless the dealer receives a unique approval number from the department," under any circumstances, and it is a crime to "[k]nowingly sell[] or deliver[] a firearm … prior to receiving a unique approval number from the department," even if the purchaser already has a concealed handgun license, §6(14).  Measure 114 thus grinds to a halt lawful, constitutionally protected transactions.  Indeed, even if OSP expeditiously determines that an individual has passed the background check, it can wait another 30 days to issue the permit, §4(3)(a), without which it is unlawful to purchase (or sell) a firearm, *see* §6(14).

Measure 114 also gives broad discretion to officials to exercise subjective judgments about who is (and is not) suitable to acquire a firearm—transforming (what on paper is) a shall-issue regime into an impermissible, subjective may-issue regime.  Even if an individual passes the OSP background check, the sheriff or police chief to whom she initially applied for the permit retains discretion to exercise on-the-spot judgment about whether to deny the application.  To repeat: Even if an individual completed a valid training course, paid the require fee, and passed a complete

background check, the permit agent can *still* deny the application—and thus prevent the law-abiding citizen from being able to lawfully obtain a firearm—based on his subjective judgment that the law-abiding citizen "is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state." §5(2).

An individual who secures a "permit-to-purchase" despite all the hurdles and discretion might think that she could now finally go to a licensed dealer and purchase the firearm that the Constitution entitles her to keep and bear. But she would be wrong. Once someone comes to a licensed dealer with a "permit-to-purchase" in hand, the process starts anew. The dealer must take her thumbprint, §§6(2)(c), 10(a), 11; verify that her "permit-to-purchase" is valid by cross-referencing a state database, §6(2)(d); and, finally, ask OSP to perform *another* background check, §6(2)(d). The dealer cannot transfer the firearm until OSP gives the green light, and—again—there is no time limit on OSP or mechanism to force it to act. The same duplicative hurdles apply at gun shows. *See* §§8(2), 9(2). And private parties seeking to transfer a firearm between them in a non-commercial setting may not do so *at all*; they must appear in person before a licensed gun dealer, where the transferee must present a permit-to-purchase—but, once again, the dealer must ask OSP to conduct another background check and await a "unique approval number"; and if the results are delayed or unknown, the transfer is off. §7(3)(a), (3)(c), (3)(d)(A), (3)(d)(B).

2. In addition to creating a regime that effectively prohibits people from obtaining firearms unless they complete as-yet-nonexistent training courses and satisfy a local officer that they are subjectively suitable to exercise a fundamental constitutional right, Measure 114 bans commonplace arms outright. Measure 114 creates the brand-new "crime of unlawful manufacture, importation, possession, use, purchase, sale or otherwise transferring of large-capacity magazines." §11(2). The term "large-capacity magazine" is defined as "a fixed or detachable

magazine, belt, drum, feed strip, helical feeding device, or similar device, including any such device joined or coupled with another in any manner, or a kit with such parts, that has an overall capacity of, or that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition and allows a shooter to keep firing without having to pause to reload."  §11(1)(d).

Unlike the few other states that have tried to ban magazines capable of holding more than 10 rounds, moreover, Oregon has not confined itself to prohibiting detachable magazines.  Under Measure 114, a firearm with a magazine "contained in or permanently attached to [it] in such a manner that the device cannot be removed without disassembly of the firearm action" is now contraband if it "has an overall capacity of, *or that can be readily restored, changed, or converted to accept*, more than 10 rounds of ammunition."  §11(1)(c), (d) (emphasis added).  No guidance is given on what that language means.  *See Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 537 (6th Cir. 1998) (invalidating ordinance using similar language as void for vagueness).

Measure 114's new crime is punishable by up to 364 days in prison and a $6,250 fine.  *See* 11(6) (classifying the new crime as "a class A misdemeanor"); ORS 161.615(1) (setting maximum prison sentence for class A misdemeanors); ORS 161.635(1)(a) (setting maximum fine for class A misdemeanors).  And it applies not only to the use, sale, or manufacture of such arms going forward, but to mere possession—even if the individual or business possessing these arms lawfully acquired them well before Measure 114 was proposed, let alone took effect.  Finally, while individuals who acquired these arms before Measure 114 took effect may keep them on their premises and may take them under certain narrow conditions to a few enumerated locations, licensed gun dealers in Oregon have no such "keep" option.  Dealers can avoid criminal liability only by sending these arms out of state, rendering them inoperable, or dispossessing of them altogether.  And come 180 days from the operative date, not even those options will be on the table.

## JURISDICTION

Plaintiffs challenge the validity of Oregon Ballot Measure 114 under 42 U.S.C. §1983 and the U.S. Constitution.  This Court has jurisdiction under 28 U.S.C. §1331.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must show that it is "likely to prevail" on the merits of its claims, that denying an injunction "would lead to irreparable injury," and that "granting relief would not harm the public interest," so "the equities favor injunctive relief." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 66 (2020) (per curiam); *id.* at 74 (Kavanaugh, J., concurring); *see California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) ("Likelihood of success on the merits is the most important factor.").  Each of those factors is satisfied here.

## I.    Plaintiffs Are Likely To Succeed On The Merits.

### A.   The Permit-to-Purchase Regime Is Unconstitutional.

The first question under *Bruen* is whether "the Second Amendment's plain text covers an individual's conduct."  142 S.Ct. at 2126.  The relevant conduct here is acquiring a firearm.  *See* §§3(4), 4, 5(2), 6(2)(a), 6(3)(c), 7(3)(a), 7(3)(d)(B), 8(2), 9(2) (imposing various restrictions on an individual's ability "to purchase or acquire a firearm").  The Second Amendment's plain text clearly covers that conduct, as one can neither "keep [nor] bear Arms," U.S. Const. amend. II, if one cannot acquire an arm in the first place.  *See Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring) ("Constitutional rights … implicitly protect those closely related acts necessary to their exercise.") (citing examples).    Measure 114 thus treads on ground "presumptively protect[ed]" by the Constitution—which means that, to justify Measure 114's restrictions on acquiring firearms, Defendants "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 142 S.Ct. at 2126.

Defendants cannot do so.  Only six states have ever had a permit-to-*purchase* regime for any substantial period of time—and all of those came in the twentieth century:  New York (1911), Oregon (1913, later repealed), North Carolina (1919), Missouri (1921, later repealed), Connecticut (1923), Michigan (1927, later partially repealed), Hawaii (1927), New Jersey (1927), and Texas (1931, later declared void).  *See* David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 360-61 (2016); Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529, 543 (2021).  That is too little and "too late to provide insight into the meaning of" constitutional provisions adopted long beforehand.  *Bruen*, 142 S.Ct. at 2137 (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting)).  As *Bruen* made clear, the kind of historical tradition the government must prove to justify a burden on Second Amendment rights is "an enduring American tradition of state regulation" that dates back to the Founding (or Reconstruction), not just a handful of later laws from "outlier jurisdictions."  *Id.* at 2155-56; *see id.* at 2138 (rejecting reliance on "a handful of late-19th-century [analogues]").  A few twentieth-century laws from a few jurisdictions hostile to Second Amendment rights does not "an enduring American tradition" make.  *Id.* at 2140.[1]

This Court previously opined "that Measure 114's permit-to-purchase requirements track squarely with the objective regime outlined in *Bruen*."  Op. & Order 32, *Oregon Firearms Federation, Inc. v. Brown*, No. 2:22-cv-01815-IM (D. Or. Dec. 6, 2022), Dkt.39 ("TRO Order").  Respectfully, that is wrong on at least two dimensions.  As an initial matter, *Bruen* dealt with a

---

[1] Even if these regimes were analogous to Measure 114's, that would not matter.  *Bruen* made clear that reasoning by analogy is appropriate only when "unprecedented societal concerns or dramatic technological changes" make the search for a dead-ringer futile.  142 S.Ct. at 2132.  That alone presents an insuperable obstacle for the state, as there is nothing novel or unique to the twenty-first century about the problem it claims it seeks to address.

EYRE PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

challenge to a permitting regime for public *carry* licenses.  That regime, which the Supreme Court invalidated for unconstitutionally burdening Second Amendment rights, at least left the right to *keep* arms for self-defense intact.  Under Measure 114, by contrast, an individual cannot even obtain a firearm to keep in the home for self-defense without first obtaining a permit.  What is "good enough" for a carry-license regime is therefore not necessarily good enough for a permit-to-purchase regime like the one Oregon has just adopted.

In all events, Oregon's new regime flunks *Bruen*'s standard even taking it on its own terms. *Bruen* made clear that regimes that "grant[] licensing officials discretion to deny licenses based on a perceived lack of … suitability" are flatly inconsistent with the Second Amendment and the notion that it guarantees a fundamental right.  142 S.Ct. at 2123.  Yet, under Measure 114, an applicant must convince a permit agent that she is not "reasonably likely to be a danger to self or others, or to the community at large," *even if she has already demonstrated that she is a law-abiding citizen* by passing a background check and completing a safety course.  §§4(1)(b)(C), 5(2). Measure 114 thus crosses the line from a permissible shall-issue regime that provides "'narrow, objective, and definite standards' [to] guid[e] licensing officials," *Bruen*, 142 S.Ct. at 2138 n.9 (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)), to an impermissible shall-issue-in-name-only regime that "requir[es] the 'appraisal of facts, the exercise of judgment, [or] the formation of an opinion,'" *id.* (quoting *Cantwell*, 310 U.S. at 305).  After all, no objective and definite standards guide officers in determining whether a law-abiding citizen (which is what one *is* if one has passed a background check and completed a training course) "is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state."  §§4(1)(b)(C), 5(2).  That is a pure judgment call—as evidenced by the fact that §§4(1)(b)(C) and 5(2) separately authorize officers to deny applications if dangerousness is

"demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence." After all, whether someone has committed "unlawful violence" (or made "threats of unlawful violence") in the "past" is an objective inquiry. Yet Measure 114 goes far beyond that. Upholding a state law that allows government officials to deny *law-abiding citizens* a permit that is a prerequisite to exercising a fundamental right, based on the officials' subjective evaluation of "the applicant's mental or psychological state," would turn the Second Amendment into a "second-class right" all over again. *Bruen*, 142 S.Ct. at 2156.

That is perhaps the most obvious problem with Oregon's new permit-to-purchase regime, but it is far from the only one. In addition to unconstitutional subjective discretion, delay is baked into the new regime at every turn. First, Measure 114 imposes no time constraints on OSP's investigation and creates no mechanism to impel OSP to act, but it makes all firearms transactions contingent on OSP giving the green light: Under Measure 114, it is a crime to transfer a firearm if OSP has not yet returned the results of a background check for the transferee, even if weeks have passed since the request was submitted. §§6(3)(C), (13)(b), (14), 7(3)(d)(B), 8(3)(B)(c). Second, even if OSP returns a background check in a timely manner and the applicant satisfies all objective and subjective criteria, the permit agent can sit on the application for 30 days after making a determination. §4(3)(a). That 30-day deadline is arguably unconstitutional all by itself; there is no other context in which the government can prevent citizens from exercising a fundamental right *for a month* on a whim. Third, even though a background check is required to get a permit, when a permitholder goes to purchase a firearm, Measure 114 requires *another* background check (and requires the transferor to wait for the completed results) before a firearm may be transferred. Perhaps a law with one of these features could pass muster. But a law with all three of them is a classic illustration of a licensing regime "put toward abusive ends." *Bruen*, 142 S.Ct. at 2138 n.9.

After all, *Bruen* went out of its way to underscore that the Second Amendment *does not countenance* "regimes where, for example, *lengthy wait times in processing* license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.* (emphasis added).

Oregon's regime also creates significant costs and barriers to compliance. Oregon may suggest that the sticker price is just $65 for the first license and then $50 to renew every five years thereafter. *See* §4(3)(b), (7)(c). But that masks other costs embedded in the regime. Those amounts, after all, cover only the license fee. They do not account for the price of completing a safety course and live-fire training. *See* §§4(1)(a)(D), (8)(c)(D). And while Oregon may argue that no one knows what those expenditures will be, that just underscores the problem. While Measure 114 requires classes, it makes no provision for offering them, and the state has not yet certified any privately offered classes. Oregon has thus tasked law-abiding citizens with paying unknown amounts for non-existent courses, and all just to exercise a fundamental right.

Compounding all the other constitutional concerns, the state is rushing to implement Measure 114 before it has set up the systems by which it can be administered. Oregon has not yet funded or set up the systems required to administer its new and onerous permitting scheme. As of right now, there still is no training course that has been certified by the state, which means that no one can lawfully obtain a permit-to-purchase. *See* Sec. Decl. of Kevin L. Campbell on behalf of the Oregon Association of Chiefs of Police ¶12; Sec. Decl. of Jason Myers on behalf of the Oregon State Sheriffs' Association ¶¶12-13. Even if there were approved courses, moreover, OSP has not put in place the background check system necessary to process applications, which (again) means that no one can lawfully obtain a permit-to-purchase. When it comes down to it, to acquire a firearm in Oregon, a citizen will need to comply with a regime that does not exist.

None of that is remotely consistent with the Second Amendment.  Oregon's regime marks a radical departure even from the most restrictive state regimes in place today.  That is not owing to some "dramatic technological change[]" or "unprecedented societal concern."  *Bruen*, 142 S.Ct. at 2132.  As the Supreme Court articulated just last June, there is nothing novel about the concern that firearms might fall into the wrong hands.  *See id.* at 2156.  And while *traditional*, objective-only, time-limited background-check regimes have been used to address that concern for decades, no other jurisdiction has seen fit to layer background check upon background check, unconstrained by any time limits to conduct them, along with a command to take a not-yet-existent firearms course that the jurisdiction has no intention of ever providing, all the while reserving to permitting officials discretion to ignore the results of the background check and deny a permit based on their own subjective assessment of whether someone seems too dangerous to trust with a firearm.

Such government efforts to pile "prophylaxis-upon-prophylaxis" are fundamentally inconsistent with the very notion of a fundamental right.  *McCutcheon v. FEC*, 572 U.S. 185, 221 (2014) (plurality op.).  Indeed, given that Measure 114's duplicative requirements apply every time someone seeks to acquire a firearm, no matter how many times or how recently a person has passed a background check, the new regime is arguably most akin to a form of probation, under which the state engages in constant supervision of anyone who seeks to exercise their Second Amendment rights, always assuming that any such person must be "more likely … to violate the law" than to follow it.  *United States v. Knights*, 534 U.S. 112, 120 (2001).  To countenance such an extraordinary incursion on the right to keep and bear arms would be fundamentally inconsistent with the notion that the Second Amendment protects a fundamental right in the first place.

Precisely because of the haste with which the state has rushed to impose its novel regime, moreover, Measure 114 violates not one, but two constitutional provisions.  The Due Process

Clause protects against arbitrary government action, especially when the result is to deprive individuals of the ability to exercise a fundamental substantive right secured by the Constitution. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998); *Texaco, Inc. v. Short*, 454 U.S. 516, 554 (1982) (Brennan, J., dissenting) ("[T]he Due Process Clause of the Fourteenth Amendment was designed to guard owners of property from the wholly arbitrary actions of state governments."). Yet, as things stand now, if Measure 114's permitting provisions take effect, it will be impossible for individuals to comply. Oregon has not yet funded or set up the systems required to administer its new and onerous permitting scheme; no training courses are approved; and OSP has no background check system in place. Add it all up, and Oregon will soon require Oregonians looking to acquire a firearm to comply with a regime that does not exist and cannot be satisfied. That is the very definition of arbitrary government action in violation of due process.

> **B.    The Magazine Ban Is Unconstitutional.**
>
> **1.    The magazine ban violates the Second Amendment.**

As explained, the first question under *Bruen* is whether "the Second Amendment's plain text covers an individual's conduct." 142 S.Ct. at 2126. As to Measure 114's magazine ban, the answer, once again, is "yes." The relevant conduct is keeping and bearing magazines capable of holding more than 10 rounds, whether "detachable" or "fixed." *See* §11(1)(d), (2); *see also* §11(1)(b), (c). And those are plainly "Arms" within the meaning of the Second Amendment.

This Court previously found, based on the limited arguments and materials available to it at the time, that "magazines capable of accepting more than ten rounds of ammunition" are not "covered by the plain text of the Second Amendment" because they are not "necessary to the use of firearms for self-defense." TRO Order 19-20. Respectfully, whether something is "necessary to the use of firearms for self-defense" is not the right question under *Bruen* and *Heller*. Indeed, if that were the right question, then state and local governments could ban all manner of feeding

devices and restrict firing capacity to one round in the chamber, as most people thankfully *never* need to actually fire their firearms for self-defense. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 26 (May 13, 2022) ("[I]n most defensive gun uses[,] the gun was not fired[.]"). The analysis the Supreme Court has identified instead sensibly focuses on the right guaranteed by the Second Amendment's text—which guarantees a right to keep and bear arms, full stop, not a right to keep and bear only those arms that the government deems "necessary" for self-defense. The first question thus is not how "necessary" the prohibited magazines are to self-defense, but simply whether they constitute bearable arms, as "the Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (emphasis added). Here, the answer is "yes": The prohibited magazines are "Arms."

At the Founding, an "Arm" was understood to mean "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id.* at 581 (quoting Founding-era dictionary). A "fixed magazine" is obviously a "thing" that a law-abiding citizen carries for self-defense; just like a trigger, it is a core component of what that citizen will "use[]" in the unfortunate event that her life or limb is threatened (whether the use is mere brandishing or actual firing), and "cannot be removed without disassembly of the firearm action." *See* §11(1)(c). While "detachable magazines" can be removed, they are no less "Arms"; after all, "'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)). The magazines that Measure 114 bans are "Arms" covered by the plain text of, and thus presumptively protected by, the Second Amendment.

Because magazines capable of holding more than 10 rounds constitute "bearable arms," the state may ban them only if it can prove that they are not "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. And as *Bruen* made clear, the state must show that these bearable arms are not commonly possessed *today*. 142 S.Ct. at 2143.

Defendants cannot begin to make that showing. Americans currently possess roughly 100 million detachable magazines capable of holding more than 10 rounds; these magazines account today for "approximately half of all privately owned magazines in the United States." *Duncan v. Becerra*, 970 F.3d 1133, 1142 (9th Cir. 2020).[2] And Americans own millions more firearms with fixed magazines of similar capacities. Indeed, nearly all of the top-selling pistols come standard with a magazine capable of accepting more than 10 rounds, *see 10 Highest Selling Pistols of 2022 (So Far)*, Refactor Tactical (Apr. 21, 2022), https://bit.ly/3FBEH1K (listing top ten pistols across all calibers), and America's longtime best-selling rifle, the AR-15, comes standard with either a 20- or 30-round capacity, David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859-60 (2015). What is more, these arms are not just popular for popularity's sake. They are marketed for self-defense; they often come standard with the most popular self-defense firearms; and they are overwhelmingly chosen by Americans specifically for self-defense. Decl. of Mark Hanish ¶17; *see National Firearms Survey*, *supra*, at 26-33 (describing numerous instances in which a citizen reported that "it would have been useful for defensive purposes to have a firearm with a magazine capacity in excess of 10 rounds"). This has been true for decades. Hanish Decl. ¶18. Indeed, "48.0% of gun owners—about 39 million individuals— have owned magazines that hold over 10 rounds (up to 542 million such magazines in total), and

---

[2] *Reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).

30.2% of gun owners—about 24.6 million individuals—have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total)." *National Firearms Survey*, *supra*, at 1-2, 20.

To be sure, some criminals have used similar arms to perpetrate horrible crimes. But that was equally true (indeed, more so) of the handguns that the Supreme Court held protected in *Heller*. *See Heller*, 554 U.S. at 682 (Breyer, J., dissenting) (arguing that the government should be able to ban "handguns" because handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly favorite weapon of armed criminals"). The Court held handguns protected nonetheless because our historical tradition focuses on what typical *law-abiding* citizens choose to keep and bear for self-defense, not how much damage an arm could cause in the hands of a criminal. *See id.* at 625 (majority op.) (holding that only "those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," are "not protect[ed]" within "the scope of the right"). In short, under *Heller* and *Bruen*, only those bearable arms "that 'are highly unusual in society at large'" fall outside what "the Second Amendment protects." *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).

It is little surprise, then, that courts throughout the country have held (or at least assumed) that magazines capable of holding more than 10 rounds, whether detachable or fixed, satisfy the typically-possessed test. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs v. Attorney Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) ("The record shows that millions of magazines are owned, … often come factory standard with semi-automatic weapons, … [and] are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense[.]"), *abrogated on other grounds by Bruen*, 142 S.Ct. 2111 (2022); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("[S]tatistics suggest that about 25 million large-capacity magazines were available in 1995, … and nearly 50 million such magazines—or nearly two large-capacity

magazines for each gun capable of accepting one—were approved for import by 2000."); *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend.").

Unable to dispute that the magazines Oregon has banned are typically possessed by millions of law-abiding citizens for lawful purposes, Defendants have instead argued that such magazines are rarely *used* to expend more than 10 rounds in self-defense settings. But that is not what matters. As the Supreme Court recently reiterated, the Second Amendment guarantees not just the right to *use* firearms for self-defense should a confrontation arise, but the right to "be[] armed and ready for offensive or defensive action in a case of conflict with another person." *Bruen*, 142 S.Ct. at 2134 (quoting *Heller*, 554 U.S. at 584). The test for which arms are covered thus focuses on whether the arms in question are "typically *possessed* by law-abiding citizens for lawful purposes" like self-defense, *Heller*, 554 U.S. at 625 (emphasis added), not on how often people actually need to use a particular arm to defend themselves or to fire a particular number of rounds when faced with a confrontation that requires self-defense. Indeed, the fact that "few people 'will require a particular firearm to effectively defend themselves' … should be celebrated, and not seen as a reason to except magazines having a capacity to accept more than ten rounds from Second Amendment protection." *Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267, 1276 (N.D. Cal. 2014), *aff'd*, 779 F.3d 991 (9th Cir. 2015). And, again, "nearly half of all magazines in the United States today hold more than ten rounds," and "such magazines are overwhelmingly owned and used for lawful purposes. This is the antithesis of unusual." *Duncan*, 970 F.3d at 1147.[3]

---

[3] Defendants' argument that more than a few rounds of ammunition are rarely expended in self-defense situations also elides the reality that, "in certain situations," "[l]imiting the law-abiding

Because magazines capable of holding more than 10 rounds are "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, the state may not ban them, period. As *Bruen* made clear, that *is* the historical test for determining whether arms fall outside the scope of the Second Amendment's protections. *See Bruen*, 142 S.Ct. at 2143. And under that test, the "Arms" that Oregon has seen fit to ban—millions of which are possessed today by millions of law-abiding Americans—plainly do not fall outside the Second Amendment's ambit. That is the end of the matter, as a state obviously may not flatly prohibit what the Constitution protects.

At a bare minimum, the arms Measure 114 bans are "presumptively protect[ed]" by the Second Amendment, which means that Defendants at the very least must "affirmatively prove that [the magazine ban] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126-27. Defendants cannot come close to making that showing either.

There were no restrictions on firing or magazine capacity when the Second Amendment (or the Fourteenth Amendment) was ratified, and "history reveals a long gap between the development and commercial distribution of magazines, on the one hand, and limiting regulations, on the other hand." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*, 974 F.3d 327, 258 (3d Cir. 2020) (Matey, C.J., dissenting), *cert granted, vacated*, 142 S.Ct. 2894 (2022). "[W]hen the Founders ratified the Second Amendment, no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some 200 years. Only during Prohibition did a handful of state legislatures enact capacity restrictions," and "'most of those laws were invalidated by the 1970s.'" *Duncan*, 970 F.3d at 1150 (quoting *Ass'n of N.J. Rifle & Pistol Clubs*,

---

citizen to a magazine of ten rounds or less will clearly limit their ability to protect themselves from violent criminals." Decl. of Massad Ayoob ¶6; *National Firearms Survey*, *supra*, at 26-33 (describing cases in which a citizen reported that "it would have been useful for defensive purposes to have a firearm with a magazine capacity in excess of 10 rounds"); Ayoob Decl. ¶¶7-17 (similar).

910 F.3d at 117 n.18).  As for the federal government, it did not restrict magazine capacity until 1994—and Congress allowed that law to expire in 2004 after a Justice Department study revealed that it had produced "no discernable reduction" in gun violence.  Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice* 96 (2004), https://bit.ly/3wUdGRE.  Defendants cannot even identify a "well-established" tradition of restricting magazine capacity in existence *today*, *see Bruen*, 142 S.Ct. at 2133, as only a handful of jurisdictions have laws analogous to Measure 114's sweeping ban.  In any event, all of these laws, enacted for the first time in the twentieth century, "come too late to provide insight into the meaning of [the Constitution]." *Bruen*, 142 S.Ct. at 2137 (alteration in original) (quoting *Sprint*, 554 U.S. at 312 (Roberts, C.J., dissenting)); *see id.* at 2138 (rejecting as anachronistic the state's reliance on "late-19th-century [laws]" supposedly analogous to the challenged regime).

The absence of historical laws restricting firing capacity is not the result of some "dramatic technological change[]" that happened in the past few decades or some "unprecedented societal concern[]" that did not exist until 1990.  *Id.* at 2132.  Firearms capable of rapidly firing more than 10 rounds without reloading long predate the Founding.  *See Duncan*, 970 F.3d at 1147 ("Semi-automatic and multi-shot firearms were not novel or unforeseen inventions to the Founders, as the first firearm that could fire more than ten rounds without reloading was invented around 1580.");  Decl. of Ashley Hlebinsky ¶20.  In 1722, Boston gunsmith John Pim manufactured and sold an 11-shot repeater that, according to historical accounts, "was discharged eleven times following, with bullets, in the space of two minutes," "loaded but once."  Samuel Niles, *A Summary Historical Narrative of the Wars in New England*, in Mass. Hist. Soc. Collections, 4th ser., vol. 5, at 347 (1837).  Lorenzoni repeaters "made by London gunsmith John Cookson" were particularly popular

among colonists "in the eighteenth century."  David Kopel, *Magazines Over 10 Rounds Were Well-known to the Founders*, Reason (Feb. 11, 2020), https://bit.ly/3uZRHJF.  And a range of similar firearms capable of discharging more than 10 rounds without reloading were commonplace in early America.  *Id.*; *see* Hlebinsky Decl. ¶¶21-22, 28-30.  To take just one example, the Girardoni air rifle, which accompanied Meriwether Lewis on his famous Lewis and Clark westward expedition, contained 22 rounds in a gravity-fed, tubular magazine.  *See* Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 2206-07 (3d ed. 2021).

To be sure, many of the firearms in this class had obvious use for military operations.  "In 1777, the Continental Congress ordered Belton rifles able to discharge sixteen or twenty rounds, but then later cancelled the order based on the extraordinary expense."  *Ass'n of N.J. Rifle & Pistol Clubs*, 974 F.3d at 255 (Matey, C.J., dissenting) (citing 7 *Journals of the Continental Congress 1774-1789*, at 324, 361 (1907)).  Yet they were also commonly owned by civilians for personal self-defense.[4]  "[R]epeaters began circulating for personal use" "by at least the early 19th century."  *Id.* (citing sources, including an 1821 New York Evening Post article describing as "importan[t], both for public and private use," a new repeater whose "number of charges may be extended to fifteen or even twenty").  This phenomenon became particularly widespread by the mid-nineteenth century, as repeaters capable of firing up to 60 shots per minute without reloading became much less expensive and easier to produce.  Kopel, *supra*, 78 Alb. L. Rev. at 854-56.

These firearms were an ordinary component of everyday Americans' private lives, and they served quintessential self-defense purposes.  *See* Hlebinsky Decl. ¶¶28-37.  To use one of many

---

[4] The same was true in the twentieth century (although that period is much less probative), as evidenced by the fact that *the federal government itself* sold more than 200,000 surplus M-1 carbines, which came standard with 15-round and later 30-round magazines, *to civilians* at a steep discount in the 1950s and 1960s, just as the AR-15 was coming onto the market.  Stephen P. Halbrook, *America's Rifle: The Case for the AR-15*, at 58, 198 (Bombardier Books 2022).

examples to illustrate the point, James M. Wilson used his Winchester rifle, which had a 17- round magazine and could fire all 17 rounds plus the one in the chamber in under nine seconds, to defend himself in 1864 from a group of seven confederate guerilla neighbors who attacked him and his family in the middle of the night.  H.W.S. Cleveland, *Hints to Riflemen* 181 (1864); *see Duncan*, 970 F.3d at 1148.  Episodes like that explain why, in the latter half of the nineteenth century, some civil rights advocates urged that "a Winchester rifle should have a place of honor in every black home" because "the only case where [a] proposed lynching did not occur, was where the men armed themselves."   Ida B. Wells, *Southern Horrors and Other Writings: The Anti-Lynching Campaign of Ida B. Wells, 1892-1900*, at 70, 72 (1997).  In sum, "magazines of more than ten rounds ha[ve] been well established in the mainstream of American gun ownership" for centuries. Kopel, *supra*, 78 Alb. L. Rev. at 862.  Thus, both the typical-possession test and the broader historical record foreclose the state's effort to ban them.

*        *        *

The magazines and firearms that Measure 114 bans are covered by the plain text of the Second Amendment, so the state has the burden to prove that they are not protected.  Defendants fail at the threshold because there can be no serious dispute that these arms are typically possessed by law-abiding citizens today for self-defense.  That alone suffices to foreclose efforts to prohibit them, but even if resort to further historical analysis were necessary, there simply is no "enduring American tradition of state regulation" forbidding magazines and firearms capable of holding more than 10 rounds by law-abiding citizens for lawful purposes.  *Bruen*, 142 S.Ct. at 2135.  Because Defendants cannot "affirmatively prove" *either* that the arms the state has banned are not typically possessed by law-abiding citizens for law-abiding purposes today *or* that the state's new ban "is

part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id.* at 2127, Measure 114's magazine ban violates the Second Amendment, *id.* at 2130.

2.      **The magazine ban violates the Fifth and Fourteenth Amendments.**

The Takings Clause of the Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *see Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 239 (1897) (applying Takings Clause to the states). It protects against both "physical appropriation[s]" of property and "restriction[s] on the use of property" (known as "regulatory takings"). *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015).

A physical taking occurs whenever the government "dispossess[es] the owner" of property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982). This rule applies to both real property and personal property; the "categorical duty" the Takings Clause imposes applies "when [the government] takes your car, just as when it takes your home." *Horne*, 576 U.S. at 358. The rule likewise applies if the dispossession arises from a regulation, rather than from the use of eminent domain: "Government action that physically appropriates property is no less a physical taking because it arises from a regulation." *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021). And it applies regardless of whether the government-authorized "invasion" of private property is partial. *Id.* at 2072. "When the government physically takes possession of *an interest in property* for some public purpose, it has a categorical duty to compensate the former owner," even if the government has not taken the entire bundle of sticks. *Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) (emphasis added).

***As to firearms dealers.*** Oregon's confiscatory ban runs afoul of these settled principles. The law makes it a crime for licensed firearms dealers to continue to possess in Oregon magazines that they lawfully acquired and that, but for the new law, they would lawfully sell to law-abiding

citizens. Under Measure 114, "licensed gun dealer[s]" that lawfully acquired and currently possess "large-capacity magazines" in Oregon can avoid committing a "crime" only if, "within 180 days of the effective date of this 2022 Act," they transfer or sell the magazines to a dealer out of state, render the magazines inoperable (and thus unsalable), or dispossess themselves of them altogether. §11(2), (3)(a). And come June 7, 2023, not even those options will be on the table. By forcing dealers to physically surrender, destroy, or send away their lawfully acquired property, Measure 114 effects a physical taking. Oregon thus must provide just compensation. After all, courts assess physical takings "using a simple, per se rule: The government must pay for what it takes." *Cedar Point*, 141 S.Ct. at 2071. Yet Measure 114 offers no compensation for the lawfully acquired property that it turns into unlawful contraband. It therefore violates the Takings Clause.

Defendants may argue that the magazine ban does not effect a taking because it allows sales within 180 days as long as the buyer is out of state. *See* §11(3)(a). That is not how the Constitution works. Selling property to avoid having it taken is an option in almost every takings case. *See Horne*, 576 U.S. at 358. But "property rights 'cannot be so easily manipulated,'" and that option does not transform a taking for which just compensation must be paid into a minor burden that the government may impose scot-free. *Id.* It likewise makes no difference that dealers can transfer products out of state. For one thing, the option of transferring a magazine out of state exists only if the property owner has some out-of-state location to store the magazine—which Plaintiff Mazama Sporting Goods does not, *see* Decl. of Adam Braatz ¶3, to take just one example. For another thing, that option depends on other states continuing to permit possession of the magazines, something Oregon obviously has no control over. Oregon may not enact an unconstitutional law simply because other states have not. *Cf. Schad v. Borough of Mount*

*Ephraim*, 452 U.S. 61, 76-77 (1981) ("One is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.").

To the extent Measure 114 somehow does not effect a physical taking, it effects an unconstitutional regulatory taking. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537-39 (2005) (a regulation that "goes too far"—by, for example, depriving a property owner of economically beneficial use or otherwise "interfer[ing] with legitimate property interests"—also constitutes a taking that requires just compensation). Absent Measure 114, these magazines would be salable and in demand (as evidenced by the fact that Americans have purchased hundreds of millions of them and counting). Because of Measure 114, however, they are now worthless to any dealer in Oregon. That violates both the Takings Clause and due process. *See Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330-31 (9th Cir. 1977) (finding a taking where the property in question had been "rendered unsaleable in the open market; its uses were severely limited by [the] Agency; … and [the property owner's] peaceful enjoyment and its right to all rents and profits from the property were substantially impaired"); *E. Enters. v. Apfel*, 524 U.S. 498, 536-37 (1998) (plurality op.) (A law that imposes a "disproportionate and severely retroactive burden" upon particular individuals or companies violates "fundamental principles of fairness underlying the Takings Clause."); *id.* at 549 (Kennedy, J., concurring in the judgment in part and dissenting in part) ("[D]ue process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity."); *cf. Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 87-88 (1982) (refusing to give retroactive effect to a decision declaring statute unconstitutional where to do so "surely would visit substantial injustice and hardship upon those litigants who relied upon the Act's vesting of jurisdiction in the bankruptcy courts").

*As to individuals.* The analysis is much the same as to individuals. Measure 114 subjects to criminal punishment any person who possesses even a single "large-capacity magazine," regardless of when or how it was acquired. An individual can escape criminal punishment only by affirmatively proving that she obtained her property before Measure 114 took effect, which will be very difficult for many people to do. It is hard to imagine a greater invasion of property rights than a prohibition on keeping the property against which one must "affirmative[ly] defen[d]" oneself. *See* §11(5). "[T]o constitute a taking under the Fifth Amendment it is not necessary that property be absolutely 'taken' in the narrow sense of that word to come within the protection of this constitutional provision; it is sufficient if the action by the government involves a direct interference with or disturbance of property rights." *Richmond Elks*, 561 F.2d at 1330.

For similar reasons, even if the ban's prospective components somehow passed muster, *but see supra*, its retrospective aspects would still violate due process. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16-17 (1976) (explaining that "the justifications for" "the prospective aspects" of a law "may not suffice for" a law's "retrospective aspects"). Due process "protects the interests in fair notice and repose that may be compromised by retroactive legislation" and prevents Congress from enacting retroactive laws that would infringe those protected interests without adequate justification. *Bank Markazi v. Peterson*, 578 U.S. 212, 229 (2016). And "in accordance with 'fundamental notions of justice' that have been recognized throughout history," "[r]etroactivity is generally disfavored in the law." *E. Enters.*, 524 U.S. at 532 (plurality op.); *see also id.* at 549 (Kennedy, J., concurring in the judgment in part and dissenting in part) ("[D]ue process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity."); 2 J. Story, *Commentaries on the Constitution* §1398 (5th ed. 1891) ("Retrospective laws are, indeed, generally unjust; and, as has been forcibly said, neither

accord with sound legislation nor with the fundamental principles of the social compact."). Consistent with these fundamental commitments, "the Court has given careful consideration to due process challenges to legislation with retroactive effects" and "treat[ed] due process challenges based on the retroactive character of the statutes in question as serious and meritorious." *E. Enters*, 524 U.S. at 547-48 (Kennedy, J., concurring in the judgment in part and dissenting in part).

Retroactive legislation also raises serious concerns under the Takings Clause, as government action that has significant "economic impact … on the claimant" and "interfered with distinct investment-backed expectations" may constitute a taking that requires just compensation even if it does not mandate dispossession. *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978); *see, e.g.*, *E. Enters.*, 524 U.S. at 533-37 (plurality op.). Thus, whether analyzed under the Due Process Clause, the Takings Clause, or both, the outcome is the same: Oregon's effort to transform the possession of lawfully obtained property into a crime against which otherwise law-abiding citizens must affirmatively defend themselves cannot be squared with the Constitution.

## II. The Remaining Factors All Favor Injunctive Relief.

The injuries Measure 114 will inflict are irreparable by definition. *See Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014) ("[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury."). Those injuries are enough in and of themselves to satisfy the second injunctive relief factor. But they do not stand alone. It is indisputable that Plaintiff Mazama Sporting Goods (and the Oregon retailers among Plaintiff NSSF's 10,000+ members) will lose revenue if Measure 114 takes effect. *See* Braatz Decl. ¶¶9-14; Decl. of Matthew G. French ¶¶12-18. Allowing Measure 114 to take effect will result in "the constriction of [Plaintiffs'] buyers' market," which is a textbook economic "injury." *Craig v. Boren*, 429 U.S. 190, 194 (1976); *see Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 205 (4th Cir. 2020) (applying *Craig*'s logic to a gun dealer challenging a Maryland handgun licensing law).

And while economic injuries typically are not irreparable because they can be remedied after the fact, economic injuries *are* irreparable when—as here—the defendants are cloaked in Eleventh Amendment immunity. *Cal. Hosp. Ass'n v. Maxwell-Jolly*, 776 F.Supp.2d 1129, 1140 (E.D. Cal. 2011) ("[I]rreparable harm is established" "where the party seeking injunctive relief is legally precluded from pursuing damages—for example, if a claim is barred by the Eleventh Amendment."). Every single cent lost and spent as a result of Measure 114's onerous provisions is and will be unrecoverable as a matter of law, thanks to the Eleventh Amendment.

The equities and the public interest favor an injunction as well. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("When the government is a party, [the public interest and equities] factors merge."). Measure 114 tramples on fundamental constitutional rights—the right to keep and bear arms, the right to private property, and more. And, as the Ninth Circuit has long held, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). The public interest does not favor in the slightest keeping in place a statute that poses such a grave threat to fundamental constitutional rights. Nor can Defendants make any serious argument that they (or the state) will suffer harm as a result of an injunction. That is true as a general matter, as government defendants "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And it is particularly obvious here. For one thing, the state has not set up the systems necessary for individuals to comply with Measure 114, which means that no resources will need to be expended to implement the injunction. For another thing, enjoining Measure 114 will have no effect on the preexisting background-check requirements that Measure 114 supplements and with which law-abiding Oregonians have complied for decades. It

will simply ensure that the exercise of fundamental constitutional rights is not frustrated by onerous and duplicative requirements with which individuals cannot even comply.

## CONCLUSION

For the reasons set forth above, this Court should grant a preliminary injunction.

DATED: January 6, 2022

Respectfully submitted,

s/ Shawn M. Lindsay
Shawn M. Lindsay (OR Bar #020695)
JurisLaw LLP
Three Centerpointe Drive
Suite 160
Lake Oswego, OR 97035
(503) 968-1475

Paul D. Clement[*]
Erin E. Murphy[*]
Matthew D. Rowen[*]
Nicholas M. Gallagher[*]
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

[*] admitted *pro hac vice*

*Counsel for Eyre Plaintiffs*