Stephen J. Joncus, OSB #013072
JONCUS LAW PC
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
971.236.1200
steve@joncus.net

Leonard W. Williamson, OSB #910020
VAN NESS WILLIAMSON LLP
960 Liberty St. SE, Ste 100
Salem, Oregon 97302
503.365.8800
l.williamson@vwllp.com

*Attorneys for OFF Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>KATE BROWN, et al.,<br><br>    Defendants. | Civil No. 2:22-cv-01815-IM (*Lead Case*)<br>Civil No. 3:22-cv-01859-IM (*Trailing Case*)<br>Civil No. 3:22-cv-01862-IM (*Trailing Case*)<br>Civil No. 3:22-cv-01869-IM (*Trailing Case*)<br><br>CONSOLIDATED CASES |
| MARK FITZ, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>    defendants. | **CORRECTED DECLARATION OF STEPHEN HELSLEY** |
| KATERINA B. EYRE, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>    Defendants. | |

DANIEL AZZOPARDI, et al.,

                    Plaintiffs,

        v.

ELLEN F. ROSENBLUM, et al.,

                    Defendants.

### DECLARATION OF STEPHEN HELSLEY

1.      I am Stephen Helsley, a retired peace officer from the California Department of Justice (DOJ). The bulk of that career was in drug enforcement. The last three positions I held were Chief of the Bureau of Narcotic Enforcement, Chief of the Bureau of Forensic Services and, finally, Assistant Director of the Division of Law Enforcement. As Assistant Director, I was responsible for the department's criminal, civil, and controlled substance investigations as well as law enforcement training, intelligence gathering and our forensic laboratory system. In my executive level positions, I had occasion to review special agent-involved shootings and a wide range of homicides involving firearms.

2.      I was the DOJ's principal firearms instructor for many years, and I am an FBI-certified range master. I also participated in the firearm training that was part of the FBI National Academy Program in Quantico, VA. I am a member of the American Society of Arms Collectors and a technical advisor to the Association of Firearm and Tool Mark Examiners. For well over two decades, I was first a state liaison and, then later, a consultant to the National Rifle Association, where I was heavily involved in "assault weapon" and magazine legislative issues. For the past ten years I have also served as the historian for the London-based company, John Rigby & Co. (Gunmakers, Ltd.). Rigby is the oldest continuously operating gun maker in the English-speaking world, having been established in 1775.

3.      I have co-authored five books on firearms and have authored or coauthored

more than fifty firearm-related articles for U.S. and Russian journals. Throughout my adult life, I have been an active participant in handgun, rifle, and shotgun competitions. I have also been a firearm collector and ammunition reloader since the early 1960s.

4.      Finally, I am a collector of firearm-related books—of which I have thousands. Included in my book collection are approximately 50 different issues of Gun Digest, the earliest of which is from 1944. It is a standard resource that is widely used by gun dealers and buyers alike. *Gun Digest* has traditionally provided a comprehensive overview of the firearms and related items available to retail buyers.

5.      I was approached by Plaintiff's Counsel in this matter, Leonard W. Williamson, about my previously filed declaration in *Duncan v. Becerra*, Case Number 17-cv-1017-BEN-JLB filed in the Southern District of California. In that matter I submitted a declaration and expert report regarding the California large capacity magazine (LCM) ban on November 30, 2022. That declaration and report was substantially similar to my prior submissions in that same case. I was deposed by defense counsel in *Duncan v. Becerra* on December 17, 2017, regarding my expert opinion and report offered in that matter.    Attached hereto and incorporated herein by reference is a true and accurate copy of the transcript of my deposition taken on December 17, 2017, in *Duncan v. Becerra* and marked **Exhibit Helsley – 4**.

6.      Mr. Williamson wanted me to review Oregon's Measure 114 LCM ban of ten rounds and thereafter submit a declaration and expert report. I agreed to do so.

7.      As a starting place for my declaration and expert report in this matter I relied upon my prior work submitted in *Duncan v. Becerra* regarding the LCM ban. After multiple telephone calls and edits that I directed a final declaration and my expert report, dated

December 29, 2022, were ready for my signature and filing in this matter. I applied my electronic signed to my declaration in this matter on January 2, 2023.

8.    During my deposition in the present case on January 19, 2023, the deposition was interrupted at one point by Mr. Williamson. Mr. Williamson noted on the record that the expert report attached to my declaration, marked **Exhibit Helsley-1**, and filed with the court was not a copy of my final report of December 29, 2022, and that an error had been made in the filing of the documents with the court. This declaration is filed to correct that error and provide the court with the final report that I approved on December 29, 2022. It is attached hereto and incorporated by reference and marked **Exhibit Helsley – 3**. It contains my opinions and analysis related to this matter.

9.    During my 35-years of involvement in the "assault weapon" issue, I have heard innumerable times that the "founding fathers" never envisioned higher capacity firearms than the single shot musket of their day and that the Second Amendment was never intended to offer protection for such arms. Such a notion is preposterous. Among the Founders, George Washington and John Adams were personally involved in the consideration to purchase for the Continental Army 100 Belton 8-shot firearms, which were repeating muskets with detachable magazines. (Washington had been encouraged by Benjamin Franklin to consider the Belton flintlock.)

10.    The Belton flintlock was one of a number of multi-shot firearms (including the Giradoni air rifle and the Lorenzoni among others) that were beginning to appear at the end of the 18th century. Such weapons were complex, likely unreliable, and fragile, but they were also a window into the future. The Belton purchase never materialized – primarily because of cost – but prescient men like the Founders surely understood that it would only be a matter of

time before such arms were practical, affordable, and reliable. In the absence of government interest, private citizens would be clients for such arms, and the Founding generation imposed no restrictions to stop them.

11.     The State also argues that magazines capable of holding more than 10 rounds do not warrant Second Amendment protection because they are accessories and not necessary to the functioning of the firearm for which they are designed. The State also argues that if the weapon can function in the absence of the magazine, then the magazine is an accessory. As a single-shot, that is correct, it could function – but not as intended. Consider such logic applied to a pickup truck. If a rear tire is removed, the truck can still be driven, but not as intended. A Glock pistol requires only the slide and barrel to fire a round, but that would not make the Glock's frame a mere accessory. The Glock is just one example of many firearms that doesn't require all of its parts to be present to discharge a cartridge. An expansive definition of "accessory" is thus a serious threat to Second Amendment rights. If by designating a part an "accessory" it can be banned, taxed, or otherwise restricted, there is no protection for the complete firearm.

12.     An expert for the defense (Ryan Busse) makes the related point that large capacity magazines are not typically manufactured by the same company that produces the firearm itself and therefore magazines should be considered an accessory. Again, I am the historian for a British company whose two main product lines were developed and patented in the third quarter of the 19th century. Do we produce all the key parts of those guns and rifles? – no. Could we? – yes. Some key parts, including the receiver, are precision machined by a specialty manufacturer for us. That does not mean our receivers are mere "accessories". The

use of outside vendors is simply a good business practice to produce the best possible product in the most cost-effective manner.

13.     AR-type magazines have been manufactured for over 60 years. Production totals aren't known but given the number of rifles and pistols that accept AR or other magazines capable of holding over ten rounds, it certainly wouldn't be unreasonable to put the total between 500 million and 1 billion. They are undoubtedly in common use by millions of Americans for lawful purposes including self-defense, sports shooting, competitions, hunting, and other similar purposes.

14.     I have received no remuneration for any work done in this matter.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on January $\underline{23}$, 2023.

_Stephen Helsley_
Stephen Helsley

Respectfully submitted,

DATED: January 24, 2023.       By:     s/ Stephen Joncus
                                       Stephen J. Joncus, OSB #013072
                                       JONCUS LAW PC
                                       13203 SE 172nd Ave Ste 166 #344
                                       Happy Valley, Oregon 97086
                                       971.236.1200
                                       steve@joncus.net

                                       Leonard W. Williamson, OSB #910020
                                       VAN NESS WILLIAMSON LLP
                                       960 Liberty St. SE, Ste 100
                                       Salem, Oregon 97302
                                       503.365.8800
                                       l.williamson@vwllp.com

                                       *Attorneys for OFF Plaintiffs*

# RESUME

**NAME:**        HELSLEY, STEPHEN C.  (Steve)

**ADDRESS:**     1040 Brookline Circle
El Dorado Hills, CA 95762

**TELEPHONE:**      (916) 933-3538 (Home)
(916) 719-2325 (Mobile)
schmjh@pacbell.net or Stephen@johnrigbyandco.com

## CURRENT STATUS

**Historian** – John Rigby & Co., London, England (est. 1775)

## PROFESSIONAL HISTORY

**National Rifle Association (**1993 to 2020**)**
**Consultant** (2000 to 2020) to the National Rifle Association's (NRA) Institute for Legislative Action (ILA).

**State Liaison** (1993 to 2000) -- As a State Liaison of the NRA's ILA, I was the principal advocate for the organization's state and local political interests in California, Arizona and Nevada. My primary functions included legislative lobbying and coordination of the NRA's election efforts.

**California Department of Justice** (1967-1993)
**Assistant Director, Division of Law Enforcement (1988 until retirement)** -- Appointed by Attorney General Van de Kamp in October 1988, I served in the position until my retirement. I had overall responsibility for the drug enforcement, intelligence, forensic, training and criminal investigation programs of the Department of Justice.

**Chief, Bureau of Forensic Services** (1985-1988) -- Reassigned by Attorney General Van de Kamp in February 1985 and served in the position until October 1988. I was responsible for the management of twelve crime laboratories that provided forensic support to approximately 400 law enforcement agencies in California.

**Chief, Bureau of Narcotic Enforcement** (1979-1985) -- Appointed by Attorney General Deukmejian in June 1979 to lead the Bureau's seven regional offices and direct state level drug law enforcement efforts.

**Special Agent in Charge -** Fresno Office (1976-1979) -- Responsible for management of investigations conducted by the Bureaus of Investigation and Narcotic Enforcement in Central California.

**Special Agent Supervisor -** San Diego Office (1972-1976) -- Supervised a team of Special Agents who conducted investigations of major drug traffickers.

RESUME
HELSLEY, STEPHEN C.
Page 2

**Special Agent** - Fresno Office (1967-1972) -- Conducted investigations of drug traffickers and provided training to local law enforcement officers.

## SIGNIFICANT ACCOMPLISHMENTS

**CAL-DNA** (1989) -- First conceived and then directed implementation of the CAL-DNA program. CAL-DNA is based on analysis of deoxyribonucleic acid that produces what is generally referred to as "genetic fingerprints."

**California Criminalistics Institute** (1986) -- Directed the conceptualization, planning and implementation of a training, research and advanced casework program to support California's forensic laboratories.

**Chinese/American Police Science Conference** (1986) -- Selected as one of 26 Americans from the criminal justice field to travel to the Republic of China and address Chinese law enforcement officials at the inaugural conference.

**Campaign Against Marijuana Planting (CAMP)** -- In 1983, conceived and brought the CAMP program to fruition. CAMP is a statewide approach to California's marijuana problem and involved over 100 federal, state, and local agencies.

**National Alliance of State Drug Enforcement Agencies (NASDEA)** -- Elected chairman in 1982 of NASDEA, an organization of state level drug law enforcement agency directors from 45 states who worked with federal agencies on legislative and policy issues.

**Narcotic Task Force Program** -- In 1977, I initiated, and in later years fully developed, the Department of Justice's Narcotic Task Force Program. The program is designed to coordinate and enhance local and state enforcement efforts.

## SPECIAL AWARDS

**Public Personnel Award** (1989) -- Selected by the Governor's Committee for Employment of Disabled Persons for this award in recognition of efforts on behalf of disabled employees.

**Attorney General's Excellence Award** (1986) -- For work in furthering the Department's Affirmative Action and Equal Employment Opportunity programs.

**DEA Administrator's Award** (1985) -- For contributions to both the Drug Enforcement Administration and the national drug law enforcement effort.

**RESUME**
HELSLEY, STEPHEN C.
Page 3

>   **Attorney General's Valor Medal** (1974) -- For actions during an undercover cocaine investigation that resulted in hostage situation and gunfight.
>
>   **U.S. Air Force Commendation Medal** (1970) -- For training support to the Office of Special Investigations and undercover investigations conducted on pilots assigned to the Strategic Air Command.
>
>   **Attorney General's Purple Heart Medal** (1970) -- Returned to duty after sustaining four gunshot wounds during an undercover heroin investigation.

## EDUCATION

| | |
|---|---|
| University - | Graduated from California State University Fresno with a Bachelor of Science Degree in Criminology (1967). |
| Continuing - | FBI National Academy (1975) - Graduated from the 102nd session with a 4.0 grade point average. |
| | Graduate level course work in Business Administration and seminars in Telecommunication Management. |
| | Completion of 45 units in Russian studies programs (1991-1993). |

## CERTIFICATION

Advanced Certification -- Peace Officers Standards and Training

Lifetime Community College Limited-Service Teaching Credential

## PROFESSIONAL MEMBERSHIP

Lifetime Honorary Membership -- National Alliance of State Drug Enforcement Agencies

Life Member -- National Association for the Advancement of Colored People (NAACP)

## CIVIL STATUS

Married to Marilyn Jane Helsley for 54 years -- three adult children and eight grandchildren.

**RESUME**
HELSLEY, STEPHEN C.
Page 4

## FIREARMS RELATED EXPERIENCE

NRA Benefactor Member.  Life Member since 1972.  Member since 1961.

Life Member -- California Rifle and Pistol Association.

Life Member -- Arizona State Rifle and Pistol Association.

Life Member -- Folsom Shooting Club, Inc.

Technical Adviser – Association of Firearm and Tool Mark Examiners

Member – American Society of Arms Collectors

Member -- California Side-By-Side Society

NRA Certified Police Firearms Instructor.

Chief firearms instructor -- California Department of Justice (1970-79).

Executive level law enforcement experience with special weapons, firearms training, shooting review boards, legislation and the development of policy concerning the use of firearms. Extensive experience in the management of the forensic analysis of firearms.

Broad formal competition experience in numerous handgun and rifle disciplines.

Firearm collector with an emphasis on vintage British sporting arms - including flintlock, percussion and cartridge models.

Reloader and bullet-caster for 50 types of cartridges (brass and paper) from .223 to 8-bore.

Author of numerous published articles on rifles, shotguns and handguns in national and international journals.

Chief Judge for the 2001 Gold Medal Concours d'Elegance of Fine Guns in Millbrook, New York.

Co-author of *Hemingway's Guns*, *Rigby – A Grand Tradition*, *The Gun Book for Boys*, *The Gun Book for Parents* and *The Gun Book for Girls*.

# EXHIBIT HELSLEY – 3

## Expert Witness Report of Stephen Helsley

*Oregon Firearms Federation, Inc. et al. v. Brown, et al.*
United States District Court (Oregon)
Case No: 2:22-cv-08151-IM
December 29, 2022

## I.    INTRODUCTION

Counsel for plaintiffs in *Oregon Firearms Federation, Inc. et al v. Brown et al*, Case No. 22-CV-01815-IM and *Eyre et al v. Rosenblum et al*, Case No. 22-cv-01862-IM have asked me to offer an opinion regarding this case. This report sets forth my qualifications, opinions, and scholarly foundation for those opinions.

## II.    BACKGROUND & QUALIFICATIONS

I am Stephen Helsley, a retired peace officer from the California Department of Justice (DOJ). The bulk of that career was in drug enforcement. The last three positions I held were Chief of the Bureau of Narcotic Enforcement, Chief of the Bureau of Forensic Services and, finally, Assistant Director of the Division of Law Enforcement. As Assistant Director, I was responsible for the department's criminal, civil, and controlled substance investigations as well as law enforcement training, intelligence gathering and our forensic laboratory system. In my executive level positions, I had occasion to review special agent involved shootings and a wide range of homicides involving firearms.

I was the DOJ's principal firearms instructor for many years, and I am an FBI-certified range master. I also participated in the firearm training that was part of the FBI National Academy Program in Quantico, VA. I am a member of the American Society of Arms Collectors and a technical advisor to the Association of Firearm and Tool Mark Examiners. For the past 27 years, I was first a state liaison and, then later, a consultant to the National Rifle Association.

I have co-authored five books on firearms and have authored or co-authored more than fifty firearm-related articles for U.S. and Russian journals. Throughout my adult life, I have been an active participant in handgun, rifle, and shotgun competitions. I have also been a firearm collector and ammunition reloader since the early 1960s.

Finally, I am a collector of firearm-related books—of which I have thousands of volumes. Included in my book collection are approximately 50 different issues of *Gun Digest*, the earliest of which is from 1944. It is a standard resource that is widely used by gun dealers and buyers alike. *Gun Digest* has traditionally provided a comprehensive overview of the firearms and related items available to retail buyers.

The combination of my consulting work, writing and free time activities puts me in constant contact with gun stores, shooting ranges, gun shows and gun owners. I am also in frequent contact with retirees from DOJ and other law enforcement agencies.

I have qualified as an expert in both criminal and civil matters.

## A. Published Articles

In the past ten years, I have written or contributed to the following published articles and opinion editorials:

### 1. Articles

- *Of Birmingham and* Belgium, Double Gun Journal, vol. 18, iss. 2 (2007).
- *The .470 Nitro Express*, Sports Afield (June/July 2007).
- *Readings on the Roots of* the .410, Shooting Sportsman, Nov./Dec. 2007.
- *Hunting in Wales*, Hunting and Fishing (Russia), Dec. 2007.
- *A Pair for a Pair of Friends*, Shooting Sportsman, March/April 2008.
- *A Welsh Fantasy*, Shooting Sportsman, July/Aug. 2008.
- *A Maine Gun Goes Home*, Shooting Sportsman, Sept./Oct. 2008.
- *The Pin Fire Comes Home*, Libby Camps Newsletter, Winter 2008.
- *John Rigby & Co.*, Hunting and Fishing (Russia), July 2008.
- *The All-American Double Rifle*, Safari, Sept./Oct. 2008.
- *Eastern Oregon Odyssey*, Shooting Sportsman, Nov./Dec. 2008.
- *Rigby Marks 275th Anniversary*, Safari, Nov./Dec. 2009.
- *Finding* Papa's Guns, Shooting Sportsman, March/April 2010.
- *The Searcy Stalking Rifle*, Safari, May/June 2010.
- *The Ruggs Riders*, Shooting Sportsman, July/Aug. 2010.
- *Searcy Brings Back the Rising-Bite*, Shooting Sportsman, Sept./Oct. 2010.
- *John Rigby & Co.*, African Hunting Gazette, Fall 2010.
- *The Ageless .416 Rigby*, Safari, Nov./Dec. 2012.
- *J. P. Clabrough*, Shooting Sportsman, March/April 2015.
- *The Mystery of Hemingway's Guns*, Friends and Neighbors, Summer 2015.
- *The Enigma of Hemingway's Guns*, Master Gun (Russia), Sept. 2015.
- *The Mystery of Hemingway's Guns*, CRPA Firing Line, Sept./Oct. 2015.
- *Pistols at Dawn*, CRPA Firing Line, Jan./Feb. 2016.
- *The Silver Star*, CRPA Firing Line, Jan./Feb. 2016.
- *Women Guns & Politics*, CRPA Firing Line, March/April 2016.
- *Hunting the Big Mouse*, CRPA Firing Line, Sept./Oct. 2016.
- *Do Guns Make Heroes? The Congressional Medal of Honor*, CRPA Firing Line, Nov./Dec. 2016.
- *Thumbs-Up Guns*, Shooting Sportsman, Jan./Feb. 2017.
- *Is Your Gun Safely Stored? (Part 1)*, Friends and Neighbors, Summer 2017.

- *History of William Powell and His Patents*, Master Gun (Russia), Aug. 2017.
- *Guns from San Francisco and Birmingham*, Master Gun (Russia), Oct. 2017.
- *Is Your Gun Safely Stored? (Part 2)*, Friends and Neighbors, Autumn 2017.
- *The Odd History of Unloved Magazines.* California Firing Line, Issue 1042, Jul/Aug 2019 pp 32-37.
- *He Never Saw it Coming*, CRPA Firing Line, September/October 2019
- *Public Policy Fraud and Unintended Consequences,* CRPA Firing Line, Nov/Dec 2019
- *Law Enforcement's Faustian Bargain,* CRPA Firing Line, May/June 2021

### 2. Opinion Editorials

- *It's About Time: State has Eroded Gun Owner's Rights*, Sac. Bee (July 4, 2010).
- *Nevada Views: Is Gun Registration Worth Cost?* Nev. Rev. J. (Sept. 16, 2012).
- *Gun Roundup Program Has Too Many Flaws*, Sac. Bee (May 3, 2013).

### B. Expert Witness History

In the past 10 years, I did testify as an expert witness in the Parker trial in California.

## III.   COMPENSATION

I am not being compensated for my work on this report.

## IV.   ASSIGNMENT

Plaintiffs' counsel has asked me to provide opinion on the historical existence and prevalence of firearms and/or magazines capable of holding more than ten rounds of ammunition and the reasons law-abiding Americans, including law enforcement and private citizens, so often select such items.

Counsel has also asked that I provide opinion on the utility of firearm magazines with the ability to accept more than ten rounds of ammunition in self-defense, as well as the impact of ten-round magazine limitations on law-abiding citizens.

## V.   OPINIONS & ANALYSIS

*1. Magazines over ten rounds are, and have historically been, a common choice for self-protection for use in both rifles and handguns.*

The standard magazine for a given firearm is one that was originally designed for use with that firearm, regardless of whether its capacity is six, ten, fifteen, or twenty rounds. Various popular handgun models originally came from the manufacturer standard, free from

artificial influences like laws restricting capacity, with magazines exceeding ten rounds. Examples include, but are in no way limited to, the Browning High Power (13 rounds) c.1954, MAB PA-15 (15 rounds) c.1966, Beretta Models 81/84 (12/13 rounds) c.1977, S&W Model 59 (14 rounds) c.1971, L.E.S P-18 (18 rounds) c.1980 aka Steyr GB, Beretta Model 92 (15 rounds) c.1980s, and Glock 17 (17 rounds) c.1986. I know there to be many more examples not listed here.

Firearms with a capacity exceeding 10-rounds date to the 'dawn of firearms.' In the late-15th Century, Leonardo Da Vinci designed a 33-shot weapon. In the late 17th Century, Michele Lorenzoni designed a practical repeating flintlock rifle. A modified 18th Century version of Lorenzoni's design, with a 12- shot capacity, is displayed at the NRA's National Firearms Museum. Perhaps the most famous rifle in American history is the one used by Lewis and Clark on their 'Corps of Discovery" expedition between 1803 and 1806—the magazine for which held twenty-two .46 caliber balls.

Rifles with fixed magazines holding 15-rounds were widely used in the American Civil War. During that same period, revolvers with a capacity of 20- rounds were available but enjoyed limited popularity because they were so ungainly.

In 1879, Remington introduced the first 'modern' detachable rifle magazine. In the 1890s, semiautomatic pistols with detachable magazines followed. During WWI, detachable magazines with capacities of 25 to 32-rounds were introduced. As those magazines protruded well below the bottom of the pistol's frame, they weren't practical for use with a belt holster—and by extension concealed carry for self-defense.

In 1935, Fabrique Nationale introduced the Model P-35 pistol with its fully internal 13-round magazine. It would become one of the most widely used military pistols of all time. During WWII, magazine capacity for shoulder-fired arms was substantially increased while most pistols (excluding the P-35) remained at 10- rounds or less. In the mid-1950s the P-35 was rebranded the High Power and imported to the US.

This transition of a firearm from military to civilian use for sport or self-defense is very common. The standards of WWI—the 1903 Springfield rifle and the Colt M1911 pistol are but two of many examples. Civilian sales of both increased after the war as a result of the training "doughboys" received before going to France. The Springfield would become the standard for both rifle hunting and target competition. Likewise, the M1911 Colt pistol was a target-shooting standard for a half-century or more and popular for self-defense.

Between the two world wars, double-action semiautomatic pistols like the Walther PPK and P-38 were introduced. The double-action feature allowed the first shot to be fired in a manner similar to a revolver. Law enforcement agencies in the United States had traditionally used revolvers. However, in the early 1970s, a confluence of events changed that: training funds became widely available and so did the first double action semiautomatic

pistol (the S&W M59) with a 14-round magazine. Soon major agencies were transitioning to the M59 and the legion of other makes that followed—CZ, Colt, HK, Sig-Sauer, Glock, Beretta, Ruger, Smith & Wesson, etc. Pistols with magazine capacities as large as 19-rounds quickly replaced the six-shot revolver.

Law enforcement demand for the new generation of semiautomatic pistols helped create an increased demand in the civilian market. Comparing 1986 and 2010 handgun sales, one can see evidence of that change. According to the Bureau of Alcohol Tobacco Firearms and Explosives, in 1986, 663,000 pistols were sold in the United States versus 761,000 revolvers. In 2010, revolver sales had dropped to 559,000, while pistol sales had grown to 2,258,000. *See* United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States, Annual Statistical Update* (2012), *available at* http://www.atf.gov/files/publications/firearms/050412-firearms-commerce-in-the-usannual- statistical-update-2012.pdf. The result of almost four decades of sales to law enforcement and civilian clients is millions of semiautomatic pistols with a magazine capacity of more than ten rounds and likely multiple millions of magazines for them. My associates who have such pistols also have a considerable number of spare magazines for them. In my case, I have one 19-round and eight 17-round magazines for my Glock.

The on-duty, uniformed police officer generally will be armed with a service pistol containing a detachable magazine holding more than ten rounds, and generally two spare magazines holding more than ten rounds on the uniform belt. The clear majority of law enforcement officers in the United States carry pistols with double-stack magazines whose capacities exceed those permitted under Oregon's Measure 114.

The homeowner and the concealed weapon permit holder want a pistol that can hold significantly more cartridges than a revolver for the same reason a law enforcement office or soldier wants one—to increase his or her chances of staying alive. For virtuous citizens buy their guns to protect themselves from the same criminals that police carry guns to protect the citizens, the public, and themselves from. For this reason, armed citizens have historically modeled their choice of firearms on what police carry.

2.   *Limiting the law-abiding citizen to a magazine of ten rounds limits their ability to protect themselves from violent criminals in certain situations. Such limits on magazine capacity are likely to impair the ability of citizens to engage in lawful self-defense in those crime incidents necessitating that the victim fire many rounds to stop the aggressive actions of offenders, while having negligible impact on the ability of criminals to carry out violent crimes.*

Based on my experience with and understanding of the customs and practices of citizens licensed to carry guns in public, individuals often carry *only* the gun, without spare ammunition or magazines. Similarly, most plainclothes police officers do not find it practical to carry multiple handguns.

Likewise, the average homeowner who keeps a defensive firearm is unlikely to have time to gather spare ammunition or magazines. Rather, they are generally limited to one firearm and its magazine capacity. For the homeowner who keeps a defensive firearm and is awakened in the night by an intruder is most unlikely to have time to gather spare ammunition. The sudden and unpredictable nature of such attacks, and their occurring in relatively confined spaces, generally prohibits the gathering of multiple firearms or magazines. Ideally, one hand would be occupied with the handgun and the other with a telephone to call the police. Assuming an individual even had time for a magazine change, most people do not sleep with firearms or magazines attached to their bodies or wearing clothing that would allow them to stow spare magazines or ammunition on their person. They would have only what was in the firearm.

The off-duty officer and the private law-abiding citizen are thus unlikely to have much, if any, spare ammunition on their person or elsewhere readily accessible. They are not likely to be wearing body armor, nor to be in reach of a spare, loaded rifle or shotgun. Their only communication to potential backup will be by phone, relayed through Police Dispatch to responding officers. Thus, for them, the ability to have a pistol already loaded with a significant amount of ammunition is all the more important.

Uniformed police officers who are traditionally armed against the same criminals, on the other hand *are* normally wearing body armor. They generally have immediate access to a loaded shotgun and/or loaded patrol rifle with magazines holding more than ten rounds in the patrol car. And they will have instant radio access to dispatch and fellow officers if backup help is needed. Further, they will generally have both a loaded gun *and* two additional magazines. Each of those magazines would generally hold 17 rounds of 9mm or 15 rounds of .40 caliber cartridges. Collective law enforcement experience has determined this to be critical to allowing the officer to survive a gunfight with armed criminals.

What's more, the average citizen is not trained like law enforcement personnel and is generally not as readily prepared for combat with an armed criminal. As noted, they are likely to have a single firearm loaded with a single magazine available, and they are more susceptible to the psychological effects that naturally occur when faced with the threat of deadly violence and tend to deprive one of the focus and clarity of mind necessary to make accurate shots.

For these reasons, having a magazine of over ten rounds at one's disposal certainly could make a difference in self-defense situations, and likely would during home invasions or when facing armed attackers. In my opinion, law-abiding citizens will thus be at a disadvantage in such situations if Oregon enforces its ban on the possession of magazines over ten rounds under Measure 114. The Measure provides no exceptions for retired or off duty officers, which is offensive. Threats are threats and retiring or being off duty does not change that fact.

EXHIBIT HELSLEY-3 PAGE 7

Criminals bent on causing harm, on the other hand, are not likely to be meaningfully affected by Oregon's Measure 114 magazine restrictions. Even assuming they were impeded from obtaining magazines over ten rounds by Oregon's Measure 114, they could simply arm themselves with multiple weapons and/or magazines, and they often do. Criminals have time to assess and plan shootings, whereas victims do not. Indeed, it is the attacker who chooses when, where, how, and whom to attack. So, the attacker is not as burdened by the surprise and shock that the victim is and is generally prepared for the confrontation with several firearms and a substantial amount of ammunition.

The virtuous citizen cannot practically be expected to have accessible multiple guns, magazines, or spare ammunition at a moment's notice. The victimized citizen is the one who is, therefore, most deleteriously impacted by the magazine capacity limitation. If he or she must use the gun to protect self and family, they will most likely have only the ammunition in the gun with which to fend off determined, perhaps multiple, attackers.

Supporters of the magazine capacity limitation may point to some firearm expert who is comfortable with an eight- or nine-shot pistol, or even a five- or six shot revolvers. It should be noted, however, that the operative term there is "expert." The individual who has spent a lifetime training in shooting and may fire hundreds or even thousands of shots on the range per month, has developed a level of skill and confidence that is not practical to expect from the average police officer or the average law-abiding citizen who keeps a firearm in the home or on his person for protection of self and family.

Finally, it is worth noting that it is difficult to say exactly how many private citizens have fired more than ten rounds in a self-defense shooting, because the number of rounds fired in such cases is very often an omitted fact in written accounts of such defensive gun uses. Rarely does the collected data reflect the capacity of the magazine used by the private citizen. Often the accounts just say, "multiple shots fired." That could mean more or less than ten. This does not seem to be the case with shootings involving police officers, for which, the number of shots fired is generally documented. In my experience researching such shootings, officers often fire more than ten rounds. And cases where an individual officer fired less than ten rounds, but where multiple officers were shooting, can be fairly characterized as involving more than ten rounds, if the multiple officers involved fired over ten rounds in aggregate. Officer-involved shootings are relevant in evaluating private citizen shootings, for the simple reason that private citizens arm themselves for protection against the same criminals the police are armed to deal with.

3.   *A firearm equipped with a magazine capable of holding more than ten rounds is more effective at incapacitating a deadly threat and, under some circumstances, may be necessary to do so.*

Gunfights frequently involve a lot of "missing" by the shooter. This can be the result of improper aim or impact with barriers such as vehicles or walls. One would be hard pressed

to find someone who had been in a gunfight that complained about having too much ammunition.

Some believe that anyone defending themselves can just "shoot to wound." Those who grew up in the 1950s likely watched Roy Rogers shoot the gun out of an evildoers' hand or— if things got really serious—let loose a grazing wound to the arm to settle matters. Such ideas are a fantasy. Equally as silly is the well-known 'fact' that a bullet from a .45ACP cartridge will knock someone to the ground no matter where it strikes them.

The notion that a bullet can "knock-down" a person is a largely Hollywood inspired myth. Most of us learned in school about Sir Isaac Newton's *Third Law of Motion* that states— "For every action, there is an opposite and equal reaction." Put another way: if the recoil of the firearm doesn't knock you down, neither will the impact of the bullet. Bullets can penetrate skin, cut arteries, brake bones or interrupt nerve function to accomplish what is generally described as "stopping power." A bullet that severs the spine or strikes a certain area of the brain will almost certainly stop an attacker instantly. Bullet design and/or increased velocity may improve performance, but placement is still the most critical factor.

A hit, or even multiple hits, to less vital areas of the body may allow an attacker to continue the assault. This phenomenon is extensively documented in the citations for American heroes who were awarded the Congressional Medal of Honor. Many of these men continued to fight after suffering multiple gunshot wounds, being struck by shrapnel or having an arm or leg severed. *See, e.g.*, *The Congressional Medal of Honor, The Names, The Deeds* 28-29, 52-53, 284-85 (Sharp & Dunnigan 1984). A fighter who has overcome fear and is motivated to continue an attack can be difficult to stop. In the infamous 1986 FBI shoot-out with two Florida bank robbers, one of the suspects, Michael Platt, sustained 12 gunshot wounds before dying. Jamie Frater, *Top 10 Most Audacious Shootouts in US History*, Listserve (October 14, 2009), http://listverse.com/2009/10/14/top-10-most-audacious- shootouts-in-us-history/.

"Knockdown" and "Stopping Power" are things I know from personal experience. During my early years as a narcotic agent with the California Department of Justice, I was conducting an undercover investigation of a significant heroin dealer. After purchasing an ounce and a half of heroin from him and the arrest was initiated, he shot me with a .45 first breaking my left arm and severing an artery (Note: I wasn't "knocked down") and then bouncing another round off my spine that exited my right leg. From a prone position, I returned fire at the suspect who was mostly concealed by the trunk of his car. My shots that struck the vehicle failed to penetrate sufficiently to reach him. In the exchange that followed I had another round pass through my right leg, while another entered my left side and lodged in the disc between L3 and L4—where it remains today. Having emptied the 8 rounds in my pistol, I tried to reload. However, with a broken arm and temporary paralysis from the waist down, I was unable to reach my spare magazine in my left rear pants pocket. Fortunately, at that time the suspect quickly surrendered to my converging surveillance team.

Very little pain was initially associated with my wounds, and I could have "fought on" if more ammunition had been available. A total of 18 rounds were fired.

Four years later, I was making an undercover cocaine purchase with a new member of my team. I had involved myself to evaluate his performance. The three suspects, two of whom were armed (initially unbeknownst to us) had decided that robbery was a better option than delivering the cocaine. The junior agent was taken hostage and was being held in the state undercover car with a sawed-off rifle to the back of his head and a revolver held against his right side. I was across the street in another undercover car with the money the suspects wanted. I informed the surveillance team that I was going to approach the other vehicle to see what I could do. When I got to the car it was difficult to determine what was happening, as it was a dark, rainy night. I told the agent to exit the vehicle and as he opened the car door and dived out, two shots were fired at him—both missed. I returned fire at the area of the muzzle flash inside the car. Of the eight rounds I fired, the automobile glass defeated most. However, one .45 bullet hit the suspect holding the rifle, causing him serious internal injuries. The suspect with the revolver came out of the passenger door and was struck through the shin with a .45 bullet from a member of the surveillance team who had quietly closed-in on the vehicle. After a short pause the suspects were ordered out of the vehicle. Both of those with gunshot wounds came out fighting. A flashlight to the chin produced the 'stopping power' for the suspect with the internal wound. The suspect with the leg wound was unaware of his injury until he saw the massive blood loss—whereupon he exclaimed "I'm bleeding" and passed out. Twenty-eight rounds were fired into the vehicle with only two hits. For my actions in this incident, I was awarded the department's Medal of Valor.

The "take away" from these incidents is that serious bullet wounds aren't necessarily incapacitating and that gunfights can require lots of ammunition.

## VII. REFERENCES

Silvio Calabi, Steve Helsley & Roger Sanger, *The Gun Book for Boys* 56-57 (Shooting Sportsman Books 2012).

United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States, Annual Statistical Update* (2012), *available at* http://www.atf.gov/files/publications/firearms/050412-firearms-commerce-in-the-us-annual-statistical-update-2012.pdf.

*The Congressional Medal of Honor, The Names, The Deeds* 28-29, 52-53, 284-85 (Sharp & Dunnigan 1984).

Jamie Frater, *Top 10 Most Audacious Shootouts in US History*, Listserve (Oct. 14, 2009), http://listverse.com/2009/10/14/top-10-most-audacious-shootouts-inus-history/.

## VIII. CONCLUSION

It is clear to me from my collective experiences and from the analysis described above that firearms and magazines with ammunition capacities exceeding ten rounds have existed and have been in use since at least the 18th Century.

It is also clear that Americans commonly choose and use magazines capable of holding more than ten rounds of ammunition for lawful purposes, including self-defense.

Dated: January 23 , 2023

Stephen Helsley
Stephen Helsley

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA


VIRGINIA DUNCAN, et al.,

        Plaintiffs,

                   Case No.: 17-cv-1017-BEN-JLB

vs.

XAVIER BECERRA, in his official
capacity as Attorney General of the
State of California; and DOES 1-10,

        Defendants.
_____



DEPOSITION OF STEPHEN HELSLEY

Monday, December 18, 2017

9:56 a.m.


1300 I Street

Sacramento, California




REPORTED BY:

Kimberly A. Barrette

CSR No. 6671

## Page 2

```
 1    APPEARANCES:
 2
 3         For Plaintiffs:
 4
 5         MICHEL & ASSOCIATES, PC
           SEAN A. BRADY, ESQ.
 6         180 East Ocean Boulevard, Suite 200
           Long Beach, California  90802-4079
 7         562.216.4444
           sbrady@michellawyers.com
 8
 9
10
11         For Defendant:
12
13         STATE OF CALIFORNIA, DEPARTMENT OF JUSTICE
           OFFICE OF THE ATTORNEY GENERAL
14         JOHN D. ECHEVERRIA, Deputy Attorney General
           300 South Spring Street, Suite 1702
15         Los Angeles, California  90013
           213.269.6249
16         john.echeverria@doj.ca.gov
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              INDEX TO EXAMINATION
 2
 3         WITNESS:  STEPHEN HELSLEY
 4
 5    EXAMINATION                        PAGE
 6
 7    By MR. ECHEVERRIA                    6
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              INDEX TO EXHIBITS
 2                STEPHEN HELSLEY
 3    Virginia Duncan, et al., v. Xavier Becerra, et al.
 4            Monday, December 18, 2017
 5          Kimberly A. Barrette  CSR No. 6671
 6
 7    MARKED          DESCRIPTION              PAGE
 8
 9    Exhibit 1  Notice of Deposition          6
10    Exhibit 2  Declaration of Stephen Helsley 6
11    Exhibit 3  Plaintiffs' Disclosure of Expert  6
12               Witnesses
13    Exhibit 4  Resume, Stephen Helsley       30
14    Exhibit 5  IRS Form 990, 2015           61
15    Exhibit 6  IRS Form 990-EZ, 2008        62
16    Exhibit 7  Deposition Excerpt, 12-16-10  78
17    Exhibit 8  Copy of article, It's About Time:  91
18               State Has Eroded Gun Owner's Rights
19    Exhibit 9  Copy of article, Is Gun Registration  100
20               Worth Cost?  Las Vegas Review Journal
21    Exhibit 10 Copy of article, Gun Roundup Program  102
22               Has Too Many Flaws
23    Exhibit 11 Copy of article, Thanks To All Who  109
24               Helped Kill AB 962, And Especially to the
25               American Hero Who Played A Central Role
```

## Page 5

```
 1              EXHIBITS, CONTINUED:
 2
 3    Exhibit 12 Declaration of Stephen Helsley      113
 4    Exhibit 13 Excerpt of book, The Gun Book For   140
 5               Boys
 6    Exhibit 14 Firearms Commerce in the United States  155
 7               Annual Statistical Update 2012
 8    Exhibit 15 Copy of article, Top 10 Most Audacious  196
 9               Shootouts in US History
10    Exhibit 16 Memorandum, 10-31-88               207
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1    SACRAMENTO, CALIFORNIA
2    Monday, December 18, 2017
3    9:56 a.m.
4
5    STEPHEN HELSLEY,
6    Having been first duly sworn, was examined and testified
7    as follows:
8
9    (Exhibit 1 through Exhibit 3 were marked.)
10
11    EXAMINATION
12    BY MR. ECHEVERRIA:
13    Q.   Good morning, Mr. Helsley.  My name is John
14    Echeverria.  I'm a deputy attorney general with the
15    California Attorney General's office and I am
16    representing the definite in this case, Javier Becerra,
17    the Attorney General of California.
18         In this lawsuit, the Plaintiffs are
19    challenging the constitutionality of California Penal
20    Code Section 32310 which regulates large capacity
21    magazines in this state and I'm going to asking you
22    questions today about that case.
23         Do you understand?
24    A.   Mm-hmm.  Yes.
25    Q.   And you've been retained as an expert witness

Page 7

1    for the Plaintiffs in this case, correct?
2    A.   Correct.
3    Q.   Are you represented by counsel today?
4    A.   No.
5    Q.   So Mr. Brady is appearing as counsel for
6    Plaintiffs?
7    A.   Correct.
8    Q.   Have you had your deposition taken before?
9    A.   Yes.
10    Q.   And do you understand generally what the
11    procedures are for a deposition?
12    A.   I do.
13    Q.   I think it would be a good idea, even though
14    you have been deposed before, for us to quickly cover the
15    ground rules so that we're on the same page.
16         Does that make sense?
17    A.   Yes.
18    Q.   Okay.  And you've just taken an oath to tell
19    the truth under penalty of perjury.
20    A.   Correct.
21    Q.   And when I'm asking questions, your answers
22    are going to be under oath.
23         Do you understand?
24    A.   I do.
25    Q.   And the court reporter here is going to be

Page 8

1    transcribing the questions that I ask and the answers
2    that you provide.
3         Do you understand?
4    A.   I understand.
5    Q.   Okay.  And even though we're in an informal
6    setting in this conference room, the oath you took will
7    have the same import as an oath you would take in a court
8    of law.
9         Do you understand?
10    A.   I understand.
11    Q.   And the penalties of perjury would apply in
12    the same way.
13    A.   I understand.
14    Q.   And it's important during this deposition that
15    we try not to speak over one another.  I'll ask my
16    questions and then I will allow you to answer the
17    questions.
18         It will help the court reporter take down
19    clear testimony and develop a clear record.
20    A.   I understand and appreciate.
21    Q.   Thank you.  And the reporter can't take down
22    nonverbal responses, so in answering questions, please
23    say yes or no instead of nodding your head or shaking
24    your head.
25         Do you understand?

Page 9

1    A.   I understand.
2    Q.   Okay.  And in answering my questions today,
3    you should not speculate or guess, but I am entitled to
4    your best testimony and your best recollection and
5    estimates where appropriate.
6         Do you understand?
7    A.   I understand.
8    Q.   And if for any reason you don't understand a
9    question that I ask, please let me know and I will
10    rephrase my question.
11    A.   I understand.
12    Q.   And if you do answer a question, I and others
13    who are reading the transcript of this deposition will
14    assume that you do understand the question that was
15    asked.
16         Do you understand?
17    A.   I understand.
18    Q.   And as you are aware, the Plaintiff's counsel
19    may interject and make objections from time to time to
20    the form of my questions.
21         You are required to answer my questions even
22    if an objection is made unless counsel instructs you not
23    to answer the question.
24         Do you understand?
25    A.   I understand.

Page 10

1    Q.   And if you're tired, hungry, thirsty or need a
2    break, just let me know.  This is not an endurance
3    contest.  It would be best not to take a break, though,
4    between a question and an answer.
5         Do you understand?
6    A.   I understand.
7    Q.   Okay.  After this deposition, the court
8    reporter will prepare a transcript and you will have a
9    chance to review the transcript and make corrections to
10   the transcript.
11        Do you understand that?
12   A.   I understand.
13   Q.   And I would caution you that if you do make
14   changes to your testimony, I will have an opportunity to
15   comment on those changes and those changes could affect
16   your credibility at trial.
17        Do you understand?
18   A.   I understand.
19   Q.   Do you have any questions about the procedures
20   that we just discussed?
21   A.   I do not.
22   Q.   Any other questions about this deposition?
23   A.   No.
24   Q.   Is there any reason you feel you cannot give
25   your best testimony today?

Page 11

1    A.   No.
2    Q.   Are you suffering from any medical condition
3    that would prevent you from giving your best testimony
4    today?
5    A.   No.
6    Q.   Are you currently taking any medication that
7    would prevent you from giving your best testimony today?
8    A.   No.
9    Q.   Any other reason you'd be unable to give your
10   best testimony today?
11   A.   No.
12   Q.   Thank you.  With those admonitions being
13   completed, we can now move on to the first exhibit which
14   has been pre-marked Exhibit 1.  I have copies.  A copy
15   for you and a copy for you, counsel.
16        Please take an opportunity to review Exhibit
17   1.  Exhibit 1 is the notice of deposition of Stephen
18   Helsley.
19        Have you seen this document before?
20   A.   I have.
21   Q.   Did you discuss this document with Plaintiff's
22   counsel?
23   A.   Yes.
24   Q.   And you have reviewed the document requests
25   that were annexed as Attachment A to Exhibit 1, is that

Page 12

1    correct?
2    A.   I have.
3    Q.   And you've brought documents this morning in
4    response to those document requests, correct?
5    A.   Yes.
6    Q.   And the documents that you have brought are in
7    response to all these categories of requests?
8    A.   Yes.
9    Q.   Are there any categories of documents listed
10   in Attachment A to Exhibit 1 that you could not find?
11   A.   No.
12   Q.   Are there any categories of documents in
13   Exhibit 1 that you found but did not produce?
14   A.   No.
15   Q.   Are there any categories of documents listed
16   in Attachment A to Exhibit 1 that you did not try to
17   find?
18   A.   No.
19   Q.   In searching for responsive documents, did you
20   search for all written materials in your possession?
21   A.   Yes.
22   Q.   Including text messages?
23   A.   Yes.
24   Q.   Any additional documents that you believe that
25   you may need to produce in the future in response to

Page 13

1    these requests?
2    A.   No.
3    Q.   Okay.  Before we begin in earnest, I think it
4    would be a good idea to briefly discuss the background on
5    Section 32310 and the nature of Plaintiff's lawsuit.
6         Are you familiar with Section 32310?
7    A.   I am.
8    Q.   And you've read the statute in full?
9    A.   Yes.
10   Q.   Are you familiar with the federal assault
11   weapons ban that was in effect from 1994 to 2004?
12   A.   I am.
13   Q.   And do you understand that the federal assault
14   weapons ban prohibited generally the manufacture and sale
15   of large capacity magazines?
16   A.   Yes.
17        MR. BRADY:  Objection, calls for a legal
18   conclusion.
19        BY MR. ECHEVERRIA:  Q.  And you understand
20   that under the federal assault weapons ban large capacity
21   magazines were defined as magazines that can accept
22   greater than 10 rounds, correct?
23        MR. BRADY:  Objection, calls for a legal
24   conclusion.
25        BY MR. ECHEVERRIA:  Q.  You can answer the

Page 14

```
1   question.
2       A.   Yes.
3       Q.   Okay.  And you also understand that the
4   federal assault weapons ban did not prohibit the
5   possession of large capacity magazines that were acquired
6   before 1994, correct?
7           MR. BRADY:  Objection, calls for a legal
8   conclusion.
9           BY MR. ECHEVERRIA:  Q.  You can answer the
10  question.
11      A.   Correct.
12      Q.   Okay.  Did you oppose the federal assault
13  weapons ban at the time?
14      A.   I need clarification on your question.
15      Q.   Did you have an opinion as to whether the
16  federal assault weapons ban should have been enacted in
17  1994?
18      A.   Yes, I did have an opinion then.
19      Q.   In 1994 you had an opinion?
20      A.   Yes.
21      Q.   About the assault weapons ban?
22      A.   Yes.
23      Q.   And what was your opinion?
24      A.   I was not supportive.
25      Q.   You were not supportive of the assault weapons
```

Page 15

```
1   ban in general or just the large capacity magazine
2   restrictions?
3       A.   All portions of it.
4       Q.   So when the assault weapons ban lapsed in
5   2004, you were supportive of the lapsing of the statute,
6   correct?
7       A.   I was.
8       Q.   Are you familiar with Senate Bill 23 which was
9   enacted in 1999?
10      A.   Yes, I am.
11      Q.   And you're aware that that is California's
12  restrictions on large capacity magazines?
13      A.   I am.
14      Q.   And you also understand that Senate Bill 23
15  prohibited the sale and manufacture of large capacity
16  magazines but did not prohibit the possession of large
17  capacity magazines that were acquired before January 1st,
18  2000, correct?
19          MR. BRADY:  Objection, calls for a legal
20  conclusion.
21          BY MR. ECHEVERRIA:  Q.  And your answer is --
22      A.   That's correct.
23      Q.   Is it your opinion today that since the year
24  2000 California's large capacity magazine restrictions
25  have undermined law abiding citizens' ability to protect
```

Page 16

```
1   themselves?
2           MR. BRADY:  Objection, calls for speculation.
3           BY MR. ECHEVERRIA:  Q.  You can answer the
4   question.
5       A.   Yes.
6       Q.   And you also understand that in November of
7   2016, the California electorate passed Proposition 63?
8       A.   I am.
9       Q.   And you understand that part of Proposition 63
10  was an amendment to Penal Code Section 32310 to prohibit
11  the possession of large capacity magazines even if they
12  were acquired before the year 2000, correct?
13          MR. BRADY:  Objection, calls for a legal
14  conclusion.
15          THE WITNESS:  I think your question is a
16  little bit too broad for me because it prohibited some
17  but not all people from possessing them.
18          BY MR. ECHEVERRIA:  Q.  But Proposition 63
19  amended Penal Code 32310 to add possession of a large
20  capacity magazine as prohibited conduct, correct?
21      A.   With exceptions.
22          MR. BRADY:  Objection, calls for a legal
23  conclusion.
24          BY MR. ECHEVERRIA:  Q.  And you do understand
25  that Plaintiffs in this case are asserting a
```

Page 17

```
1   constitutional challenge to Penal Code 32310, is that
2   correct?
3       A.   Correct.
4       Q.   And their claims are a Second Amendment claim,
5   a taking claims and a due process claim in this case,
6   correct?
7       A.   Correct.
8       Q.   Are you familiar with the definition of a
9   large capacity magazine under the Penal Code?
10      A.   Yes.
11      Q.   And you are aware that the Section 16740
12  defines a large capacity magazine as, quote, "Any
13  ammunition feeding device with the capacity to accept
14  more than 10 rounds but shall not be construed to include
15  any of the following, subdivision (a), a feeding device
16  that has been permanently altered so that it cannot
17  accommodate more than 10 rounds; subdivision (b), a .22
18  caliber tube ammunition feeding device; subdivision (c),
19  a tubular magazine that is contained in a lever action
20  firearm," unquote.
21          You are familiar with this definition?
22      A.   Yes.
23      Q.   And during this deposition, this is the
24  definition of a large capacity magazine that we will be
25  using.
```

EXHIBIT HELSLEY - 4 Page 5

Page 18

1    A.   Correct.

2    Q.   You're also aware that the Court has entered a

3  preliminary injunction in this case temporarily enjoining

4  enforcement of the amended version of Section 32310,

5  correct?

6    A.   Yes.

7    Q.   Are you aware of large capacity magazines ever

8  being used in mass killings where mass killings is

9  defined as a shooting incident involving four or more

10  fatalities?

11       MR. BRADY:  Objection, calls for speculation,

12  vague and ambiguous.

13       BY MR. ECHEVERRIA:  Q.  You can answer the

14  question.

15    A.   Yes.

16    Q.   So you're aware that on December 2nd, 2015

17  Syed Farook and Tashfeen Malik used assault rifles and

18  large capacity magazines to kill 14 people at an office

19  Christmas party in San Bernardino, California?

20       MR. BRADY:  Objection, vague and ambiguous as

21  to large capacity magazine.

22       BY MR. ECHEVERRIA:  Q.  You can answer.

23    A.   I need clarification.  I don't know if they

24  used assault rifles or assault weapons.

25       BY MR. ECHEVERRIA:  Q.  I'll amend my

Page 19

1  question.

2       You are aware that on December 2nd, 2015 those

3  individuals, Syed Farook and Tashfeen Malik used assault

4  weapons and large capacity magazines to kill 14 people at

5  an office Christmas party in San Bernardino, California?

6       MR. BRADY:  Objection, vague and ambiguous as

7  to large capacity magazines.

8       BY MR. ECHEVERRIA:  Q.  You can answer the

9  question.

10    A.   That is what I heard in news reports.

11    Q.   Do you have any reason to doubt the accuracy

12  of those news reports?

13    A.   That's difficult to respond to because

14  frequently news reports are incorrect when describing

15  firearms used in crimes.

16       I have no specific reasons to believe that

17  those reports were incorrect, but I have a general

18  reluctance to accept such descriptions.

19    Q.   I think healthy skepticism is always good.

20    A.   Yes.

21    Q.   You're also aware that on June 12, 2016, Omar

22  Mateen, M-A-T-E-E-N, used an assault weapon and large

23  capacity magazines to kill 49 individuals at the Pulse

24  nightclub in Orlando, Florida?

25       MR. BRADY:  Objection, vague and ambiguous.

Page 20

1       THE WITNESS:  Again, based on the news reports

2  that I've seen, those were what were described as being

3  used.

4       BY MR. ECHEVERRIA:  Q.  And on October 1st,

5  2017, Stephen Paddock used over 20 firearms and large

6  capacity magazines to kill 58 individuals and injure more

7  than 500 individuals in Las Vegas, Nevada?

8       MR. BRADY:  Objection, vague and ambiguous,

9  calls for speculation.

10       THE WITNESS:  Again, that's what the news has

11  reported.

12       BY MR. ECHEVERRIA:  Q.  And you have no reason

13  to doubt that Mr. Paddock used large capacity magazines

14  in his attack, do you?

15       MR. BRADY:  Objection, argumentative, vague

16  and ambiguous, calls for speculation.

17       BY MR. ECHEVERRIA:  Q.  You may answer that

18  question.

19    A.   I assume the news reports were correct.

20    Q.   Are you aware of large capacity magazines ever

21  being used to kill or injure law enforcement personnel?

22       MR. BRADY:  Objection, vague and ambiguous,

23  calls for speculation.

24       BY MR. ECHEVERRIA:  Q.  You can answer that

25  question.

Page 21

1    A.   I am aware of news reports saying that law

2  enforcement officers were killed with firearms that use

3  large capacity magazines.

4    Q.   And you worked for the California Department

5  of Justice for approximately 26 years, is that correct?

6    A.   Correct.

7    Q.   And in the course of your employment with the

8  Department of Justice, you did review homicide incidents

9  and officer involved shootings, correct?

10    A.   I reviewed them for our staff -- not for local

11  law enforcement, but for DOJ special agents, yes.

12    Q.   And in your reviews of those shooting

13  incidents, did any of them involve large capacity

14  magazines in which law enforcement personnel were killed

15  or injured?

16    A.   No.

17    Q.   And during your time at the Department of

18  Justice, were you personally aware of any other incidents

19  in which law enforcement personnel were killed or injured

20  by large capacity magazines?

21       MR. BRADY:  Objection, vague and ambiguous,

22  calls for speculation, go ahead.

23       THE WITNESS:  Trying to go back in my

24  databases here.

25       BY MR. ECHEVERRIA:  Q.  It was a long time

Page 22

1  ago, I understand.
2      A.   I don't think so.  At least I certainly can't
3  bring such a case to mind.
4      Q.   Okay.  When did you first become involved in
5  this case?
6      A.   I think it was about four months ago.  I can't
7  remember specifically, but it was this year and I want to
8  say June, but I'd have to go back and check to see when
9  the mails occurred.
10     Q.   Mm-hmm.
11     A.   But sometime this year, probably five or six
12  months ago.
13     Q.   Okay.  So approximately June of 2017?
14     A.   I think so.
15     Q.   Okay.  And who contacted you about becoming an
16  expert in this case?
17     A.   Anna -- is it Bavrir?  Is that the --
18          MR. BRADY:  Barvir, B-A-R-V-I-R.
19          BY MR. ECHEVERRIA:  Q.  So Anna Barvir
20  contacted you?
21     A.   Yes, correct.
22     Q.   And what did she ask you -- what kind of --
23  let me rephrase the question.
24          What assistance did she ask for you to provide
25  in this case?

Page 23

1      A.   She asked me to provide expert testimony on
2  this case.
3      Q.   Was anything else about this case discussed
4  with Ms. Barvir?
5          MR. BRADY:  Objection to the extent it calls
6  for attorney expert communications or work product.
7          BY MR. ECHEVERRIA:  Q.  Can you answer that
8  question without divulging any attorney-client privilege
9  information?
10     A.   Yes.  I think the discussion was that she
11  would send me the materials to review to see if I would
12  be willing to do it or not.
13     Q.   Okay.  And were you particularly eager to
14  provide assistance in this case?
15          MR. BRADY:  Objection, vague and ambiguous,
16  argumentative.
17          BY MR. ECHEVERRIA:  Q.  You can answer that
18  question.
19     A.   I was more than happy to do it.
20     Q.   Do you have a written agreement with anyone
21  concerning your involvement in this case?
22     A.   I do not.
23          MR. BRADY:  Can we take a -- go off the record
24  for five seconds?
25          MR. ECHEVERRIA:  We can take a quick break.

Page 24

1          (Discussion held off the record.)
2          MR. ECHEVERRIA:  Back on the record.
3          BY MR. ECHEVERRIA:  Q.  Are you being
4  compensated for your work in this case?
5      A.   No.
6      Q.   You're not receiving any financial
7  compensation?
8      A.   No.
9      Q.   Any other form of benefit that you're
10  receiving for your testimony in this case?
11          MR. BRADY:  Objection, vague and ambiguous.
12          THE WITNESS:  Just the joy of being here
13  today.
14          BY MR. ECHEVERRIA:  Q.  It is fun, isn't it.
15  And did you do anything to prepare for your deposition
16  today?
17     A.   Nothing specific.
18     Q.   Did you review your expert report?
19     A.   Yes.
20     Q.   Did you discuss with counsel in preparation
21  for today's deposition?
22     A.   Yes.
23     Q.   Did you meet with Plaintiff's counsel to
24  prepare for the deposition today?
25     A.   No.

Page 25

1      Q.   You did not meet with Plaintiff's counsel?
2      A.   Did not.
3      Q.   Did you discuss with Plaintiff's counsel on
4  the telephone to prepare for the deposition?
5      A.   Yes.
6      Q.   How many times did you speak on the telephone
7  with Plaintiff's counsel to prepare for the deposition?
8      A.   I think once.
9      Q.   I'm going to provide Exhibit 2 which has been
10  pre-marked.  This is the declaration of Stephen Helsley,
11  pardon me, in support of Plaintiff's motion for
12  preliminary injunction.
13          Have you seen this document before?
14     A.   Yes.
15     Q.   This is a declaration that you wrote in
16  support of Plaintiff's motion for preliminary injunction,
17  correct?
18     A.   Correct.
19     Q.   And this was filed on May 26, 2017.  The
20  filing date?
21     A.   Yes, that's correct.
22     Q.   All right.  So it would appear this was filed
23  before June 2017, correct?
24     A.   Correct.
25     Q.   So you were retained as an expert witness

Page 26

1  before June 2017?
2      A.   Appears so.
3      Q.   Okay.  Were you retained before the filing of
4  this report?
5          MR. BRADY:  Objection, vague and ambiguous as
6  retained.  Calls for speculation, legal question.
7          BY MR. ECHEVERRIA:  Q.  I'll rephrase my
8  question.
9          Did you -- you began drafting this declaration
10 before May 26, 2017, correct?
11     A.   Correct.
12     Q.   How far in advance of the filing of this
13 declaration did you begin your work for Plaintiff's
14 counsel in this case?
15     A.   As best I can recall, my wife and I went to --
16 on our 50th anniversary cruise in May and I'm trying to
17 put things in relationship to that.
18          It was probably when we returned from that
19 cruise which would have been mid to late May.  It's the
20 best I can recall.
21     Q.   Were you working on this declaration while you
22 were on your cruise?
23     A.   No, I don't believe so.
24     Q.   Okay.  I'll provide another exhibit,
25 pre-marked Exhibit 3, Plaintiff's disclosure of expert

Page 27

1  witnesses, and I assume that you have seen this document
2  before?
3          You can take some time to review it.  Have you
4  seen this document before?
5      A.   Yes.
6      Q.   And this document identifies you on page two
7  as an expert witness for Plaintiffs, correct?
8      A.   Correct.
9      Q.   And in Exhibit B attached to Exhibit 3, you
10 provided an expert witness report, correct?
11     A.   Correct.
12     Q.   And this expert witness report is dated
13 October 6, 2017, correct?
14     A.   Yes.
15     Q.   Did you author this document?
16     A.   I did.
17     Q.   What portions of the document did you write?
18     A.   Well, I wrote the majority of it.  I
19 incorporated some of the writings of another that
20 expressed my views that saved me the time composing it,
21 but given that I wrote the whole thing.
22     Q.   Mm-hmm.  I would like to compare the expert
23 report that is Exhibit 3 with the declaration that you
24 submitted in support of the preliminary injunction motion
25 which is Exhibit 2.

Page 28

1      A.   Okay.
2      Q.   I'll try to do this in a way that won't
3  confuse all of us and the court reporter and whoever is
4  reading this deposition transcript.
5          Are you familiar with any differences between
6  your declaration in support of the preliminary injunction
7  motion, Exhibit 2, and your expert witness report,
8  Exhibit 3?
9      A.   The only differences that I'm aware of is
10 there is more information or different information in the
11 two of them.
12     Q.   And what would that different information be?
13     A.   It calls for a list of the articles that I
14 have written or the books I have written, those sorts of
15 things.
16     Q.   But otherwise the substance of your opinions
17 would be the same between the two documents?
18     A.   The substance of the two should be close,
19 although there's probably more in the latter.
20     Q.   The latter being Exhibit 3?
21     A.   Yeah, I guess that's 3.
22     Q.   On page nine through 10 of Exhibit 3 under
23 section seven, references, you list four documents
24 spanning pages nine to 10?
25     A.   Yes.

Page 29

1      Q.   Are these the only documents that you relied
2  upon in forming your opinions that are set forth in the
3  report?
4          MR. BRADY:  Objection, vague and ambiguous as
5  to relied upon.
6          BY MR. ECHEVERRIA:  Q.  You can answer that
7  question.
8      A.   These are the only documents where I went to a
9  book or a journal.  The majority of which here is just
10 information that I know through the years of being
11 involved with firearms.
12     Q.   And do any of these documents listed under the
13 references section, do any of these documents concern
14 large capacity magazines?
15          MR. BRADY:  Objection, vague and ambiguous as
16 to concern.
17          THE WITNESS:  The first one, Gun Book For
18 Boys, there are chapters in there that discuss large
19 capacity magazines.
20          BY MR. ECHEVERRIA:  Q.  You cite to pages 56
21 and 57 of the Gun Book For Boys?
22     A.   Mm-hmm, yes.
23     Q.   Is that page range within any of the chapters
24 that discuss large capacity magazines?
25     A.   I would have to look.  The book is here.  I

Page 30

1  don't recall.
2      Q.  Okay.  Did Plaintiff's counsel assist you in
3  the preparation of this report Exhibit 3?
4      A.  What do you mean by assist?
5      Q.  Did Plaintiff's counsel provide any comments
6  to you about your report or suggest any revisions to your
7  report?
8      A.  I'm trying to recall.  There may have been
9  discussions about clarity.
10         I don't recall discussions about content, but
11  there may have been places where the way I wrote
12  something might not have been clear enough.
13         So if that's what you mean by assistance, then
14  yes.
15         MR. ECHEVERRIA:  Okay.  I'm going to mark as
16  Exhibit 4 a copy of a document entitled "Resume" that was
17  marked as Exhibit 2 to a prior deposition that you
18  participated in.
19         (Exhibit 4 was marked.)
20         BY MR. ECHEVERRIA:  Q.  This document was
21  Exhibit 2 to the deposition of Stephen Helsley in the
22  case of Parker versus State of California, Case Number
23  10-CECG-02116 in the Superior Court of Fresno County.
24         Were you deposed in that case?
25      A.  I was.

Page 31

1      Q.  And do you recall seeing Exhibit 4 before?
2      A.  I do.
3      Q.  And this resume was current as of
4  approximately 2010, correct?
5      A.  Correct.
6      Q.  I'd like to walk through the resume and your
7  background and then maybe after we do that we can see
8  whether anything else needs to be added in terms of your
9  experiences, publications or any work since 2010 to
10  today.  Okay?
11      A.  Okay.
12      Q.  And you attended college, correct?
13      A.  Correct.
14      Q.  Where did you go to college?
15      A.  I attended, I think, eight different ones.
16  Would you like them all?
17      Q.  So on page three of your resume under
18  education it says university, graduated from California
19  State University, Fresno.
20         Did you attend any other institutions before
21  receiving your degree from Fresno State University?
22      A.  I did.
23      Q.  And what were those schools?
24      A.  The University of North Dakota, Santa Monica
25  City College prior, and then a number post.

Page 32

1      Q.  Post -- what do you mean by post?
2      A.  After I obtained my degree from Fresno State,
3  I went to additional --
4      Q.  Right.
5      A.  -- schooling.
6      Q.  And you received a bachelor's degree in -- or
7  a bachelor of science degree in criminology in 1967?
8      A.  Correct.
9      Q.  And you attended graduate school?
10      A.  Yes.
11      Q.  Where did you attend graduate school?
12      A.  National University.
13      Q.  National University?
14      A.  Correct.
15      Q.  Where is that located?
16      A.  Well, the campus that I went to was San Diego.
17  I also had graduate work at the University of Virginia
18  through the FBI National Academy program.
19      Q.  Okay.  So at National University, what were
20  you studying?
21      A.  Business administration.
22      Q.  Did you receive a degree in business
23  administration from National University?
24      A.  I did not.
25      Q.  And how long did you attend National

Page 33

1  University?
2      A.  A year, I think.
3      Q.  Then after attending National University, you
4  participated in the FBI National Academy?
5      A.  Correct.
6      Q.  Can you describe the FBI National Academy?
7      A.  It was an 11 or 12-week course in Quantico,
8  Virginia for law enforcement managers.
9      Q.  And you testified that you attended the
10  University of Virginia?
11      A.  Yes, that's -- the coursework there is
12  University of Virginia credits that you can apply toward
13  a graduate degree.
14      Q.  I see.  I see.  And you graduated from the FBI
15  National Academy in 1975?
16      A.  Correct.
17      Q.  I see that you received a 4.0 grade point
18  average.  That's impressive.
19         Did you take any other graduate courses after
20  attending the FBI National Academy?
21      A.  Graduate, no.
22      Q.  Did you attend any other educational
23  institutions?
24      A.  Yes.
25      Q.  What were those?

Page 34

1    A.  Sacramento City College, Sacramento State,
2  UCD.
3    Q.  That would be University of California, Davis?
4    A.  Davis.  And the University of Washington in
5  Seattle.
6    Q.  And what did you study at Sacramento City
7  College?
8    A.  Russian.
9    Q.  And at Sacramento State?
10   A.  Same.
11   Q.  And at the University of California Davis?
12   A.  The same.
13   Q.  And the University of Washington?
14   A.  Same.
15   Q.  Were you pursuing any degree when you were
16  attending those schools?
17   A.  Well, I wanted to get the equivalent of a
18  degree by going to all those schools essentially at the
19  same time.
20       I couldn't get a degree, but I wanted to
21  complete all the coursework that would have been required
22  for a degree.
23   Q.  And why couldn't you get a degree -- oh, an
24  undergraduate degree?
25   A.  Yes.

Page 35

1    Q.  Okay.  Have you ever taught any courses at a
2  community college or university?
3    A.  I have.
4    Q.  What were those courses?
5    A.  Merced Junior College Drug Law Enforcement
6  circa 1971.
7    Q.  You taught a course in drug enforcement?
8    A.  Yes.
9    Q.  In 1971?
10   A.  Yes.
11   Q.  Can you describe what that course was about
12  beyond the name of the course?
13   A.  The health and safety code, the techniques
14  used by drug law enforcement staff, the technical aspects
15  of drugs, narcotics versus hallucinogens.
16       All of the things that someone who did drug
17  lawn enforcement would need to know.
18   Q.  Did that course cover firearms at all?
19   A.  No.
20   Q.  That course did not cover large capacity
21  magazines?
22   A.  No.
23   Q.  You are an FBI certified range master,
24  correct?
25   A.  Correct.

Page 36

1    Q.  Can you describe what that is?
2    A.  Well, it's a course that I took that certified
3  me to teach law enforcement employees the proper way to
4  use their firearms.
5    Q.  And what did you have to do to become
6  certified?
7    A.  There was a course held at the Stockton Police
8  Department.  I want to say it was a one-week course.
9    Q.  And what were you required to do during that
10  one-week course?
11   A.  Well, there was classroom instruction.  There
12  was on the range instruction being taught to teach, all
13  firearm related just about exclusively for handguns.
14   Q.  During that course did you use any large
15  capacity magazines with those handguns?
16   A.  No.
17   Q.  Do you use your FBI certification today?
18   A.  No.
19   Q.  Do you provide any training to anyone in the
20  use or operation of firearms?
21   A.  Training.  The last training I did was
22  probably 2008.  I've given talks to professional groups
23  about firearms, but if we're talking about training, I
24  want to say 2008.
25   Q.  And what is your definition of the term

Page 37

1  training?
2    A.  My definition of training is a structured --
3  either a classroom session or an on-the-range session
4  where I have a lesson plan and visual aids.
5    Q.  Okay.  And you last provided training in 2008,
6  correct?
7    A.  Correct.
8    Q.  And when did you begin providing training?
9    A.  The first training in firearms that I did was
10  for Department of Justice, Bureau of Narcotic
11  Enforcement.  It would have been 1971, I think.
12   Q.  And did you provide training to law
13  enforcement personnel?
14   A.  Yes.
15   Q.  And you provided training from 1971 until you
16  retired from the Department of Justice in 1993?
17   A.  No.  I provided training while I was still in
18  the field, if you will.  When I was promoted to a
19  management position, I ceased doing it.  I was still
20  involved, but not with training directly.
21       I was the firearms instructor's instructor for
22  the academy classes.  When new special agents were
23  brought on board, I was the person -- or one of the
24  people, at least, that taught the new hires how to shoot.
25   Q.  And in these training sessions, did you

Page 38

1    discuss the use or the operation of large capacity
2    magazines?
3        A.   No.
4        Q.   And you testified a bit a short while ago that
5    you also provided talks concerning the use or operation
6    of firearms, is that correct?
7        A.   Or the firearm subject in general, yes.
8        Q.   And what is your definition of the term
9    "talks"?
10       A.   Well, for instance, a professor in the
11   religion department, I believe it was at UCD, asked me to
12   come and address her class on firearm issues.
13            And so there was a class of 120 students, I
14   believe it was, in an auditorium kind of room where I
15   gave them a talk about a whole variety of things relating
16   to firearms.
17            I gave a talk in September at the American
18   Society of Arms Collectors on the location of Hemingway's
19   guns and related things.
20       Q.   So these talks are not just to law enforcement
21   personnel, correct?
22       A.   Correct.  I have not spoken as a trainer to
23   law enforcement in some time.
24       Q.   And in these talks, have you discussed large
25   capacity magazines?

Page 39

1        A.   Yes.  In the talk at UCD I did, yes.
2        Q.   And when was the talk at UCD?
3        A.   Probably two years ago.
4        Q.   And what was the discussion about large
5    capacity magazines during that talk?
6        A.   I took the group through legislation that had
7    been passed -- whether it was assault firearms, so-called
8    large capacity magazines, a variety of things -- and
9    suggested that they take a look at them from an alternate
10   point of view.
11            And so it was basically taking existing law
12   and explaining to them that most people don't understand
13   firearms and don't understand the law and to better
14   understand it, you should think of A, B and C.
15       Q.   Have you served in the military before?
16       A.   No.
17       Q.   So we're going to cover your career at the
18   Department of Justice.
19            In the resume which has been marked as Exhibit
20   4 in this deposition, under professional history, at the
21   bottom it indicates that you were a special agent in the
22   Fresno office from 1967 to 1972, correct?
23       A.   Correct.
24       Q.   Can you describe what your duties and
25   responsibilities were as a special agent in the Fresno

Page 40

1    office?
2        A.   Okay.  The position was then referred to as
3    narcotic agent.  There was a reorganization that took
4    place in 1973 that changed the titles, but the job
5    remained the same.
6            As a new hire, as a trainee, what my basic
7    function was to work in an under cover role and buy drugs
8    and that was primarily what I did for years.
9        Q.   And then you became a special agent supervisor
10   in the San Diego office?
11       A.   Correct.  When I was promoted, it was called
12   narcotic field supervisor.
13            And then in 1973 the name was changed to
14   special agent supervisor.
15       A.   Yes.
16       Q.   What were your duties and responsibilities as
17   a special agent supervisor?
18       A.   I supervised a team of six doing drug
19   investigations and making arrests.
20       Q.   During your time as a special agent and
21   special agent supervisor, did you provide any instruction
22   or training to other Department of Justice personnel
23   about the use of firearms?
24       A.   Yes.
25       Q.   Did you provide any advice to Department of

Page 41

1    Justice personnel on the use of firearms?
2        A.   Yes.  I provided advice to management.  We
3    were -- there were academy classes that were hired during
4    that period, so I would go from San Diego to Sacramento
5    to teach the academy classes.
6            And there seems to be a constant revision of
7    the qualification courses and the rules and regulations
8    relating to firearms and I was more or less the point
9    person on doing the staff work on a lot of that related
10   stuff.
11       Q.   And while you were a special agent and a
12   special agent supervisor, you had -- you used a firearm
13   in the course of your duties, right?
14       A.   I did.
15       Q.   What firearm or firearms did you use at that
16   time?
17       A.   I had a Colt model 1911 commercial 45 ACP,
18   serial number 312850.
19       Q.   Good memory.  And did that firearm use large
20   capacity magazines?
21       A.   It did not.
22       Q.   Did you possess any large capacity magazines
23   at that time?
24       A.   No.
25       Q.   Did you instruct or advise any Department of

Page 42

1  Justice personnel that they should use large capacity
2  magazines in connection with their law enforcement
3  duties?
4      A.   Prior to 1976, special agents provided their
5  own firearm and so you could carry whatever you felt
6  like.
7           Some people chose to carry a model 59 Smith or
8  a Browning high power, both of which had what we're now
9  referring to as high capacity magazines.
10          So I was dealing with some employees, some new
11 hires who had those, but it was not until I think 1976
12 that standardization began.
13     Q.   So prior to 1976, law enforcement personnel
14 could choose what firearm they would bring to the job?
15     A.   DOJ special agents could.
16     Q.   And some of them did use the two firearms you
17 just testified about?
18     A.   Yes.
19     Q.   And those accept large capacity magazines?
20     A.   Well, the high power has a 13-round magazine,
21 I believe, and the model 59 Smith, I believe, has a
22 14-round.
23     Q.   Can they operate with a magazine that holds 10
24 bullets or less?
25     A.   You mean cartridges.

Page 43

1      Q.   My question was about bullets.
2      A.   Well, a bullet is a part of a cartridge.
3  There's a bullet, powder charge, primer in a case.
4  Combined they are a cartridge.
5           So they can hold less than 13.  You can load
6  13 cartridges into -- I'm sorry.  You can load 10
7  cartridges into a magazine that holds 13, yes.
8      Q.   And the firearm will operate if it is loaded
9  with 10 or fewer cartridges?
10     A.   Yes.
11     Q.   And even though you could bring as a special
12 agent any firearm that you wanted, you did not select a
13 firearm that used any large capacity magazines, is that
14 correct?
15     MR. BRADY:  Objection, misstates testimony,
16 vague and ambiguous.
17     BY MR. ECHEVERRIA:  Q.  You can answer that
18 question.
19     A.   Correct.
20     Q.   Why did you choose not to use any large
21 capacity magazines while you were a special agent?
22     A.   When I was hired, I don't believe that I knew
23 there was such a thing.
24          The universe was very small of semi-auto
25 pistols that had a magazine that held 10 rounds or more

Page 44

1  and I selected the .45.
2      I had an extensive amount of work done to it.
3  I shot it a lot.  I was bonded with it and I didn't
4  choose to replace it until it wore out.
5      Q.   And when did you replace that firearm?
6      A.   1987 approximately.
7      Q.   Okay.  So moving along in your career, in 1976
8  you became special agent in charge?
9      A.   Correct.
10     Q.   Would that be in charge of the Fresno office
11 or were you just working out of the Fresno office?
12     A.   No.  I was in charge of the field office in
13 Fresno.  We were then BINE, B-I-N-E, the Bureau of
14 Investigation and Narcotic Enforcement, and I was the
15 special agent in charge of that field office.
16     Q.   And what were your duties and responsibilities
17 as special agent in charge?
18     A.   Well, it was to manage the drug investigations
19 and the civil and criminal work that the staff from that
20 site did.
21     Q.   Then you became the chief of the Bureau of
22 Narcotic Enforcement?
23     A.   Correct.
24     Q.   And you served in that position from 1979
25 until 1985?

Page 45

1      A.   Correct.
2      Q.   And what were your duties and responsibilities
3  as chief of the Bureau of Narcotic Enforcement?
4      A.   Well, the bureau had -- I forget.  I think
5  there were seven field offices at the time and county
6  tasks forces and through time the CAMP program came
7  online.
8           My job was to manage all the drug law
9  enforcement work that DOJ did.
10     Q.   In your expert report which is Exhibit 3, you
11 state that, quote, "In my executive level positions, I
12 had occasion to review special agent involved shootings
13 and a wide range of homicides involving firearms," end
14 quote.
15          Are you familiar with that sentence?
16     A.   Yes.
17     Q.   What were your executive level positions that
18 you're referring to in that sentence?
19     A.   Essentially when I was in the Bureau of
20 Narcotic Enforcement and then again when I was assistant
21 director, I had a role in shooting review boards, Skelly
22 hearings.
23          With the Bureau of Forensic Services, I was
24 involved in crime scenes and the work that the crime labs
25 did.

Page 46

1    So it was -- the executive level stuff I did
2    was different in BFS than it was in BNE or as assistant
3    director.
4    Q.   Okay.  And you state that you had occasion to
5    review.  What do you mean by the word occasion?
6    A.   Well, whenever we would have a shooting, there
7    would be reports done regarding the shooting and
8    sometimes -- most times there were shooting review boards
9    and all of that paperwork would eventually come to me for
10   approval or review or --
11   Q.   And those reports discussed incidents
12   involving firearms?
13   A.   Yes.
14   Q.   Did any of those reports, to the best of your
15   recollection, concern large capacity magazines used by
16   criminals?
17   A.   I don't think so.  Involved firearms, but I
18   don't recall firearms with magazines that held more than
19   10 rounds.
20   Q.   Then in the next sentence of Exhibit 3 you
21   write, quote, "I was the DOJ's principle firearms
22   instructor for many years" --
23   A.   Yes.
24   Q.   -- unquote.  And we discussed this a bit
25   earlier.

Page 47

1    But your prior testimony suggested that there
2    may have been other instructors, correct?
3    A.   Yes, but I was the lead.  If you had an
4    academy class of 20 or 25 students, you needed more than
5    one instructor, but I was the boss instructor, if you
6    will.
7    Q.   Okay.  And how many years were you the
8    principle firearms instructor at the Department of
9    Justice?
10   A.   Basically from 1971 until I became chief in
11   '79.
12   Q.   So when you became the chief of Bureau of
13   Narcotic Enforcement, you ceased being a firearms
14   instructor?
15   A.   Correct.
16   Q.   Okay.  And after you were the chief of the
17   Bureau of Narcotic Enforcement you became the chief of
18   the Bureau of Forensic Services, correct?
19   A.   Correct.
20   Q.   Why were you reassigned to the Bureau of
21   Forensic Services?
22   A.   Because the attorney general then was very
23   upset with the management of the crime laboratory system
24   and I was dispatched there to fix it.
25   Q.   And what were your duties and responsibilities

Page 48

1    as the chief of the Bureau of Forensic Services?
2    A.   Well, the key was we had 12 or so crime
3    laboratories and there was a major push to re-equip the
4    labs and to enhance what they were doing.
5    So it was to manage what was there and then to
6    lead the effort to craft the BCPs to obtain additional
7    funds to expand the laboratory system.  Midway through,
8    it was to bring DNA online.
9    Q.   Okay.  I generally have an aversion to
10   acronyms, so I'm curious as to what you meant by BCP?
11   A.   Budget change proposal.
12   Q.   Okay.  And I won't ask you to define DNA.  I
13   think we understand that.
14   Then after you were the chief at the Bureau of
15   Forensic Services, you became the assistant director of
16   the division of law enforcement, correct?
17   A.   Correct.
18   Q.   And you served in that position from 1988
19   until you retired, correct?
20   A.   Correct.
21   Q.   And you retired in 1993?
22   A.   Well, I left in '91.  I retired in '93.
23   Burning up time on the books.
24   Q.   What were your duties and responsibilities as
25   the assistant director of the division of law

Page 49

1    enforcement?
2    A.   I believe the position is now referred to as
3    chief.  At that time there was a director who was in
4    charge of the data systems, the fingerprints, records,
5    all of those things and enforcement.
6    So there was a director and there were three
7    assistant directors.  It's my understanding that all of
8    those then became directors and now one has since become
9    chief.  Maybe they've all been converted to be calling
10   chief.
11   So I was in charge.  I was as assistant
12   director then what the chief of the division of law
13   enforcement is now, I believe.  And that is I was in
14   charge of the Bureau of Forensic Services, Bureau of
15   Investigation, Bureau of Narcotic Enforcement, Advanced
16   Training Center, Western States Information Network and
17   the Bureau of Organized Crime.
18   Q.   Okay.  And when you were an assistant
19   director, were you involved in the drafting of the
20   California Assault Weapons Control Act?
21   A.   Not in the drafting of the act, no.
22   Q.   Were you involved in any way in the enactment
23   of the California Assault Weapons Control Act?
24   A.   Yes.
25   Q.   What was your involvement?

EXHIBIT HELSLEY - 4 Page 13

Page 50

1    A.   Attorney General Van de Kamp tasked me with
2    being the lead on technical firearm related issues for
3    the legislation that was then moving its way through and
4    there were committees that were formed and I served on
5    the various committees and provided technical support to
6    our lawyers who were working with Roberti-Roos.
7    Q.   And these committees were in DOJ?
8    A.   No.   These would be police chiefs, sheriffs,
9    DAs.
10        There were some working groups in DOJ, but the
11   main role that I had was to work with then Sheriff
12   Sherman Block from Los Angeles or Daryl Gates, Los
13   Angeles Police Chief, all the members of that advisory
14   group.
15   Q.   And the Roberti-Roos Assault Weapon Control
16   Act was eventually enacted, correct?
17   A.   Yes.
18   Q.   Do you know what year it was enacted?
19   A.   It became effective, I believe, on January 1st
20   of '90, I think.
21   Q.   And you left the Department of Justice in
22   1991?
23   A.   Yes.
24   Q.   So according to your resume which is Exhibit
25   4, it indicates that you were employed by the California

Page 51

1    Department of Justice from 1967 until 1993.
2        Do you see that?
3    A.   Correct.
4    Q.   But you left in 1991?
5    A.   Correct.
6    Q.   And you deferred your retirement until 1993?
7    A.   Yeah.  I was burning off time and so I didn't
8    officially retire.  I got my first PERS check in July of
9    '93.
10   Q.   But from 1991 until 1993 you were not actively
11   working at the Department of Justice?
12   A.   Correct.
13   Q.   Why did you decide to leave the Department of
14   Justice in 1991?
15   A.   A confluence of factors.  The first was that I
16   was walking down the hall carrying some retirement -- or
17   not retirement, some recruiting posters and the ball of
18   my foot collapsed.
19        Because of the wounds I've sustained years
20   before, my left leg is paralyzed and my right leg does
21   all of the work and my right foot just wore out, and so
22   then I was going to have to have the ball of my foot
23   replaced.
24        It was clear, too, that I was not in the plans
25   of the new team and I thought it was best that they have

Page 52

1    their own folks and I didn't think that with the medical
2    problems I had that I should stay on being a sworn peace
3    officer.
4    Q.   Were there any other factors that influenced
5    your decision to leave?
6    A.   No.
7    Q.   And when you testified just now that you were
8    not in the plans of the new team, who was the new team
9    that you're referring to?
10   A.   Dan Lungren.
11   Q.   And what do you mean by the plans of the new
12   team?
13   A.   Well, I was in a career executive assignment
14   position, CEA-4, which meant that I served at the
15   pleasure of -- if they did not want to retain me, I'd
16   revert to a prior civil service position.
17        And it was clear that they were going in an
18   entirely different direction than the Van de Kamp group
19   had gone in, and I just didn't see myself as being part
20   of that.
21   Q.   And what was this different direction that
22   you're speaking about?
23   A.   Well, I guess it depends on how far you want
24   to get into the weeds.
25        The management -- and it was my view that the

Page 53

1    management of the department in the Van de Kamp years was
2    exceptional.  He had placed career people in positions
3    that frequently had been filled by friends of the boss
4    and it was just well run.  We were doing well and the --
5        Because I had gone through the Deukmejian
6    years and the Younger years and the Lynch years, I saw us
7    going back to a way that I was not comfortable with and
8    the people that were appointed and I just -- I just
9    didn't want to be part of that.
10   Q.   So the new direction of the incoming Lungren
11   administration, if you could say, that was concerning
12   organizational issues that you had concerns with?
13   A.   Yes.
14   Q.   Were there any concerns with the new team's
15   policies or positions concerning firearms regulation?
16   A.   No, I don't think that was discussed.
17   Q.   Okay.  So your decision to leave the
18   Department of Justice, it did not have anything to do
19   with the enactment of the Assault Weapons Control Act?
20   A.   No.
21   Q.   On page one of your report Exhibit 3, you
22   state, "For the past 24 years, I was first a state
23   liaison, then later a consultant to the National Rifle
24   Association."
25        Do you see that sentence?

EXHIBIT HELSLEY - 4 Page 14

## Page 54

1    A.   Correct.
2    Q.   How long have you been a member of the
3  National Rifle Association?
4        MR. BRADY:  Objection, privacy grounds.  You
5  can answer if you wish.
6        THE WITNESS:  I think since 1961.  I'm sure
7  since 1968.
8        BY MR. ECHEVERRIA:  Q.  On page four of your
9  resume which has been marked as Exhibit 4, you indicate
10 under firearms related experience that you were an NRA
11 benefactor member.
12       Can you describe what an NRA benefactor member
13 is?
14   A.   The primary role in being one is a
15 contribution.
16   Q.   So anyone who makes a contribution to the
17 National Rifle Association is a benefactor?
18   A.   No, of a certain size.  I don't recall what
19 the threshold is.
20       I think -- well, I'd be guessing.  I don't
21 know what it was.  I became a benefactor by the
22 contribution I made in '93 and I don't know what the
23 financial threshold was.
24   Q.   Okay.  So you became a member of the National
25 Rifle Association in 1961, correct?

## Page 55

1    A.   Yes.
2    Q.   And that was not based on any contribution of
3  money at a certain threshold, correct?
4    A.   No.
5    Q.   Why did you become a member of the National
6  Rifle Association in 1961?
7    A.   In 1961 there was a program known as the DCM,
8  the Director of Civilian Marksmanship.
9        And through the DCM you could purchase surplus
10 military firearms and one of them was the M1 Carbine
11 which, as a 15-year-old at the time, I really wanted to
12 have one of those, but to buy something through the DCM,
13 you had to belong to the NRA.
14   Q.   And you were a life member since 1972,
15 correct?
16   A.   Correct.
17   Q.   What is the difference between a life member
18 and a member?
19   A.   Contribution.  A member is generally someone
20 who pays each year for a subscription and membership.
21       There's a magazine that comes with the
22 membership and pays annual dues.
23   Q.   And then you became a benefactor member after
24 you became a life member?
25   A.   Correct.

## Page 56

1    Q.   What year was that again?
2    A.   '93.
3    Q.   '93, okay.  What activities did you engage in
4  as a member of the National Rifle Association since 1961?
5        MR. BRADY:  Objection on privacy grounds.  To
6  the extent you want to explain your activities, you are
7  free to do so.
8        THE WITNESS:  The only specific activity that
9  I can recall is I attended an annual meeting that was
10 held in San Diego in 1974.  Other than that, I read the
11 magazines.
12       BY MR. ECHEVERRIA:  Q.  Were there any
13 specific activities you engaged in as a life member from
14 1972 on?
15   A.   No.
16       MR. BRADY:  Objection on privacy grounds.
17       BY MR. ECHEVERRIA:  Q.  Any particular
18 activities as a benefactor member since 1993 on?
19       MR. BRADY:  Objection on privacy grounds.
20       THE WITNESS:  No.
21       BY MR. ECHEVERRIA:  Q.  So when you were an
22 employee of the Department of Justice and assisting in
23 the development of the Assault Weapons Control Act, you
24 were a member of the National Rifle Association at that
25 time?

## Page 57

1    A.   Correct.
2    Q.   Okay.  At that time you were a life member, is
3  that right?
4    A.   Yes.
5    Q.   Okay.  And then shortly after the enactment of
6  the Assault Weapons Control Act you became a benefactor
7  member?
8    A.   Correct.
9    Q.   Are you member of the California Rifle and
10 Pistol Association?
11   A.   I am.
12   Q.   And how long have you been a member of the
13 California Rifle and Pistol Association which we will
14 abbreviate as CRPA?
15   A.   I believe since 1993.
16   Q.   Did you become a life member of the CRPA in
17 1993?
18   A.   Correct.
19   Q.   And the CRPA is a Plaintiff in this case?
20   A.   Yes.
21   Q.   And you're currently a member of the CRPA?
22   A.   Yes.
23   Q.   Are you familiar with the CRPA foundation?
24   A.   Yes.
25   Q.   Just to step back a bit, can you explain the

## Page 58

1  mission of the National Rifle Association?
2      MR. BRADY:  Objection, calls for speculation,
3  beyond the scope of what the expert is called to testify
4  about, vague and ambiguous.
5      THE WITNESS:  How detailed would you like this
6  to be?
7      BY MR. ECHEVERRIA:  Q.  At a general level.
8  An elevator pitch for what the National Rifle Association
9  does.
10     A.  Well, the association was formed in New York
11  in 1871.  And many of the members, the founding ones were
12  concerned at the lack of marksmanship skills during the
13  Civil War and they wanted to encourage marksmanship.
14         And initially the NRA was basically a state
15  association from New York, held their first meeting in
16  1873 and worked to get a range, thousand-yard range at
17  Creedmore for competition and practice.
18         Through the years what started off as simply a
19  marksmanship development program morphed into law
20  enforcement instruction, military instruction, safety
21  instruction for kids, political advocacy.
22         The organization, of course, has grown in the
23  140-some years, but it began -- and I believe it still
24  has a core of safe responsible use of firearms.
25     Q.  And today the National Rifle Association

## Page 59

1  engages in political advocacy expressing opinions on
2  proposed legislation, correct?
3      A.  Yes.
4      Q.  Does the CRPA have a different mission than
5  the National Rifle Association?
6      MR. BRADY:  Objection, calls for speculation,
7  vague and ambiguous, beyond the scope of what the expert
8  was called to testify about.
9      THE WITNESS:  The CRPA is the state affiliate
10  for the NRA and the CRPA and state associations
11  throughout the United States that are affiliated have a
12  more local hand on putting on the shooting matches more
13  so because they have the people in the state.
14         They do the hands-on work for state matches
15  for handguns or rifles or those sorts of things.
16     BY MR. ECHEVERRIA:  Q.  Okay.  And do you have
17  any role or have you had any role with the CRPA
18  Foundation?
19     A.  Yes.
20     Q.  What was that role?
21     A.  I served --
22     MR. BRADY:  Objection on privacy grounds.  Go
23  ahead.
24     THE WITNESS:  I served as a trustee for the
25  foundation.

## Page 60

1      BY MR. ECHEVERRIA:  Q.  Was that the only role
2  you had at the CRPA Foundation?
3      A.  Yes.
4      Q.  What is a trustee or what are the duties or
5  responsibilities of a trustee at the CRPA Foundation?
6      A.  The foundation was working to encourage
7  membership to bequeath to the association funds when they
8  passed away or just funds to help the functions of the
9  CRPA.
10         The trustees were the folks who reviewed
11  requests that were received for a grant for new
12  equipment, for a range or using the funds that were
13  appropriate to come out of that account.
14     Q.  Okay.  And what does the CRPA Foundation do,
15  again?
16     A.  Well, the trustees -- I guess you'd call them
17  the board of directors, the managers of the account, and
18  the role that I remember specifically being involved with
19  was a shooting range in Los Angeles, for instance, would
20  say, well, we need a grant for project X.
21         And if that project was consistent with how
22  foundation funds were supposed to be spent, we would
23  review the merits of those requests and say yes, we will
24  grant this request or no, we won't.
25     MR. ECHEVERRIA:  Okay.  I'm going to mark as

## Page 61

1  Exhibit 5 an IRS Tax Form 990 titled, "Return of
2  Organization Exempt From Income Tax," and this is from
3  the year 2016.
4      (Exhibit 5 was marked.)
5      BY MR. ECHEVERRIA:  Q.  Have you ever seen
6  this document before?
7      A.  I have not.
8      Q.  Are you familiar with the IRS Tax Form 990?
9      A.  No.
10     Q.  Okay.  If you turn to page seven of Exhibit 5,
11  this provides a list -- or this section is for
12  compensation of officers, directors, trustees, key
13  employees, highly compensated employees and independent
14  contractors.
15         Do you see that title at the top of page
16  seven?
17     A.  Yes.
18     Q.  Okay.  And then there's a list of different
19  officers of the CRPA Foundation, correct?
20     A.  Correct.
21     Q.  And at item number four, Steve Helsley is
22  identified, correct?
23     A.  Correct.
24     Q.  Is that you?
25     A.  Yes.

EXHIBIT HELSLEY - 4 Page 16

Page 62

1    Q.   And it indicates that your position is
2  secretary of the CRPA Foundation?
3    A.   Correct.
4    Q.   So you were not trustee of the CRPA Foundation
5  in 2016, correct?
6    A.   Yes.
7    Q.   You were the secretary?
8    A.   There was a title, I was trustee and
9  secretary.
10    Q.   So when did you -- were you always the
11  secretary of the CRPA Foundation?
12    A.   When I was voted in as a trustee, I believe
13  the vacancy was in the secretary position and I think
14  that's the sequence of events.
15    Q.   Okay.
16        MR. ECHEVERRIA:  Okay.  I'm going to mark as
17  Exhibit 6 a document that may help refresh your
18  recollection.
19        (Exhibit 6 was marked.)
20        BY MR. ECHEVERRIA:  Q.  Have you ever seen
21  Exhibit 6 before, Mr. Helsley?
22    A.   No.
23    Q.   Exhibit 6 is a form 990 EZ entitled, "Short
24  Form Return of Organization Exempt From Income Tax," and
25  the year is 2008 for Exhibit 6.

Page 63

1        Do you see that?
2    A.   I do.
3    Q.   Okay.  And if you refer to page two of Exhibit
4  6, in part four there is a list of officers, directors,
5  trustees and key employees.
6        Do you see that?
7    A.   I do.
8    Q.   And do you see your name second from the
9  bottom of that list?
10    A.   I do.
11    Q.   And it identifies your position as trustee,
12  correct?
13    A.   Correct.
14    Q.   And then for the individual above your name,
15  the office that is identified is secretary, do you see
16  that?
17    A.   I do.
18    Q.   So in 2008, were you a secretary and trustee
19  of the CRPA Foundation or just a trustee?
20    A.   I'm trying to recall the sequence of events.
21  There were people who left the board of trustees and I
22  joined it and my recollection is that when I went in, I
23  went in as secretary, but I can't -- I can't explain
24  this.
25        My recollection is that if not immediately

Page 64

1  upon becoming part of the board of trustees, that very
2  soon thereafter I became secretary.
3    Q.   And when did you become a trustee at the CRPA
4  Foundation, again?
5    A.   Boy, I'd have to go back and check on that.  I
6  don't recall now.
7    Q.   But it was before 2008?
8    A.   Well, I don't know that it was before then.
9  There's a limit on the number of years you can serve and
10  I remember that I was on the board of trustees for a
11  number of years, but as to what years they were, I'm not
12  clear on that.
13    Q.   Okay.  So the office that was identified for
14  you in Exhibit 6 may have been incorrect?
15        You may have also been the secretary at that
16  time, is that correct?  Is that your testimony?
17        MR. BRADY:  Objection, misstates the
18  testimony, vague and ambiguous, calls for speculation.
19  You can answer.
20        THE WITNESS:  I don't know that it's
21  incorrect.  I remember that Walt Mancell left and I don't
22  remember if he was there the full year or how exactly it
23  worked, but my memory could be faulty here.
24        But I remember going on to the board of
25  trustees as the secretary when I originally joined the

Page 65

1  board of trustees.
2        BY MR. ECHEVERRIA:  Q.  Okay.  And what were
3  your duties and responsibilities as secretary of the CRPA
4  Foundation?
5        MR. BRADY:  Objection to the extent it calls
6  for protected information.
7        BY MR. ECHEVERRIA:  Q.  You can answer that
8  question.
9    A.   Nothing in particular.  We had -- virtually
10  all the meetings we had were by telephone.
11    Q.   Did you record meeting minutes?
12    A.   I did not.
13    Q.   As secretary, did you maintain any records for
14  the CRPA Foundation?
15    A.   I did not.
16    Q.   Were there any activities that you engaged in
17  as secretary of the CRPA Foundation?
18    A.   Beyond the telephone calls, no.
19    Q.   And these are telephone calls that other
20  officers would also participate in, correct?
21    A.   Yes, teleconferences.
22    Q.   Okay.  Are you familiar with Chuck Michel?
23    A.   Yes.
24    Q.   How long have you known Chuck Michel?
25    A.   23, 4, 5 years.

1    MR. ECHEVERRIA:  And for the reporter, Michel
2  is M-I-C-H-E-L.
3    BY MR. ECHEVERRIA:  Q.  Can you please repeat
4  that testimony?
5    A.  Somewhere between 23 and 25 years.
6    Q.  And Mr. Michel is affiliated with the CRPA?
7    A.  Yes.
8    Q.  Has he served in any roles, to your knowledge,
9  with the CRPA?
10    A.  Yes.
11    Q.  What were those roles?
12    A.  I believe he's president now.
13    Q.  And he was also on -- he was also an officer
14  of the CRPA Foundation, correct?
15    A.  I don't recall if he was an officer or if he
16  was -- served in some sort of counselor role.  I don't
17  recall.
18    Q.  Okay.  Exhibit 6 may refresh your
19  recollection.  On page two, the same page that has your
20  name --
21    A.  Mm-hmm.
22    Q.  A few lines above your name is Chuck Michel
23  and he's identified as a trustee?
24    A.  Okay.
25    Q.  Does that refresh your recollection as to what

1  his involvement may have been with the CRPA Foundation?
2    A.  I remember that Chuck was on our
3  teleconference calls.  I just don't recall him being a
4  trustee.
5    Q.  And how did you meet Chuck Michel?
6    A.  When I was the liaison for the NRA, my
7  recollection is that Chuck represented a client who had
8  come to us for assistance or advice.
9    I can't think of the specifics, but it was
10  more than likely someone had been arrested for illegal
11  possession of something and I got to know Chuck through
12  that case, but I can't recall the specifics.
13    Q.  Okay.  And this is approximately 23 to 25
14  years ago?
15    A.  Yes.
16    Q.  And you stayed in touch with Mr. Michel since
17  then?
18    A.  Yes.
19    Q.  Okay.  Are you primarily a business associate
20  of Mr. Michel?
21    A.  No.
22    Q.  Would you describe yourself as a friend of
23  Mr. Michel?
24    A.  Yes.
25    Q.  Would you say that Mr. Michel is a close

1  friend of yours?
2    A.  Well, I don't think I've seen him in years.
3  He's a person I respect, that I worked with, but we've
4  never socialized.  I've never been to his house, he's
5  never been to my house.
6    All of the contact that I've had with him is
7  professionally related things.
8    Q.  But you would still describe him as a friend?
9    A.  Yes.
10    Q.  Were you compensated for your work at the CRPA
11  Foundation?
12    A.  No.
13    Q.  You received no monetary compensation for the
14  CRPA --
15    A.  No.
16    Q.  -- CRPA or the CRPA Foundation?
17    A.  No.
18    Q.  Okay.  Are you a member of Calguns?
19    A.  No.
20    Q.  Are you familiar with Calguns?
21    A.  Yes.
22    Q.  Are you a member of any other firearms-related
23  organizations?
24    A.  Yes.
25    Q.  What are those organizations?

1    A.  Well, I belong to the Arizona State Rifle and
2  Pistol Association.  I belong to the German Gun
3  Collectors Association.  To the California Side by Side
4  Association -- or Society, I'm sorry.  California Side by
5  Side Society.
6    I belong to the American Society of Arms
7  Collectors.  The Nevada State Association that's listed
8  on this form is defunct.  I suppose I still belong to it,
9  but they are gone.
10    Q.  And when you say listed on this form, you're
11  referring to page four --
12    A.  Page four of --
13    Q.  -- Exhibit 4?
14    A.  Correct.
15    Q.  Okay.
16    A.  I'm a technical advisor to the Association of
17  Firearm and Tool Mark Examiners.
18    Q.  Are you still a life member of the Folsom
19  Shooting Club, Incorporated?
20    A.  Yes.
21    Q.  What is the Folsom Shooting Club, Inc.?
22    A.  The Folsom Shooting Club, Inc., is a group
23  that used to own a range in the City of Folsom but had to
24  move because the city surrounded it.
25    And they bought a new piece of land that's

Page 70

1 called the Sacramento Valley Shooting Center, but it's
2 run and owned by the Folsom Shooting Club, Inc., and so
3 it's a very large public range down in the Ione area.
4     Q.   Okay.  I don't know if you testified about
5 this yet, but are you still an annual member of Single
6 Action Shooters Society?
7     A.   No.
8     Q.   Does the Single Action Shooters Society still
9 exist?
10    A.   Yes.
11    Q.   Can you describe what that organization is?
12    A.   It's focused on what they call cowboy shooting
13 where you dress up with your 10-gallon hat and your
14 single action revolver and recreate the old west.
15    Q.   When did you stop being a member of the Single
16 Action Shooters Society?
17    A.   Probably two or three years ago.
18    Q.   Would you consider yourself a gun enthusiast?
19    A.   Yes.
20    Q.   Going back to your professional career, you
21 left the Department of Justice in 1991?
22    A.   Yes.
23    Q.   And you deferred retirement until 1993?
24    A.   Correct.
25    Q.   Were you employed by anyone between 1991 and

Page 71

1 1993?
2     A.   Yes.
3     Q.   Who were you employed by?
4     A.   I went to work for the NRA on March 1st, I
5 believe it was, 1993.
6     Q.   So between 1991 and 1993 you were not employed
7 by anyone or any organizations?
8     A.   I was a student.
9     Q.   And you became the state liaison for the
10 National Rifle Association in 1993, correct?
11    A.   Correct.
12    Q.   Who contacted you or who did you contact about
13 that position?
14    A.   I was contacted by Sandra Froman who was on
15 the board of directors of the NRA at the time.
16    Q.   Did you know Sandra Froman before she
17 contacted you?
18    A.   Yes.
19    Q.   And what was your association with Sandra
20 Froman before she contacted you?
21    A.   Her husband, the late Bruce Nelson had been a
22 shooting associate of mine and a subordinate of mine at
23 DOJ.
24    Q.   And during your conversation with Sandra
25 Froman, did she explain to you why the National Rifle

Page 72

1 Association wanted to employ you?
2     A.   Well, she didn't know if the association
3 wanted to employ me or not.  She wanted me to come back
4 to Washington, D.C. and talk to them because she thought
5 that I should go to work for them.
6     Q.   Okay.  So she thought that you should work for
7 the National Rifle Association?
8     A.   Yes.
9     Q.   Not that the National Rifle Association
10 necessarily wanted to hire you?
11    A.   Correct.
12    Q.   And why did she think that you would be a good
13 fit for the National Rifle Association?
14        MR. BRADY:  Objection, calls for speculation,
15 beyond the scope of what the expert was called to testify
16 about, irrelevant.
17        BY MR. ECHEVERRIA:  Q.  You can answer that
18 question.
19    A.   She knew what my views on firearms were and I
20 had known her at that point for probably 10 years.
21    Q.   And what views about firearms are you
22 referring to?
23    A.   Well, just what Second Amendment rights were
24 or should be.
25    Q.   Ms. Froman did not have any concerns about the

Page 73

1 fact that you were involved in the enactment of the
2 Assault Weapons Control Act?
3        MR. BRADY:  Objection, calls for speculation,
4 misstates testimony, beyond the scope of what the expert
5 was called to testify about, irrelevant.
6        BY MR. ECHEVERRIA:  Q.  You can answer.
7     A.   No.
8     Q.   How long did you serve as a state liaison for
9 the National Rifle Association?
10    A.   Seven years.
11    Q.   Were you the only state liaison for the
12 National Rifle Association in California during that
13 time?
14    A.   There was another one stationed here, but his
15 assignment was the northwest.  So he had no role in
16 California, but he was housed in the same space that I
17 was in.
18    Q.   Understood.  But you were the only California
19 state liaison for the National Rifle Association?
20    A.   Correct.
21    Q.   And what were the years of that position?
22    A.   '93 to 2000.
23    Q.   And what were your duties and responsibilities
24 as the state liaison for the California for the National
25 Rifle Association?

EXHIBIT HELSLEY - 4 Page 19

Page 74

1    A.    I was to represent the interests of the
2  association in state and local affairs primarily for
3  legislation, media.
4    Q.    Were you a lobbyist for the National Rifle
5  Association at that time?
6    A.    Yes.
7    Q.    So you would contact members of the California
8  legislature and lobby on behalf of the National Rifle
9  Association in connection with potential firearms
10 legislation?
11   A.    Yes.
12   Q.    During your time as the state liaison for the
13 National Rifle Association, did you ever advocate in
14 support of any gun control measures?
15        MR. BRADY:  Objection --
16        THE WITNESS:  Advocate --
17        MR. BRADY:  Sorry.  Objection, vague and
18 ambiguous.
19        THE WITNESS:  For --
20        BY MR. ECHEVERRIA:  Q.  Let me rephrase the
21 question.
22        When you were the state liaison for the
23 National Rifle Association, did you ever lobby any
24 members of the legislature in support of any gun control
25 measures?

Page 75

1         MR. BRADY:  Objection, vague and ambiguous.
2         BY MR. ECHEVERRIA:  Q.  You can answer.
3    A.    Not gun control, no.
4    Q.    So you opposed gun control measures when you
5  were the state liaison for the National Rifle
6  Association?
7         MR. BRADY:  Objection, misstates testimony,
8  vague and ambiguous.
9         THE WITNESS:  Correct.
10        BY MR. ECHEVERRIA:  Q.  Okay.  Were you
11 compensated for your work as the state liaison for the
12 National Rifle Association?
13   A.    I was.
14   Q.    Did you receive a salary from the National
15 Rifle Association?
16   A.    Yes.
17   Q.    Did your salary change during the 17 years
18 that you served as the state liaison?
19   A.    Seven years.
20   Q.    Apparently my math is faulty, thank you.  Is
21 years, 1993 to 2000?
22   A.    I don't recall if there were cost of living
23 pay increases or not, but for the most part my salary was
24 the same for all seven years.
25   Q.    Okay.  And what was that salary?

Page 76

1         MR. BRADY:  Objection on privacy grounds,
2  beyond the scope of what the expert was called to testify
3  about.  You can answer if you want.
4         THE WITNESS:  I think it was about 75 to
5  80,000 a year.
6         BY MR. ECHEVERRIA:  Q.  Did you receive any
7  other benefits from the National Rifle Association in
8  connection with your service as the state liaison?
9         MR. BRADY:  Objection on privacy grounds,
10 beyond the scope of what the expert is called to testify
11 about, irrelevant.  You can answer if you wish.
12        BY MR. ECHEVERRIA:  Q.  You can answer.
13   A.    It had a 401(k) plan, a retirement plan.
14   Q.    So it would be your estimate that over the
15 course of your seven years as the state liaison, you
16 earned approximately 560,000?
17        MR. BRADY:  Objection, calls for speculation,
18 beyond the scope of what the expert was called to testify
19 about, misstates the testimony, irrelevant.
20        BY MR. ECHEVERRIA:  Q.  You can answer.
21   A.    I'll rely on your math.
22   Q.    Okay.  And that would be in addition to
23 retirement benefits that the National Rifle Association
24 provided to you?
25        MR. BRADY:  Objection, misstates testimony,

Page 77

1  calls for speculation, beyond the scope of what the
2  expert was called to testify about, irrelevant.
3         BY MR. ECHEVERRIA:  Q.  You can answer the
4  question.
5    A.    Correct.
6    Q.    After your discussion with Ms. Froman, when
7  were you -- or what other discussions did you have with
8  the National Rifle Association before becoming the state
9  liaison?
10        MR. BRADY:  Objection, vague and ambiguous, to
11 the extent it calls for private communications that are
12 protected.
13        BY MR. ECHEVERRIA:  Q.  You may answer.
14   A.    I was contacted, I believe, by Patrick
15 O'Malley.  I don't recall what his title was.  And they
16 arranged for me to fly back to Washington, D.C. to meet
17 with various NRA officials.
18   Q.    And did you attend just that one meeting with
19 various NRA officials before being offered the position
20 of state liaison?
21   A.    Yes.
22   Q.    When did they offer you the job of becoming
23 the state liaison?
24   A.    I believe I traveled back there in January and
25 about a week after I was there, they offered me the

EXHIBIT HELSLEY - 4 Page 20

Page 78

1  position.
2      Q.   Did you accept the offer on the spot?
3      A.   I did.
4      Q.   Why did you accept the offer?
5      A.   Well, I believed in what the mission was.  I
6   was caught a little off balance because I had been
7   planning to go to Moscow to work and -- but I guess the
8   best answer is that I just believed in what I would be
9   doing.
10     Q.   Do you recall being deposed in the Parker
11  versus State action?
12     A.   I do.
13     Q.   Do you recall testifying during that
14  deposition that the National Rifle Association made you,
15  quote, unquote "an offer I couldn't refuse"?
16     A.   I don't recall that, but it sounds right.
17         MR. ECHEVERRIA:  Okay.  I'm going to mark as
18  Exhibit 7 excerpts from the deposition transcript in that
19  case.
20         (Exhibit 7 was marked.)
21     BY MR. ECHEVERRIA:  Q.  Do you see the cover
22  page for Exhibit 7, Mr. Helsley?
23     A.   I do.
24     Q.   Have you seen this cover page before?
25     A.   I don't recall seeing it before.

Page 79

1      Q.   Did you review the deposition transcript in
2   Parker versus California before?
3      A.   I'm sure I did.
4      Q.   Okay.  So this is an excerpt from the
5   deposition transcript which was, as you can imagine,
6   fairly lengthy.
7          And this is an excerpt that has pages two
8   through five and then 42 through 44, and I'm going to
9   refer you to page 43 of the deposition transcript on
10  lines four to five.
11         Do you see the testimony quote, "and they made
12  me an offer I couldn't refuse" unquote?
13     A.   Yes.
14     Q.   Is that your -- does that refresh your
15  recollection as having testified that the National Rifle
16  Association made you an offer you couldn't refuse?
17     A.   Well, I'm sure that's correct and whether I
18  can remember it or not, I -- it reflects my perspective
19  on it.
20     Q.   So sitting here today, can you testify that
21  the National Rifle Association made you an offer you
22  couldn't refuse when you accepted the position of state
23  liaison?
24         MR. BRADY:  Objection, confusing, misstates
25  testimony, vague and ambiguous.

Page 80

1      BY MR. ECHEVERRIA:  Q.  You can answer the
2   question to the extent you understand my question.
3      A.   Yes.
4      Q.   Okay.  And what was your -- what do you mean
5   by "an offer I couldn't refuse"?
6      A.   Well, when I went back there to meet with
7   them, I really had no idea what a lobbyist did.
8          The only political activity that I'd been
9   involved with at DOJ was entirely different than what was
10  being proposed.  And so once I understood what the
11  position was, what I'd be required to do, then I agreed
12  to do it.
13     Q.   When the National Rifle Association made you
14  an offer of employment, did they offer you a salary at
15  that time?
16     A.   There was a preliminary offer.  I believe
17  there was some back and forth on benefits and the salary
18  itself.  That's the best I can recall.
19     Q.   Okay.  So from 1993 to 2000 you were the state
20  liaison for the National Rifle Association, correct?
21     A.   Yes.
22     Q.   And you are aware of Senate Bill 23 which we
23  discussed earlier this morning, correct?
24     A.   Yes.
25     Q.   And what is your understanding of what Senate

Page 81

1   Bill 23 intended to do?
2          MR. BRADY:  Objection, calls for a legal
3   conclusion.
4      BY MR. ECHEVERRIA:  Q.  You can answer.
5      A.   Well, Senate Bill 23 was an outgrowth of
6   Assembly Bill 23, I believe, from Senator Perata.
7          And Perata, in his dealings with me, and I
8   dealt with him extensively, was convinced that he could
9   right all the wrongs in the Roberti-Roos Act the way that
10  it was drafted and he wanted to impose further
11  restrictions.
12     Q.   And Senate Bill 23 proposed restrictions on
13  the manufacture and sale of large capacity magazines,
14  correct?
15     A.   Yes.  That was one of the things in the bill.
16     Q.   Right.  And you were the state liaison of the
17  National Rifle Association when Senate Bill 23 was
18  working its way through the legislature, is that correct?
19     A.   Yes.
20     Q.   Did you lobby any members of the legislature
21  in opposition to Senate Bill 23?
22     A.   All that were opposed.
23     Q.   You lobbied all the legislators that were
24  opposed to that bill?
25     A.   Yes.

EXHIBIT HELSLEY - 4 Page 21

Page 82

1    Q.    Then in the year 2000 you ceased being the
2  state liaison for the National Rifle Association, is that
3  correct?
4    A.    Correct.
5    Q.    Did someone replace you?
6    A.    Yes.
7    Q.    Why did you stop being the state liaison for
8  the National Rifle Association?
9    A.    When I was hired, I told Jim Baker, who was
10 then the head of the Institute for Legislative Action,
11 which is where I was employed, that I would work for five
12 years; my belief being that after you've done something
13 for five years, you -- you're not growing.
14          And so I was at the seven-year mark and I
15 said, Jim, I did my five and I want to go do something
16 else.
17   Q.    It was about time for a change?
18   A.    Yeah.
19   Q.    And what was -- what was the position that you
20 assumed after stopping as the state liaison?
21   A.    Well, I did and have done a variety of things.
22 A lot of it was photography, writing, consulting on this
23 and that.
24          And in my current day job, to the degree that
25 I have a day job, is I'm the historian for the firm of

Page 83

1  John Rigby & Company in London and that consumes most of
2  my work time.
3    Q.    All right.  And then after you ceased being
4  the state liaison for the National Rifle Association, did
5  you become a consultant for the National Rifle
6  Association?
7    A.    Yes.
8    Q.    And how long did you serve as consultant for
9  the National Rifle Association?
10   A.    I have since then.  So it's been 24 years.
11   Q.    So from 2000 to today you have served as a
12 consultant to the National Rifle Association?
13   A.    Yes.
14   Q.    And what are your duties and responsibilities
15 as a consultant for the NRA?
16   A.    There are no specific duties.  Requests will
17 be made that I review this or go do that, but there's no
18 -- there's no job description.
19   Q.    Does the NRA compensate you for your
20 consulting services?
21   A.    Yes.
22   Q.    Do you charge the National Rifle Association a
23 certain amount of money per hour for your work or what is
24 the payment arrangement that you've established for the
25 NRA for your consulting services?

Page 84

1    A.    I'm just paid by the month.
2    Q.    Do you get paid every month?
3    A.    Yes.
4    Q.    So it's like a retainer?
5    A.    Yes.
6    Q.    And has that amount of money stayed constant
7  from 2000 until today or has it increased?
8    A.    No.
9    Q.    Has the monthly payment increased since 2000?
10   A.    No.
11   Q.    Has it decreased?
12   A.    Yes.
13   Q.    What was the monthly payment amount when you
14 became the consultant for the NRA in 2000, to the best of
15 your recollection?
16   A.    4,120 a month.
17   Q.    And when did you begin receiving that monthly
18 payment?
19   A.    Right after I left being employed as an
20 employee.
21   Q.    And that was when in 2000?
22   A.    I believe March.
23   Q.    Okay.  And when did your monthly payment
24 decrease?
25   A.    I think about 2008 or 9.  I'd have to look at

Page 85

1  the check stubs, but about 2008 or 9.
2    Q.    Okay.  So from March 2000 until somewhere
3  around 2008 or 9 you were receiving $4,120 per month?
4    A.    Correct.
5    Q.    And based on my math, that would equate to
6  about 50,000 per year, correct?
7    A.    Approximately.
8    Q.    Okay.  And what was your monthly benefit fixed
9  at when it was decreased?
10   A.    3,300 a month.
11   Q.    Did the National Rifle Association provide any
12 explanation as to why your monthly benefit would
13 decrease?
14   A.    No.
15   Q.    And for how long did you receive a monthly
16 payment of $3,300 for your consulting services from the
17 NRA?
18   A.    Until now.
19   Q.    Okay.  And based on my math, that would equate
20 to approximately a $40,000 yearly payment from the
21 National Rifle Association for your consulting services?
22   A.    Correct.
23   Q.    Is the National Rifle Association compensating
24 you for your work in connection with this case?
25   A.    No.

Page 86

```
 1      Q.   But you are still being compensated as a
 2 consultant at the amount of 3,300 per month, is that
 3 correct?
 4      A.   My contract expires this month.  I have not
 5 received word if it will be renewed or not.
 6      Q.   But if the National Rifle Association offers
 7 to continue your contract, would you be inclined to
 8 accept that offer?
 9      A.   Yes.
10      Q.   So you still want to work for the National
11 Rifle Association as a consultant?
12      A.   Yes.
13      Q.   Would the National Rifle Association be
14 pleased if the Plaintiffs prevail in this case?
15           MR. BRADY:  Objection, calls for speculation.
16           BY MR. ECHEVERRIA:  Q.  You can answer that
17 question.
18      A.   I assume so.
19      Q.   Okay.  So if we can go back to your expert
20 report which has been marked as Exhibit 3, you state in
21 paragraph four that you have coauthored five books on
22 firearms and have authored or co-authored more than 50
23 firearm-related articles for U.S. and Russian journals.
24           Do you see that?
25      A.   Yes.
```

Page 87

```
 1      Q.   And what are the titles of the books that you
 2 are referring to in that paragraph?
 3      A.   Well, there's the Rigby Grand Tradition.  And,
 4 again, they are all in that roller bag there.
 5           Hemingway's Guns.  The Gun Book For Boys.  The
 6 Gun Book For Girls.  The Gun Book For Parents.
 7      Q.   And approximately when were these books
 8 published?  Maybe we should take them one at a time.
 9      A.   The first published was Hemingway's Guns.
10 That would have been, I believe, 2010.
11           And that was followed, I believe, by Rigby, A
12 Grand Tradition.  And then the Gun Book For Boys.
13      Q.   Pardon me -- and when was the Rigby Grand
14 Tradition published, to the best of your recollection?
15      A.   '11 or '12.  2011 or 2012.  The Gun Book For
16 Boys followed by The Gun Book for Parents, The Gun Book
17 For Girls, and then the second edition of Hemingway's
18 Guns which was in 2015.
19           So the Gun Book For Boys, Gun Book For Parents
20 and Gun Book For Girls are somewhere between Rigby, A
21 Grand Tradition and the second edition of Hemingway's
22 Guns.
23      Q.   Understood.  Did any of these books focus on
24 large capacity magazines?
25           MR. BRADY:  Objection, vague and ambiguous.
```

Page 88

```
 1           THE WITNESS:  Two of the books -- the Gun Book
 2 For Boys and The Gun Book For Girls -- discuss magazines,
 3 discuss machine guns, discuss AR-15s, various types of
 4 firearms that used large capacity magazines.
 5           BY MR. ECHEVERRIA:  Q.  Were these more
 6 technical descriptions of these types of firearms?
 7      A.   Yes.
 8      Q.   Okay.  Did any of these books that you've just
 9 discussed focus on civilian self defense?
10      A.   It was discussed more in the context of we
11 profiled -- I'll say it was in The Gun Book For Girls we
12 profiled women who were involved in firearms related
13 things and that one or more of them had gotten into
14 firearms because of a self defense need, a threat, and so
15 it was discussed, but in that light.
16      Q.   In those discussions that you just referenced,
17 did you advise any of the readers to use large capacity
18 magazines to protect themselves?
19      A.   No.
20      Q.   On page two of Exhibit 3 which is your expert
21 report, you have a list of articles that you've
22 published.
23           Do you see that?
24      A.   Yes.
25      Q.   And this list includes only 32 articles, is
```

Page 89

```
 1 that correct?
 2      A.   I didn't count them, but I'll take your word
 3 for it.
 4      Q.   Okay.  Have you published any other articles
 5 that predate 2010 -- or, sorry, that were more than 10
 6 years old?
 7      A.   Yes.
 8      Q.   Do any of the articles listed on page two
 9 through page three focus on large capacity magazines?
10           MR. BRADY:  Objection, vague and ambiguous.
11           BY MR. ECHEVERRIA:  Q.  You can answer.
12      A.   I'm just going through the list.  No, they do
13 not.
14      Q.   Okay.  Do any of the articles listed on pages
15 two through three of Exhibit 3 discuss civilian self
16 defense?
17      A.   In "Women, Guns and Politics," that was in the
18 CRPA Firing Line, it's mentioned there.  I don't know
19 that you'd say that it was discussed.
20           In the article -- the last one, "Is Your Gun
21 Safely Stored," I believe I discussed in there the issue
22 of concealed carry and storage and self defense.
23      Q.   And that would be "Is Your Gun Safely Stored,
24 Part 2"?
25      A.   Part 2.
```

Page 90

1    Q.   And you have produced that article this
2  morning?
3    A.   Yes.
4    Q.   Okay.  Have you ever published any peer
5  reviewed articles, books or studies?
6    A.   No.
7    Q.   Have you ever peer reviewed anyone else's
8  articles, books or studies?
9    A.   I don't think so.
10   Q.   And on page three of Exhibit 3 you identify
11 three opinion editorials?
12   A.   Yes.
13   Q.   These are editorials that you wrote within the
14 last 10 years, correct?
15   A.   Correct.
16   Q.   And you have written other op-eds before that
17 are --
18   A.   Yes.
19   Q.   -- more than 10 years old?
20   A.   I think so, yes.
21   Q.   And going back to your articles really quick,
22 for articles that you wrote that are more than 10 years
23 old, did any of those articles focus on large capacity
24 magazines, to the best of your recollection?
25   A.   They may have.  Those were the ones I produced

Page 91

1  for Parker.
2         And in 1998, 9, 2000, I was writing for
3  magazines that were more in that direction.  So there is
4  -- there are probably some that discussed the use of such
5  magazines.
6    Q.   And what are the titles of those articles?
7    A.   I have no idea.
8    Q.   Have you produced those articles this morning?
9    A.   No.  I produced those for Parker because they
10 are almost 20 years old now.
11   Q.   And in any of the articles that you have
12 published, did you advise the readers to use large
13 capacity magazines for self defense?
14   A.   I don't believe so.
15   Q.   Okay.  So we're going to get into your opinion
16 editorials in a little greater depth right now.
17        MR. ECHEVERRIA:  I'm going to mark as Exhibit
18 Number 8 an op-ed entitled, "It's About Time: State Has
19 Eroded Gun Owner's Rights."
20        (Exhibit 8 was marked.)
21        BY MR. ECHEVERRIA:  Q.  Have you seen this
22 article before?
23   A.   Yes.
24   Q.   Did you write this op-ed?
25   A.   I did.

Page 92

1    Q.   And this was published in the Sacramento Bee
2  on or about July 4, 2010?
3    A.   Yes.
4    Q.   And what does this op-ed concern?
5    A.   Let me just review this here a minute.
6    Q.   Take your time.
7         (Brief pause.)
8         THE WITNESS:  Well, the subject was concealed
9  carry and so-called assault firearms.
10        BY MR. ECHEVERRIA:  Q.  So in the opening
11 paragraph of Exhibit 8, you state that "The past 20 years
12 have seen California's legislature enact a wish list for
13 gun control advocates."
14        Do you see that sentence?
15   A.   Yes.
16   Q.   Would you say that that's referring to
17 California's firearms policy generally?
18   A.   Yes.
19   Q.   And in the next paragraph you write, quote,
20 "All were touted as must-have tools for law enforcement's
21 crime fighting arsenal, yet the result has been 20 years
22 of unintended consequences, a steady erosion of the
23 rights of gun owners and no measurable enhancement of
24 public safety."
25        Do you see that?

Page 93

1    A.   I do.
2    Q.   And you wrote that, correct?
3    A.   I did.
4    Q.   Is it your testimony sitting here today that
5  California's gun control measure have had quote, unquote,
6  "no measurable enhancement of public safety"?
7    A.   That's my belief.
8    Q.   Okay.  And you also say on page two of Exhibit
9  8 in the last paragraph, quote, "It is also offensive
10 that my 'nanny' government" -- and the word nanny is in
11 quotes -- "can decide what handguns are safe enough for
12 me to own and how many I can buy in a month."
13        Do you see that sentence?
14   A.   I do.
15   Q.   Do you believe that the California government
16 is a nanny government?
17   A.   As it relates to firearms control?
18   Q.   Yes?
19   A.   Absolutely.
20   Q.   And can you describe what you meant by nanny
21 government in that sentence?
22   A.   Well, for instance, let's take the unsafe
23 handgun law.  I worked on that bill extensively with
24 Senator Polanco and every gun that --
25        Well, it requires that manufacturers submit

Page 94

1    handguns for testing before they could be sold by a
2    dealer.  DOJ has to sign off on them.  There's a fee
3    involved.
4         But very quickly DOJ figured out that there
5    had to be a way to sell the guns that weren't on the safe
6    gun list for fear of loss of DROS fees or black market
7    sales.
8         So DOJ decided that licensed dealers could
9    sell such guns on consignment but not out of their own
10   stock.
11        We got alleged counsel opinion on that that
12   DOJ was wrong.  The statute was pretty clear that you
13   can't sell, offer for sale, display, and yet that's the
14   way it is.
15        The end result of all this is that guns that
16   are so-called unsafe can still be sold in this state,
17   it's just how they are sold.
18        A person can come in from out of state with a
19   gun as long as he does not bring it in for sale.  And
20   then put it on consignment in a store.  Law enforcement
21   can buy the unsafe guns.  People who own them before the
22   law can put them on consignment for a dealer.
23        So everything can still be sold, it's just the
24   state saying, well, we're going get in the middle of this
25   and -- well --

Page 95

1    Q.   So your criticism of the government's response
2    to firearms in that context is more a criticism of the
3    government's efficiency, right?
4         MR. BRADY:  Objection, misstates the
5    testimony, vague and ambiguous.
6         THE WITNESS:  Well, I remember the day of the
7    hearing when Senate bill -- I can't remember the bill
8    number now, but Polanco's bill, and we were in the Senate
9    judiciary committee and I walked into the room and
10   Polanco was standing there with committee staff and they
11   had the chief of staff, a fellow by the name of Simon
12   Haines had a copy of Gun Digest in his hand and was
13   pointing to things.
14        When that little scrum broke up, we walked up
15   to Simon, who we knew, and we said, "What's going on
16   here?"  And he was staring down at the floor and he said,
17   "Senator Polanco asked me which part of the gun the
18   barrel was."
19        Well, Polanco, like many of these people, had
20   no idea what they were talking about.  He
21   mischaracterized the bill to the press.
22        And, in the end, it's my belief that it's been
23   a problem for people who want to buy firearms legally,
24   but I believe it's served no law enforcement use because
25   the first thing we did with that bill as a result of that

Page 96

1    hearing is it was realized immediately that so-called
2    cowboy guns, single action revolvers would all fail
3    safety tests, so they were exempted from the bill.
4         Q.   Okay.
5         A.   The guns that were known to be unsafe, quote,
6    unquote, were exempted.
7         And then it was realized, well, gee, Olympic
8    target pistols won't pass the test.  So we exempted
9    them -- and when I say we, Polanco and his side exempted
10   them.
11        So the guns that were known to not be able to
12   pass his standards were exempt from the bill.  So that's
13   my perspective on it.
14        Q.   Okay.  And in initially enacting Senate Bill
15   23 and the initial restrictions on large capacity
16   magazines, in your view was that an example of California
17   acting as a quote, unquote, nanny government?
18        A.   Well, I know that Senator Perata told me face
19   to face that he had such magazines for his pistols.  I
20   would have been more impressed if he was willing to
21   surrender his.  He was not.
22        But, yes.  What the 20-round -- well, if you
23   -- if you can't have a magazine that holds more than 10
24   rounds but you can have two of them, restricting the one
25   to me makes no sense.

Page 97

1    Q.   Does Penal Code 32310 restrict in any way the
2    number of firearms an individual can own?
3         MR. BRADY:  Objection, calls for a legal
4    conclusion.
5         BY MR. ECHEVERRIA:  Q.  You can answer that
6    question.
7         A.   No.
8         Q.   Does Penal Code 32310 restrict in any way the
9    number of magazines that an individual can own?
10        MR. BRADY:  Objection, calls for a legal
11   conclusion.
12        THE WITNESS:  No.
13        BY MR. ECHEVERRIA:  Q.  Sorry.  Your
14   testimony?
15        A.   I'm sorry, no.
16        Q.   No.  Going back to that last paragraph of
17   Exhibit 8, the next sentence is, "In a more rational
18   environment, the results of two decades of gun control
19   zealotry would be subjected to critical study and
20   analysis."
21        Do you see that sentence?
22        A.   Yes.
23        Q.   What do you mean by gun control zealotry?
24        A.   I previously referenced the advisory group I
25   sat on for the Van de Kamp years when we were dealing

EXHIBIT HELSLEY - 4 Page 25

Page 98

1 with the Roberti-Roos Act and when I was in the crime
2 laboratories, the first assault weapon bill had been
3 proposed.  That was about 1986.  I believe it was an Art
4 Agnos bill.
5        And in anticipation that we would have to do
6 analysis of the bill, I tasked the crime laboratories
7 under my command with searching through the cases that
8 they had to identify firearms that would meet the
9 criteria that Agnos was proposing.
10       When Roberti-Roos was being considered with
11 this advisory group -- which included, again, Sherman
12 Block, Los Angeles Sheriff; and Daryl Gates, Los Angeles
13 Police Chief -- I proposed that we survey all the state
14 laboratories.
15       All the labs in the state, not just the DOJ
16 laboratories, but police, sheriff's and DA's laboratories
17 to find out what they had because at question was what
18 guns would be on the list, what guns were Roberti-Roos
19 -- what was going to be restricted.
20       And there was no objective information at all,
21 none.  Everybody had a feeling.  Everybody had an
22 opinion, but nobody knew anything.  So I said, well, why
23 don't we go to the labs and look at firearms used in
24 violent crimes.
25       Sherman Block, who I have great admiration

Page 99

1 for, the late Sherman Block, said, no, we're not going to
2 do that.  He said it won't support what we're trying to
3 do.  Well, that was true then.  It's true now.
4        What should have occurred and the point that I
5 was making here which was made repeatedly is that DOJ has
6 databases galore and yet as far as I can tell, there's
7 virtually no analysis that's done.
8  Q.  So you support critical study analysis and
9 research of firearms policy to better inform government
10 responses to violence, correct?
11       MR. BRADY:  Objection, misstates testimony,
12 vague and ambiguous, compound.
13       BY MR. ECHEVERRIA:  Q.  So you write in this
14 sentence that "in a more rational environment, the
15 results of two decades of gun control zealotry would be
16 subjected to critical study and analysis."
17       Do you see that?
18  A.  Yes.
19  Q.  So do you think that in a more rational
20 environment firearms issues would be subjected to
21 critical study and analysis?
22  A.  Yes.
23  Q.  Do you support the use of federal funds to
24 engage in research regarding violence concerning
25 firearms?

Page 100

1  A.  A qualified yes.
2  Q.  Okay.
3        MR. ECHEVERRIA:  Moving on to the next op-ed
4 that you list in your report and we'll mark this as
5 Exhibit 9.
6        (Exhibit 9 was marked.)
7        BY MR. ECHEVERRIA:  Q.  This is an op-ed
8 entitled, "Is Gun Registration Worth cost."
9        Have you seen this document before?
10  A.  I have.
11  Q.  Did you write this op-ed?
12  A.  I did.
13  Q.  And it was published in the Las Vegas Review
14 Journal on or about September 16, 2012?
15  A.  Correct.
16  Q.  What does this article concern generally?
17  A.  It has to do with a program that the Clark
18 County in Nevada had for -- that required handgun
19 registration.
20       They called it the Blue Card system and I was
21 objecting to it.
22  Q.  So you were critical in this op-ed of the
23 proposed handgun registration?
24  A.  Well, it wasn't proposed, it was in place.
25  Q.  And you were critical of that handgun

Page 101

1 registration?
2  A.  Yes.
3  Q.  Okay.  And you write on page three of Exhibit
4 9 on paragraph four, quote, "Put the same questions to
5 the folks who manage California's handgun registration
6 system and you get the same answers.  Not only that, but
7 after almost a century, most handguns in California are
8 still unregistered."
9        Do you see that statement?  It's on page
10 three.
11  A.  Okay.
12  Q.  Fourth paragraph.
13  A.  Okay.  Yes.
14  Q.  Did you write that sentence?
15  A.  Yes.
16  Q.  So in this sentence you are being critical of
17 California's handgun registration system, is that
18 correct?
19  A.  Correct.
20  Q.  And you're critical of California's handgun
21 registration system because it is ineffective, is that
22 correct?
23  A.  Correct.
24       MR. ECHEVERRIA:  Moving on to the final op-ed
25 that you list in your report, I am going to mark as

Page 102

```
1    Exhibit 10 an op-ed entitled, "Gun Roundup Program Has
2    Too Many Flaws."
3                (Exhibit 10 was marked.)
4                BY MR. ECHEVERRIA:  Q.  Have you seen this
5    document before?
6         A.   I have.
7         Q.   And this op-ed was published in the Sacramento
8    Bee on or about May 3rd, 2013, correct?
9         A.   Correct.
10        Q.   And you wrote this op-ed?
11        A.   I did.
12        Q.   In the first sentence you write, quote, "There
13   is broad agreement across America that bad guys shouldn't
14   have guns," and bad guys who shouldn't have guns -- I'm
15   sorry -- "bad guys shouldn't have guns" is in quotation
16   marks.
17              Do you see that?
18        A.   Yes.
19        Q.   Do you also agree that bad guys shouldn't have
20   guns?
21        A.   I do.
22        Q.   And you would also agree that bad guys should
23   not have large capacity magazines?
24        A.   I'd give you a qualified response on that.
25   The magazine sitting there by itself with no firearm is
```

Page 103

```
1    nothing more than a metal or plastic box.
2         Q.   But a bad guy could give a large capacity
3    magazine to another bad guy who may have a gun, right?
4                MR. BRADY:  Objection, incomplete
5    hypothetical.
6                BY MR. ECHEVERRIA:  Q.  You can answer that
7    question.
8         A.   If the magazine, for instance, is for a World
9    War I French machine gun for which there is no gun that
10   it would ever be attached to, um -- I think there's
11   circumstances where that would not apply.
12              I'm just trying to consider a number of
13   scenarios here that -- part of the universe of large
14   capacity quote, unquote magazines are antiques, curios,
15   things that for which if you could find a gun, you'd
16   never find cartridges for it.
17              So as a general proposition, bad guys
18   shouldn't have guns and whatever magazine went with the
19   gun.  But the universe of large -- quote, unquote large
20   capacity magazines is very, very large and very, very
21   technical and --
22        Q.   Understood.  So setting aside the more fringe
23   cases of curios or relics, in general would you agree
24   with the proposition that bad guys should not have large
25   capacity magazines?
```

Page 104

```
1                MR. BRADY:  Objection, misstates testimony,
2    argumentative.
3                BY MR. ECHEVERRIA:  Q.  You may answer the
4    question.
5         A.   Bad guys shouldn't have guns.  And if the
6    magazine is along with the gun, then they shouldn't have
7    it.
8         Q.   Okay.  In this op-ed which has been marked as
9    Exhibit 10, you are critical of the decision to have the
10   Bureau of Firearms administer certain aspects of
11   California's gun control regime, correct?
12        A.   Yes.
13        Q.   And in this op-ed you're advocating for local
14   law enforcement to be involved, is that correct?
15        A.   If the task is going to be done, it should be
16   them doing it.
17        Q.   Is it your opinion that it would be more
18   effective if local law enforcement were involved?
19        A.   It would certainly be more cost effective.
20        Q.   Would it be more effective in terms of
21   enforcement and ensuring compliance with California's gun
22   laws?
23                MR. BRADY:  Objection, calls for speculation,
24   vague and ambiguous, compound.
25                BY MR. ECHEVERRIA:  Q.  You may answer.
```

Page 105

```
1         A.   I make the point in here that the level of
2    investigative work that's required to pursue these types
3    of cases is like having the FBI work security at a high
4    school basketball game.
5              You don't need DOJ special agents to do this
6    work.  For a DOJ team to drive from Sacramento, say, to
7    Redding to knock on somebody's door to find out they are
8    not home is just not a good use of your time.
9              And since the DROS information from which this
10   flows from is too old for search warrants, if the bad
11   guy, if you will, has any sense at all, he won't give a
12   consent search and all the DOJ special agents can then do
13   is turn around and go home.
14        Q.   Mn-hmm.
15        A.   That could have been done by a local police
16   officer, so I didn't think that the Harris administration
17   was managing it well.
18        Q.   Okay.  So in the three op-eds that you list in
19   your report, are any of them supportive of gun control
20   efforts?
21                MR. BRADY:  Objection, vague and ambiguous.
22                BY MR. ECHEVERRIA:  Q.  You may answer that
23   question.
24        A.   I think they are supportive of informed gun
25   legislation, which I don't think we've had.
```

Page 106

1    Going back to what -- I'd like to see some
2 real work done with the DROS information, the firearm
3 system here.  It will never happen, but I would like to
4 see it done because I think such analysis would put the
5 lie to a lot of what's been going on in terms of gun
6 control.
7    Q.   And if the analysis supported certain gun
8 control measures, would you be in support of those
9 measures?
10    MR. BRADY:  Objection, incomplete
11 hypothetical.
12    BY MR. ECHEVERRIA:  Q.  You may answer.
13    A.   I'd cross that bridge when I got there.
14    Q.   Okay.  Have you testified as an expert witness
15 in any civil or criminal cases?
16    A.   Yes.
17    Q.   Okay.  And that would be as an expert in
18 firearms?
19    A.   Yes.
20    Q.   And for the criminal cases, would those have
21 all been while you were an employee of the Department of
22 Justice?
23    A.   No.
24    Q.   Can you list the criminal cases that you
25 testified as an expert in after your employment with the

Page 107

1 Department of Justice?
2    A.   The only criminal or civil testimony I've
3 given relating to firearms was in the James Dingman case
4 that was in Santa Clara in '93 or 4.
5    It was assault weapon related.  It found its
6 way up to the Supreme Court.
7    Q.   And what was your involvement in the Dingman
8 case?
9    A.   It was the question of what constituted an
10 assault weapon.
11    The original assault weapon list which I'd had
12 a large role in crafting -- not because I agreed with it,
13 but because I was tasked by the attorney general to do
14 it -- made a distinction between an SKS and an SKS with a
15 detachable magazine.
16    The deputy attorney general at the time and
17 the department had taken the position that an SKS with a
18 certain type of magazine was not covered by the
19 Roberti-Roos Act and so advised dealers, so they were
20 being sold.
21    Q.   Okay.
22    A.   Santa Clara took the position that the
23 attorney general is one lawyer, there are 58 more of us
24 out here and we don't care what he says and so we're
25 going to prosecute this guy that had one of them, even

Page 108

1 though DOJ said they could be sold.
2    Q.   Mm-hmm.
3    A.   And so DOJ originally supported the Defendant
4 up to the Supreme Court and then the attorney general had
5 a -- I'll call it a fit and changed his position after he
6 was battered by some reporters from the Los Angeles
7 Times.
8    He fired, if you will, the lawyer that was
9 assigned to it and they withdrew their support while the
10 case was at the Supreme Court.
11    Q.   And you served as an expert witness in that
12 case?
13    A.   Yes, I did.
14    Q.   Were you qualified by a Court?
15    A.   Yes.
16    Q.   As an expert witness?
17    A.   Yes.
18    Q.   And your field of expertise in that case was
19 what?
20    A.   Well, as I recall, it was assault weapons and
21 all that had brought us to that point.
22    Q.   Okay.  Any other criminal cases after your
23 employment with the Department of Justice that you were
24 qualified as an expert in?
25    A.   No.

Page 109

1    Q.   Okay.  How about civil matters?
2    A.   Was I qualified in Parker?  I don't -- I gave
3 a deposition in Parker like we're doing here today.
4    Q.   Mm-hmm.
5    A.   But --
6    Q.   This is Parker versus State?
7    A.   Yeah.
8    Q.   Do you recall the result in that case?
9    A.   I think we were successful in superior court
10 in Fresno.
11    Q.   And Parker versus State was a challenge to
12 Assembly Bill 962, is that your recollection?
13    A.   Yeah.  It was the definition of what is
14 handgun ammunition.
15    Q.   And the Michel firm was counsel of record for
16 the Plaintiffs in that case, was it not?
17    A.   Yes.
18    MR. ECHEVERRIA:  I'm going to mark as Exhibit
19 11 a press release.
20    (Exhibit 11 was marked.)
21    BY MR. ECHEVERRIA:  Q.  This is a document
22 that is entitled, "Thanks To All Who Helped Kill AB 962
23 and Especially to the American Hero Who Played a Central
24 Role."
25    Do you see that title?

Page 110

1    A.   Yes.

2    Q.   Do you know who authored this document?

3    A.   I don't know who did it.

4    Q.   And it was published on February 24, 2011?

5    A.   Appears to have been.

6    Q.   Have you seen this document before?

7    A.   Not in this form, but I've seen it on the web.

8    Q.   In a different form?

9    A.   Different format.

10   Q.   Okay.  And in this document Chuck Michel is

11   quoted at length describing the nature of the case and

12   your involvement in Parker versus State, is that correct?

13   A.   Yes.

14   Q.   And is this quotation substantially similar to

15   the other formats of this document that you viewed?

16   A.   Yes.

17   Q.   So after the Parker versus State case,

18   Mr. Michel described you as a true American hero,

19   correct?

20   A.   Yes.

21   Q.   Very complimentary terms, correct?

22   A.   Rather glowing.

23   Q.   He also described you as a quote, unquote,

24   "human encyclopedia" on issues concerning firearms and

25   ammunition, is that correct?

Page 111

1    A.   Yes.

2    Q.   And at the end of this statement, he states --

3    Mr. Michel states that you quote, "Spent dozens of hours

4    preparing masterpiece declarations on the history and

5    nature of ammunition answering the attorney's multiple

6    questions about specific ammunition issues and providing

7    testimony," is that correct?

8    A.   Yes.

9    Q.   And he also described you as one of the quote,

10   unquote patriots that made the results of the case

11   possible, is that correct?

12   A.   I don't know where he said I was a patriot,

13   but he was rather effusive in his praise.

14   Q.   And that would be in the last paragraph?

15   A.   Okay.

16   Q.   So you agree that he described you as a

17   patriot?

18   A.   Yes.

19   Q.   Okay.  Did you have any involvement in the

20   preparation of this statement?

21   A.   I did not.

22   Q.   Did Mr. Michel give you any advance notice

23   that this statement would be issued?

24   A.   He did not.

25   Q.   Has there ever been any discussion with

Page 112

1    Mr. Michel or anyone else at the Michel firm about

2    producing a similar statement if the Plaintiffs prevail

3    in this case?

4    A.   No.

5         MR. BRADY:  Objection --

6         MR. ECHEVERRIA:  What's your objection?

7         MR. BRADY:  Attorney-expert communications.

8         MR. ECHEVERRIA:  Are you instructing him not

9    to answer that question?

10        THE REPORTER:  I have an answer.

11        MR. BRADY:  Yeah, he answered anyway.

12        BY MR. ECHEVERRIA:  Q.  You also -- are there

13   any other civil matters that you appeared as an expert

14   in?

15   A.   When you say appeared, I produced declarations

16   as you have supplied here.  I have never appeared in

17   court or at a deposition of this sort.

18   Q.   Right.  Are there any other civil matters in

19   which you submitted expert testimony?

20   A.   Beyond what we have here, um -- not that I

21   recall.

22   Q.   Okay.  Do you recall your involvement in the

23   case Fyock versus City of Sunnyvale?

24   A.   Yes.

25        MR. ECHEVERRIA:  Okay.  I'm going to mark as

Page 113

1    Exhibit 12 the Declaration of Stephen Helsley in Support

2    of Motion for Preliminary Injunction which was submitted

3    in Fyock, F-Y-O-C-K, versus City of Sunnyvale in the

4    Northern District of California and it was filed on

5    December 23rd, 2013.

6         (Exhibit 12 was marked.)

7         BY MR. ECHEVERRIA:  Q.  Have you seen this

8    document before, Mr. Helsley?

9    A.   Yes.

10   Q.   Did you write this document?

11   A.   Yes.

12   Q.   And Fyock versus the City of Sunnyvale was a

13   constitutional challenge brought by Plaintiffs represent

14   by the Michel firm challenging a municipal ordinance

15   regulating large capacity magazines.

16        Is that your recollection?

17   A.   I believe so.

18   Q.   And in this declaration you are critical of

19   that ordinance, is that correct?

20   A.   Yes.

21   Q.   Is this declaration similar to the report that

22   you had submitted in this matter which has been marked

23   Exhibit 3?

24   A.   Similar, yes.

25   Q.   How do they differ?

Page 114

1    A.   I'm sorry.
2    Q.   How does Exhibit 12 which is your Fyock
3  declaration differ from Exhibit 3 which is your expert
4  report submitted in this case?
5    A.   Without sitting down and comparing the two of
6  them, I couldn't say.
7    Q.   Okay.  In paragraph one of Exhibit 12 which is
8  your Fyock declaration, you state, "I am a member of the
9  American Academy of Forensic Sciences" and that's on line
10  14.
11        Do you see that?
12    A.   Correct.
13    Q.   And if you refer to your expert report in this
14  case which is Exhibit 3, you state, "I am a member of the
15  American Society of Arms Collectors" and that appears to
16  be a difference between the two reports.
17        Are you -- do you see the difference?
18    A.   Yes.
19    Q.   Are you still a member of the American Academy
20  of Forensic Sciences?
21    A.   I am not.
22    Q.   Were you a member of the American Society of
23  Arms Collectors when you submitted your declaration in
24  Fyock?
25    A.   No.

Page 115

1    Q.   Okay.  So it is a new development for you?
2    A.   September of this year.
3    Q.   Okay.  And this declaration discusses many of
4  the same firearms that are discussed in your expert
5  report submitted in this case, is that correct?
6    A.   Correct.
7    Q.   And it also discusses the two incidents that
8  you were involved in, is that correct?
9    A.   Correct.
10    Q.   The Fyock declaration, however, does not have
11  the discussion that runs from page five to page seven in
12  your expert report in this case, correct?
13    A.   Again, I'd have to put them side by side in
14  comparison.  I don't recall.
15    Q.   Okay.  How many firearms do you own,
16  Mr. Helsley?
17        MR. BRADY:  Objection privacy, to the extent
18  you want to answer you may.  You do not need to.
19        THE WITNESS:  Well, if I don't need to, I
20  won't.
21        BY MR. ECHEVERRIA:  Q.  You won't testify on
22  the number of firearms that you own?
23        MR. BRADY:  If he doesn't want to, he doesn't
24  need to.  He has a right to privacy in the amount of
25  firearms he owns.

Page 116

1        BY MR. ECHEVERRIA:  Q.  You have a collection
2  of firearms-related books, is that correct?
3    A.   Yes, I do.
4    Q.   How many books do you have?
5    A.   Approximately 3,000.
6    Q.   Have you read all those books?
7    A.   I wish.  I have used most of them.  I have
8  read many of them.
9    Q.   And if you could estimate, what does many
10  mean?
11    A.   Hundreds and hundreds.
12    Q.   Do you know anyone who has a larger collection
13  of firearms-related books than you do?
14    A.   Yes.
15    Q.   How many do they own?
16    A.   I don't know.
17    Q.   But you do know that they own more than you?
18    A.   Yes.
19    Q.   Do any of the books in your collection focus
20  on large capacity magazines?
21        MR. BRADY:  Objection, vague and ambiguous.
22        THE WITNESS:  Do they --
23        BY MR. ECHEVERRIA:  Q.  You may answer the
24  question.
25    A.   Do they focus or does it include?  For

Page 117

1  instance, if I --
2        I have a book on the H&K pistol.  Those
3  pistols have more than 10-round capacity magazines.  So
4  that's included in the story about the firearms.  The
5  book is not about the magazines, but clearly the magazine
6  is integral to the story.
7        So many of the books I have include
8  information about magazines that hold more than 10
9  rounds.
10    Q.   But do any of the books focus on large
11  capacity magazines?
12        MR. BRADY:  Objection, vague and ambiguous.
13        THE WITNESS:  No.
14        BY MR. ECHEVERRIA:  Q.  Do any of the books
15  you have concern civilian self defense?
16    A.   Civilian self defense is part of the material
17  in a number of the books I have.
18    Q.   Do any of the books you have focus on civilian
19  self defense?
20        MR. BRADY:  Objection, vague and ambiguous.
21        THE WITNESS:  My difficulty is with the word
22  focus.  Certainly it's included.  To me, focus means that
23  that's the main thrust of the books.
24        BY MR. ECHEVERRIA:  Q.  Based on that
25  definition of the word focus, do any of your books focus

Page 118

1  on civilian self defense?
2      A.  I'm not sure.  I'm scanning the shelves.
3      Q.  There are a lot of books to think about.
4      A.  I just don't know.
5      Q.  Okay.  Do you ever carry a concealed weapon?
6      A.  Yes.
7      Q.  And what weapon is that?
8      A.  Glock.
9      Q.  And that uses a 17 or 19-round magazine?
10     A.  Both.
11     Q.  Both.  Do you ever concealed carry any other
12  firearms?
13     A.  Depending on the clothing I'm wearing.  If the
14  Glock won't conceal well, I will carry a Walther PPK/S.
15     Q.  And what magazine does the Walther PPK/S use?
16     A.  10 rounds.  10 plus one.
17     Q.  And the plus one would be the bullet in the
18  chamber?
19     A.  Cartridge in the chamber, yes.
20     Q.  Cartridge or round in the chamber?
21     A.  Right, yeah.
22     Q.  Okay.  Do you own any large capacity magazines
23  as that term is defined under the Penal Code?
24     A.  I do.
25     Q.  How many large capacity magazines do you own?

Page 119

1          MR. BRADY:  Objection, privacy grounds.  To
2  the extent you want to answer, go ahead.
3          BY MR. ECHEVERRIA:  Q.  You may answer that
4  question.
5      A.  I'm scanning here.
6      Q.  Well, if you --
7      A.  I'm just going through my possessions and
8  trying to get a count.
9      Q.  To help you in your recollection, on page five
10  of your expert report which is marked as Exhibit 3, you
11  state on paragraph -- the first complete paragraph of
12  that page, you say, quote, "In my case, I have one
13  19-round and eight 17-round magazines for my Glock."
14     A.  Yes.
15     Q.  Do you have any other large capacity magazines
16  in addition to those nine large capacity magazines?
17     A.  Yes.
18     Q.  And how many more would you estimate that you
19  have?
20     A.  That's what I'm trying to calculate.  Probably
21  20 to 30.
22     Q.  Okay.  And you are authorized under the Penal
23  Code to possess those large capacity magazines, are you
24  not?
25     A.  I am.

Page 120

1      Q.  And that is because you are an honorably
2  retired peace officer, is that correct?
3      A.  That's correct.
4      Q.  And does Penal Code 32310 as amended by
5  Proposition 63 affect your ability to continue to possess
6  those large capacity magazines?
7          MR. BRADY:  Objection, calls for a legal
8  conclusion.
9          BY MR. ECHEVERRIA:  Q.  You may answer that
10  question.
11     A.  I --
12     Q.  Did you answer my question?
13     A.  I assume that the confluence of the statute
14  and the proposition are such that I can still possess
15  them.
16     Q.  Okay.  You also write in your expert report,
17  quote, "My associates who have such pistols also have a
18  considerable number of spare magazines for them,"
19  unquote.
20          Do you see that sentence?
21     A.  Mm-hmm.
22     Q.  Who are the associates that you're referring
23  to?
24     A.  DOJ retired for the most part.
25     Q.  So they are also authorized to possess large

Page 121

1  capacity magazines?
2      A.  Yes.
3      Q.  And is your understanding that Penal Code
4  32310 would not affect their ability to continue to
5  possess their large capacity magazines?
6          MR. BRADY:  Objection, calls for a legal
7  conclusion.
8          BY MR. ECHEVERRIA:  Q.  To the best of your
9  understanding?
10          MR. BRADY:  Objection, calls for a legal
11  conclusion.
12          THE WITNESS:  Yes.
13          MR. ECHEVERRIA:  Okay.  So the time now is
14  12:43, according to my phone.
15          (Discussion held off the record.)
16          (Lunch break.)
17          MR. ECHEVERRIA:  Back on the record.
18          BY MR. ECHEVERRIA:  Q.  Welcome back,
19  Mr. Helsley.  I'd like you to refer to page three of your
20  expert report which has been marked as Exhibit 3.
21          Do you have your expert report in front of
22  you?
23     A.  Okay.
24     Q.  We'll be spending a substantial amount of the
25  remainder of the deposition going through your expert

Page 122

1   report in this case.  So on page three under section
2   four, assignment, you describe the nature of your
3   assignment in this case and the scope of your opinions,
4   is that correct?
5       A.   Mm-hmm.
6       Q.   And you state the Plaintiff's counsel has
7   asked you to provide an opinion on the historical
8   existence and prevalence of firearms and/or magazines
9   capable of holding more than 10 rounds of ammunition, is
10  that correct?
11      A.   Correct.
12      Q.   And the reasons law abiding Americans
13  including law enforcement and private citizens so often
14  select such items, is that correct?
15      A.   Correct.
16      Q.   Are those two distinct opinions that you're
17  providing in this case?
18      A.   From my perspective, no.
19      Q.   So they are part of one opinion?
20      A.   Yes.
21      Q.   Okay.  And then you go on to say that "Counsel
22  has also asked that I provide opinion on the utility of
23  firearm magazines with the ability to accept more than 10
24  rounds of ammunition in self defense as well as the
25  impact of 10-round magazine limitations on law abiding

Page 123

1   citizens."
2            Do you see that?
3       A.   Yes.
4       Q.   Are those two separate opinions stated in that
5   paragraph?
6       A.   I don't believe so.
7       Q.   Okay.  Because in your opinions and analysis
8   section which span page three through page nine, you have
9   three different sections with different headings, is that
10  correct?
11      A.   Yes.
12      Q.   So in the assignment section you understand
13  that you are providing two opinions in this case and you
14  have three sections in your opinions and analysis
15  section?
16      A.   Well, from my perspective that's sort of a
17  distinction without a difference.
18           I was telling a story that dealt with their
19  questions.
20      Q.   So the three different sections are in
21  response to the assignment that the Michel firm asked you
22  to do?
23      A.   Yes.
24      Q.   Okay.  So the three opinions that are set
25  forth in section five of your report, those are the three

Page 124

1   opinions that you are going to offer in this case, is
2   that right?
3       A.   Yes.
4       Q.   And that would be namely, one, the existence
5   and prevalence of large capacity magazines throughout
6   history?
7       A.   Mm-hmm, yes.
8       Q.   The second opinion would be on page five that
9   limiting the law abiding citizen to a magazine of 10
10  rounds limits their ability to protect themselves from
11  violent criminals in certain situations, is that correct?
12      A.   Correct.
13      Q.   And that generally could be described as the
14  utility of large capacity magazines in self defense
15  scenarios, is that fair to say?
16      A.   Yes.
17      Q.   Thank you.  And then section three is your
18  opinion that a firearm equipped with a magazine capable
19  of holding more than 10 rounds is more effective at
20  incapacitating a deadly threat and under some
21  circumstances may be necessary to do so.  Is that
22  correct?
23      A.   Correct.
24      Q.   How is that third opinion distinct from the
25  second opinion that also deals with self defense uses of

Page 125

1   large capacity magazines?
2       A.   Okay.  The third section deals with some of
3   the technical aspects of the second.
4            The fact that as I say that when gun fights
5   occur, a number of rounds are misses.  And that in
6   response to things that you frequently hear, well, why
7   didn't you shoot to wound him or why didn't you just
8   shoot the gun out of his hand or -- the point being is
9   that human beings can take a lot of stopping.
10           So three is more of a ballistics, forensics;
11  and two is more just the personal need, the best I can
12  make the distinction.
13      Q.   That third opinion is related to the second
14  opinion about the utility of large capacity magazines in
15  your view in self defense, is that correct?
16      A.   Yes.
17      Q.   Okay.  And I'm just generally going to be
18  treating those as two opinions, if that's okay with you?
19      A.   Fine.
20      Q.   And you have not been asked to provide any
21  other opinions in this case?
22      A.   No.
23      Q.   And you do not intend to offer any other
24  opinions in this case, correct?
25      A.   I do not.

Page 126

1     Q.   Okay.  On page one of your expert report in
2   the first paragraph, second sentence, you say, "This
3   report sets forth my qualifications, opinions and
4   scholarly foundation for those opinions."
5           What is the scholarly foundation of your
6   opinions?  What are you referring to in that statement?
7           MR. BRADY:  Objection, vague and ambiguous.
8           BY MR. ECHEVERRIA:  Q.  Let me rephrase that
9   question.
10          What do you mean by scholarly foundation in
11  that sentence?
12    Q.   What I mean by it is those things that I've
13  written.
14    Q.   So the scholarly foundation would only refer
15  to your writings?
16          MR. BRADY:  Objection, misstates testimony.
17          THE WITNESS:  It would be the writings and the
18  research, the study that I had to do to write something.
19          BY MR. ECHEVERRIA:  Q.  Did you consult other
20  writings in forming your opinions?
21    A.   For this case?
22    Q.   Yes?
23    A.   Well, directly -- let's see how to phrase
24  this.
25          Many of the -- I'm sorry.  The detailed facts

Page 127

1   that I speak to in here about dates and types of firearms
2   and those kinds of things are just things that I've
3   learned through the years.  They are just part of my
4   database, if you will.  They are the result of experience
5   and reading.
6           Most of what I wrote, I didn't have to consult
7   a book for or journal for because they were just simply
8   things I know.  When I learned them, I can't say.
9           But, for instance, if we talk about the P-35
10  pistol, for instance, well, I don't know when I learned
11  that, but I know the things I know about it.  So I hope
12  I've been responsive.
13    Q.   So when you say scholarly foundation, are you
14  referring to scholarship concerning the historical
15  existence and prevalence of large capacity magazines?
16    A.   Yes.
17    Q.   Is there any scholarly foundation as you've
18  used that phrase concerning your opinions regarding the
19  self defense utility of large capacity magazines?
20    A.   Scholarly foundation -- I'm having trouble
21  with the question.
22          Do you mean have I -- have I learned things
23  through reading or discussions with people in the field?
24          MR. ECHEVERRIA:  Can you read back the
25  question, please.

Page 128

1           (The record was read as requested.)
2           BY MR. ECHEVERRIA:  Q.  Can you answer that
3   question?
4           MR. BRADY:  Objection, confusing, vague and
5   ambiguous.
6           THE WITNESS:  I'm struggling with the
7   construction of the question.
8           BY MR. ECHEVERRIA:  Q.  Sure.  So when you use
9   the phrase, scholarly foundation for your opinions, what
10  is the scholarly foundation that you're referring to
11  concerning your second opinion that large capacity
12  magazines have utility for self defense?
13    A.   The scholarly foundation is all of the reading
14  that I've done, some writing -- not a lot, but a lot of
15  reading and talking to peace officers or other people who
16  have been involved in shootings and learning what was
17  involved in those events.
18    Q.   Okay.  Is it your understanding that
19  conversations with peace officers and other types of
20  research that you just described, is it your
21  understanding that that would qualify as scholarship?
22          MR. BRADY:  Objection, misstates testimony,
23  vague and ambiguous.
24          THE WITNESS:  Well, your question is what I
25  meant and that's what I mean.

Page 129

1           BY MR. ECHEVERRIA:  Q.  Okay.  Of what field
2   of expertise are you submitting your report in in this
3   case?
4           MR. BRADY:  Objection, vague and ambiguous.
5           THE WITNESS:  The ones stated.  The history of
6   use -- I forget how it's phrased in the --
7           BY MR. ECHEVERRIA:  Q.  So would you describe
8   yourself as an expert in the history of firearms?
9     A.   Yes.
10    Q.   And you're not submitting any testimony in
11  this case or any opinions as an expert in psychology?
12    A.   No.
13    Q.   You're not an expert in psychology, is that
14  correct?
15    A.   I am not.
16    Q.   And you're not an expert in behavioral
17  psychology?
18    A.   I am not.
19    Q.   And you are not an expert in criminology, is
20  that correct?
21    A.   Well, that's what I have my degree in, but I
22  would not describe myself as such.
23    Q.   Okay.  I also have a -- I have a master's in
24  criminal justice and I also would not say that I am an
25  expert in criminology.

Page 130

1    And you are not an expert in psychology,
2  right?
3    A.  I am not.
4    Q.  Okay.  So let's explore your first opinion
5  concerning the historical existence and prevalence of
6  large capacity magazines.
7    That opinion begins on page three of your
8  expert report, is that correct?
9    A.  Mm-hmm.  Yes.
10   Q.  What is your definition of a quote, unquote
11 "standard magazine" as that phrase is used in your
12 opinion?
13   A.  Well, standard magazine is the magazine that
14 comes with the firearm.
15   Q.  Do all firearms have a standard magazine?
16   A.  I don't know of one that does not.
17   Q.  And firearms generally can use other magazines
18 that are not the standard magazine for the firearm, is
19 that correct?
20   A.  That's correct.
21   Q.  Okay.  And you provide some examples of
22 firearms that have standard large capacity magazines, is
23 that correct?
24   A.  Yes.
25   Q.  And the first one is the Browning High Power?

Page 131

1    A.  Correct.
2    Q.  And that has a magazine capacity of 13 rounds
3  for the standard magazine, is that correct?
4    A.  Correct.
5    Q.  Are you familiar with the standard magazine
6  for the .40 caliber Browning?
7    A.  .40 caliber Browning, um -- I'm not familiar
8  with the -- that's the P-35 and 40.  No, I'd have to
9  guess on that.
10   Q.  Okay.  But when you're referring to the
11 Browning High Power, that's the nine millimeter version,
12 is that correct?
13   A.  Yes.
14   Q.  And the nine millimeter version has a standard
15 magazine of 13 rounds, is that correct?
16   A.  Correct.
17   Q.  Are you familiar with the Brown 1911 .22
18 pistol?
19   A.  The what?
20   Q.  The Browning 1911 .22 pistol?
21   A.  Yes.
22   Q.  And that uses a standard 10-round magazine, is
23 that correct?
24   A.  I didn't think it was 10.  I thought it was
25 eight, but --

Page 132

1    Q.  In any event, it would not qualify as a large
2  capacity magazine?
3    A.  No.
4    Q.  Are you familiar with the Browning 1911 .380?
5    A.  1911 .380.  I know of a Browning 1903, I think
6  a 1908.
7    The dates that you're -- aren't syncing with
8  the descriptions that I have of the firearms.
9    It wouldn't be a plus 10 magazine for it, but
10 I don't know.
11   Q.  And when you say it wouldn't be a plus 10
12 magazine, you're testifying that it would not be a large
13 capacity magazine?
14   A.  Yes.
15   Q.  And why is that?  How do you know that?
16   A.  Well, the model -- again, if we're dealing,
17 say, for instance, with the 1922, there were very few
18 handguns then that had a magazine of that capacity.
19   Q.  Okay.  And are you familiar with the Browning
20 Buck Mark pistol?
21   A.  Yes.
22   Q.  You're familiar with the fact that that
23 magazine capacity is 10 rounds?
24   A.  It's a .22.
25   Q.  Okay.  So you also mentioned the Beretta

Page 133

1  models 81 and 84 --
2    A.  Yes.
3    Q.  -- as having 12 and 13 rounds respectively in
4  a standard magazine, is that correct?
5    A.  Yes.
6    Q.  Are you aware that most Beretta model 92s come
7  with a standard magazine of 10 rounds or less?
8    MR. BRADY:  Objection, argumentative.
9    BY MR. ECHEVERRIA:  Q.  You may answer that
10 question.
11   MR. BRADY:  Objection, calls for speculation.
12   THE WITNESS:  Say that again.
13   BY MR. ECHEVERRIA:  Q.  Are you familiar with
14 the Beretta model 92?
15   A.  Yes.
16   Q.  Are you aware of the standard magazine for the
17 Beretta 92?
18   A.  I know that there are departments and there
19 were -- initially the gun -- the pistol was supplied with
20 a larger capacity magazine than that.  If they've
21 downsized it, I am not aware of that.
22   Q.  So your testimony is that the Beretta model 92
23 when it was first introduced had a large capacity
24 magazine as the standard magazine?
25   A.  I believe it did.  That was the military one

EXHIBIT HELSLEY - 4 Page 34

Page 134

1  used by our forces.
2      Q.  And you state that there are many more
3  examples on page four?
4      A.  Yes.
5      Q.  Can you provide some of those examples here
6  today?
7      A.  Yeah.  There are the pistols made by Heckler &
8  Koch.  Pistol made by Sig Sauer.  There are all sorts of
9  models of pistols made by Smith & Wesson, just to name a
10  few of them.
11          There are after market frames for the 1511
12  Colt that allow a double stack magazine and there's a
13  large universe of those.
14      Q.  But those after market magazines would not
15  qualify as standard magazines, would they?
16      A.  Well, they would for the different receiver,
17  for the different frame, yes.  Because a double stack
18  magazine is wider, thus a single stack magazine wouldn't
19  work.
20          So if you increase the size of the magazine
21  well, you've got to have a magazine that fills the well.
22      Q.  Right.  So you're speaking about after market
23  frames?
24      A.  Yes.
25      Q.  Okay.  Got it.  And then going through the

Page 135

1  history of large capacity magazines, you begin with "The
2  dawn of firearms" in the first paragraph on page two of
3  Exhibit 3?
4      A.  Yes.
5      Q.  When was the dawn of firearms?
6      A.  Well, there's some debate about that as to
7  whether it was the 13th or 14th century.
8          It dates back to when black powder was
9  invented.  It's not exactly clear.  But if we talk about
10  the 14th century, we're probably pretty close.
11      Q.  Okay.  And the first example of a large
12  capacity magazine or a weapon that holds more than 10
13  rounds, that is in the 15th century, is that correct?
14      A.  Yes.
15      Q.  Are there any earlier examples that you're
16  aware of of a firearm holding more than 10 rounds of
17  ammunition?
18      A.  Not that I'm aware of.
19      Q.  All right.  So large capacity magazines do
20  not, in fact, date back to the dawn of firearms, is that
21  correct?
22          MR. BRADY:  Objection, argumentative,
23  misstates testimony, vague and ambiguous.
24          BY MR. ECHEVERRIA:  Q.  You may answer that
25  question.

Page 136

1      A.  Well, if it was -- I would consider the late
2  15th century to be far enough back to be part of the
3  dawn.
4      Q.  Okay.  And in the 15th century, were firearms
5  capable of holding more than 10 bullets commonly
6  available for civilians?
7          MR. BRADY:  Objection, vague and ambiguous.
8          THE WITNESS:  No.
9          BY MR. ECHEVERRIA:  Q.  And in the 17th
10  century, you state that -- I believe it's pronounced
11  Michele Lorenzoni?
12      A.  Yes.
13      Q.  He designed a practical repeating flintlock
14  rifle.  What is your meaning of the term practical?
15      A.  It means that it was a reliable and -- I'm not
16  sure you could say affordable, but it was -- the design
17  was such that it worked well and was reliable.
18      Q.  And how many rounds of ammunition did
19  Lorenzoni's repeating flintlock rifle hold?
20      A.  I believe it was 12.
21      Q.  In the 17th century were firearms capable of
22  holding more than 10 rounds commonly available for
23  civilians?
24          MR. BRADY:  Objection, vague and ambiguous.
25          THE WITNESS:  They were available.  The burden

Page 137

1  was cost.
2          BY MR. ECHEVERRIA:  Q.  Were there any other
3  firearms in addition to the practical repeating flintlock
4  rifle designed by Lorenzoni available in the 17th
5  century?
6      A.  There are none that I can bring to mind.
7      Q.  Okay.  So would you testify that in the 17th
8  century firearms that hold more than 10 rounds were
9  commonly available to civilians even though you cite to
10  only one firearm that was designed at that time that did
11  so?
12          MR. BRADY:  Objection, argumentative,
13  misstates testimony, vague and ambiguous, compound.
14          BY MR. ECHEVERRIA:  Q.  You may answer that
15  question unless you'd like me to repeat it or rephrase
16  it.
17      A.  The burden was not that they weren't
18  accessible.  It was cost.
19      Q.  And then you move on to a modified 18th
20  century version of the Lorenzoni design, correct?
21      A.  Yes.
22      Q.  And that had a 12-shot capacity?
23      A.  It varied 12 to -- but he made -- there were
24  some that were pistols as well as rifles.  So the
25  capacity of the handguns was less than the rifles were,

Page 138

1  but --
2      Q.   Okay.  And were the rifles -- the modified
3  Lorenzoni rifles, were those commonly available to
4  civilians in the 18th century?
5      A.   Well, again, they were available.  But, again,
6  cost would be a burden.
7      Q.   And the cost would reduce the prevalence of
8  that firearm at that time?
9      A.   Yes, fewer made because of the cost.
10     Q.   Okay.  And you state that the modified
11 Lorenzoni rifle -- pardon me, let me rephrase.
12          You state that the modified 18th century
13 version of Lorenzoni's design, without specifying whether
14 it was the rifle or the pistol, is displayed at the NRA's
15 National Firearms Museum, is that correct?
16     A.   Yes.
17     Q.   Have you been to the NRA's National Firearms
18 Museum?
19     A.   I have.
20     Q.   How many guns are on display at that museum in
21 your estimation?
22     A.   I suspect thousands.
23     Q.   And of those thousands of firearms, what
24 percentage would you say holds more than 10 rounds of
25 ammunition or have a standard magazine that holds more

Page 139

1  than 10 rounds of ammunition?
2          MR. BRADY:  Objection, calls for speculation,
3  compound, vague and ambiguous.
4          THE WITNESS:  I couldn't --
5          BY MR. ECHEVERRIA:  Q.  If you can answer that
6  question?
7      A.   I couldn't begin to guess because I believe
8  the displays there, they rotate them and so I don't know
9  what's there now as opposed to when I was there.
10     Q.   Okay.  Then you move on to the Lewis & Clark
11 Expedition.  What firearm was used by Lewis & Clark?
12     A.   Girandoni.  The spelling for that is in one of
13 those books.  It's -- well, I won't try it.
14     Q.   Okay.  And that had a magazine size of 22 .46
15 caliber balls?
16     A.   Yes.
17     Q.   Would you say that that weapon was commonly
18 used by civilians at that time?
19          MR. BRADY:  Objection, calls for speculation,
20 calls for a legal conclusion.
21          THE WITNESS:  The rifle was used by the
22 Austrian military.  They were made in Philadelphia.  They
23 were certainly available.  Again, very expensive.
24          MR. ECHEVERRIA:  Okay.  I'm going to mark as
25 Exhibit 13 an excerpt from your book, a book that you

Page 140

1  coauthored, the Gun Book For Boys which you produced this
2  morning.
3          (Exhibit 13 was marked.)
4          BY MR. ECHEVERRIA:  Q.  If I could refer you
5  to page 57.
6          You discuss the Girandoni rifle that was used
7  in the Lewis & Clark expedition, is that correct?
8      A.   Yes.
9      Q.   And you state, quote, "Advanced as it was in
10 some ways, the Girandoni was too expensive and
11 impractical to be a reliable military weapon."
12          Do you see that?
13     A.   Yes.
14     Q.   And is it your testimony that the Girandoni
15 was commonly used by militaries at that time?
16          MR. BRADY:  Objection, misstates testimony,
17 vague and ambiguous.
18          THE WITNESS:  No, it was not.
19          BY MR. ECHEVERRIA:  Q.  And it was not
20 commonly used by civilians, either, is that correct,
21 during that time?
22     A.   Correct.
23     Q.   Okay.  Then your opinion moves on to the
24 American Civil War and you write that "Rifles with fixed
25 magazines holding 15 rounds were widely used in the

Page 141

1  American Civil War."
2          Do you see that?
3      A.   Yes.
4      Q.   What do you mean by widely used?
5      A.   The United States military for the union
6  purchased 1,700 and then individual militias from the
7  various states purchased their own.
8          I don't know what the total count was, but the
9  Henry repeating rifle was used -- well, it saw a lot of
10 use in the Civil War.
11     Q.   And, to the best of your knowledge, what
12 percentage of firearms used during the Civil War were --
13 had 15-round magazines?
14     A.   Probably a fairly small percentage.
15     Q.   And even though it was a fairly small
16 percentage, you would still say that it was widely used?
17     A.   Yes.  They were captured by the Confederates
18 and used by them.
19          The military objected to them because of
20 supply problems, but there were, you know, many thousands
21 in use in the Civil War.
22     Q.   And these firearms were developed for military
23 application, is that correct?
24     A.   I don't know that that was the objective.  The
25 Henry was the outgrowth of the Volcanic circa 1854 and

Page 142

1  the Henry was one of the first that used metallic
2  cartridge rimfire and there was no -- there was no war
3  going on at the time.
4           Well, I shouldn't -- there were wars going on
5  all the time, but there was no particular war that these
6  were developed for.  This was just the evolution of the
7  firearm and the metallic cartridge.
8     Q.   But these firearms that you're discussing,
9  they were mostly used in the militaries, is that correct?
10          MR. BRADY:  Objection, misstates testimony,
11  vague and ambiguous.
12          THE WITNESS:  Initially.  Then they became the
13  standard for civilians.
14          BY MR. ECHEVERRIA:  Q.  Okay.  You also write
15  that "During the same period, which would be during the
16  Civil War, revolvers with a capacity of 20 rounds were
17  available but enjoyed limited popularity because they
18  were so ungainly."
19          Did you write that?
20     A.   Yes.
21     Q.   So revolvers with a capacity of more than 10
22  rounds had limited popularity at that time, is that
23  correct?
24     A.   Yes.
25     Q.   Okay.  And then in 1879, Remington introduced

Page 143

1  the first modern detachable rifle magazine, is that
2  correct?
3     A.   Yeah.  It was developed by James Paris Lee and
4  the patent was sold to Remington and then they produced
5  it.
6     Q.   How many rounds did that magazine hold?
7     A.   I believe five.
8     Q.   So that would not be a large capacity
9  magazine, is that correct?
10     A.   No.
11     Q.   And you write, "In the 1890s semi-automatic
12  pistols with detachable magazines followed," is that
13  correct?
14     A.   Yes.
15     Q.   And what was the magazine size for those
16  detachable magazines that you're referencing in that
17  sentence?
18     A.   Well, originally they were 10 or less.  That
19  would have been the Borchardt and the Mars, Luger.  Those
20  were all less -- 10 or less than 10.
21     Q.   And those firearms were available in the
22  United States?
23     A.   Luger was and the Borchardt was, yes.
24     Q.   Then you write, "During World War I,
25  detachable magazines with capability" -- sorry, "with

Page 144

1  capacities of 25 to 32 rounds were introduced."  Is that
2  correct?
3     A.   Yes.
4     Q.   And those firearms were introduced for a
5  military application, is that correct?
6     A.   Yes.
7     Q.   And those firearms that were introduced during
8  World War I were not practical for civilian self defense,
9  is that correct?
10          MR. BRADY:  Objection, vague and ambiguous,
11  calls for speculation.
12          BY MR. ECHEVERRIA:  Q.  Let me rephrase.  The
13  large capacity magazines that were introduced during
14  World War I were not practical for use with a belt
15  holster and, by extension, concealed carry for self
16  defense, is that correct?
17     A.   Correct.  If self defense is only about
18  concealed carry, which it's not.
19     Q.   Were these World War I era large capacity
20  magazines commonly used by civilians for self defense?
21     A.   I don't know.
22     Q.   Okay.  And "In 1935, Fabrique Nationale
23  introduced the model P-35 pistol with its fully internal
24  13-round magazine," is that correct?
25     A.   Yes.

Page 145

1     Q.   Was that pistol developed for the military or
2  for civilian use?
3     A.   John Browning designed that and there was no
4  war going on at the time for which it was designed
5  specifically.
6           It was just the next step in the evolution of
7  handguns that he designed.  He designed a number for Colt
8  and for FN, and so I -- I don't know that you could say
9  that it was intended for the military.  You know, I don't
10  know what his thoughts were.
11     Q.   But it eventually became, according to your
12  report, one of the most widely used military pistols of
13  all time, is that correct?
14     A.   Yes.
15     Q.   Was it widely used by civilians as well?
16     A.   In the 1950s it became so because the
17  marketing in the United States, for instance, began after
18  World War II.
19     Q.   You also write that "During World War II,
20  magazine capacity for shoulder-fired firearms
21  substantially increased," is that correct?
22     A.   Yes.
23     Q.   And what would the magazine capacity have
24  increased to, according to that statement?
25     A.   Well, for instance, the M-1 Carbine, which did

EXHIBIT HELSLEY - 4 Page 37

December 18, 2017

Page 146

1  not exist before World War II, it was designed during the
2  war, it had two sizes of magazines available for the
3      One was 15 rounds and one was 30 rounds and
4  there were about six million of those made.
5      Q.   And during World War II, most pistols,
6  including the P-35, remained at 10 rounds or less, is
7  that correct?
8      A.   Correct.
9      Q.   Would you say that during World War II large
10  capacity magazines were commonly used by civilians for
11  self defense?
12      MR. BRADY:  Objection, vague and ambiguous.
13      THE WITNESS:  No.
14      BY MR. ECHEVERRIA:  Q.  And you write, "In the
15  mid 1950s, the P-35 was rebranded the High Power and
16  imported to the U.S."  That would be the Browning High
17  Power?
18      A.   Yes.
19      Q.   Why was it rebranded, to your knowledge, to
20  have the name High Power?
21      MR. BRADY:  Objection, calls for speculation.
22      THE WITNESS:  I assume it was a marketing
23  decision, but I don't know why they renamed it.
24      BY MR. ECHEVERRIA:  Q.  Is it possible that
25  the marketing decision was because of the magazine

Page 147

1  capacity of that firearm?
2      MR. BRADY:  Objection, calls for speculation.
3      THE WITNESS:  Possible.
4      BY MR. ECHEVERRIA:  Q.  And when was the
5  Browning High Power introduced into the United States?
6      A.   All I can say is the mid '50s, by looking at
7  the ads and gun magazines of that era.
8      Q.   And you write on page three of your report
9  that "The Browning High Power with 13 rounds" -- pardon
10  me.  I'll rephrase.
11      You write on page three, "The Browning High
12  Power (13 rounds c. 1954)" --  what does c. 1954 refer to
13  in that statement?
14      A.   When it was introduced to the United States.
15      Q.   So the Browning High Power was introduced in
16  1954?
17      A.   Well, yes.  Sometimes that's hard to pin down
18  because there's a difference between what the journals
19  say and when the marketing occurred, but mid '50s is
20  pretty good.
21      Q.   Okay.  And was this the first semi-automatic
22  handgun with a factory issue large capacity magazine
23  available for sale to civilians in the United States?
24      A.   No.  There was a snail drum 32-round magazine
25  for the Luger that was available right after World War I.

Page 148

1      The Lugers were sold in the United States by
2  Stoeger and so they were available.
3      Q.   Is there a reason why you don't reference the
4  Luger in your report?
5      A.   Well, this was about high cap magazines -- let
6  me see here.
7      I just said that I included these but not
8  limited to.  There were -- I mean, if you get really out
9  in the weeds, there are small production guns here and
10  there, but --
11      Q.   Okay.
12      A.   That's why.
13      Q.   Okay.  Then you go on to write, "This
14  transition of a firearm from military to civilian use for
15  sport or self defense is very common."
16      What do you mean by the transition of a
17  firearm from military to civilian use?
18      A.   Well, for instance, probably one of the
19  largest production firearms in the history of the world
20  is the Mauser bolt action.
21      And the Mausers were built for military use,
22  but they also became the standard for sporting use.  But
23  they began their life as a military arm.
24      The Springfield in the United States was the
25  same.  Made for the military, but after World War I, you

Page 149

1  had a bunch of doughboys quote, unquote who had been
2  trained in the use of the '03 Springfield and that then
3  was something they wanted to have and it became the deer
4  rifle of choice.
5      So it was frequent that the military arm
6  becomes the civilian arm of choice through military
7  training and experience.
8      Q.   Okay.  And by doughboys you're referring to
9  American servicemen who served in World War I?
10      A.   Yes.
11      Q.   And the standards of World War I that you
12  referenced, the 1903 Springfield rifle and the Colt M
13  1911 pistol, what were the magazine capacities for those
14  two firearms?
15      A.   Well, it varied depending on how they were
16  used.  Both of them had larger capacity magazines for air
17  service use.
18      So if your '03 Springfield was being used in a
19  biplane, you would have a 20 or 30-round mag on it.  The
20  1911 was the same.  There was a 25-round magazine for it.
21      Q.   Sure, but what was the standard magazine for
22  those two firearms?
23      A.   Well, the standard magazine on the '03
24  Springfield is a nondetachable.  It's built into the gun,
25  so it held five rounds plus one.  The 1911 was seven

Page 150

1    rounds plus one.
2    Q.  Okay.  So neither of those had the capacity of
3    -- let me rephrase.  Strike that.  We'll move on.
4        So in the next paragraph you state, "Between
5    the two World Wars, double-action semi-automatic pistols
6    like the Walther PPK and P-38 were introduced."
7        What is your meaning of the term introduced?
8    A.  Designed, developed and sales began.
9    Q.  Were those two firearms sold to civilians in
10   the United States?
11   A.  The PP and the PPK, I believe, were.  I don't
12   believe the P-38 was because it came too late and the
13   Germans were sucking it up for military use.
14   Q.  And what was the standard magazine capacity
15   for the PPK?
16   A.  Well, it depends on if it was 2232 or 380, but
17   generally it was a seven-round for the larger rounds.
18   Q.  So the PPK would not have had a standard large
19   capacity magazine, is that correct?
20   A.  No.
21   Q.  And the same would go for the P-38, is that
22   correct?
23   A.  Correct.
24   Q.  Okay.  And your report then jumps from World
25   War II to the early 1970s in that same paragraph, is that

Page 151

1    correct?
2    A.  Yes.
3    Q.  And you describe how law enforcement agencies
4    began to use firearms that had capacities of holding more
5    than 10 rounds, is that correct?
6    A.  Correct.
7    Q.  And why did law enforcement agencies
8    transition to those types of firearms?
9        MR. BRADY:  Objection, calls for speculation.
10       BY MR. ECHEVERRIA:  Q.  You may answer.
11   A.  Traditionally in the United States, law
12   enforcement had carried revolvers which were either five
13   or six rounds and that was what was required.
14       Rank and file, as I understand it, started to
15   object to being restricted to a five or six-round
16   capacity.
17       The old saying was, well, if I can't get him
18   in six rounds, I don't need anything more.  Well, they
19   didn't believe that and they wanted more fire power, if
20   you will.
21       And so administrators were concerned that --
22   with the 1911 Colt, for instance, there was a concern
23   about how it was carried.  Did you carry it cocked with a
24   round in the chamber with the safety on or how -- how is
25   this done.

Page 152

1    Well, the PPK and the P-38 were a design that
2    allowed the pistol to work like a revolver where you pull
3    the trigger the same way you did on a revolver, and so
4    that became married with the higher capacity magazine
5    that the P-35 had shown and then you had a gun that was
6    more acceptable to police chiefs and sheriffs from a
7    training perspective and it had the higher capacity that
8    the rank and file wanted to have.
9        And so tremendous change was going on in law
10   enforcement at that time with the LEA grants and whatnot
11   because the transition from one hand gun to the next is
12   expensive.
13       Well, the funds were available for it.  That's
14   when DOJ did the transition.  Governor Brown, as matter
15   of fact, was governor then and that's when it was
16   required that the hiring agency paid for the gun.
17       Monies were available for it and pretty soon
18   revolvers were just gone and semi-auto pistols with plus
19   10-round capacities were there and there to stay.
20   Q.  And what is the standard magazine capacity for
21   the M 59?
22   A.  I believe it was 14 rounds.
23   Q.  And you write -- sorry.
24   A.  It's more than 10.
25   Q.  Right.  And you write that "Law enforcement

Page 153

1    demand for the new generation of semi-automatic pistols
2    helped create an increased demand in the civilian
3    market."
4        What is your definition of the phrase helped
5    create?
6    A.  Well, there was a lot of press about -- in a
7    city.  For instance, when the city was going to
8    transition to the revolvers going out the door and the
9    semi-auto pistols on the way in, there would be some note
10   in the press about that because it was expensive.
11       And so a lot of people were introduced to the
12   fact that these were available and viable because they
13   had the imprimatur, if you will, of the local police
14   chief or sheriff and there were just a lot of them being
15   made and available for sale.
16   Q.  So when you refer to semi-automatic pistols in
17   that sentence, are you referring to semi-automatic
18   pistols that have large capacity magazines as the
19   standard magazine?
20   A.  Well, both.  But virtually all of the law
21   enforcement agencies that I know of went for the plus
22   10s.
23       There were certainly variants and there are
24   now with single stacks that are less than 10, but most of
25   what was going on was more than 10 rounds.

Page 154

1    Q.   And it was your testimony that you yourself
2  did not select a firearm that used a large capacity
3  magazine, is that correct?
4    A.   When I was in the field, yes.
5    Q.   Okay.  And when you say that law enforcement
6  demand for these semi-automatic pistols helped create an
7  increased demand in the civilian market, what is the
8  basis for that statement?
9    A.   Just observing it.  I mean, we know that
10 revolver sales as opposed to 40 years ago are way down
11 and semi-autos are way up and that the figure that I've
12 heard is that Glock has 60 percent of the law enforcement
13 sales in the United States.
14       I don't know that that's correct, but that's
15 what I've read.  There's just been a total transition
16 from revolvers to semi-automatic pistols.
17   Q.   And you cite in support of this increased
18 demand an Alcohol, Tobacco, Firearms and Explosives
19 report from 2012, is that correct?
20   A.   Yes.
21   Q.   This would be the firearms commerce in the
22 United States --
23   A.   Yes.
24   Q.   -- report.
25       MR. ECHEVERRIA:  I'm going to mark as Exhibit

Page 155

1  14 that report and provide you with a copy, and you as
2  well, counsel.
3       (Exhibit 14 was marked.)
4       BY MR. ECHEVERRIA:  Q.  Have you seen this
5  report before?
6    A.   Yes.
7    Q.   And can you describe what this report is?
8    A.   What it's described as, "Firearms Commerce in
9  the United States."
10   Q.   Okay.  So this is not a report on the
11 prevalence of large capacity magazines in the market, is
12 that correct?
13       MR. BRADY:  Objection, misstates testimony,
14 vague and ambiguous.  You can answer.
15       BY MR. ECHEVERRIA:  Q.  You may answer that
16 question.
17   A.   Correct.
18   Q.   And the firearms that are discussed in this
19 report do not necessarily have standard large capacity
20 magazines, is that correct?
21   A.   That's correct.
22   Q.   And this report also includes figures
23 concerning the sales of these firearms to law
24 enforcement, is that correct?
25       At the bottom of page one in a footnote it

Page 156

1  states, quote, "The AFMER report excludes production for
2  the U.S. military but includes firearms purchased by
3  domestic law enforcement agencies."
4    A.   Right.
5    Q.   That's correct?
6    A.   Yes.
7    Q.   So this report does include figures concerning
8  sales to law enforcement as well as civilians, is that
9  correct?
10   A.   Yes.
11   Q.   And that footnote also goes on to state that
12 the report also includes firearms manufactured for
13 export, is that correct?
14   A.   Correct.
15   Q.   Could that also include export to foreign
16 militaries?
17       MR. BRADY:  Objection, calls for speculation.
18 You can answer.
19       THE WITNESS:  I don't know, but I assume it
20 could.
21       BY MR. ECHEVERRIA:  Q.  Okay.  You say in your
22 report, "The result of almost four decades of sales to
23 law enforcement and civilian clients is millions of
24 semi-automatic pistols with a magazine capacity of more
25 than 10 rounds," is that correct?

Page 157

1    A.   Yes.
2    Q.   And are you basing that statement on this
3  report which has been marked as Exhibit 14?
4    A.   In part.
5    Q.   And this report does not specify how many
6  semi-automatic pistols with large capacity magazines have
7  been sold, is that correct?
8    A.   That's correct.
9    Q.   And you state that this is in part the basis
10 for your statement?
11   A.   Yes.
12   Q.   What other evidence are you relying on to make
13 that statement?
14   A.   Again, the reports that I've read about what
15 law enforcement buys and what share the market companies
16 like Glock have, and just observing what police
17 departments carry, whether it's the CHP or Los Angeles
18 Police Department.
19       I don't think that I have seen a peace officer
20 in this state with a duty-issued less than 10-round
21 sidearm.  Now, maybe there's some of them out there, but
22 I have not seen them.
23   Q.   Okay.  So you state that there are other
24 reports that you have seen that support your statement
25 that there are millions of semi-automatic pistols with a

Page 158

1  magazine capacity of more than 10 rounds that have been
2  sold to law enforcement and civilian clients, is that
3  right?
4       A.   Mm-hmm.
5       Q.   What are those other reports?
6       A.   Well, I can't cite them specifically.  They
7  are just news reports that I've seen, things I've read in
8  firearm magazines, personal experience.
9            There are in excess of 100,000 folks with
10  peace officer authority in the state and, again, I don't
11  know.  There may well be some department that issues
12  sidearms that have less than 10, but I'm not aware of
13  them.
14       Q.   Okay.  And focusing on civilian purchasers of
15  the semi-automatic weapons, do any of the reports that
16  you're talking about concern civilian sales?
17       A.   Well, the reports, again, with the -- the
18  reports that I've read and things that I see in gun
19  stores, this is what's on display for sale or was, of
20  course, until the magazine capacity thing has struck.
21            I don't know how that will affect sales, but
22  if we're talking about prior to 2015, for instance, gun
23  stores were just full of Glocks and Sigs and Smiths and
24  they all had plus 10 magazines in them or virtually all
25  of them.  The universe of revolvers is significantly

Page 159

1  smaller.
2       Q.   And you state that there are likely multiple
3  millions of magazines for them where "them" is referring
4  to semi-automatic pistols with a magazine capacity of
5  more than 10 rounds, is that correct?
6       A.   Yes.
7       Q.   And what is your evidentiary basis for
8  concluding that there are likely multiple millions of
9  those magazines in existence?
10       A.   Well, virtually everyone that I know that has
11  a handgun that will accept a magazine of more than 10
12  rounds has quite a few of them.
13       Q.   And when you say virtually everyone you know,
14  are you referring to current or retired law enforcement
15  personnel?
16       A.   Those folks as well, but civilians who have
17  gone out to purchase them.
18            Of course they are going to have to reconsider
19  now, but if you have a pistol that will hold a magazine
20  of more than 10 rounds, it's just been my experience that
21  people buy a stash, if you will, of magazines for them.
22       Q.   And you go on to state, "My associates who
23  have such pistols also have a considerable number of
24  spare magazines for them."
25            Are your associates law enforcement and

Page 160

1  civilians or --
2       A.   Both.
3       Q.   -- just law enforcement?
4       A.   Both.
5       Q.   And you stated that some of your associates
6  who are civilians, they have large capacity magazines, is
7  that correct?
8       A.   Well, I don't know what they are going to do
9  if they have to divest themselves of the things, but the
10  last time I spoke with most of these folks, they still
11  have them.
12       Q.   So these would be large capacity magazines
13  that were grandfathered in under Senate Bill 23?
14       A.   Yes.
15       Q.   Did you discuss with any of these associates
16  their plans for trying to comply with the amended version
17  of Penal Code 32310?
18       A.   No.  They weren't in a mood to discuss what
19  they were going to do.  They were not very pleased.
20       Q.   Is it possible to permanently modify a large
21  capacity magazine so that it can accommodate no more than
22  10 bullets?
23            MR. BRADY:  Objection, calls for speculation,
24  vague and ambiguous, beyond the scope of what the witness
25  was called to testify about.

Page 161

1            THE WITNESS:  I suppose anything is possible.
2  I think for a Glock, for instance, it's probably totally
3  impractical.
4            If -- I don't think it's possible, but if it
5  is, it's totally impractical to do it because it's
6  polymer.
7            BY MR. ECHEVERRIA:  Q.  Does Glock make
8  available any magazines for use in its pistols that hold
9  no more than 10 bullets?
10       A.   Yes.  I believe the New York Police Department
11  restricted at one time Glock capacity to 10 rounds.  I
12  have never seen such a magazine, but I believe they
13  exist.
14       Q.   And you are aware that under Penal Code
15  Section 32310 individuals can remove a large capacity
16  magazine from the State of California and store that
17  magazine out of state?
18            MR. BRADY:  Objection, calls for a legal
19  conclusion, calls for speculation, vague and ambiguous.
20            BY MR. ECHEVERRIA:  Q.  You may answer that
21  question.
22       A.   I'm sorry?
23       Q.   You may answer that question.
24       A.   Yes, I'm aware of that.
25       Q.   You also stated that "The homeowner and the

**Page 162**

1  concealed weapon permit holder want a pistol that can
2  hold significantly more cartridges than a revolver for
3  the same reason a law enforcement office" -- it says
4  office -- "or soldier wants one, to increase his or her
5  chances of staying alive," is that correct?
6      A.   Correct.
7      Q.   What is the meaning of the phrase
8  significantly more?
9      A.   Well, there's sort of a break point between a
10  revolver and with your -- now there's some of them with
11  seven-round capacities.  But basically you want to have
12  all the cartridges you can have when you're being
13  threatened.
14      Q.   Isn't another benefit of a magazine, even if
15  it holds no more than 10 rounds, that it can reload the
16  firearm faster than a revolver can be reloaded?
17      A.   Theoretically, yes.  It's a matter of
18  training.
19           There are some people that are very quick with
20  a revolver, but it's harder to be quick with a revolver
21  than it is with a semi-auto pistol with a detachable
22  magazine.
23      Q.   Okay.  And you write, "for virtuous citizens
24  buy their guns to protect themselves from the same
25  criminals that police carry guns to protect the citizens,

**Page 163**

1  the public and themselves from," is that correct?
2      A.   That's correct.
3      Q.   What is a virtuous citizen?
4      A.   People who can own firearms.  People that are
5  not in a prohibited class.
6      Q.   Is it possible for a virtuous citizen to
7  become a criminal?
8           MR. BRADY:  Objection, vague and ambiguous,
9  calls for speculation, beyond the scope of what the
10  witness was called to testify about.
11           BY MR. ECHEVERRIA:  Q.  You may answer that
12  question.
13      A.   Possible, certainly.
14      Q.   In fact, all criminals at some point were
15  virtuous citizens, is that correct?
16           MR. BRADY:  Objection, argumentative, calls
17  for speculation, beyond the scope of what the witness was
18  called to testify about, vague and ambiguous.
19           BY MR. ECHEVERRIA:  Q.  You may answer.
20      A.   Yes.
21      Q.   And you state that "virtuous citizens buy
22  their guns to protect themselves from the same criminals
23  that police carry guns to protect the citizens, the
24  public and themselves from," is that correct?
25      A.   Yes.

**Page 164**

1      Q.   Do private civilians face the same criminal
2  threats as law enforcement personnel?
3           MR. BRADY:  Objection, vague and ambiguous,
4  calls for speculation.
5           THE WITNESS:  In some cases they most
6  assuredly do.
7           BY MR. ECHEVERRIA:  Law enforcement personnel
8  use firearms for defensive uses, correct?
9      A.   Defensive and offensive both.
10      Q.   So law enforcement also use firearms for
11  offensive purposes?
12      A.   Yes.
13      Q.   Do civilians also own firearms for offensive
14  purposes?
15      A.   A circumstance could arise where -- yes.
16      Q.   So it's your testimony sitting here today that
17  virtuous citizens can possession firearms for offensive
18  purposes?
19           MR. BRADY:  Objection, misstates testimony,
20  vague and ambiguous, calls for speculation.
21           THE WITNESS:  Yeah.  The Texas shooting of two
22  months ago was a good example of that.
23           The citizen who responded to the fellow who
24  had shot up the church was in an offensive role to stop
25  what the guy was doing, so --

**Page 165**

1           BY MR. ECHEVERRIA:  Q.  You wouldn't
2  characterize that incident as a defensive shooting?
3      A.   No.  He went to the fight to stop the fight,
4  so it was offensive.  He didn't need to join the fight.
5  He chose to do it.  Therefore, it was an offensive use of
6  the rifle.
7      Q.   So let's move on to your second opinion in
8  this case.
9           Actually, I just want to go back.  According
10  -- in your opinion, when did large capacity magazines
11  become commonly used by civilians?
12           MR. BRADY:  Objection, vague and ambiguous.
13           BY MR. ECHEVERRIA:  Q.  You can answer that
14  question.
15      A.   I would say the market started to be pretty
16  robust for them about 30 years ago.
17      Q.   And that would be a relatively small fraction
18  of time in comparison with the history of this country,
19  is that correct?
20           MR. BRADY:  Objection, misstates testimony,
21  calls for speculation, argumentative.
22           THE WITNESS:  If we're dealing only with
23  handguns, it's 30 years.  If it's rifles as well, it's
24  probably a little bit more.  Maybe 40 years, but --
25           BY MR. ECHEVERRIA:  Q.  Do you have any

EXHIBIT HELSLEY - 4 Page 42

Page 166

1  further adjustment of it?
2      A.  No.
3      Q.  Okay.  So it is your testimony that handguns
4  using large capacity magazines were commonly used by
5  civilians for the last 30 years and rifles using large
6  capacity magazines have been commonly used by civilians
7  for the past 40 years?
8      A.  Approximately.
9      Q.  Okay.  And moving on to your second opinion
10  concerning the self defense utility of large capacity
11  magazines.
12          You write on page five that "Limiting the law
13  abiding citizen to a magazine of 10 rounds limits their
14  ability to protect themselves from violent criminals in
15  certain situations."  Is that correct?
16      A.  Yes.
17      Q.  What are the certain situations that you're
18  referring to in that statement?
19      A.  Well, in circumstances where there are
20  multiple Defendants, attackers or the person -- the
21  attacker is shot and not stopped or shots are fired and
22  missed but there's still a threat.
23      Q.  Are large capacity magazines necessary for
24  civilians to defend themselves?
25          MR. BRADY:  Objection, vague and ambiguous.

Page 167

1          THE WITNESS:  If they think they are to
2  protect themselves, yes.
3          BY MR. ECHEVERRIA:  Q.  And you are aware that
4  the purchase of large capacity magazines has been illegal
5  in the State of California since 2000?
6      A.  I'm aware of that.
7      Q.  And that's with exception to those large
8  capacity magazines that were grandfathered in under the
9  statute, correct?
10          MR. BRADY:  Objection, calls for a legal
11  conclusion.
12          THE WITNESS:  Correct.
13          BY MR. ECHEVERRIA:  Q.  So from the year 2000
14  to the present, have Californians been unable to defend
15  themselves with firearms that have magazine capacities of
16  10 rounds or fewer?
17          MR. BRADY:  Objection, argumentative, calls
18  for speculation, vague and ambiguous.
19          THE WITNESS:  Some may have.
20          BY MR. ECHEVERRIA:  Q.  Do you know of any
21  examples in which a Californian has been unable to
22  successfully defend themselves with a firearm that did
23  not have a large capacity magazine?
24      A.  I do not.
25      Q.  And you base your -- well, strike that.  In

Page 168

1  the first sentence of your second section you state,
2  "Based on my experience with and understanding of the
3  customs and practices of citizens licensed to carry guns
4  in public, individuals carry only" -- only is
5  italicized -- "the gun without spare ammunition or
6  magazines," is that correct?
7      A.  Correct.
8      Q.  What is your meaning of the phrase customs and
9  practices?
10      A.  Let me see here.  Which page?
11      Q.  This would be at the bottom of page five of
12  Exhibit 3.
13      A.  Simply is what they do.  It's the -- how
14  better to describe it.
15          People who carry guns, be they law enforcement
16  or civilians, do it in certain ways.  For instance, many
17  people want to carry a firearm in the glove box of their
18  car.
19          I know that one of the problems that we had at
20  the DOJ was to get the special agents to carry them at
21  all.  They'd be in their briefcase or in the trunk of
22  their state cars.  And those were the customs and
23  practices.
24      Q.  But even if they were customs and practices in
25  your mind, those would not have been best practices,

Page 169

1  correct?
2      A.  I didn't think so.
3      Q.  And when you say "Individuals often carry only
4  the gun without spare ammunition or magazines," are you
5  including in that statement civilians as well as law
6  enforcement?
7      A.  Yes.
8      Q.  So according to your understanding of the
9  customs and practices, individuals, whether they be law
10  enforcement or civilian, only carry their gun without any
11  spare ammunition or magazines?
12      A.  Very frequently that's the case.
13      Q.  Do individuals ever carry spare magazines on
14  their person?
15          MR. BRADY:  Objection, calls for speculation.
16          THE WITNESS:  I'm sure that some do.
17  Generally if I see someone carrying a fanny pack, then I
18  know that they are probably carrying spare magazines as
19  well as their firearm.
20          BY MR. ECHEVERRIA:  Q.  So individuals who are
21  engaging in concealed carry of a handgun, say, it's your
22  testimony sitting here today that they are unlikely to
23  carry spare magazines for that firearm?
24      A.  Many of them do not.
25      Q.  Do you carry spare magazines with your

Page 170

1    firearm?
2        A.   No.
3        Q.   And you have a large capacity magazine for
4    your firearm?
5        A.   I do.
6        Q.   Okay.  But nothing in Section 32310 is
7    preventing anyone from carrying spare magazines, is that
8    correct?
9            MR. BRADY:  Objection, calls for a legal
10   conclusion.
11           THE WITNESS:  No.  Because their safety is
12   more important than someone else's, according to the
13   statute.
14           BY MR. ECHEVERRIA:  Q.   So when civilians
15   carry concealed weapons, can you describe how they
16   normally carry them?
17           MR. BRADY:  Objection, vague and ambiguous,
18   calls for a narrative, calls for speculation.
19           MR. ECHEVERRIA:  Let me rephrase.
20           BY MR. ECHEVERRIA:  Q.   When civilians carry
21   concealed weapons, can they sometimes have them strapped
22   onto their bodies?
23       A.   Yes.
24       Q.   And would you refer to that as a rig, R-I-G?
25       A.   I'm not -- I don't know what that means.

Page 171

1        Q.   Are you aware of any companies that
2    manufacture and sell CCW rigs that are equipped to hold a
3    concealed firearm and spare magazines?
4        A.   Yes.  I just -- I've not heard of them
5    described as rigs.  Is that a brand name or -- I don't
6    know.
7        Q.   But you are familiar with these types of
8    products?
9        A.   I am familiar with some shoulder holsters that
10   are counterbalanced by a spare mag or magazines on the
11   flip side of where the firearm is carried, if that's what
12   you mean by rig.
13       Q.   And you state that most plain-clothes police
14   officers do not find it practical to carry multiple
15   handguns, correct?
16       A.   Correct.
17       Q.   Do they find it practical to carry multiple
18   magazines?
19       A.   Well, if we're talking about the police
20   officers at the DOJ, it was hard enough just to get them
21   to carry the gun or handcuffs or -- it's a real challenge
22   to get safety equipment on their person.
23       Q.   You had testified that it would be best
24   practices to be armed with a firearm and spare magazines
25   if you were a plain-clothes officer?

Page 172

1        A.   Absolutely.
2        Q.   Okay.  In the next paragraph you discuss the
3    average homeowner.
4            What is your definition of the phrase average
5    homeowner?
6        A.   I don't know.  I think the term sort of speaks
7    for itself.
8            The person who lives in a house, apartment --
9    just an average citizen would be what I'm referring to.
10   I mean, John Doe.
11       Q.   Did you use any methodology to determine what
12   an average homeowner is?
13       A.   No.
14       Q.   So you didn't conduct any surveys of
15   homeowners?
16       A.   No.
17       Q.   You didn't review any literature concerning
18   homeowner practices with firearms?
19       A.   Well, I know that there have been surveys that
20   speak to the percentage of homes that have a firearm in
21   the home.
22           But those surveys don't discuss whether or not
23   the average homeowner is likely to have time to gather
24   spare ammunition or magazines, correct?
25       A.   No survey that I'm aware of has studied that.

Page 173

1        Q.   So what is the evidentiary basis for your
2    opinion concerning how much time average homeowners have
3    to gather spare ammunition or magazines?
4            MR. BRADY:  Objection, misstates testimony,
5    vague and ambiguous.
6            THE WITNESS:  It would be on personal
7    observations of people that I know that have a firearm
8    for self defense -- and by that I mean they have a loaded
9    firearm that is positioned somewhere in their business or
10   home that they would go to in the event of a threat.
11           BY MR. ECHEVERRIA:  Q.   And how many
12   homeowners did you observe?
13       A.   I don't know that I observed them.  They are
14   people to whom I've spoken about this question.  I
15   couldn't begin to say.
16           Generally, everywhere I go and everything I
17   do, I'm talking to people about firearms and their
18   practices.  You know, my job is firearms 24/7 and so I've
19   spoken with, I'm sure, hundreds of folks about their
20   practices.
21       Q.   And you state that "The average homeowner is
22   generally limited to one firearm and its magazine
23   capacity," is that correct?
24       A.   It's been my observation.
25       Q.   And it's been your observation by speaking

EXHIBIT HELSLEY - 4 Page 44

Page 174

1   with homeowners who have firearms in the home for self
2   defense?
3       A.   Yes.
4       Q.   And these homeowners that you've spoken to,
5   how many are they?
6       A.   Well, again, that would be hundreds of people
7   that are my social acquaintances or business
8   acquaintances with whom I've discussed this.
9       Q.   And do any of these associates have a firearm
10  with multiple magazines?
11      MR. BRADY:   Objection, vague and ambiguous.
12      THE WITNESS:   I don't recall there being that.
13  Generally, if they are storing them in compliance with
14  state law, they have one firearm that's in a lock box or
15  in some sort of a safety device that restricts the access
16  of children or folks who aren't supposed to have the gun
17  and that's it.
18      BY MR. ECHEVERRIA:   Q.   Is anything in the
19  Penal Code preventing civilians from having a firearm
20  with multiple magazines near where they sleep?
21      MR. BRADY:   Objection, calls for a legal
22  conclusion, asked and answered, calls for speculation,
23  vague and ambiguous.
24      BY MR. ECHEVERRIA:   Q.   You may answer.
25      A.   Preventing, no.

Page 175

1       Q.   Do you ever provide advice to civilians on
2   best practices for storing firearms at the home?
3       A.   Yes.
4       Q.   Do you ever provide advice to civilians on
5   best practices for storing firearms at home for self
6   defense?
7       A.   Yes.
8       Q.   Do you advise civilians to have a single
9   firearm with no spare magazines nearby for self defense?
10      A.   I suggest that they have a firearm for which
11  they are comfortable and that they are -- have confidence
12  in and can operate correctly under stress in the dark and
13  they have a device that secures it correctly, but I don't
14  advise them on if they should have a spare magazine or
15  two or three.
16      Q.   And you write that "for the homeowner who
17  keeps a defensive firearm and is awakened in the night by
18  an intruder is most unlikely to have time to gather spare
19  ammunition."
20           You write that statement, right?
21      A.   Correct.
22      Q.   Do you have an opinion on how frequently these
23  types of home invasions occur?
24      A.   How frequently?
25      Q.   Mm-hmm.

Page 176

1       MR. BRADY:   Objection, calls for speculation,
2   beyond the scope of what the witness is called to testify
3   about, vague and ambiguous.
4       THE WITNESS:   Well, I know that I read about
5   them frequently.
6           I don't know that all of them are reported
7   and, of course, I'd only read about the ones that occur
8   in the range of where the Sacramento Bee records, but
9   they are certainly not an uncommon event.
10      BY MR. ECHEVERRIA:   Q.   And you go on to
11  discuss off duty police officers and private law abiding
12  citizens, correct?
13      A.   Yes.
14      Q.   You state that "Off-duty officers and private
15  law abiding citizens are unlikely to have much, if any,
16  spare ammunition on their person or elsewhere readily
17  accessible," correct?
18      A.   Correct.
19      Q.   And what is the basis of your statement that
20  they are unlikely to do so?
21      A.   Well, for instance, if it's at night and
22  someone hears something they believe is a threat, in my
23  own case, for instance, if -- if I think somebody is
24  breaking in my house, I'm getting out of bed, I have my
25  boxer shorts on, I've got a flashlight in one hand and

Page 177

1   the Glock in the other hand and I really don't have any
2   place to put that spare magazine.
3       Q.   Have you been a victim of a home invasion?
4       A.   No, no.
5       Q.   So the situation you just described has never
6   happened to you?
7       A.   I have heard things that caused me alarm that
8   I responded to.
9           There was nobody breaking into the house, but
10  when I responded, I thought there was.
11      Q.   Okay.   And you state that "For off-duty
12  officers and private law abiding citizens, the ability to
13  have a pistol already loaded with a significant amount of
14  ammunition is all the more important," correct?
15      A.   That's my belief.
16      Q.   What is your definition of the word
17  significant in that sense?
18      A.   You mean significant number of rounds?
19      Q.   Yes.
20      A.   Well, to me personally it's as many as I can
21  have, but I've chosen to have the Glock with 20 rounds.
22      Q.   So 20 rounds is a significant amount of
23  ammunition in your opinion?
24      A.   I'd rather have 40, but 20 is a good start.
25      Q.   Would you rather have 50?

EXHIBIT HELSLEY - 4 Page 45

Page 178

1    A.  I think that anybody who has been in a gun
2  fight would come away saying you can't have too many
3  rounds and so I am a believer.
4        If when I got up at night I had somewhere to
5  carry all that in my boxer shorts, I'd take two or three
6  magazines along.
7    Q.  You would take two or three large capacity
8  magazines?
9    A.  Yes.
10   Q.  Do you have an opinion on whether there is any
11 permissible limit on magazine size that would be
12 acceptable to you?
13   A.  Well, there is a practical limit, I suppose,
14 to what will function.
15       The spring has to be able to push the rounds
16 up to a point to feed and so the practical limit is -- in
17 terms of high caps for handguns is in the 20-round range,
18 although there is a 32, 33-round magazine for a Glock.
19       The only restriction that I would see is
20 reliable functioning.
21   Q.  And is there a practical limit in your opinion
22 as to the magazine size for a rifle?
23   A.  Again, the same thing.  Functioning.
24   Q.  And can you provide a number as to what the
25 practical limit would be for a rifle?

Page 179

1    A.  Well, I know that if I'm shooting an FN 10 FAL
2  and I have a 30-round magazine and I want to shoot prone
3  or an AK variant shooting prone, I run into a problem of
4  the magazine hits the ground before I can get into a good
5  prone position.
6        So there are some practical considerations,
7  but, again, functioning is the one thing that I'm
8  concerned with.  They have to function reliably.
9    Q.  And, in your opinion, would 11 rounds be a
10 significant amount of ammunition?
11   A.  It's better than six.
12   Q.  In your opinion, is 11 rounds a significant
13 amount of ammunition?
14       MR. BRADY:  Objection, vague and ambiguous.
15       THE WITNESS:  No, I don't think so.
16 BY MR. ECHEVERRIA:  Q.  Why not?
17   A.  Because if I thought for a minute that I was
18 going to be in some sort of a confrontation, I'd want a
19 whole lot more than that.
20       It's better than none, but I'd want to take
21 all of the fight that I could take.
22   Q.  You also write that "The average citizen is
23 not trained like law enforcement personnel and is
24 generally not as readily prepared for combat with an
25 armed criminal," right?

Page 180

1    A.  Yes.
2    Q.  What is your basis for stating that the
3  average citizen is not trained like law enforcement
4  personnel?
5    A.  Well, most of them have not taken the type of
6  firearms training to which law enforcement personnel are
7  now subjected.
8    Q.  But civilians can participate in firearms
9  training even if they are not in law enforcement,
10 correct?
11   A.  Yes.  And some are better trained than law
12 enforcement is.
13   Q.  Right.  So what is your basis for stating that
14 the average citizen is not trained like law enforcement
15 personnel, given that these -- given that civilians do
16 engage in these types of trainings?
17   A.  Because the percentage of people who engage in
18 that training is relatively small.
19   Q.  And what is that percentage?
20   A.  I don't know.
21   Q.  What is the basis for your stating that the
22 percentage is low?
23   A.  The number of schools or academies that
24 provide such training are relatively few in the United
25 States and they couldn't possibly train a significant

Page 181

1  number of civilians.
2    Q.  A civilian does not need to go to a school or
3  an academy to be trained in the use of firearms, is that
4  correct?
5    A.  They don't need to learn how to operate the
6  firearm safely and perform the basics of shooting sight
7  picture, trigger squeeze, those sorts of things.
8        The tactical stuff -- use of the flashlight,
9  magazines changes, how to use a barricade, all those
10 things -- that's not the kind of instruction that you
11 would get at your local indoor range.
12       So you'd have to be more specific about
13 training.
14   Q.  Does the National Rifle Association provide
15 any training to its members in the use of firearms?
16   A.  The NRA provides all manner of firearms
17 related training to law enforcement, to military, to
18 civilians, to children, Boy Scouts, to -- yes.
19 BY MR. ECHEVERRIA:  Q.  And would a civilian
20 who participates in that kind of training qualify as an
21 average citizen as you use that phrase, in your opinion?
22       MR. BRADY:  Objection, vague and ambiguous,
23 calls for speculation.
24       THE WITNESS:  Well, I don't know what other
25 training a person might have, but the fact that a person

Page 182

1   was trained by the NRA to shoot skeet correctly with a
2   shotgun has nothing to do with their use of a handgun for
3   self defense except for the basics of you only point the
4   gun in a safe direction and those sorts of things.
5         BY MR. ECHEVERRIA:  Q.  It could enhance their
6   marksmanship, though, right?
7         MR. BRADY:  Objection, vague and ambiguous,
8   incomplete hypothetical.
9         THE WITNESS:  Shooting a shotgun would not
10  enhance your marksmanship.
11        BY MR. ECHEVERRIA:  Q.  Okay.  You also state
12  that the average citizen is, quote, "More susceptible to
13  the psychological effects that naturally occur when faced
14  with the threat of deadly violence and tend to deprive
15  one of the focus and clarity of mind necessary to make
16  accurate shots," correct?
17        A.  Yes.
18        Q.  You're not providing an opinion concerning the
19  psychological effects of violence to the average citizen,
20  correct?
21        A.  No.
22        Q.  You're not an expert in psychology?
23        A.  No.
24        Q.  You're not an expert in psychiatry?
25        A.  Correct.

Page 183

1         Q.  So what is the basis for your statement that
2   the average citizen is more susceptible to the
3   psychological effects that naturally occur when faced
4   with a deadly threat?
5         A.  The lack of training and muscle memory.  When
6   you're trained to deal with certain situations, how you
7   react is by instinct.
8         It's easier for you to make decisions under
9   pressure because your body simply does certain things.
10  It gets behind the barricade or you put the flashlight in
11  the correct position.  That's the difference.
12        Q.  Okay.  You state that on page seven that
13  "Criminals are not likely meaningfully affected by
14  California's magazine restrictions," is that right?
15        A.  Correct.
16        Q.  Why are they not meaningfully affected by
17  large capacity magazine restrictions?
18        A.  Well, part of the problem with California
19  firearm law in general is that very few people understand
20  what's required of them at all.
21        Many people that I deal with don't even know
22  that the Roberti-Roos restrictions exist even after 25
23  years.
24        Q.  You are aware that Section 32310 as amended by
25  Proposition 63 would prohibit the possession of large

Page 184

1   capacity magazines, correct?
2         A.  Yes.
3         Q.  And one of the reasons why that amendment was
4   enacted was to close the loophole on grandfathered large
5   capacity magazines, is that correct?
6         A.  Yes.
7         MR. BRADY:  Objection, argumentative, vague
8   and ambiguous.  Did you have an answer?
9         THE WITNESS:  Yes.
10        BY MR. ECHEVERRIA:  Q.  And part of the
11  reasons why Proposition 63 was enacted was because it was
12  difficult for law enforcement to enforce Section 32310 as
13  it has existed previously, is that correct?
14        MR. BRADY:  Objection, calls for speculation.
15        THE WITNESS:  Yes.
16        BY MR. ECHEVERRIA:  Q.  And enforcing Section
17  32310 as amended, could that potentially increase the
18  price of large capacity magazines in the State of
19  California?
20        MR. BRADY:  Objection, calls for speculation,
21  beyond the scope of what the witness was called to
22  testify about, irrelevant, vague and ambiguous.
23        THE WITNESS:  Unlikely for generations.
24        BY MR. ECHEVERRIA:  Q.  And if Section 32310
25  did increase the price of large capacity magazines in the

Page 185

1   State of California, could that meaningfully affect
2   criminals?
3         MR. BRADY:  Objection, incomplete
4   hypothetical, vague and ambiguous, calls for speculation.
5         THE WITNESS:  Well, when things are stolen,
6   which firearms frequently are, there's little cost
7   associated.
8         BY MR. ECHEVERRIA:  Q.  But the amended
9   version of Section 32310 would also enable law
10  enforcement to confiscate large capacity magazines that
11  are discovered during the course of their enforcement
12  duties, is that correct?
13        MR. BRADY:  Objection, incomplete
14  hypothetical, calls for speculation, vague and ambiguous.
15        THE WITNESS:  Correct.
16        BY MR. ECHEVERRIA:  Q.  And as the supply of
17  large capacity magazines depreciates in the state of
18  California, that could also increase the price of large
19  capacity magazines for criminals who are bent on
20  obtaining them for criminal purposes, correct?
21        MR. BRADY:  Objection, incomplete
22  hypothetical, assumes facts not in evidence, calls for
23  speculation.  Go ahead.
24        THE WITNESS:  That's why I said in generations
25  decades that it might have some relevance.

Page 186

1  BY MR. ECHEVERRIA:  Q.  So eventually a large
2  capacity magazine restriction such as Section 32310 as
3  amended by Proposition 63 could have a meaningful impact
4  on criminals?
5  MR. BRADY:  Objection, incomplete
6  hypothetical, assumes facts not in evidence, calls for
7  speculation.
8  THE WITNESS:  I'd be hard pressed to say that
9  it would be meaningful.  To me it's not unlike banning
10  screwdrivers.
11  I suppose eventually all the screwdrivers in
12  the United States or in the state would wear out and
13  there would be a shortage.
14  But they are just a metal and plastic tool as
15  a magazine is, and my experience is that there are so
16  many of them that I can't see beyond the horizon, but
17  it's a long, long way out before there would be, in my
18  opinion, a significant reduction.
19  BY MR. ECHEVERRIA:  Q.  Okay.  You also state
20  that "An attacker is not as burdened by the surprise and
21  shock that the victim is," is that correct?
22  A.  Yes.
23  Q.  What's the basis for your testimony about an
24  attacker's state of mind?
25  A.  Well, when we served search warrants in my

Page 187

1  past life at the BNE, we were essentially the attacker
2  and we picked the time and the place that we struck the
3  deal or the dealer's home.
4  And there is a period where basically the bad
5  guy would freeze for fear and so the attacker generally
6  has the advantage and that's based on my experience as
7  being the quote, unquote attacker.
8  Q.  You also state in your report that "Supporters
9  of the magazine capacity limitation may point to some
10  firearm expert who is comfortable with an eight or
11  nine-shot pistol or even a five or six-shot revolver," is
12  that right?
13  This is on paragraph three on page seven of
14  Exhibit 3.
15  A.  Yes.
16  Q.  And why would such an expert be comfortable
17  with a firearm that holds less than 10 rounds?
18  A.  Well, you notice that expert is in single
19  quotes.
20  There are a lot of people that fashion
21  themselves, and I refer back to something I said this
22  morning, that with bravado a lot of the cops that I used
23  to work with said, well, I carry a five-shot revolver and
24  if I need more than five shots, then so-and-so.
25  Well, a lot of people don't know what they are

Page 188

1  talking about and most people don't have experience in
2  shooting or being shot.  And so that's why I say they are
3  an expert.
4  Q.  Okay.  In the last paragraph, full paragraph
5  on page seven, you say that "It is worth noting that it
6  is difficult to say exactly how many private citizens
7  have fired more than 10 rounds in a self defense shooting
8  because the number of rounds fired in such cases is very
9  often an omitted fact in written accounts of such
10  defensive gun uses."
11  Do you see that statement?
12  A.  Yes.
13  Q.  And you state that it is very often an omitted
14  fact, is that correct?
15  A.  I'm sorry, that last question again?
16  Q.  And you state that it is very often an omitted
17  fact, is that correct?
18  A.  That's my belief, yes.
19  Q.  How many written accounts of defensive gun
20  uses have you reviewed to conclude that the number of
21  rounds fired is very often an omitted fact?
22  A.  Just about every newspaper account I read or
23  news report I hear or see does not discuss that.
24  They say that so-and-so shot so-and-so, but --
25  and at the time that they are reporting it might not be

Page 189

1  knowable because those are things that the Bureau of
2  Forensic Services may have to come in there and find the
3  bullet holes and sort it out.
4  So I don't know that there's a criticism of
5  the presents for not reporting it, they just at that
6  point don't know it.
7  Some of the shootings we've had recently, they
8  are still trying to sort it out.
9  Q.  Sure.  But earlier today you testified that
10  when you were working for the Department of Justice, you
11  had occasion to review reports of homicides and
12  officer-involved shootings, correct?
13  A.  Yes.
14  Q.  And you testified earlier today that none of
15  those reports involve large capacity magazines, is that
16  correct?
17  A.  That's my recollection, yes.
18  Q.  And how many reports did you review in the
19  course of your duties at the Department of Justice, would
20  you say?
21  A.  I couldn't say.  I went out.  We had a
22  shooting in -- I'm blanking on the name, Yolo County
23  direction where a police officer was killed, one of our
24  people was shot, the suspect was dead and I went out
25  there to the scene.

Page 190

1    That was the only time I went out to one of
2    our shootings.  I went to crime scenes that BFS people
3    were killed.  I saw the reports.  I saw the shooting
4    reports that -- where primarily BNE folks shot or shot
5    and killed suspects.
6        As to the count over -- I was a CEA for 12
7    years.  I couldn't give you a count.
8    Q.    Okay.  And you state at the conclusion of this
9    section that "Officer-involved shootings are relevant in
10   evaluating private citizen shootings for the simple
11   reason that private citizens arm themselves for
12   protection against the same criminals the police are
13   armed to deal with," is that correct?
14   A.    Yes.
15   Q.    And that is an accurate statement?
16   A.    That's my belief.
17   Q.    It's your belief that private citizens arm
18   themselves to protect themselves against the same
19   criminals that police are armed to deal with?
20   A.    Yes.
21   Q.    Private citizens arm themselves to deal with
22   bank robbers?
23   A.    Robbers.  They wouldn't be at the bank.  But
24   if I'm a jewelry store owner and two crooks come in the
25   door with guns, there's no difference between that and a

Page 191

1    patrol officer who has made a vehicle stop because the
2    taillights are out and two crooks come out of the car to
3    shoot.
4        In both cases, no one was expecting this to
5    occur.  In both cases, the bad guys were the aggressors,
6    so I don't see a distinction there.
7        One was out on the road and one was in the
8    jewelry store, but -- so, yeah.  I stand by that.
9    MR. ECHEVERRIA:  Okay.  We're going to move on
10   to the third and final section which is related to the
11   second opinion, but I just want to check to see if we
12   should take a quick break.
13   (Brief break.)
14   MR. ECHEVERRIA:  Back on the record.
15   BY MR. ECHEVERRIA:  Q.  In section three,
16   Mr. Helsley, you state "A firearm equipped with a
17   magazine capable of holding more than 10 rounds is more
18   effective at incapacitating a deadly threat and under
19   some circumstances may be necessary to do so," is that
20   correct?
21   A.    Correct.
22   Q.    And in support of this statement, you discuss
23   gun fights and you provide two anecdotes from your own
24   personal experience, is that correct?
25   A.    Correct.

Page 192

1    Q.    Are gun fights a frequent occurrence for
2    civilians who need to use firearms for self defense?
3    MR. BRADY:  Objection, vague and ambiguous,
4    calls for speculation.
5    BY MR. ECHEVERRIA:  Q.  You may answer the
6    question.
7    A.    Based on news reports, there seem to be quite
8    a few of them.
9    Q.    What is your definition of the term gun fights
10   as used in your opinion?
11   A.    You have a gun and you shoot at me and I have
12   a gun and I shoot at you.
13   Q.    And it is a frequent occurrence for private
14   civilians to engage in gun fights with criminals?
15   MR. BRADY:  Objection, vague and ambiguous,
16   calls for speculation.
17   THE WITNESS:  I think it's quite frequent.
18   BY MR. ECHEVERRIA:  Q.  And who is more likely
19   to engage in a gun fight, a law enforcement officer or a
20   private civilian?
21   MR. BRADY:  Objection, calls for speculation,
22   incomplete hypothetical, vague and ambiguous.
23   THE WITNESS:  My opinion, and it's a guess, is
24   that per capita, law enforcement is more apt to be in a
25   shooting.  But in raw numbers, civilians are probably in

Page 193

1    more shootings than police are.
2    BY MR. ECHEVERRIA:  Q.  And where are you
3    deriving these raw numbers from?
4    A.    I look at the number of times, for instance,
5    that Los Angeles Police Department -- I see a report that
6    they fired this number of rounds during a year at
7    suspects.
8        And then I read newspaper stories and I don't
9    know that anybody keeps track of civilians firing their
10   guns, but it is my impression that given the number of
11   times that police officers fire their guns, which is
12   relatively infrequently for most of them.
13       Most police officers won't fire their gun
14   during their career and some may not even draw it.
15       But -- and, again, I don't know what the stats
16   for DOJ are now, but we generally had maybe five or six
17   shootings a year.
18       My impression from reading the newspaper
19   stories and hearing the news reports that just in raw
20   numbers, civilians have at least as many as police do,
21   but -- and perhaps more.
22   Q.    And how many news reports have you read to
23   arrive at that conclusion?
24   A.    I haven't kept track of them.  I'm a news
25   junky and I watch the news all the time and I read

Page 194

1  voraciously on my phone and so -- and, of course, I'm
2  interested by these sorts of things.
3          And the NRA publishes each month in their
4  magazine civilians who use firearms for self defense and,
5  of course, I read those.
6          And the bottom line is that there are just a
7  lot of civilians who never had to fire because their guns
8  scared off the bad guy or bad guys, but many times
9  there's a shooting involved.
10     Q.   And in those NRA self reports of defensive gun
11 uses or DGUs, in some cases just the mere brandishment of
12 a firearm can avert an attack, correct?
13     A.   Correct.
14     Q.   And are you aware of how many DGUs were
15 recorded by NRA members in which they had to expend more
16 than 10 rounds to defend themselves?
17          MR. BRADY:  Objection, vague and ambiguous.
18          THE WITNESS:  No, because what's reported in
19 the magazines is simply a clip from the news account.  So
20 the news accounts generally don't have that kind of
21 detail.
22          So, again, because the police don't know at
23 that point, the forensic folks have not processed the
24 scene, so there may be nobody that knows when the paper
25 reports it how many rounds were fired.

Page 195

1          BY MR. ECHEVERRIA:  Q.  But are you aware of
2  how many rounds are reported in those NRA self reported
3  instances of DGUs?
4          MR. BRADY:  Objection, assumes facts not in
5  evidence, vague and ambiguous.
6          THE WITNESS:  Frequently that information is
7  not part of the story.
8          It just says that Joe Smith had people break
9  into his house and he shot suspect A and B and suspect B
10 expired, but there's no round count or that type of
11 detail in the story.
12     BY MR. ECHEVERRIA:  Q.  Okay.  You also go on
13 to discuss the phenomenon of the individuals requiring
14 multiple hits to avert an attack, is that right?
15     A.   Yes.
16     Q.   And that's in paragraph -- the third full
17 paragraph on page eight of Exhibit 3?
18     A.   Mm-hmm.  Yes.
19     Q.   And you cite to a particular example involving
20 an individual named Michael Platt, P-L-A-T-T, is that
21 correct?
22     A.   Yes.
23     Q.   And Mr. Platt sustained 12 gunshot wounds
24 before he was killed by law enforcement?
25     A.   Yes.

Page 196

1      Q.   And as support for your account of this
2  example, you cite to a document titled "Top 10 Most
3  Audacious Shootouts in U.S. History," is that correct?
4      A.   Yes.
5          MR. ECHEVERRIA:  I will mark as Exhibit 15
6  that document.
7          (Exhibit 15 was marked.)
8          BY MR. ECHEVERRIA:  Q.  Have you seen this
9  document before?
10     A.   Not in this form, but --
11     Q.   The discussion of the Platt --
12     A.   There it is.
13     Q.   -- episode is on page 11 --
14     A.   Yes.
15     Q.   -- of Exhibit 15.
16     A.   Yes.
17     Q.   Are the types of shootouts described in this
18 document a frequent occurrence for law enforcement?
19          MR. BRADY:  Objection, vague and ambiguous,
20 calls for speculation.
21          THE WITNESS:  Probably not.
22          BY MR. ECHEVERRIA:  Q.  Are these types of
23 shootouts a frequent occurrence for civilians?
24          MR. BRADY:  Objection, vague and ambiguous,
25 calls for speculation.

Page 197

1          THE WITNESS:  Probably not.
2          BY MR. ECHEVERRIA:  Q.  And Mr. Platt was an
3  ex-army special forces member, was he not?
4      A.   Yes.
5      Q.   And this episode was described at least by the
6  author of this document as one of the most astounding
7  cases of physical stamina in history, is that correct?
8      A.   Correct.
9      Q.   And how many gunshot wounds did Mr. Platt
10 sustain before he was killed?
11     A.   Oh, I don't know.  I've seen the FBI report
12 that reconstructed this whole thing, but in terms of the
13 number of times he was hit, I can't recall.
14     Q.   Well, you write in your report that "Michael
15 Platt sustained 12 gunshot wounds before dying," is that
16 correct?
17     A.   Yes.  Before dying, yeah.
18     Q.   Do you have any reason to believe that he
19 sustained more gunshot wounds after he died?
20     A.   No, no.
21     Q.   And the number of gunshot wounds that he
22 sustained before dying would be one round more than a
23 firearm that is equipped with a magazine that holds 10 or
24 less rounds, is that correct?
25     A.   Correct.

Page 198

```
1        Q.   You also state that the -- strike that.  You
2    move on to discuss two incidents that you were personally
3    involved in.
4             The first was an incident in which you were
5    injured, is that correct?
6        A.   Correct.
7        Q.   Can you briefly describe that incident for the
8    record?
9        A.   Yes.  I was negotiating with a suspect in
10   Bakersfield, technically Oildale, to purchase an ounce
11   and a half of heroin.
12            It was informal policy at the time that the
13   buyer, which was me, didn't participate in the arrest
14   because I've spent all this time convincing the suspect
15   that I was a crook and to all of a sudden become the cop,
16   it was better that the surveillance made the arrest.
17            I was sitting in his car counting out the cash
18   and I had given signal to make the arrest and
19   unfortunately those that were supposed to respond to it
20   didn't and I was out of money.
21            I had gotten him to bring more heroin than I
22   had cash for and so the car was idling and so I gave him
23   all the cash, I popped the keys out of the ignition of
24   the car and rolled out of the car on my way to a tree
25   nearby.
```

Page 199

```
1             And as I did that, I saw him arching in the
2    seat and pulling a .45 out of his waistband.  I thought I
3    could get to the tree fast enough.  I was wrong.  He put
4    a round through my arm.  And so I spun around and got
5    prone on the ground, was going bang, bang, bang, bang,
6    and he shot me again in the back.
7             And then my crack surveillance team got
8    confused on who was who and the Kern County deputy
9    sheriff shot me twice.
10            And I exhausted all the rounds in my gun and
11   my left arm was broken and my both legs at the time were
12   paralyzed and I had a spare magazine, but it was on my
13   left-hand side and I couldn't get to it.
14            So the guy realized that the surveillance was
15   closing in behind him, he took his gun, threw it, stood
16   up and surrendered.
17       Q.   And how many rounds did you fire in that
18   episode?
19       A.   Eight.
20       Q.   And how many rounds did the criminal fire in
21   that episode?
22       A.   Seven, I believe.
23       Q.   And how many rounds did the officer who fired
24   at you expend?
25       A.   I forget.  It was either three or four.  I
```

Page 200

```
1    forget.
2        Q.   Did any of these individuals fire more than 10
3    rounds?
4        A.   No.
5        Q.   You write in describing this incident that
6    "With a broken arm and temporary paralysis from the waist
7    down, I was unable to reach my spare magazine in my left
8    rear pants pocket."
9             Were any of those injuries caused by the
10   friendly fire that you sustained?
11       A.   They compounded it, but the round from the
12   crook broke my arm.  The second round hit my spine and
13   that's what shot my legs initially.
14            The one round from the deputy sheriff went
15   through my right thigh.  The second round went in my side
16   and lodged in my spine and that caused the long-term
17   paralysis of the left leg.
18            But essentially the two rounds that the crook
19   fired kept me from reloading my gun.
20       Q.   And you write in your report, which is Exhibit
21   3, that "Very little pain was initially associated with
22   my wounds and I could have fought on if more ammunition
23   had been available"?
24       A.   Yes.
25       Q.   Is it your testimony that had you been armed
```

Page 201

```
1    with a large capacity magazine you would have been able
2    to fight on, notwithstanding the friendly fire that you
3    sustained?
4        A.   Absolutely.
5             MR. ECHEVERRIA:  Do you have any objection?
6             MR. BRADY:  It's all right.  No.
7             BY MR. ECHEVERRIA:  Q.  Okay.  And can you
8    please describe the second incident that you describe on
9    page nine of your report?
10       A.   It was my practice that when I had new
11   trainees on my crew that I would go out and make a drug
12   purchase with them in order to evaluate their skills and
13   we met two fellows in Coronado who said they could
14   deliver us -- I don't recall now whether it was a pound
15   or a kilo of cocaine.
16            And it was set up for the night of April 1st
17   and the plan was that my partner was in one car, I was in
18   a second car.  The crook could come over to my car to see
19   the cash, but the cash was never going to go to my
20   partner's car.
21            And so I showed the cash, I think it was 28
22   grand, to the crook.  He then went back and got into the
23   car with a partner, my subordinate, and the two crooks
24   and my subordinate took off, in theory, to go pick up the
25   drugs.
```

Page 202

1          Well, what they picked up instead was a third
2    crook and he got in the back seat and he put the gun up
3    to the head of my subordinate.  And so they drove back
4    and my subordinate yelled across the street for me to
5    bring the cash.
6          Well, that was not the plan.  The cash was not
7    going to go from my car to that car, so I knew something
8    was wrong.  And it's at night, it's raining, and my
9    subordinate just keeps on saying, "Bring the cash, bring
10   the cash."
11         And so I -- the way the communication system
12   worked in DOJ cars at the time, it may still work the
13   same way, you had a foot switch that would allow you to
14   talk to the surveillance.
15         I told the surveillance, I said I think this
16   is a rip-off, and so I'm going to go across the street to
17   see what's going on.  I walked across the street and my
18   subordinate's eyes were as big as eggs and the crooks
19   told me to get in the car.
20         And what I didn't know is that the
21   surveillance had come up quietly and -- I'm getting dry
22   here.  It was fortunate the crook told me to get in the
23   car at the same time that I told my subordinate to get
24   out.
25         He popped the door on the car and started to

Page 203

1    draw his gun.  The guy in the front seat fired, missed.
2    I shot the guy in the back seat.  The shooter in the
3    front seat bailed out the front door and got shot by the
4    Coronado police detective and then they were all in the
5    car.  All three of them were in the car and two of them
6    shot.
7          And we gave them commands to get out of the
8    car and eventually they did and the guy who was shot
9    through the thigh -- I'm sorry, the shin and into his
10   thigh and he had been hit in the butt, too.
11         He came out of the car and was engaged by a
12   flashlight and -- I'm sorry.  The guy in the front seat
13   came out fighting.
14         It was the guy in the back seat that got hit
15   with the flashlight, the guy that I had shot.  He didn't
16   know he was hit.  The bullet had gone through his spleen
17   and he was pretty hurt inside, but he didn't know he'd
18   been hit.  He didn't know he'd been hit until he got hit
19   with the flashlight and then he was out.
20         The guy who was shot in the shin and in the
21   butt was fighting and all of a sudden he realized that he
22   was spewing blood all over the place and he fainted.
23   Q.   Okay.  And how many rounds were expended in
24   that episode?
25   A.   Oh, let's see.  Eight, 10, 12 -- I think about

Page 204

1    28.
2    Q.   How many rounds did you expend?
3    A.   Eight.
4    Q.   And you had a spare magazine available at that
5    time?
6    A.   I did not.
7    Q.   So at that time you were not carrying a spare
8    magazine?
9    A.   I was not.
10   Q.   And in the first instance you were?
11   A.   Yes.
12   Q.   Was it your practice to normally have a spare
13   magazine on your person?
14   A.   Yes.
15   Q.   Why did you not have a spare magazine at that
16   time?
17   A.   I've asked myself that many times.
18   Q.   Nothing was stopping you from having a spare
19   magazine on your person at that time?
20   A.   Correct.
21   Q.   Okay.  Is it your opinion that these two
22   episodes are representative of the threats that law
23   enforcement face?
24         MR. BRADY:  Objection, calls for speculation,
25   incomplete hypothetical, vague and ambiguous.

Page 205

1          THE WITNESS:  I think they are very consistent
2    with what those in drug law enforcement do.  That's a
3    very different brand of law enforcement than patrol work
4    is.
5          Virtually all of -- well, a very high
6    percentage of BNE shootings are probably narcotic
7    enforcement shootings involve either when the door is
8    kicked in serving the warrant or when the arrest is made
9    when you're buying drugs and so that's not what most
10   police officers do.
11         So while I think it is consistent with drug
12   law enforcement, it's not consistent with law
13   enforcement.
14         BY MR. ECHEVERRIA:  Q.   Okay.  So these two
15   episodes are not representative of the types of shooting
16   situations that all law enforcement may encounter in the
17   course of their duties, correct?
18         MR. BRADY:  Objection, misstates the
19   testimony, assumes facts not in evidence, vague and
20   ambiguous, calls for speculation.
21         BY MR. ECHEVERRIA:  Q.   You may answer.
22   A.   Yes, because both involved buying drugs.
23         MR. ECHEVERRIA:  Can you repeat what my
24   question was.
25         (The record was read as requested.)

EXHIBIT HELSLEY - 4 Page 52

Page 206

1    BY MR. ECHEVERRIA:  Q.  And you testified yes?
2        A.   I said yes, they are not representative
3    because they involve the purchasing of drugs.
4        Q.   That's what I wanted to clarify.  And are
5    these two situations representative of the type of
6    shooting situations that a civilian may encounter?
7        MR. BRADY:  Objection, calls for speculation,
8    incomplete hypothetical, vague and ambiguous.
9        THE WITNESS:  Can I respond?
10       MR. BRADY:  Yes.
11       THE WITNESS:  I see a correlation,
12   particularly with the second one, where someone is
13   carjacked.
14           And part of the point I make here is that in
15   terms of when shooting occurs, you miss a lot or the
16   bullet can't get to where it is supposed to go.
17           In the case of that second shooting of mine, I
18   fired eight rounds, but I believe only two of them found
19   their way into the car.
20           The angle of the glass on the car defeated
21   them and the bullets were laying on the rear deck of the
22   car.  So I could see a strong correlation between my
23   second shooting and carjacking of civilians.
24       BY MR. ECHEVERRIA:  Q.  In forming your
25   opinions, do you rely on any other personal instances in

Page 207

1    which you were involved in shootings?
2        A.   I was involved in two other situations where a
3    round was fired.
4            They weren't shootings in the sense that shots
5    were exchanged, but in both cases our guy fired a round
6    but there were no rounds fired back.
7        Q.   So they weren't gun fights?
8        A.   They weren't gun fights, no.
9        Q.   And those two other shooting instances, no
10   more than 10 rounds were fired by the officer, is that
11   correct?
12       A.   Correct.
13       Q.   How many rounds were fired again?
14       A.   One each.
15       MR. ECHEVERRIA:  Okay.  I'm going to mark as
16   Exhibit 16 a memorandum that you authored in 1988.  I was
17   eight years old at the time.  Here is Exhibit 16.
18           (Exhibit 16 was marked.)
19       THE WITNESS:  Oh, yes.
20       BY MR. ECHEVERRIA:  Q.  Are you familiar with
21   this memorandum?
22       A.   I most assuredly am.
23       Q.   Can you describe briefly what this memorandum
24   is?
25       A.   This is a memorandum that I wrote to the

Page 208

1    director of the division of law enforcement at the
2    request of acting director Fred Wynbrandt when the
3    Roberti-Roos Act was first stirring around.
4        Q.   And on page three of your memorandum, in the
5    second full paragraph you write, "It goes without saying
6    that the three million strong National Rifle Association
7    would take exception to such an approach."
8            Which approach are you referring to?
9        A.   Well, the so-called banning of these types of
10   firearms.
11       Q.   And how did you know that the National Rifle
12   Association would take exception to that approach?
13       A.   Well, at that point I had read the magazine
14   for 27 years and I had a general sense of what the
15   political perspective of the association was.
16           I didn't know anyone who was employed by the
17   association.  I had no contact with them.  But I thought
18   it was a reasonable assumption that they wouldn't
19   approve.
20       Q.   And you were a member of the National Rifle
21   Association at the time you wrote this memorandum?
22       A.   I was, yes.
23       Q.   And later in that paragraph you write,
24   "Obviously, there has been some high-visibility crimes
25   which involved semi-automatic Uzis and AK-47s, but I

Page 209

1    suspect that a close analysis would put that frequency at
2    or slightly above the statistical aberration level."
3            Do you see that?
4        A.   Yes.
5        Q.   What did you mean by that statement?
6        A.   Well, I think I spoke to first thing this
7    morning when the Agnos bill was proposed, and I think
8    that was '86, 7 now that we were going to ban -- quote,
9    unquote the political word ban certain types of firearms,
10   primarily long guns.  I'd had the BFS lab study what we
11   saw and --
12       Q.   Pardon me.  What is that acronym?
13       A.   BFS, Bureau of Forensic Services.
14       Q.   Okay.
15       A.   The DOJ forensic lab system.
16       Q.   Okay.  Please continue.
17       A.   I'd had them study it and provide me the stats
18   so that I could provide them on to the director.
19           And based on everything that I heard from
20   forensic laboratories -- and, again, that was the world I
21   lived in then -- they all said these aren't the problem.
22   Handguns are what people are killed with.
23           So-called assault weapons -- of course, we
24   didn't even have a definition for the term yet.  But
25   based on what I had seen from the statistics from BFS,

Page 210

1    this was a very, very small bite.
2        Q.    And was it your opinion at that time that
3    individuals needed large capacity magazines to defend
4    themselves against handguns?
5        A.    I have always believed that I or you or anyone
6    else should be allowed to own the firearm and the
7    magazine for that firearm that I or you think is best.
8        Q.    And in the last paragraph of your memorandum
9    in Exhibit 16, you write "By focusing on assault rifles,
10   we create the impression that somehow a 10-shot
11   semi-automatic rifle is inherently more evil or dangerous
12   than is a pistol with a 20-round magazine."
13       Do you see that?
14       A.    Yes.
15       Q.    Did you write that?
16       A.    Yes.
17       Q.    Is it your opinion that a pistol with a
18   20-round magazine is more dangerous than a 10-shot
19   semi-automatic rifle?
20       A.    No.
21       Q.    Is a 10-shot semi-automatic rifle more
22   dangerous than a pistol with a 20-round magazine?
23       A.    No.
24       Q.    What were you trying to convey by that
25   sentence?

Page 211

1        A.    I was in the midst of what I considered to be
2    insanity.  I was being tasked by our legislative DAGs to
3    try to come up with definitions for the Roberti-Roos
4    bill, and I asked them what do you mean.
5        They couldn't tell me what they meant because,
6    as I've described these things before, most of the people
7    involved couldn't tell a shotgun from a '36 Ford truck.
8    They just wanted to do something.
9        And I said, well, that's swell, but we've got
10   to put some walls on this thing to define it and
11   everybody had their own theory.  And initially in the
12   construction of the assault weapon list, the focus was on
13   rifles.
14       Now, that changed through time, but my
15   recollection of the sequence of events is that when this
16   was written, primarily we were talking about long guns as
17   opposed to handguns.
18       It's a little bit vague in my memory now, but
19   I remember there was massive confusion.
20       Q.    So is it your opinion that a 10-shot
21   semi-automatic rifle is equally dangerous as a pistol
22   with a 20-round magazine?
23       MR. BRADY:  Objection, misstates testimony,
24   vague and ambiguous, incomplete hypothetical.
25       THE WITNESS:  Well, they are both dangerous if

Page 212

1    someone is trying to hurt you with them.
2        BY MR. ECHEVERRIA:  Q.    Which one would be
3    more dangerous, in your opinion?
4        MR. BRADY:  Objection, incomplete
5    hypothetical, calls for speculation, vague and ambiguous.
6        THE WITNESS:  If I'm 100 yards away from the
7    threat, the rifle.
8        BY MR. ECHEVERRIA:  Q.    And in other
9    circumstances, could the pistol with a 20-round magazine
10   be more dangerous than the rifle?
11       MR. BRADY:  Objection, incomplete
12   hypothetical, calls for speculation, vague and ambiguous.
13       THE WITNESS:  If the bad guy has his arm
14   around my throat and the gun up to my head, pistol,
15   because you probably can't do that with a rifle.  So it
16   depends.
17       BY MR. ECHEVERRIA:  Q.    But there's some
18   circumstances in which a pistol with a 20-round magazine
19   could be more dangerous than a 10-shot semi-automatic
20   rifle?
21       A.    Well, it wouldn't have anything to do with the
22   magazine size.  Initially it's distance and skill or
23   state of mind of the person with the firearm.
24       Q.    So dangerousness is impacted by the type of
25   the firearm and the skill of the shooter, is that

Page 213

1    correct?
2        MR. BRADY:  Objection, misstates testimony.
3        THE WITNESS:  And intent and skill, yes.
4        BY MR. ECHEVERRIA:  Q.    And adding magazine
5    size to the mix, which is the most important factor in
6    your opinion for self defense?
7        A.    Well, if I'm a civilian and choosing a firearm
8    for self defense, it's probably going to be a handgun
9    because I'm more comfortable with that.
10       I know people who absolutely think an AR
11   platform firearm is the finest thing for self defense.
12   They are not right or wrong.  It's along the same lines
13   of should you marry a brunette or a blond.
14       It's -- you need a firearm that you're
15   comfortable with, you're competent with and that you
16   believe will serve you best if things go bad for you.
17       Q.    Okay.  I'd like to go back to this one
18   sentence in the memo, if I may.
19       A.    Okay.
20       Q.    You write "By focusing on assault rifles, we
21   create the impression" -- you were implying in writing
22   this sentence that the impression was a false impression,
23   is that correct?
24       A.    Yes.
25       Q.    And it was, in your opinion, a false

EXHIBIT HELSLEY - 4 Page 54

Page 214

1  impression that somehow a 10-shot semi-automatic rifle is
2  inherently more evil or dangerous than is a pistol with a
3  20-round magazine, is that correct?
4        A.   It was not just that.  It was the whole notion
5  of assault weapons and what we were planning to do to
6  engage the so-called problem.
7             It wasn't just the capacity size.  It was the
8  entirety of the debate.
9             MR. ECHEVERRIA:  Okay.  I don't have any more
10 questions.
11            MR. BRADY:  Nor do I.
12            THE REPORTER:  Mr. Brady, would you like a
13 copy?
14            MR. BRADY:  Please.
15            THE REPORTER:  Any rush?
16            MR. ECHEVERRIA:  No.
17
18         (Deposition concluded at 3:59 p.m.)
19
20                        * * *
21
22
23
24
25

Page 216

1              DEPOSITION ERRATA SHEET
2  Page No. _____ Line No. _____
3  Change: _____
4  Reason for change: _____
5  Page No. _____ Line No. _____
6  Change: _____
7  Reason for change: _____
8  Page No. _____ Line No. _____
9  Change: _____
10 Reason for change: _____
11 Page No. _____ Line No. _____
12 Change: _____
13 Reason for change: _____
14 Page No. _____ Line No. _____
15 Change: _____
16 Reason for change: _____
17 Page No. _____ Line No. _____
18 Change: _____
19 Reason for change: _____
20 Page No. _____ Line No. _____
21 Change: _____
22 Reason for change: _____
23
24 _____     _____
25 STEPHEN HELSLEY                Dated

Page 215

1         DECLARATION UNDER PENALTY OF PERJURY
2
3        I, STEPHEN HELSLEY, do hereby certify under
4  penalty of perjury that I have read the foregoing
5  transcript of my deposition taken on Monday, December 18,
6  2017; that I have made such corrections as appear noted
7  on the Deposition Errata Page, attached hereto, signed by
8  me; that my testimony as contained herein, as corrected,
9  is true and correct.
10
11        Dated this _____ day of _____,
12 2018, at _____,
13 California.
14
15
16
17
18        _____
             STEPHEN HELSLEY
19
20
21
22
23
24
25

Page 217

1  STATE OF CALIFORNIA   )
                          )
2  COUNTY OF SACRAMENTO  )
3
4        I, Kimberly A. Barrette, CSR No. 6671,
5  Certified Shorthand Reporter, certify:
6        That the foregoing proceedings were taken
7  before me at the time and place therein set forth, at
8  which time the witness was put under oath by me;
9        That the testimony of the witness, the
10 questions propounded, and all objections and statements
11 made at the time of the examination were recorded
12 stenographically by me and were thereafter transcribed;
13        That a review of the transcript by the
14 deponent WAS requested;
15        That the foregoing is a true and correct
16 transcript of my shorthand notes so taken.
17        I further certify that I am not a relative or
18 employee of any attorney of the parties, nor financially
19 interested in the action.
20        I declare under penalty of perjury under the
21 law of California that the foregoing is true and correct.
22        Dated this 2nd day of January, 2018.
23
24 _____
25 Kimberly A. Barrette
   CSR No. 6671

```
                                                Page 218
 1    U.S. Legal Support, Inc.            January 3, 2018
      2710 Gateway Oaks Drive
 2    Suite 300-South
      Sacramento, CA  95833
 3
 4    STEPHEN HELSLEY
      C/O:  SEAN A. BRADY, ESQ.
 5    MICHEL & ASSOCIATES, PC
      180 East Ocean Blvd., Ste. 200
 6    Long Beach, CA  90802-4079
      562.216.4444
 7    sbrady@michellawyers.com
 8    Re:  Virginia Duncan, et al., v. Xavier Becerra, et al.
      Date of Deposition:   Monday, December 18, 2017
 9
10    Dear STEPHEN HELSLEY:
11            The original transcript of your deposition
      taken in the above-referenced matter is available at this
12    office for your review.  If it is more convenient to read
      a copy of the transcript and waive signature of the
13    original transcript, please notify our office by letter
      sent certified or registered mail of any changes made,
14    with copies sent to all counsel
              In the event you have not read, corrected and
15    signed your deposition within 30 (30) days of receipt of
      this letter, it may be used with the full force and
16    effect as though it had been read, corrected and signed.
              If you wish to arrange an appointment to
17    review the original transcript, please contact this
      office at 916.248.5608.
18
                            Sincerely,
19
20
21                          U.S. LEGAL SUPPORT
                            Production Department
22
23    cc:  All Counsel
           The deponent
24
25    Original:  Original Transcript
```

EXHIBIT HELSLEY - 4 Page 56

| | | | |
|---|---|---|---|
| **Exhibits** | **0** | **11** 33:7 87:15 109:19,20 179:9,12 196:13 | **19-round** 118:9 119:13 |

EX 0001 Stephen
Helsley 121817
EX 0002 Stephen
Helsley 121817
EX 0003 Stephen
Helsley 121817
EX 0004 Stephen
Helsley 121817
EX 0005 Stephen
Helsley 121817
EX 0006 Stephen
Helsley 121817
EX 0007 Stephen
Helsley 121817
EX 0008 Stephen
Helsley 121817
EX 0009 Stephen
Helsley 121817
EX 0010 Stephen
Helsley 121817
EX 0011 Stephen
Helsley 121817
EX 0012 Stephen
Helsley 121817
EX 0013 Stephen
Helsley 121817
EX 0014 Stephen
Helsley 121817
EX 0015 Stephen
Helsley 121817
EX 0016 Stephen
Helsley 121817

**$**

$3,300 85:16
$4,120 85:3
$40,000 85:20

**(**

(a) 17:15
(b) 17:17
(c) 17:18

**0**

03 149:2,18,23

**1**

1 6:9 11:14,17,
25 12:10,13,16
1,700 141:6
10 13:22 17:14,
17 28:22,24
42:23 43:6,9,
25 46:19 72:20
89:5 90:14,19,
22 96:23
102:1,3 104:9
117:8 118:16
122:9,23
124:9,19
131:24 132:9,
11,23 133:7
135:12,16
136:5,22 137:8
138:24 139:1
142:21 143:18,
20 146:6 151:5
152:24 153:24,
25 156:25
158:1,12,24
159:5,11,20
160:22 161:9,
11 162:15
166:13 167:16
179:1 187:17
188:7 191:17
194:16 196:2
197:23 200:2
203:25 207:10
10-CECG-02116
30:23
10-gallon 70:13
10-round 117:3
122:25 131:22
152:19 157:20
10-shot 210:10,
18,21 211:20
212:19 214:1
100 212:6
100,000 158:9
10s 153:22

**11** 33:7 87:15
109:19,20
179:9,12
196:13
**12** 19:21 48:2
87:15 113:1,6
114:2,7 133:3
136:20 137:23
190:6 195:23
197:15 203:25
**12-shot** 137:22
**12-week** 33:7
**120** 38:13
**12:43** 121:14
**13** 43:5,6,7
131:2,15 133:3
139:25 140:3
147:9,12
**13-round** 42:20
144:24
**13th** 135:7
**14** 18:18 19:4
114:10 152:22
155:1,3 157:3
**14-round** 42:22
**140-some** 58:23
**14th** 135:7,10
**15** 140:25 146:3
196:5,7,15
**15-round** 141:13
**15-year-old**
55:11
**1511** 134:11
**15th** 135:13
136:2,4
**16** 100:14
207:16,17,18
210:9
**16740** 17:11
**17** 75:17 118:9
**17-round** 119:13
**17th** 136:9,21
137:4,7
**18** 6:2
**1854** 141:25
**1871** 58:11
**1873** 58:16
**1879** 142:25
**1890s** 143:11
**18th** 137:19
138:4,12

**19-round** 118:9
119:13
**1903** 132:5
149:12
**1908** 132:6
**1911** 41:17
131:17,20
132:4,5
149:13,20,25
151:22
**1922** 132:17
**1935** 144:22
**1950s** 145:16
146:15
**1954** 147:12,16
**1961** 54:6,25
55:6,7 56:4
**1967** 32:7 39:22
51:1
**1968** 54:7
**1970s** 150:25
**1971** 35:6,9
37:11,15 47:10
**1972** 39:22
55:14 56:14
**1973** 40:4,13
**1974** 56:10
**1975** 33:15
**1976** 42:4,11,13
44:7
**1979** 44:24
**1985** 44:25
**1986** 98:3
**1987** 44:6
**1988** 48:18
207:16
**1991** 50:22
51:4,10,14
70:21,25 71:6
**1993** 37:16
48:21 51:1,6,
10 56:18
57:15,17 70:23
71:1,5,6,10
75:21 80:19
**1994** 13:11
14:6,17,19
**1998** 91:2
**1999** 15:9
**1st** 15:17 20:4
50:19 71:4

201:16

## 2

**2**   25:9 27:25
28:7 30:17,21
89:24,25
**20**   20:5 47:4
91:10 92:11,21
119:21 142:16
149:19 177:21,
22,24
**20-round**   96:22
178:17 210:12,
18,22 211:22
212:9,18 214:3
**2000**   15:18,24
16:12 73:22
75:21 80:19
82:1 83:11
84:7,9,14,21
85:2 91:2
167:5,13
**2004**   13:11 15:5
**2008**   36:22,24
37:5 62:25
63:18 64:7
84:25 85:1,3
**2010**   31:4,9
87:10 89:5
92:2
**2011**   87:15
110:4
**2012**   87:15
100:14 154:19
**2013**   102:8
113:5
**2015**   18:16 19:2
87:18 158:22
**2016**   16:7 19:21
61:3 62:5
**2017**   6:2 20:5
22:13 25:19,23
26:1,10 27:13
**22**   17:17
131:17,20
132:24 139:14
**2232**   150:16
**23**   15:8,14
65:25 66:5
67:13 80:22
81:1,5,6,12,

17,21 96:15
160:13
**23rd**   113:5
**24**   53:22 83:10
110:4
**24/7**   173:18
**25**   47:4 66:5
67:13 144:1
183:22
**25-round**   149:20
**26**   21:5 25:19
26:10
**27**   208:14
**28**   201:21 204:1
**2nd**   18:16 19:2

## 3

**3**   6:9 26:25
27:9,23 28:8,
20,21,22 30:3
45:10 46:20
53:21 86:20
88:20 89:15
90:10 113:23
114:3,14
119:10 121:20
135:3 168:12
187:14 195:17
200:21
**3,000**   116:5
**3,300**   85:10
86:2
**30**   119:21 146:3
165:16,23
166:5
**30-round**   149:19
179:2
**312850**   41:18
**32**   88:25 144:1
178:18
**32-round**   147:24
**32310**   6:20
13:5,6 16:10,
19 17:1 18:4
97:1,8 120:4
121:4 160:17
161:15 170:6
183:24 184:12,
17,24 185:9
186:2

**33-round**   178:18
**36**   211:7
**380**   132:4,5
150:16
**3:59**   214:18
**3rd**   102:8

## 4

**4**   30:16,19 31:1
39:20 50:25
54:9 65:25
69:13 92:2
107:4
**4,120**   84:16
**4.0**   33:17
**40**   131:6,7,8
154:10 165:24
166:7 177:24
**401(k)**   76:13
**42**   79:8
**43**   79:9
**44**   79:8
**45**   41:17 44:1
199:2
**46**   139:14
**49**   19:23

## 5

**5**   61:1,4,10
65:25
**50**   86:22 177:25
**50,000**   85:6
**500**   20:7
**50s**   147:6,19
**50th**   26:16
**56**   29:20
**560,000**   76:16
**57**   29:21 140:5
**58**   20:6 107:23
**59**   42:7,21
152:21

## 6

**6**   27:13 62:17,
19,21,23,25
63:4 64:14
66:18

**60**   154:12
**63**   16:7,9,18
120:5 183:25
184:11 186:3

## 7

**7**   78:18,20,22
209:8
**75**   76:4
**79**   47:11

## 8

**8**   91:18,20
92:11 93:9
97:17
**80,000**   76:5
**81**   133:1
**84**   133:1
**86**   209:8

## 9

**9**   84:25 85:1,3
91:2 100:5,6
101:4
**90**   50:20
**91**   48:22
**92**   133:14,17,22
**92s**   133:6
**93**   48:22 51:9
54:22 56:2,3
73:22 107:4
**962**   109:12,22
**990**   61:1,8
62:23
**9:56**   6:3

## A

**a.m.**   6:3
**AB**   109:22
**abbreviate**
57:14
**aberration**
209:2
**abiding**   15:25
122:12,25
124:9 166:13

176:11,15
177:12
**ability** 15:25
120:5 121:4
122:23 124:10
166:14 177:12
**absolutely**
93:19 172:1
201:4 213:10
**academies**
180:23
**academy** 32:18
33:4,6,15,20
37:22 41:3,5
47:4 114:9,19
181:3
**accept** 13:21
17:13 19:18
42:19 78:2,4
86:8 122:23
159:11
**acceptable**
152:6 178:12
**accepted** 79:22
**access** 174:15
**accessible**
137:18 176:17
**accommodate**
17:17 160:21
**account** 60:13,
17 188:22
194:19 196:1
**accounts** 188:9,
19 194:20
**accuracy** 19:11
**accurate** 182:16
190:15
**ACP** 41:17
**acquaintances**
174:7,8
**acquired** 14:5
15:17 16:12
**acronym** 209:12
**acronyms** 48:10
**act** 49:20,21,23
50:16 53:19
56:23 57:6
73:2 81:9 98:1
107:19 208:3
**acting** 96:17
208:2

**action** 17:19
70:6,8,14,16
78:11 82:10
96:2 148:20
**actively** 51:10
**activities**
56:3,6,13,18
65:16
**activity** 56:8
80:8
**add** 16:19
**added** 31:8
**adding** 213:4
**addition** 76:22
119:16 137:3
**additional**
12:24 32:3
48:6
**address** 38:12
**adjustment**
166:1
**administer**
104:10
**administration**
32:21,23 53:11
105:16
**administrators**
151:21
**admiration**
98:25
**admonitions**
11:12
**ads** 147:7
**advance** 26:12
111:22
**Advanced** 49:15
140:9
**advantage** 187:6
**advice** 40:25
41:2 67:8
175:1,4
**advise** 41:25
88:17 91:12
175:8,14
**advised** 107:19
**advisor** 69:16
**advisory** 50:13
97:24 98:11
**advocacy** 58:21
59:1

**advocate** 74:13,
16
**advocates** 92:13
**advocating**
104:13
**affairs** 74:2
**affect** 10:15
120:5 121:4
158:21 185:1
**affected**
183:13,16
**affiliate** 59:9
**affiliated**
59:11 66:6
**affordable**
136:16
**AFMER** 156:1
**agencies** 151:3,
7 153:21 156:3
**agency** 152:16
**agent** 39:21,25
40:3,9,14,17,
20,21 41:11,12
43:12,21 44:8,
15,17 45:12
**agents** 21:11
37:22 42:4,15
105:5,12
168:20
**aggressors**
191:5
**Agnos** 98:4,9
209:7
**agree** 102:19,22
103:23 111:16
**agreed** 80:11
107:12
**agreement** 23:20
102:13
**ahead** 21:22
59:23 119:2
185:23
**aids** 37:4
**air** 149:16
**AK** 179:3
**AK-47S** 208:25
**alarm** 177:7
**Alcohol** 154:18
**alive** 162:5
**alleged** 94:11

**allowed** 152:2
210:6
**altered** 17:16
**alternate** 39:9
**ambiguous**
18:12,20 19:6,
25 20:8,16,22
21:21 23:15
24:11 26:5
29:4,15 43:16
58:4 59:7
64:18 74:18
75:1,8 77:10
79:25 87:25
89:10 95:5
99:12 104:24
105:21 116:21
117:12,20
126:7 128:5,23
129:4 135:23
136:7,24
137:13 139:3
140:17 142:11
144:10 146:12
155:14 160:24
161:19 163:8,
18 164:3,20
165:12 166:25
167:18 170:17
173:5 174:11,
23 176:3
179:14 181:22
182:7 184:8,22
185:4,14
192:3,15,22
194:17 195:5
196:19,24
204:25 205:20
206:8 211:24
212:5,12
**amend** 18:25
**amended** 16:19
18:4 120:4
160:16 183:24
184:17 185:8
186:3
**amendment** 16:10
17:4 72:23
184:3
**America** 102:13
**American** 38:17
69:6 109:23
110:18 114:9,

15,19,22
140:24 141:1
149:9
Americans
122:12
ammunition
17:13,18
109:14 110:25
111:5,6 122:9,
24 135:17
136:18 138:25
139:1 168:5
169:4,11
172:24 173:3
175:19 176:16
177:14,23
179:10,13
200:22
amount  44:2
83:23 84:6,13
86:2 115:24
121:24 177:13,
22 179:10,13
analysis  97:20
98:6 99:7,8,
16,21 106:4,7
123:7,14 209:1
and/or  122:8
anecdotes
191:23
Angeles  50:12,
13 60:19 98:12
108:6 157:17
193:5
angle  206:20
Anna  22:17,19
annexed  11:25
anniversary
26:16
annual  55:22
56:9 70:5
answering  8:22
9:2 111:5
answers  7:21
8:1 101:6
anticipation
98:5
antiques  103:14
apartment  172:8
Apparently
75:20

appeared
112:13,15,16
appearing  7:5
appears  26:2
110:5 114:15
application
141:23 144:5
apply  8:11
33:12 103:11
appointed  53:8
approach  208:7,
8,12
approval  46:10
approve  208:19
approximately
21:5 22:13
31:4 44:6
67:13 76:16
85:7,20 87:7
116:5 166:8
April  201:16
apt  192:24
AR  213:10
AR-15S  88:3
arching  199:1
area  70:3
argumentative
20:15 23:16
104:2 133:8
135:22 137:12
163:16 165:21
167:17 184:7
arise  164:15
Arizona  69:1
arm  148:23
149:5,6
190:11,17,21
199:4,11
200:6,12
212:13
armed  171:24
179:25 190:13,
19 200:25
Arms  38:18 69:6
114:15,23
arranged  77:16
arrangement
83:24
arrest  198:13,
16,18 205:8

arrested  67:10
arrests  40:19
arrive  193:23
arsenal  92:21
Art  98:3
article  89:20
90:1 91:22
100:16
articles  28:13
86:23 88:21,25
89:4,8,14
90:5,8,21,22,
23 91:6,8,11
aspects  35:14
104:10 125:3
assault  13:10,
13,20 14:4,12,
16,21,25 15:4
18:17,24 19:3,
22 39:7 49:20,
23 50:15 53:19
56:23 57:6
73:2 92:9 98:2
107:5,10,11
108:20 209:23
210:9 211:12
213:20 214:5
Assembly  81:6
109:12
asserting  16:25
assigned  108:9
assignment
52:13 73:15
122:2,3
123:12,21
assist  30:2,4
assistance
22:24 23:14
30:13 67:8
assistant  45:20
46:2 48:15,25
49:7,11,18
assisting  56:22
associate  67:19
71:22
associates
120:17,22
159:22,25
160:5,15 174:9
association
53:24 54:3,17,
25 55:6 56:4,

24 57:10,13
58:1,8,10,15,
25 59:5 60:7
69:2,3,4,7,16
71:10,19 72:1,
2,7,9,13 73:9,
12,19,25 74:2,
5,9,13,23
75:6,12,15
76:7,23 77:8
78:14 79:16,21
80:13,20 81:17
82:2,8 83:4,6,
9,12,22 85:11,
21,23 86:6,11,
13 181:14
208:6,12,15,
17,21
associations
59:10
assume  9:14
20:19 27:1
86:18 120:13
146:22 156:19
assumed  82:20
assumes  185:22
186:6 195:4
205:19
assumption
208:18
assuredly  164:6
207:22
astounding
197:6
attached  27:9
103:10
Attachment
11:25 12:10,16
attack  20:14
194:12 195:14
attacker  166:21
186:20 187:1,
5,7
attacker's
186:24
attackers
166:20
attend  31:20
32:11,25 33:22
77:18
attended  31:12,
15 32:9 33:9

56:9
**attending** 33:3,
20 34:16
**attorney** 6:14,
15,17 23:6
47:22 50:1
107:13,16,23
108:4
**attorney's**
111:5
**attorney-client**
23:8
**Attorney-expert**
112:7
**Audacious** 196:3
**auditorium**
38:14
**Austrian** 139:22
**author** 27:15
197:6
**authored** 86:22
110:2 207:16
**authority**
158:10
**authorized**
119:22 120:25
**average** 33:18
172:3,4,9,12,
23 173:2,21
179:22 180:3,
14 181:21
182:12,19
183:2
**aversion** 48:9
**avert** 194:12
195:14
**awakened** 175:17
**aware** 9:18
15:11 17:11
18:2,7,16
19:2,21 20:20
21:1,18 28:9
80:22 133:6,
16,21 135:16,
18 158:12
161:14,24
167:3,6 171:1
172:25 183:24
194:14 195:1

---

**B**

---

**B-A-R-V-I-R**
22:18
**B-I-N-E** 44:13
**bachelor** 32:7
**bachelor's** 32:6
**back** 21:23 22:8
24:2 53:7
57:25 64:5
70:20 72:3
77:16,24 80:6,
17 86:19 90:21
97:16 106:1
121:17,18
127:24 135:8,
20 136:2 165:9
187:21 191:14
199:6 201:22
202:2,3 203:2,
14 207:6
213:17
**background** 13:4
31:7
**bad** 102:13,14,
15,19,22
103:2,3,17,24
104:5 105:10
187:4 191:5
194:8 212:13
213:16
**bag** 87:4
**bailed** 203:3
**Baker** 82:9
**Bakersfield**
198:10
**balance** 78:6
**ball** 51:17,22
**ballistics**
125:10
**balls** 139:15
**ban** 13:11,14,20
14:4,13,16,21
15:1,4 209:8,9
**bang** 199:5
**bank** 190:22,23
**banning** 186:9
208:9
**barrel** 95:18

**barricade** 181:9
183:10
**Barvir** 22:18,19
23:4
**base** 167:25
**based** 20:1 55:2
85:5,19 117:24
168:2 187:6
192:7 209:19,
25
**basic** 40:6
**basically** 39:11
47:10 58:14
162:11 187:4
**basics** 181:6
182:3
**basing** 157:2
**basis** 154:8
157:9 159:7
173:1 176:19
180:2,13,21
183:1 186:23
**basketball**
105:4
**battered** 108:6
**Bavrir** 22:17
**BCP** 48:10
**BCPS** 48:6
**Becerra** 6:16
**bed** 176:24
**Bee** 92:1 102:8
176:8
**began** 26:9
42:12 58:23
145:17 148:23
150:8 151:4
**begin** 13:3
26:13 37:8
84:17 135:1
139:7 173:15
**begins** 130:7
**behalf** 74:8
**behavioral**
129:16
**beings** 125:9
**belief** 82:12
93:7 95:22
177:15 188:18
190:16,17
**believed** 78:5,8
210:5

**believer** 178:3
**belong** 55:13
69:1,2,6,8
**belt** 144:14
**benefactor**
54:11,12,17,21
55:23 56:18
57:6
**benefit** 24:9
85:8,12 162:14
**benefits** 76:7,
23 80:17
**bent** 185:19
**bequeath** 60:7
**Beretta** 132:25
133:6,14,17,22
**Bernardino**
18:19 19:5
**BFS** 46:2 190:2
209:10,13,25
**big** 202:18
**bill** 15:8,14
80:22 81:1,5,
6,12,15,17,21,
24 93:23 95:7,
8,21,25 96:3,
12,14 98:2,4,6
109:12 160:13
209:7 211:4
**BINE** 44:13
**biplane** 149:19
**bit** 16:16 38:4
46:24 57:25
165:24 211:18
**bite** 210:1
**black** 94:6
135:8
**blanking** 189:22
**Block** 50:12
98:12,25 99:1
**blond** 213:13
**blood** 203:22
**Blue** 100:20
**BNE** 46:2 187:1
190:4 205:6
**board** 37:23
60:17 63:21
64:1,10,24
65:1 71:15
**boards** 45:21
46:8

EXHIBIT HELSLEY - 4 Page 61

bodies  170:22
body  183:9
bolt  148:20
bonded  44:3
book  29:9,17,
  21,25 87:5,6,
  12,15,16,19,20
  88:1,2,11
  117:2,5 127:7
  139:25 140:1
books  28:14
  48:23 86:21
  87:1,7,23
  88:1,8 90:5,8
  116:2,4,6,13,
  19 117:7,10,
  14,17,18,23,25
  118:3 139:13
Borchardt
  143:19,23
boss  47:5 53:3
bottom  39:21
  63:9 155:25
  168:11 194:6
bought  69:25
box  103:1
  168:17 174:14
boxer  176:25
  178:5
Boy  64:5 181:18
Boys  29:18,21
  87:5,12,16,19
  88:2 140:1
Brady  7:5
  13:17,23 14:7
  15:19 16:2,13,
  22 18:11,20
  19:6,25 20:8,
  15,22 21:21
  22:18 23:5,15,
  23 24:11 26:5
  29:4,15 43:15
  54:4 56:5,16,
  19 58:2 59:6,
  22 64:17 65:5
  72:14 73:3
  74:15,17 75:1,
  7 76:1,9,17,25
  77:10 79:24
  81:2 86:15
  87:25 89:10
  95:4 97:3,10

99:11 103:4
104:1,23
105:21 106:10
112:5,7,11
115:17,23
116:21 117:12,
20 119:1 120:7
121:6,10
126:7,16
128:4,22 129:4
133:8,11
135:22 136:7,
24 137:12
139:2,19
140:16 142:10
144:10 146:12,
21 147:2 151:9
155:13 156:17
160:23 161:18
163:8,16
164:3,19
165:12,20
166:25 167:10,
17 169:15
170:9,17 173:4
174:11,21
176:1 179:14
181:22 182:7
184:7,14,20
185:3,13,21
186:5 192:3,
15,21 194:17
195:4 196:19,
24 201:6
204:24 205:18
206:7,10
211:23 212:4,
11 213:2
214:11,12,14
brand  171:5
  205:3
brandishment
  194:11
bravado  187:22
break  10:2,3
  23:25 121:16
  162:9 191:12,
  13 195:8
breaking  176:24
  177:9
bridge  106:13
briefcase
  168:21

briefly  13:4
  198:7 207:23
bring  22:3
  42:14 43:11
  48:8 94:19
  137:6 198:21
  202:5,9
broad  16:16
  102:13
broke  95:14
  200:12
broken  199:11
  200:6
brought  12:3,6
  37:23 108:21
  113:13
Brown  131:17
  152:14
Browning  42:8
  130:25 131:6,
  7,11,20 132:4,
  5,19 145:3
  146:16 147:5,
  9,11,15
Bruce  71:21
brunette  213:13
Buck  132:20
Budget  48:11
built  148:21
  149:24
bullet  43:2,3
  118:17 189:3
  203:16 206:16
bullets  42:24
  43:1 136:5
  160:22 161:9
  206:21
bunch  149:1
burden  136:25
  137:17 138:6
burdened  186:20
bureau  37:10
  44:13,21 45:3,
  4,19,23 47:12,
  17,18,20 48:1,
  14 49:14,15,17
  104:10 189:1
  209:13
burning  48:23
  51:7
business  32:21,
  22 67:19 173:9

174:7
butt  203:10,21
buy  40:7 55:12
  93:12 94:21
  95:23 159:21
  162:24 163:21
buyer  198:13
buying  205:9,22
buys  157:15

---

C

calculate
  119:20
Calguns  68:18,
  20
caliber  17:18
  131:6,7 139:15
California  6:1,
  15,17,19 16:7
  18:19 19:5
  21:4 30:22
  31:18 34:3,11
  49:20,23 50:25
  57:9,13 69:3,4
  73:12,16,18,24
  74:7 79:2
  93:15 96:16
  101:7 113:4
  161:16 167:5
  183:18 184:19
  185:1,18
California's
  15:11,24
  92:12,17 93:5
  101:5,17,20
  104:11,21
  183:14
Californian
  167:21
Californians
  167:14
call  60:16
  70:12 108:5
called  40:11
  58:3 59:8 70:1
  72:15 73:5
  76:2,10,18
  77:2 100:20
  160:25 163:10,
  18 176:2
  184:21

calling 49:9
calls 13:17,23
  14:7 15:19
  16:2,13,22
  18:11 20:9,16,
  23 21:22 23:5
  26:6 28:13
  58:2 59:6
  64:18 65:5,18,
  19 67:3 72:14
  73:3 76:17
  77:1,11 81:2
  86:15 97:3,10
  104:23 120:7
  121:6,10
  133:11 139:2,
  19,20 144:11
  146:21 147:2
  151:9 156:17
  160:23 161:18,
  19 163:9,16
  164:4,20
  165:21 167:10,
  17 169:15
  170:9,18
  174:21,22
  176:1 181:23
  184:14,20
  185:4,14,22
  186:6 192:4,
  16,21 196:20,
  25 204:24
  205:20 206:7
  212:5,12
CAMP 45:6
campus 32:16
cap 148:5
capability
  143:25
capable 122:9
  124:18 136:5,
  21 191:17
capacities
  144:1 149:13
  151:4 152:19
  162:11 167:15
capacity 6:20
  13:15,20 14:5
  15:1,12,15,17,
  24 16:11,20
  17:9,12,13,24
  18:7,18,21
  19:4,7,23

20:6,13,20
21:3,13,20
29:14,19,24
35:20 36:15
38:1,25 39:5,8
41:20,22 42:1,
9,19 43:13,21
46:15 81:13
87:24 88:4,17
89:9 90:23
91:13 96:15
102:23 103:2,
14,20,25
113:15 116:20
117:3,11
118:22,25
119:15,16,23
120:6 121:1,5
124:5,14
125:1,14
127:15,19
128:11 130:6,
22 131:2
132:2,13,18,23
133:20,23
135:1,12,19
137:22,25
142:16,21
143:8 144:13,
19 145:20,23
146:10 147:1,
22 149:16
150:2,14,19
151:16 152:4,
7,20 153:18
154:2 155:11,
19 156:24
157:6 158:1,20
159:4 160:6,
12,21 161:11,
15 165:10
166:4,6,10,23
167:4,8,23
170:3 173:23
178:7 183:17
184:1,5,18,25
185:10,17,19
186:2 187:9
189:15 201:1
210:3 214:7
capita 192:24
caps 178:17
captured 141:17

car 168:18
  191:2 198:17,
  22,24 201:17,
  18,20,23
  202:7,19,23,25
  203:5,8,11
  206:19,20,22
Carbine 55:10
  145:25
Card 100:20
care 107:24
career 39:17
  44:7 52:13
  53:2 70:20
  193:14
carjacked
  206:13
carjacking
  206:23
carried 151:12,
  23 171:11
carry 42:5,7
  89:22 92:9
  118:5,11,14
  144:15,18
  151:23 157:17
  162:25 163:23
  168:3,4,15,17,
  20 169:3,10,
  13,21,23,25
  170:15,16,20
  171:14,17,21
  178:5 187:23
carrying 51:16
  169:17,18
  170:7 204:7
cars 168:22
  202:12
cartridge 43:2,
  4 118:19,20
  142:2,7
cartridges
  42:25 43:6,7,9
  103:16 162:2,
  12
case 6:16,22
  7:1 16:25 17:5
  18:3 22:3,5,
  16,25 23:2,3,
  14,21 24:4,10
  26:14 30:22,24
  43:3 57:19

67:12 78:19
85:24 86:14
107:3,8
108:10,12,18
109:8,16
110:11,17
111:10 112:3,
23 114:4,14
115:5,12
119:12 122:1,
3,17 123:13
124:1 125:21,
24 126:21
129:3,11 165:8
169:12 176:23
206:17
cases 98:7
  103:23 105:3
  106:15,20,24
  108:22 164:5
  188:8 191:4,5
  194:11 197:7
  207:5
cash 198:17,22,
  23 201:19,21
  202:5,6,9,10
categories
  12:7,9,12,15
caught 78:6
caused 177:7
  200:9,16
caution 10:13
CCW 171:2
CEA 190:6
CEA-4 52:14
ceased 37:19
  47:13 82:1
  83:3
Center 49:16
  70:1
Central 109:23
century 101:7
  135:7,10,13
  136:2,4,10,21
  137:5,8,20
  138:4,12
certification
  36:17
certified 35:23
  36:2,6
challenge 17:1
  109:11 113:13

171:21
**challenging**
6:19 113:14
**chamber** 118:18,
19,20 151:24
**chance** 10:9
**chances** 162:5
**change** 48:11
75:17 82:17
152:9
**changed** 40:4,13
108:5 211:14
**chapters** 29:18,
23
**characterize**
165:2
**charge** 43:3
44:8,10,12,15,
17 49:4,11,14
83:22
**check** 22:8 51:8
64:5 85:1
191:11
**chief** 44:21
45:3 47:10,12,
16,17 48:1,14
49:3,9,10,12
50:13 95:11
98:13 153:14
**chiefs** 50:8
152:6
**children** 174:16
181:18
**choice** 149:4,6
**choose** 42:14
43:20 44:4
**choosing** 213:7
**chose** 42:7
165:5
**chosen** 177:21
**CHP** 157:17
**Christmas** 18:19
19:5
**Chuck** 65:22,24
66:22 67:2,5,
7,11 110:10
**church** 164:24
**circa** 35:6
141:25
**circumstance**
164:15

**circumstances**
103:11 124:21
166:19 191:19
212:9,18
**cite** 29:20
137:9 154:17
158:6 195:19
196:2
**citizen** 124:9
163:3,6 164:23
166:13 172:9
179:22 180:3,
14 181:21
182:12,19
183:2 190:10
**citizens** 122:13
123:1 162:23,
25 163:15,21,
23 164:17
168:3 176:12,
15 177:12
188:6 190:11,
17,21
**citizens'** 15:25
**city** 31:25
34:1,6 69:23,
24 112:23
113:3,12 153:7
**civil** 44:19
52:16 58:13
106:15 107:2
109:1 112:13,
18 140:24
141:1,10,12,21
142:16
**civilian** 55:8
88:9 89:15
117:15,16,18
118:1 144:8
145:2 148:14,
17 149:6 153:2
154:7 156:23
158:2,14,16
169:10 181:2,
19 192:20
206:6 213:7
**civilians**
136:6,23 137:9
138:4 139:18
140:20 142:13
144:20 145:15
146:10 147:23
150:9 156:8

159:16 160:1,6
164:1,13
165:11 166:5,
6,24 168:16
169:5 170:14,
20 174:19
175:1,4,8
180:8,15
181:1,18
192:2,14,25
193:9,20
194:4,7 196:23
206:23
**claim** 17:4,5
**claims** 17:4,5
**Clara** 107:4,22
**clarification**
14:14 18:23
**clarify** 206:4
**clarity** 30:9
182:15
**Clark** 100:17
139:10,11
140:7
**class** 38:12,13
47:4 163:5
**classes** 37:22
41:3,5
**classroom** 36:11
37:3
**clear** 8:19
30:12 51:24
52:17 64:12
94:12 135:9
**client** 67:7
**clients** 156:23
158:2
**clip** 194:19
**close** 28:18
67:25 135:10
184:4 209:1
**closing** 199:15
**clothing** 118:13
**Club** 69:19,21,
22 70:2
**co-authored**
86:22
**coauthored**
86:21 140:1
**cocaine** 201:15

**cocked** 151:23
**code** 6:20
16:10,19 17:1,
9 35:13 97:1,8
118:23 119:23
120:4 121:3
160:17 161:14
174:19
**collapsed** 51:18
**collection**
116:1,12,19
**Collectors**
38:18 69:3,7
114:15,23
**college** 31:12,
14,25 34:1,7
35:2,5
**Colt** 41:17
134:12 145:7
149:12 151:22
**combat** 179:24
**Combined** 43:4
**comfortable**
53:7 175:11
187:10,16
213:9,15
**command** 98:7
**commands** 203:7
**comment** 10:15
**comments** 30:5
**commerce** 154:21
155:8
**commercial**
41:17
**committee** 95:9,
10
**committees**
50:4,5,7
**common** 148:15
**commonly** 136:5,
22 137:9 138:3
139:17 140:15,
20 144:20
146:10 165:11
166:4,6
**communication**
202:11
**communications**
23:6 77:11
112:7

EXHIBIT HELSLEY - 4 Page 64

```
community  35:2
companies
  157:15 171:1
Company  83:1
compare  27:22
comparing  114:5
comparison
  115:14 165:18
compensate
  83:19
compensated
  24:4 61:13
  68:10 75:11
  86:1
compensating
  85:23
compensation
  24:7 61:12
  68:13
competent
  213:15
competition
  58:17
complete  34:21
  119:11
completed  11:13
compliance
  104:21 174:13
complimentary
  110:21
comply  160:16
composing  27:20
compound  99:12
  104:24 137:13
  139:3
compounded
  200:11
conceal  118:14
concealed  89:22
  92:8 118:5,11
  144:15,18
  162:1 169:21
  170:15,21
  171:3
concern  29:13,
  16 46:15 92:4
  100:16 117:15
  151:22 158:16
concerned  58:12
  151:21 179:8
```

```
concerns  53:12,
  14 72:25
conclude  188:20
concluded
  214:18
concluding
  159:8
conclusion
  13:18,24 14:8
  15:20 16:14,23
  81:3 97:4,11
  120:8 121:7,11
  139:20 161:19
  167:11 170:10
  174:22 190:8
  193:23
condition  11:2
conduct  16:20
  172:14
Confederates
  141:17
conference  8:6
confidence
  175:11
confiscate
  185:10
confluence
  51:15 120:13
confrontation
  179:18
confuse  28:3
confused  199:8
confusing  79:24
  128:4
confusion
  211:19
connection  42:2
  74:9 76:8
  85:24
consent  105:12
consequences
  92:22
considerable
  120:18 159:23
considerations
  179:6
considered
  98:10 211:1
consignment
  94:9,20,22
```

```
consistent
  60:21 205:1,
  11,12
constant  41:6
  84:6
constituted
  107:9
constitutional
  17:1 113:13
constitutionalit
  y  6:19
construction
  128:7 211:12
construed  17:14
consult  126:19
  127:6
consultant
  53:23 83:5,8,
  12,15 84:14
  86:2,11
consulting
  82:22 83:20,25
  85:16,21
consumes  83:1
contact  68:6
  71:12 74:7
  208:17
contacted
  22:15,20
  71:12,14,17,20
  77:14
contained  17:19
content  30:10
contest  10:3
context  88:10
  95:2
continue  86:7
  120:5 121:4
  209:16
contract  86:4,7
contractors
  61:14
contribution
  54:15,16,22
  55:2,19
control  49:20,
  23 50:15 53:19
  56:23 57:6
  73:2 74:14,24
  75:3,4 92:13
  93:5,17 97:18,
```

```
23 99:15
  104:11 105:19
  106:6,8
conversation
  71:24
conversations
  128:19
converted  49:9
convey  210:24
convinced  81:8
convincing
  198:14
cop  198:15
copies  11:14
cops  187:22
copy  11:14,15
  30:16 95:12
  155:1 214:13
core  58:24
Coronado  201:13
  203:4
correct  7:1,2,
  7,20 12:1,4
  13:22 14:6,11
  15:6,18,22
  16:12,20 17:2,
  3,6,7 18:1,5
  20:19 21:5,6,9
  22:21 25:17,
  18,21,23,24
  26:10,11 27:7,
  8,10,11,13
  31:4,5,12,13
  32:8,14 33:5,
  16 35:24,25
  37:6,7 38:6,
  21,22 39:22,23
  40:11 43:14,19
  44:9,23 45:1
  47:2,15,18,19
  48:16,17,19,20
  50:16 51:3,5,
  12 54:1,25
  55:3,15,16,25
  57:1,8,18 59:2
  61:19,20,22,23
  62:3,5 63:12,
  13 64:16 65:20
  66:14 69:14
  70:24 71:10,11
  72:11 73:20
  75:9 77:5
```

EXHIBIT HELSLEY - 4 Page 65

79:17 80:20,23
81:14,18 82:3,
4 85:4,6,22
86:3 89:1
90:14,15 93:2
99:10 100:15
101:18,19,22,
23 102:8,9
104:11,14
110:12,19,21,
25 111:7,11
113:19 114:12
115:5,6,8,9,12
116:2 120:2,3
122:4,10,11,
14,15 123:10
124:11,12,22,
23 125:15,24
129:14,20
130:8,19,20,23
131:1,3,4,12,
15,16,23 133:4
135:13,21
137:20 138:15
140:7,20,22
141:23 142:9,
23 143:2,9,13
144:2,5,9,16,
17,24 145:13,
21 146:7,8
150:19,22,23
151:1,5,6
154:3,14,19
155:12,17,20,
21,24 156:5,9,
13,14,25
157:7,8 159:5
160:7 162:5,6
163:1,2,15,24
164:8 165:19
166:15 167:9,
12 168:6,7
169:1 170:8
171:15,16
172:24 173:23
175:21 176:12,
17,18 177:14
180:10 181:4
182:16,20,25
183:11,15
184:1,5,13
185:12,15,20
186:21 188:14,
17 189:12,16

190:13 191:20,
21,24,25
194:12,13
195:21 196:3
197:7,8,16,24,
25 198:5,6
204:20 205:17
207:11,12
213:1,23 214:3
**corrections**
10:9
**correctly**
175:12,13
182:1
**correlation**
206:11,22
**cost** 75:22
100:8 104:19
137:1,18
138:6,7,9
185:6
**counsel** 7:3,5
9:18,22 11:15,
22 24:20,23
25:1,3,7 26:14
30:2,5 94:11
109:15 122:6,
21 155:2
**counselor** 66:16
**count** 89:2
119:8 141:8
190:6,7 195:10
**counterbalanced**
171:10
**counting** 198:17
**country** 165:18
**county** 30:23
45:5 100:18
189:22 199:8
**courses** 33:19
35:1,4 41:7
**coursework**
33:11 34:21
**court** 7:25 8:7,
18 10:7 18:2
28:3 30:23
107:6 108:4,
10,14 109:9
112:17
**cover** 7:14
35:18,20 39:17
40:7 78:21,24

**covered** 107:18
**cowboy** 70:12
96:2
**crack** 199:7
**craft** 48:6
**crafting** 107:12
**create** 153:2,5
154:6 210:10
213:21
**credibility**
10:16
**credits** 33:12
**Creedmore** 58:17
**crew** 201:11
**crime** 45:24
47:23 48:2
49:17 92:21
98:1,6 190:2
**crimes** 19:15
98:24 208:24
**criminal** 44:19
106:15,20,24
107:2 108:22
129:24 163:7
164:1 179:25
185:20 199:20
**criminals** 46:16
124:11 162:25
163:14,22
166:14 183:13
185:2,19 186:4
190:12,19
192:14
**criminology**
32:7 129:19,25
**criteria** 98:9
**critical** 97:19
99:8,16,21
100:22,25
101:16,20
104:9 113:18
**criticism** 95:1,
2 189:4
**crook** 198:15
200:12,18
201:18,22
202:2,22
**crooks** 190:24
191:2 201:23
202:18
**cross** 106:13

**CRPA** 57:14,16,
19,21,23 59:4,
9,10,17 60:2,
5,9,14 61:19
62:2,4,11
63:19 64:3
65:3,14,17
66:6,9,14 67:1
68:10,14,16
89:18
**cruise** 26:16,
19,22
**curios** 103:14,
23
**curious** 48:10
**current** 31:3
82:24 159:14
**customs** 168:3,
8,22,24 169:9

---

### D

**D.C.** 72:4 77:16
**DA's** 98:16
**DAGS** 211:2
**Dakota** 31:24
**Dan** 52:10
**dangerous**
210:11,18,22
211:21,25
212:3,10,19
214:2
**dangerousness**
212:24
**dark** 175:12
**Daryl** 50:12
98:12
**DAS** 50:9
**data** 49:4
**database** 127:4
**databases** 21:24
99:6
**date** 25:20
135:20
**dated** 27:12
**dates** 127:1
132:7 135:8
**Davis** 34:3,4,11
**dawn** 135:2,5,20
136:3

EXHIBIT HELSLEY - 4 Page 66

day 82:24,25
95:6
DCM 55:7,9,12
de 50:1 52:18
53:1 97:25
dead 189:24
deadly 124:20
182:14 183:4
191:18
deal 183:6,21
187:3 190:13,
19,21
dealer 94:2,22
dealer's 187:3
dealers 94:8
107:19
dealing 42:10
97:25 132:16
165:22
dealings 81:7
deals 124:25
125:2
dealt 81:8
123:18
debate 135:6
214:8
decades 97:18
99:15 156:22
185:25
December 6:2
18:16 19:2
113:5
decide 51:13
93:11
decided 94:8
decision 52:5
53:17 104:9
146:23,25
decisions 183:8
deck 206:21
declaration
25:10,15 26:9,
13,21 27:23
28:6 113:1,18,
21 114:3,8,23
115:3,10
declarations
111:4 112:15
decrease 84:24
85:13

decreased 84:11
85:9
deer 149:3
defeated 206:20
defend 166:24
167:14,22
194:16 210:3
Defendant 108:3
Defendants
166:20
defense 88:9,14
89:16,22 91:13
117:15,16,19
118:1 122:24
124:14,25
125:15 127:19
128:12 144:8,
16,17,20
146:11 148:15
166:10 173:8
174:2 175:6,9
182:3 188:7
192:2 194:4
213:6,8,11
defensive
164:8,9 165:2
175:17 188:10,
19 194:10
deferred 51:6
70:23
define 48:12
211:10
defined 13:21
18:9 118:23
defines 17:12
definite 6:16
definition
17:8,21,24
36:25 37:2
38:8 109:13
117:25 130:10
153:4 172:4
177:16 192:9
209:24
definitions
211:3
defunct 69:8
degree 31:21
32:2,6,7,22
33:13 34:15,
18,20,22,23,24
82:24 129:21

deliver 201:14
demand 153:1,2
154:6,7,18
department
21:4,8,17 36:8
37:10,16 38:11
39:18 40:22,25
41:25 47:8
50:21 51:1,11,
13 53:1,18
56:22 70:21
106:21 107:1,
17 108:23
157:18 158:11
161:10 189:10,
19 193:5
departments
133:18 157:17
depending
118:13 149:15
depends 52:23
150:16 212:16
deposed 7:14
30:24 78:10
deposition 7:8,
11 8:14 9:13
10:7,22 11:17
17:23 24:15,
21,24 25:4,7
28:4 30:17,21
39:20 78:14,18
79:1,5,9 109:3
112:17 121:25
214:18
depreciates
185:17
deprive 182:14
depth 91:16
deputy 6:14
107:16 199:8
200:14
deriving 193:3
describe 33:6
35:11 36:1
39:24 54:12
67:22 68:8
70:11 93:20
122:2 129:7,22
151:3 155:7
168:14 170:15
198:7 201:8
207:23

describing
19:14 110:11
200:5
description
83:18
descriptions
19:18 88:6
132:8
design 136:16
137:20 138:13
152:1
designed 136:13
137:4,10
145:3,4,7
146:1 150:8
detachable
107:15 143:1,
12,16,25
162:21
detail 194:21
195:11
detailed 58:5
126:25
detective 203:4
determine
172:11
Deukmejian 53:5
develop 8:19
developed
141:22 142:6
143:3 145:1
150:8
development
56:23 58:19
115:1
device 17:13,
15,18 174:15
175:13
DGUS 194:11,14
195:3
died 197:19
Diego 32:16
40:10 41:4
56:10
differ 113:25
114:3
difference
55:17 114:16,
17 123:17
147:18 183:11
190:25

**differences** 28:5,9
**difficult** 19:13 184:12 188:6
**difficulty** 117:21
**Digest** 95:12
**Dingman** 107:3,7
**direction** 52:18,21 53:10 91:3 182:4 189:23
**directly** 37:20 126:23
**director** 45:21 46:3 48:15,25 49:3,6,12,19 55:8 208:1,2 209:18
**directors** 49:7, 8 60:17 61:12 63:4 71:15
**disclosure** 26:25
**discovered** 185:11
**discuss** 11:21 13:4 24:20 25:3 29:18,24 38:1 88:2,3 89:15 140:6 160:15,18 172:2,22 176:11 188:23 191:22 195:13 198:2
**discussed** 10:20 23:3 38:24 46:11,24 53:16 80:23 88:9,10, 15 89:19,21 91:4 115:4 155:18 174:8
**discusses** 115:3,7
**discussing** 142:8
**discussion** 23:10 24:1 39:4 77:6 111:25 115:11 121:15 196:11
**discussions** 30:9,10 77:7 88:16 127:23
**dispatched** 47:24
**display** 94:13 138:20 158:19
**displayed** 138:14
**displays** 139:8
**distance** 212:22
**distinct** 122:16 124:24
**distinction** 107:14 123:17 125:12 191:6
**District** 113:4
**divest** 160:9
**division** 48:16, 25 49:12 208:1
**divulging** 23:8
**DNA** 48:8,12
**document** 11:19, 21,24 12:4 25:13 27:1,4, 6,15,17 30:16, 20 61:6 62:17 100:9 102:5 109:21 110:2, 6,10,15 113:8, 10 196:2,6,9, 18 197:6
**documents** 12:3, 6,9,12,15,19, 24 28:17,23 29:1,8,12,13
**Doe** 172:10
**DOJ** 21:11 42:15 45:9 50:7,10 71:23 80:9 94:2,4,8,12 98:15 99:5 105:5,6,12 108:1,3 120:24 152:14 168:20 171:20 193:16 202:12 209:15
**DOJ's** 46:21
**domestic** 156:3
**door** 105:7 153:8 190:25 202:25 203:3 205:7
**double** 134:12, 17
**double-action** 150:5
**doubt** 19:11 20:13
**doughboys** 149:1,8
**downsized** 133:21
**dozens** 111:3
**drafted** 81:10
**drafting** 26:9 49:19,21
**draw** 193:14 203:1
**dress** 70:13
**drive** 105:6
**DROS** 94:6 105:9 106:2
**drove** 202:3
**drug** 35:5,7,14, 16 40:18 44:18 45:8 201:11 205:2,11
**drugs** 35:15 40:7 201:25 205:9,22 206:3
**drum** 147:24
**dry** 202:21
**due** 17:5
**dues** 55:22
**duly** 6:6
**duties** 39:24 40:16 41:13 42:3 44:16 45:2 47:25 48:24 60:4 65:3 73:23 83:14,16 185:12 189:19 205:17
**duty** 176:11
**duty-issued** 157:20
**dying** 197:15, 17,22

**E**

**eager** 23:13
**earlier** 46:25 80:23 135:15 189:9,14
**early** 150:25
**earned** 76:16
**earnest** 13:3
**easier** 183:8
**Echeverria** 6:12,14 13:19, 25 14:9 15:21 16:3,18,24 18:13,22,25 19:8 20:4,12, 17,24 21:25 22:19 23:7,17, 25 24:2,3,14 26:7 29:6,20 30:15,20 43:17 54:8 56:12,17, 21 58:7 59:16 60:1,25 61:5 62:16,20 65:2, 7 66:1,3 72:17 73:6 74:20 75:2,10 76:6, 12,20 77:3,13 78:17,21 80:1 81:4 86:16 88:5 89:11 91:17,21 92:10 97:5,13 99:13 100:3,7 101:24 102:4 103:6 104:3,25 105:22 106:12 109:18,21 112:6,8,12,25 113:7 115:21 116:1,23 117:14,24 119:3 120:9 121:8,13,17,18 126:8,19 127:24 128:2,8 129:1,7 133:9, 13 135:24 136:9 137:2,14 139:5,24 140:4,19

142:14 144:12
146:14,24
147:4 151:10
154:25 155:4,
15 156:21
161:7,20
163:11,19
164:7 165:1,
13,25 167:3,
13,20 169:20
170:14,19,20
173:11 174:18,
24 176:10
179:16 181:19
182:5,11
184:10,16,24
185:8,16
186:1,19
191:9,14,15
192:5,18 193:2
195:1,12
196:5,8,22
197:2 201:5,7
205:14,21,23
206:1,24
207:15,20
212:2,8,17
213:4 214:9,16
**edition** 87:17,
21
**editorials**
90:11,13 91:16
**education** 31:18
**educational**
33:22
**effect** 13:11
**effective** 50:19
104:18,19,20
124:19 191:18
**effects** 182:13,
19 183:3
**efficiency** 95:3
**effort** 48:6
**efforts** 105:20
**effusive** 111:13
**eggs** 202:18
**electorate** 16:7
**elevator** 58:8
**else's** 90:7
170:12
**employ** 72:1,3

**employed** 50:25
70:25 71:3,6
82:11 84:19
208:16
**employee** 56:22
84:20 106:21
**employees** 36:3
42:10 61:13
63:5
**employment** 21:7
80:14 106:25
108:23
**enable** 185:9
**enact** 92:12
**enacted** 14:16
15:9 50:16,18
184:4,11
**enacting** 96:14
**enactment** 49:22
53:19 57:5
73:1
**encounter**
205:16 206:6
**encourage** 58:13
60:6
**encyclopedia**
110:24
**end** 45:13 94:15
95:22 111:2
**endurance** 10:2
**enforce** 184:12
**enforcement**
18:4 20:21
21:2,11,14,19
33:8 35:5,7,
14,17 36:3
37:11,13
38:20,23 42:2,
13 44:14,22
45:3,9,20
47:13,17 48:16
49:1,5,13,15
58:20 94:20
95:24 104:14,
18,21 122:13
151:3,7,12
152:10,25
153:21 154:5,
12 155:24
156:3,8,23
157:15 158:2
159:14,25

160:3 162:3
164:2,7,10
168:15 169:6,
10 179:23
180:3,6,9,12,
14 181:17
184:12 185:10,
11 192:19,24
195:24 196:18
204:23 205:2,
3,7,12,13,16
208:1
**enforcement's**
92:20
**enforcing**
184:16
**engage** 56:3
99:24 180:16,
17 192:14,19
214:6
**engaged** 56:13
65:16 203:11
**engages** 59:1
**engaging** 169:21
**enhance** 48:4
182:5,10
**enhancement**
92:23 93:6
**enjoining** 18:3
**enjoyed** 142:17
**ensuring** 104:21
**entered** 18:2
**enthusiast**
70:18
**entirety** 214:8
**entitled** 9:3
30:16 62:23
91:18 100:8
102:1 109:22
**environment**
97:18 99:14,20
**episode** 196:13
197:5 199:18,
21 203:24
**episodes** 204:22
205:15
**equally** 211:21
**equate** 85:5,19
**equipment** 60:12
171:22

**equipped** 124:18
171:2 191:16
197:23
**equivalent**
34:17
**era** 144:19
147:7
**Eroded** 91:19
**erosion** 92:22
**essentially**
34:18 45:19
187:1 200:18
**established**
83:24
**estimate** 76:14
116:9 119:18
**estimates** 9:5
**estimation**
138:21
**evaluate** 201:12
**evaluating**
190:10
**event** 132:1
173:10 176:9
**events** 62:14
63:20 128:17
211:15
**eventually** 46:9
50:16 145:11
186:1,11 203:8
**evidence** 157:12
185:22 186:6
195:5 205:19
**evidentiary**
159:7 173:1
**evil** 210:11
214:2
**evolution** 142:6
145:6
**ex-army** 197:3
**EXAMINATION**
6:11
**examined** 6:6
**Examiners** 69:17
**examples** 130:21
134:3,5 135:15
167:21
**exception** 167:7
208:7,12
**exceptional**
53:2

exceptions 16:21
excerpt 79:4,7 139:25
excerpts 78:18
excess 158:9
exchanged 207:5
excludes 156:1
exclusively 36:13
executive 45:11,17 46:1 52:13
exempt 61:2 62:24 96:12
exempted 96:3, 6,8,9
exhausted 199:10
exhibit 6:9 11:13,14,16, 17,25 12:10, 13,16 25:9 26:24,25 27:9, 23,25 28:7,8, 20,22 30:3,16, 17,19,21 31:1 39:19 45:10 46:20 50:24 53:21 54:9 61:1,4,10 62:17,19,21, 23,25 63:3 64:14 66:18 69:13 78:18, 20,22 86:20 88:20 89:15 90:10 91:17,20 92:11 93:8 97:17 100:5,6 101:3 102:1,3 104:9 109:18, 20 113:1,6,23 114:2,3,7,14 119:10 121:20 135:3 139:25 140:3 154:25 155:3 157:3 168:12 187:14 195:17 196:5, 7,15 200:20 207:16,17,18 210:9

exist 70:9 146:1 161:13 183:22
existed 184:13
existence 122:8 124:4 127:15 130:5 159:9
existing 39:11
expand 48:7
expecting 191:4
expedition 139:11 140:7
expend 194:15 199:24 204:2
expended 203:23
expensive 139:23 140:10 152:12 153:10
experience 54:10 127:4 149:7 158:8 159:20 168:2 186:15 187:6 188:1 191:24
experiences 31:9
expert 6:25 22:16 23:1,6 24:18 25:25 26:25 27:7,10, 12,22 28:7 45:10 58:3 59:7 72:15 73:4 76:2,10, 18 77:2 86:19 88:20 106:14, 17,25 108:11, 16,24 112:13, 19 114:3,13 115:4,12 119:10 120:16 121:20,21,25 126:1 129:8, 11,13,16,19,25 130:1,8 182:22,24 187:10,16,18 188:3
expertise 108:18 129:2
expired 195:10

expires 86:4
explain 56:6 57:25 63:23 71:25
explaining 39:12
explanation 85:12
explore 130:4
Explosives 154:18
export 156:13, 15
expressed 27:20
expressing 59:1
extension 144:15
extensive 44:2
extensively 81:8 93:23
extent 23:5 56:6 65:5 77:11 80:2 115:17 119:2
eyes 202:18
EZ 62:23

F

F-Y-O-C-K 113:3
Fabrique 144:22
face 96:18,19 164:1 204:23
faced 182:13 183:3
fact 73:1 125:4 132:22 135:20 152:15 153:12 163:14 181:25 188:9,14,17,21
factor 213:5
factors 51:15 52:4
factory 147:22
facts 126:25 185:22 186:6 195:4 205:19
fail 96:2
fainted 203:22
fair 124:15

fairly 79:6 141:14,15
FAL 179:1
false 213:22,25
familiar 13:6, 10 15:8 17:8, 21 28:5 45:15 57:23 61:8 65:22 68:20 131:5,7,17 132:4,19,22 133:13 171:7,9 207:20
fanny 169:17
Farook 18:17 19:3
fashion 187:20
fast 199:3
faster 162:16
fatalities 18:10
faulty 64:23 75:20
FBI 32:18 33:4, 6,14,20 35:23 36:17 105:3 197:11
fear 94:6 187:5
February 110:4
federal 13:10, 13,20 14:4,12, 16 99:23
fee 94:2
feed 178:16
feeding 17:13, 15,18
feel 10:24
feeling 98:21
fees 94:6
fellow 95:11 164:23
fellows 201:13
felt 42:5
fewer 43:9 138:9 167:16
field 37:18 40:12 44:12,15 45:5 108:18 127:23 129:1 154:4

Graham Helsley
December 18, 2017

fight  165:3,4
  178:2 179:21
  192:19 201:2
fighting  92:21
  203:13,21
fights  125:4
  191:23 192:1,
  9,14 207:7,8
figure  154:11
figured  94:4
figures  155:22
  156:7
file  151:14
  152:8
filed  25:19,22
  113:4
filing  25:20
  26:3,12
filled  53:3
fills  134:21
final  101:24
  191:10
financial  24:6
  54:23
find  12:10,17
  98:17 103:15,
  16 105:7
  171:14,17
  189:2
Fine  125:19
finest  213:11
fingerprints
  49:4
fire  151:19
  193:11,13
  194:7 199:17,
  20 200:2,10
  201:2
firearm  17:20
  36:13 38:7,12
  41:12,15,19
  42:5,14 43:8,
  12,13 44:5
  50:2 69:17
  102:25 106:2
  122:23 124:18
  130:14,18
  135:16 137:10
  138:8 139:11
  142:7 147:1
  148:14,17
  154:2 158:8

162:16 167:22
  168:17 169:19,
  23 170:1,4
  171:3,11,24
  172:20 173:7,
  9,22 174:9,14,
  19 175:9,10,17
  181:6 183:19
  187:10,17
  191:16 194:12
  197:23 210:6,7
  212:23,25
  213:7,11,14
firearm-related
  86:23
firearms  19:15
  20:5 21:2
  29:11 35:18
  36:4,20,23
  37:9,21 38:6,
  16 39:7,13
  40:23 41:1,8,
  15 42:16 45:13
  46:12,17,18,21
  47:8,13 53:15
  54:10 55:10
  58:24 72:19,21
  74:9 86:22
  88:4,6,12,14
  92:9,17 93:17
  95:2,23 97:2
  98:8,23 99:9,
  20,25 104:10
  106:18 107:3
  110:24 115:4,
  15,22,25 117:4
  118:12 122:8
  127:1 129:8
  130:15,17,22
  132:8 135:2,5,
  20 136:4,21
  137:3,8
  138:15,17,23
  141:12,22
  142:8 143:21
  144:4,7 145:20
  148:19 149:14,
  22 150:9
  151:4,8
  154:18,21
  155:8,18,23
  156:2,12 163:4
  164:8,10,13,17
  167:15 172:18

173:17,18
  174:1 175:2,5
  180:6,8 181:3,
  15,16 185:6
  192:2 194:4
  208:10 209:9
firearms-related
  68:22 116:2,13
fired  108:8
  166:21 188:7,
  8,21 193:6
  194:25 199:23
  200:19 203:1
  206:18 207:3,
  5,6,10,13
firing  89:18
  193:9
firm  82:25
  109:15 112:1
  113:14 123:21
fit  72:13 108:5
five-shot
  187:23
fix  47:24
fixed  85:8
  140:24
flashlight
  176:25 181:8
  183:10 203:12,
  15,19
Flaws  102:2
flintlock
  136:13,19
  137:3
flip  171:11
floor  95:16
Florida  19:24
flows  105:10
fly  77:16
FN  145:8 179:1
focus  87:23
  88:9 89:9
  90:23 116:19,
  25 117:10,18,
  22,25 182:15
  211:12
focused  70:12
focusing  158:14
  210:9 213:20
folks  52:1
  60:10 101:5

158:9 159:16
  160:10 173:19
  174:16 190:4
  194:23
Folsom  69:18,
  21,22,23 70:2
foot  51:18,21,
  22 202:13
footnote  155:25
  156:11
forces  45:6
  134:1 197:3
Ford  211:7
foreign  156:15
forensic  45:23
  47:18,21 48:1,
  15 49:14
  114:9,20 189:2
  194:23 209:13,
  15,20
forensics
  125:10
forget  45:4
  129:6 199:25
  200:1
form  9:20 24:9
  61:1,8 62:23,
  24 69:8,10
  110:7,8 196:10
format  110:9
formats  110:15
formed  50:4
  58:10
forming  29:2
  126:20 206:24
fortunate
  202:22
fought  200:22
found  12:13
  107:5 206:18
foundation
  57:23 59:18,25
  60:2,5,6,14,22
  61:19 62:2,4,
  11 63:19 64:4
  65:4,14,17
  66:14 67:1
  68:11,16
  126:4,5,10,14
  127:13,17,20
  128:9,10,13

EXHIBIT HELSLEY - 4 Page 71

founding  58:11
Fourth  101:12
fraction  165:17
frame  134:17
frames  134:11,
  23
Fred  208:2
free  56:7
freeze  187:5
French  103:9
frequency  209:1
frequent  149:5
  192:1,13,17
  196:18,23
frequently
  19:14 53:3
  125:6 169:12
  175:22,24
  176:5 185:6
  195:6
Fresno  30:23
  31:19,21 32:2
  39:22,25
  44:10,11,13
  109:10
friend  67:22
  68:1,8
friendly  200:10
  201:2
friends  53:3
fringe  103:22
Froman  71:14,
  16,20,25 72:25
  77:6
front  121:21
  203:1,3,12
full  13:8 64:22
  158:23 188:4
  195:16 208:5
fully  144:23
fun  24:14
function  40:7
  178:14 179:8
functioning
  178:20,23
  179:7
functions  60:8
funds  48:7
  60:7,8,12,22
  99:23 152:13

future  12:25
Fyock  112:23
  113:3,12
  114:2,8,24
  115:10

---

**G**

galore  99:6
game  105:4
Gates  50:12
  98:12
gather  172:23
  173:3 175:18
gave  38:15,17
  109:2 198:22
  203:7
gee  96:7
general  6:14,17
  15:1 19:17
  38:7 47:22
  50:1 58:7
  103:17,23
  107:13,16,23
  108:4 183:19
  208:14
General's  6:15
generally  7:10
  13:14 48:9
  55:19 92:17
  100:16 124:13
  125:17 130:17
  150:17 169:17
  173:16,22
  174:13 179:24
  187:5 193:16
  194:20
generation
  153:1
generations
  184:23 185:24
German  69:2
Germans  150:13
Girandoni
  139:12 140:6,
  10,14
Girls  87:6,17,
  20 88:2,11
give  10:24 11:9
  102:24 103:2
  105:11 111:22
  190:7

giving  11:3,7
glass  206:20
Glock  118:8,14
  119:13 154:12
  157:16 161:2,
  7,11 177:1,21
  178:18
Glocks  158:23
glove  168:17
glowing  110:22
good  6:13 7:13
  13:4 19:19
  41:19 72:12
  105:8 147:20
  164:22 177:24
  179:4
government
  93:10,15,16,21
  96:17 99:9
government's
  95:1,3
governor
  152:14,15
grade  33:17
graduate  32:9,
  11,17 33:13,
  19,21
graduated  31:18
  33:14
grand  87:3,12,
  13,21 201:22
grandfathered
  160:13 167:8
  184:4
grant  60:11,20,
  24
grants  152:10
great  98:25
greater  13:22
  91:16
ground  7:15
  179:4 199:5
grounds  54:4
  56:5,16,19
  59:22 76:1,9
  119:1
group  39:6
  50:14 52:18
  69:22 97:24
  98:11

groups  36:22
  50:10
growing  82:13
grown  58:22
guess  9:3 28:21
  52:23 60:16
  78:7 131:9
  139:7 192:23
guessing  54:20
gun  29:17,21
  69:2 70:18
  74:14,24 75:3,
  4 87:5,6,12,
  15,16,19,20
  88:1,2,11
  89:20,23 91:19
  92:13,23 93:5,
  24 94:6,19
  95:12,17
  97:18,23 99:15
  100:8 102:1
  103:3,9,15,19
  104:6,11,21
  105:19,24
  106:5,7 125:4,
  8 133:19 140:1
  147:7 149:24
  152:5,11,16
  158:18,22
  168:5 169:4,10
  171:21 174:16
  178:1 182:4
  188:10,19
  191:23 192:1,
  9,11,12,14,19
  193:13 194:10
  199:10,15
  200:19 202:2
  203:1 207:7,8
  212:14
guns  38:19
  87:5,9,18,22
  88:3 89:17
  94:5,9,15,21
  96:2,5,11
  98:18 102:14,
  15,20 103:18
  104:5 138:20
  148:9 162:24,
  25 163:22,23
  168:3,15
  190:25 193:10,
  11 194:7

EXHIBIT HELSLEY - 4 Page 72

209:10 211:16
**gunshot** 195:23
197:9,15,19,21
**guy** 103:2,3
105:11 107:25
164:25 187:5
194:8 199:14
203:1,2,8,12,
14,15,20 207:5
212:13
**guys** 102:13,14,
15,19,22
103:17,24
104:5 191:5
194:8

---

**H**

**H&k** 117:2
**Haines** 95:12
**half** 198:11
**hall** 51:16
**hallucinogens**
35:15
**hand** 59:12
95:12 125:8
152:11 176:25
177:1
**handcuffs**
171:21
**handgun** 93:23
100:18,23,25
101:5,17,20
109:14 147:22
159:11 169:21
182:2 213:8
**handguns** 36:13,
15 59:15 93:11
94:1 101:7
132:18 137:25
145:7 165:23
166:3 171:15
178:17 209:22
210:4 211:17
**hands-on** 59:14
**happen** 106:3
**happened** 177:6
**happy** 23:19
**hard** 147:17
171:20 186:8
**harder** 162:20

**Harris** 105:16
**hat** 70:13
**head** 8:23,24
82:10 202:3
212:14
**headings** 123:9
**health** 35:13
**healthy** 19:19
**hear** 125:6
188:23
**heard** 19:10
154:12 171:4
177:7 209:19
**hearing** 95:7
96:1 193:19
**hearings** 45:22
**hears** 176:22
**Heckler** 134:7
**held** 24:1 36:7
43:25 46:18
56:10 58:15
121:15 149:25
**helped** 109:22
153:2,4 154:6
**Helsley** 6:5,13
11:18 25:10
30:21 61:21
62:21 78:22
113:1,8 115:16
121:19 191:16
**Hemingway's**
38:18 87:5,9,
17,21
**Henry** 141:9,25
142:1
**hero** 109:23
110:18
**heroin** 198:11,
21
**high** 42:8,9,20
105:3 130:25
131:11 146:15,
16,20 147:5,9,
11,15 148:5
178:17 205:5
**high-visibility**
208:24
**higher** 152:4,7
**highly** 61:13
**hire** 40:6 72:10

**hired** 41:3
43:22 82:9
**hires** 37:24
42:11
**hiring** 152:16
**historian** 82:25
**historical**
122:7 127:14
130:5
**history** 39:20
111:4 124:6
129:5,8 135:1
148:19 165:18
196:3 197:7
**hit** 197:13
200:12 203:10,
14,16,18
**hits** 179:4
195:14
**hold** 43:5 117:8
136:19 137:8
143:6 159:19
161:8 162:2
171:2
**holder** 162:1
**holding** 122:9
124:19 135:16
136:5,22
140:25 151:4
191:17
**holds** 42:23
43:7 96:23
135:12 138:24,
25 162:15
187:17 197:23
**holes** 189:3
**holster** 144:15
**holsters** 171:9
**home** 105:8,13
172:21 173:10
174:1 175:2,5,
23 177:3 187:3
**homeowner**
161:25 172:3,
5,12,18,23
173:21 175:16
**homeowners**
172:15 173:2,
12 174:1,4
**homes** 172:20
**homicide** 21:8

**homicides** 45:13
189:11
**honorably** 120:1
**hope** 127:11
**horizon** 186:16
**hour** 83:23
**hours** 111:3
**house** 68:4,5
172:8 176:24
177:9 195:9
**housed** 73:16
**human** 110:24
125:9
**hundreds** 116:11
173:19 174:6
**hungry** 10:1
**hurt** 203:17
212:1
**husband** 71:21
**hypothetical**
103:5 106:11
182:8 185:4,
14,22 186:6
192:22 204:25
206:8 211:24
212:5,12

---

**I**

**idea** 7:13 13:4
80:7 91:7
95:20
**identified**
61:22 63:15
64:13 66:23
**identifies** 27:6
63:11
**identify** 90:10
98:8
**idling** 198:22
**ignition** 198:23
**II** 145:18,19
146:1,5,9
150:25
**illegal** 67:10
167:4
**imagine** 79:5
**immediately**
63:25 96:1
**impact** 122:25
186:3

impacted  212:24
implying  213:21
import  8:7
important  8:14
  170:12 177:14
  213:5
imported  146:16
impose  81:10
impractical
  140:11 161:3,5
impressed  96:20
impression
  193:10,18
  210:10 213:21,
  22 214:1
impressive
  33:18
imprimatur
  153:13
incapacitating
  124:20 191:18
incident  18:9
  165:2 198:4,7
  200:5 201:8
incidents  21:8,
  13,18 46:11
  115:7 198:2
inclined  86:7
include  17:14
  116:25 117:7
  156:7,15
included  98:11
  117:4,22 148:7
includes  88:25
  155:22 156:2,
  12
including  12:22
  122:13 146:6
  169:5
Income  61:2
  62:24
incoming  53:10
incomplete
  103:4 106:10
  182:8 185:3,
  13,21 186:5
  192:22 204:25
  206:8 211:24
  212:4,11
incorporated
  27:19 69:19

incorrect
  19:14,17
  64:14,21
increase  134:20
  162:4 184:17,
  25 185:18
increased  84:7,
  9 145:21,24
  153:2 154:7,17
increases  75:23
independent
  61:13
individual
  63:14 97:2,9
  141:6 195:20
individuals
  19:3,23 20:6,7
  161:15 168:4
  169:3,9,13,20
  195:13 200:2
  210:3
indoor  181:11
ineffective
  101:21
influenced  52:4
inform  99:9
informal  8:5
  198:12
information
  23:9 28:10,12
  29:10 49:16
  65:6 98:20
  105:9 106:2
  117:8 195:6
informed  105:24
infrequently
  193:12
inherently
  210:11 214:2
initial  96:15
initially  58:14
  96:14 133:19
  142:12 200:13,
  21 211:11
  212:22
injunction  18:3
  25:12,16 27:24
  28:6 113:2
injure  20:6,21
injured  21:15,
  19 198:5

injuries  200:9
insanity  211:2
inside  203:17
instance  38:10
  60:19 93:22
  103:8 117:1
  127:9,10
  132:17 145:17,
  25 148:18
  151:22 153:7
  158:22 161:2
  168:16 176:21,
  23 193:4
  204:10
instances  195:3
  206:25 207:9
instinct  183:7
Institute  82:10
institutions
  31:20 33:23
instruct  41:25
instructing
  112:8
instruction
  36:11,12 40:21
  58:20,21
  181:10
instructor
  37:21 46:22
  47:5,8,14
instructor's
  37:21
instructors
  47:2
instructs  9:22
integral  117:6
intend  125:23
intended  81:1
  145:9
intent  213:3
interested
  194:2
interests  74:1
interject  9:19
internal  144:23
introduced
  133:23 142:25
  144:1,4,7,13,
  23 147:5,14,15
  150:6,7 153:11

intruder  175:18
invasion  177:3
invasions
  175:23
invented  135:9
Investigation
  44:14 49:15
investigations
  40:19 44:18
investigative
  105:2
involve  21:13
  189:15 205:7
  206:3
involved  21:9
  22:4 29:11
  37:20 45:12,24
  46:17 49:19,22
  60:18 73:1
  80:9 88:12
  94:3 104:14,18
  115:8 128:16,
  17 194:9 198:3
  205:22 207:1,2
  208:25 211:7
involvement
  23:21 49:25
  67:1 107:7
  110:12 111:19
  112:22
involving  18:9
  45:13 46:12
  195:19
Ione  70:3
irrelevant
  72:16 73:5
  76:11,19 77:2
  184:22
IRS  61:1,8
issue  89:21
  147:22
issued  111:23
issues  38:12
  50:2 53:12
  99:20 110:24
  111:6 158:11
italicized
  168:5
item  61:21
items  122:14

---

**J**

**James** 107:3
143:3
**January** 15:17
50:19 77:24
**Javier** 6:16
**jewelry** 190:24
191:8
**Jim** 82:9,15
**job** 40:4 42:14
45:8 77:22
82:24,25 83:18
173:18
**Joe** 195:8
**John** 6:13 83:1
145:3 172:10
**join** 165:4
**joined** 63:22
64:25
**journal** 29:9
100:14 127:7
**journals** 86:23
147:18
**joy** 24:12
**judiciary** 95:9
**July** 51:8 92:2
**jumps** 150:24
**June** 19:21
22:8,13 25:23
26:1
**Junior** 35:5
**junky** 193:25
**justice** 21:5,8,
18 37:10,16
39:18 40:22
41:1 42:1 47:9
50:21 51:1,11,
14 53:18 56:22
70:21 106:22
107:1 108:23
129:24 189:10,
19

---

**K**

**Kamp** 50:1 52:18
53:1 97:25
**Kern** 199:8

**key** 48:2 61:12
63:5
**keys** 198:23
**kicked** 205:8
**kids** 58:21
**kill** 18:18
19:4,23 20:6,
21 109:22
**killed** 21:2,14,
19 189:23
190:3,5 195:24
197:10 209:22
**killings** 18:8
**kilo** 201:15
**kind** 22:22
38:14 181:10,
20 194:20
**kinds** 127:2
**knew** 43:22
72:19 95:15
98:22 202:7
**knock** 105:7
**knowable** 189:1
**knowledge** 66:8
141:11 146:19
**Koch** 134:8

---

**L**

**lab** 209:10,15
**laboratories**
48:3 98:2,6,
14,16 209:20
**laboratory**
47:23 48:7
**labs** 45:24 48:4
98:15,23
**lack** 58:12
183:5
**land** 69:25
**lapsed** 15:4
**lapsing** 15:5
**large** 6:20
13:15,20 14:5
15:1,12,15,16,
24 16:11,19
17:9,12,24
18:7,18,21
19:4,7,22
20:5,13,20
21:3,13,20

29:14,18,24
35:20 36:14
38:1,24 39:4,8
41:19,22 42:1,
19 43:13,20
46:15 70:3
81:13 87:24
88:4,17 89:9
90:23 91:12
96:15 102:23
103:2,13,19,
20,24 107:12
113:15 116:20
117:10 118:22,
25 119:15,16,
23 120:6,25
121:5 124:5,14
125:1,14
127:15,19
128:11 130:6,
22 132:1,12
133:23 134:13
135:1,11,19
143:8 144:13,
19 146:9
147:22 150:18
153:18 154:2
155:11,19
157:6 160:6,
12,20 161:15
165:10 166:4,
5,10,23 167:4,
7,23 170:3
178:7 183:17,
25 184:4,18,25
185:10,17,18
186:1 189:15
201:1 210:3
**larger** 116:12
133:20 149:16
150:17
**largest** 148:19
**Las** 20:7 100:13
**late** 26:19
71:21 99:1
136:1 150:12
**law** 8:8 15:25
20:21 21:1,11,
14,19 33:8
35:5,14 36:3
37:12 38:20,23
39:11,13 42:2,
13 45:8 48:16,

25 49:12 58:19
92:20 93:23
94:20,22 95:24
104:14,18
122:12,13,25
124:9 151:3,7,
11 152:9,25
153:20 154:5,
12 155:23
156:3,8,23
157:15 158:2
159:14,25
160:3 162:3
164:2,7,10
166:12 168:15
169:5,9 174:14
176:11,15
177:12 179:23
180:3,6,9,11,
14 181:17
183:19 184:12
185:9 192:19,
24 195:24
196:18 204:22
205:2,3,12,16
208:1
**lawn** 35:17
**laws** 104:22
**lawsuit** 6:18
13:5
**lawyer** 107:23
108:8
**lawyers** 50:6
**laying** 206:21
**LEA** 152:10
**lead** 47:3 48:6
50:2
**learn** 181:5
**learned** 127:3,
8,10,22
**learning** 128:16
**leave** 51:13
52:5 53:17
**Lee** 143:3
**left** 48:22
50:21 51:4,20
63:21 64:21
70:21 84:19
199:11 200:7,
17
**left-hand**
199:13

EXHIBIT HELSLEY - 4 Page 75

leg   51:20
 200:17
legal   13:17,23
 14:7 15:19
 16:13,22 26:6
 81:2 97:3,10
 120:7 121:6,10
 139:20 161:18
 167:10 170:9
 174:21
legally   95:23
legislation
 39:6 50:3 59:2
 74:3,10 105:25
legislative
 82:10 211:2
legislators
 81:23
legislature
 74:8,24 81:18,
 20 92:12
legs   199:11
 200:13
length   110:11
lengthy   79:6
lesson   37:4
level   45:11,17
 46:1 58:7
 105:1 209:2
lever   17:19
Lewis   139:10,11
 140:7
liaison   53:23
 67:6 71:9
 73:8,11,19,24
 74:12,22 75:5,
 11,18 76:8,15
 77:9,20,23
 79:23 80:20
 81:16 82:2,7,
 20 83:4
licensed   94:8
 168:3
lie   106:5
life   55:14,17,
 24 56:13 57:2,
 16 69:18
 148:23 187:1
light   88:15
limit   64:9
 178:11,13,16,
 21,25

limitation
 187:9
limitations
 122:25
limited   142:17,
 22 148:8
 173:22
limiting   124:9
 166:12
limits   124:10
 166:13
lines   66:22
 79:10 213:12
list   28:13,23
 61:11,18 63:4,
 9 88:21,25
 89:12 92:12
 94:6 98:18
 100:4 101:25
 105:18 106:24
 107:11 211:12
listed   12:9,15
 29:12 69:7,10
 89:8,14
literature
 172:17
lived   209:21
lives   172:8
living   75:22
load   43:5,6
loaded   43:8
 173:8 177:13
lobbied   81:23
lobby   74:8,23
 81:20
lobbyist   74:4
 80:7
local   21:10
 59:12 74:2
 104:13,18
 105:15 153:13
 181:11
located   32:15
location   38:18
lock   174:14
lodged   200:16
London   83:1
long   21:25
 32:25 54:2
 57:12 65:24
 73:8 83:8

85:15 94:19
 186:17 209:10
 211:16
long-term
 200:16
loophole   184:4
Lorenzoni
 136:11 137:4,
 20 138:3,11
Lorenzoni's
 136:19 138:13
Los   50:12 60:19
 98:12 108:6
 157:17 193:5
loss   94:6
lot   41:9 44:3
 82:22 106:5
 118:3 125:9
 128:14 141:9
 153:6,11,14
 179:19 187:20,
 22,25 194:7
 206:15
low   180:22
Luger   143:19,23
 147:25 148:4
Lugers   148:1
lunch   121:16
Lungren   52:10
 53:10
Lynch   53:6

---

**M**

M-1   145:25
M-A-T-E-E-N
 19:22
M-I-C-H-E-L
 66:2
M1   55:10
machine   88:3
 103:9
made   9:22 54:22
 78:14 79:11,
 16,21 80:13
 83:17 99:5
 107:14 111:10
 134:7,8,9
 137:23 138:9
 139:22 146:4
 148:25 153:15

191:1 198:16
 205:8
mag   149:19
 171:10
magazine   15:1,
 24 16:20 17:9,
 12,19,24 18:21
 42:20,23 43:7,
 25 55:21 96:23
 102:25 103:3,
 8,18 104:6
 107:15,18
 117:5 118:9,15
 122:25 124:9,
 18 130:11,13,
 15,18 131:2,3,
 5,15,22 132:2,
 9,12,13,18,23
 133:4,7,16,20,
 24 134:12,18,
 20,21 135:12
 138:25 139:14
 143:1,6,9,15
 144:24 145:20,
 23 146:25
 147:22,24
 149:13,20,21,
 23 150:14,19
 152:4,20
 153:19 154:3
 156:24 158:1,
 20 159:4,11,19
 160:21 161:12,
 16,17 162:14,
 22 166:13
 167:15,23
 170:3 173:22
 175:14 177:2
 178:11,18,22
 179:2,4
 183:14,17
 186:2,15 187:9
 191:17 194:4
 197:23 199:12
 200:7 201:1
 204:4,8,13,15,
 19 208:13
 210:7,12,18,22
 211:22 212:9,
 18,22 213:4
 214:3
magazines   6:21
 13:15,21 14:5
 15:12,16,17

16:11 18:7,18
19:4,7,23
20:6,13,20
21:3,14,20
29:14,19,24
35:21 36:15
38:2,25 39:5,8
41:20,22 42:2,
9,19 43:13,21
46:15,18 56:11
81:13 87:24
88:2,4,18 89:9
90:24 91:3,5,
13 96:16,19
97:9 102:23
103:14,20,25
113:15 116:20
117:3,5,8,11
118:22,25
119:13,15,16,
23 120:6,18
121:1,5 122:8,
23 124:5,14
125:1,14
127:15,19
128:12 130:6,
17,22 134:14,
15 135:1,19
140:25 141:13
143:12,16,25
144:13,20
146:2,10 147:7
148:5 149:16
153:18 155:11,
20 157:6
158:8,24
159:3,9,21,24
160:6,12 161:8
165:10 166:4,
6,11,23 167:4,
8 168:6 169:4,
11,13,18,23,25
170:7 171:3,
10,18,24
172:24 173:3
174:10,20
175:9 178:6,8
181:9 184:1,5,
18,25 185:10,
17,19 189:15
194:19 210:3
**mails** 22:9
**main** 50:11
117:23

**maintain** 65:13
**major** 48:3
**majority** 27:18
29:9
**make** 7:16 9:19
10:9,13 105:1
125:12 157:12
161:7 182:15
183:8 198:18
201:11 206:14
**makes** 54:16
96:25
**making** 40:19
99:5
**Malik** 18:17
19:3
**manage** 44:18
45:8 48:5
101:5
**management**
37:19 41:2
47:23 52:25
53:1
**managers** 33:8
60:17
**managing** 105:17
**Mancell** 64:21
**manner** 181:16
**manufacture**
13:14 15:15
81:13 171:2
**manufactured**
156:12
**manufacturers**
93:25
**March** 71:4
84:22 85:2
**mark** 30:15
60:25 62:16
69:17 78:17
82:14 91:17
100:4 101:25
109:18 112:25
132:20 139:24
154:25 196:5
207:15
**marked** 6:9
30:17,19 39:19
54:9 61:4
62:19 78:20
86:20 91:20
100:6 102:3

104:8 109:20
113:6,22
119:10 121:20
140:3 155:3
157:3 196:7
207:18
**market** 94:6
134:11,14,22
153:3 154:7
155:11 157:15
165:15
**marketing**
145:17 146:22,
25 147:19
**marks** 102:16
**marksmanship**
55:8 58:12,13,
19 182:6,10
**married** 152:4
**marry** 213:13
**Mars** 143:19
**mass** 18:8
**massive** 211:19
**master** 35:23
**master's** 129:23
**masterpiece**
111:4
**matches** 59:12,
14
**Mateen** 19:22
**material** 117:16
**materials** 12:20
23:11
**math** 75:20
76:21 85:5,19
**matter** 113:22
152:14 162:17
**matters** 109:1
112:13,18
**Mauser** 148:20
**Mausers** 148:21
**meaning** 136:14
150:7 162:7
168:8
**meaningful**
186:3,9
**meaningfully**
183:13,16
185:1
**means** 117:22
136:15 170:25

**meant** 48:10
52:14 93:20
128:25 211:5
**measurable**
92:23 93:6
**measure** 93:5
**measures** 74:14,
25 75:4 106:8,
9
**media** 74:3
**medical** 11:2
52:1
**medication** 11:6
**meet** 24:23 25:1
67:5 77:16
80:6 98:8
**meeting** 56:9
58:15 65:11
77:18
**meetings** 65:10
**member** 54:2,11,
12,24 55:5,14,
17,18,19,23,24
56:4,13,18,24
57:2,7,9,12,
16,21 68:18,22
69:18 70:5,15
114:8,14,19,22
197:3 208:20
**members** 50:13
58:11 74:7,24
81:20 181:15
194:15
**membership**
55:20,22 60:7
**memo** 213:18
**memorandum**
207:16,21,23,
25 208:4,21
210:8
**memory** 41:19
64:23 183:5
211:18
**mentioned** 89:18
132:25
**Merced** 35:5
**mere** 194:11
**merits** 60:23
**messages** 12:22
**met** 201:13

metal  103:1
  186:14
metallic  142:1,
  7
methodology
  172:11
Michael  195:20
  197:14
Michel  65:22,24
  66:1,6,22
  67:5,16,20,23,
  25 109:15
  110:10,18
  111:3,22 112:1
  113:14 123:21
Michele  136:11
mid  26:19
  146:15 147:6,
  19
middle  94:24
midst  211:1
Midway  48:7
militaries
  140:15 142:9
  156:16
military  39:15
  55:10 58:20
  133:25 139:22
  140:11 141:5,
  19,22 144:5
  145:1,9,12
  148:14,17,21,
  23,25 149:5,6
  150:13 156:2
  181:17
militias  141:6
millimeter
  131:11,14
million  146:4
  208:6
millions  156:23
  157:25 159:3,8
mind  22:3 137:6
  168:25 182:15
  186:24 212:23
mine  71:22
  206:17
minute  92:5
  179:17
minutes  65:11
mischaracterized
  95:21

missed  166:22
  203:1
misses  125:5
mission  58:1
  59:4 78:5
misstates  43:15
  64:17 73:4
  75:7 76:19,25
  79:24 95:4
  99:11 104:1
  126:16 128:22
  135:23 137:13
  140:16 142:10
  155:13 164:19
  165:20 173:4
  205:18 211:23
  213:2
mix  213:5
Mm-hmm  6:24
  22:10 27:22
  29:22 66:21
  105:14 108:2
  109:4 120:21
  122:5 124:7
  130:9 158:4
  175:25 195:18
model  41:17
  42:7,21 132:16
  133:6,14,22
  144:23
models  133:1
  134:9
modern  143:1
modified  137:19
  138:2,10,12
modify  160:20
Monday  6:2
monetary  68:13
money  55:3
  83:23 84:6
  198:20
Monica  31:24
Monies  152:17
month  84:1,2,16
  85:3,10 86:2,4
  93:12 194:3
monthly  84:9,
  13,17,23 85:8,
  12,15
months  22:6,12
  164:22

mood  160:18
morning  6:13
  12:3 80:23
  90:2 91:8
  140:2 187:22
  209:7
morphed  58:19
Moscow  78:7
motion  25:11,16
  27:24 28:7
  113:2
move  11:13
  69:24 137:19
  139:10 150:3
  165:7 191:9
  198:2
moves  140:23
moving  44:7
  50:3 100:3
  101:24 166:9
multiple  111:5
  159:2,8 166:20
  171:14,17
  174:10,20
  195:14
municipal
  113:14
muscle  183:5
museum  138:15,
  18,20
must-have  92:20

N

named  195:20
nanny  93:10,16,
  20 96:17
narcotic  37:10
  40:3,12 44:14,
  22 45:3,20
  47:13,17 49:15
  205:6
narcotics  35:15
narrative
  170:18
National  32:12,
  13,18,19,23,25
  33:3,4,6,15,20
  53:23 54:3,17,
  24 55:5 56:4,
  24 58:1,8,25

59:5 71:10,25
  72:7,9,13
  73:9,12,19,24
  74:4,8,13,23
  75:5,12,14
  76:7,23 77:8
  78:14 79:15,21
  80:13,20 81:17
  82:2,8 83:4,5,
  9,12,22 85:11,
  21,23 86:6,10,
  13 138:15,17
  181:14 208:6,
  11,20
Nationale
  144:22
naturally
  182:13 183:3
nature  13:5
  110:11 111:5
  122:2
nearby  175:9
  198:25
necessarily
  72:10 155:19
needed  47:4
  210:3
negotiating
  198:9
Nelson  71:21
Network  49:16
Nevada  20:7
  69:7 100:18
news  19:10,12,
  14 20:1,10,19
  21:1 158:7
  188:23 192:7
  193:19,22,24,
  25 194:19,20
newspaper
  188:22 193:8,
  18
night  175:17
  176:21 178:4
  201:16 202:8
nightclub  19:24
nine-shot
  187:11
nodding  8:23
nondetachable
  149:24

nonverbal 8:22
North 31:24
Northern 113:4
northwest 73:15
note 153:9
notice 11:17
 111:22 187:18
noting 188:5
notion 214:4
notwithstanding
 201:2
November 16:6
NRA 54:10,12
 55:13 58:14
 59:10 67:6
 71:4,15 77:17,
 19 83:15,19,25
 84:14 85:17
 181:16 182:1
 194:3,10,15
 195:2
NRA's 138:14,17
number 30:22
 31:25 41:18
 61:21 64:9,11
 91:18 95:8
 97:2,9 103:12
 115:22 117:17
 120:18 125:5
 145:7 159:23
 177:18 178:24
 180:23 181:1
 188:8,20
 193:4,6,10
 197:13,21
numbers 192:25
 193:3,20

O

O'MALLEY 77:15
oath 7:18,22
 8:6,7
object 151:15
objected 141:19
objecting
 100:21
objection 9:22
 13:17,23 14:7
 15:19 16:2,13,
 22 18:11,20

19:6,25 20:8,
15,22 21:21
23:5,15 24:11
26:5 29:4,15
43:15 54:4
56:5,16,19
58:2 59:6,22
64:17 65:5
72:14 73:3
74:15,17 75:1,
7 76:1,9,17,25
77:10 79:24
81:2 86:15
87:25 89:10
95:4 97:3,10
99:11 103:4
104:1,23
105:21 106:10
112:5,6 115:17
116:21 117:12,
20 119:1 120:7
121:6,10
126:7,16
128:4,22 129:4
133:8,11
135:22 136:7,
24 137:12
139:2,19
140:16 142:10
144:10 146:12,
21 147:2 151:9
155:13 156:17
160:23 161:18
163:8,16
164:3,19
165:12,20
166:25 167:10,
17 169:15
170:9,17 173:4
174:11,21
176:1 179:14
181:22 182:7
184:7,14,20
185:3,13,21
186:5 192:3,
15,21 194:17
195:4 196:19,
24 201:5
204:24 205:18
206:7 211:23
212:4,11 213:2
objections 9:19
objective 98:20
141:24

observation
 173:24,25
observations
 173:7
observe 173:12
observed 173:13
observing 154:9
 157:16
obtain 48:6
obtained 32:2
obtaining
 185:20
occasion 45:12
 46:4,5 189:11
occur 125:5
 175:23 176:7
 182:13 183:3
 191:5
occurred 22:9
 99:4 147:19
occurrence
 192:1,13
 196:18,23
occurs 206:15
October 20:4
 27:13
off-duty 176:14
 177:11
offensive 93:9
 164:9,11,13,
 17,24 165:4,5
offer 77:22
 78:2,4,15
 79:12,16,21
 80:5,14,16
 86:8 94:13
 124:1 125:23
offered 77:19,
 25
offers 86:6
office 6:15
 18:18 19:5
 39:22 40:1,10
 44:10,11,12,15
 63:15 64:13
 162:3,4
officer 21:9
 52:3 66:13,15
 105:16 120:2
 157:19 158:10
 171:25 189:23
 191:1 192:19

199:23 207:10
officer-involved
 189:12 190:9
officers 21:2
 61:12,19 63:4
 65:20 128:15,
 19 171:14,20
 176:11,14
 177:12 193:11,
 13 205:10
offices 45:5
officially 51:8
officials
 77:17,19
Oildale 198:10
Olympic 96:7
Omar 19:21
omitted 188:9,
 13,16,21
on-the-range
 37:3
one-week 36:8,
 10
online 45:7
 48:8
op-ed 91:18,24
 92:4 100:3,7,
 11,22 101:24
 102:1,7,10
 104:8,13
op-eds 90:16
 105:18
opening 92:10
operate 42:23
 43:8 175:12
 181:5
operation 36:20
 38:1,5
opinion 14:15,
 18,19,23 15:23
 90:11 91:15
 94:11 98:22
 104:17 122:7,
 19,22 124:8,
 18,24,25
 125:13,14
 128:11 130:4,
 7,12 140:23
 165:7,10 166:9
 173:2 175:22
 177:23 178:10,
 21 179:9,12

181:21 182:18
186:18 191:11
192:10,23
204:21 210:2,
17 211:20
212:3 213:6,25
**opinions** 28:16
29:2 59:1
122:3,16
123:4,7,13,14,
24 124:1
125:18,21,24
126:3,4,6,20
127:18 128:9
129:11 206:25
**opportunity**
10:14 11:16
**oppose** 14:12
**opposed** 75:4
81:22,24 139:9
154:10 211:17
**opposition**
81:21
**order** 201:12
**ordinance**
113:14,19
**organization**
58:22 61:2
62:24 70:11
**organizational**
53:12
**organizations**
68:23,25 71:7
**Organized** 49:17
**original** 107:11
**originally**
64:25 108:3
143:18
**Orlando** 19:24
**ounce** 198:10
**outgrowth** 81:5
141:25
**owned** 70:2
**owner** 190:24
**Owner's** 91:19
**owners** 92:23
**owns** 115:25

---

**P**

---

**P-35** 127:9
131:8 144:23
146:6,15 152:5
**P-38** 150:6,12,
21 152:1
**P-L-A-T-T**
195:20
**p.m.** 214:18
**pack** 169:17
**Paddock** 20:5,13
**pages** 28:24
29:20 79:7
89:14
**paid** 84:1,2
152:16
**pain** 200:21
**pants** 200:8
**paper** 194:24
**paperwork** 46:9
**paragraph** 86:21
87:2 92:11,19
93:9 97:16
101:4,12
111:14 114:7
119:11 123:5
126:2 135:2
150:4,25 172:2
187:13 188:4
195:16,17
208:5,23 210:8
**paralysis**
200:6,17
**paralyzed** 51:20
199:12
**pardon** 25:11
87:13 138:11
147:9 209:12
**Parents** 87:6,
16,19
**Paris** 143:3
**Parker** 30:22
78:10 79:2
91:1,9 109:2,
3,6,11 110:12,
17
**part** 16:9 43:2
52:19 53:9
63:4 64:1

75:23 89:24,25
95:17 103:13
117:16 120:24
122:19 127:3
136:2 157:4,9
183:18 184:10
195:7 206:14
**participate**
65:20 180:8
198:13
**participated**
30:18 33:4
**participates**
181:20
**partner** 201:17,
23
**partner's**
201:20
**party** 18:19
19:5
**pass** 96:8,12
**passed** 16:7
39:7 60:8
**past** 53:22
92:11 166:7
187:1
**patent** 143:4
**Patrick** 77:14
**patriot** 111:12,
17
**patriots** 111:10
**patrol** 191:1
205:3
**pause** 92:7
**pay** 75:23
**payment** 83:24
84:9,13,18,23
85:16,20
**pays** 55:20,22
**peace** 52:2
120:2 128:15,
19 157:19
158:10
**peer** 90:4,7
**Penal** 6:19
16:10,19 17:1,
9 97:1,8
118:23 119:22
120:4 121:3
160:17 161:14
174:19

**penalties** 8:11
**penalty** 7:19
**people** 16:17
18:18 19:4
37:24 39:12
42:7 53:2,8
59:13 63:21
94:21 95:19,23
127:23 128:15
153:11 159:21
162:19 163:4
168:15,17
173:7,14,17
174:6 180:17
183:19,21
187:20,25
188:1 189:24
190:2 195:8
209:22 211:6
213:10
**Perata** 81:6,7
96:18
**percent** 154:12
**percentage**
138:24 141:12,
14,16 172:20
180:17,19,22
205:6
**perform** 181:6
**period** 41:4
142:15 187:4
**perjury** 7:19
8:11
**permanently**
17:16 160:20
**permissible**
178:11
**permit** 162:1
**PERS** 51:8
**person** 37:23
41:9 68:3
94:18 166:20
169:14 171:22
172:8 176:16
181:25 204:13,
19 212:23
**personal** 125:11
158:8 173:6
191:24 206:25
**personally**
21:18 177:20
198:2

personnel  20:21
  21:14,19 37:13
  38:21 40:22
  41:1 42:1,13
  159:15 164:2,7
  179:23 180:4,
  6,15
perspective
  79:18 96:13
  122:18 123:16
  152:7 208:15
phenomenon
  195:13
Philadelphia
  139:22
phone  121:14
  194:1
photography
  82:22
phrase  126:23
  127:18 128:9
  130:11 153:4
  162:7 168:8
  172:4 181:21
phrased  129:6
physical  197:7
pick  201:24
picked  187:2
  202:1
picture  181:7
piece  69:25
pin  147:17
pistol  57:10,13
  69:2 117:2
  127:10 131:18,
  20 132:20
  133:19 134:8
  138:14 144:23
  145:1 149:13
  152:2 159:19
  162:1,21
  177:13 187:11
  210:12,17,22
  211:21 212:9,
  14,18 214:2
pistols  43:25
  96:8,19 117:3
  120:17 134:7,9
  137:24 143:12
  145:12 146:5
  150:5 152:18
  153:1,9,16,18

154:6,16
  156:24 157:6,
  25 159:4,23
  161:8
pitch  58:8
place  40:4
  100:24 177:2
  187:2 203:22
places  30:11
plain-clothes
  171:13,25
Plaintiff  57:19
Plaintiff's
  9:18 11:21
  13:5 24:23
  25:1,3,7,11,16
  26:13,25 30:2,
  5 122:6
Plaintiffs  6:18
  7:1,6 16:25
  27:7 86:14
  109:16 112:2
  113:13
plan  37:4 76:13
  201:17 202:6
planning  78:7
  214:5
plans  51:24
  52:8,11 160:16
plastic  103:1
  186:14
platform  213:11
Platt  195:20,23
  196:11 197:2,
  9,15
Played  109:23
pleased  86:14
  160:19
pleasure  52:15
pocket  200:8
point  33:17
  39:10 41:8
  72:20 99:4
  105:1 108:21
  125:8 162:9
  163:14 178:16
  182:3 187:9
  189:6 194:23
  206:14 208:13
pointing  95:13
Polanco  93:24
  95:10,17,19

96:9
Polanco's  95:8
police  36:7
  50:8,13 98:13,
  16 105:15
  152:6 153:13
  157:16,18
  161:10 162:25
  163:23 171:13,
  19 176:11
  189:23 190:12,
  19 193:1,5,11,
  13,20 194:22
  203:4 205:10
policies  53:15
policy  92:17
  99:9 198:12
political  58:21
  59:1 80:8
  208:15 209:9
Politics  89:17
polymer  161:6
popped  198:23
  202:25
popularity
  142:17,22
portions  15:3
  27:17
position  37:19
  40:2 44:24
  48:18 49:2
  52:14,16 62:1,
  13 63:11 71:13
  73:21 77:19
  78:1 79:22
  80:11 82:19
  107:17,22
  108:5 179:5
  183:11
positioned
  173:9
positions
  45:11,17 53:2,
  15
possess  41:22
  119:23 120:5,
  14,25 121:5
possessing
  16:17
possession
  12:20 14:5
  15:16 16:11,19

67:11 164:17
  183:25
possessions
  119:7
possibly  180:25
post  31:25 32:1
posters  51:17
potential  74:9
potentially
  184:17
pound  201:14
powder  43:3
  135:8
power  42:8,20
  130:25 131:11
  146:15,17,20
  147:5,9,12,15
  151:19
PP  150:11
PPK  150:6,11,
  15,18 152:1
PPK/S  118:14,15
practical
  136:13,14
  137:3 144:8,14
  171:14,17
  178:13,16,21,
  25 179:6
practice  58:17
  201:10 204:12
practices
  168:3,9,23,24,
  25 169:9
  171:24 172:18
  173:18,20
  175:2,5
praise  111:13
pre-marked
  11:14 25:10
  26:25
predate  89:5
preliminary
  18:3 25:12,16
  27:24 28:6
  80:16 113:2
preparation
  24:20 30:3
  111:20
prepare  10:8
  24:15,24 25:4,
  7

prepared 179:24
preparing 111:4
present 167:14
presents 189:5
president 66:12
press 95:21
  109:19 153:6,
  10
pressed 186:8
pressure 183:9
pretty 94:12
  135:10 147:20
  152:17 165:15
  203:17
prevail 86:14
  112:2
prevalence
  122:8 124:5
  127:15 130:5
  138:7 155:11
prevent 11:3,7
preventing
  170:7 174:19,
  25
previously
  97:24 184:13
price 184:18,25
  185:18
primarily 40:8
  67:19 74:2
  190:4 209:10
  211:16
primary 54:14
primer 43:3
principle 46:21
  47:8
prior 30:17
  31:25 42:4,13
  47:1 52:16
  158:22
privacy 54:4
  56:5,16,19
  59:22 76:1,9
  115:17,24
  119:1
private 77:11
  122:13 164:1
  176:11,14
  177:12 188:6
  190:10,11,17,
  21 192:13,20

privilege 23:8
problem 95:23
  179:3 183:18
  209:21 214:6
problems 52:2
  141:20 168:19
procedures 7:11
  10:19
process 17:5
processed
  194:23
produce 12:13,
  25
produced 90:1,
  25 91:8,9
  112:15 140:1
  143:4
producing 112:2
product 23:6
production
  148:9,19 156:1
products 171:8
professional
  36:22 39:20
  70:20
professionally
  68:7
professor 38:10
profiled 88:11,
  12
program 32:18
  45:6 55:7
  58:19 100:17
  102:1
prohibit 14:4
  15:16 16:10
  183:25
prohibited
  13:14 15:15
  16:16,20 163:5
project 60:20,
  21
promoted 37:18
  40:11
prone 179:2,3,5
  199:5
pronounced
  136:10
proper 36:3
proposal 48:11

proposed 59:2
  80:10 81:12
  98:3,13
  100:23,24
  209:7
proposing 98:9
proposition
  16:7,9,18
  103:17,24
  120:5,14
  183:25 184:11
  186:3
prosecute
  107:25
protect 15:25
  88:18 124:10
  162:24,25
  163:22,23
  166:14 167:2
  190:18
protected 65:6
  77:12
protection
  190:12
provide 8:2
  22:24 23:1,14
  25:9 26:24
  30:5 36:19
  37:12 40:21,25
  85:11 122:7,22
  125:20 130:21
  134:5 155:1
  175:1,4 178:24
  180:24 181:14
  191:23 209:17,
  18
provided 27:10
  37:5,15,17
  38:5 41:2 42:4
  50:5 76:24
providing 37:8
  111:6 122:17
  123:13 182:18
psychiatry
  182:24
psychological
  182:13,19
  183:3
psychology
  129:11,13,17
  130:1 182:22

public 70:3
  92:24 93:6
  163:1,24 168:4
publications
  31:9
published 87:8,
  9,14 88:22
  89:4 90:4
  91:12 92:1
  100:13 102:7
  110:4
publishes 194:3
pull 152:2
pulling 199:2
Pulse 19:23
purchase 55:9
  159:17 167:4
  198:10 201:12
purchased
  141:6,7 156:2
purchasers
  158:14
purchasing
  206:3
purposes
  164:11,14,18
  185:20
pursue 105:2
pursuing 34:15
push 48:3
  178:15
put 26:17
  94:20,22 101:4
  106:4 115:13
  177:2 183:10
  199:3 202:2
  209:1 211:10
putting 59:12

Q

qualification
  41:7
qualifications
  126:3
qualified 100:1
  102:24 108:14,
  24 109:2
qualify 128:21
  132:1 134:15
  181:20

Quantico 33:7
question 9:9,
10,12,14,23
10:4 14:1,10,
14 16:4,15
18:14 19:1,9
20:18,25 22:23
23:8,18 26:6,8
29:7 43:1,18
65:8 72:18
74:21 77:4
80:2 86:17
97:6 98:17
103:7 104:4
105:23 107:9
112:9 116:24
119:4 120:10,
12 126:9
127:21,25
128:3,7,24
133:10 135:25
137:15 139:6
155:16 161:21,
23 163:12
165:14 173:14
188:15 192:6
205:24
questions 6:22
7:21 8:1,16,
17,22 9:2,20,
21 10:19,22
101:4 111:6
123:19 214:10
quick 23:25
90:21 162:19,
20 191:12
quickly 7:14
94:4
quietly 202:21
quotation
102:15 110:14
quote 17:12
45:11,14 46:21
78:15 79:11
92:19 93:5,9
96:5,17 101:4
102:12 103:14,
19 110:23
111:3,9 119:12
120:17 130:10
140:9 149:1
156:1 182:12
187:7 209:8

quoted 110:11
quotes 93:11
187:19

_____

**R**

R-I-G 170:24
raining 202:8
range 29:23
35:23 36:12
45:13 58:16
60:12,19 69:23
70:3 176:8
178:17 181:11
rank 151:14
152:8
rational 97:17
99:14,19
raw 192:25
193:3,19
re-equip 48:3
reach 200:7
react 183:7
read 13:8 56:10
116:6,8 127:24
128:1 154:15
157:14 158:7,
18 176:4,7
188:22 193:8,
22,25 194:5
205:25 208:13
readers 88:17
91:12
readily 176:16
179:24
reading 9:13
28:4 127:5,23
128:13,15
193:18
real 106:2
171:21
realized 96:1,7
199:14 203:21
rear 200:8
206:21
reason 9:8
10:24 11:9
19:11 20:12
148:3 162:3
190:11 197:18

reasonable
208:18
reasons 19:16
122:12 184:3,
11
reassigned
47:20
rebranded
146:15,19
recall 26:15,20
30:1,8,10 31:1
46:18 54:18
56:9 63:20
64:6 66:15,17
67:3,12 75:22
77:15 78:10,
13,16,25 80:18
108:20 109:8
112:21,22
115:14 174:12
197:13 201:14
receive 32:22
75:14 76:6
85:15
received 32:6
33:17 60:11
68:13 86:5
receiver 134:16
receiving 24:6,
10 31:21 84:17
85:3
recently 189:7
recollection
9:4 46:15
62:18 63:22,25
66:19,25 67:7
79:15 84:15
87:14 90:24
109:12 113:16
119:9 189:17
211:15
reconsider
159:18
reconstructed
197:12
record 8:19
23:23 24:1,2
65:11 109:15
121:15,17
128:1 191:14
198:8 205:25

recorded 194:15
records 49:4
65:13 176:8
recreate 70:14
recruiting
51:17
Redding 105:7
reduce 138:7
reduction
186:18
refer 63:3 79:9
114:13 121:19
126:14 140:4
147:12 153:16
170:24 187:21
reference 148:3
referenced
88:16 97:24
149:12
references
28:23 29:13
referencing
143:16
referred 40:2
49:2
referring 42:9
45:18 52:9
69:11 72:22
87:2 92:16
120:22 126:6
127:14 128:10
131:10 149:8
153:17 159:3,
14 166:18
172:9 208:8
reflects 79:18
refresh 62:17
66:18,25 79:14
refuse 78:15
79:12,16,22
80:5
regime 104:11
registration
100:8,19,23
101:1,5,17,21
regulates 6:20
regulating
113:15
regulation
53:15

EXHIBIT HELSLEY - 4 Page 83

regulations
  41:7
related  36:13
  38:19 41:9
  50:2 54:10
  68:7 88:12
  107:5 125:13
  181:17 191:10
relates  93:17
relating  38:15
  41:8 107:3
relationship
  26:17
release  109:19
relevance
  185:25
relevant  190:9
reliable
  136:15,17
  140:11 178:20
reliably  179:8
relics  103:23
relied  29:1,5
religion  38:11
reload  162:15
reloaded  162:16
reloading
  200:19
reluctance
  19:18
rely  76:21
  206:25
relying  157:12
remainder
  121:25
remained  40:5
  146:6
remember  22:7
  60:18 64:10,
  21,22,24 67:2
  79:18 95:6,7
  211:19
Remington
  142:25 143:4
remove  161:15
renamed  146:23
renewed  86:5
reorganization
  40:3
repeat  66:3
  137:15 205:23

repeatedly  99:5
repeating
  136:13,19
  137:3 141:9
rephrase  9:10
  22:23 26:7
  74:20 126:8
  137:15 138:11
  144:12 147:10
  150:3 170:19
replace  44:4,5
  82:5
replaced  51:23
report  24:18
  26:4 27:10,12,
  23 28:7 29:3
  30:3,6,7 45:10
  53:21 86:20
  88:21 100:4
  101:25 105:19
  113:21 114:4,
  13 115:5,12
  119:10 120:16
  121:20,21
  122:1 123:25
  126:1,3 129:2
  130:8 145:12
  147:8 148:4
  150:24 154:19,
  24 155:1,5,7,
  10,19,22
  156:1,7,12,22
  157:3,5 187:8
  188:23 193:5
  197:11,14
  200:20 201:9
reported  20:11
  176:6 194:18
  195:2
reporter  7:25
  8:18,21 10:8
  28:3 66:1
  112:10 214:12,
  15
reporters  108:6
reporting
  188:25 189:5
reports  19:10,
  12,14,17 20:1,
  19 21:1 46:7,
  11,14 114:16
  157:14,24
  158:5,7,15,17,

18 189:11,15,
18 190:3,4
192:7 193:19,
22 194:10,25
represent  74:1
  113:13
representative
  204:22 205:15
  206:2,5
represented  7:3
  67:7
representing
  6:16
request  60:24
  208:2
requested  128:1
  205:25
requests  11:24
  12:4,7 13:1
  60:11,23 83:16
required  9:21
  34:21 36:9
  80:11 100:18
  105:2 151:13
  152:16 183:20
requires  93:25
requiring
  195:13
research  99:9,
  24 126:18
  128:20
respect  68:3
respond  19:13
  198:19 206:9
responded
  164:23 177:8,
  10
response  12:4,
  7,25 95:1
  102:24 123:21
  125:6
responses  8:22
  99:10
responsibilities
  39:25 40:16
  44:16 45:2
  47:25 48:24
  60:5 65:3
  73:23 83:14
responsible
  58:24

responsive
  12:19 127:12
restrict  97:1,8
restricted
  98:19 151:15
  161:11
restricting
  96:24
restriction
  178:19 186:2
restrictions
  15:2,12,14
  81:11,12 96:15
  183:14,17,22
restricts
  174:15
result  92:21
  94:15 95:25
  109:8 127:4
  156:22
results  97:18
  99:15 111:10
resume  30:16
  31:3,6,17
  39:19 50:24
  54:9
retain  52:15
retained  6:25
  25:25 26:3,6
retainer  84:4
retire  51:8
retired  37:16
  48:19,21,22
  120:2,24
  159:14
retirement
  51:6,16,17
  70:23 76:13,23
Return  61:1
  62:24
returned  26:18
revert  52:16
review  10:9
  11:16 21:8
  23:11 24:18
  27:3 45:12,21
  46:5,8,10
  60:23 79:1
  83:17 92:5
  100:13 172:17
  189:11,18

**reviewed** 11:24 21:10 60:10 90:5,7 188:20
**reviews** 21:12
**revision** 41:6
**revisions** 30:6
**revolver** 70:14 152:2,3 154:10 162:2,10,16,20 187:11,23
**revolvers** 96:2 142:16,21 151:12 152:18 153:8 154:16 158:25
**rifle** 53:23 54:3,17,25 55:6 56:4,24 57:9,13 58:1, 8,25 59:5 69:1 71:10,25 72:7, 9,13 73:9,12, 19,25 74:4,8, 13,23 75:5,12, 15 76:7,23 77:8 78:14 79:15,21 80:13,20 81:17 82:2,8 83:4,5, 9,12,22 85:11, 21,23 86:6,11, 13 136:14,19 137:4 138:11, 14 139:21 140:6 141:9 143:1 149:4,12 165:6 178:22, 25 181:14 208:6,11,20 210:11,19,21 211:21 212:7, 10,15,20 214:1
**rifles** 18:17,24 59:15 137:24, 25 138:2,3 140:24 165:23 166:5 210:9 211:13 213:20
**rig** 170:24 171:12
**Rigby** 83:1 87:3,11,13,20

**rights** 72:23 91:19 92:23
**rigs** 171:2,5
**rimfire** 142:2
**rip-off** 202:16
**road** 191:7
**robbers** 190:22, 23
**Roberti-roos** 50:6,15 81:9 98:1,10,18 107:19 183:22 208:3 211:3
**robust** 165:16
**role** 40:7 45:21 50:11 54:14 59:17,20 60:1, 18 66:16 73:15 107:12 109:24 164:24
**roles** 66:8,11
**rolled** 198:24
**roller** 87:4
**room** 8:6 38:14 95:9
**rotate** 139:8
**round** 118:20 151:24 195:10 197:22 199:4 200:11,12,14, 15 207:3,5
**rounds** 13:22 17:14,17 43:25 46:19 96:24 117:9 118:16 122:9,24 124:10,19 125:5 131:2,15 132:23 133:3,7 135:13,16 136:18,22 137:8 138:24 139:1 140:25 142:16,22 143:6 144:1 146:3,6 147:9, 12 149:25 150:1,17 151:5,13,18 152:22 153:25 156:25 158:1 159:5,12,20

161:11 162:15 166:13 167:16 177:18,21,22 178:3,15 179:9,12 187:17 188:7, 8,21 191:17 193:6 194:16, 25 195:2 197:24 199:10, 17,20,23 200:3,18 203:23 204:2 206:18 207:6, 10,13
**Roundup** 102:1
**rules** 7:15 41:7
**run** 53:4 70:2 179:3
**runs** 115:11
**rush** 214:15
**Russian** 34:8 86:23

---

**S**

**Sacramento** 6:1 34:1,6,9 41:4 70:1 92:1 102:7 105:6 176:8
**safe** 58:24 93:11 94:5 182:4
**safely** 89:21,23 181:6
**safety** 35:13 58:20 92:24 93:6 96:3 151:24 170:11 171:22 174:15
**salary** 75:14, 17,23,25 80:14,17
**sale** 13:14 15:15 81:13 94:13,19 147:23 153:15 158:19
**sales** 94:7 150:8 154:10, 13 155:23

156:8,22 158:16,21
**San** 18:19 19:5 32:16 40:10 41:4 56:10
**Sandra** 71:14, 16,19,24
**Santa** 31:24 107:4,22
**sat** 97:25
**Sauer** 134:8
**saved** 27:20
**scanning** 118:2 119:5
**scared** 194:8
**scenarios** 103:13 124:15
**scene** 189:25 194:24
**scenes** 45:24 190:2
**scholarly** 126:4,5,10,14 127:13,17,20 128:9,10,13
**scholarship** 127:14 128:21
**school** 32:9,11 105:4 181:2
**schooling** 32:5
**schools** 31:23 34:16,18 180:23
**science** 32:7
**Sciences** 114:9, 20
**scope** 58:3 59:7 72:15 73:4 76:2,10,18 77:1 122:3 160:24 163:9, 17 176:2 184:21
**Scouts** 181:18
**screwdrivers** 186:10,11
**scrum** 95:14
**search** 12:20 105:10,12 186:25

searching 12:19
98:7
seat 199:2
202:2 203:1,2,
3,12,14
Seattle 34:5
seconds 23:24
secretary 62:2,
7,9,11,13
63:15,18,23
64:2,15,25
65:3,13,17
section 6:20
13:5,6 16:10
17:11 18:4
28:23 29:13
61:11 122:1
123:8,12,15,25
124:17 125:2
161:15 168:1
170:6 183:24
184:12,16,24
185:9 186:2
190:9 191:10,
15
sections 123:9,
14,20
secures 175:13
security 105:3
select 43:12
122:14 154:2
selected 44:1
sell 94:5,9,13
171:2
semi-auto 43:24
152:18 153:9
162:21
semi-automatic
143:11 147:21
150:5 153:1,
16,17 154:6,16
156:24 157:6,
25 158:15
159:4 208:25
210:11,19,21
211:21 212:19
214:1
semi-autos
154:11
Senate 15:8,14
80:22,25 81:5,
12,17,21 95:7,

8 96:14 160:13
Senator 81:6
93:24 95:17
96:18
send 23:11
sense 7:16
96:25 105:11
177:17 207:4
208:14
sentence 45:15,
18 46:20 53:25
92:14 93:13,21
97:17,21 99:14
101:14,16
102:12 120:20
126:2,11
143:17 153:17
168:1 210:25
213:18,22
separate 123:4
September 38:17
100:14 115:2
sequence 62:14
63:20 211:15
serial 41:18
serve 64:9 73:8
83:8 213:16
served 39:15
44:24 48:18
50:4 52:14
59:21,24 66:8,
16 75:18 83:11
95:24 108:11
149:9 186:25
service 52:16
76:8 149:17
servicemen
149:9
services 45:23
47:18,21 48:1,
15 49:14
83:20,25
85:16,21 189:2
209:13
serving 205:8
session 37:3
sessions 37:25
set 29:2 123:24
201:16
sets 126:3
setting 8:6
103:22

seven-round
150:17 162:11
seven-year
82:14
shaking 8:23
share 157:15
shelves 118:2
sheriff 50:11
98:12 153:14
199:9 200:14
sheriff's 98:16
sheriffs 50:8
152:6
Sherman 50:12
98:11,25 99:1
shin 203:9,20
shock 186:21
shoot 37:24
125:7,8 179:2
182:1 191:3
192:11,12
shooter 203:2
212:25
Shooters 70:6,
8,16
shooting 18:9
21:12 45:21
46:6,7,8 59:12
60:19 69:19,
21,22 70:1,2,
12 71:22
164:21 165:2
179:1,3 181:6
182:9 188:2,7
189:22 190:3
192:25 194:9
205:15 206:6,
15,17,23 207:9
shootings 21:9
45:12 128:16
189:7,12
190:2,9,10
193:1,17
205:6,7 207:1,
4
shootouts
196:3,17,23
short 38:4
62:23
shortage 186:13
shortly 57:5

shorts 176:25
178:5
shot 44:3
164:24 166:21
188:2,24
189:24 190:4
195:9 199:6,9
203:2,3,6,8,
15,20
shotgun 182:2,9
211:7
shots 166:21
182:16 187:24
207:4
shoulder 171:9
shoulder-fired
145:20
showed 201:21
shown 152:5
shut 200:13
side 69:3,4,5
96:9 115:13
171:11 199:13
200:15
sidearm 157:21
sidearms 158:12
Sig 134:8
sight 181:6
sign 94:2
signal 198:18
significant
177:13,17,18,
22 179:10,12
180:25 186:18
significantly
158:25 162:2,8
Sigs 158:23
similar 110:14
112:2 113:21,
24
Simon 95:11,15
simple 190:10
simply 58:18
127:7 168:13
183:9 194:19
single 70:5,8,
14,15 96:2
134:18 153:24
175:8 187:18
site 44:20

sitting  79:20
  93:4 102:25
  114:5 164:16
  169:22 198:17
situation  177:5
situations
  124:11 166:15,
  17 183:6
  205:16 206:5,6
  207:2
six-round
  151:15
six-shot  187:11
size  54:18
  134:20 139:14
  143:15 178:11,
  22 212:22
  213:5 214:7
sizes  146:2
skeet  182:1
Skelly  45:21
skepticism
  19:19
skill  212:22,25
  213:3
skills  58:12
  201:12
SKS  107:14,17
sleep  174:20
slightly  209:2
small  43:24
  141:14,15
  148:9 165:17
  180:18 210:1
smaller  159:1
Smith  42:7,21
  134:9 195:8
Smiths  158:23
snail  147:24
so-and-so
  187:24 188:24
so-called  39:7
  92:9 94:16
  96:1 208:9
  209:23 214:6
social  174:7
socialized  68:4
Society  38:18
  69:4,5,6 70:6,
  8,16 114:15,22

sold  94:1,16,
  17,23 107:20
  108:1 143:4
  148:1 150:9
  157:7 158:2
soldier  162:4
somebody's
  105:7
sort  66:16
  112:17 123:16
  162:9 172:6
  174:15 179:18
  189:3,8
sorts  28:14
  59:15 134:8
  181:7 182:4
  194:2
sounds  78:16
space  73:16
span  123:8
spanning  28:24
spare  120:18
  159:24 168:5
  169:4,11,13,
  18,23,25 170:7
  171:3,10,24
  172:24 173:3
  175:9,14,18
  176:16 177:2
  199:12 200:7
  204:4,7,12,15,
  18
speak  8:15 25:6
  127:1 172:20
speaking  52:22
  134:22 173:25
speaks  172:6
special  21:11
  37:22 39:21,25
  40:9,14,17,20,
  21 41:11,12
  42:4,15 43:11,
  21 44:8,15,17
  45:12 105:5,12
  168:20 197:3
specific  19:16
  24:17 56:8,13
  83:16 111:6
  181:12
specifically
  22:7 60:18
  145:5 158:6

specifics  67:9,
  12
speculate  9:3
speculation
  16:2 18:11
  20:9,16,23
  21:22 26:6
  58:2 59:6
  64:18 72:14
  73:3 76:17
  77:1 86:15
  104:23 133:11
  139:2,19
  144:11 146:21
  147:2 151:9
  156:17 160:23
  161:19 163:9,
  17 164:4,20
  165:21 167:18
  169:15 170:18
  174:22 176:1
  181:23 184:14,
  20 185:4,14,23
  186:7 192:4,
  16,21 196:20,
  25 204:24
  205:20 206:7
  212:5,12
spelling  139:12
spending  121:24
spent  60:22
  111:3 198:14
spewing  203:22
spine  200:12,16
spleen  203:16
spoke  160:10
  209:6
spoken  38:22
  173:14,19
  174:4
sport  148:15
sporting  148:22
spot  78:2
spring  178:15
Springfield
  148:24 149:2,
  12,18,24
spun  199:4
squeeze  181:7
stack  134:12,
  17,18

stacks  153:24
staff  21:10
  35:14 41:9
  44:19 95:10,11
stamina  197:7
stand  191:8
standard
  130:11,13,15,
  18,22 131:3,5,
  14,22 133:4,7,
  16,24 134:15
  138:25 142:13
  148:22 149:21,
  23 150:14,18
  152:20 153:19
  155:19
standardization
  42:12
standards  96:12
  149:11
standing  95:10
staring  95:16
start  177:24
started  58:18
  151:14 165:15
  202:25
stash  159:21
state  6:21
  30:22 31:19,21
  32:2 34:1,9
  45:11 46:4
  53:22 58:14
  59:9,10,13,14
  69:1,7 71:9
  73:8,11,19,24
  74:2,12,22
  75:5,11,18
  76:8,15 77:8,
  20,23 78:11
  79:22 80:19
  81:16 82:2,7,
  20 83:4 86:20
  91:18 92:11
  94:16,18,24
  98:13,15
  109:6,11
  110:12,17
  114:8,14
  119:11 122:6
  134:2 136:10
  138:10,12
  140:9 150:4

156:11 157:9,
20,23 158:10
159:2,22
161:16,17
163:21 167:5
168:1,22
171:13 173:21
174:14 176:14
177:11 182:11
183:12 184:18
185:1,17
186:12,19,24
187:8 188:13,
16 190:8
191:16 198:1
212:23
**stated** 123:4
129:5 160:5
161:25
**statement** 101:9
111:2,20,23
112:2 126:6
145:24 147:13
154:8 157:2,
10,13,24
166:18 169:5
175:20 176:19
183:1 188:11
190:15 191:22
209:5
**states** 49:16
59:11 111:2,3
141:5,7 143:22
145:17 147:5,
14,23 148:1,24
150:10 151:11
154:13,22
155:9 156:1
180:25 186:12
**stating** 180:2,
13,21
**stationed** 73:14
**statistical**
209:2
**statistics**
209:25
**stats** 193:15
209:17
**statute** 13:8
15:5 94:12
120:13 167:9
170:13

**stay** 52:2
152:19
**stayed** 67:16
84:6
**staying** 162:5
**steady** 92:22
**step** 57:25
145:6
**Stephen** 6:5
11:17 20:5
25:10 30:21
113:1
**Steve** 61:21
**stirring** 208:3
**stock** 94:10
**Stockton** 36:7
**Stoeger** 148:2
**stolen** 185:5
**stood** 199:15
**stop** 70:15 82:7
164:24 165:3
191:1
**stopped** 166:21
**stopping** 82:20
125:9 204:18
**storage** 89:22
**store** 94:20
161:16 190:24
191:8
**Stored** 89:21,23
**stores** 158:19,
23
**stories** 193:8,
19
**storing** 174:13
175:2,5
**story** 117:4,6
123:18 195:7,
11
**strapped** 170:21
**street** 202:4,
16,17
**stress** 175:12
**strike** 150:3
167:25 198:1
**strong** 206:22
208:6
**struck** 158:20
187:2
**structured** 37:2

**struggling**
128:6
**stubs** 85:1
**student** 71:8
**students** 38:13
47:4
**studied** 172:25
**studies** 90:5,8
**study** 34:6
97:19 99:8,16,
21 126:18
209:10,17
**studying** 32:20
**stuff** 41:10
46:1 181:8
**subdivision**
17:15,17,18
**subject** 38:7
92:8
**subjected** 97:19
99:16,20 180:7
**submit** 93:25
**submitted** 27:24
112:19 113:2,
22 114:4,23
115:5
**submitting**
129:2,10
**subordinate**
71:22 201:23,
24 202:3,4,9,
23
**subordinate's**
202:18
**subscription**
55:20
**substance**
28:16,18
**substantial**
121:24
**substantially**
110:14 145:21
**successful**
109:9
**successfully**
167:22
**sucking** 150:13
**sudden** 198:15
203:21
**suffering** 11:2

**suggest** 30:6
175:10
**suggested** 39:9
47:1
**Sunnyvale**
112:23 113:3,
12
**superior** 30:23
109:9
**supervised**
40:18
**supervisor**
40:9,12,14,17,
21 41:12
**supplied** 112:16
133:19
**supply** 141:20
185:16
**support** 25:11,
16 27:24 28:6
50:5 74:14,24
99:2,8,23
106:8 108:9
113:1 154:17
157:24 191:22
196:1
**supported** 106:7
108:3
**Supporters**
187:8
**supportive**
14:24,25 15:5
105:19,24
**suppose** 69:8
161:1 178:13
186:11
**supposed** 60:22
174:16 198:19
206:16
**Supreme** 107:6
108:4,10
**surplus** 55:9
**surprise** 186:20
**surrender** 96:21
**surrendered**
199:16
**surrounded**
69:24
**surveillance**
198:16 199:7,
14 202:14,15,
21

survey  98:13
    172:25
surveys  172:14,
    19,22
susceptible
    182:12 183:2
suspect  138:22
    189:24 195:9
    198:9,14 209:1
suspects  190:5
    193:7
sustain  197:10
sustained  51:19
    195:23 197:15,
    19,22 200:10
    201:3
swell  211:9
switch  202:13
sworn  6:6 52:9
Syed  18:17 19:3
syncing  132:7
system  47:23
    48:7 100:20
    101:6,17,21
    106:3 202:11
    209:15
systems  49:4

            T

tactical  181:8
taillights
    191:2
taking  11:6
    17:5 39:11
talk  38:15,17
    39:1,2,5 72:4
    127:9 135:9
    202:14
talking  36:23
    95:20 128:15
    158:16,22
    171:19 173:17
    188:1 211:16
talks  36:22
    38:5,9,20,24
target  96:8
Tashfeen  18:17
    19:3
task  104:15

tasked  50:1
    98:6 107:13
    211:2
tasks  45:6
taught  35:1,7
    36:12 37:24
Tax  61:1,2,8
    62:24
teach  36:3,12
    41:5
team  40:18
    51:25 52:8,12
    105:6 199:7
team's  53:14
technical  35:14
    50:2,5 69:16
    88:6 103:21
    125:3
technically
    198:10
techniques
    35:13
teleconference
    67:3
teleconferences
    65:21
telephone  25:4,
    6 65:10,18,19
telling  123:18
temporarily
    18:3
temporary  200:6
tend  182:14
term  36:25 38:8
    118:23 136:14
    150:7 172:6
    192:9 209:24
terms  31:8
    104:20 106:5
    110:21 178:17
    197:12 206:15
test  96:8
testified  6:6
    33:9 38:4
    42:17 52:7
    70:4 79:15
    106:14,25
    171:23 189:9,
    14 206:1
testify  58:3
    59:8 72:15

73:5 76:2,10,
    18 77:2 79:20
    115:21 137:7
    160:25 163:10,
    18 176:2
    184:22
testifying
    78:13 132:12
testimony  8:19
    9:4 10:14,25
    11:3,7,10 23:1
    24:10 43:15
    47:1 64:16,18
    66:4 73:4 75:7
    76:19,25
    79:11,25 93:4
    95:5 97:14
    99:11 104:1
    107:2 111:7
    112:19 126:16
    128:22 129:10
    133:22 135:23
    137:13 140:14,
    16 142:10
    154:1 155:13
    164:16,19
    165:20 166:3
    169:22 173:4
    186:23 200:25
    205:19 211:23
    213:2
testing  94:1
tests  96:3
Texas  164:21
text  12:22
Theoretically
    162:17
theory  201:24
    211:11
thigh  200:15
    203:9,10
thing  27:21
    43:23 95:25
    158:20 178:23
    179:7 197:12
    209:6 211:10
    213:11
things  26:17
    28:15 35:16
    38:15,19 39:8
    49:5 59:15
    68:7 81:15
    82:21 88:13

95:13 103:15
    125:6 126:12
    127:2,8,11,22
    158:7,18 160:9
    177:7 181:7,10
    182:4 183:9
    185:5 189:1
    194:2 211:6
    213:16
thirsty  10:1
thought  51:25
    72:4,6 131:24
    177:10 179:17
    199:2 208:17
thoughts  145:10
thousand-yard
    58:16
thousands
    138:22,23
    141:20
threat  88:14
    124:20 166:22
    173:10 176:22
    182:14 183:4
    191:18 212:7
threatened
    162:13
threats  164:2
    204:22
threshold
    54:19,23 55:3
threw  199:15
throat  212:14
thrust  117:23
time  9:19 14:13
    21:17,25 27:3,
    20 34:19 38:23
    40:20 41:16,23
    45:5,6 48:23
    49:3 51:7
    55:11 56:25
    57:2 64:16
    71:15 73:13
    74:5,12 80:15
    82:17 83:2
    87:8 91:18
    92:6 105:8
    107:16 121:13
    137:10 138:8
    139:18 140:15,
    21 142:3,5,22
    145:4,13

152:10 160:10 161:11 165:18 172:23 173:2 175:18 187:2 188:25 190:1 193:25 198:12, 14 199:11 202:12,23 204:5,7,16,19 207:17 208:21 210:2 211:14

**times** 25:6 46:8 108:7 193:4,11 194:8 197:13 204:17

**tired** 10:1

**title** 61:15 62:8 77:15 109:25

**titled** 61:1 196:2

**titles** 40:4 87:1 91:6

**Tobacco** 154:18

**today** 6:22 7:3 9:2 10:25 11:4,7,10 15:23 24:13, 16,24 31:10 36:17 58:25 79:20 83:11 84:7 93:4 109:3 134:6 164:16 169:22 189:9,14

**today's** 24:21

**told** 82:9 96:18 202:15,19,22, 23

**tool** 69:17 186:14

**tools** 92:20

**top** 61:15 196:2

**total** 141:8 154:15

**totally** 161:2,5

**touch** 67:16

**touted** 92:20

**track** 193:9,24

**Tradition** 87:3, 12,14,21

**Traditionally** 151:11

**train** 180:25

**trained** 149:2 179:23 180:3, 11,14 181:3 182:1 183:6

**trainee** 40:6

**trainees** 201:11

**trainer** 38:22

**training** 36:19, 21,23 37:1,2, 5,8,9,12,15, 17,20,25 40:22 49:16 149:7 152:7 162:18 180:6,9,18,24 181:13,15,17, 20,25 183:5

**trainings** 180:16

**transcribing** 8:1

**transcript** 9:13 10:8,9,10 28:4 78:18 79:1,5,9

**transition** 148:14,16 151:8 152:11, 14 153:8 154:15

**traveled** 77:24

**treating** 125:18

**tree** 198:24 199:3

**tremendous** 152:9

**trial** 10:16

**trigger** 152:3 181:7

**trouble** 127:20

**truck** 211:7

**true** 99:3 110:18

**trunk** 168:21

**trustee** 59:24 60:4,5 62:4,8, 12 63:11,18,19 64:3 66:23 67:4

**trustees** 60:10, 16 61:12 63:5, 21 64:1,10,25 65:1

**truth** 7:19

**tube** 17:18

**tubular** 17:19

**turn** 61:10 105:13

**type** 107:18 180:5 195:10 206:5 212:24

**types** 88:3,6 105:2 127:1 128:19 151:8 171:7 175:23 180:16 196:17, 22 205:15 208:9 209:9

___

## U

**U.S.** 86:23 146:16 156:2 196:3

**UCD** 34:2 38:11 39:1,2

**unable** 11:9 167:14,21 200:7

**uncommon** 176:9

**undergraduate** 34:24

**undermined** 15:25

**understand** 6:23 7:10,23 8:3,4, 9,10,13,20,25 9:1,6,7,8,11, 14,16,17,24,25 10:5,6,11,12, 17,18 13:13,19 14:3 15:14 16:6,9,24 22:1 39:12,13,14 48:13 80:2 123:12 151:14 183:19

**understanding** 49:7 80:25 121:3,9 128:18,21

168:2 169:8

**understood** 73:18 80:10 87:23 103:22

**ungainly** 142:18

**unintended** 92:22

**union** 141:5

**United** 59:11 141:5 143:22 145:17 147:5, 14,23 148:1,24 150:10 151:11 154:13,22 155:9 180:24 186:12

**universe** 43:24 103:13,19 134:13 158:25

**university** 31:18,19,21,24 32:12,13,17, 19,23 33:1,3, 10,12 34:3,4, 11,13 35:2

**unlike** 186:9

**unquote** 17:20 46:24 78:15 79:12 93:5 96:6,17 103:14,19 110:23 111:10 120:19 130:10 149:1 187:7 209:9

**unregistered** 101:8

**unsafe** 93:22 94:16,21 96:5

**upset** 47:23

**utility** 122:22 124:14 125:14 127:19 128:12 166:10

**Uzis** 208:25

___

## V

**vacancy** 62:13

**vague** 18:12,20 19:6,25 20:8, 15,22 21:21

23:15 24:11
26:5 29:4,15
43:16 58:4
59:7 64:18
74:17 75:1,8
77:10 79:25
87:25 89:10
95:5 99:12
104:24 105:21
116:21 117:12,
20 126:7
128:4,23 129:4
135:23 136:7,
24 137:13
139:3 140:17
142:11 144:10
146:12 155:14
160:24 161:19
163:8,18
164:3,20
165:12 166:25
167:18 170:17
173:5 174:11,
23 176:3
179:14 181:22
182:7 184:7,22
185:4,14
192:3,15,22
194:17 195:5
196:19,24
204:25 205:19
206:8 211:18,
24 212:5,12
**Valley** 70:1
**Van** 50:1 52:18
53:1 97:25
**variant** 179:3
**variants** 153:23
**varied** 137:23
149:15
**variety** 38:15
39:8 82:21
**Vegas** 20:7
100:13
**vehicle** 191:1
**version** 18:4
131:11,14
137:20 138:13
160:16 185:9
**versus** 30:22
35:15 78:11
79:2 109:6,11
110:12,17

112:23 113:3,
12
**viable** 153:12
**victim** 177:3
186:21
**view** 39:10
52:25 96:16
125:15
**viewed** 110:15
**views** 27:20
72:19,21
**violence** 99:10,
24 182:14,19
**violent** 98:24
124:11 166:14
**Virginia** 32:17
33:8,10,12
**virtually** 65:9
99:7 153:20
158:24 159:10,
13 205:5
**virtuous** 162:23
163:3,6,15,21
164:17
**visual** 37:4
**Volcanic** 141:25
**voraciously**
194:1
**voted** 62:12

---

## W

**waist** 200:6
**waistband** 199:2
**walk** 31:6
**walked** 95:9,14
202:17
**walking** 51:16
**walls** 211:10
**Walt** 64:21
**Walther** 118:14,
15 150:6
**wanted** 34:17,20
43:12 55:11
58:13 72:1,3,
10 81:10 149:3
151:19 152:8
206:4 211:8
**war** 58:13 103:9
140:24 141:1,
10,12,21

142:2,5,16
143:24 144:8,
14,19 145:4,
18,19 146:1,2,
5,9 147:25
148:25 149:9,
11 150:25
**warrant** 205:8
**warrants** 105:10
186:25
**wars** 142:4
150:5
**Washington**
34:4,13 72:4
77:16
**watch** 193:25
**ways** 140:10
168:16
**weapon** 19:22
50:15 98:2
107:5,10,11
118:5,7 135:12
139:17 140:11
162:1 211:12
**weapons** 13:11,
14,20 14:4,13,
16,21,25 15:4
18:24 19:4
49:20,23 53:19
56:23 57:6
73:2 108:20
158:15 170:15,
21 209:23
214:5
**wear** 186:12
**wearing** 118:13
**web** 110:7
**weeds** 52:24
148:9
**week** 77:25
**Wesson** 134:9
**west** 70:14
**Western** 49:16
**whatnot** 152:10
**wide** 45:13
**widely** 140:25
141:4,16
145:12,15
**wider** 134:18
**wife** 26:15

**withdrew** 108:9
**witnesses** 27:1
**women** 88:12
89:17
**word** 46:5 86:5
89:2 93:10
117:21,25
177:16 209:9
**wore** 44:4 51:21
**work** 23:6 24:4
26:13 31:9
32:17 40:7
41:9 44:2,19
45:9,24 50:11
51:21 59:14
68:10 71:4
72:5,6 75:11
78:7 82:11
83:2,23 85:24
86:10 105:2,3,
6 106:2 134:19
152:2 187:23
202:12 205:3
**worked** 21:4
58:16 64:23
68:3 93:23
136:17 202:12
**working** 26:21
44:11 50:6,10
51:11 60:6
81:18 189:10
**world** 103:8
143:24 144:8,
14,19 145:18,
19 146:1,5,9
147:25 148:19,
25 149:9,11
150:5,24
209:20
**worth** 100:8
188:5
**wound** 125:7
**wounds** 51:19
195:23 197:9,
15,19,21
200:22
**write** 27:17
46:21 91:24
92:19 99:13
100:11 101:3,
14 102:12
113:10 120:16

126:18 140:24
142:14,19
143:11,24
145:19 146:14
147:8,11
148:13 152:23,
25 162:23
166:12 175:16,
20 179:22
197:14 200:5,
20 208:5,23
210:9,15
213:20

**writing**  82:22
91:2 128:14
213:21

**writings**  27:19
126:15,17,20

**written**  12:20
23:20 28:14
90:16 126:13
188:9,19
211:16

**wrong**  94:12
199:3 202:8
213:12

**wrongs**  81:9

**wrote**  25:15
27:18,21 30:11
90:13,22 93:2
102:10 127:6
207:25 208:21

**Wynbrandt**  208:2

---

**Y**

**yards**  212:6
**year**  15:23
16:12 22:7,11
33:2 50:18
55:20 56:1
61:3 62:25
64:22 76:5
82:1 85:6
115:2 167:13
193:6,17
**yearly**  85:20
**years**  21:5
29:10 39:3
40:8 46:22
47:7 51:19
53:1,6,22

58:18,23 64:9,
11 65:25 66:5
67:14 68:2
70:17 72:20
73:10,21
75:17,19,21,24
76:15 82:12,13
83:10 89:6
90:14,19,22
91:10 92:11,21
97:25 127:3
154:10 165:16,
23,24 166:5,7
183:23 190:7
207:17 208:14

**yelled**  202:4
**Yolo**  189:22
**York**  58:10,15
161:10
**Younger**  53:6

---

**Z**

**zealotry**  97:19,
23 99:15

EXHIBIT HELSLEY - 4 Page 92