Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION


OREGON FIREARMS FEDERATION,)
INC.,                      )
                           )
            Plaintiffs,    )
                           )
        vs.                )Case 2:22-cv-01815-IM
                           )    2:22-cv-01859-IM
TINA KOTEK, et al,         )    2:22-cv-01862-IM
                           )    2:22-cv-01869-IM
                           )
            Defendants.    )


DEPOSITION OF 30(b)(6) WENDY LANDERS

        THE DEPOSITION OF WENDY LANDERS was taken as
a witness on behalf of the Plaintiffs, pursuant
to Federal Rules of Civil Procedure, at
12:15 p.m., Friday, the 5th of May 2023, at the
offices of the Oregon State Police, 3565 Trelstad
Avenue SE, in the City of Salem, County of
Marion, State of Oregon, before Traci R. Moore,
Professional Court Reporter in and for the State
of Oregon.

Page 2

1

2                        APPEARANCES

3

4    FOR THE PLAINTIFF EYRE:

5            JURISLAW LLP
             By:   Shawn M. Lindsay
6            shawn@jurislawyer.com
             Three Centerpointe Drive
7            Suite 160
             Lake Oswego, Oregon 97035
8            (503) 986-1475

9

    FOR THE PLAINTIFF OREGON FIREARMS FEDERATION:
10
             VAN NESS WILLIAMSON
11           By:   Leonard W. Williamson
             l.williamson@vwlp.com
12           960 Liberty Street SE
             Suite 100
13           Salem, Oregon 97302
             (503) 365-8800
14

15   FOR THE DEFENDANTS:

16           MARKOWITZ HERBOLD PC
             By: Harry B. Wilson
17           harrywilson@markowitzherbold.com
             1455 Southwest Broadway
18           Suite 1900
             Portland, Oregon 97201-1900
19

20   ALSO PRESENT:  Wendy Landers

21

22

23

24

25

Page 8

1      Q.    -- and yourself have signed off on

2  this?

3      A.    Uh-huh.

4      Q.    Okay.  Is Oregon State Police prepared

5  to accept applications today?

6      A.    We are, we are prepared.

7      Q.    Have you received applications?

8      A.    We had one application that was

9  submitted by a citizen.  It was not submitted by

10 a permit agent, and so we returned that

11 application to that citizen informing them of

12 what the ballot measure states, that that's to go

13 through the permit agent.

14     Q.    And you say that you're prepared to

15 receive completed applications.

16     A.    Uh-huh.

17     Q.    In what ways are you prepared to

18 receive them?

19     A.    Uh-huh.  So, we're prepared to receive

20 applications via U.S. Mail or courier.  We

21 are -- we could also send the application via

22 fax.

23 As for the fingerprint piece of that, that would

24 need to come to us via U.S. Mail or courier at

25 this time.

Page 10

1    whatever the statute says or what the new law

2    will say, and then they let us know -- "us",

3    being states, know whether that meets Public

4    Law 92-544.

5          For Ballot Measure 114 the FBI has

6    returned back to us that Ballot Measure 114 does

7    not meet Public Law 92-544.

8    Q.    What does that mean, "your unit"?

9    A.    Uh-huh.  So, we will process -- if

10   Ballot Measure 114 went into effect tomorrow, we

11   would process the applications and the

12   fingerprints, just as we are to as outlined in

13   Ballot Measure 114.

14          What we would report is what we have

15   found and we would report that in regards to the

16   FBI fingerprint background check, that we were

17   denied that access at this time, so that would be

18   how we would report that out.

19   Q.    I think you said that you had processed

20   the fingerprints.

21   A.    Uh-huh.

22   Q.    What does that mean?

23   A.    So, we can process the fingerprints in

24   regards to any Oregon records.  So we would bring

25   those fingerprints in and process those through

Page 11

1    our ABIS Unit, and then we would look at any

2    Oregon records that were identified through that

3    positive identification.

4         Q.   So you will report to the permit agent

5    that you processed the background check, you

6    processed the fingerprints through the Oregon

7    system?

8         A.   (Nodding head.)

9         Q.   And report back to the dealer -- I'm

10   sorry.  Not the dealer, to the permit agent --

11        A.   Uh-huh.

12        Q.   -- approved or -- well, what are the

13   possible responses?

14        A.   So, as stated here, there would be,

15   qualified, disqualified, or we would note if we

16   found -- if we found a record, we would also note

17   what that was.

18             We will also report that we -- we have

19   completed everything; however, we are unable to

20   complete the FBI response for the fingerprints at

21   this time.

22        Q.   In my mind, that leaves it to the

23   permit agency to waive that FBI background check

24   or not?

25        A.   It would, it would lie to the permit

Page 12

1    agent to make that determination.

2        Q.    And if there are differing responses by

3    differing permit agencies, what does that mean to

4    the Oregon State Police?

5        A.    Our responsibility in this is to run

6    the background and -- and comply with what Ballot

7    Measure 114 says.

8            The ultimate issue of issuing of the

9    permit lies within the permit agent as Ballot

10    Measure 114 is written.  We would look to

11    whatever determination that permit agent has

12    made, as to whether they will issue or not issue

13    the permit.

14        Q.    Personally, I think that Measure 114

15    could be read to say that the Oregon State Police

16    as part of the background check must consider the

17    fingerprint analysis by the FBI, and that would

18    be part of the background check.

19            Who made that decision at the Oregon

20    State Police to respond as you indicate you

21    intend to respond?

22        A.    Uh-huh.  We have worked with our

23    general counsel, and with advise from our general

24    counsel we were able to determine what -- what

25    our response would be.

Page 13

1            In Ballot Measure 114, it says that we

2    are to report the outcome, and the outcome is

3    that the FBI has not approved for us to run the

4    fingerprints that the level.

5        Q.    And when you say, we made that

6    determination, who is "we"?

7        A.    We would be at -- with conversations

8    between myself, Commander Davie, and up to the

9    superintendent level.

10       Q.    Governor level?

11       A.    To my knowledge, no.

12       Q.    What do you do with the fingerprint

13   cards for the permit application once you've

14   run -- "processed" them, I guess is the word you

15   used?

16       A.    Uh-huh.  As in what happens to the card

17   afterwards?

18       Q.    Yes.

19       A.    Is that the question?

20       Q.    Yes.

21       A.    We would retain the fingerprint card.

22   It -- and hold that record, so long as the person

23   had a permit.

24       Q.    And so I understand that these

25   applications would come to you from the permit a

Page 14

1    agent through mail?

2          A.    Uh-huh.

3          Q.    Fax?

4          A.    Uh-huh.

5          Q.    Or hand delivery?

6          A.    Uh-huh.

7          Q.    Tell me how you would process this.

8    I'm assuming that you manually maybe scan it,

9    maybe suck the data off somehow?

10         A.    Right.

11         Q.    Tell me what that process looks like.

12         A.    Yeah.  So at this time we don't have a

13   system that we would use.  We have been very open

14   about that.  It would be a manual process.  We

15   would have staff reviewing the information and

16   then manually searching the same systems that we

17   would search for FICS background, as well as the

18   return they would get on that positive

19   identification for any record that exists.

20              Our plan at this time, and we're ready

21   to do it tomorrow if we are told to, would be to

22   have spreadsheets for tracking this information

23   and, frankly, keeping paper copies until we are

24   able to stand up a system.

25         Q.    So it sounds like that this might be

Page 15

1    given to a FICS Unit employee, that unit employee
2    would enter that manually into the FICS
3    background check application?
4        A.    We -- we would not use that
5    application.  We would need to stand up our own
6    system.  We
7    would -- but we would be using -- we would be
8    hitting the same databases that we hit for FICS.
9            So, we can access databases outside of
10   the FICS system as needed.  So, we access it
11   through what's called LEDS.  And so all of our
12   folks are LEDS certified, and they would get into
13   the LEDS system and query those databases.
14       Q.    When you say "stand up your own
15   system," what does that mean?
16       A.    So we would need to work with vendors,
17   probably go out for RFP and select a vendor to
18   build a permit to purchase software for us to
19   use.
20       Q.    Okay.  That sounds like that would take
21   some time?
22       A.    It would take some time.
23       Q.    Okay.  I think you just said, though,
24   that you are ready and prepared to process
25   applications --

Page 16

1      A.    Uh-huh.

2      Q.    -- now?

3      A.    Yes.

4      Q.    How would you do that before this

5    standing up of your own system?

6      A.    It would be a manual process.  It

7    would -- I envision an employee would have an

8    application and fingerprint, and they would be

9    sitting at their assigned area and accessing into

10   the LEDS database and entering the information

11   that they have in front of them.

12          And then reviewing those returns, much

13   like our FICS system does our FICS system returns

14   from databases, and it's all there for the FICS

15   employee to review.  And then they would be able

16   to make a determination or realize if they need

17   additional information in order to reach that

18   determination.

19     Q.    How long would that process take?

20     A.    It -- it depends, but I don't know that

21   I have an exact time, but I -- I have asked this

22   question of staff, and it sounds that it would

23   take anywhere from five to ten minutes to process

24   through those systems on a manual entry.

25     Q.    Meanwhile, background checks are going

Page 17

1    on?

2        A.    Uh-huh.

3        Q.    Regular background checks.  So, this is

4    an additional major assignment given to the

5    FICS Unit?

6        A.    Correct.

7        Q.    How would you prioritize to purchase

8    applications compared to background check

9    requests?

10        A.    So, if Ballot Measure 114 were to come

11    to fruition tomorrow, we would immediately work

12    on recruitment.  We've already drafted a position

13    description.  We're ready to open recruitments

14    and immediately start hiring staff so that we can

15    fit the need.

16        Q.    Is this in addition to the 30 employees

17    that you currently have --

18        A.    Yes.

19        Q.    -- allocated, and the 17?

20        A.    Yes, that would be in addition.

21        Q.    So, have you received budget for this

22    additional staff or --

23        A.    No, we have not.

24        Q.    How many staff would you intend to

25    recruit?

Page 18

1      A.    So, it's a hard question to answer.  I

2   appreciate the question, but it is a hard

3   question to answer, because we don't -- we don't

4   initially know how many people are going to apply

5   for a permit to purchase.

6           Initial thoughts -- I don't know if I

7   have anything in my notebook here, but I know

8   that -- give me just a minute to glance over this

9   to see if I have anything in here.

10          I know we had some initial thoughts

11   when first it was a petition and then when it

12   became a ballot measure.  I'm not seeing those

13   documents in my binder, and I don't necessarily

14   want to guess, but I know that we have definitely

15   thrown a significant amount of staff at that.

16          If -- if memory serves, I would say

17   probably about 20 staff that we have identified

18   that we would need to get for the permit to

19   purchase program.

20      Q.    So, if Measure 114 went into effect

21   tomorrow --

22      A.    Uh-huh.

23      Q.    -- it's fair to say that you could put

24   out job opportunity recruitments for 20-plus

25   employees?

Page 19

1      A.    Absolutely, yes.

2      Q.    And you have the budgeting for that?

3      A.    We have not been given the budget, but

4  we would need to uphold the law.  And the law

5  would say that's something we're responsible for,

6  so we would start the recruitment process.

7      Q.    Do you have surplus to cover those

8  labor costs?

9      A.    I don't know that I could answer that

10  question.  That would be a question that I need

11  to speak with my budget folks.

12      Q.    Who is that that would be able to

13  answer that question?

14      A.    I would probably lean towards Jenny

15  Cribbs (phonetic).  She's our CFO.

16      Q.    Of the Oregon State Police?

17      A.    Uh-huh.

18      Q.    You don't know whether you have surplus

19  dollars to cover those labor costs?

20      A.    We do have -- we do have moneys, but I

21  wouldn't be able to speak to what that looks like

22  exactly.

23      Q.    That would take a little while to

24  recruit and train some staff, correct?

25      A.    That is a correct statement.

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    30(b)(6) Wendy Landers

Page 20

1      Q.    Initially, if 114 went into effect, you
2    would be using your current FICS Unit staff until
3    those employees were hired and trained?
4      A.    Yes, that is a correct statement.
5      Q.    And you would split responsibilities
6    between permit to purchase applications and
7    background checks?
8      A.    Yes.
9      Q.    So, there's the manual entry of the
10   application.  Tell me about the database that you
11   would maintain and how this information would get
12   there and how it's maintained?
13     A.    Uh-huh.  So, at this time we would have
14   an Excel spreadsheet that we would use.  We would
15   have staff entering the information into that
16   Excel spreadsheet for us to use.  Like I said, we
17   would immediately want to work with vendors and
18   figure out how we could get a system stood up.
19     Q.    Where would that Excel spreadsheet file
20   reside?
21     A.    We would -- we would work with our IT
22   to find the most appropriate place to park a
23   spreadsheet like that.  We have different drives
24   that we can use right now.
25            We have it parked in what we call our

Page 22

1   time entering data.

2       Q.   So, it could be that 20 different

3   employees have their own Excel file on their

4   individual computer system?

5       A.   Uh-huh.

6       Q.   And what I'm hearing is that somebody

7   would gather those files and consolidate them

8   somehow?

9       A.   Yes.

10      Q.   It sounds like a lot of manual

11  inputting?

12      A.   Yeah, it would be.

13      Q.   On those individual employee computer

14  work stations or on the master Z drive, what

15  administrative safeguards would there be?

16      A.   Again, we would work with our IT to

17  find the best way to protect the data and make

18  sure that we are maintaining the data.

19      Q.   That hasn't been done today?

20      A.   That has not been done today, but I

21  don't think that's a heavy lift for us to do.

22      Q.   The Excel spreadsheet doesn't exist

23  today?

24      A.   We have the Excel spreadsheet, but

25  there's no data.

b2da3fbe-1f38-4199-8e32-4bec4d3aac65

Page 23

1    Q.    That Excel spreadsheet file exists in

2    one location at this point?

3    A.    Yes.

4    Q.    Do you know if there's any

5    administrative safeguards in place for that

6    spreadsheet?

7    A.    At this time, no.

8    Q.    How about any FFL safeguards?

9    A.    What do you mean by "FFL"?

10    Q.    FFL would be, like, say, from

11    (unintelligible) or DOJ?

12    A.    Oh, so our hard drives aren't on

13    location, so -- and there are backups done where

14    our data is stored, so I would say that FFL

15    safeguards are in place.

16    Q.    The last one would be what's called

17    security safeguards.

18    A.    Uh-huh.

19    Q.    That would be, like, an encryption for

20    limitation of who has access.

21    A.    Yeah.

22    Q.    Explain that.

23    A.    There's limitations to accessing our

24    systems anyways.  You have to -- you have to be a

25    user.  There's VPNAs to -- a VPN to get into our

Page 24

1   systems.  It's not -- not anybody can just log

2   into our systems is what I'm trying to say.

3        Q.   What about employees taking a file on a

4   thumb drive and walking out with the thumb

5   drive, is that possible?

6                  MR. WILSON:   Objection.  Scope.

7                  THE WITNESS: I think that's

8   possible with any -- with any workplace.  We have

9   regular trainings in regards to safeguarding our

10  data, and in that training it specifically talks

11  about how the biggest risk to data is the

12  employees themselves purposefully or

13  accidentally.

14              And so could an employee do something

15  like that, unfortunately, they probably could.

16  Do I think that our employees would do that, no,

17  I don't.

18  BY MR. LINDSAY:

19       Q.   I think you said that the Excel

20  spreadsheet file exists already today, but it's

21  just empty?

22       A.   Uh-huh.

23       Q.   What is the information that it's

24  prepared to receive?

25       A.   Sure.  That's a great question, and I

Page 33

1    submission of fingerprints.

2        Q.    And do permit agents have access to

3    Live Scan fingerprint machines?

4        A.    Some do, some do not.

5        Q.    How many do and how many do not?

6        A.    I don't know that I have those exact

7    numbers with me today.  And I would be reaching

8    to guess, but I do know that there are -- there

9    are permit agents specifically, from what I

10   understand, on the police department side that

11   don't have Live Scans.

12       Q.    And are you set up today and prepared

13   to receive Live Scan from permit agents?

14       A.    Today we cannot; however, we have

15   worked with our vendor and we would be able to

16   receive electronic submissions of fingerprints

17   within 30 days.

18              COURT REPORTER:  Live Scans.

19              THE WITNESS:  L-i-v-e.

20   BY MR. LINDSAY:

21       Q.    What vendor would that be?

22       A.    We work with Diverse Computing.

23   They're the vendor that we have for most of our

24   programs in CJIS Division.

25       Q.    If Measure 114 went into effect right

Page 36

1      Q.   Does section E require that the State

2  Police run a background check with the

3  fingerprint card?

4                MR. WILSON:   Same objection.

5                THE WITNESS:  Yeah, I would say

6  that I'm not an attorney and cannot speak to the

7  interpretation of that.

8  BY MR. WILLIAMSON:

9      Q.   If your general counsel were to read

10  this in a way that's the only reason to take

11  fingerprints, is for the FBI to run them, what

12  kind of background check would the State Police

13  then be doing at this level?

14      A.   Through --

15      Q.   Would you be running the same

16  background check that the FICS would if

17  fingerprints weren't involved?

18      A.   If fingerprints weren't involved, but

19  everything else stayed?

20      Q.   Uh-huh.

21      A.   Yes, it would be our same background as

22  what our FICS currently does.

23      Q.   Okay.  And presently I think the way

24  the statute is constructed, your understanding

25  from the replies from the FBI, is it simply

Page 38

1   sheriffs, the response reads, "OSP can receive

2   fingerprints on cards through U.S. Mail."

3         OSP is also preparing a grant

4   application that could allow local law

5   enforcement agencies to obtain equipment.  Are

6   you familiar with any grant application to do

7   such?

8         A.   Yeah, so we're currently in the process

9   of completing an application to ask for grant

10  money for Live Scan purchases.  I believe that

11  we've heard from -- I don't think that --

12         Again, it's in my binder.  I'm not

13  trying to be evasive, but I think we're around 15

14  agencies that have shown interest, and some of

15  them wanting one and some wanting two machines.

16  We are preparing that grant application.

17         Q.   And assuming the application is

18  granted, and maybe you've already answered this,

19  but if those come online in the counties, then

20  you would be able to receive the fingerprints

21  electronically?

22         A.   Yes.

23         Q.   And that would speed up the process?

24         A.   It would in that they would be able to

25  electronically send that, fax the application,

Page 42

1                          CERTIFICATE

2              I, Traci R. Moore, a Professional Court

3    Reporter and Notary Public, hereby certify that

4    said witness, WENDY LANDERS, personally appeared

5    before me at the time and place set forth in the

6    caption hereof; that at said time and place I

7    reported in stenotype all testimony adduced and

8    other oral proceedings had in the foregoing

9    matter; that thereafter my notes were transcribed

10   through computer-aided transcription, under my

11   direction; and that the foregoing pages

12   constitute a full, true and accurate record of

13   all such testimony adduced and oral proceedings

14   had, and of the whole thereof.

15             I further certify that review of the

16   transcript was not requested.

17             Witness my hand at Portland, Oregon,

18   this 12th day of May, 2023.

19

20

21

22

23             _____

24             Traci R. Moore

25             Professional Court Reporter

26