**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Hannah K. Hoffman, OSB #183641**
HannahHoffman@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201-3412
(503) 295-3085

       Special Assistant Attorneys General for Defendants

**Ellen F. Rosenblum, OSB #753239**
Attorney General
**Brian Simmonds Marshall, OSB #196129**
Senior Assistant Attorney General
Brian.S.Marshall@doj.state.or.us
**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
(971) 673-1880

       Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Case No. 2:22-cv-01815-IM (lead case) |
| | 3:22-cv-01859-IM (trailing case) |
| | 3:22-cv-01862-IM (trailing case) |
| Plaintiffs, | 3:22-cv-01869-IM (trailing case) |
| v. | **DEFENDANTS' MOTION TO EXCLUDE TESTIMONY** |
| TINA KOTEK, et al., | |
| Defendants, | **Fed. R. Evid. 702** |
| and | |

**DEFENDANTS' MOTION TO EXCLUDE TESTIMONY**

OREGON ALLIANCE FOR GUN SAFETY,

|                                 Intervenor-Defendant.

MARK FITZ, et al.,

                                           Plaintiffs,

                    v.

ELLEN F. ROSENBLUM, et al.,

|                                 Defendants.

KATERINA B. EYRE, et al.,

                                           Plaintiffs,

                    v.

ELLEN F. ROSENBLUM, et al.,

|                                 Defendants,
                    and

OREGON ALLIANCE FOR GUN SAFETY,

|                                 Intervenor-Defendant.

DANIEL AZZOPARDI, et al.,

                                           Plaintiffs,

                    v.

ELLEN F. ROSENBLUM, et al.,

|                                 Defendants.

**DEFENDANTS' MOTION TO EXCLUDE TESTIMONY**

# TABLE OF CONTENTS

LR 7-1 CERTIFICATION .................................................................................................. 1

MOTION ............................................................................................................................ 1

LEGAL STANDARD ......................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

   I.    Massad Ayoob .................................................................................................... 2

      A.   Mr. Ayoob's proffered testimony ................................................................ 2

      B.   Mr. Ayoob's testimony is not reliable. ........................................................ 3

   II.   Clayton Cramer ................................................................................................. 7

      A.   Mr. Cramer's LCM Declarations .................................................................. 7

      B.   Mr. Cramer is not qualified to offer testimony concerning mass murder and mental health. ........................................................................................... 10

      C.   Mr. Cramer's opinions are unreliable. ....................................................... 11

          1.   Mr. Cramer's opinions are based on selective use of facts. ................... 11

          2.   Mr. Cramer's testimony is unreliable because it is laced with errors. ................... 13

   III.   Ashley Hlebinsky ............................................................................................ 14

      A.   Ms. Hlebinsky's proffered testimony ......................................................... 14

      B.   Ms. Hlebinsky is not qualified to provide expert testimony as a legal historian of firearms regulation. ..................................................................... 14

          1.   Ms. Hlebinsky is not trained as a legal historian. ................................... 15

          2.   Ms. Hlebinsky's work at the Firearms Research Center does not qualify her as an expert in the history of firearm regulations. ................................... 15

          3.   Ms. Hlebinsky's museum experience and publishing history do not qualify her as an expert in the history of firearm regulations. ................................... 16

          4.   Ms. Hlebinsky's methods undermine her supposed qualifications as an expert witness. ................................................................................................. 17

   IV.   Dr. Gary Kleck .............................................................................................. 19

      A.   Dr. Kleck's Proffered Testimony ................................................................ 19

      B.   Dr. Kleck should not be allowed to testify concerning Table 1 of his declaration because he cannot produce the underlying data. ........................................... 20

   CONCLUSION .............................................................................................................. 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allen v. Am. Cap. Ltd.*,
  287 F. Supp. 3d 763 (D. Ariz. 2017) ................................................................. 11

*Allison v. McGhan Med. Corp.*,
  184 F.3d 1300 (11th Cir. 1999) ........................................................................... 2

*Avila v. Willits Env't Remediation Tr.*,
  633 F.3d 828 (9th Cir. 2011) ............................................................................ 16

*Barabin v. AstenJohnson, Inc.*,
  740 F.3d 457 (9th Cir. 2014) ........................................................................ 1, 2

*Best v. Lowe's Home Centers, Inc.*,
  563 F.3d 171 (6th Cir. 2009) ............................................................................ 12

*Cascadia Wildlands v. Scott Timber Co.*,
  618 F. Supp. 3d 1038 (D. Or. 2022) ................................................................. 10

*City of Pomona v. SQM N. Am. Corp*,
  750 F.3d 1036 (9th Cir. 2014) ............................................................................. 5

*Daubert v. Merrell Dow Pharm., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) .....................................................................Passim

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ..................................................................................Passim

*Downs v. Perstop Components, Inc.*,
  126 F. Supp. 2d 1090 (D. Tenn. 1999) ............................................................. 11

*Duncan v. Becerra*,
  366 F. Supp. 3d 1131 (S.D. Cal. 2019) ............................................................ 18

*E.E.O.C. v. Freeman*,
  778 F.3d 463 (4th Cir. 2015) ............................................................................ 13

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ............................................................................................. 2

*In re Silicone Gel Brest Implants Prods. Liab. Litig.*,
  318 F. Supp.2d 879 (C.D. Cal. 2004) ................................................................. 1

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ..................................................................................Passim

*Laux v. Mentor Worldwide, LLC*,
  295 F. Supp. 3d 1094 (C.D. Cal. 2017) ............................................................ 11

*McClellan v. I-Flow Corp.*,
  710 F. Supp. 2d 1092 (D. Or. 2010) ...................................................... 1, 21, 22

*Muzzey v. Kerr-McGee Chem. Corp.*,
  921 F. Supp. 511 (N.D. Ill. 1996) ....................................................................... 4

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
  676 F.3d 521 (6th Cir. 2012) .............................................................................. 4

*Ocean State Tactical, LLC v. State of Rhode Island*,
  2022 WL 17721175 (D.R.I. Dec. 14, 2022) ............................................... 15, 16

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) ................................................................ 5, 14
*Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*,
   927 F. Supp. 2d 1069 (D. Or. 2013) ......................................................... 5, 6
*State v. Reams*,
   292 Or 1 (1981) .............................................................................................. 9
*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
   949 F.3d 825 (3d Cir. 2020) .......................................................................... 1
*United States v. Jawara*,
   474 F.3d 565 (9th Cir. 2007) ........................................................................ 2
*United States v. Miller*,
   771 F.2d 1219 (9th Cir. 1985) ................................................................ 21, 22
*United States v. Ruvalcaba-Garcia*,
   923 F.3d 1183 (9th Cir. 2019) ...................................................................... 2
*United States v. Tham*,
   118 F.3d 1501 (11th Cir. 1997) .................................................................... 9

## Rules

Fed. R. Civ. P. 26(a)(2)(B)(ii) ............................................................... 20
Fed. R. Evid. 702 ............................................................................ Passim
Fed. R. Evid. 705 ................................................................................ 20
Fed. R. Evid. 1006 .............................................................................. 20

## LR 7-1 CERTIFICATION

Pursuant to L.R. 7-1(a), counsel for defendants certify that they made a good-faith effort to resolve this dispute but have been unable to do so.

## MOTION

Pursuant to Federal Rule of Evidence 702, defendants Governor Tina Kotek, Attorney General Ellen F. Rosenblum, and Superintendent of the Oregon State Police Casey Codding respectfully request that the Court exclude all or portions of testimony from Massad Ayoob, Clayton Cramer, Ashley Hlebinsky, and Gary Kleck, expert witnesses for plaintiffs.

## LEGAL STANDARD

Rule 702 allows qualified experts to present testimony that will "assist the trier of fact" in understanding the evidence or determining a factual issue so long as the testimony is based on adequate facts or data, produced by reliable principles and methods, and the witness has reliably applied those principles and methods to the facts of the case. *McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1098 (D. Or. 2010). A witness can qualify as expert on the basis of "knowledge, skill, experience, training, or education" and a witness' qualifications are construed broadly. *In re Silicone Gel Brest Implants Prods. Liab. Litig.*, 318 F. Supp.2d 879, 889 (C.D. Cal. 2004) (quoting Fed. R. Evid. 702). Trial judges act as "gatekeepers" to ensure that an expert's testimony is both "relevant" and "reliable" under Rule 702. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Although the risk of prejudice is greatly diminished in a bench trial, the trial court must nonetheless assess expert testimony for admissibility under *Daubert*. *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832-33 (3d Cir. 2020).

An expert's testimony must have "a reliable basis in the knowledge and experience of the relevant discipline." *Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (citation

omitted).  To satisfy its "gatekeeping duty" under *Daubert*, the Court must "make an explicit reliability finding."  *United States v. Jawara*, 474 F.3d 565, 582-83 (9th Cir. 2007) (citation omitted).  A trial court's failure to make an explicit reliability finding before admitting expert testimony is an abuse of discretion.  *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1190 (9th Cir. 2019).

In assessing the reliability of an expert's opinions, the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  *Daubert,* 509 U.S. at 595.  *Daubert* describes four nonexclusive considerations that courts should weigh to determine whether an expert's opinion is reliable: (1) the ability to test the expert's methodology or reasoning; (2) whether the expert's theory has been subjected to peer review and publication; (3) its potential rate of error; and finally, (4) its general acceptance in the relevant scientific community.  *Id.* at 592-94.  An expert's failure to define or apply a reliable principle or method generally renders that testimony inadmissible because of the "analytical gap" created by the omission.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316-19 (9th Cir. 1995) ("*Daubert II*").  Expert testimony should not be based solely on anecdotal evidence.  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

## ARGUMENT

### I.    Massad Ayoob

The Court should exclude all of Mr. Ayoob's testimony because it is based on self-selected, anecdotal reports and generalized conclusions untied to a reliable, scientific foundation.

#### A.    Mr. Ayoob's proffered testimony

Mr. Ayoob describes himself as a self-defense and weapons expert with extensive experience in "firearms, firearms training standards, deadline force training standards, dynamics

of violent encounters, and related subject matter areas."  (Decl. of Massad Ayoob ("Ayoob

Decl.") ¶ 1 (ECF 73).)  His declaration is based, in part, on his research into "incidents of

defensive gun uses by law-abiding citizens," including private citizens and law enforcement.  (*Id.*

¶ 3.)  The thesis of his testimony is that limitations on large-capacity magazines ("LCMs") will

inhibit the ability of citizens to defend themselves but not the ability of criminals to commit

crimes.  (*Id.* ¶¶ 6-31.)  Mr. Ayoob further opines that disabled individuals will be

disproportionately harmed by a restriction of LCMs.  (*Id.* ¶¶ 32-34.)

> **B.  Mr. Ayoob's testimony is not reliable.**

Mr. Ayoob's methodology does not meet the standard for an admissible expert opinion

for multiple reasons.  First, he relies on a series of anecdotes as support for his conclusion that

"limits on magazine capacity are likely to impair the ability of citizens to engage in lawful self-

defense" in scenarios where multiple rounds are needed to stop an attacker.  (*Id.* ¶ 6.)  Mr. Ayoob

does not purport to analyze the impact of magazine limitations in self-defense incidents over a

large, randomly chosen sample, but, rather, presents a handful of incidents that illustrate his

thesis.

Further, the self-defense incidents Mr. Ayoob outlines in his declaration were not chosen

in a systematic and scientific manner.  He described the process he used to select these anecdotes

as follows:

> Q. [W]hen you were putting your declaration together, how did
> you select the examples that you reference in here?
>
> A. Just as they came to me, really.
>
> Q. What do you mean as they came to you?
>
> A. Well, the question is where are situations -- what situations can
> you think of where someone needed more than 10 rounds, and as
> they occurred to me, they point out --
>
> Q. So as they came to mind? As -- as they came to your mind?

> A. Correct. Correct. There was some that I had written about
> before, so they were the ones that . . .  They were the ones I had
> written about in the past, so they were the ones that occurred to
> me.

(Decl. of Harry B. Wilson ("Wilson Decl.") Ex. 1 (Massad Ayoob Dep. ("Ayoob Dep.") at Tr.

73:4-22).)

For example, as to the anecdote in paragraph 14, he stated: "I don't recall whether I got

those from attorneys or, you know, when you're in my business, people are always sending you

links to this, that, and the other news story that either supports or opposes your position.  So I

honestly don't recall. It may have come simply from a Google search."  (Wilson Decl. Ex. 1

(Ayoob Dep. Tr. at 60:8-17).)  In other words, to illustrate his opinions regarding self-defense

and limitations on magazine capacity, Mr. Ayoob selected anecdotes from a variety of sources

including, presumably, "this, that, and the other news story" that supports his "position."  (*Id.*)

Indeed, Mr. Ayoob could not even identify the source or method used to obtain his anecdotes,

whether from a lawyer or a Google search.  Mr. Ayoob's method of handpicking a few anecdotes

that support his position is not a reliable methodology on which to base expert testimony.

*Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) ("Red flags that

caution against certifying an expert include reliance on anecdotal evidence, improper

extrapolation, failure to consider other possible causes, lack of testing, and subjectivity.");

*Muzzey v. Kerr-McGee Chem. Corp.*, 921 F. Supp. 511, 519 (N.D. Ill. 1996) ("Anecdotal reports

. . . are not reliable bases to form a scientific opinion about a causal link.  Such anecdotal

evidence, based on a few cases without systematic comparison or data collection, may be an

incentive for more careful investigation but may also reflect rumor and speculation rather than

fact." (Quotation marks and citation omitted)).

Mr. Ayoob's testimony also fails to meet the threshold of reliability for admission under FRE 702. In its gatekeeping role, the Court must ensure that expert testimony "is relevant to the task at hand." *Daubert,* 509 U.S. at 597. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010)). Mr. Ayoob admits that his selection of anecdotes did not follow any apparent methodology. Further, the recitation of these anecdotes does not provide any expert perspective or analysis that is "valid[ly] connected to the pertinent inquiry." *Primiano*, 598 F.3d at 565 (citation and internal quotation marks omitted). Merely curating information that may support a given position is not the proper function of an expert witness.

The reliability of Mr. Ayoob's analysis of these anecdotes fares no better. After reciting his selected examples of firearm uses, Mr. Ayoob engages in a disquisition regarding the potential consequences of limiting magazine capacity. (Ayoob Decl. at ¶¶ 18-20, 23, 25-35.) But this testimony is characterized by broad generalizations and provides no basis upon which the Court can evaluate how or why Mr. Ayoob came to his conclusions. An expert who relies on "personal experience" must nonetheless bring "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999); *see also Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*, 927 F. Supp. 2d 1069, 1074 (D. Or. 2013). "If an expert is relying solely or primarily on experience, then the expert 'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Siring v. Oregon State Bd. of Higher Educ. ex rel. E.*

*Oregon Univ.*, 927 F. Supp. 2d 1069, 1074 (D. Or. 2013) (citing Fed. R. Evid. 702 advisory

committee notes, 2000 amendments).

Mr. Ayoob makes no effort to connect his experiences with his conclusions.  While

Mr. Ayoob's personal experience with firearms may be extensive, his declaration fails to

articulate how his experience informs his many unsupported conclusions, such as:

- "armed citizens have historically modeled their choice of firearms on what police carry."  (Ayoob Decl. ¶ 26.)

- "The vast majority of Oregon law enforcement officers carry pistols with double-stick magazines whose capacities exceed those permitted under Measure 114."  (*Id.* ¶ 26.)

- "The loss of time for a magazine change is generally of little consequence for the attacker."  (*Id.* ¶ 30.)

- "study of events in the real world indicates that Measure 114's restriction on magazine capacity can be expected to have little, if any, effect in reducing casualties due to intentional mass murder."  (*Id.* ¶ 35.)

Mr. Ayoob provides no explanation, for example, how his personal experience informs a

conclusion that "Measure 114's restriction on magazine capacity can be expected to have

little, if any, effect in reducing casualties."  Mr. Ayoob is not a scholar on public policy

and his "study or events in the real world" does not appear to go beyond curating

newspaper articles on the use of firearms.

Under *Daubert*, the trial court's gatekeeping function requires more than simply

taking the expert's word for it.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43

F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts'

qualifications, their conclusions and their assurances of reliability.  Under *Daubert*, that's

not enough.").  Mr. Ayoob's interest and experience with firearms and self-defense

training does not render him capable of providing reliable expert testimony on public

policies related to LCMs.  Mr. Ayoob's recitation of self-defense anecdotes does not

qualify as expert opinion, nor does it elucidate any issue that is presently before the Court. The remainder of Mr. Ayoob's testimony consists of generalized conclusions on a variety of topics that lack a sufficient foundation to establish their reliability. The Court should exclude Mr. Ayoob's testimony in full.

## II. Clayton Cramer

The Court should exclude Mr. Cramer's testimony on the history of mass murder because it is based on an unreliable and unscientific methodology.

### A. Mr. Cramer's LCM Declarations

Mr. Cramer is a professor of history with several books and other publications to his name. In 1994, he prepared a master's thesis entitled "Concealed Weapon Laws of the Early Republic." Mr. Cramer has submitted two declarations—an original declaration (Second Decl. of Clayton Cramer (Magazine Issue) ("Cramer Decl.") (ECF 75)) and a corrected declaration (Corrected Decl. of Clayton Cramer (Magazine Issue) ("Corrected Cramer Decl.") (ECF 111))— concerning Measure 114's LCM provisions. The thrust of these declarations is that limiting the size of gun magazines is illogical because throughout American history, mass murderers have been able to kill large numbers without modern firearms technology. According to Mr. Cramer, mass murders have been a common event in American history and are commonly perpetrated by individual actors. (Cramer Decl. at 8-9; Corrected Cramer Decl. at 14.) Mr. Cramer also opines that most American mass murders are the product of mental illness and that the state would be best served by making changes to its mental health system. (Cramer Decl. at 49; Corrected Cramer Decl. at 46.)

Mr. Cramer's opinions are based on a review of reports about "mass murder" in newspapers. For the purposes of Mr. Cramer's survey, a "mass murder" is an incident where there are "at least two murder victims," "committed in multiple locations within 24 hours" where

"three or more people [are] harmed." (Cramer Decl. at 8; Corrected Cramer Decl. at 7.) For the purposes of Mr. Cramer's study, if the perpetrator is killed during the incident by "suicide or lawful killing," the perpetrator's death is not included in the count of the dead. (Cramer Decl.at 8-9; Corrected Cramer Decl. at 7.)

Mr. Cramer identified qualifying incidents by searching the Library of Congress' collection for variants of the words "murder," "killed," "slain," and "dead," accompanied by numbers—*i.e.* "three dead" or "five slain." (Cramer Decl. at 12; Corrected Cramer Decl. at 11.) Mr. Cramer's review of newspaper accounts for mass murders is limited to "the front pages" of those papers because "if it didn't make the front page, it seems unlikely it could be either a specific crime, or something as shocking as a mass murder." (Cramer Decl. at 13; Corrected Cramer Decl. at 12.) When considering the number of deaths to determine if an incident meets his "mass murder" standard, if the news report mentions that individuals were injured, "probably fatally," Mr. Cramer includes those individuals among the dead, because "when considering the nature of medical and surgical care available until [his] lifetime, it seems [like] *a good guess* that those described as 'probably fatally' wounded can be properly included among the dead." (Cramer Decl.at 13; Corrected Cramer Decl. at 12 (emphasis added).)

Notwithstanding his definition of "mass murder," Mr. Cramer excluded some otherwise qualifying incidents from his review. These exclusions include deaths where there are "circumstances that might also qualify as lawful self-defense" or that the deaths appear to be gang related. (Cramer Decl. at 9; Corrected Cramer Decl. at 8.) Mr. Cramer also excluded incidents when he suspected the involvement of a foreign power or where news reports indicated that all the decedents are felons. (Cramer Decl. at 9-10; Corrected Cramer Decl. at 10-11.) In instances of felony murder, *i.e.*, when people were killed "in the course of a felony," Mr. Cramer

included incidents where those killed were innocent of the underlying crime but "excluded incidents in which all the dead were felons."  It is not clear, however, whether Mr. Cramer is relying on the common-law felony murder rule which held a perpetrator liable for any death that occurred during the commission of any felony or considering the rule as it may have been narrowed by statute at the time of the incident.  *See United States v. Tham*, 118 F.3d 1501, 1508 (11th Cir. 1997) (summarizing felony-murder rule under English common law); *State v. Reams*, 292 Or 1, 8-9 (1981) (discussing limitation of felony-murder rule to specific felonies).  But where news reports indicate that the perpetrator of a "clear[] mass murder" was acquitted after trial, the incident is excluded from Mr. Cramer's survey.  (Cramer Decl. at 11; Corrected Cramer Decl. at 10.)

When Mr. Cramer began his survey, he did not record which mass murders were committed by individual actors versus groups because, in his personal view, it "seemed [to be] an unnecessary detail."  (Cramer Decl. at 15; Corrected Cramer Decl. at 14.)  Mr. Cramer also failed to collect data after 1960.  (Cramer Decl. at 34 ("After 1960, the data is not yet complete."); Corrected Cramer Decl. at 55 (same).)

To capture instances where mental illness was "the proximate cause" of the mass murder, Mr. Cramer attributes mental illness as the cause where "contemporary accounts described the murderer as insane, or where the nature of the crime makes other explanations implausible." (Cramer Decl. at 36; Corrected Cramer Decl. at 35.)  Mr. Cramer acknowledges that "this is necessarily a judgment call," and he relies on his "experience with mentally ill relatives and friends," which "informs [his] opinion."  (Cramer Decl. at 36; Corrected Cramer Decl. at 35.) According to Mr. Cramer's survey, where he was able to attribute a cause to in the instances of mass murder, mental illness was the leading cause of the event.  Based on this frequency, as well

as his personal experience with his brother's mental illness, Mr. Cramer opines that "severely mentally ill people are overrepresented in murder and other violent crimes." (Cramer Decl. at 42; Corrected Cramer Decl. at 41.) Mr. Cramer's mass murder and mental health testimony should be excluded.

**B.    Mr. Cramer is not qualified to offer testimony concerning mass murder and mental health.**

Plaintiffs have not established Mr. Cramer's qualifications to offer his opinions on "mass murder" and mental health. To determine whether a witness is qualified, courts generally look to evidence about the witness' education and experience. *Cascadia Wildlands v. Scott Timber Co.*, 618 F. Supp. 3d 1038, 1050 (D. Or. 2022). When an expert bases his testimony on professional studies or personal experience, a court must ensure that the expert employs the same level of "intellectual rigor" that characterizes the practice of an expert in the relevant field. *Kumho Tire Co.*, 526 U.S. at 152.

Mr. Cramer is unqualified to offer any opinion concerning the impact of mental health on the frequency of mass murders. Mr. Cramer's academic background is in history and he has no medical or mental health training. (Corrected Cramer Decl. at 50-55.) Nevertheless, Mr. Cramer purports to be able to determine—from historical news reports—whether perpetrators were mentally ill "where the nature of the crime makes other explanations implausible." Mr. Cramer acknowledges that this is "necessarily a judgment call," but purports to be qualified to make that determination because his "experience with mentally ill relatives and friends informs [his] opinion." (Cramer Decl. at 33; Corrected Cramer Decl. at 34). That is not the law, nor does such a casual approach constitute the experience or expertise required for qualification as an expert. Mr. Cramer's opinions should be excluded because he is not qualified to offer them.

C.     **Mr. Cramer's opinions are unreliable.**

     1.     **Mr. Cramer's opinions are based on selective use of facts.**

Even if Mr. Cramer were qualified to offer his opinions, they should be excluded because they are based on an unreliable methodology.  An expert's reliability is determined almost exclusively by reviewing their decision-making process.  *Allen v. Am. Cap. Ltd.*, 287 F. Supp. 3d 763, 777 (D. Ariz. 2017).  If an expert's methodology cannot be explained objectively, the methodology is presumptively unreliable.  *Downs v. Perstop Components, Inc.*, 126 F. Supp. 2d 1090, 1128 (D. Tenn. 1999).  Thus, an expert's use of "[u]nexplained, selective use of facts fails to satisfy the scientific method," and renders their opinion unreliable.  *Laux v. Mentor Worldwide, LLC*, 295 F. Supp. 3d 1094, 1099 (C.D. Cal. 2017).

Mr. Cramer's opinions are unreliable because they are based on an unexplained, subjective methodology and the arbitrary use of facts.  First, Mr. Cramer collected his data based on a non-standard definition of "mass murder."  Mr. Cramer acknowledged that "scholarship in the field accepts . . . four or more dead" as the threshold number for mass murders.  (Wilson Decl. Ex. 4, (Dep. of Clayton Cramer ("Cramer Dep.") at Tr. 45:19-25.)  But Mr. Cramer opted to use a different standard of his own making.  Mr. Cramer's only explanation for his unique standard was to point to a Secret Service definition in a 2019 report for a "mass attack," which he chose because the report it came from focused primarily on "firearms mass murders." (Wilson Decl. Ex. 4. (Cramer Dep. at Tr. 45:23-46:6).)

Furthermore, Mr. Cramer's methodology for selecting incidents of mass murder is subjective.  In selecting incidents, for example, Mr. Cramer considers the moral or legal culpability of the victims or perpetrators.  In particular, Mr. Cramer does not categorize incidents as "mass murder" where he believes based on newspaper articles that the perpetrator acted in self-defense or where he perceives the incident to be gang related.  (Cramer Decl. at 9; Corrected

Cramer Decl. at 8).  One of the reasons that Mr. Cramer gives for excluding incidents that he believes are gang-related is "the integrity of the participants," who he believes "often have reason to lie."  (Cramer Decl. at 9; Corrected Cramer Decl. at 8.)  Relatedly, although Mr. Cramer settled on his definition of "mass murder" in part because he wanted to exclude lawfully killed perpetrators from the death count, he apparently relies on the felony-murder rule to determine whose death should be included in identifying a "mass murder."  (Cramer Decl. at 10; Corrected Cramer Decl. at 10).  Moreover, Mr. Cramer does not have reliable data after 1960.  (Cramer Decl. at 34 ("After 1960, the data is not yet complete."); Corrected Cramer Decl. at 55 (same).)  Thus, he cannot draw reliable comparisons to events over the last 60 years.

In addition, some of the deaths in Mr. Cramer's survey are not necessarily deaths because, according to Mr. Cramer, where news reports state that victims were injured "probably fatally," it is a "good guess" that the injured victims can [safely] be counted among the decedents."  (Cramer Decl. at 13; Corrected Cramer Decl. at 12).  But guessing does not constitute the rigor required for admission under *Daubert*.  And there are other indications that Mr. Cramer's survey is not intellectually rigorous.  Mr. Cramer acknowledged that he did not keep track of which incidents were group mass murders and which were individual because, at the time, it "seemed like an unnecessary detail."  (Cramer Decl. at 14; Corrected Cramer Decl. at 14).  As the Sixth Circuit has noted, subjectivity in an expert's methods is a "red flag" that the expert should not be certified.  *See Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 177 (6th Cir. 2009).  Such is the case here.  Mr. Cramer's unique definition and subjective process for identifying relevant data renders his opinion unreliable.

2.    **Mr. Cramer's testimony is unreliable because it is laced with errors.**

When deciding whether an expert's opinion is reliable, a court should consider, among other factors, its potential rate of error. *Daubert,* 509 U.S. at 592-94.  Mr. Cramer's opinion is based on data that contains errors and unsupported assumptions.

The potential error rate for the study underlying Mr. Cramer's opinion is high.  His declarations contain errors that go to the heart of his conclusions.  Mr. Cramer's first "magazine issue" declaration reported that his survey had recorded mass murder incidents where 3,809 deaths involved firearms and 2,068 deaths involved non-firearms, or 5,877 total deaths.  (Wilson Decl. Ex. 4 (Cramer Dep. at Tr. 81:14-17).)  Mr. Cramer also provided a chart detailing the number of single-weapon incidents in his survey, and those totaled 10,032.  In other words, although Mr. Cramer recorded over 10,000 incidents that met his definition of "mass murder," there were fewer mass murder deaths than incidents of mass murder.  When confronted by this during a deposition, Mr. Cramer admitted that the declaration was "clearly wrong" and speculated that he had constructed an incorrect query of his data.  (Wilson Decl. Ex. 4 (Cramer Dep. at Tr. 86:6-88:19).)  Such errors justify exclusion of Mr. Cramer's opinions as unreliable. *See E.E.O.C. v. Freeman*, 778 F.3d 463, 467 (4th Cir. 2015) (affirming exclusion of expert testimony based on database containing errors).

In addition, Mr. Cramer does not keep track of some of the critical data underlying his opinions.  For example, although Mr. Cramer asserts with "confidence" that most of the incidents underlying his survey were committed by individual actors, he also admits that, when he began the project he did not track which mass murders were committed by groups and which by individuals because it "seemed [like] an unnecessary detail."  (Cramer Decl. at 14; Corrected Cramer Decl. at 14.)  And Mr. Cramer lacks complete data for incidents after 1960, meaning his data cannot be used to make crucial comparisons to events in the last 60 years.  Mr. Cramer's

willingness to have confidence in data he admits is incomplete raises red flags about his

conclusions.

Because Mr. Cramer's opinions are unreliable, his testimony should be excluded under

*Daubert*.

## III.    Ashley Hlebinsky

The Court should exclude Ms. Hlebinsky's testimony on the history of firearm regulation

because she has no qualifications in legal history and did not perform reliable research.

### A.    Ms. Hlebinsky's proffered testimony

In her declaration, Ms. Hlebinsky identifies the subject matter of her testimony as

"historical testimony on firearms technology," (Decl. of Ashley Hlebinsky ("Hlebinsky Decl.")

at ¶ 2 (ECF 72)), and "the laws that existed at the time" periods relevant to the standard set forth

in *Bruen*.  (*Id*.)  Ms. Hlebinsky is not qualified to testify on "the laws that existed at the time"

periods relevant to the standard set forth in *Bruen*.

### B.    Ms. Hlebinsky is not qualified to provide expert testimony as a legal historian of firearms regulation.

"Expert opinion testimony is relevant if the knowledge underlying it has a valid

connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a

reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*,

598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (citation and internal quotation

marks omitted).  The court's gatekeeping function requires that it "make certain that an expert,

whether basing testimony upon professional studies or personal experience, employs in the

courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Here, the "pertinent

inquiry" concerns the history of firearm regulations.  Although Ms. Hlebinsky has practical

experience with involving firearms in U.S. history, she does not have knowledge or experience in the relevant discipline: legal history.

### 1. Ms. Hlebinsky is not trained as a legal historian.

Although Ms. Hlebinsky has practical experience with firearms, especially at museums, she does not have a law degree or Ph.D. in history.  Her master's degree studies involved "armed feminism and liberal activism in the 1960s and '70s that involved the use of firearms," not founding-era firearm regulations.  (Wilson Decl., Ex. 6, (Dep. of Ashley Hlebinsky ("Hlebinsky Dep.") at Tr. 87:10-17).)  Ms. Hlebinsky's academic background does not disclose any sustained or meaningful study of the history of firearms or firearms regulations in the colonial period, or any study of legal history at any time.  For that reason, the federal district court for the District of Rhode Island discounted her proffered testimony, noting that her "only academic appointments seem to have been a decade ago as a course-specific teaching assistant."  *Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at *7 (D.R.I. Dec. 14, 2022).

### 2. Ms. Hlebinsky's work at the Firearms Research Center does not qualify her as an expert in the history of firearm regulations.

Ms. Hlebinsky has been involved as a founder and senior fellow at the Firearms Research Center (the "Center") at the University of Wyoming College of Law.  This role provides no basis to qualify her as an expert.  As the court noted in *Ocean State Tactical*, as of December 2022, the Center was not yet formally founded or affiliated with the University of Wyoming.  *Id.* at *8 n.14.  Since then, the Center has formally launched but its scholarship remains aspirational.  A press release for the Center states: "Under the leadership of preeminent firearms scholars and

**Page 15 - DEFENDANTS' MOTION TO EXCLUDE TESTIMONY**

experts, the FRC will foster groundbreaking research for peer review and public use."[1]  As of this writing, the website does not disclose any ongoing scholarship.  In addition, as the *Ocean State Tactical* court observed, Ms. Helbinsky is not identified as a faculty member on the law school's website.[2]

### 3. Ms. Hlebinsky's museum experience and publishing history do not qualify her as an expert in the history of firearm regulations.

Most of Ms. Hlebinsky's practical experience is as a curator for museums dedicated, in whole or in part, to firearms.  While professional expertise can be the basis for expert testimony sufficient to survive an FRE 702 challenge, it must be sufficiently specialized to provide a reliable basis for the opinions offered.  *See Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (affirming exclusion of expert testimony where witness had significant expertise in immunology, toxicology, and chemistry "but nothing in the record indicate[d] that [the proffered expert] had any special training or knowledge regarding metal working industries such that he could reliably opine" on the disputed issue).  Here, Ms. Hlebinky's work as a museum curator does not provide her any special training or knowledge regarding the history of firearm regulations.

Ms. Hlebinsky also has not widely published on historical firearm regulation.  At her deposition, Ms. Hlebinsky claimed authorship of three articles that she believes are supportive of her qualification as an expert historian.  The first is an online article that provides, in Ms. Hlebinsky's words, "a broad glance at the ways that guns have been interpreted and used in

---

[1]  https://www.uwyo.edu/uw/news/2023/01/firearms-research-center-launches-at-uw.html (last visited May 6, 2022)

[2] *See* https://www.uwyo.edu/law/directory/ (last visited May 6, 2022)

museums."[3]  This article is short and, as described, does not concern the history of firearms or firearm regulation during the Founding or Second Founding Eras.

The second article mentioned by Ms. Hlebinsky appeared in *Armax: The Journal of Contemporary Arms* and, according to its abstract, "explores the history of Colt-type single-action revolvers in the post-World War II period, analyses the availability of historic mechanical safety mechanisms for double-action revolvers in the 19th and 20th centuries, and summarizes the patents on single-action safeties that Ruger had received by 1973."[4]  This article is focused on a single type of firearm in a discrete time-period long after the Founding Era, and does not analyze any firearm regulations.

Third, Ms. Hlebinsky points to her contribution to the "Firearms Curator Roundtable" in a publication entitled Technology & Culture Journal.  Defendants were unable to locate this article through an internet search.  Based on its title, however, it appears to be an article devoted to several perspectives on curation of firearms in a museum setting.

These publications do not support a finding that Ms. Hlebinsky is qualified as an expert witness regarding the history of firearm regulation in the periods at issue in this case.

### 4.    Ms. Hlebinsky's methods undermine her supposed qualifications as an expert witness.

Ms. Hlebinsky's deposition testimony further undermines any claim that she employs "the same level of intellectual rigor" practiced by a qualified legal historian.  *Kumho Tire*, 526 U.S. at 152.  On the topic of the thoroughness of her historical research, Ms. Hlebinsky was equivocal.  Asked if she had surveyed "the full array" of available sources, including primary

---

[3] *See* http://thepanorama.shear.org/2018/09/17/its-complicated-the-short-answer-to-firearms-museums-and-history/ (last visited May 6, 2023).

[4] *See* https://www.armaxjournal.org/doi/armax15225 (last accessed May 6, 2023).

**Page 17 - DEFENDANTS' MOTION TO EXCLUDE TESTIMONY**

sources, as would be necessary to form a proper historical perspective, Ms. Hlebinsky questioned

what would constitute "the full array," and admitted that her research had been limited by time

constraints because "timeframes are always tight on these things." (Wilson Decl. Ex. 6

(Hlebinsky Dep. at Tr. 113:21-114:21).) When questioned about her reliance on a district court

decision, *Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019), Ms. Hlebinsky described a

less-than-rigorous approach:

> Q. Okay. Well, let's take *Duncan* first. Do historians typically rely on contemporary judicial opinions as sources for understanding historical events?
>
> A. I think that's up to the person. A lot of times with that it's coming from experts. So if it was a place where I could find something that was a succinct analysis of it and then I saw the laws on the Duke site, then, yes, I would use it.
>
> Q. Okay. It's a secondary source, you agree?
>
> A. Correct.
>
> Q. Probably several steps removed from the original source, whatever it's relying on, you would agree?
>
> A. Correct.
>
> Q. In this case the *Duncan* decision was reversed by the Court of Appeals. Were you aware of that when you cited it?
>
> A. I wasn't aware of all of the different components of it. I know it went through, and then I know it went up, and now it's back down for evaluation.
>
> Q. Right. So the fact that that decision was actually vacated or reversed, does that cause you any concern with relying on this as an assertion?
>
> A. Not necessarily.
>
> Q. Why not?
>
> A. Because just because the overarching argument created by one side may have had -- may have been reversed for specific reasons, it doesn't mean that's one of them.

(Wilson Decl. Ex. 6 (Hlebinsky Dep. at Tr. 129:15-130:19).)  Not only was Ms. Hlebinsky unconcerned that the decision was reversed, but the specific passage she cites from *Duncan* itself lacks any citation to authority, historical or otherwise.

Ms. Hlebinsky's declaration and deposition testimony reveals an absence of comprehensive scholarship on firearm regulation.  For all these reasons, Ms. Hlebinksy's testimony on historical firearm regulations should be excluded.

## IV.    Dr. Gary Kleck

The Court should exclude Mr. Kleck's testimony regarding mass shootings because he cannot produce his underlying data.

### A.    Dr. Kleck's Proffered Testimony

Dr. Kleck's declaration contains rebuttal to a report prepared by Lucy Allen and Dr. Louis Klarevas concerning the use of LCMs in mass shootings in another case.  At the time Dr. Kleck submitted his declaration, Ms. Allen and Dr. Klarevas had not submitted their reports in this case.  Dr. Kleck contends that the data underlying Ms. Allen's and Dr. Klarevas's research covers only a small minority of mass shootings and the incidents that it does cover are unrepresentative of the full set of mass shootings.  (Decl. of Gary Kleck ("Kleck Decl.") at 5 (ECF 76).)  Dr. Kleck also offers competing counts of the use of LCMs in mass shootings, which this motion seeks to exclude.

In connection with his declaration, Dr. Kleck prepared a table based on data in the Gun Violence Database and the Violence Policy Center, both of which aggregate information regarding gun violence in the United States.  *See* https://www.gunviolencearchive.org/ (last visited May 11, 2023) and https://vpc.org/fact_sht/VPCshootinglist.pdf (last visited May 11, 2023).  Dr. Kleck's conclusions are based in part on the data provided by these publicly available resources.  (Kleck Decl. at ¶¶ 12-14.)

**Page 19 - DEFENDANTS' MOTION TO EXCLUDE TESTIMONY**

**B.      Dr. Kleck should not be allowed to testify concerning Table 1 of his declaration because he cannot produce the underlying data.**

An expert report must contain "the facts or data considered by the witness in forming them…."  Fed. R. Civ. P. 26(a)(2)(B)(ii); *see also* Fed. R. Evid. 705 ("the expert may be required to disclose those facts or data on cross-examination"); Fed. R. Evid. 1006 ("The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.  The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place.").  The party offering an expert must be able to explain the expert's methodology and demonstrate in an objectively verifiable way that the expert has both chosen a reliable method and followed it faithfully.  *Daubert II*, 43 F.3d at 1319 n.11.

Plaintiffs have not done so here.  Dr. Kleck was aware that the Gun Violence Archive is frequently updated.  (Wilson Decl. Ex. 7 (Dep. of Gary Kleck ("Kleck Dep.") at Tr. 36:21–24 ("[U]nfortunately, they're always revising, and so there can be a little bit of deviation from what's shown in Table 1 and what's in the Gun Violence Archive database at any one moment in time."); *see also id.* at 36:13–24, 37:12–23).)  Nevertheless, Dr. Kleck did not preserve the data he incorporated into his report.  (*Id.* at Tr. At 35:11–37:23.)  Moreover, Dr. Kleck's coding required making decisions about whether each person who died qualified as a "victim" (rather than a perpetrator), which is not readily ascertained from that data itself.  (*Id.* at Tr. 33:20–34:18 ("[A]mong the [shootings] where [the number killed] was exactly four, you've also got to check to see whether or not … that count includes killings of people other than victims.").

Dr. Kleck's inability to produce his data is consequential.  Just one month after signing his declaration and nine days after testifying at deposition in this case, Dr. Kleck submitted an

expert report in another case[5] ("*Rupp* report") reporting substantially different numbers from the same data source:

| Dr. Kleck's summaries of Gun Violence Archive data Mass shootings with 4+ victim fatalities | | | |
|---|---|---|---|
| Year | Oregon declaration (1/6/2023)[6] | *Rupp* report (2/3/2023) | % change |
| 2014 | 20 | 16 | - 20% |
| 2015 | 26 | 21 | - 19% |
| 2016 | 25 | 25 | 0% |
| 2017 | 24 | 18 | - 25% |
| 2018 | 22 | 15 | - 32% |
| 2019 | 31 | 30 | - 3% |
| 2020 | 21 | 19 | - 10% |
| 2021 | 28 | 22 | - 21% |

Given Dr. Kleck's failure to preserve the data he relied on, there is no way for defendants—or the Court—to verify the accuracy of his data compilations or the calculations that he derives from those compilations. Dr. Kleck should be precluded from testifying regarding data from the Gun Violence Archive reflected in Table 1, which was set forth in paragraph 14 of his declaration. This exclusion is appropriate in light of Dr. Kleck's failure to preserve and produce the data underlying his report. *See United States v. Miller*, 771 F.2d 1219, 1238 (9th Cir. 1985) (excluding summary of evidence where the proponent failed to provide the underlying data); *McClellan*, 710 F. Supp. 2d at 1129 (excluding expert testimony in part because the expert was unable to provide information used in preparing the report).

---

[5] Wilson Decl. Ex. 11 (Expert Witness Rebuttal Report of Gary Kleck, ¶ 17, tbl. 1, dated 2/3/2023, disclosed in *Rupp v. Becerra*, Case No. 8:17-cv-00746-JLS-JDE (C.D. Cal.)).

[6] Kleck Decl. at 6 (Table 1).

**Page 21 – DEFENDANTS' MOTION TO EXCLUDE TESTIMONY**

## CONCLUSION

For the foregoing reasons, the Court should exclude the testimony of Massad Ayoob,

Clayton Cramer, Ashley Hlebinsky, and Gary Kleck.

DATED: May 15, 2023.

ELLEN ROSENBLUM
ATTORNEY GENERAL
FOR THE STATE OF OREGON

By:    *s/ Harry Wilson*

Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Hannah K. Hoffman, OSB #183641
HannahHoffman@MarkowitzHerbold.com
*Special Assistant Attorneys General for
Defendants*

Brian Simmonds Marshall, OSB #196129
brian.s.marshall@doj.state.or.us
*Of Attorney for Defendants*

1449326