Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

_____

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | ) |
| | ) |
| | ) Civil No. |
| Plaintiffs, | ) 2:22-cv-01815-IM |
| v. | ) (Lead Case) |
| | ) |
| TINA KOTEK, et al., | ) Civil No. |
| | ) 3:22-cv-01859-IM |
| Defendants. | ) (Trailing Case) |
| _____ | ) |
| | ) Civil No. |
| (Continued) | ) 3:22-cv-01862-IM |
| | ) (Trailing Case) |
| | ) |
| | ) Civil No. |
| | ) 3:22-cv-01869-IM |
| | ) (Trailing Case) |
| | ) |

_____

* VIDEOCONFERENCE *

DEPOSITION UPON ORAL EXAMINATION

OF EXPERT

DENNIS E. BARON

_____

Witness located in:

Champaign, Illinois


* All participants appeared via videoconference *


DATE TAKEN:  March 30, 2023
REPORTED BY:  Tia B. Reidt, Washington RPR, CCR #2798
                     Oregon # 22-0001

Page 2

1    _____

2    (continued)                        )
                                        )
3    MARK FITZ, et al.,                 )
                                        )
4              Plaintiffs,              )
         v.                             )
5                                       )
     ELLEN F. ROSENBLUM, et al.,        )
6                                       )
               Defendants.              )
7    _____     )
                                        )
8    KATERINA B. EYRE, et al.,          )
                                        )
9              Plaintiffs,              )
                                        )
10        v.                            )
                                        )
11   ELLEN F. ROSENBLUM, et al.,        )
                                        )
12             Defendants.              )
     _____     )
13   DANIEL AZZOPARDI, et al.,          )
                                        )
14             Plaintiffs,              )
         v.                             )
15                                      )
     ELLEN F. ROSENBLUM, et al.,        )
16                                      )
               Defendants.              )
17                                      )
     _____

18

19

20

21

22

23

24

25

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 3

1                        APPEARANCES

2     For the Eyre Plaintiffs:

3                  NICHOLAS M. GALLAGHER
                   CLEMENT & MURPHY, PLLC
4                  706 Duke Street
                   Alexandria, VA 22314
5                  (202) 742-8900
                   Nicholas.gallagher@clementmurphy.com
6


7     For the State of Oregon Defendants:

8                  ERIN DAWSON
9                  MARKOWITZ HERBOLD
                   1455 SW Broadway, Suite 1900
10                 Portland, OR 97201
                   (503) 972-5076
11                 ErinDawson@markowitzherbold.com

12
      For Intervenor-Defendant Oregon Alliance for Gun Safety:
13
                   ZACHARY J. PEKELIS
14                 PACIFIC LAW GROUP, LLP
                   1191 Second Avenue, Suite 2000
15                 Seattle, WA 98101-3404
                   (206) 245-1700
16                 Zach.pekelis@pacificalawgroup.com;

17

18                      *   *   *   *   *

19

20

21

22

23

24

25

Exhibit 5 - Lindsay Decl. (Baron Depo.)
Page 3 of 50
75a91125-7f65-43e9-821a-166ba427247f

Page 4

1                          EXAMINATION INDEX

2      EXAMINATION BY:                        PAGE

3      Mr. Gallagher                          6, 101, 108, 110

4      Mr. Pekelis                            97, 106, 109

5                            EXHIBIT INDEX

6      EXHIBIT      DESCRIPTION                            PAGE

7      EXHIBIT 25   Expert Report of Professor Dennis      10
                    Baron.
8
       EXHIBIT 26   Curriculum Vitae of Dennis Baron.      9
9
       EXHIBIT 29   National Park Service Manual for       28
10                  the Safe Use of Reproduction
                    Flintlock Weapons in Historic
11                  Weapons Demonstrations.

12     EXHIBIT 32   New York Times article titled          55
                    "News from Washington."
13
       EXHIBIT 33   National Archives article              67
14                  "Declaration of Independence:
                    A Transcription."
15
       EXHIBIT 34   Blog titled "The iPad: What is a       84
16                  Gutenberg moment, Anyway?"

17     EXHIBIT 35   C.M. Spencer magazine gun patent       49
                    dated 3/6/1860.
18
       EXHIBIT 36   B.T. Henry magazine firearm            50
19                  patent dated 10/16/1860.

20     EXHIBIT 37   N. King magazine firearm patent        51
                    dated 5/22/1866.
21
       EXHIBIT 38   O.F. Winchester magazine firearm       54
22                  dated 9/4/1866.

23     EXHIBIT 39   Tweet by Dennis Baron dated            90
                    11/4/2013.
24
       EXHIBIT 40   Tweet by Dennis Baron dated            91
25                  6/25/2015.

Page 5

EXHIBIT INDEX CONTINUED

1

2    EXHIBIT      DESCRIPTION                                      PAGE

3    EXHIBIT 41   Tweets dated 10/15/2020.                         93

4    EXHIBIT 42   Project Muse: Look It Up in Your                 81
                  Funk & Wagnalls: How Courts Define
5                 the Words of the Law.

6    EXHIBIT 43   Brief For Professors of Linguistics             16
                   And English Dennis E. Baron, Ph.D.,
7                 Richard W. Bailey, Ph.D. and
                  Jeffrey P. Kaplan, Ph.D. in Support
8                 of Petitioners.

9    EXHIBIT 44   Brief For Corpus Linguistics                    18
                  Professors and Experts As Amici
10                Curiae Supporting Respondents.

11   EXHIBIT 47   The Washington Post article                     95
                  "Opinion Antonin Scalia was wrong
12                about the meaning of 'bear arms.'"

13   EXHIBIT 49   Declaration of Roger Pauly.                     61

14   EXHIBIT 62   Dennis Baron faculty profile.                   88

15

16

17

18

19

20

21

22

23

24

25

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                                    Dennis E. Baron

Page 11

1        THE COURT REPORTER:  Exhibit 25 has been marked.

2   BY MR. GALLAGHER:

3        Q.   Professor, in your declaration in this case,

4   paragraphs 2 and 3, you state "I have evaluated the

5   historical use of the terms 'arms' and 'accoutrement' in

6   order to determine whether ammunition or ammunition storage

7   containers were considered arms in the time during and just

8   after the Founding Era (1750-1820) through the

9   Reconstruction Era, i.e., the period

10  following the ratification of the Fourteenth Amendment

11  (1868-1890).  The purpose of this inquiry is to examine

12  whether modern firearm magazines (including large-capacity

13  magazines), which are ammunition containers, should be

14  considered 'arms' within the original public meaning of the

15  Second Amendment's text.  Based on my research, they should

16  not.

17        "The lexical evidence leads me to conclude that

18  ammunition and ammunition storage containers were considered

19  accoutrements and not arms during the Founding and

20  Reconstruction Eras."

21        Are those the opinions you plan to testify about

22  at trial?

23        A.   Yes.

24        Q.   Are there any other opinions you plan to testify

25  to at trial?

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 23

1          A.    I believe Zach reviewed it.

2          Q.    Your declaration says that, quote, "cartridge

3     boxes," unquote, are, quote, "analogs to modern firearms

4     magazines," unquote.   That's in paragraph 26.

5                What is a cartridge box?

6          A.    A cartridge box, sometimes called a cartouche

7     box -- "cartridge" and "cartouche" seemed to be used

8     synonymously at the period.   Sometimes "cartridge case."

9     They were ammunition holders.

10         Q.    Could you expand a little bit more on what you

11    mean by "ammunition holders"?

12         A.    They were containers in which, in most of the

13    contexts that I found in the data, soldiers kept their

14    bullets.

15         Q.    And what do you understand bullets at the time to

16    consist of?

17         A.    In many cases, I did not find that defined in the

18    data.  Not being a weapons expert, I really can't comment on

19    the nature of those bullets.

20         Q.    How did you arrive at your definition of

21    "cartridge box"?

22         A.    I started with a dictionary.

23         Q.    And did you refine it from there?

24         A.    Looking at the Corpus data, I came across

25    references to what they tended to be made of.  In some

Exhibit 5 - Lindsay Decl. (Baron Depo.)
Page 7 of 50
75a91125-7f65-43e9-821a-166ba427247f

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 25

1      Q.   So the Supreme Court in Bruen said, quote, "All
2   analogical reasoning requires a determination of whether the
3   two things are relevantly similar," unquote.   "And because,"
4   quote, "everything is similar in infinite ways to everything
5   else, one needs some metric enabling the analogizer to
6   assess which similarities are important and which are not.
7   For instance, a green truck and a green hat are relevantly
8   similar if one's metric is things that are green.   They are
9   not relevantly similar if the applicable metric is things
10  you can wear," unquote.
11      Would you agree with this definition of
12  "analogical reasoning"?
13      A.   I don't have any objections.   I don't know how
14  exhaustive it is, but it seems like a good place to start.
15      Q.   Is there anything you would like to add to it for
16  the purposes that we're discussing analogs in this case?
17      A.   No.
18      Q.   How did you select "cartridge box" as your analog
19  for "modern firearms magazines" as a process?
20      Let me rephrase.
21      In terms of your procedure, how did you select
22  "cartridge box" as your analog for "firearms magazines"?
23      A.   You know, I'm not entirely sure.
24      Q.   Did you consult --
25      A.   It happened several months ago when I first made

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                      Dennis E. Baron

Page 26

1    the connection, and I don't remember exactly how it

2    happened.

3        Q.   Did you consult with one of the other experts in

4    making this conclusion?

5        A.   No.

6        Q.   Did you consult any written sources in making this

7    conclusion?

8        A.   I believe it came through some of the reading I

9    was doing about magazines.

10       Q.   Did you talk with any firearms engineers or

11   firearms historians before deciding that "cartridge box" was

12   the analog you would use for "magazine"?

13       A.   No.

14       Q.   Why didn't you consult any of these sources?

15       A.   I didn't know anybody to consult.

16       Q.   Did you consider using any other part of an

17   18th-century firearm or equipment as your analog?

18       A.   No.  I believe I was fairly focused on looking for

19   something that had a similar function to a modern magazine.

20       Q.   Would you agree there have been a lot of changes

21   in firearms technology since the 18th century?

22       A.   From what I understand, yes.

23       Q.   Given that, what made you certain there was a

24   proper analog at all?

25       A.   Because of the functional similarity.  Both hold

**Exhibit 5 - Lindsay Decl. (Baron Depo.)**
**Page 9 of 50**
75a91125-7f65-43e9-821a-166ba427247f

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                      Dennis E. Baron

Page 27

1    ammunition.

2         Q.    Professor, what is your understanding of how

3    modern firearms magazines work when used with a

4    semi-automatic weapon?

5         A.    Only what I read in the Washington Post.  I have

6    no -- I have no -- I have no hands-on knowledge.  I haven't

7    even looked at diagrams or --

8         Q.    So could you explain to the best of your ability

9    how a modern firearms magazine works?

10        A.    Again, from an article in the Washington Post just

11   the other day, which I think is the first time I actually

12   read something about how modern firearms magazines work,

13   they are apparently now made of hard plastic and contain

14   bullets that are moved into the firing chamber using a

15   spring.

16             But, again, this was a total layperson's

17   understanding.  I've got no linguistic expertise to add to

18   that and certainly no firearms background to add to that.

19   It's like I'm giving you a book report of what I read the

20   other day.

21        Q.    How were the bullets moved from the cartridge box

22   into an 18th-century musket?

23        A.    From a couple descriptions that were in the data,

24   the user removed the bullet from the cartridge box and

25   placed it in the firearm.  And different firearms had

Page 28

1    different ways of doing that from what I understand from the

2    data.

3         Q.    Were the 18th-century cartridge boxes attached to

4    the firearm?

5         A.    I believe they were not.

6         Q.    Are you aware of how many steps it took to reload

7    a standard musket from the period, say, the Brown Bess?

8         A.    Not specifically, but I believe it was not a

9    simple process.

10        Q.    Would, depending on count, a figure of like 15 or

11   26 different steps sound reasonable to you?

12             MR. PEKELIS:  Object to form.

13             THE WITNESS:  I have no way of knowing how many

14   steps.  A few steps is what I would say, but I have no way

15   of knowing that.  You would have to ask a Civil War

16   reenactor or something like that.

17   BY MR. GALLAGHER:

18        Q.    I'm glad you bring that up because that brings me

19   to Exhibit 29, which is the Manual for Safe Use of

20   Reproduction Flintlock Weapons in Historic Weapons

21   Demonstrations.

22             (Exhibit 29 marked for identification.)

23             THE COURT REPORTER:  Exhibit 29 has been marked.

24   BY MR. GALLAGHER:

25        Q.    Sir, can you see that either on your end or my

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Dennis E. Baron

Page 29

1   end?

2        A.   Yeah, I can see it on your end now.  I was looking

3   at it on my end.

4        Q.   This is the list of required motions for firing an

5   18th-century flintlock.  Would you agree this is quite a

6   number of steps?

7        A.   Appears to be, yes.

8        Q.   And would you say it's more than ten?

9        A.   Yes.

10       Q.   Well, hold on.  I may keep sharing it just for the

11  time being.

12            Do you know how long the reloading process took

13  or, put another way, how many rounds per minute a

14  well-trained user could fire?

15       A.   No idea.

16       Q.   Do you know how many steps it takes for a

17  semi-automatic firearm to reload from a modern magazine?

18       A.   I do not.

19       Q.   These are the parts of a Brown Bess musket.

20            Do you see that?

21       A.   Yes.

22       Q.   Are you familiar with what a ramrod was?

23       A.   Sort of.

24       Q.   Did you consider using the ramrod instead of the

25  cartridge box as your analog for a magazine in light of the

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                     Dennis E. Baron

Page 30

1    spring that is within the magazine?

2        A.    I did not.

3        Q.    If you did consider it, how would you say that it

4    compares as an analog to the cartridge box?

5        A.    I'm not prepared to answer.  I don't know.

6        Q.    I'll move to a related topic.

7              In Paragraph 10 of your -- of your declaration,

8    you wrote that "arms does not include flints," end quote.

9    And, quote, "Nor does arms refer to parts of the weapon, for

10   example, the trigger of a gun, the hilt of a sword," end

11   quote.

12             Is it still your opinion today that a trigger is

13   not an arm?

14       A.    I guess so.

15       Q.    Professor, could you please describe to the best

16   of your ability what parts of an 18th-century musket such as

17   this one is necessary for the firearm to actually fire as

18   designed?

19       A.    I could not do that, no.

20       Q.    Would you agree that the barrel is necessary for

21   the gun to fire as designed?

22       A.    The barrel, did you say?

23       Q.    Yes.

24       A.    It's a part versus whole question, isn't it?

25       Q.    I agree it's a part versus whole question.  Let me

Page 37

1    mechanism as you see here versus if it were kept loose, say,

2    in the soldier's pocket?

3         A.   I really don't feel qualified to make those kinds

4    of --

5         Q.   Okay.

6              Let me -- let me ask a related question.

7         A.   These are things you need to get firearms people

8    to testify.  I'm just looking at a whole bunch of lists, and

9    if something appears on the list separately from the

10   firearm, that's what I understand it, it's something

11   separate.  And how you put all those things together -- I

12   mean, I saw the lists, and reading that list would not give

13   me enough understanding of how to work the gun.

14        Q.   I understand that.  And I'm trying to ask a

15   linguistic question with --

16        A.   Okay.

17             (Speaking simultaneously.  Unreportable

18   crosstalk.)

19        Q.   -- so maybe I should just rephrase it.

20             Take a firearm -- take an armory shop, I guess

21   might be the right term, in which there are many barrels but

22   they're not in guns.

23        A.   Correct.

24        Q.   Speaking of the barrel --

25        A.   Right.  Okay.

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 47

1          Q.   Would you agree there was significant changes in

2     firearms technology after the Founding period?

3          A.   So I understand.   Again, not an expert.

4          Q.   To the best of your ability and knowledge, can you

5     briefly describe what those changes were.

6          A.   I don't feel qualified to do that except in the

7     broadest of terms that I know revolving pistols get

8     introduced somewhere around the mid-19th century, and what

9     we would call machine guns or, I suppose, automatic get

10    introduced around that time, around the Civil War time as

11    well.

12               But, again, this comes from watching cowboy movies

13    as a kid and vague recollections of things I've read in

14    newspaper accounts today reflecting on the history of

15    firearms.   I am no historian of these things.   I only track

16    the words and the data.

17         Q.   Just to drill down a little bit on the machine gun

18    point that you just made.   When you say "machine gun," do

19    you mean a fully automatic --

20         A.   I think so.   I think so.   Well, I don't know how

21    automatic they were, okay?

22         Q.   Do you know what an automatic firearm -- what the

23    automatic firearm mechanism is?   Or how would you define an

24    automatic firearm in the technical sense?

25         A.   Just a layperson's understanding of it, from what

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 48

1    I gather -- and I'm not giving an expert opinion here --

2    that the automatic weapon is one where you can fire multiple

3    bullets with one pull of the trigger whereas a

4    semi-automatic requires multiple trigger pulls.

5            Does that sound right?

6        Q.    And can you distinguish a repeating rifle from

7    those two terms, so just function?

8        A.    No.

9        Q.    Do you know what a repeating rifle is?

10        A.    I have heard the term.  I don't know what it is.

11    I'm sure it's one or the other.  Or not.  It could be a

12    third thing.

13        Q.    And last question on this just to inform our

14    linguistic --

15        A.    You like to expose my ignorance to the Court, I

16    know.

17        Q.    I swear we're going somewhere with all of this.

18            Can you discuss the -- any understanding you have

19    of the changes in ammunition from the Founding period to the

20    time of the Civil War?

21        A.    I believe -- and again, this is just nonexpert

22    opinion -- they learned how to combine the gunpowder and the

23    bullet together.

24            MR. GALLAGHER:  I am now going to display

25    Exhibit 35.

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 49

1          (Exhibit 35 marked for identification.)

2          THE COURT REPORTER:   Exhibit 35 has been marked.

3    BY MR. GALLAGHER:

4          Q.    Professor, can you describe what type of document

5    this appears to be?

6          A.    It's a patent for the C.N. Springer [sic] magazine

7    gun dated 1860.

8          Q.    Take a look at the inventor's name again.

9          A.    C.N Spencer.

10         Q.    Spencer, yes.

11         A.    Yes.

12         Q.    And do you see the patent number there?   It's also

13   highlighted on the first page.

14         A.    Yeah, 27,393.

15         Q.    And can you read the description on the first

16   page with text in it that's highlighted beginning

17   "Figure 1."

18         A.    "Figure 1 is a longitudinal sectional view of the

19   breech and parts of the stock, magazine, and barrel of a gun

20   with my improvement, exhibiting it in condition for firing."

21         Q.    And can you see the magazine in the picture on the

22   first page?

23         A.    I would not be able to identify which part is the

24   magazine.   I assume it's where your cursor is, but --

25         Q.    Can you see any bullets in this illustration?

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                Dennis E. Baron

Page 50

1      A.   I -- I don't see -- I'm looking.  I don't see

2   anything that looks like a bullet, but am I missing

3   something here?

4      Q.   Do those appear to be bullets beneath the letter

5   "K"?

6      A.   I'm sorry.

7      Q.   Do those appear to be bullets beneath the part

8   that is labeled with the letter "K"?

9      A.   Oh, yeah.

10      Q.   And the part that's labeled "I," which I now see

11   as well?

12      A.   I'm looking for "I."

13      Q.   Behind that first -- behind the last bullet, I

14   think.

15      A.   Oh, oh, okay.  It looks like two bullets; is that

16   right?

17      Q.   Yes.

18           Okay.  I'm going to display a couple exhibits,

19   mand then we'll discuss them collectively.

20      A.   Okay.

21           MR. GALLAGHER:  So this will be Exhibit 36.

22           (Exhibit 36 marked for identification.)

23           THE COURT REPORTER:  Exhibit 36 has been marked.

24   BY MR. GALLAGHER:

25      Q.   Professor, if you can see it on my screen or

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Dennis E. Baron

Page 51

1   yours --

2       A.   Yeah, I see it on your screen.  Okay.  I see --

3   now I can see bullets, now that you showed me what they

4   looked like.

5       Q.   And can you describe for the record what this

6   exhibit is.

7       A.   This is the patent office record for improvement

8   in magazine firearms number 30,446 by someone named B.T.

9   Henry, patented in 1860.  So the same year as the last one.

10      Q.   And can you please read the sentence beginning

11  "Figure 6" on the bottom left of the first page with text on

12  it.

13      A.   "Figure 6 gives a perspective view of the carrier,

14  Block C, showing the Chamber, 3, in which the ammunition is

15  received from the magazine and carried up to the breech of

16  the gun."

17  BY MR. GALLAGHER:

18      Q.   Thank you.

19           MR. GALLAGHER:  We'll now turn to Exhibit 37,

20  which I'm bringing up.

21           (Exhibit 37 marked for identification.)

22           THE COURT REPORTER:  Exhibit 37 has been marked.

23  BY MR. GALLAGHER:

24      Q.   Is it easier for you, Professor, to see if I keep

25  these on single-page view instead of double?  I'm working

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 52

1    with some big screens here.

2          A.    No.  No.  No.

3          Q.    Okay.

4                Please could you describe what this exhibit

5    appears to be.

6          A.    Okay.  It's another patent dated 1866, Patent

7    No. 55,012 in the name of N. King for a magazine firearm.

8          Q.    And do you see anywhere on the second page where

9    there was --

10         A.    My --

11               (Speaking simultaneously.  Unreportable

12    crosstalk.)

13               (Reporter clarification.)

14    BY MR. GALLAGHER:

15         Q.    -- an assignor.

16         A.    Where there was what?

17         Q.    An assignor.

18               Can you read the second line from the very top of

19    the page, the sub-headline.

20         A.    Oh, oh, "Assignor to O.F. Winchester."

21               Oh, so this is the famous Winchester.

22         Q.    Yes, part of it.  We'll get to the other part.

23         A.    Okay.

24         Q.    Can you read the highlighted section:  "My

25    invention relates" --

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 53

1          A.    "My" -- "My invention" --

2               (Speaking simultaneously.  Unreportable

3     crosstalk.)

4               (Reporter clarification.)

5     BY MR. GALLAGHER:

6          Q.    That's my fault also.

7               Can you please read from "My invention," where

8     it's highlighted on the second page.

9          A.    "My invention relates to an improvement in the

10    repeating firearms patented by Horace Smith and Daniel B.

11    Wesson, the 14th of February, 1854, improved by B.T. Henry,

12    patented October 16th, 1860, in which several metallic

13    cartridges are placed in a tube or magazine beneath the

14    barrel of the arm and carried therefrom to the barrel of the

15    movement of the trigger guard."

16              Do you want me --

17         Q.    No, that is -- that is fine.

18              Actually, yes.  Could you continue reading "And

19    my..."

20         A.    "And my invention consists of an improvement in

21    the said arm whereby the cartridges may be placed in the

22    magazine with greater facility and without other objections

23    which exist to the tube as heretofore constructed."

24         Q.    Great.

25              And one last patent.

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Page 54

1          MR. GALLAGHER:  This is Exhibit 38.

2          (Exhibit 38 marked for identification.)

3          THE COURT REPORTER:  Exhibit 38 has been marked.

4    BY MR. GALLAGHER:

5          Q.   Please could you describe this exhibit, sir?

6          A.   A patent by O.F. Winchester of New Haven,

7    Improvement in Magazine Firearms, patent number 57,808,

8    dated 1866, for a magazine firearm.

9          Q.   And could you please read the highlighted section,

10   Figure 8.

11         A.   "Figure 8 illustrates the manner of filling the

12   magazine with cartridges."

13         Q.   So looking at these -- well, let me stop there

14   and --

15              Sorry.  Let me start with a different question.

16              You said earlier "the famous Winchester."

17              Do you -- could you expand by what you mean by the

18   famous Winchester?

19         A.   Just from having watched cowboy movies as a kid,

20   the Winchester rifle.  I knew nothing about it other than

21   the name.

22         Q.   And do you now understand that the Winchester

23   rifle had a magazine?

24         A.   Yes.

25         Q.   And that the magazine was inside the construction

Page 55

1      of the rifle itself?

2          A.    Yes.

3          Q.    It could not be removed without disassembling the

4      rifle?

5          A.    Apparently not.

6          Q.    Would you agree that the dates on -- well, would

7      you agree that the same is true of the Henry and Spencer

8      rifles based on the patents that you just reviewed?

9          A.    It seems to be the case, yes.

10         Q.    Do you know anything about the Henry or Spencer

11     rifles?

12         A.    No.

13         Q.    And you would agree that the dates on all four of

14     these patents were before the ratification of the Fourteenth

15     Amendment; correct?

16         A.    Right.  Which was what, 1868?

17         Q.    Yes.

18         A.    Yeah.

19             MR. GALLAGHER:  I am going to display one more

20     exhibit.  Let me find it here.  Exhibit 32.

21             This is from the third page of the New York Times

22     on Friday, December 23rd, 1864, offered as Exhibit 32.

23             (Exhibit 32 marked for identification.)

24             THE COURT REPORTER:  Exhibit 32 has been marked.

25     ///

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 56

1    BY MR. GALLAGHER:

2        Q.    Let's get this down to a more manageable size.

3        A.    Yeah.

4        Q.    Does that work for you, Professor?

5        A.    That's better.

6        Q.    Could you read the highlighted portions of this --

7    it's a paragraph, but I think it's also one sentence.

8        A.    Yeah.

9             "An ordnance examining board.  By special order of

10   the War Department, a board of the officers will convene at

11   the Springfield armory on the 4th of January, 1865, for the

12   purpose of examining, testing and recommending for adoption

13   a suitable breech loader for muskets and carbines and

14   repeater or magazine carbine."

15       Q.    Would you agree that the phrase "repeater or

16   magazine carbine" indicates that repeater rifles or carbines

17   were considered synonymous with those that used magazines,

18   at least as is used in this sentence?

19            MR. PEKELIS:  Object to form.

20            THE WITNESS:  They seem to be synonymous.

21   BY MR. GALLAGHER:

22       Q.    So taking --

23       A.    Sorry.  This is one that did not come up in my

24   newspaper searches, which is curious, because they did cover

25   the Times.

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Page 57

1       Q.   Did you run the phrase "magazine" through the New

2   York Times Times Machine archive?

3       A.   No.  I used newspapers.com, which also covers the

4   Times.  It's a little easier to use.

5       Q.   So stepping back from this specific document to

6   consider the four patents and the article as a whole, what

7   would this tell you about the use of the word "magazine" by

8   this period?

9       A.   That -- what it would tell me is that people

10  involved in the manufacture of military firearms were

11  familiar with the term "magazine" in relation to what we

12  would loosely call the part that holds the bullets.

13      Q.   Earlier, you said that when a term isn't explained

14  in a source, it often indicates familiarity with that term.

15  Is that correct?

16      A.   Yes.

17      Q.   And in the New York Times article we just looked

18  at, is the phrase "magazine" explained?

19      A.   Only -- in my view, only insofar as it's listed as

20  a synonym for "repeater."

21      Q.   And does that indicate --

22      A.   Repeater --

23           (Speaking simultaneously.  Unreportable

24  crosstalk.)

25           THE WITNESS:  Sorry.

Page 58

1          (Reporter clarification.)

2     BY MR. GALLAGHER:

3          Q.   No.  Professor, if you had anything else --

4          A.   No.  No.  Ask your question.

5          Q.   So it's only explained insofar as it indicates

6     that it's a synonym for "repeater."  Does that indicate that

7     the term "repeater" and/or "magazine" would be understood by

8     the readership of the New York Times because there's not a,

9     as you said, an explanation given of those two terms beyond

10    one another?

11         A.   It would suggest that, yeah.

12         Q.   And the readership of the New York Times is the

13    general public, more or less?

14         A.   More or less.

15         Q.   Finally, whether or not they knew of the term --

16         A.   Can I -- can I modify that statement?

17         Q.   Sure.

18         A.   In -- what is the date of this article?

19         Q.   1864.

20         A.   Okay.

21              So the Times starts publishing in, what, 1858?

22         Q.   '52, I think, but that's --

23         A.   '52.  '52.  Okay.  I knew -- I knew it was around

24    there.

25              The readership of the Times early on was -- I'm

Page 59

1    not sure it would be fair to characterize it as a national

2    newspaper at the time.  We would think of it that way today,

3    but I think certainly, readers of the Times would be

4    expected to understand.

5         Q.   Can you think of why this ordnance examining board

6    might have been page 3 news in the New York Times in 1864?

7         A.   I can't say that, no.

8         Q.   Would examining the rest of this article -- and

9    I'm happy to give you a second -- indicate why?  It's not a

10   trick question.

11        A.   It might help.

12        Q.   Okay.

13             Take a second and --

14        A.   (Speaking simultaneously.)

15             (Reporter asks parties to speak one at a time.)

16   BY MR. GALLAGHER:

17        Q.   -- feel free to look the article over.

18        A.   News from Washington.

19        Q.   Maybe I can put it another way.

20             Was there anything going on in 1864 that would

21   cause the general public to be interested in developments in

22   military technology more so than usual?

23        A.   Well, it was the Civil War period.

24        Q.   Putting aside the linguistic term "magazine" for a

25   second, I assume you would agree that the users of the

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 62

1        A.    According to the patent that you showed me.

2        Q.    And they were called magazines.  The term was

3    called -- the term by which that component of the gun was

4    referred to was "magazine" at the time, yes?

5        A.    In the patent, yeah.

6        Q.    And in the newspaper coverage at least that we've

7    seen.

8        A.    In the one article in the Times, yeah.

9        Q.    Did you do any -- hold on.  I'll stop sharing

10   this.

11        Did you do any research to see if any magazines,

12   once they came into common use, were referred to as

13   accoutrement?

14        A.    No.

15        Q.    And the items that you have seen that were

16   referred to as accoutrement were items that were outside of

17   or separate from the gun itself; correct?

18        A.    Well, I suppose, although if you're -- you had

19   suggested that things like the ramrods and the flints were

20   internal.

21        Q.    I think we had -- based on your testimony, we had

22   agreed there was a distinction between a part when it was

23   outside the whole and a part as part of the whole.

24        A.    Okay.

25        Q.    But I guess for completeness' sake, even -- even

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                          Dennis E. Baron

Page 63

1    speaking of a barrel, did you see anything to suggest that,

2    like, a barrel would be referred as an accoutrement as

3    opposed to a gun part?

4         A.    I can't say offhand, but...

5         Q.    Let me direct your attention to your declaration,

6    paragraph 33, subparagraph (l).

7         A.    33(l).

8              Okay.

9         Q.    And I'll just ask you to take a minute to look

10   will you (l) through (r), which are the examples -- excuse

11   me.  That should have been (k) through (r).

12        A.    Okay.

13        Q.    The examples that were proffered in the

14   Reconstruction period.

15        A.    Okay.

16        Q.    Is it accurate to say that your Reconstruction-Era

17   examples refer to the standard old-fashioned cartridge

18   boxes, boxes for carrying cartridges to be manually loaded

19   into rifles, rather than to magazines of the sort that were

20   internal to the gun as we have seen in the Winchester?

21             MR. PEKELIS:  Tia, could you read back the

22   question for me?

23             (Reporter clarification.)

24   BY MR. GALLAGHER:

25        Q.    Is it accurate to say that your examples from the

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Dennis E. Baron

Page 64

1      Reconstruction Era given here in paragraph 33(k) through (r)

2      refer to standard old-fashioned cartridge boxes, which is to

3      say boxes for carrying cartridges to be loaded manually into

4      rifles, rather than to magazines of the sort that we saw

5      were internal to repeating rifles?

6          A.    They seem to be, yes.

7          Q.    And directing your attention specifically to

8      33(m), that's a little different, isn't it?

9          A.    Okay.

10              Yeah.

11         Q.    Do you know what the Mitrailleuse was?

12         A.    I know what it sounds like, which is more of a

13     machine gun or -- but they refer to it as a cannon as well.

14     So in terms of size or anything like that, I could not

15     comment. I'm just guessing from the context.

16         Q.    The entire cartridge box, what they're referring

17     to as a cartridge box, appears to be put into this cannon or

18     artillery piece at once and fired and then removed; is

19     that -- is that correct?

20         A.    That's my understanding, yeah.

21         Q.    And that's a bit different from the other

22     cartridge boxes in paragraph 33(k), (l), and then (n)

23     through (r); right?

24         A.    Right.

25              So what is the -- the implication is that whoever

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Dennis E. Baron

Page 65

1    reporter writing this story was using a term they were

2    familiar with, "cartridge box."  Why did they not pick

3    "magazine"?  Was it not in their sort of reporter's

4    vocabulary?  It's an interesting question.

5        Q.   Did you make any effort to disaggregate the use of

6    old-fashioned cartridge boxes and either new magazines or

7    feeding devices of any new sort in your study of the

8    Reconstruction period sources?

9        A.   Not as such, no.

10       Q.   So turning to a slightly broader topic, Professor,

11   in your declaration, you say you studied the uses of the

12   words "cartridge boxes" or "cartouche boxes" or other

13   synonyms and the word "accoutrement."

14            Did you study for this declaration instances in

15   which arms were mentioned but cartridge boxes or

16   accoutrement were not mentioned?  In other words, when

17   "arms" was used as a term on its own absent the term

18   "cartridge box" or "accoutrement"?

19       A.   Not specifically, no, because there were too many

20   examples to -- given the time frame.

21       Q.   So --

22            Please continue.

23       A.   No.  That's it.

24       Q.   If we look at paragraph 49 of your declaration, it

25   begins "There are over 47,000 citations in newspapers.com

Page 66

1    for 'arms' or 'accoutrement' in the period 1868 to 1900 and

2    15,799 citations for the exact phrase" --

3            (Reporter requests to please read slowly when

4    reading.)

5            MR. GALLAGHER:  Sorry.  I'm a Philadelphian, and

6    I'm trying to be slow, but I'm maybe not good at it.

7            THE WITNESS:  Which paragraph are you on?

8            MR. GALLAGHER:  49.

9            THE WITNESS:  49.  Got it.

10   BY MR. GALLAGHER:

11       Q.   Could you read the opening -- could you read the

12   opening sentence in paragraph 49.

13       A.   Yeah.  "There are over 47,000 citations in

14   newspapers.com for 'arms' or 'accoutrement'

15   in the period 1868-1900, and 15,799 citations for the exact

16   phrase 'arms and accoutrements.'"

17       Q.   So I -- at the risk of doing math, I assume the

18   difference between the 47,000 figure for "arms" or

19   "accoutrements" and the about 16,000 figure for "arms and

20   accoutrement" means that there were several thousand

21   instances at a minimum of results for "arms" alone?

22       A.   Right.  That's a fair guess.

23       Q.   Did you analyze the several thousand instances of

24   the use of "arms" on its own to see if they, in context,

25   covered ammunition and accoutrement also?

Page 67

1       A.    No.

2       Q.    Why not?

3       A.    Too many.

4       Q.    Okay.

5       A.    Short time turnaround.

6       Q.    I would like to -- yeah.

7            MR. GALLAGHER:  I would like to share what will be

8    Exhibit 33.  It's a copy of the Declaration of Independence.

9            (Exhibit 33 marked for identification.)

10           THE COURT REPORTER:  Exhibit 33 has been marked.

11   BY MR. GALLAGHER:

12      Q.    Professor, if you can turn to page 3 of this

13   document.  I'm not sure the Declaration itself had

14   pagination, but on this document, page 3 and read the

15   highlighted clause, please.

16      A.    Yes.  "He has" --

17           You want me to read it?

18      Q.    Yes, please.

19      A.    "He has constrained our fellow citizens taken

20   captive on the high seas to bear arms against their

21   country," "he" being King George.

22      Q.    Yes.

23           Is it your position that the text implies that

24   these impressed sailors had arms but not ammunition?

25      A.    It is my interpretation of that sentence that

Page 68

1    "bear arms" is used in its idiomatic sense to mean "fight

2    against" in general.

3         Q.   And since these are -- sorry.  Please continue.

4         A.   However, that fight is to be construed, does not

5    specify.

6         Q.   And since they're on the high seas, do you

7    understand that we're talking about impressment?

8         A.   Yes.

9         Q.   And do you know what impressment is?

10        A.   Roughly, it is when -- when one power captures

11   another power's ship on the high seas and forces the crew to

12   fight against their country of origin.

13        Q.   As sailors in the Navy?

14        A.   Yes.  And so if you're talking about the actual

15   arms, we're talking about, what, ships' cannons; right?  So

16   we're not talking about civilian firearms.  We're talking --

17   we're talking "bear arms" in its general sense of to serve

18   in a military force.

19        Q.   Of course.

20        A.   Right?  I mean, there's a difference between that

21   and an actual firearm.

22        Q.   Right.

23             But on a narrower question, as you understand it,

24   a ship's cannon would use both the iron cannon itself and

25   the ammunition, the powder and ball that go into the cannon,

Exhibit 5 - Lindsay Decl. (Baron Depo.)
Page 34 of 50
75a91125-7f65-43e9-821a-166ba427247f

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Dennis E. Baron

Page 69

1      yes?

2              MR. PEKELIS:  Object to form.

3      BY MR. GALLAGHER:

4          Q.   I can rephrase that.

5              Professor, what is your understanding of what it

6      takes to fire a ship's cannon?

7          A.   Oh, you need a cannon.  You need a cannonball.

8      You need someone to create the explosion.

9          Q.   Okay.

10         A.   I don't think that "bear arms" refers specifically

11     to the type of weaponry in this instance.  I don't think

12     that -- they were going for dramatic effect here.  They were

13     not going for accuracy and detail.  This is a rhetorical

14     phrase.

15         Q.   Let's turn to a few more examples from a related

16     exhibit, Exhibit 44, which is -- I think we have already

17     entered it, but it's the Bruen amicus brief.

18         A.   44.  Oh, okay.  Yeah.

19         Q.   And I'll share my screen again this time too.  I

20     keep forgetting to actually do that because I think it's

21     just permanently shared.

22             Let's go to page 15 of this.

23         A.   Mm-hm.

24             Do you want me to read the highlight?

25         Q.   Let's start with the second highlight.  The second

Page 70

1    highlight.

2         A.    "All male persons, from sixteen years of age

3    to fifty, shall bear arms and duly attend all

4    musters and military exercise of the respective

5    troops and companies," dated 1760.

6         Q.    And in this context, do you understand that the

7    male persons from 16 years of age to 50 were supposed to

8    bring anything to the musters?

9         A.    The typical militia regulations called for

10   bringing your own weapon.

11        Q.    Did they typically call for anything beyond the

12   weapon itself?

13        A.    Sometimes they specified -- depends on the weapon,

14   okay?  There are different weapons for different classes or

15   fighters in the militia, and "bear arms" is a general term

16   here to cover everything from the officers to the infantry

17   or the line soldier.

18        Q.    So when it comes to the infantry line soldier,

19   what would you understand from this phrase that they were

20   supposed to bring to the musters?

21        A.    It would depend on the particular requirements of

22   that particular militia.

23        Q.    Do you have an opinion as to what generally would

24   be required?

25        A.    Typically, some kind of firearm, long gun.

Page 71

1    Pistols were for the officers.  Possibly specifying how many

2    bullets they were required to bring.  How much gunpowder in

3    terms of weight sometimes is mentioned in the regs.

4    Sometimes the other accoutrement, like flints and other

5    implements, accessories to the firearm.  But...

6        Q.   So in a state that specified that infantry

7    soldiers were to bring ammunition and accoutrement and, in

8    the case of an infantry soldier, is it a fair reading to say

9    that this phrase, "all male persons shall bear arms and duly

10   attend all musters," would include bringing not only the

11   musket itself, but also the ammunition and accoutrement?

12       A.   Probably.

13       Q.   So at times, "arms" used on its own could imply

14   something more than the weapon itself, even if when

15   specified "arms," "ammunition," and "accoutrement" can refer

16   to distinct ideas; right?

17       A.   Sometimes "bear arms" is used generally to just

18   indicate that you are being a soldier.  I mean, one of the

19   early definitions of "bear arms," let's say in the Webster's

20   unabridged, was to serve as a soldier.

21       Q.   But this passage, this 1760 passage we have been

22   discussing, it appears to be from a state militia law;

23   right?

24       A.   It would appear to be, yes.

25       Q.   And is it your understanding as to this specific

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                              Dennis E. Baron

Page 72

1    passage that a state infantryman -- you know, assuming that

2    the state specified a given amount of accoutrement and

3    weapon -- and bullets that he was supposed to bring, would

4    be required to show up with all of that based on the phrase

5    "bear arms"?

6              MR. PEKELIS:  Object to form.

7              THE WITNESS:  Based on the fact they were in the

8    militia, they would be required to do it.  But I would have

9    to see the full context.

10   BY MR. GALLAGHER:

11       Q.   Let's bring up -- this is another sort of "may

12   use" exhibit, United States versus Miller.  So I'll share

13   my...

14       A.   Mm-hm.

15             THE COURT REPORTER:  I'm not marking this,

16   Counsel?

17             MR. GALLAGHER:  Let's mark this as Exhibit 46,

18   please.

19             We don't need to read, I think, all of this,

20   Professor.

21             THE COURT REPORTER:  One moment.

22             I don't have Exhibit 46.  Is this --

23             MR. PEKELIS:  I don't either.

24             MR. GALLAGHER:  Sorry.  I was -- I thought I'd

25   said clearly enough that this isn't one that I had

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                   Dennis E. Baron

Page 73

1    circulated.  I didn't anticipate necessarily needing to use

2    it.  It is -- I will circulate it afterwards, and it is --

3    it's just the plain text of the United States versus Miller.

4                MR. PEKELIS:  Nick, if you could send it at least

5    to counsel now, that would be helpful.

6                MR. GALLAGHER:  Sure.

7                MR. PEKELIS:  And we have been going about another

8    hour.  So maybe -- would this be a good time to take a break

9    so you can circulate your remaining exhibits to us?

10                MR. GALLAGHER:  Yeah, let me do that.  I -- I --

11    because of the problems that we ran into earlier -- well,

12    let's go off the record, and I'll just...

13                THE COURT REPORTER:  We are off the record.

14                (Pause in the proceedings.)

15    BY MR. GALLAGHER:

16        Q.    I had just offered Exhibit 46, United States

17    versus Miller.  And, Professor, I'd asked you to look at the

18    highlighted sections of the militia laws that are discussed

19    from star 180 through star 182.

20                Have you had a chance to do so?

21        A.    I'm looking at it now.  That's on page 3; right?

22        Q.    Yes.  Yeah.  Page 3 of this PDF, yeah.

23        A.    Oh.

24                I see the stars.  I didn't know what the stars

25    were.

Page 74

1      Q.   It's a lawyer thing, and I couldn't remember the

2      initial US report number.  So, yeah, page 3 of the PDF.

3          A.   Okay.

4               What --

5          Q.   So as to the laws here, at least as to infantrymen

6      who carried muskets, you would agree that they were all

7      required to show up not just with the musket, but with

8      ammunition and accoutrement as well; right?

9          A.   Right.

10         Q.   So returning to Exhibit -- where was it?

11     Exhibit 44, the Bruen amicus brief, our discussion of the

12     militia law in 1760.  "All male persons shall bear arms and

13     duly attend all musters."

14              If you were an ordinary militiaman who was a

15     musketman and you were reading this law, would you

16     understand it to require you to turn up with just your

17     musket or also the ammunition and accoutrement that you were

18     required to bring as well?

19         A.   The ammunition and accoutrement.

20         Q.   And so at least in some circumstances, "arms" can

21     include ammunition and accoutrement; right?

22         A.   It depends how you read "arms."  If you read it in

23     the context of "bear arms," which means, as I read it, serve

24     as a soldier, then you are -- you are required to bring a

25     certain number of things.  It doesn't mean all of those

Page 75

1    things are arms.

2         Q.   Let me come at this a slightly different way.

3              You said earlier that the term "bear arms" can

4    vary technologically.  In other words, in a society that

5    fought with -- or maybe I misunderstood you, but you said

6    that "bear arms" doesn't involve specific arms.  It's a

7    phrase, but it doesn't necessarily entail just on its own

8    specific arms; right?

9         A.   Not necessarily.  That's right.

10        Q.   So in a society that used swords and shields to

11   fight, you know, if we said that Aneas and his companions

12   were bearing arms, we would assume that they were not using

13   firearms but maybe swords or shields; right?

14        A.   Yeah.

15             (Reporter clarification.)

16             MR. GALLAGHER:  Aneas, A-N-E-A-S.  Testing my

17   classical spelling today.

18   By MR. GALLAGHER:

19        Q.   But by the same token, in a society that the

20   prevailing arms were firearms, we would assume that "bear

21   arms" referred to all of the usual firearms and things to

22   make them work; right?

23             THE COURT REPORTER:  I saw your mouth move,

24   Mr. Pekelis, but you're muted.

25             Was there an objection?

Page 76

1              MR. PEKELIS:  Thank you.  Good catch.

2              Object to form.

3              I've been objecting throughout, all of these

4      questions, by the way.

5              THE COURT REPORTER:  I have not heard --

6              MR. PEKELIS:  I'm kidding.  I'm kidding.

7              THE COURT REPORTER:  Okay.

8              MR. PEKELIS:  That was the only one.

9              THE COURT REPORTER:  Thank you.

10     BY MR. GALLAGHER:

11         Q.   Well, let's take a look at --

12             THE COURT REPORTER:  I did not hear an answer if

13     there was one.

14             MR. GALLAGHER:  Oh, yeah.  Sorry.

15             THE WITNESS:  I'm not sure I actually answered

16     that because -- say the question again.  Say the question

17     again.

18     BY MR. GALLAGHER:

19         Q.   So in the same way that if the society in question

20     used as arms swords and shields, we would assume that

21     "bearing arms" involved the use of swords and shields.  If a

22     society used firearms, we would assume that the phrase "bear

23     arms" involved firearms and things that make them work;

24     right?

25             MR. PEKELIS:  Object to form.

Page 77

1          THE WITNESS:  I suppose.  But --

2     BY MR. GALLAGHER:

3          Q.   So let's take, for example, this non-highlighted

4     fourth-from-the-top on page 15 of Exhibit 44:  "That numbers

5     of the inhabitants murmur at being obliged to bear arms; and

6     the dread of a French War is very general."

7               And this is from 1777.

8               Do you see that?

9          A.   Yes.

10         Q.   And in 1777, they generally used firearms to wage

11    wars; correct?

12         A.   If you say so.

13         Q.   Is there any reason to assume that the inhabitants

14    obliged to bear arms would only use muskets but not

15    ammunition in this passage?

16         A.   My reading of the passage, and I assume that

17    "murmur" means object in some fashion, is not that the

18    numbers of inhabitants, as mentioned, object to the carrying

19    of weapons.  They object to being drafted into the military.

20         Q.   Right.

21         A.   So I think that it's being used generally to say,

22    you know, I don't want to fight.  Not my fight.  I would

23    rather be tending to my crops or my shop or whatever.  Being

24    obliged to bear arms means that they're being drafted,

25    basically.  They're being -- they're being, as you used the

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 78

1    term before, impressed into service, that they would rather

2    not do that.  So that when you have the conscientious

3    objector clause that was in early drafts of the Second

4    Amendment --

5        Q.    But if they were -- sorry.  I thought you were

6    done.

7        A.    -- where those -- I believe the phrase was

8    something like scrupulous of bearing arms or to be excused

9    from service in the militia, I mean, if you're talking about

10   the phrase that was put in to the early drafts of the Second

11   Amendment to excuse Quakers who were pacifists from serving

12   in the military.  It's not that Quakers didn't use guns to

13   shoot game, it was that they didn't want to use arms to --

14   they didn't want to engage in any kind of warlike activity.

15   So I don't think "bear arms" here is referring specifically

16   to the equipment that the French peasants are supposed to

17   bring to their military service, but rather, their objection

18   in general to having to serve at all.

19       Q.    Okay.

20             But in the next -- in the next example, then, the

21   one we have already discussed, it does actually somewhat

22   refer to the weapons they were supposed to bring to their

23   musters?

24       A.    Yeah.  That one is -- you know, covers both of

25   those meanings.  One was bear arms as being in the militia

Page 79

1   to begin with.  And then if you want to possibly drill down

2   to talk about what arms, we're getting away from bear arms,

3   which I still think is the idiomatic phrase rather referring

4   to -- rather than -- sorry.  My earphones are whistling --

5   rather than referring to the specific weapon, which are

6   later in other parts of the regulation spelled out.

7         Q.   Okay.

8              So let me give you a hypothetical, then, to maybe

9   disaggregate those two meanings that are born in the second

10  example.

11        A.   Yeah.

12        Q.   Supposing that, you know, a sergeant of militia in

13  1777 says to his men, you know, "Grab your arms and report

14  to the parade ground," do you think it's fair to assume that

15  he means ammunition as well as musket, assuming it's an

16  infantry company that uses muskets?

17        A.   Right.  And assuming that the drill includes live

18  ammo.

19        Q.   Okay.

20             So to clarify -- even a better hypothetical,

21  suppose the drill sergeant in 1777 says to his infantrymen

22  who use muskets "Grab your arms.  The enemy is attacking."

23  I would assume that it would be correct to interpret "arms"

24  as including ammunition in that phrase?

25        A.   Probably, yeah.

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 99

1    distinction between detachable magazines and fixed

2    magazines.  Would you agree?

3        A.   Yeah.  Yeah.

4        Q.   And in looking at cartridge boxes as an analog for

5    modern magazines, would you say cartridge boxes are more

6    analogous to detachable magazines or fixed magazines?

7        A.   They would be detachable.  They're something

8    soldiers wore on their belts, perhaps on a shoulder strap.

9    They were not part of the weapon itself.

10       Q.   Understood.

11            Mr. Gallagher asked you about whether a ramrod

12   would be more analogous to a modern-day magazine than a

13   cartridge box.  And I believe your testimony was that it

14   would not be; is that right?

15       A.   In my opinion, it would not be because it doesn't

16   hold bullets.

17       Q.   What does a ramrod do?

18       A.   It -- you use it to push the bullet down the

19   barrel.

20            I presume, although, again, not a firearms expert,

21   that once breech-loading firearms were developed and became

22   more common, the ramrod was no longer necessary.  This may

23   or may not be the case, but the ramrod didn't seem to be

24   analogous to a magazine.

25       Q.   Based on your -- I realize you didn't -- well, let

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 100

1    me ask it.

2              Did you look at the corpora for the word ramrod in

3    its use with the word arms?

4         A.    No.

5         Q.    Okay.

6              But based on your research in looking at the word

7    "arms" and the word "accoutrement," would a ramrod be

8    considered -- in the 18th-century and 19th-century lexicon,

9    would a ramrod be considered an arm or an accoutrement?

10        A.    I believe it would be considered an accoutrement

11   or an accessory.

12        Q.    Mr. Gallagher showed you several patents from the

13   1860s of very similar types of firearms that used the word

14   "magazine" in a way that appeared to refer to an internal

15   holder of ammunition.

16             Do you recall that?

17        A.    Yes.

18        Q.    Are patents parts of the corpora?

19        A.    No.

20        Q.    Why not?

21        A.    I would have to guess because I'm not involved in

22   compiling the corpora.  It may be -- patents may be on their

23   list to ultimately include them, but I did not come across

24   in my search any patent references.  I don't know how well

25   they are digitized.

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                    Dennis E. Baron

Page 103

1          A.    The --

2                (Speaking simultaneously.   Unreportable

3      crosstalk.)

4                (Reporter clarification.)

5      BY MR. GALLAGHER:

6          Q.    In other words, what is the difference between a

7      firearms magazine and a box of bullets lying on the ground?

8          A.    It sounds like an intro to a joke.

9          Q.    Given that they are relevantly similar in that

10     both hold bullets, what is the difference between a magazine

11     and a box of --

12         A.    Okay.  Okay.

13               (Speaking simultaneously.   Unreportable

14     crosstalk.)

15               (Reporter clarification.)

16     BY MR. GALLAGHER:

17         Q.    I was saying:  Given that they are relevantly

18     similar and that both hold bullets, what is the difference

19     between a modern magazine and a box that contains bullets?

20         A.    The magazine, once it contains bullets, combines

21     the function of holding the bullets and feeding the bullets

22     into the firearm.

23         Q.    Mr. Pekelis --

24         A.    (Speaking simultaneously.)

25         Q.    Sorry.  Please finish.  I thought you were done.

Exhibit 5 - Lindsay Decl. (Baron Depo.)
Page 48 of 50
75a91125-7f65-43e9-821a-166ba427247f

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                    Dennis E. Baron

Page 108

1    ammunition, if such a device existed, would it be consistent

2    with your research that it be called an arm or an

3    accoutrement or both?

4         A.   I'm leaning towards accoutrement, but if you could

5    describe in more detail what kind of mechanism you're

6    talking about...

7         Q.   Well, it's hypothetical because as far as I know,

8    there wasn't such a device.  But --

9         A.   Right.

10        Q.   -- if there were, would it be properly

11   characterized, based on your linguistic research, as an arm

12   or an accoutrement?

13        A.   Okay.

14             I think I understand the question.  I'm still

15   leaning towards accoutrement here.

16             MR. PEKELIS:  Okay.  I don't have anything else.

17             MR. GALLAGHER:  I have two follow-ups on that.

18

19                      FURTHER EXAMINATION

20   BY MR. GALLAGHER:

21        Q.   So did I understand you correctly to answer that

22   in general, your opinion is that there is no analogy to a

23   mechanical feeding device in common use in the Founding

24   period?

25        A.   Yes.

Oregon Firearms Federation, Inc., et al. v. Kotek, et al. (Consolidated)                                      Dennis E. Baron

Page 112

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6         I, Tia Reidt, a Certified Court Reporter in and

7    for the State of Washington, do hereby certify that the

8    foregoing transcript of the deposition of DENNIS E.

9    BARON, having been duly sworn, on March 30, 2023, is

10   true and accurate to the best of my knowledge, skill and

11   ability.  Reading and signing was requested pursuant to

12   FRCP Rule 30(e).

13        IN WITNESS WHEREOF, I have hereunto set my hand

14   and seal this 4th day of April, 2023.

15

16

17

18   _____

19        /S/ Tia B. Reidt
          Tia B. Reidt, RPR, CCR # 22-0001
20        NOTARY PUBLIC, State of
          Washington.
21        My commission expires
          5/15/2026.

22

23

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

**Exhibit 5 - Lindsay Decl. (Baron Depo.)**
**Page 50 of 50**
75a91125-7f65-43e9-821a-166ba427247f