Michael R McLane
mmclane@lynchmurphy.com
Lynch Murphy McLane LLP
1000 SW Disk Dr
Bend, OR 97702
Telephone: (541) 383-5857

Matthew A Wand
matt@wandlegal.com
Wand Legal LLC
1000 SW Disk Dr
Bend, OR 97702
Telephone: (503) 680-8180

*Attorneys for Amicus*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KATE BROWN, et al.,<br><br>Defendants. | Case No. 2:22-cv-01815-IM *(Lead Case)*<br>Case No. 3:22-cv-01859-IM *(Trailing Case)*<br>Case No. 3:22-cv-01862-IM *(Trailing Case)*<br>Case No. 3:22-cv-01869-IM *(Trailing Case)*<br><br>CONSOLIDATED CASES<br><br>***AMICUS CURIAE* BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD, INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL**<br><br>*(caption continued on next page)* |

Page 1 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

MARK FITZ, et al.,

                                Plaintiffs,

      v.

ELLEN F. ROSENBLUM, et al.,

                                Defendants.

KATERINA B. EYRE, TIM FREEMAN, MAZAMA SPORTING GOODS, NATIONAL SHOOTING SPORTS FOUNDATION, and OREGON STATE SHOOTING ASSOCIATION,

                                Plaintiffs,

      v.

ELLEN F. ROSENBLUM, Attorney General of Oregon, and TERRI DAVIE, Superintendent of the Oregon State Police,

                                Defendants.

DANIEL AZZOPARDI, et al.,

                                Plaintiffs,

      v.

ELLEN F. ROSENBLUM, et al.,

                                Defendants.

Page 2 -      AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL

LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

# TABLE OF CONTENTS

STATEMENT OF INTEREST................................................................5

INTRODUCTION ...............................................................................7

BACKGROUND ................................................................................8

   1.  African Americans / NAAGA...............................................8
   2.  Asian Americans and Pacific Islander Americans / APAGOA .....12
   3.  Women / DCPF ...................................................................15
   4.  LGBTQ / OBSPP ................................................................16

ARGUMENT .....................................................................................18

   1.  Ballot Measure 114 ............................................................18
   2.  The permit-to-purchase requirement of Measure 114 is unconstitutional .......19
   3.  The effective seizure by the state government of certain ammunition magazines under Measure 114, as well as the criminalization of possession of the same, is unconstitutional ..................................25

CONCLUSION...................................................................................26

# TABLE OF AUTHORITIES

## CASES

*Watkins v. Ackley*, 370 Or 604, 637, 644 (2022) .........................................8,22

*New York State Rifle & Pistol Association v. Bruen,*
   597 U.S. ___, 142 S.Ct. 2111, 2134-35, 2137-38, 2156 (2022) ...................9,20,21,22

*McDonald v. City of Chicago*, 561 U.S 742, 771, 776, 790 (2010)..................10,19,23,25

*District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)...............................9,19

*Warren v. District of Columbia,* 444 A.2d 1, 3 (D.C. 1981) ............................14

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961) .........................20

*Koons v. Reynolds*, No. 22-7464 (RMB/EAP), 2023 WL 128882 at *9 (D. N.J. Jan. 9, 2023) ................................................................................20

*Yukutake v. Conners,* 554 F.Supp.3d 1074 (D. Haw. 2021) ..............................22

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008)..................22

*Harman v. Forssenius,* 380 U.S. 528, 543 (1965) .........................................23

*DeShaney v. Winnebago Cty,* 489 U.S. 189 (1989) ........................................24

*Haynes v. United States*, 390 US 85 (1968).............................................24

*Castle Rock v. Gonzales*, 545 U.S. 748 (2005).............................................24

Page 3 -   AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL

LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

**OTHER AUTHORITIES**

Greg Nokes, *Black Exclusion Laws in Oregon* ................................................................8

Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional
Right of the People or a Privilege of the Ruling Class?* (2021) .................................9,21

Frederick Douglass on the American Crisis, *Newcastle
Weekly Courant* (May 26, 1865) ...................................................................................9

Stephen Halbrook, *Freedmen, the Fourteenth Amendment,
and the Right to Bear Arms*, (1998) .............................................................................10

Nicholas Johnson, *Negroes and the Gun: The Black Tradition of Arms* (2014) ...........10

Charles E. Cobb, Jr., *This Nonviolent Stuff'll Get You Killed* (2014) .........................10

Ida B. Wells, *Southern Horrors: Lynch Law in All its Phases* (1892) ........................10

Centers for Disease Control and Prevention, *Web-based Injury Statistics Query and
Reporting System (WISQARS) Fatal Injury Reports, National, Regional and State, 1981 –
2020*.............................................................................................................................10

Centers for Disease Control and Prevention, *WISQARS Nonfatal Injury Reports, 2000 –
2020*.............................................................................................................................10

Centers for Disease Control and Prevention, *WISQARS Leading Causes of Death
Reports, 1981 – 2020* ..................................................................................................10

Shen x, Millet L., *Violent Deaths in Oregon: 2013* .....................................................11

Shen X, Millet L., *Homicide Trends and Characteristics, Oregon, 2003-2012* .............11

*Firearm Injury Emergency Department Visits in Oregon, 2018-2021* at 6, OHA & OHSU
(Aug. 2022) ..................................................................................................................11

OHSU, *Gun Violence: A Public Health Issue* ..............................................................11

Nancy La Vigne, Jocelyn Fontaine, and Anamika Dwivedi, *How do People in High-
Crime, Low-Income Communities View the Police?* Urban Institute (February 2017) .....12

Jennifer Fang, *Erasure and Reclamation: Centering Diasporic Chinese
Populations in Oregon History* Oregon Historical Quarterly, vol 122, no. 4 (2021) ........12

Center for The Study of Hate and Extremism, California State University San
Bernardino, *FACT SHEET: ANTI-ASIAN PREJUDICE* (March 2021) ...........................13

Jonghyun Lee, *Return of the Yellow Peril? Racism, Xenophobia and Bigotry
Against Asian Americans*, Bridgewater Review (December 2022) ..................................13

Conrad Wilson, *Oregon Hate Crime Reports Up 366% Amid Coronavirus
Pandemic*, OPB (April 30, 2020).................................................................................13

Conrad Wilson, *Two Years and Thousands of Voices: What Community-Generated
Data Tells Us About Anti-AAPI Hate,* Stop AAPI Hate (July 20, 2022)...........................13

Kate Williams, *Asian-Owned Business Hit in More Than a Dozen Acts of
Vandalism in Portland's Jade District*, OregonLive.com (February 10, 2021) ................13

Nazmia E.A. Comrie, *Combating Hate Crimes against Asian American and
Pacific Islander Communities*, COPS Office USDOJ (April 2021) .................................14

Wendy Grossman Kantor, *Filipino American Man Recounts Brutal Attack With
Box Cutter on N.Y.C. Subway: 'Nobody Helped'*, PEOPLE (February 18, 2021)............14

Tim Elfrink, *New York man charged with hate crime in Asian American attack that
bystanders watched without helping*, WASHINGTON POST (March 31, 2021)...........14

Marian Liu & Rachel Hatzipanagos, *"Nobody came, nobody helped": Fears of Anti-
Asian violence rattle the community*, WASHINGTON POST (February 25, 2021) .........14

Page 4 -     AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN
             PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND
             OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
             LYNCH MURPHY MCLANE LLP
             ATTORNEYS AT LAW
             T: (541) 383-5857 | F: (541) 383-3968
             1000 SW DISK DRIVE
             BEND, OREGON  97702

*Fatal Domestic Violence in Oregon: Demographics Related to Victims, Perpetrators, and Incidents: 2017 Report*, Oregon Coalition Against Domestic & Sexual Violence (2017) ...........................................................................15

Aaron Smith, *More Asian-Americans Are Buying Guns for Protection from Hate Crimes*, FORBES (March 18, 2021) .......................................................14

*2021 Oregon Annual Report*, Uniform Crime Report - Section 8 - Domestic Violence and Bias Reporting ..........................................................................15

Oregon State Police Uniform Crime Reporting Data (January 1, 2020) ...........15

Andrew Flores, Lynn Langston, Ilan Meyer, and Adam Romero, *Victimization rates and traits of sexual and gender minorities in the United States: Results from the National Crime Victimization Survey, 2017*, Science Advances (October 2, 2020).........16

Ericka Dixon, Audacia Ray, Beverly Tillery, Michelle Leigh, *Pride and Pain: A Snapshot of Anti-LGBTQ Hate and Violence during Pride Season 2019*, National Coalition of Anti-violence Programs (2020) .....................................................16

*A Crisis of Hate: A Report on Lesbian, Gay, Bisexual, Transgender and Queer Hate Violence Homicides in 2017*, National Coalition of Anti-violence Programs (2017) .......17

*Study: Oregon ranks No. 8 for most anti-LGBT hate crimes*, KOIN 6 (Sept. 11, 2019).........................................................................17

*Anti-LGBT Hate Crimes are Rising*, Security.org (December 20, 2022) ..........................17

D. Speak, *Oregon's LGBTQ Community Worries that a New Law Will Keep Them from Obtaining Guns*, NPR (December 16, 2022)....................................................17

Jesse Jannetta, Sino Esthappan, Jocelyn Fontaine, Mathew Lynch, Nancy G. La Vigne, *Learning to Build Police-Community Trust*, Urban Institute (August 8, 2019) ......................................................................19,24

David B. Kopel, *Background Checks For Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 343, 360-61 (2016) ...........................21,22

Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529, 543 (2021) ..................................................................22

Rob Davis, *The Oregonian's Racist Legacy* (October 24, 2022) ......................................24

## INTEREST OF *AMICI CURIAE*

National African American Gun Association, Inc. (NAAGA), Asian Pacific American Gun Owners Association (APAGOA), DC Project Foundation, Inc. (DCPF), and Operation Blazing Sword, Inc. (operating as Operation Blazing Sword - Pink Pistols) (OBSPP) are member associations with thousands of members residing throughout the United States, including Oregon. APAGOA and OBSPP are non-profit organizations, exempt from federal taxation under section 501(c)(3) of the Internal Revenue Code. NAAGA and DCPF are non-profit organizations with an approval under section 501(c)(4) of the Internal Revenue Code.

Page 5 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

NAAGA was founded on February 28, 2015, to defend the Second Amendment rights of members of the African American community.  NAAGA has over 130 chapters in 38 states, and over 50,000 members living in every state of the United States and the District of Columbia.  NAAGA's mission is to establish a fellowship by educating about the rich legacy of gun ownership by African Americans, offering training that supports safe gun use for self-defense and sportsmanship, and advocating for the inalienable right to self-defense for African Americans.  Its goal is to have every African American introduced to firearm use for home protection, competitive shooting, and outdoor recreational activities.  NAAGA welcomes people of all religious, social, and racial perspectives, including African American members of law enforcement and active/retired military.  NAAGA's interest in this case stems in part from the fact that there has been a long history of discrimination against African Americans with respect to the exercise of their Second Amendment right to bear arms.  More specifically, African Americans were denied their Second Amendment right to bear arms under the antebellum Slave Codes, the post-Civil War Black Codes, and the Jim Crow laws that persisted into the twentieth century.  Measure 114 is just another prohibition on the African American community's ability to exercise their Second Amendment right to bear arms for self-defense.

APAGOA was founded in 2021 to create a community of gun owners with an Asian Pacific American Heritage.  APAGOA advocates for strong firearms safety, education, and community building initiatives.  A core focus of APAGOA is to promote safe and responsible gun ownership within the Asian Pacific American community by providing educational materials and other supportive resources to its members and other interested parties.  APAGOA has a significant interest in this case as an organization that represents racial groups who have been disproportionately targeted for racial violence over the past year and who have increasingly purchased firearms to defend themselves.

The DC Project Foundation was established in 2016 by retired police officer and professional shooting competitor, Dianna Muller.  A woman from each state originally met in

Page 6 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON 97702

Washington DC to organize nationally and advocate in each state for the right of women in America to own firearms and for the training and the safe use of firearms by women. DCPF members work together in a bipartisan fashion to educate legislators on firearm safety and culture. Currently there are over 3,000 members. DCPF believes that Measure 114 will negatively impact women's right to self-defense and the rights to bear arms secured by the Second Amendment.

OBSPP was established to advocate on behalf of lesbian, gay, bisexual, transgender, and queer ("LGBTQ") firearm owners, with specific emphasis on self-defense issues. Operation Blazing Sword, founded in 2016 the day after the Orlando Pulse Nightclub Massacre, has over 1,500 volunteer firearm instructors in nearly a thousand locations across all 50 states who will teach anyone the basics of firearm safety, operation and ownership for no cost and without judgement for race, gender, sexual orientation, biology, or manner of dress. Pink Pistols, founded in 2000 and incorporated into Operation Blazing Sword in 2018, is a shooting society that honors gender and sexual diversity and advocates the responsible use of firearms for self-defense. It represents portions of the American population that are disproportionately the targets of hate crimes and armed criminal violence, and consists of 45 chapters across the country. Pink Pistols does not maintain a list of members out of respect for those who wish to stay "inside the gun closet." Membership of both aspects of this organization is open to anyone, regardless of sexual orientation or gender identity, who supports the rights of LGBTQ firearm owners.

## INTRODUCTION

African Americans, Asian Pacific Americans, women and LGBTQ people have the right to defend themselves against violent crimes. The Second Amendment to the United States Constitution guarantees them that right. Oregon owes them that right. Measure 114 will take that right away by delaying and arbitrarily denying them the ability to be armed.

The *Amici* submit this brief to discuss the negative and unconstitutional effects that Measure 114 will have on the ability of their respective members in Oregon to defend

Page 7 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

themselves and conduct lawful activity.  They offer this Court a perspective that no other party offers in this action – the perspective of citizens that Oregon has a history of discrimination against; Oregon's government in the past has condoned violence against people who looked like them, lived like them, and loved like them.  The *Amici* seek the protection of the federal court because, as history shows, the Constitution is the place of refuge when the majority – in the name of safety – seek to disarm them, disenfranchise them, and devalue them.

## BACKGROUND

Because of the unique perspective of each of the *Amici* and their troubled history with Oregon's government, as well as other state governments and the national government, *Amici* offer the following historical backgrounds and insight into prior efforts to disarm them. The groups that comprise the *Amici* have suffered violence at a disproportionately higher rate than members of the majority.

### African Americans / NAAGA

As the Oregon Supreme Court recently recognized, Oregon has a racist past – a "sordid history" as Justice Baldwin in concurrence put it – and its government has been reluctant to acknowledge it and right the wrongs.  *See Watkins v. Ackley*, 370 Or 604, 637 (2022) (post-conviction relief granted to defendants convicted on the basis of nonunanimous juries).  "The state of Oregon was founded primarily by white emigrants that opposed slavery but didn't want to live alongside African Americans; exclusion laws were passed to discourage African Americans from coming to Oregon."  Id. at 642 (Justice Baldwin, concurring, quoting Greg Nokes, *Black Exclusion Laws in Oregon*).  For those African Americans who did come to Oregon and live here in the late 19th and early 20th centuries, they faced discrimination and racial intolerance that rivaled the Jim Crow laws of the South.  Id. at 643 (Justice Baldwin, concurring).

> "As citizens of Oregon from all backgrounds-particularly based on
> our history of racial exclusion-we must understand that the passage
> of our nonunanimous jury verdict law has not only caused great
> harm to people of color: That unchecked bigotry also undermined

Page 8 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN
PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND
OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

the fundamental Sixth Amendment rights of all Oregonians for nearly a century. The direct passage of that exclusionary law in 1934 by Oregon voters was a self-inflicted injury to our precious constitutional heritage. For us to protect and preserve that constitutional heritage, we must always be on our guard against such mischief. With that understanding-and with a measure of courage-we can learn from our history and avoid such grievous injury in the future to our civic health." Id. at 644 (Justice Baldwin, concurring).

Oregon, like other states, did not confine its indignity and injustice to jury verdicts and exclusion laws. Oregon targeted African Americans with laws that were on its face racially neutral but disproportionately impacted minorities, which was their intended outcome. For example, in 1913 Oregon passed and later repealed a requirement for a license to purchase a pistol. Unbridled discretion by a government official in Oregon in the early 20th century denied people of color the ability to defend themselves on an equal basis with white applicants. Over 100 years later, Measure 114 gives little comfort to the members of NAAGA.

Requiring a permit or license to possess a firearm has long been a tool of white supremacy. *See* Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class?* 204-63 (2021). Indeed, following the Civil War, Frederick Douglas, an African American civil rights leader, stated in 1865 that freed people "must have the cartridge box, the jury box, and the ballot box, to protect them." Brief for Amicus Curiae National African American Gun Association in support of Petitioners in *New York State Rifle & Pistol Association v. Bruen,* United States Supreme Court, 18 (quoting, "Frederick Douglass on the American Crisis," *Newcastle Weekly Courant*, May 26, 1865, at 6).

Oregon has come to terms with its discrimination at the ballot box and jury box. It's now time for this Court to force Oregon to acknowledge that its discrimination of the cartridge box is likewise unacceptable, and a violation of the rights acknowledged and protected by the Bill of Rights.[1] The Fourteenth Amendment guaranteed the right to bear arms to all

---

[1] "[T]he Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).

AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL

LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

Oregonians.  African Americans needed that protection.  "[I]n debating the Civil Rights Act of 1871, Congress routinely referred to the right to keep and bear arms and decried the continued disarmament of blacks in the South." *McDonald v. City of Chicago*, 561 U.S 742, 776 (citing Stephen Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms*, 120-131 (1998)).  African Americans have the right to defend themselves and their families in a world that is too often inhospitable, to say the least.

African American communities have at different times in history been subjected to lynchings, racist attacks, and gang violence.  Law-abiding African Americans, including civil rights icons, have a long tradition of use of firearms to protect themselves and their communities.[2]  Ida B. Wells wrote that a "Winchester rifle should have a place of honor in every black home, and it should be used for that protection which the law refuses to give."[3]

African Americans are subject to more violence than White Americans.  *See* Centers for Disease Control and Prevention, *Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports, National, Regional and State, 1981 - 2020*, available at https://wisqars.cdc.gov/fatal-reports (last accessed Jan. 6, 2023).  Between 2001 and 2020, African Americans experienced a homicide rate 5.67 times greater than White Americans; between 2001 and 2020, African Americans were nearly 3.6 times more likely to be assaulted and sustain injuries requiring medical treatment; between 2001 and 2020, the No. 1 leading cause of death for African Americans ages 15 to 34 was homicide, while being No. 7 overall for all ages.  By contrast, homicide was highest ranked as the No. 3 leading cause of death for White Americans ages 15-24, and No. 19 overall for all ages.  Id; Centers for Disease Control and Prevention, *WISQARS Nonfatal Injury Reports, 2000 – 2020*, available at https://wisqars.cdc.gov/nonfatal-reports (last accessed Jan. 6, 2023); Centers for Disease Control and Prevention, *WISQARS Leading Causes of Death Reports, 1981 – 2020*, available at

---

[2]*See* Nicholas Johnson, *Negroes and the Gun: The Black Tradition of Arms* (2014); Charles E. Cobb, Jr., *This Nonviolent Stuff'll Get You Killed* (2014).
[3]Ida B. Wells, *Southern Horrors: Lynch Law in All its Phases,* 16 (1892).

Page 10 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

https://wisqars.cdc.gov/fatal-leading (last accessed Jan. 6, 2020).

Living in Oregon does not present African Americans with a safer environment. *See* Shen x, Millet L., *Violent Deaths in Oregon: 2013*, Oregon Health Authority (2013) (citing Shen X, Millet L., *Homicide Trends and Characteristics, Oregon, 2003-2012*, Oregon Health Authority (2014), available at https://www.oregon.gov/oha/PH/DISEASESCONDITIONS/INJURYFATALITYDATA/Pages/reports.aspx. "Health disparities exist due in part to policies and practices such as sundown laws, redlining, restrictive zoning practices, neighborhood disinvestment, and gentrification that have created barriers to home ownership and have contributed to economic instability, gaps in educational attainment and income, and unequal access to health care among Oregon's African-American population." *Firearm Injury Emergency Department Visits in Oregon, 2018-2021* at 6, OHA & OHSU (Aug. 2022), available at https://www.ohsu.edu/about/gun-violence-public-health-issue. From 2018 to 2021, Oregonians identified as Black or African American comprised 2.0% of the population of Oregon but experienced 14.1% of the firearm injury Emergency Department visits. Id. at 16. Compared to white Oregonians, rates of gun death are 450% higher for Black Oregonians. OHSU, *Gun Violence: A Public Health Issue*, available at https://www.ohsu.edu/about/gun-violence-public-health-issue (last accessed Jan. 6, 2023). In the Portland, Oregon metro region, 50.8% of shooting victims and suspects are Black, even though just 5.7% of Portlanders are Black. Id.

Compounding the increased violence against them is that many African Americans don't trust the police. Recent studies show that American communities where many minorities reside, including African Americans, have a low trust for law enforcement.

> "In certain American communities, public trust in law enforcement, a critical ingredient in public safety, is tenuous at best. Residents of these high-crime, heavily disadvantaged communities witness and experience intensive police presence, high rates of incarceration and community supervision, and concentrated violence and question the intent, effectiveness, and equity of the criminal justice system. Indeed, police may carry out

Page 11 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

aggressive strategies that target quality-of-life infractions and drug-, gun-, and gang-related violence in ways that undermine public confidence. Perhaps not surprisingly, areas with high levels of mistrust tend to be those that are heavily policed, where police use tactics such as pretextual stops that damage their relationship with the people they are charged to protect. The results can be far-reaching: a distrust of the criminal justice system, an unwillingness to cooperate with the police, and a cynical view of the law that can perpetuate crime and victimization." Nancy La Vigne, Jocelyn Fontaine, and Anamika Dwivedi, *How do People in High-Crime, Low-Income Communities View the Police?,* p. 1, Urban Institute (Feb. 2017), available at https://www.urban.org/research/publication/how-do-people-high-crime-low-income-communities-view-police.

It has been this lack of trust between law enforcement and African Americans that have been contributing factors to some of the worse incidents of police-citizen violent encounters and subsequent civil unrest as seen in recent years, such as in Ferguson, Missouri, and the weeks that followed the murder of George Floyd. It is little wonder why African Americans demand the right to protect themselves by purchasing and possessing a firearm without having to ask permission from a local law enforcement official – the very system imposed by Measure 114.

<u>Asian Americans and Pacific Islander Americans</u> / APAGOA

The "sordid history" of Oregon was sadly not confined to its treatment of African Americans but was extended brutally to Asian Pacific Americans.[4] For example, "[d]espite this sizable presence, the existence and critical contributions of Chinese people have been twice erased from Oregon's history. First, racist violence, intimidation, social ostracism, and exclusionary laws before and during the Exclusion Era (1882–1943) reduced population sizes and resulted in social, political, and economic marginalization." Jennifer Fang, *Erasure and Reclamation: Centering Diasporic Chinese Populations in Oregon History,* p. 326, Oregon Historical Quarterly, vol 122, no. 4 (2021).

---

[4]The term Asian-American and Pacific Islander (AAPI) are referred to in this brief as Asian Pacific American or APA

Page 12 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON 97702

For brevity, *Amici* need not address the long list of injustices suffered by Asian Pacific Americans living in Oregon during the 19th and 20th centuries. *Amici* are happy to provide that to the Court should the Court request it. Suffice it to say that the effort to deny all people of color their rights, including the right to purchase and possess a firearm, was active in Oregon for far too long after statehood.

In modern times, Asian Pacific Americans (APA) have been targets of violence in Oregon and elsewhere in America. During the Covid-19 pandemic, APA have been disproportionately targeted for racially motivated violence. Although hate crimes in general dropped by 6% nationally in 2020, hate crimes against APA spiked by 145%. Center for The Study of Hate and Extremism, California State University San Bernardino, *FACT SHEET: ANTI-ASIAN PREJUDICE*, March 2021, 1 (2021). *See* Jonghyun Lee, *Return of the Yellow Peril? Racism, Xenophobia and Bigotry Against Asian Americans*, Bridgewater Review (Dec. 2022) ("It is estimated that over two million Asian American individuals have experienced hate incidents since the Covid-19 pandemic started.").

The increase in reports of hate crimes against Asian Pacific Americans in Oregon was even higher – 366%. *See* Conrad Wilson, *Oregon Hate Crime Reports Up 366% Amid Coronavirus Pandemic*, OPB (Apr. 30, 2020), available at https://www.opb.org/news/article/hate-bias-crime-incidents-covid-19-asian-americans-oregon/; *see also Two Years and Thousands of Voices: What Community-Generated Data Tells Us About Anti-AAPI Hate,* Stop AAPI Hate (July 20, 2022), available at https://stopaapihate.org/year-2-report/. "In Oregon, the Department of Justice took 77 similar reports between March [2020] and January [2021]. Of those, the vast majority were reported in Multnomah County." Kate Williams, "Asian-Owned Business Hit in More Than a Dozen Acts of Vandalism in Portland's Jade District," OregonLive.com, last modified February 10, 2021, https://www.oregonlive.com/crime/2021/02/asian-owned-businesses-hit-in-more-than-a-dozen-acts-of-vandalism-in-portlands-jade-district.html.

Page 13 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN
PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND
OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

APA-owned businesses were also targets of acts of hate in Oregon.  Id.  "In January 2021, people vandalized at least 13 businesses, all mostly Asian-owned, in Portland, Oregon."  Nazmia E.A. Comrie, *Combating Hate Crimes against Asian American and Pacific Islander Communities*, COPS Office USDOJ (Apr. 2021), available at https://cops.usdoj.gov/html/dispatch/04-2021/asian_hate_crimes.html#5.

Violence against Asian Pacific Americans can happen in a crowd or in broad daylight.  Noel Quintana, a Filipino-American, was slashed from ear to ear with a box cutter on a crowded subway in New York City. Yet, "nobody helped, . . . [n]obody moved."[5]  An unidentified Asian-American woman was brutally beaten in New York in broad daylight in front of multiple witnesses, yet nobody intervened, and one witness even closed a door to the victim after the attacker left.[6]  The rise in violence against APA has led many to arm themselves for self-defense as the confidence in the police is low, believing that the police "are not always there to protect . . . [t]hey're only there to take the report."[7]  As the D.C. Court of Appeals explained in *Warren v. District of Columbia,* police usually have no general duty to protect an individual citizen, since their duty is owed to the public at large. 444 A.2d 1, 3 (D.C. 1981).  Most APA remember the Rodney King riots in Los Angeles, California, in 1992 and the fact that the residents of Koreatown were left by the police to protect themselves.  APA "have been historically underrepresented among gun owners,"[8] but that has changed since the Covid-19 pandemic.  APA are buying firearms for self-defense in record numbers in response to the increase in anti-APA hate crimes.[9]

---

[5] Wendy Grossman Kantor, *Filipino American Man Recounts Brutal Attack With Box Cutter on N.Y.C. Subway: 'Nobody Helped'*, PEOPLE, February 18, 2021, https://people.com/crime/filipino-american-man- recounts-brutal-attack-with-box-cutter-on-n-y-c-subway-nobody- helped/

[6] Tim Elfrink, *New York man charged with hate crime in Asian American attack that bystanders watched without helping*, WASHINGTON POST, March 31, 2021, https://www.washingtonpost.com/nation/2021/03/30/asian-american-attack-newyork-condo/.

[7] Marian Liu & Rachel Hatzipanagos, *"Nobody came, nobody helped": Fears of anti-Asian violence rattle the community*, WASHINGTON POST, Feb. 25, 2021, https://www.washingtonpost.com/nation/2021/02/25/asian-hate-crime-attack-patrol/.

[8] Aaron Smith, *More Asian-Americans Are Buying Guns for Protection from Hate Crimes*, FORBES, Mar. 18, 2021, https://www.forbes.com/ sites/aaronsmith/2021/03/18/asian-americans-buy-guns-for-protection-from-hate-crimes/?sh=7fa242c53edd

[9] Smith, *supra* note 8.

Page 14 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
1000 SW DISK DRIVE
T: (541) 383-5857 | F: (541) 383-3968
BEND, OREGON  97702

<u>Women</u> / DCPF

While the laws in Oregon have been neutral with regards to sex for a long time, society at large does not put women on an equal plane. In Oregon, women are the primary victims of domestic violence. When domestic violence is fatal, men are the primary perpetuators of such violence. *See Fatal Domestic Violence in Oregon: Demographics Related to Victims, Perpetrators, and Incidents: 2017 Report*, Oregon Coalition Against Domestic & Sexual Violence (2017) available at https://www.ocadsv.org/resources/fatal-domestic-violence-in-oregon-demographics-related-to-victims-perpetrators-and-incidents/. In 2017 in Oregon, when victims defended themselves against homicidal domestic violence and the perpetuator was killed, 80% of the time the victim used a firearm. Id.[10]

In 2021 in Oregon, there was 18,256 reported incidents of domestic violence and there was a total of 1,608 restraining orders issued. *2021 Oregon Annual Report*, Uniform Crime Report - Section 8 - Domestic Violence and Bias Reporting, p. 61, available at: https://www.oregon.gov/osp/pages/uniform-crime-reporting-data.aspx. While 46.76% of crime is directed at women, 74% of crime is committed by men. Oregon State Police Uniform Crime Reporting Data as of January 1, 2020, available at https://www.oregon.gov/osp/pages/uniform-crime-reporting-data.aspx. As Sheena Williams points out in her Declaration attached to this brief, "[a] restraining order does not protect anyone; it only enforces consequences for when it is

---

[10] *Fatal Domestic Violence in Oregon: Demographics Related to Victims, Perpetrators, and Incidents: 2017 Report*, Oregon Coalition Against Domestic & Sexual Violence (2017), available at https://www.ocadsv.org/resources/fatal-domestic-violence-in-oregon-demographics-related-to-victims-perpetrators-and-incidents/
- In 2017, Oregon suffered a total of 27 separate incidents of fatal domestic violence and 37 people killed, with the highest number concentrated in Multnomah County.
- Police intervention was the cause of a death in only 1 of the 27 separate incidents of fatal domestic violence.
- Of 27 total incidents, there was a total of 42 victims, 21 females and 18 males
- In 27 incidents, there was a total of 29 perpetrators, 21 males and 7 females.
- Of the 42 victims, 32 in total were killed (76%)
- Of 21 total female victims, 17 (81%) were killed; Of 18 total male victims, 14 (78%) were killed.
- Only 5 of the 29 total perpetrators were killed (17%), 4 of which were male. Only 1 other male perpetrator was physically injured, but not killed. The cause of death of the 1 female perpetrator killed is unknown.
- Of the 5 perpetrators killed, 4 died by gunshot.

Page 15 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON 97702

violated, which we see happens nearly 50% of the time." *See* Exhibit 2, Declaration of Sheena Williams, para. 10. "As if there were not enough hurdles placed in front of a domestic violence survivor but now add in with Measure 114 is the additional cost of a class on top of the firearm, training, child care during training, ammunition, as well as safes or gun locks, and it becomes clear to see that single mothers, people who live at or below the poverty line, and other minority groups will not be able to afford to protect themselves." Id.

As well, because of physical size differences, women are generally at a disadvantage when in physical confrontations with men. Exhibit 2, Williams Declaration, para. 11-13. When confronted with one or more men and threatened with violence, a woman needs a firearm as an equalizer. Id. at para. 14. The choice of what firearm is needed for the individual woman to protect herself and her family, is a decision for her to make, not a government official.

LGBTQ / OBSPP

Oregon, like so many other states, had a historical and modern array of legal discrimination against the LGBTQ community that has only been recently addressed. Despite growing acceptance, the LGBTQ community still suffers a higher rate of violence in America than the majority. LGBTQ people are nearly <u>four times</u> more likely than non-LGBTQ people to experience violent victimization, including rape, sexual assault, and aggravated or simple assault. Andrew Flores, Lynn Langston, Ilan Meyer, and Adam Romero, *Victimization rates and traits of sexual and gender minorities in the United States: Results from the National Crime Victimization Survey*, 2017, Science Advances, October 2, 2020, available at https://www.science.org/doi/10.1126/sciadv.aba6910?fbclid=IwAR01oLZW1XfpYlZIif_XRxO TzgBjmddp6ML9zTl6URfqFYCw6vL88CwguHc. *See* Ericka Dixon, Audacia Ray, Beverly Tillery, Michelle Leigh, *Pride and Pain: A Snapshot of Anti-LGBTQ Hate and Violence during Pride Season 2019*, National Coalition of Anti-violence Programs (2020), available at https://avp.org/reports/.[11]

---

[11]The National Coalition of Anti-violence Programs (NCAVP) recorded the homicides of 14 LGBTQ people from May 15 – July 15, 2019, an average of nearly 2 (1.75) homicides each week and more than three times the hate

Page 16 - AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON 97702

In 2017, The National Coalition of Anti-violence Programs (NCAVP) recorded reports of 52 hate violence related homicides of LGBTQ people, the highest number ever recorded by NCAVP.  *See A Crisis of Hate: A Report on Lesbian, Gay, Bisexual, Transgender and Queer Hate Violence Homicides in 2017*, National Coalition of Anti-violence Programs (2017), available at https://avp.org/reports/.  This number represents an 86% increase in single incident reports from 2016.  Id.  In 2017, there was the equivalent of one homicide of an LGBTQ person in the U.S. each week.  Id.  "Of the total number of homicides in 2017, 71% (n=37) of the victims were people of color, 31 (60%) of the victims were Black, 4 (8%) were Latinx, 2 (4%) were Asian, and 1 (2%) was Native.  Additionally, 12 (23%) of the victims were white and 2 victims' racial and ethnic identity is unknown to NCAVP at this time."  Id.

Oregon is not a safe haven for members of the LGBTQ community.  Oregon "ranked at No. 8 for the most anti-LGBT hate crimes in the nation, showing that these hate crimes increased by more than a third since 1996."  *Study: Oregon ranks No. 8 for most anti-LGBT hate crimes, KOIN 6* (Sep. 11, 2019), available at https://www.koin.com/news/study-oregon-ranks-no-8-for-most-anti-lgbt-hate-crimes/ (citing *Anti-LGBT Hate Crimes are Rising*, Security.org (Updated Dec. 20, 2022), available at https://www.security.org/resources/anti-lgbt-hate-crime-stats/).  It is no wonder that some LGBTQ people are worried about being able to defend themselves with the passage of Measure 114.  *See* D. Speak, *Oregon's LGBTQ Community Worries that a New Law Will Keep Them from Obtaining Guns,* NPR (Dec. 16, 2022), available at https://www.npr.org/2022/12/15/1140713659/oregons-lgbtq-community-worries-that-a-new-law-will-keep-them-from-obtaining-gun.

---

violence homicides recorded between January 1 and May 14, 2019.  Eleven of the homicides were hate violence related. Ten of these victims (91%) were Black and seven (64%) were Black trans women. Of the three intimate partner violence homicides, one victim was a white, gay man, one was a Black woman, and one was a white woman who identifies as asexual. The youngest victim was 17 years old, with the majority (86%) of all homicide victims being under the age of 35.

Page 17 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

## ARGUMENT

Question Presented:  Should Ballot Measure 114 be held inapplicable because it violates the Second Amendment, the Fourteenth Amendment, and the Takings Clause to the United States Constitution?

Answer:  Yes.  Measure 114 makes it more difficult, more time consuming and more expensive to obtain a firearm in Oregon, if at all.  *Amici* are all too familiar with games played by the majority to prevent their members from defending themselves.  The Court should grant judgment for the Eyre Plaintiffs against Measure 114.

### 1.    Ballot Measure 114

As the Eyre Plaintiffs allege in paragraphs 2-7 and 37-43 of the First Amended Complaint, Measure 114 sets up a permit-to-purchase requirement that is time-consuming, expensive, and subject to a government official's discretion.  In other words, no member of *Amici* will be able to purchase a firearm in Oregon to protect themselves and their family without navigating the multiple hurdles in the permit-to-purchase system.  The failure of the state government to have systems in place notwithstanding, the effect of compliance with Measure 114 by members of the *Amici* and those similarly situated in sex, race, and gender-identity is unduly burdensome if not triggering as to past government hostility.

Under Measure 114, a permit is always required for an individual to acquire a firearm, whether via a commercial purchase from a licensed gun dealer, §6(2)(a), (2)(d), (3)(c), in a private transfer from one individual to another, §7(3)(a), (3)(d)(B), or at a gun show, §§8(2), 9(2).  To obtain a "permit-to-purchase," an individual must apply to a "county sheriff or police chief with jurisdiction over the [applicant's] residence," §4(1)(a), and pay the required fee, §4(3)(b).  Before he or she can do that, however, they must pay for and complete a "firearms training course" §4(1)(b)(D), that covers federal and state firearms law; safe use, transportation, and storage, and the prevention of firearms abuse, §4(8)(c)(A)-(C).  The course must include an "in-person demonstration" of proficiency with a firearm, §4(8)(c)(D), and "utilize[e] instructors

Page 18 -   AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN
PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND
OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

certified by a law enforcement agency," §4(8)(a).  If an applicant makes it through the course, he or she must then submit to fingerprinting and photographing by the sheriff or police chief, who in turn must ask OSP to conduct a complete criminal background check.  §4(1)(e).

Despite all of that, Measure 114's permit-to-purchase system prolongs the delay and increases the discretion of a government official.  By agreeing to complete the background check, an applicant invites a fishing expedition:  The sheriff or police chief can demand "any additional information determined necessary by department rules."  §4(1)(c).  Further, the sheriff or police chief retains discretion to exercise on-the-spot judgment about whether to deny a permit, even if the applicant passes the background check.  §§4(1)(b)(C), 5(2).  After all of that, "[a] permit-to-purchase issued under this section does not create any right of the permit holder to receive a firearm."  §4(6)(a).  If an individual comes to a licensed gun dealer with a "permit-to-purchase" in hand, the process essentially starts all over again.  All of this assumes that the State of Oregon is ready to implement Measure 114, which, as clearly shown in discovery in this case, the state is not ready.  See Plaintiffs' Motion for Summary Judgment, pages 24-28.

There is a reason *Amici* point out all of these "hurdles" that members must clear in order to purchase a firearm and protect themselves and their family.  While the language of Measure 114 is racially neutral, the impact on members of minority communities is not.  It is well-documented that minority communities are not so eager to engage with law enforcement at such a personal level and to disclose intimate details of their lives.  *See*, *e.g.*, Jesse Jannetta, Sino Esthappan, Jocelyn Fontaine, Mathew Lynch, Nancy G. La Vigne, *Learning to Build Police-Community Trust,* p. 6, Urban Institute (Aug. 8, 2019), available at https://www.urban.org/research/publication/learning-build-police-community-trust (communities of color often struggle with high levels of mistrust in the police and strained police-community relations).

2.      **The permit-to-purchase requirement of Measure 114 is unconstitutional.**

The historic nature of *District of Columbia v. Heller*, 554 U.S. 570 (2008) and

Page 19 -   AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) have been widely recognized by the courts and in society at large.  With the United States Supreme Court's opinion in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ___, 142 S.Ct. 2111 (2022), more than ten years of jurisprudence in Circuit Courts and District Courts has been swept away.  It is merely seven months from the *Bruen* decision, and this is one of the first cases to be considered under this new standard.

    Most importantly, *Bruen* clarifies the basic lens through which all courts must view the Second Amendment when it holds that this is no "second-class right" subject to a uniquely pro-government set of rules and that it is not available only to those with "special need" to exercise it.  *Bruen,* 142 S.Ct. at 2134-35, 2156.  The individual right to keep and bear arms must be analyzed as all other constitutional rights held by individuals.  The proper analysis courts must undertake reads:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historic tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).  Thus, the *Bruen* rule requires the government to prove the historical basis for its regulations.  This standard was applied this week by the District Court of New Jersey, holding:

> [The State] must be able to rebut the presumption that the challenged conduct is constitutionally protected by "demonstrate[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  To reiterate, [the State] "<u>may not simply posit that the regulation promotes an important interest.  Rather, the [State] must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.</u>" *Id.* (emphasis added).

*Koons v. Reynolds*, No. 22-7464 (RMB/EAP), 2023 WL 128882 at *9 (D. N.J. Jan. 9, 2023)

Page 20 -   AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN
PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND
OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

Case 1:22-cv-076464-RMB-EAP (Document 34), (U.S. Dist. N.J., Jan. 9, 2023) (citation in original) (granting Motion for Temporary Restraining Order staying enforcement of New Jersey's gun control legislation).  Left unstated, however, is how a court should consider historical regulations of firearms ownership and possession premised upon now-unconstitutional biases against racial and other minorities.

Oregon's history with firearms regulations is not free from racial animus.  Oregon passed a permit-to-purchase system in 1913 and repealed it in 1925.  *See* Ch. 256, § 2, 1913 Or. Laws 497 (attached for the Court's convenience as Exhibit 1 to this brief).  That law required that an applicant for a permit to "procure" a "pocket pistol or revolver" was required to submit two affidavits signed by "reputable freeholders" as to "the applicant's good moral character." Exhibit 1, page 1; *see also* David B. Kopel, *Background Checks For Firearms Sales and Loans: Law, History, and Policy,* 53 Harv. J. on Legis. 303, 343 (2016).  The 1913 act was later repealed and replaced in 1925 by Oregon's Revolver Association Act that imposed requirements on retail vendors of handguns and restricted sales when neither party held a dealers' license, but notably contained an exception for transactions between those who were "personally known" to each other.  *Id.* at 351.  Oregon, like other states, outlawed handguns for those it described as "aliens." *Id.*  As discussed above concerning the historical treatment of African Americans, requiring a permit or license to possess a firearm has long been a tool of white supremacy.  *See* Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class*? 204-63 (2021).

Perhaps most importantly, however, is that none of the past Oregon regulations were enacted in a time period relevant under the *Bruen* test.  The Second Amendment refers back to the adoption of the Constitution and the Founding Era.  The Fourteenth Amendment was enacted during the Reconstruction Era shortly after the American Civil War with it passing Congress in 1866 and final ratification by the states in 1868.  Oregon's first permit to purchase law was not passed until nearly fifty years later in 1913, rendering it meaningless under *Bruen*.

Page 21 -  AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

Even if, somehow, the Court viewed the 1913 Oregon law as a relevant historical firearm regulation, *Amici* urge this Court to disregard any and all historical traditions for firearm regulations that had racial or bias motivations. As aptly written in his December 30, 2022, concurring opinion, Justice Richard Baldwin, regarding Oregon's unconstitutional use of non-unanimous jury verdicts, stated: "For [Oregonians] to protect and preserve that constitutional heritage, we must always be on our guard against such mischief." *Watkins v. Ackley,* 370 Or 604, 644 (2022).

Oregon, like eight other states in the Jim Crow era, passed a law that required a permit to purchase a pistol, and, like Oregon, most permit requirements were short-lived. *See* Eyre Plaintiffs First Amended Complaint, ¶ 88 (New York (1911), North Carolina (1919), Missouri (1921, repealed 2007), Connecticut (1923), Michigan (1927, partially repealed by several steps in early twenty-first century), Hawaii (1927, deemed invalid in 2021, *see Yukutake v. Conners,* 554 F.Supp.3d 1074 (D. Haw. 2021), now on appeal), New Jersey (1927), and Texas (1931, later declared void)). *See also* David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy,* 53 Harv. J. on Legis. 303, 360-61 (2016); Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529, 543 (2021). Those laws, however, do not justify Oregon's Measure 114 as having historical precedence for regulating Second Amendment rights. As stated above, laws enacted for the first time in the twentieth century "come too late to provide insight into the meaning of [the Constitution]." *Bruen*, 142 S.Ct. at 2137 (alteration in original) (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting)); *see* id. at 2138 (rejecting reliance even on "a handful of late-19th-century [laws]" similar to the challenged restriction).

Even if the state government could prove that the permit requirement was permissible, the delay, cost and discretion baked into Measure 114 is not. The Supreme Court went out of its way to underscore that the Second Amendment does not countenance licensing or

Page 22 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN
PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND
OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

permitting "regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen,* 142 S.Ct. at 2138 n.9. Measure 114 gives "licensing officials" discretion to "exercise … judgment"; it allows the application or verification process to create "lengthy" delays; and it imposes "exorbitant" fees and costs. *Id.* Indeed, the first state law noted in *McDonald v. City of Chicago* as typical of what the Fourteenth Amendment would invalidate provided that "no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind . . . ." Certain Offenses of Freedmen, 1865 Miss. Laws p. 165, § 1, quoted in *McDonald v. City of Chicago*, 561 U.S. 742, 771 (2010). The official had discretion to grant or deny the license. Measure 114, as it stands today, does the same.

The cost of compliance with Measure 114 is not *de minimis*. No one knows yet what the cost of compliance will be, given the uncertainty surrounding the classes and the multiple rounds of government engagement. But it is not unreasonable to expect the cost to exceed several hundred dollars per individual. Certainly, such cost for the exercise of a fundamental right is repugnant. For example, a poll tax, albeit small, is unconstitutional. *See Harman v. Forssenius,* 380 U.S. 528, 543 (1965) ("The Virginia poll tax was born of a desire to disenfranchise the Negro.").

Besides the unbridled discretion of government officials, the intrusive demands by Measure 114 – the requirement of significant disclosures of personal information to local law enforcement, the multiple fingerprinting, etc. – has an undue burden on racial and sexual minorities who seek to arm themselves for self-defense. Oregon has no one to blame but itself.

> "Many communities throughout the United States that face high levels of crime and concentrated disadvantage—particularly communities of color—also struggle with high levels of mistrust in the police and strained police-community relations. Recognizing that a lack of legitimacy and community trust in policing was a serious and persistent problem with deep historical roots, and that addressing that problem required a well-resourced,

LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

multidimensional approach combining proven practices with new tools and approaches, the US Department of Justice launched the National Initiative for Building Community Trust and Justice." Jesse Jannetta, Sino Esthappan, Jocelyn Fontaine, Mathew Lynch, Nancy G. La Vigne, Learning to Build Police-Community Trust, p. 6, Urban Institute (Aug. 8, 2019), available at https://www.urban.org/research/publication/learning-build-police-community-trust.[12]

Whether efforts like that undertaken by the US Dept. of Justice will change the relationship between racial and sexual minorities and local law enforcement remains to be seen.  For now, *Amici* ask this Court to recognize that the burdens of Measure 114 are not born equally by the white population and those of color or in a marginalized community.[13]   It is not unreasonable to assume that the disclosures, vulnerability to the discretion of government officials, and the permanent records of fingerprints, will have a chilling effect on people of color, women and LGBTQ people in the exercise of their Second Amendment rights.  Certainly, the question will be asked:  Am I making myself a target if I go through this process to arm myself?

Finally, as discussed above, racial and sexual minorities suffer higher rates of violence and, arguably, have a higher need for self-defense.  All Oregonians have the right to defend themselves and their families.  How one does that is up to the individual.  Measure 114, whether intended or not, has the effect of making minority Oregonians even more vulnerable to violence by disarming them in the name of public safety.  As members of the racial and sexual minority well know, the police don't always respond in time to help.  Indeed, the government is not liable if the police don't show up at all.  *See DeShaney v. Winnebago Cty*, 489 U.S. 189 (1989) (due process does not give rise to an affirmative right to government assistance with protecting one's life, liberty, or property; the government does not assume a permanent guarantee

---

[12]*The Oregonian*, the state's leading news site, recently published an investigative series on racism in its own ranks and the history of the state.  *See* Rob Davis, *The Oregonian's Racist Legacy*, October 24, 2022, located at: https://projects.oregonlive.com/publishing-prejudice/racist-legacy.

[13]Measure 114's permit-to-purchase system is a registration of firearms, pure and simple.  Ironically, the US Supreme Court held in *Haynes v. United States*, 390 US 85 (1968) that the government cannot require felons to register firearms, because to do so would violate their constitutional right against self-incrimination.  In Oregon, however, the state government is arguing that registration of firearms by non-felons is constitutional.

Page 24 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL

LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

of an individual's safety once it provides protection for a temporary period); *see also Castle Rock v. Gonzales*, 545 U.S. 748 (2005).

The U.S. Supreme Court, in *McDonald v. City of Chicago*, states about governments that disarm and subject minorities to criminal attack:

> "Amici supporting incorporation of the right to keep and bear arms contend that the right is especially important for women and members of other groups that may be especially vulnerable to violent crime.  If, as petitioners believe, their safety and the safety of other law-abiding members of the community would be enhanced by the possession of handguns in the home for self-defense, then the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials."

*McDonald*, 561 U.S. at 790 & n.33 (citing, *inter alia*, Brief of Pink Pistols).

*Amici* agree with the Eyre Plaintiffs' Motion for Summary Judgment that Measure 114 should be overturned.  "Measure 114 is radically out of step with the historical and even modern-day tradition of firearms regulation in this country—not to mention with the Supreme Court's recent and unambiguous pronouncements on what kinds of permitting regimes are and are not consistent with the Second Amendment."  First Amended Complaint, para. 11.  The Court should grant judgment for the Eyre Plaintiffs against Measure 114.

### 3. The effective seizure by the state government of certain ammunition magazines under Measure 114, as well as the criminalization of possession of the same, is unconstitutional.

*Amici* support the Eyre Plaintiffs' motions as to the unconstitutionality of Measure 114 as it concerns the limitations on magazine sizes and the government's *de facto* seizure of ammunition holders.  Disabled Oregonians are at a unique disadvantage when faced with the need for self-defense.  The instance of Phillip Pressgrove is instructive.  *See* Declaration of Phillip Pressgrove, attached hereto as Exhibit 3. Mr. Pressgrove suffered Spina Bifida at birth and is confined to an electric wheelchair.  Pressgrove Dec., ¶ 2.  According to the U.S. Department of Justice Bureau of Justice Statistics, the disabled are nearly four times more likely

Page 25 -   AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

to be victims of a crime.  Id.  For this reason, Mr. Pressgrove chose to purchase and learn how to use a firearm.  Id. at ¶ 3.  Because of his disability, Mr. Pressgrove learned to shoot with his left hand, because his right hand is needed to control his electric wheelchair.  Id. at ¶ 4.  Reloading the magazine in his firearm is difficult and the process leaves him exposed and vulnerable.  Id.  Accordingly, any government regulation that limits the capacity of rounds in the magazine of his firearm substantially inhibits his self-defense.  Id.

Finally, many members of the *Amici* will lose under Measure 114 the ability to use ammunition holders of greater than 10 rounds.  If upheld, Measure 114 is a taking of private property either directly or by regulation.

## **CONCLUSION**

To be truly free is to enjoy the rights that every other member of society enjoys.  The right to defend oneself is fundamental to any civilized society and is guaranteed to every American by the Second Amendment.  That right should be equal to all citizens in Oregon.

Measure 114 is history repeating itself, a history of discrimination that Oregon must leave behind.  Whether the actions of the majority lie in caring for others or downright paternalism, the Constitution cares not.  It is not the majority that our Bill of Rights rises to protect.  It is the minority.

For the reasons stated above, NAAGA, APAGOA, DCPF, and OBSPP ask this Court to grant judgment in favor of the Eyre Plaintiffs.

Respectfully submitted,

DATED: June 1, 2023

LYNCH MURPHY MCLANE LLP

*/s/ Michael R. McLane*
Michael R McLane, OSB No. 904435
mmclane@lynchmurphy.com
*Attorneys for Amicus*

WAND LEGAL LLC

*/s/ Matthew A. Wand*
Matthew A Wand, OSB No. 004189
matt@wandlegal.com
*Attorneys for Amicus*

Page 26 -    AMICUS CURIAE BRIEF OF NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, INC., ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, DC PROJECT FOUNDATION, INC., AND OPERATION BLAZING SWORD. INC. IN SUPPORT OF EYRE PLAINTIFFS AT TRIAL
LYNCH MURPHY MCLANE LLP
ATTORNEYS AT LAW
T: (541) 383-5857 | F: (541) 383-3968
1000 SW DISK DRIVE
BEND, OREGON  97702

## CERTIFICATE OF SERVICE

In accordance with Fed. R. Civ. P. 5(b)(2)(E) and LR5-1, I hereby certify that on June 1, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

DATED this 1st day of June 2023.

LYNCH MURPHY MCLANE LLP

*/s/ Michael R. McLane*
Michael R McLane, OSB No. 904435
1000 SW Disk Dr
Bend, OR 97702
(541) 383-5857
mmclane@lynchmurphy.com

WAND LEGAL LLC

*/s/ Matthew A. Wand*
Matthew A Wand, OSB No. 004189
1000 SW Disk Dr
Bend, OR 97702
(541) 383-5857
matt@wandlegal.com

*Attorneys for Amicus*

Page 1 -    CERTIFICATE OF SERVICE